UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


THE UNITED STATES OF AMERICA        )
                                    )
                                    )
                                    )
vs.                                 )  No.
                                    )  1:11-cr-10014-DPW-1
                                    )
MATTHEW J. KUC,                     )
                                    )
                    Defendant.      )



BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK


                        MOTION HEARING




              John Joseph Moakley United States Courthouse
                        Courtroom No. 1
                        One Courthouse Way
                        Boston, MA 02210
                      Wednesday, May 23, 2012
                          11:30 a.m.




                  Brenda K. Hancock, RMR, CRR
                      Official Court Reporter
            John Joseph Moakley United States Courthouse
                        One Courthouse Way
                        Boston, MA 02210
                        (617)439-3214

1    APPEARANCES:

2         UNITED STATES ATTORNEY'S OFFICE
          By:  AUSA Amy H. Burkart
3              AUSA Scott Garland
          Suite 9200
4         Boston, MA 02210
          On behalf of the United States of America

5
          ROBERT L. SHEKETOFF, ESQ.
6         One McKinley Square
          Boston, MA 02109
7         On behalf of the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2    before the Honorable Douglas P. Woodlock, United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6    Wednesday, May 23, 2012):

7          THE CLERK:  All rise.

8       (The Honorable Court entered the courtroom at 11:30 a.m.)

9          THE CLERK:  This Honorable Court is now in session.

10   You may be seated.

11         This is Criminal Action 11-10014, the United States

12   versus Matthew J. Kuc.

13         THE COURT:  I think the first order of business is how

14   do I pronounce the defendant's name?

15         MR. SHEKETOFF:  Your Clerk asked the same question,

16   and he pronounced it right.  It's "Kuc."  This younger

17   generation can't spell, your Honor.

18         THE COURT:  Just like "Lord Cook"?

19         MR. SHEKETOFF:  Yes.

20         THE COURT:  So, we are down to the question of the

21   affidavit and application.  Does it really come down to

22   "including but not limited to"?

23         MR. SHEKETOFF:  Yes, mostly.  I also say, and the

24   Government points out, I do not specify, I also claim that

25   other categories are -- that the specific categories that they

1   list are overly broad.

2          THE COURT:  But how do I treat that as fully argued?

3   Footnotes count, but it appears in the footnote.  It is not

4   argued.  It just generally said "overly broad."  Am I left to

5   my own devices to decide how that works?

6          MR. SHEKETOFF:  To me, they're just obviously overly

7   broad, but I think it is a subset of the fact that they say,

8   "We are not limited to the things that we list."

9          THE COURT:  Well, but is that now, then, to make of

10  "including but not limited to" not magic words but dangerous

11  words to use in an affidavit, and how would it make any

12  difference here to say things like "identified items or similar

13  thereto"?  Maybe I need to understand what you are really

14  worried about in the evidence that was collected.

15         MR. SHEKETOFF:  Well, what I'm really worried about

16  and what my goals are may be different things, your Honor.

17         THE COURT:  Right.

18         MR. SHEKETOFF:  So, this is my basic thesis, that when

19  you say words like "including but not limited to the

20  following," that you are not limiting it at all.

21         THE COURT:  But there is no case that said that, is

22  there?  I looked around.  This seems like an issue that was

23  really hot about 15 years ago, maybe a little longer, when the

24  Government was doing kind of fraud cases more, particularly

25  kind of doctor-Medicare fraud stuff or doctor-insurance fraud

1    stuff --

2            MR. SHEKETOFF:  Right.

3            THE COURT:  -- and they said, "Everything in the

4    world, including but not limited to every piece of paper."

5    That, I understood, was problematic.

6            MR. SHEKETOFF:  And that's what I'm arguing happened

7    here, because there is a First Circuit case that says that if

8    you limit the category to something like evidence of mail

9    fraud, then you haven't limited it at all, because it could be

10   anything in the world.

11           THE COURT:  So, here it is limited to wire fraud,

12   interstate transportation, stolen property, storage and sales,

13   stolen property and, of course, aiding and abetting.

14           MR. SHEKETOFF:  I say that is the equivalent of the

15   mail fraud case.  That is no limitation at all.  That leaves

16   them completely to their own devices, which is what the

17   particularity clause is about, and if they didn't put in

18   "including but not limited to," I would have picked some of the

19   categories to say, "This is going too far."

20           THE COURT:  Like what?  Or not just "like what."

21   What?

22           MR. SHEKETOFF:  Category 5.  Do you have the

23   Government's memorandum?

24           THE COURT:  I have got the attachment here.

25           MR. SHEKETOFF:  Records and tangible objects related

1    to Matthew Kuc.

2          THE COURT:  Got that.  I just want to know what it is

3    that is specifically concerning.  Is it just 5?

4          MR. SHEKETOFF:  No, no, no.  So, there is 5 and then

5    there is 9, which is all records having to do with, among other

6    things, the address that they are searching, and then there is

7    10, all records having to do with every address that he has at

8    every --

9          THE COURT:  But in 10 is that a question of

10   particularity, or is it a question about whether or not there

11   is probable cause to believe that linking him to those e-mail

12   addresses is not supported by probable cause?

13         MR. SHEKETOFF:  No.  I think there is probable cause

14   in the affidavit to link him to those e-mail addresses, but I

15   don't think there is probable cause to look at every e-mail

16   that he ever had associated with those addresses.  So, that's

17   why I think it lacks particularity.  I think it could have

18   been --

19         THE COURT:  So, it is the language that is an "e-mail

20   to, from, or about" these e-mail addresses?

21         MR. SHEKETOFF:  Yeah.

22         THE COURT:  Because, clearly, subscriber information

23   and billing information is supportable, isn't it?

24         MR. SHEKETOFF:  Absolutely.

25         THE COURT:  You have got to tie him to this.

1      MR. SHEKETOFF:  I agree.  So, there is 10 and then

2  there is 19, and then there is 21.  These are lesser ones to

3  me.  And then there is all of B, which is they are going to

4  take the computers offsite and they are going to search the

5  computers.  The warrant allows them to do that and the case law

6  does too, but they are going to search the computers only with

7  the limitations that are expressed above, which are no

8  limitations at all.

9      THE COURT:  But let me be sure that I have the

10  particularity of your particularity argument, and it is Items

11  A5, A9, A10, at least limited to the -- as it deals with

12  e-mails to, from and about, 19, 21 and B, to the degree that it

13  incorporates by reference what is problematic in A, as I have

14  described it.

15      MR. SHEKETOFF:  Right.  If they hadn't put "all

16  including," I would have objected to those particularity, but I

17  think the "all including" just, you know, captures all of those

18  too.

19      THE COURT:  So, I am going to look at this carefully.

20      MR. SHEKETOFF:  Right.  Your Honor, I didn't think I

21  was going to get an oral argument on this, if this was the only

22  issue before the Court.

23      THE COURT:  No, I understand.  The oral argument is

24  sometimes helpful to me to focus my attention.

25      MR. SHEKETOFF:  Right.

1          THE COURT:  So that I am clear, the case that you

2     really want me to look at is --

3          MR. SHEKETOFF:  The Government's correct, United

4     States versus Roche, 614 F.2d 6 at 8.  That is the case that

5     says the mail fraud statute is no limitation at all.

6          THE COURT:  Roche is 614?

7          MR. SHEKETOFF:  F.2d 6 at page 8.

8          THE COURT:  Was I in the ballpark in terms of timing,

9     15 years or so, maybe more?

10          MR. SHEKETOFF:  No.  You are like me in some ways.

11          THE COURT:  Life is moving a lot faster and I am

12     moving a lot slower?

13          MR. SHEKETOFF:  This is 1980.

14          THE COURT:  Right, right.  Well, that is 15 years.

15          MR. SHEKETOFF:  I remember it well.

16          THE COURT:  On or about 15 years ago.

17          MR. SHEKETOFF:  You guys have cheated by putting the

18     paintings of present judges on, because when I go to other

19     courts where it's only retired judges I know every painting on

20     the wall.

21          THE COURT:  You are alone in that.  I am stunned that

22     lawyers now look at Arthur Garrity and say, "Who is Arthur

23     Garrity?"  The dominant figure in the second half of the 20th

24     Century in this court.

25          MR. SHEKETOFF:  In Boston, I know.

1          THE COURT:  So, I think I understand the argument

2    here.

3          MR. SHEKETOFF:  That's my argument.

4          THE COURT:  So, what is the response to this?  I don't

5    want to foreclose the use of certain kinds of language, but

6    what limitations really does "including but not limited to"

7    have on things like e-mails?  Every e-mail that is in there,

8    e-mails having to do with personal, medical matters, e-mails

9    having to do with intimate domestic matters?  Everything?

10         MS. BURKART:  You are right, your Honor.  The contents

11   of certain e-mails that would be included in such a broad "all

12   emails" about a certain thing could be problematic.  We have

13   not briefed or looked at any of the categories because they

14   have not been identified in the brief, but I think the main

15   answer to the various categories that the defense counsel has

16   pointed out are that the affidavit itself explains very clearly

17   how the pervasive fraud at issue here tied in.

18         THE COURT:  Was the affidavit attached to the warrant

19   itself?

20         MS. BURKART:  It was provided to Magistrate Judge

21   Sorokin.

22         THE COURT:  It may have been, but the role of the

23   warrant is to limit the discretion of the law enforcement

24   personnel.  If the law enforcement personnel do not have that

25   affidavit with them attached to the warrant, then I cannot

1    incorporate it by reference.

2          MS. BURKART:  Absolutely, your Honor.

3          THE COURT:  So, I am looking at what it is that the

4    warrant told them that they were authorized to look at.

5          MS. BURKART:  The warrant explained very clearly the

6    issues that were being investigated were Mail Fraud, Wire

7    Fraud.  They enumerated the statute.  It provided 23 examples

8    of the types of evidence that would be related to this

9    pervasive fraud scheme, and the e-mail addresses, the names,

10   the names pointed out in Category 5, those were all aliases

11   that were used by the defendant in the course of his pervasive

12   fraud scheme.  So, you see, his actual name, "Matt Kuc" as

13   spelled correctly is not one of the things that are listed, but

14   "Matthew Kuc" spelled incorrectly was one of the names that he

15   used in addition to "Matthew Cookie" and a variety of other

16   variations of those names.  Similarly, your Honor, the

17   variations of his address was an integral part of his fraud

18   scheme.

19         THE COURT:  What real limitation is there here?

20   Frankly, there is not a challenge as to probable cause,

21   although I think there is obviously some connection to the

22   issue of particularity.  But I think I have to look at the

23   affidavit as a seasoned police officer, a law enforcement

24   personnel unfamiliar with the case, who is asked to go execute.

25   So, he gets this, and he says anything tangible or intangible

1    related to wire fraud, interstate transportation, storage and

2    sale of property and aiding and abetting, without limitation,

3    including without limitation things that -- some of which have

4    no limitation.  What am I supposed to make of that?

5         Now, I suppose I can look at records and tangible

6    objects in No. 5 and say, well, they really are entitled to

7    scoop up things that have to do with these named individuals.

8    I will have to look at that more carefully, but that is

9    possible.  I can look at 9 and say that I can deal with these

10   various addresses because they are tied to the defendant's

11   activities.  I will put to one side 10, because that is the

12   e-mail issue.  Tax records for any of the people identified

13   above is an invitation to go look at every piece of paper that

14   they have, as is, frankly, 20.  And records of travel does the

15   same thing.

16        What is it that provides a limitation?  This seems to

17   provide an authorization for the agents to rummage through

18   every bit of paper that he has and, presumably, to identify

19   some of this stuff, and how is that a limitation?

20        MS. BURKART:  Well, your Honor, I think the difficulty

21   that you are spotting is an accurate concern, but the issue is

22   that it's the fraud that the defendant was committing that was

23   so widespread and had so many different arms that involved

24   permutations of his own address and his own name.

25        It reminds me, your Honor, of the Andresen v. Maryland

1    case cited in the briefs where they talked about the fact that

2    defendant's complicated scheme, the fact that it was a jigsaw

3    puzzle with a variety of different things happening in the

4    scheme, made it hard to particularize a warrant in a way that

5    was very clear cut.  The fact that the defendant was committing

6    a scheme like that shouldn't be a shield to be able to say,

7    okay --

8            THE COURT:  It is not.  But let us take the things

9    that I think are the most problematic.  Tax returns.  Tax

10   records, not returns.  Tax records.  Anything financial is tax

11   records, I suppose, or reading "including but not limited to,"

12   it is every piece of paper.

13           MS. BURKART:  Yeah.

14           THE COURT:  There is no limitation here, then, for the

15   officers to look through any piece of paper they find, right?

16           MS. BURKART:  Yes.  It's important for the officers in

17   investigating this kind of a financial fraud to be able to look

18   through everything.  I think it's important to note two things:

19   One, there is a tax agent who was on the case at this point and

20   taxes were very much a part of the investigation.

21           THE COURT:  Well, but, see -- I am interrupting you, I

22   know, but I do want to keep this back on the focus, and the

23   focus is what is it that the agents were told to do, not

24   whether or not there were adjuncts involved, not whether or not

25   somebody who wanted to go read the affidavit or consult with

1    whoever the affiant was.  At least the traditional reading of

2    search warrants is I look at the four corners to see whether or

3    not it describes with particularity what it is that they are

4    authorized to look for.

5         So, tax records seems to me to open up virtually every

6    piece of paper for review that is there.  Now, you may say,

7    well, that is what probable cause was, that there is probable

8    cause to link all of this to that.  But I am not so sure that

9    that is right, and I want to know whether there is anything

10   else to your argument -- I do not mean to diminish it, but is

11   there anything else to your argument than he used a lot of

12   paper, he was in a complex scheme, and, consequently, we had to

13   gather a lot of complex papers, and so we backed the U-haul

14   truck up to the house and we dumped everything we could find in

15   it?

16        MS. BURKART:  I think the fact that there are certain

17   cases, including the one that defense counsel pointed to, the

18   Roche case, where there were clear ways that the Government

19   could have limited the papers that were taken.  For Roche, for

20   instance, it was a mail fraud, and they just cited to mail

21   fraud, but the Court's real concern was that it was a case

22   where auto insurance was at issue.  It was one of the sort of

23   cases that your Honor remembers with the group.

24        THE COURT:  Dimly, dimly remembers.

25        MS. BURKART:  And in this case they just said "all

1     insurance," where they could have easily said "auto insurance,"

2     they could have limited it in that way.  In the Medicare and

3     the Medicaid cases, Lafayette was one of them, Abrams was

4     another, there were different ways that the Government could

5     have clearly limited the discretion of the officers by sweeping

6     that whole category.  In one case they were color-coded for the

7     ones that they were not going to bill Medicaid, and that's what

8     was at issue, and they could have just said, "Take only the

9     green ones or only the blue ones," whatever it was at issue,

10    and they didn't do that.

11         There's another case, Fuccillo, which defense counsel

12    cites, where they said it was just like this where women's

13    clothing was at issue, another case, Montilla Records, where

14    it's Mowtown records are at issue.  And you could say "Mowtown

15    records."  Instead, they say "all records" in a copyright case.

16         THE COURT:  So, your view is that tied to the probable

17    cause that is demonstrated by the affidavit, that this is

18    limited in a way that identifying Mowtown would in that scheme?

19         MS. BURKART:  Yes.  It is that the Government didn't

20    have a way that they could cleanly and precisely say this

21    entire category is in, this entire category is out because of

22    the very nature of defendant's scheme.  Now, where there is a

23    situation where you can do that and make a clean distinction so

24    that they don't have the general rummaging that the Founding

25    Fathers are concerned about that the Government should

1    absolutely be held to that standard.  But here we didn't have

2    that.  We had a pervasive scheme that all of the tax records

3    were relevant, probable cause was developed for that, and we

4    had to prove that.  Once that was out there, the officers were

5    given the ability to take all of those records because they

6    were deemed to be relevant to the case.  So, it wasn't a

7    situation where any piece of paper that was in the home was

8    immediately thrown into the truck.  It was very different.  It

9    was a situation where there was a pervasive fraud being run out

10   of the defendant's home that was, in fact, something so

11   intrinsically part of the fraud, was the very broad way in

12   which he took advantage of different variations of his address.

13           THE COURT:  So, what do you do with the problem that

14   is created by this, given your analysis, which is that you say

15   you have got sufficient particularity to describe what it is

16   that you are interested in, but the effect of that is to

17   authorize a general warrant to look in every box, open every

18   drawer and generally rummage around in the location?

19           MS. BURKART:  I would say actually, your Honor, it's

20   very different than a general warrant, which would be a general

21   rummaging with unfettered discretion.

22           THE COURT:  Well, but it amounts to the same thing.

23   Here is the concern, a concern, not the only concern that I

24   have, and it is that warrants are frequently the camel's nose

25   under the tent, and once the camel gets its nose under the

1    tent, then the camel can engage in the act of inevitable

2    discovery of things that he would not otherwise be entitled to

3    look at.

4         Now, it may be that that simply is the cost of a

5    warrant that describes with particularity items which cannot be

6    identified without general rummaging, but it is an issue that I

7    think those cases from long ago and far away were concerned

8    with:  the authorization of the law enforcement in complex

9    fraud investigations to turn a house upside down.  I guess your

10   response -- you can give me your response too, but I will give

11   you what I think your response is.  Your response is going to

12   be, Well, that is the cost.  The Fourth Amendment is not

13   concerned with rummaging, except in a broader sort of way; it

14   is concerned with particularity in respect of affidavits -- I

15   should say warrants themselves.

16        MS. BURKART:  Yes, yes.  I think that the Fourth

17   Amendment is concerned with officers running rampant through

18   the colonies, poring through people's papers without

19   justification.

20        Here we have a very different situation.  We have a

21   pervasive fraud being run out of the defendant's home.  It's

22   his choice to make the fraud so complex and it's his choice to

23   do it out of his home.  When he does that, it shouldn't become

24   then a shield for him to able to say, Oh, no you would never be

25   able to create a warrant that would satisfy the concerns.  The

1    concerns were fully addressed in a lengthy affidavit, and we

2    wouldn't have been there in the situation with the camel under

3    the tent unless we had had a neutral and detached magistrate

4    take a look at the warrant.  That's his protection.  He's got

5    the probable cause.  Once we have the probable cause to say,

6    yes, out of his home he is engaged in a far-reaching fraud that

7    requires us to look at a number of different records, then we

8    have a very different situation, and I think we are far away

9    from the general exploratory rummaging that the Fourth

10   Amendment is concerned with.  There I think we have a situation

11   like the Brien case that's cited in the brief, also Ostrowski,

12   another First Circuit case where you have a pervasive fraud and

13   all of the records become relevant.  Those cases are looking at

14   situations, boiler-room-type situations, where you have got a

15   large percentage of what's going on there fraudulent, and

16   that's a situation where you sort of tip and become less

17   concerned with the rummaging because so much of what you are

18   looking at is something that relates to the illegal conduct or

19   the probable cause.

20        Again, I would cite the Andresen versus Maryland case

21   for saying that the fact that a defendant has come up with a

22   complex fraud scheme isn't something that he should be able to

23   use as a shield to protect himself from rummaging.

24        I think the motion in general does seem to focus on

25   this phrase "including but not limited to," so I think worth

1    addressing briefly, when it's read, there are a number of cases

2    that say when you read these warrants in context with the

3    statute before it and the 23 enumerated examples after it, that

4    getting hyper-focused on the technical language "including but

5    not limited to -- "

6           THE COURT:  Well, why do people use that anymore?

7           MS. BURKART:  I think it's just another way of saying,

8    Here's some examples.  This is what we are investigating, and

9    here are illustrative examples of the types of things that

10   could show that.

11          THE COURT:  Well, what would not be covered,

12   particularly when you are dealing with wire fraud?

13          MS. BURKART:  Well, personal matters, the medical

14   examples that you have raised.  It is in the home and there is

15   a great deal of care taken in such a case to make sure that we

16   are not over-sweeping.  At the same time, we need to be able to

17   get the evidence.

18          THE COURT:  Where do I see that in the affidavit?

19   What I see in the affidavit is that they get to lug the

20   computer home, and presumably they get to look at all kinds of

21   -- I use "medical" as a form of privacy, probably the last

22   bastion of privacy left in America, but it is privacy -- and

23   they get to look at this stuff, right?

24          MS. BURKART:  Well, they need to look through it, just

25   like they would be able to look through the home and make sure

1   that the drawer that appears to be the sock drawer is actually

2   the sock drawer and isn't where the contraband is.  The

3   computer in many ways is a holder of information, and

4   logistically --

5            THE COURT:  But a homely metaphor, the computer is a

6   sock drawer.

7            MS. BURKART:  The computer is the bureau, your Honor,

8   and the sock drawer is where you are looking to see if there's

9   drugs in there or if there's socks.

10           THE COURT:  Is the hard drive.

11           MS. BURKART:  In this case, there are cases where they

12   say defendants are unlikely to label the folder "This is the

13   bad evidence of my drug use."  Much like that, in a computer

14   you have to look and see, and the logistical difficulties of

15   being able to image a computer on-site have made it a situation

16   where it is actually necessary, and there is a great deal of

17   case law about that, to take it out.  That is a challenge of

18   the computer age, but that is not something that I think tips

19   the balance.

20           THE COURT:  Well, it does if this language of

21   "including but not limited to" sweeps up virtually everything,

22   including things for which there is not probable cause, but it

23   is this difficulty, I think, of inevitable discovery or the

24   themes and variations of it that adds this extra film to it.

25           MS. BURKART:  I think moving the computer is more to

1    an off-site search than it is a seizure.  Efforts are made to

2    look through and search those materials for relevant --

3         THE COURT:  Well, there is a different body of law

4    certainly dealing with it.

5         Anything else?

6         MS. BURKART:  Just, your Honor, to point out that to

7    the extent that there are concerns about the validity of the

8    warrant, we do believe that it is a valid warrant, but that the

9    appropriate remedy under Leon would not be to suppress the

10   evidence.  We think that there was clearly a good-faith basis

11   for the officers --

12        THE COURT:  Am I going to hear this in every one of

13   these cases now?

14        MS. BURKART:  Likely, your Honor.

15        The other argument you will probably hear is that if

16   you do find something to suppress, we would suggest that clear

17   prevailing case law under Falon and other cases in the First

18   Circuit would be that you would only suppress the items that

19   you thought were seized that were overbroad and not blanket

20   suppression.

21        THE COURT:  Well, the problem of applying Davis to

22   this, I think, is unlike a case that I am dealing with right

23   now, where there is a sea change or potentially a sea change in

24   the Fourth Amendment doctrine, this is the quotidian detail of

25   Fourth Amendment, there is nothing surprising here about it,

1    and the agents, it seems to me, can be chargeable with whatever

2    the general case law is about overbroad categories "including

3    but not limited to."

4          MS. BURKART:  Sure.  But even pre-Davis, your Honor,

5    Falon and Riggs and other First Amendment cases would be very

6    clear on this point.

7          THE COURT:  Well, yes and no.  I do not think the

8    Fourth Amendment was eviscerated before Davis, and I am not

9    sure that the legitimate interests of the Fourth Amendment are

10   eviscerated after it.  But, in any event, I understand that

11   argument.

12         So, Mr. Sheketoff, it does get back to the specific

13   stuff.  That is, let us assume I do exclude some of this stuff,

14   but I buy the Government's argument that I apply a scalpel to

15   this.  We are back to text and pretext.  What are you concerned

16   about here?  I just do not understand.

17         MR. SHEKETOFF:  Well, I would like our medical records

18   back, which they took, just as an aside.

19         THE COURT:  But what is it that is in here, because I

20   do not think it would surprise anyone, unless it is going to

21   disclose your trial strategy prematurely, what is it that is

22   here other than a body of materials that apparently link

23   Mr. Kuc to some of the other people allegedly involved in the

24   scheme?

25         I will do it a different way.  If I said I have the

1   authority -- I am not sure I do, and if I do that I would

2   exercise it -- but if I had the authority to say, Government,

3   you do not get 5, or 9, or 10, or 19 or 21, what would I be

4   excluding that is meaningful in the proof of the case?

5          MR. SHEKETOFF:  Well, I haven't seen their exhibit

6   list yet, your Honor, so I don't know what from those

7   categories they intend.

8          THE COURT:  So, rather than bobbing and weaving

9   through it, are there Crown Jewels somewhere here, evidentiary

10  Crown Jewels?

11         MR. SHEKETOFF:  I don't really think so, myself.  From

12  the Government's point of view, maybe there are.  I think my

13  sister writes very well, and if you read her description of the

14  investigation, I think that's their case in a nutshell.  It's

15  only a couple of pages.  I don't see it as a "complex fraud."

16         The basic theory is that he claims to have a part

17  that's under warranty that doesn't work, and he lets the

18  company know, and they send him the replacement part and he

19  sells it.  That's the basic theory.  I don't think anything

20  taken from his house is going to defeat their ability to show

21  that DELL received a certain request and sent a certain part.

22         THE COURT:  Well, I do not know.  I appreciate the

23  concise statement of the fraud, but I am not sure that proof of

24  it is quite so concise.  I guess I will not ask any more what

25  you are really looking at here, unless there is something that

1   would focus my attention in some particular way on the question

2   of particularity.  I am not going to strain it any further.

3            MS. BURKART:  May I be heard, your Honor?

4            THE COURT:  Just a minute.

5            Anything else, Mr. Sheketoff?

6            MR. SHEKETOFF:  No, your Honor.

7            MS. BURKART:  Just to briefly address one clarifying

8   point, the names in number 5 are not other people.  They are,

9   in fact, the aliases that the defendant used.  So, I would

10  agree that in many ways it's a very simple fraud in that, yes,

11  he was exploiting the return policy of these companies to have

12  things sent to his house, but what was complex about it was the

13  number of aliases and the number of different variations of the

14  addresses of both his home and a few other addresses that were

15  used to be able to perpetrate this fraud and of the computer

16  companies realizing, wait, this is the same guy.

17           So, all of the names that he used, all of the

18  addresses that he used to be able to get them to send him

19  materials but have them still delivered to his house, that's

20  where the complexity comes in.  What's important is that when

21  we get to the house there are 173 or so boxes with all these

22  different names, with all these different permutations of ways

23  to put the address but still make sure they get to the house,

24  that is actually very valuable evidence to the Government's

25  case, and I think it goes right to the heart of the fraud.

1          THE COURT:  In 8 the various what appear to be

2     computer companies, what are they?  I had not matched up yet, I

3     will, the affidavit with the warrant, but are these fake

4     companies or are these real companies or what?

5          MS. BURKART:  The first two, your Honor, are companies

6     that are associated with the defendant.  One is a company that

7     he used in a way that's a little bit unclear.  It's sort of

8     complex, it will come out at trial.  But True Data is the one

9     that he used very much as part of the fraud.  He sort of held

10    that out as a company that he was associated with.  And then

11    these other ones are generally all companies that he used,

12    again with this whole variation to trick the computer companies

13    into thinking they're not sending millions of dollars worth of

14    equipment to the same guy.  He tweaks things.

15         THE COURT:  But these are the purported ultimate

16    recipients?

17         MS. BURKART:  I believe that's right in most of these

18    cases, your Honor.

19         THE COURT:  All right.  Well, I am going to look

20    through the materials more carefully now and try and get

21    something out.  I realize we have a trial in a reasonably close

22    time period.  My expectation is I am going to deny the Motion

23    to Suppress, but I am going to look at it carefully in light of

24    this.  So, as the parties prepare for trial they can act on

25    that assumption that I will be doing that.  It will not be the

1    first time that I have dashed expectations if I decide to deal

2    with this differently, but that is the way I stand on it now,

3    and I will try to get something out promptly.

4              MR. SHEKETOFF:  Thank you.

5              MS. BURKART:  Thank you, your Honor.

6              THE CLERK:  All rise.

7          (The Honorable Court exited the courtroom at 12:05 p.m.)

8              (WHEREUPON, the proceedings adjourned at 12:05 p.m.)

C E R T I F I C A T E

I, Brenda K. Hancock, RMR, CRR and Official Reporter of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of United States of America v. Matthew Kuc, No. 1:11-cr-10014-DPW-1.

Date: ___January 28, 2013___          /s/ *Brenda K. Hancock*

                                      Brenda K. Hancock, RMR, CRR

                                      Official Court Reporter