UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


THE UNITED STATES OF AMERICA        )
                                    )
                                    )
                                    )
vs.                                 )  No.
                                    )  1:11-cr-10014-DPW-1
                                    )
MATTHEW J. KUC,                     )
                                    )
                Defendant.          )


BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK


DAY ONE OF JURY TRIAL




John Joseph Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, MA 02210
Monday, June 25, 2012
9:55 a.m.




Brenda K. Hancock, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way
Boston, MA 02210
(617)439-3214

1    APPEARANCES:

2         UNITED STATES ATTORNEY'S OFFICE
          By:  AUSA Amy H. Burkart
3              AUSA Scott Garland
          Suite 9200
4         Boston, MA 02210
          On behalf of the United States of America
5
          ROBERT L. SHEKETOFF, ESQ.
6         One McKinley Square
          Boston, MA 02109
7         On behalf of the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E  X  H  I  B  I  T  S

                                    Page

Jury Selection                        4


OPENING STATEMENT

By Ms. Burkart                       130
By Mr. Sheketoff                     143


WITNESSES:          DIRECT    CROSS     REDIRECT    RECROSS

ROBERT LONG
By Ms. Burkart        146
By Mr. Sheketoff                185



E  X  H  I  B  I  T  S

No.                   Description              In Evd.


71        Dell Websites                         149
5         Record of Items sent to
          36 Laurelwood Drive -Spreadsheet      161
6         Record of Items sent to
          247 Maple Street - Spreadsheet        166
7         Record of Items  sent to
          2130 Mendon Road - Spreadsheet        166
8         Record of Items sent to
          42 Union Street - Spreadsheet         166
26        Output from D3 System                 168
1         Chat Session - Count 1                169
2         Chat Session - Count 2                173
3         Chat Session - Count 3                175
4         Chat session - Count 4                177
46        Dell Instructions for Returns         199

1                 P R O C E E D I N G S:

2            THE CLERK:  All rise.

3        (The Honorable Court entered the courtroom at 9:55 a.m.)

4            THE CLERK:  This is Criminal Action No. 11-10014, The

5    United States versus Matthew Kuc.

6            THE COURT:  Good morning, ladies and gentlemen.  My

7    name is Douglas Woodlock, and I am the judge in this session.

8    What we are going to be doing is picking a jury in a criminal

9    case, a case in which the United States has accused an

10   individual by the name of Matthew Kuc of engaging in a

11   fraudulent scheme in connection with return and transfer of

12   various kinds of computer equipment.  You know about as much

13   about this case as I do at this point.  We are going to learn

14   about it during the course of the trial.

15           But it is important for me at the outset to emphasize

16   what we are about this morning, and what we are about this

17   morning is picking the fairest, the most impartial jury that we

18   can to decide this case between Mr. Kuc and the United States.

19   That means that you have to observe basic principles, core

20   principles that are fundamental to the way in which we conduct

21   criminal trials in the United States.

22           The first is that Mr. Cook is presumed innocent unless

23   and until the Government proves beyond a reasonable doubt each

24   essential element of the offenses charged against him.  That

25   means he comes in here cloaked in a presumption of innocence.

1      He, frankly, does not have to do anything at all; he can look

2      the Government straight in the eye and say, "Prove, it," and

3      unless and until they do, he cannot be found guilty.

4              The second basic principle is that it has to be proof

5      beyond a reasonable doubt.  It is a very demanding standard.  I

6      will explain it to you at greater length in the future, but you

7      should understand that that standard is established to ensure

8      that there is fairness in criminal trials in the United States.

9              So, you start with those basic fundamental principles

10     that is, the presumption of innocence, that the burden always

11     rests with the Government, and that that burden is a very high

12     one, proof beyond a reasonable doubt.

13             Those are the background principles that you are going

14     to have to observe in connection with this case.  There are a

15     number of others that I will be describing to you, but I

16     emphasize them at the outset to put you in the frame of mind to

17     understand what it is that we want to do, which is to be

18     assured that we have people who fairly and impartially decide

19     this case only on the basis of the evidence that is presented

20     here in court and on the basis of the law as I have and will

21     describe it to you.

22             Now, in order to do that, I am going to have

23     Mr. Lovett, the Courtroom Deputy, swear you as the panel of

24     persons from whom the jurors will be selected in this case, and

25     then we will move on to the next stage.

1          But, Mr. Lovett, if you could do that.

2          THE CLERK:  Members of the jury pool, will you all

3   rise and please raise your right hand.

4          (The jury venire duly sworn by the Clerk)

5          THE CLERK:  You may be seated.

6          THE COURT:  Now, the way we are going to go about this

7   is that I am going to be asking questions of various of the

8   jurors or potential jurors, and for management purposes, that

9   is, to keep it manageable for me here, I am going to start with

10  the folks who are sitting now in the jury box and then include

11  the people who are sitting in the front row.  What will happen

12  is from time to time people will be excused, other potential

13  jurors will be called up to fill the empty seats, and the first

14  question I am going to ask those other jurors who are called to

15  fill the empty seats is, "Did you hear all those questions I

16  asked those other people; do any of those questions apply to

17  you?"  So, everybody is going to be listening to the questions,

18  but the only people who answer the questions are going to be

19  the persons who are sitting in the jury box and in the front

20  row.

21         Now, before we start with you, you need to know who we

22  are, so I will start with myself.  I am the judge.  My

23  responsibility is to decide questions of law, to rule on

24  questions of evidence and make the case move as fairly and

25  efficiently as it possibly can.  But there is one thing I do

1    not do.  I do not decide this case.  You are going to decide

2    this case.  If, in the course of the trial, you think you have

3    some idea of where I stand, think again.

4         I have always thought that I stand more or less like a

5    traffic cop in the middle of the intersection.  I am here to

6    make sure that the parties get the opportunity to go wherever

7    they think they can get to, but it is not my responsibility to

8    decide whether or not they have gotten there.  It is only to

9    make sure that they do not crash into each other as they go

10   through the intersection.  So, basically I am trying to assure

11   that there is an orderly and efficient trial in the case.

12        Now, sitting directly in front of me is Mr. Lovett,

13   who swore you in.  He is the Courtroom Deputy.  He is the

14   executive officer of this operation, and to the degree that

15   anything runs efficiently it is because Mr. Lovett is at the

16   wheel here.  He is the person who will swear witnesses and deal

17   with you on creature-comfort kinds of things.  He will deal

18   with the lawyers about various evidentiary matters, the

19   submission of evidence during the course of trial, and during

20   the course of trial from time to time, if he is absent, some

21   reasonable facsimile of Mr. Lovett will be here, although there

22   is no reasonable facsimile of Mr. Lovett.

23        Sitting just to the right of Mr. Lovett is

24   Ms. Hancock.  She is the court reporter.  She is taking

25   stenographic notes of all that transpires here in the

1    courtroom.  But there are a couple of things I want to

2    emphasize about this case and the taking of notes.  The process

3    of creating a stenographic record ultimately for purposes of a

4    transcript is a very demanding job; it is the toughest job in

5    the courtroom.  I recognize it.  Ms. Hancock makes sure that I

6    recognize it from time to time.  Getting that transcript up

7    takes a lot of time, and so you should understand that there

8    will not be any transcript available for you at the end of the

9    trial.

10         I tell you that, in part, for philosophical reasons.

11    The philosophical reason is this; that during the course of the

12    trial I want you to be listening to the witnesses.  The

13    witnesses will be in that box just beyond Ms. Hancock.  I want

14    you to be paying attention to the witnesses.  I do not want

15    anyone to feel the impulse to take a mental vacation and say,

16    well, I will look at the transcript when the trial is over,

17    because there will not be a transcript.

18         There is a second point that I make in connection with

19    introducing Ms. Hancock, and that is from time to time in

20    certain cases I have thought it is a good idea for jurors to

21    take notes.  It is not that I do not think it is a good idea to

22    take notes as a general proposition, but this is not one of

23    those cases in which I am going to permit the jurors to take

24    notes, and the reason for it is this:  I emphasize the

25    importance of keeping your eye on the witnesses.  I want to

1    emphasize as well that some people take very good notes, say,

2    between 10:02 and 10:05 in the morning, and then it kind of

3    trails off after that, some people take good notes much longer,

4    some people do not take notes at all.  But the process of

5    taking notes is distracting to the note taker and to the

6    persons around the note taker.  So, in order to encourage you

7    to follow the basic philosophical precept that you want to keep

8    your eye on the witnesses and also to avoid distractions, I am

9    just going to instruct you not to take notes during the course

10   of the trial.  You are going to have to rely upon your

11   collective recollection of the evidence at the conclusion of

12   the trial to render your verdict.

13          Sitting just beyond Ms. Hancock is Ms. Gelfman, who is

14   one of my law clerks.  Law clerks are relatively recent

15   graduates of law school, whose duty is to protect the judge

16   from making silly legal mistakes.  So, what they do is provide

17   legal research and support for me.  You will see during the

18   course of trial Ms. Gelfman and her colleague, Mr. Cushing,

19   sitting over at that table.  They will be here, depending on

20   whether they have other work obligations that they have to

21   perform.

22          Now, sitting directly in front of Mr. Lovett to his

23   left are the Assistant United States Attorneys who will be

24   presenting this case on behalf of the Government.  Closest to

25   you is Scott Garland.

1          Mr. Garland, if you would stand.

2          And Amy Harman Burkart.  Their responsibility is to

3     represent the Government in bringing this case and pursuing

4     this action.

5          Now, sitting just to the left of Ms. Burkart is Robert

6     Sheketoff.

7          Mr. Sheketoff, if you would stand.

8          Mr. Sheketoff is the attorney for the defendant,

9     Mr. Kuc.

10         And, Mr. Kuc, if you would stand as well.

11         Now, in addition, we have a person who is going to be

12    kind of in charge of computer equipment.  You will see that in

13    the jury box and elsewhere in the room we have video screens

14    and those screens are going to present the presentation of

15    various kinds of documents and pictures and that sort of thing

16    much more efficiently, and we have Robert Quigley who will be

17    doing that.  So, you will see Mr. Quigley from time to time

18    during the course of the trial.

19         So, those are the people you are going to see on a

20    regular basis in the course of the trial.

21         Now we have to know about you, and the way in which I

22    want to find out about you and permit the lawyers to learn a

23    bit about you is to have each of you stand in order and tell us

24    your name.  Spell your last name.  The lawyers are very quick,

25    I am slow, so it will be helpful if you could spell your name.

1    Tell us the town you live in, what you do for a living, if you

2    are employed, what your spouse or partner does for a living, if

3    you have a significant relationship and that person is

4    employed.

5           So, we will start with the folks in the back row of

6    the jury box, and then we will go to the front row.  As said, I

7    want everybody to be listening to all of this.  The only people

8    who are going to be introducing themselves are the people who

9    are in the jury box and in the front row for now, and then, as

10   time develops and people get excused for various reasons,

11   others of you will be called forward, and when you are, you are

12   going to get to introduce yourselves as well.

13          So, we will start, sir, with you.

14          THE JUROR:  Stand up?

15          THE COURT:  Please.

16          THE JUROR:  My name's martin Goguen, G-O-G-U-E-N.  I

17   am a manager for a landscaping company.  I live in Chelmsford,

18   Mass, and my wife is a Human Resources Director.

19          THE COURT:  Thank you, Mr. Goguen.

20          Yes, ma'am.

21          THE JUROR:  Judith Swartwood, Cambridge, Mass.  I am a

22   self-employed interior designer.  I am divorced.

23          THE COURT:  And it is S-W-A-R --

24          THE JUROR:  S-W-A-R-T-W-O-O-D.

25          THE COURT:  Thank you.

1          Yes, ma'am.

2          THE JUROR:  Donna Robinson, R-O-B-I-N-S-O-N.  I am a

3    wireless transport engineering manager.  I live in Bridgewater,

4    and my husband works for Rockland IT.  He is a computer

5    specialist.

6          THE COURT:  Thank you.

7          THE JUROR:  My name is Brian Yetman, Y-E-T-M-A-N.  I

8    work for Distrigas Corporation.  I'm a shift supervisor.  My

9    wife's name is Mary.

10         THE COURT:  And the town you live in?

11         THE JUROR:  Cambridge.

12         THE COURT:  Thank you.

13         Yes, sir.

14         THE JUROR:  Good morning.  I'm Steven Herschlag,

15   H-E-R-S-C-H-L-A-G.  I am a pediatric dentist.  I live in

16   Easton, Massachusetts, and my wife is an office manager.

17         THE COURT:  Thank you, Mr. Herschlag.

18         Yes, ma'am.

19         THE JUROR:  I'm Katrice Farris, F-A-R-R-I-S.  I'm a

20   preschool teacher, and I live in Malden, Mass.

21         THE JUROR:  Good morning.  My name is Steven, with a

22   V, last name is Branchaud, B-R-A-N-C-H-A-U-D.  I live in New

23   Bedford.  I'm a sales floor clerk for a major retailer, and my

24   wife is a scheduler for Southcoast Visiting Nurses.

25         THE COURT:  Thank you.

1              Yes, ma'am.

2              THE JUROR:  My name is Dary Carvalho, C-A-R-V-A-L-H-O,

3    and I'm unemployed, and my husband works as a packer-shipper.

4              THE COURT:  And the town you live in?

5              THE JUROR:  Attleboro.

6              THE COURT:  Thank you very much, Ms. Carvalho.

7              THE JUROR:  I'm Judith Johnson, J-O-H-N-S-O-N.  I am a

8    supervisor for the Department of Revenue.  I live in

9    Charlestown, and my husband is a construction inspector.

10             THE COURT:  Yes, ma'am.

11             THE JUROR:  Jeanne Babineau, B-A-B-I-N-E-A-U.  I live

12   in Saugus.  I am a fifth grade teacher, fitness instructor and

13   fitness director.

14             THE COURT:  Thank you, Ms. Babineau.

15             Yes, ma'am.

16             THE JUROR:  Patricia Scott, S-C-O-T-T.  I am a

17   hygienist assistant.  I live in the town of Ayer.  My husband

18   is a truck driver for the Town of Ayer.

19             THE COURT:  Thank you, Ms. Scott.

20             THE JUROR:  Jennifer Kimball, K-I-M-B-A-L-L.  I am a

21   Director of Regulatory Affairs at Boston Scientific.  I live in

22   Hopkinton, and my husband is a tax accountant with The

23   MathWorks.

24             THE COURT:  Thank you.

25             Yes, sir.

1            THE JUROR:  I'm Eugene Pettinelli.  I'm a high school

2    teacher.  I live in Sudbury, and my wife is a high school

3    teacher.

4            THE COURT:  Thank you, Mr. Pettinelli.

5            THE JUROR:  Frank Hardy, H-A-R-D-Y.  I live in

6    Ashland.  I work for Steth (ph) Products and UPS.

7            THE COURT:  Thank you, Mr. Hardy.

8            THE JUROR:  Donna Marcotte, M-A-R-C-O-T-T-E.  I am

9    from New Bedford.  I am a secretary in a law office, and my

10   husband is a self-employed telephone technician.

11           THE JUROR:  Julie Camara, C-A-M-A-R-A.  I am from East

12   Taunton, and I'm an Assistant Group Leader in a daycare.

13           THE COURT:  I'm sorry.  You are?

14           THE JUROR:  Assistant Group Leader at a daycare.

15           THE COURT:  Fine.  Thank you very much.

16           THE JUROR:  My name is Diane Hogan, H-O-G-A-N.  I

17   provide Accounting Consulting Services to various clients, and

18   my husband and I own a retail store, and I'm from Holliston.

19           THE COURT:  Thank you.

20           THE JUROR:  I'm Gregory Bunimovich,

21   B-U-N-I-M-O-V-I-C-H.  I'm a portfolio manager in the asset

22   management industry.  I live in Cambridge, and my wife is a

23   journalist.

24           THE COURT:  Thank you, Mr. Bunimovich.

25           We will start with the fellow in the back row.

1          THE JUROR:  Steven Pereira, P-E-R-E-I-R-A.  I live in

2     the Town of Somerset.  I am an operations manager for the

3     Executive Office of Labor and Work Force Development.  My wife

4     is a Registered Nurse.

5          THE COURT:  Thank you.

6          THE JUROR:  My name is Tyler McGowan, M-C-G-O-W-A-N.

7     I'm an electrician, and I live in Haverhill.

8          THE COURT:  Thank you.

9          THE JUROR:  Hi.  My name is Stephen Earls.  I am

10    currently self-employed with a rental property.  I live in the

11    Town of Wilmington, and my wife is a sales rep for a lab

12    services company.

13          THE COURT:  Thank you, Mr. Earls.

14          THE JUROR:  Hi.  I'm Erik Lauritzen,

15    L-A-U-R-I-T-Z-E-N, and I am a college student from Townsend.

16          THE COURT:  Thank you.

17          THE JUROR:  Faye Brabant, B-R-A-B-A-N-T.  I'm an

18    animal caregiver at Forever Paws Animal Shelter, and my husband

19    is currently unemployed, and I live in Swansea.

20          THE COURT:  Thank you.

21          THE JUROR:  Jennifer Barone, B, as in boy, A-R-O-N-E.

22    I am a career counselor at UMass, Boston.  I live in Walpole,

23    and my husband is an educational specialist with EMC.

24          THE COURT:  Thank you.

25          THE JUROR:  Sheila M. Adiletto, A-D-I-L-E-T-T-O.  I

1    live in Franklin, and I'm in retail, and my husband is a sales

2    manager.

3                THE COURT:  Thank you, MS. Adiletto.

4                THE JUROR:  Jennifer Smulligan, S-M-U-L-L-I-G-A-N.  I

5    live in Lowell.  I am a high school teacher at Lowell High

6    School.  My husband is also a high school teacher, and we're

7    both summer camp counselors.

8                THE COURT:  Thank you, Ms. Smulligan.

9                THE JUROR:  Timothy Valade, V-A-L-A-D-E.  I am a sales

10   specialist for Lowe's, and my wife is a sales representative,

11   and I live in Attleboro.

12               THE COURT:  Thank you.

13               THE JUROR:  Catherine Redfield, R-E-D-F-I-E-L-D.  I am

14   a computer scientist, I live in Cambridge, and I'm single.

15               THE COURT:  Thank you.

16               THE JUROR:  My name is Michael Lindo, L-I-N-D-O.  I

17   work for Planet Fitness overnight front desk, and I'm from Fall

18   River.

19               THE COURT:  Thank you, Mr. Lindo.

20               THE JUROR:  James Plankey.  I'm currently unemployed.

21   I live in Gloucester, and my partner's occupation is

22   receptionist.

23               THE COURT:  Mr. Plankey, what did you do for a living?

24               THE JUROR:  I was a salesman.

25               THE COURT:  Fine, thank you.

1              THE JUROR:  Hi.  My name is Daniel Fenton,

2     F-E-N-T-O-N.  I'm a mechanic for Dyer Construction, and my wife

3     drives a bus for A&A Metro.

4              THE COURT:  Thank you.

5              THE JUROR:  And I live in Middleboro.

6              THE COURT:  Thank you.

7              THE JUROR:  David Hardt.  I'm a professor of

8     mechanical engineering.  I live in Acton, Massachusetts, and my

9     wife runs our local Land Trust, nonprofit.

10             THE COURT:  Thank you.

11             THE JUROR:  My name is Marie Simon.  I work as a cook.

12             THE COURT:  And the town you live in, Ms. Simon?

13             THE JUROR:  Malden.

14             THE COURT:  Thank you.

15             THE JUROR:  My name is Constance Hyder, H-Y-D-E-R.  I

16    am a high school administrator.  I live in Randolph, Mass, and

17    my husband is a pension fund aid consultant.

18             THE COURT:  Thank you, Ms. Hyder.

19             So, we will stop there.  Let me start by asking

20    whether you think you know anything about this case or know any

21    of the lawyers involved in this case know Mr. Kuc?  I see one

22    response to that, so let me tell you how we are going to deal

23    with this.  Every time I get a positive response for one of the

24    questions, I am going to ask the individual or individuals who

25    raised their hand to come over to the sidebar, which is this

1    area over to my right (indicating), where we can have a more

2    confidential discussion with counsel present so that we can

3    explore whatever the response is.  So, whenever anybody has a

4    positive response, anybody who has introduced themselves.

5           The folks who are in the back who have not yet

6    introduced yourselves, of course you will have your time, but I

7    just want to deal with the folks that have introduced

8    themselves now.  So, I see that Ms. Robinson, I guess, has a

9    positive response, so we will talk to Ms. Robinson at the

10   sidebar.

11

12   (SIDEBAR CONFERENCE AS FOLLOWS):

13          MR. SHEKETOFF:  What's your position on the defendant

14   being at sidebar?

15          THE COURT:  He can be present, if he wants to.

16                  (Juror approached sidebar)

17          THE COURT:  Ms. Robinson.

18          THE JUROR:  Good morning.

19          THE COURT:  What aspect of the question brought you

20   up?

21          THE JUROR:  This may be very similar to another case

22   my husband was involved with, and I believe that case is still

23   ongoing.  His name does sound familiar.  My husband used to

24   work for BL Trading, which was involved in a fraud case.

25          THE COURT:  Let me just stop a minute.

1          MR. GARLAND:  That was my case.  I was going to ask

2     about that too, because I recognize the name.  I think because

3     of the circumstances of it --

4          THE COURT:  This is a similar kind of case?

5          MR. GARLAND:  Similar sorts of allegations, yes.

6          THE COURT:  I think this is probably not the kind of

7     case for you to sit on.  So, what I am going to do is ask you

8     to take that card.  You should go down to the jury room and you

9     will get further instructions.

10         THE JUROR:  Todd Robinson.

11         MR. GARLAND:  Yup.

12         THE COURT:  So, we will find you another case.

13         THE JUROR:  Okay.  Thank you.

14         THE COURT:  But if you take the card from Mr. Lovett,

15    go down to the second floor, and that will be fine.  Thank you.

16    (END OF SIDEBAR CONFERENCE)

17

18         THE CLERK:  William Prenovitz, that's Juror No. 35,

19    will you please come forward and take seat number 3 in the back

20    row of the jury box.

21         THE COURT:  Mr. Prenovitz, before you sit down, you

22    are going to have to introduce yourself too.

23         THE JUROR:  My name is William Prenovitz,

24    P-R-E-N-O-V-I-T-Z.  I do product development management for

25    Philips Electronics.  I live in Lexington.  My wife works for

1    Epp (ph) Associates as a project administrator.

2            THE COURT:  Thank you.  Did that prior question apply

3    to you, Mr. Prenovitz?

4            THE JUROR:  No.

5            THE COURT:  Let me try to put some meat on the

6    allegations in the case, and I want to emphasize these are just

7    allegations.  They are brought in the form of an indictment.

8    An "indictment" is just a piece of paper by which the

9    Government frames the issues for the jury's determination.  But

10   the gist of the allegations, at least as I understand it, is

11   that Mr. Kuc was engaged in a scheme to repeatedly ask various

12   computer companies to replace computer equipment that he

13   claimed was broken or was otherwise faulty when, in fact, there

14   was no broken computer equipment and he did not own or have

15   responsibility for servicing that equipment, and what would

16   happen is that, according to the Government, various computer

17   companies would send this equipment to addresses that he gave.

18   He gave, according to the Government, number of addresses.

19           When he received the equipment, he took advantage of

20   the fact that, by and large, the computer companies did not

21   follow through on keeping track of who had what, and, as a

22   consequence, he was able to resell this equipment or otherwise

23   dispose of the equipment.

24           Now, as I said, those are the allegations, but we need

25   to shape the case for you, because, as, for example, with the

1    last juror, she or her husband was involved in some dispute

2    about something similar to that from the perspective of a

3    computer company, at least as I understood it.  So, we need to

4    know whether or not you have ever been involved with the

5    companies here.  But I want you to be thinking in a broader

6    sense, which is whether or not you have been involved in some

7    scheme like this or had some exposure to some scheme like this

8    in your business affairs.  And when I say "you," I am going to

9    be talking about you or any member of your immediate family, by

10   which I mean people that you live with in the same household.

11         New, the companies that the Government says are

12   involved are Dell, 3COM, Hewlett-Packard and Lenovo, if I

13   pronounce it correctly.

14         Do I?

15         MR. GARLAND:  Lenovo, yes, your Honor.

16         THE COURT:  I did not, so it is Lenovo.  Those are the

17   basic companies, and we need to know whether or not you have

18   been involved with any of them.

19         But, as I said, I want you to be thinking more

20   broadly, because the purpose of this exercise of asking you

21   questions is to make sure that we don't have people who come to

22   this with some sort of predisposition, or background or

23   experience that may affect or interfere with their ability to

24   do what I keep telling you is going to be your responsibility,

25   which is to decide this case solely on the basis of the

1   evidence that is presented here and according to the law as I

2   instruct you.

3         So, have any of you, yourselves, or any members of

4   your immediate family been involved with any of the computer

5   companies that have been identified, Dell, 3COM,

6   Hewlett-Packard and Lenovo in any way?  I see no response from

7   the persons who have introduced yourself.  Oh, I see at least

8   one response.  Let me ask one more question here, I guess it is

9   Mr. Earls -- that casts a broader net.  Have any of you,

10  yourselves, or any members of your immediate family been drawn

11  into a dispute over a scheme such as that that is alleged here

12  about receiving equipment and then reselling it when the

13  individual who is receiving that equipment does not have a

14  right to it?

15        I see at least one other response to that, so I will

16  see the two of you at the sidebar.

17

18  (SIDEBAR CONFERENCE AS FOLLOWS)

19                    (Juror approached sidebar)

20        THE COURT:  And Mr. Earls is Juror No. 21.

21        What brought you up here?

22        THE JUROR:  My previous employment.  You asked about

23  an exposure to computers.  I was involved with purchasing

24  computer equipment for our high-tech company.

25        THE COURT:  What was the company?

1          THE JUROR:  Our company was Apollo Systems.  We were

2     located out in Foxborough, Massachusetts, and we were a

3     supplier to the printing inspection industry.  We frequently

4     bought Dell computers, HP, high-end work stations that would

5     run basically the computer software for our printing

6     inspection.

7          THE COURT:  Were you directly involved in procurement

8     yourself?

9          THE JUROR:  I would actually issue the purchase orders

10    and -- yes.

11         THE COURT:  Now, that somebody has a background is not

12    disqualifying.  The real issue is whether or not they are going

13    to bring to bear in the jury room their past experience in the

14    sense of saying, well, let me tell you how it is really done,

15    let me tell you what Dell does, let me tell you what HP does.

16         THE JUROR:  Yes.

17         THE COURT:  Do you think you can keep yourself from

18    doing that?  Because you are going to have to decide the case

19    on the basis of the evidence that is presented here, not this

20    background information.

21         THE JUROR:  Right, right.  I wasn't involved with any

22    type of scheme or anything like that.

23         THE COURT:  No, I am not suggesting any other way.  I

24    am just simply asking whether or not you are going to be able

25    to keep separate what happens here in the courtroom, which will

1    be some presentation, I suppose, by both parties about what is

2    involved when someone returns equipment --

3              THE JUROR:  Yes.

4              THE COURT:  -- rather than what your past experience

5    is.

6              THE JUROR:  Yes, your Honor.

7              THE COURT:  Do you think you can be fair and

8    impartial?

9              THE JUROR:  Yes, I do.

10             THE COURT:  That is all we can ask for.  Thank you.

11                    (Juror left sidebar)

12                  (Next juror approached sidebar)

13             THE JUROR:  Hi.

14             THE COURT:  Can you tell us your name again.

15             THE JUROR:  My name is Brian Yetman, Y-E-T-M-A-N.

16             THE COURT:  And Mr. Yetman is Juror No. 4.

17             Go ahead.

18             THE JUROR:  My brother-in-law had owned Matrix

19   Marketing, related to the same thing, they bought and sold

20   computer parts, and he was indicted -- he wasn't found guilty

21   but he had numerous employees that were indicted and did go to

22   jail for buying computer parts, selling computer parts under a

23   different name, taking computer systems, replacing the chips

24   with different types of chips.

25             THE COURT:  Where was this?

1            THE JUROR:  Portsmouth, New Hampshire.

2            THE COURT:  Was it in the courts in New Hampshire?  Is

3     that where it took place?

4            THE JUROR:  Yes.

5            THE COURT:  If I understand the scheme that you are

6     talking about, it was essentially doing resale of equipment

7     from other companies that did not want to have their equipment

8     enter the resale market?  Is that as you understand it?

9            THE JUROR:  As I understand it, they would buy Dell

10    computers and take the chips out, buy IBM computers, replace

11    them with different types of chips, and sell them as IBM or

12    Dell or those types of computers.

13           THE COURT:  And your brother --

14           THE JUROR:  He owned Matrix Marketing.  He was never

15    found guilty, no.

16           THE COURT:  Was he indicted?

17           THE JUROR:  Yes.

18           THE COURT:  Is that going to affect your judgment

19    here?  Are you going to lean toward one side or the other?

20           THE JUROR:  Maybe.  It is possible.

21           THE COURT:  Because of the experience your brother

22    went through?

23           THE JUROR:  Yes, because of his experience.

24           THE COURT:  I think I am going to excuse you from this

25    case.  I do not think this is the best case for you.

1           THE JUROR:  Okay.

2           THE COURT:  So, you should take that card from

3    Mr. Lovett, go down to the jury room, and you will get further

4    instructions about other cases.

5           THE JUROR:  Okay.  Thank you, your Honor.

6           THE COURT:  Thank you very much.

7                      (Juror left sidebar)

8           THE COURT:  One other thing.  Do you have a list by

9    names of the witnesses?

10          MR. GARLAND:  We do, yes.

11          MS. BURKART:  Yes.  I can give you a copy.

12          THE COURT:  If you can pass it up to Mr. Lovett.

13          MR. GARLAND:  There's also one name here that I saw

14   that you might want to inquire of specifically, Juror No. 15,

15   Donna Marcotte.  I don't know her specifically, but I think

16   that Mr. Kuc's employer, Sensible Computers, had a client

17   called Marcotte Technologies or something like that.  That's

18   the same area.

19          THE COURT:  What does she say is her employment?

20          MR. GARLAND:  She is a secretary in a law office.

21          THE COURT:  And what does her husband do?

22          MR. GARLAND:  An operator of a telephone technology

23   sort of thing, so it's conceivable that it may be the client,

24   and one of the things we are going to get into is the use of

25   the name "Marcotte."  It may be total coincidence.

1          THE COURT:  I may invite her up if she does not come

2    up in response to some other question.

3          MR. GARLAND:  Thank you, your Honor.

4    (END OF SIDEBAR CONFERENCE)

5

6          THE CLERK:  Angela Decker, that's Juror No. 46, please

7    come forward and take seat number 4 in the back row of the jury

8    box.

9          THE COURT:  And, again, Ms. Decker, before you sit

10   down, if you could introduce yourself.

11         THE JUROR:  Angela Decker, D-E-C-K-E-R.  I am an

12   accountant.  I live in Salem, Mass.

13         THE COURT:  Thank you.  And do any of the questions

14   that I asked so far apply to you?

15         THE JUROR:  I'm good.

16         THE COURT:  Let me read out the names of some people

17   whose activities are likely to come to your attention during

18   the course of the trial either because they are witnesses or

19   because they are affiliated with some entity whose activities

20   come up here.  You will understand why I am reading these names

21   off.  The thing that concerns us most is that in the middle of

22   the trial some juror looks up and identifies their

23   brother-in-law on the witness stand.  So, if this is someone

24   you know, we want to know about it ahead of time.

25         There is a William "Bill" Atwell from Morrisville,

1    North Carolina, a Morgan Backhous from Austin, Texas, a Raymond

2    Di Ciaccio, from Attleboro, a Special Agent Sarah DeLair from

3    the FBI, a Joseph Fallon from Scituate, Massachusetts, a Leanne

4    Farrell from Ashland, Massachusetts, a Ruth Forrand

5    F-O-R-R-A-N-D, from Attleboro, a Jefferson "Jeff" Foster from

6    Austin, Texas, a Tadeusz Kuc, that's spelled T-A-D-E-U-S-Z, Kuc

7    from North Attleborough.

8            That is Mr. Kuc's father; is that right?

9            MR. SHEKETOFF:  Yes, your Honor.

10           THE COURT:  And then Zofia Kuc, Z-O-F-I-A, from North

11   Attleborough, who I belive is Mr. Kuc's mother.  A Robert Long

12   from Round Rock Texas, a Ken McCarthy from North Attleborough,

13   Massachusetts, a Mark Olson from Larimer County, Colorado, Ben

14   Rubin from Brooklyn, New York, Francisco Samuel from Attleboro,

15   a Michael Schievert, S-C-H-I-E-V-E-R-T, from West Kingston,

16   Massachusetts, Emanuel, also known as "Manny," Valasco from the

17   FBI, a Michael Wisenur from Baton Rouge, Louisiana, April

18   Williams from Cumberland, Rhode Island, and a Thomas Zappala,

19   Z-A-P-P-A-L-A from the United States Attorney's Office here.

20           Do any of those names ring a bell with you, anybody

21   that you have ever done business with?  And I see no response

22   to that.

23           The names of these various entities that arise in this

24   case, that is, the computers names, have at least a few

25   parallels on the other side.  As I understand it, one of the

1     companies that the Government says that the defendant had

2     equipment sent to was something called Sensible Computers in, I

3     believe, North Attleborough here.  Has anybody had anything to

4     do with an entity known as Sensible Computers or Total Asset

5     Recovery?  Does that ring a bell for any of the jurors?

6             In addition, there are entities known as Abacus

7     Software and True Data, Incorporated.  Have any of the jurors

8     had anything to do with those companies?

9             Now, are there any other entities that I should bring

10    to the attention of the jury or individuals who I should bring

11    to the attention of the jury from the perspective of the

12    parties?

13                        (No response)

14            THE COURT:  Let me put this also in a broader sense.

15    One of the, perhaps, unhappy aspects of contemporary life is

16    that from time to time a large number of us find ourselves

17    caught up in the criminal justice system in one way or another,

18    and it is important for us to know whether or not any potential

19    jurors found himself or herself in that position.  When I say

20    "caught up in the criminal justice system," I mean that you

21    have been involved actively as a law enforcement personnel

22    either at the state, or the federal or the local level, that

23    you have been a victim of a crime, that you have been a witness

24    to a crime, and by "witness" I mean somebody who has been

25    called upon to testify either before a jury or a grand jury or

1    a judge, or you have been accused of a crime.

2         I want to draw as broad a possible net as I can to

3    identifying anybody who has been caught up in the criminal

4    justice system, either employment in law enforcement or as a

5    prosecutor or a defense counsel.

6         Ms. Decker, we will be talking to you, I guess, in a

7    minute.

8         Or have been a witness or have been accused.  And when

9    I say "individuals," again, I mean you or some member of your

10   immediate family, someone that you have lived with.  I know it

11   applies to Ms. Decker and maybe some other people, so I will

12   see anybody to whom it applies up at the sidebar.

13

14   (SIDEBAR CONFERENCE AS FOLLOWS):

15                    (Juror approached sidebar)

16        THE COURT:  Ms. Swartwood.

17        THE JUROR:  My only connection was that my former

18   husband was a federal judge, now retired.  So, that would be my

19   connection.

20        THE COURT:  Is that going to affect your judgment in

21   any way in this case?  Is it going to interfere?

22        THE JUROR:  I don't think so, but I think it's fair to

23   put it out there.

24        THE COURT:  Oh, no.  It is exactly what I am asking

25   people to tell us about.

1          The only issue I would have is this, and an attenuated

2     one, but it is whether or not in the course of discussions with

3     your husband you would have developed some knowledge about

4     legal principles that you would apply here, even if I

5     instructed you otherwise.

6          THE JUROR:  I don't know.

7          THE COURT:  Well, let me put it differently.  If you

8     hear me instruct on the law and it is different from what you

9     might have developed in the course of a discussion with your

10    husband, are you going to be prepared to follow what I tell you

11    is the law in this case?

12         THE JUROR:  Oh, of course.

13         THE COURT:  Any question about that?

14         THE JUROR:  No.

15         THE COURT:  Do you have any question about your

16    ability to be fair and impartial here?

17         THE JUROR:  No, I don't.

18         THE COURT:  That is all we can ask for.  Thank you.

19         THE JUROR:  All right.

20                    (Juror left sidebar)

21               (Next juror approached sidebar)

22         THE JUROR:  Hello.

23         THE COURT:  Can you tell us your name again for the

24    record.

25         THE JUROR:  Jennifer Smulligan.

1          THE COURT:  Ms. Smulligan, you are Juror No. 26, just

2     for the lawyers' purposes.  What brought you up here?

3          THE JUROR:  I was hit by a car driven by a drunk

4     driver when I was in eighth grade and was part of the court

5     proceedings of that and identifying the driver and testifying

6     against her.

7          THE COURT:  Is that going to affect your judgment

8     here?

9          THE JUROR:  No, sir.

10         THE COURT:  Do you think you can lean toward one side

11    or the other?

12         THE JUROR:  No.

13         THE COURT:  What happened to the driver, do you know?

14         THE JUROR:  She got away with it.

15         THE COURT:  Because you phrased it that way, I think I

16    am obligated to follow up a little bit on it.  Sometimes people

17    say a phrase like "They got away with it," when what they mean

18    is that the Government did not prove its case beyond a

19    reasonable doubt.

20         THE JUROR:  Correct.

21         THE COURT:  Do you understand the difference between

22    those principles?

23         THE JUROR:  Yes.

24         THE COURT:  And that it is the obligation of the

25    Government to meet that burden?

1              THE JUROR:  Yes.

2              THE COURT:  Do you have any question or any concern

3      about your ability to apply that principle?

4              THE JUROR:  No.

5              THE COURT:  Because you used the phrase "got away with

6      it," do you think you would be leaning toward the Government

7      under these circumstances of this case?

8              THE JUROR:  I don't think I would be leaning one way

9      or the other.

10             THE COURT:  Do you think you can be fair and

11     impartial?

12             THE JUROR:  Yes.

13             THE COURT:  That is all we can ask for.  Thank you.

14                          (Juror left sidebar)

15                     (Next juror approached sidebar)

16             THE JUROR:  Hi.

17             THE COURT:  Ms. Decker, you caused a rush on the

18     Court.

19             THE JUROR:  Sorry.  Guilty.

20             Two issues, I believe, that might be relevant.  I was

21     military police eons ago.  I don't think it will affect my

22     judgment, but I want to make it clear that it had occurred.

23             THE COURT:  Where did you serve?

24             THE JUROR:  I served in Germany for most of my tour.

25             THE COURT:  When you say "eons ago," you mean five

```
 1    years ago?

 2            THE JUROR:  No, no, no.  We're talking 20 years ago,

 3    late '80s.

 4            THE COURT:  How long did you serve?

 5            THE JUROR:  Just three years.

 6            THE COURT:  Did you stay in law enforcement at all

 7    after that?

 8            THE JUROR:  No.  I'm an accountant.

 9            THE COURT:  You raised it, so I have to ask, you

10    pretty much answered the question, too, which is, do you think

11    it is going to interfere with your ability to be fair and

12    impartial here?

13            THE JUROR:  I don't think it will.

14            THE COURT:  Do you think you will be able to decide

15    this case solely on the basis of the evidence presented and not

16    lean toward one side or the other?

17            THE JUROR:  Yes, I believe I can.

18            THE COURT:  That is number one.

19            THE JUROR:  Number two, my son was arrested and

20    accused of larceny.

21            THE COURT:  How long ago was that?

22            THE JUROR:  Four years, five years.

23            THE COURT:  You understand I am not asking this

24    question to find out personal matters --

25            THE JUROR:  No.
```

```
1              THE COURT:  -- but to develop the information for the

2      lawyers.

3              THE JUROR:  But point of interest.

4              THE COURT:  What happened?

5              THE JUROR:  He was guilty.  I made him stand up and

6      take accountability for that.

7              THE COURT:  Did he plead guilty?

8              THE JUROR:  Continued without a finding.

9              THE COURT:  Where is he now?  Time passed?

10             THE JUROR:  Time passed, and he's fine.  He came out

11     of it on the other side, and now he is a law-abiding citizen.

12             THE COURT:  Now, is that going to affect your judgment

13     here?

14             THE JUROR:  No.

15             THE COURT:  You are not going to lean toward one side

16     or the other?

17             THE JUROR:  No.

18             THE COURT:  Thank you very much.

19             THE JUROR:  Thank you.  May I go home now?

20             THE COURT:  You can go back to your seat.

21             THE JUROR:  Darn.

22                             (Laughter)

23                         (Juror left sidebar)

24                     (Next juror approached sidebar)

25             THE COURT:  And it is Mr?
```

1          THE JUROR:  Bunimovich.

2          THE COURT:  One thing I should bring up, too, is that

3    I believe you know my law clerk, Ms. Gelfman.

4          THE JUROR:  Correct, yes.

5          THE COURT:  And you are going to be having lunch next

6    Saturday?

7          THE JUROR:  That's true.

8          THE COURT:  But you are not going to discuss this case

9    in any way; is that right?

10         THE JUROR:  Right.

11         THE COURT:  But the lawyers should be aware of that.

12   I do not think it is a disqualification, but you understand you

13   are not going to be discussing this case with anybody,

14   including my law clerk?

15         THE JUROR:  Yes.

16         THE COURT:  Go ahead.

17         THE JUROR:  I was involved in an incident a few months

18   back that's making its way through the court system now.

19         THE COURT:  What was the incident?

20         THE JUROR:  A cyclist attacked the vehicle that my

21   wife and I were in with a bike lock in our garage and basically

22   tried to break through the glass and attack us.  He also

23   assaulted the doorman of the building who came to assist us.

24         THE COURT:  Was this kind of bike rage?

25         THE JUROR:  Yeah, that's my understanding.

1          THE COURT:  And you say it is working its way through

2     the system.  What do you understand is happening?

3          THE JUROR:  I have gotten some communication from the

4     District Attorney's Office.  I don't think it has gone to trial

5     yet, but there have been a number of hearings.

6          THE COURT:  The individual has been charged?

7          THE JUROR:  Correct, yeah.  He's been charged with

8     Assault and I think Malicious Damage to a Motor Vehicle.

9          THE COURT:  Now, you are in the middle of what is a

10    criminal case.  Is that going to affect your judgment in this

11    criminal case?

12         THE JUROR:  I'm not sure.

13         THE COURT:  Why do you pause when you answer that?

14         THE JUROR:  I mean, I think certainly the experience

15    for me was somewhat frightening, and I don't know if that will

16    -- so, it might bias me a little bit toward victims of other

17    crimes.

18         THE COURT:  Even if the other crime was not something

19    involving some act of violence?

20         THE JUROR:  I'm not sure.  It's difficult for me to

21    say at this point.

22         THE COURT:  It frequently is for people.  I think this

23    is probably not the case for you to be sitting on.  What I am

24    going to do is excuse you from this case.  You should take your

25    card, go down to the jury room, and you will get further

1    instructions about other cases.

2              THE JUROR:  All right.  Thank you.

3                    (Juror left sidebar)

4         MR. SHEKETOFF:  What Juror No. was that?

5         MR. GARLAND:  18.

6         THE COURT:  18, yes.

7                 (Next juror approached sidebar)

8         THE COURT:  Ms. Babineau?

9         THE JUROR:  Yes.

10        THE COURT:  And Ms. Babineau is Juror No. 10.

11        THE JUROR:  Yes.  You said have you ever been accused

12   of something.  I have something that is coming up.  I work for

13   a fitness company, and there is a trial that's coming up.  I

14   had a girl that, she got injured during one of my classes, so

15   it's like a pending thing.

16             THE COURT:  And this isn't a criminal matter, this is

17   a civil case?

18             THE JUROR:  I don't know yet.  I have been talking to,

19   like, the lawyers of companies.  She's suing the company, and

20   ultimately it's going to be going up to me, too.

21             THE COURT:  As a result of your involvement in some

22   incident?

23             THE JUROR:  Yeah.

24             THE COURT:  Is that going to affect your judgment

25   here?

1          THE JUROR:  No.

2          THE COURT:  It's important for you to tell us, but you

3    don't get off just telling us; you've got to answer more

4    questions.

5          THE JUROR:  Sorry.

6          THE COURT:  So, the question really for me is whether

7    or not being tied up in the legal system, more broadly, as a

8    result of some accusation against you is going to affect your

9    judgment here, that you are going to lean toward one side or

10   the other.

11         THE JUROR:  No.

12         THE COURT:  Do you think you can be fair and impartial

13   here?

14         THE JUROR:  Yeah, if I heard the evidence, all that

15   stuff.

16         THE COURT:  All right.  Well, that is the issue.  I am

17   going to keep saying this.  You will hear it over and over

18   again, as everybody else will.  You have got to decide this

19   case solely on the basis of the evidence that is presented

20   here, not something that is lurking around in the back of your

21   mind, and in accordance with the law as I give you that law.

22   Do you think you can do that?

23         THE JUROR:  Mm-hmm.

24         THE COURT:  Any question in your mind?

25         THE JUROR:  No.

```
1                THE COURT:  Fine.  Thank you.

2                THE JUROR:  Thank you.

3                        (Juror left sidebar)

4                     (Next juror approached sidebar)

5                THE JUROR:  Good morning.

6                THE COURT:  Good morning.  Could you tell us your name

7     again?

8                THE JUROR:  Sure.  Steve Herschlag.

9                THE COURT:  Mr. Herschlag is Juror No. 5.

10               THE JUROR:  Yes.  About four years ago I was called as

11    a witness in a jury trial concerning real estate transactions,

12    and I testified for about half the morning, and one of the

13    people that I did have to testify against four years ago, we're

14    now friends and actually works for me.

15               THE COURT:  Was this a civil case of some sort?  When

16    you say "real estate transaction," was it a criminal case or a

17    civil case?

18               THE JUROR:  It was actually civil.

19               THE COURT:  And did anything about that give you

20    pause, or does anything about that give you pause about your

21    ability to be fair and impartial here?

22               THE JUROR:  Not at all.

23               THE COURT:  Do you think you can do that?

24               THE JUROR:  Yeah.

25               THE COURT:  That is all we can ask for.  Thank you.
```

1                    (Juror left sidebar)

2                 (Next juror approached sidebar)

3          THE COURT:  Is it Mr. Prenovitz?

4          THE JUROR:  Yes.

5          THE COURT:  Juror No. 35.

6          THE JUROR:  I was convicted of Disorderly Conduct in

7    1973.

8          THE COURT:  What were the circumstances?

9          THE JUROR:  It was a protest.

10          THE COURT:  Now, what was the consequence that you --

11          THE JUROR:  It was like a $50 fine.

12          THE COURT:  Where was it?

13          THE JUROR:  Binghamton, New York.

14          THE COURT:  At the university there?

15          THE JUROR:  Yes.

16          THE COURT:  The reason I ask this question,

17    interesting as it is, is not to find out about people's

18    background.  I do not ask it to do that, but really to see

19    whether or not that is going to interfere with your ability to

20    be fair and impartial here.

21          THE JUROR:  No.

22          THE COURT:  Do you bear any animus toward prosecution

23    for prosecuting you?

24          THE JUROR:  No.

25          THE COURT:  Do you think you can decide this case

```
1    solely on the basis of the evidence presented here --

2              THE JUROR:  Mm-hmm.

3              THE COURT:  -- and in light of the law I give you?

4              THE JUROR:  Yes.

5              THE COURT:  That is all we can ask for.  Thank you.

6                        (Juror left sidebar)

7                    (Next juror approached sidebar)

8              THE JUROR:  Hi.

9              THE COURT:  This is Mr. Goguen?

10             THE JUROR:  Goguen, yeah.

11             THE COURT:  Juror No. 1.

12             THE JUROR:  I don't know if this has any bearing at

13   all.  My youngest son was 15 or 16 and was arrested for

14   possession of marijuana.  He pleaded guilty.  When my oldest

15   son was in his early 20s he was charged with Resisting Arrest,

16   was found guilty.  And I was involved with my brother when he

17   was going through a divorce.  He was charged with some sort of

18   domestic abuse thing and he was found not guilty, but I went to

19   court with him.

20             THE COURT:  How long ago were each of these incidents?

21   The boy who had the marijuana issue?

22             THE JUROR:  It was, like, 15 years ago.

23             THE COURT:  And what happened to him?  Was there any

24   consequence in the court system of incarceration?

25             THE JUROR:  I think because of his age, I can't
```

1    remember the term, but he was, like, put on probation.

2              THE COURT:  And that was discharged?

3              THE JUROR:  Fifteen years ago.

4              THE COURT:  And with respect to your other son, was he

5    in his late 20s?

6              THE JUROR:  Early 20s.

7              THE COURT:  And the Resisting Arrest?

8              THE JUROR:  I think he got put on probation and was

9    fined.

10             THE COURT:  How long ago was that?

11             THE JUROR:  10 or 12 years ago.

12             THE COURT:  With respect to the domestic abuse adjunct

13   to the divorce case, how long ago was that?

14             THE JUROR:  Maybe 10 years ago.

15             THE COURT:  In asking this, I am not trying to find

16   out about personal matters, but I am trying to determine or at

17   least help the parties think about determining whether or not

18   any of that is going to interfere with your ability to be fair

19   and impartial here.  Do you think it will?

20             THE JUROR:  Not at all.

21             THE COURT:  Do you think you can be fair and

22   impartial?

23             THE JUROR:  Absolutely.

24             THE COURT:  Do you think you would lean toward one

25   side or the other after having gone through one of these three

1    incidents?

2              THE JUROR:  No.

3              THE COURT:  Thank you very much.

4              THE JUROR:  Okay.

5                   (Juror left sidebar)

6                (Next juror approached sidebar)

7              THE COURT:  Can you tell us your name.

8              THE JUROR:  Good morning, your Honor.

9              THE COURT:  Can you tell us your name, again, for the

10   record.

11             THE JUROR:  Oh, I'm sorry.  Constance Hyder.

12             THE COURT:  And Ms. Hyder is Juror No. 34.

13             THE JUROR:  I don't know how far back you want.  As a

14   teacher, I testified in a case about a student who stabbed

15   another and subsequently died.  I was the teacher of the

16   accused who was found --

17             THE COURT:  Where was this?

18             THE JUROR:  In Sharon, Massachusetts, Sharon High

19   School, and it was in the late '80s.  That's why I thought I

20   should bring it up.

21             THE COURT:  Right.  And what happed to the other

22   youngster, the accused?

23             THE JUROR:  Initially he was being tried -- the

24   District Attorney was trying to try him as an adult and failed

25   to make the case for that, however, and he was tried as a

1    juvenile.  He was put on probation and there was a weekly --

2    the judge ordered an evaluation by a psychiatrist and

3    psychologist and a report to be given.

4            THE COURT:  Was he a student also at Sharon High

5    School?

6            THE JUROR:  He was the student who was accused of

7    this.

8            THE COURT:  Right.  But both were students?

9            THE JUROR:  Both were, yes.

10           THE COURT:  Did he return to the school?

11           THE JUROR:  Well, by the time the case came up, he had

12   already graduated or passed the age in which he had to be

13   educated.  I don't think this has any relevance to the case,

14   but I thought I had better share it.

15           THE COURT:  Right.

16           THE JUROR:  He was asked to go to the vocational

17   technical school.  They weren't able to handle him.  He was

18   subsequently sent back to our high school, and that's when the

19   situation --

20           THE COURT:  Incident took place?

21           THE JUROR:  -- took place.

22           THE COURT:  Did you observe the stabbing or not?

23           THE JUROR:  No, I did not.  A number of the teachers

24   were called upon, because when we were initially deposed, I had

25   said that in all the times that I was -- up until then for the

1    last 15 years before that, I had never been afraid of anyone,

2    any student, and I was in this case.

3              THE COURT:  Now, you began it by saying this is long

4    ago and far away.

5              THE JUROR:  Yeah, and I don't know whether that has --

6              THE COURT:  Well, the real issue is less for me to

7    answer than for you.  Do you think it is going to interfere

8    with your ability to be fair and impartial here?

9              THE JUROR:  I don't know, but I feel this has nothing

10   to do with that case.

11             I have to be honest.  I don't think I can be fair and

12   impartial in this case, because I'm not sure that the

13   Government would make a case if there was not enough evidence

14   to prove it, with the time and the money spent and taxes for

15   such a case, and I have to be honest with you.

16             THE COURT:  That is why we ask the question, why we

17   ask a question that broadly elicits such a view otherwise, and

18   it is the conundrum, which is, we have these standards, as I

19   have told you.  Do you think that that background view that you

20   have will interfere with your ability to follow my

21   instructions?

22             THE JUROR:  The background of that initial case?

23             THE COURT:  Yes.

24             THE JUROR:  No.

25             THE COURT:  No, no, not the initial case.  The idea

1    that you have that nothing like this would happen if --

2           THE JUROR:  Well, as an administrator, I have worked

3    in the court system as an assistant principal as far as

4    discipline, and I have gone to court with CHINS and those kinds

5    of situations.  There was a drug bust that I helped, and I've

6    worked closely with probation officers, so I know that in order

7    to go to the Court you need information and evidence enough to

8    do this.  So, that's why I'm saying this.

9           THE COURT:  I appreciate your candor.  I think I am

10   going to excuse you from this case.

11          THE JUROR:  Okay.

12          THE COURT:  What you should do is take the card and go

13   down to the jury room, and you will get further instructions

14   about other cases you might be called for.

15          THE JUROR:  All right.  Thank you.

16                       (Juror left sidebar)

17                  (Next juror approached sidebar)

18          THE JUROR:  My name's Daniel Fenton.

19          THE COURT:  And, Mr. Fenton, you are Juror No. 31.

20          THE JUROR:  Yes.  I have been charged with two DUIs.

21          THE COURT:  How long ago?

22          THE JUROR:  About 15, 20 years ago.

23          THE COURT:  What was the outcome of them?

24          THE JUROR:  Both guilty.

25          THE COURT:  And did you serve any time?

1          THE JUROR:  Yes.  I did seven days up in Portsmouth,

2     New Hampshire.

3          THE COURT:  That was for one?

4          THE JUROR:  That was for the second one.

5          THE COURT:  The first one was not --

6          THE JUROR:  No.  Just a fine.

7          THE COURT:  Let me ask you this:  Is that going to

8     affect your judgment in this case?  Are you going to lean

9     toward one side or the other?

10         THE JUROR:  See, I have a hard time hearing, and I'm

11    dyslexic, so I have a hard time comprehending things, too.

12         THE COURT:  That is a separate question that we will

13    get to.

14         THE JUROR:  Yes.

15         THE COURT:  But do you think that experience is going

16    to interfere with your ability?

17         THE JUROR:  I don't really know.  That's a hard

18    question.

19         THE COURT:  I will tell you what, I think I will

20    excuse you from this case.  Take your card and go down to the

21    jury room down on the second floor, and you will get further

22    instructions about other cases.

23         THE JUROR:  Thank you.

24         THE COURT:  Thank you.

25                    (Juror left sidebar)

1                      (Next juror approached sidebar)

2               THE JUROR:  Hi.

3               THE COURT:  Can you tell us your name again for the

4     record.

5               THE JUROR:  Yes.  Timothy Valade.

6               MR. GARLAND:  27, I think.

7               THE COURT:  He is Juror No. 27, yes.

8               THE JUROR:  I live in Attleboro, I grew up in North

9     Attleborough, and three or four of the names that you spoke out

10    are people from Attleboro and North Attleborough, and I know

11    the names, because where I work at Lowe's I wait on a lot of

12    people.

13              THE COURT:  Well, let me ask you that.  I asked the

14    question to see if somebody knows somebody.

15              THE JUROR:  But as soon as I see them by facial I will

16    probably know them from the town.

17              THE COURT:  But is that going to affect your judgment

18    in this case?

19              THE JUROR:  I'm not saying it's going to affect my

20    judgment, but I wouldn't want one of them to say, "I know that

21    juror."

22              THE COURT:  Would you feel uncomfortable sitting on a

23    case in which those people came up?

24              THE JUROR:  Mm-hmm.

25              THE COURT:  I am going to excuse you from this case.

1    You will take the card from Mr. Lovett there, and go back to

2    the jury room and you will get further instructions about other

3    cases.

4              THE JUROR:  Thank you.

5              THE COURT:  Thank you.

6                        (Juror left sidebar)

7                  (Next juror approached sidebar)

8              THE JUROR:  Your Honor, you asked if --

9              THE COURT:  I do not think you introduced yourself yet

10   as a juror.

11             THE JUROR:  Vincent Daily, D-A-I-L-Y.

12             THE COURT:  But you were not one of the people who

13   stood up --

14             THE JUROR:  I'm sorry.

15             THE COURT:  -- who introduced yourself.

16             THE JUROR:  Forget it.

17             THE COURT:  I will keep you in mind, however.

18                        (Laughter)

19                  (Next juror approached sidebar)

20             THE COURT:  Can you tell us your name.

21             THE JUROR:  Steven Prescott, P-R-E-S-C-O-T-T.

22             THE COURT:  Mr. Prescott, did you introduce yourself

23   as one of the jurors?

24             THE JUROR:  No, I haven't.

25             THE COURT:  So, we are going to wait for the folks who

1    have not yet introduced themselves until they do, until they

2    are called.

3              THE JUROR:  It's very, very minor.  My son was

4    involved in a court case, that's all.

5              THE COURT:  Well, we will probably take it up if you

6    are called.

7              THE JUROR:  Okay.

8              THE COURT:  Thank you.

9                        (Juror left sidebar)

10                    (Next juror approached sidebar)

11             THE JUROR:  Gerald Inserra, I-N-S-E-R-R-A.

12             THE COURT:  Mr. Inserra, did you introduce yourself as

13   one of the jurors?  Did you end up standing up?

14             THE JUROR:  No, not yet.

15             THE COURT:  We are going to wait to hear from people

16   who have not yet introduced themselves until they, in fact, do.

17             THE JUROR:  Okay.

18             THE COURT:  Thank you.

19                        (Juror left sidebar)

20             THE COURT:  Let me ask another question, which is the

21   timing question now.  Given the schedule that I have outlined,

22   which is, you get today and tomorrow full days and then the

23   three days this week and, obviously, two days next week -- I do

24   not think I am going to sit on Thursday and Friday of next

25   week, I just think it is inviting trouble or long lines; we may

1    have long lines anyway, but not about that -- what is your

2    current estimate?

3        MR. GARLAND:  I think that we can do this case before

4    the July 4th holiday.

5        THE COURT:  What does that mean?

6        MR. GARLAND:  Our hope is to be able to do it by the

7    end of the week.  We just do not know what the cross is going

8    to be like.

9        THE COURT:  Do you think that is realistic?

10        MR. SHEKETOFF:  I do.  I still think we should be

11    conservative, your Honor.

12        THE COURT:  I will be conservative.  But I think I am

13    going to tell them that my expectation is it will be completed

14    before the July 4th holiday, but if it is not we will go into

15    the week after that, just so we have that.

16        MR. GARLAND:  Thank you, your Honor.

17    (END OF SIDEBAR CONFERENCE)

18

19        THE CLERK:  Zaira Loura, Juror No. 37, please come

20    forward and take seat number 18 in the front row of the jury

21    box.

22        Thomas Levangie, that is Juror No. 38, will you please

23    come forward and please take seat number 27 in the front row of

24    the spectator section.

25        Karen Hills, that is Juror No. 39, will you please

```
 1    come forward and take seat number 31 in the front row of the
 2    spectator section.
 3               Mary Ellen Dugan, that is Juror No. 40, will you
 4    please come forward and take seat number 34 in the front row of
 5    the spectator section.
 6               THE COURT:  So, Ms. Loura, we will start with you.  If
 7    you could introduce yourself.
 8               THE JUROR:  Zaira Loura, L-O-U-R-A.  I'm unemployed,
 9    and my husband works at Rinchem as a driver.  I am unemployed
10    right now.
11               THE COURT:  Did you tell us the town you live in?
12               THE JUROR:  Hudson.
13               THE COURT:  Okay.  Thank you.
14               And Mr. Levangie.
15               THE JUROR:  Thomas Levangie, L-E-V-A-N-G-I-E.  I'm a
16    self-employed construction estimator from Randolph, Mass.  My
17    wife, Cheryl, is a systems business analyst for Sun Life
18    Financial.
19               THE COURT:  Thank you, Mr. Levangie.
20               THE JUROR:  And my answer is yes to a previous
21    question.
22               THE COURT:  Good.  Well, you may be first in line if
23    someone does not get in front of you.
24                              (Laughter)
25               THE COURT:  Ms. Hills.
```

1              THE JUROR:  I'm Karen Hills, H-I-L-L-S.  I am

2     Executive Assistant to a Vice President at Raytheon Company in

3     Andover, and I live in Bradford.

4              THE COURT:  Thank you, Ms. Hills.

5              And Ms. Dugan.

6              THE JUROR:  Mary Ellen Dugan, D-U-G-A-N.  I'm a

7     pediatrician.  I live in Hopkinton, and my husband is a retired

8     engineer.

9              THE COURT:  So, for the four of you who have just

10    introduced yourselves, I know Mr. Levangie, one of the

11    questions applies to him.  Do any of the questions I have asked

12    so far apply to any of you?

13             So, Mr. Levangie, I will see you.

14

15    (SIDEBAR CONFERENCE AS FOLLOWS):

16             THE JUROR:  You asked if I had been arrested.  I have

17    been arrested back when I was 18 for B&E.  It was a suspended

18    sentence, a sealed record.

19             My grandfather was a Chief of Police, my aunts and

20    uncles were all in or have been in the police departments.

21             The other thing is there was a case not too long ago

22    that it was something to do with computers, and it was a

23    brother of somebody that I palled around with, and I don't know

24    if that's related to this case.

25             THE COURT:  Do you know what the last name was?

1             THE JUROR:  Cooney, C-O-O-N-E-Y.

2             THE COURT:  And do you know exactly --

3             THE JUROR:  It was something to do with computers.  It

4     sounds similar to this, but I don't know if it's related.

5             THE COURT:  So, let me unpack that a bit.  You have

6     had a conviction for Breaking and Entering some time ago.

7             THE JUROR:  Correct.

8             THE COURT:  Did you serve any time?

9             THE JUROR:  No.  It was a suspended sentence.

10            THE COURT:  Was that 20 years ago?

11            THE JUROR:  Let's see.  I was 18, so that was 30, 35

12    years ago.

13            THE COURT:  See, I underestimate.  At my age I

14    underestimate how long ago things really are.

15                        (Laughter)

16            THE COURT:  But, in any event, is that going to impact

17    you here?

18            THE JUROR:  No.

19            THE COURT:  You come from a law enforcement

20    background, at least family members.  Did any of your family

21    live in your household when they were in law enforcement?

22            THE JUROR:  No.

23            THE COURT:  Is that going to affect your judgment?

24            THE JUROR:  No.

25            THE COURT:  Are you going to lean toward one side or

1    the other because of that?

2            THE JUROR:  No.

3            THE COURT:  The computer case.  Do you talk to this

4    other person?

5            THE JUROR:  No.  I haven't talked to -- no.  I haven't

6    seen them in years, but he lived down the street, and I just

7    didn't know if that would impact things.

8            THE COURT:  It only impacts it if it does impact you,

9    that is to say, if you are going to bring some background

10   information or how it is going to influence your judgment.

11           THE JUROR:  I don't know the specifics of that case or

12   anything.

13           THE COURT:  Do you think you can decide this case

14   based on the evidence presented here --

15           THE JUROR:  Yes.

16           THE COURT:  -- and in light of the law I give you?

17           THE JUROR:  The other thing is I am self-employed, I'm

18   not making any money, and I don't know if that has an impact,

19   either.

20           THE COURT:  It may, but I will give an instruction

21   about how generous I am going to be about excuses.

22           THE JUROR:  Okay.

23           THE COURT:  But that is a later question.

24           THE JUROR:  All right.  Great.  Thank you.

25           THE COURT:  Thank you.

```
 1                    (Juror left sidebar)
 2                 (Next juror approached sidebar)
 3          THE JUROR:  Hi.  Karen Hills, H-I-L-L-S.
 4          THE COURT:  Right.
 5          THE JUROR:  This isn't an excuse, it's just my Vice
 6   President works with some VPs at Dell and Hewlett-Packard, so I
 7   don't know if that has any --
 8          THE COURT:  What does he do?
 9          THE JUROR:  He is the Executive Vice President of a
10   supply chain.
11          THE COURT:  So, he is involved in procurement?
12          THE JUROR:  Yes.
13          THE COURT:  Does he ever get himself involved in
14   warranty programs?
15          THE JUROR:  He is involved in a little bit of
16   everything, basically.
17          THE COURT:  I think I am going to excuse you from this
18   case.
19          THE JUROR:  Okay.
20          THE COURT:  It just may touch on things --
21          THE JUROR:  Okay, okay.
22          THE COURT:  -- that involve your work.
23          THE JUROR:  Sure.
24          THE COURT:  You should take your card, go back to the
25   jury room, and you will get further instructions.
```

1        THE JUROR:  Second floor, okay.  Okay.  Thank you.

2        THE COURT:  Thank you very much.

3        THE JUROR:  Thanks.

4                    (Juror left sidebar)

5        THE COURT:  I am going to ask a general kind of fraud

6   in procurement question, and that is going to be the end of the

7   substance of the case.  Is there anything else -- and then, of

8   course, I am going to do kind of capacity sorts of things and

9   scheduling sorts of things.  Is there anything else that you

10  want me to tease out here?

11       MR. SHEKETOFF:  No, your Honor.

12       THE COURT:  All right.

13       MR. GARLAND:  Nothing.

14       MS. BURKART:  No, thank you.

15  (END OF SIDEBAR CONFERENCE)

16

17       THE CLERK:  Linda Ford, that is Juror No. 41, will you

18  please come forward and take seat number 31 in the front row of

19  the spectator section.

20       THE COURT:  Ms. Ford, could you introduce yourself.

21       THE JUROR:  Sure.  Linda Ford, F-O-R-D.  I manage a

22  woman's personal training gym.  I live in Middleton, and my

23  husband is a police officer for the Revere Police Department,

24  and he handles the computers there also.

25       THE COURT:  We are going to see you at the sidebar.

1    Come on up.

2                              (Laughter)

3

4    (SIDEBAR CONFERENCE AS FOLLOWS):

5                         (Juror approached sidebar)

6          THE COURT:  I identify the police officer stuff and

7    touching on the computers, but let me just ask a broader

8    question.  Do you think either one of those things is going to

9    interfere with your ability to be fair and impartial here?

10         THE JUROR:  A little bit, and also I had another

11   instance.  My head trainer, in his apartment he was getting

12   hacked into a system, and he actually turned to my husband and

13   there was really no recourse, and he actually had to move out

14   of his apartment to get help, and I feel like that's the issue,

15   that a lot of these hackers and all of that, and my husband is

16   very friendly with computer companies, and so -- I mean, he had

17   to move out and he had no place to go.

18         THE COURT:  I do not think this is quite that kind of

19   case, but I hear what you are saying.  I think I am going to

20   excuse you from this case.

21         THE JUROR:  All right.

22         THE COURT:  You should take the card and go down to

23   the jury room --

24         THE JUROR:  Thank you.

25         THE COURT:  -- and you will get other instructions

1    about other cases.

2            THE JUROR:  Thank you.

3    (END OF SIDEBAR CONFERENCE)

4

5            THE CLERK:  Maureen Mitchell, that is Juror No. 42,

6    will you please come forward and take seat number 31 in the

7    front row spectator section.

8            THE JUROR:  Good morning.  I am Maureen

9    M-I-T-C-H-E-L-L.  I am a retired elementary school teacher.  I

10   live in Methuen, and my husband is a retired high school

11   teacher.

12           THE COURT:  And, Ms. Mitchell, do any of the questions

13   I have asked so far apply to you?

14           THE JUROR:  No.

15           THE COURT:  Let me put this in the broadest possible

16   setting.  The case is, as I understand it, about computers and

17   return of computers and the warranty programs for computers and

18   that sort of thing, but it raises broader issues by analogy to

19   any kind of allegations of fraud in connection with the return

20   of equipment and when there is no right to return it, as the

21   Government suggests here, and taking advantage of warranty

22   programs to obtain, under false pretenses, economic benefits.

23           One of the things that I am sure the lawyers are

24   concerned about, and I am, of course, too, is whether any of

25   you yourselves or any members of your immediate family have

1    been touched by schemes like that, like what is alleged by the

2    Government here, in other contexts.  And when I say "touched by

3    it," I mean not that you have been accused of it, that is only

4    one part, but whether or not your business has been affected by

5    something like that or you have been concerned about that

6    happening to you personally or some entity that you have been

7    involved in; in short, whether or not you have been involved in

8    and concerned with circumstances in which the allegations are

9    that there has been some effort to defraud through the use of

10   replacement parts or warranties for any kind of goods.

11          Does that apply to any of the jurors who have

12   identified themselves so far?  And I see no response to that.

13          Let me get to more specific questions.  The parties

14   are entitled to a fair trial, and a "fair trial" means that the

15   individuals who are sitting in judgment are able, under the

16   schedule that we sit on, to decide this case without being

17   distracted and have the capacity to decide this case.  When I

18   say "capacity," I mean that no juror is suffering from some

19   sort of physical problem or emotional problem or limitation in

20   their ability to comprehend the English language as it might

21   apply to this case.  The schedule for the first two days, that

22   is, today and tomorrow, will be that we will sit from 9:00 to

23   1:00 and then 2:00 to 4:00, and we provide lunch.  Then, the

24   last couple of days will be from 9:00 to 1:00, and in each case

25   there is a break in between during the morning and the

1    afternoon.

2          I will get to the larger issue of schedule in a moment

3    but I am really concerned now with physical capacity or

4    emotional capacity to sit on a schedule like that.  Some people

5    have physical problems that make it difficult for them to

6    remain concentrated for a period of time or have other issues

7    that they confront.  So, I need to know whether any of you

8    suffer from -- I use "suffer" -- but are subject to any kind of

9    physical problem, emotional problem, psychological problem or

10   any concern about your capacity to process the information that

11   is necessary to make an informed judgment in this case.

12         I see a couple of responses to that, and so I will see

13   those folks at the sidebar.

14

15   (SIDEBAR CONFERENCE AS FOLLOWS):

16                      (Juror approached sidebar)

17         THE COURT:  Can you tell us your name again for the

18   record.

19         THE JUROR:  Michael Lindo.

20         THE COURT:  And Mr. Lindo is Juror No. 29.

21         THE JUROR:  I suffer from spinal cerebellar ataxia.

22   It's a part of the brain which controls the nervous system, and

23   it's shrinking.  That's why when I walk I look like I'm drunk.

24         THE COURT:  Right.

25         THE JUROR:  But also my work schedule.  I gave my two

1    weeks' notice, like, two weeks ago and because of my back and

2    everything --

3              THE COURT:  Let me ask you this.  Do you think you are

4    physically unable to sit for an extended period of time?

5              THE JUROR:  Well, if I sit for a long period of time,

6    it's when I get up, that it's tough for me to get up.

7              THE COURT:  What have you been doing for a living for

8    the past seven years?

9              THE JUROR:  I've been substitute teaching and recently

10   I was at Planet Fitness overnight, and I can't do it anymore.

11             THE COURT:  Well, I think I am going to excuse you

12   from being a juror in this case.  What I think you should do,

13   however -- I am going to tell Mr. Lovett to have you called

14   back six months from now.  You should bring along a doctor's

15   certificate that explains what the circumstances are more

16   fully, but I am going to excuse you from this case.

17             THE JUROR:  Okay.  Thank you.

18             THE COURT:  Thank you.

19                      (Juror left sidebar)

20                  (Next juror approached sidebar)

21             THE COURT:  Ms. Babineau.

22             THE JUROR:  I am currently seeking treatment for -- I

23   am seeing a doctor, therapists because I have an eating

24   disorder and I am currently seeking therapy with a therapist

25   and psychologist and just working on that.  So, I don't know.

1    I do have appointments next week, and I am going to meet with

2    them on a weekly basis.

3              THE COURT:  When are your appointments, generally?

4              THE JUROR:  It's, like, in the afternoons.

5              THE COURT:  When is the next one?

6              THE JUROR:  This Wednesday.

7              THE COURT:  We will not be sitting in the afternoon

8    this Wednesday.

9              THE JUROR:  Okay.

10             THE COURT:  I am not sure I see that as an issue,

11   unless you do.

12             THE JUROR:  Okay.

13             THE COURT:  Do you think that is interfering with your

14   ability to process information or make judgments?

15             THE JUROR:  No.  I just didn't know, because I just

16   don't want that to interfere with that.

17             THE COURT:  No, it will not this Wednesday, and it

18   will be enough time if we go beyond that to deal with it.

19             THE JUROR:  Okay.

20             THE COURT:  Thank you.

21                   (Juror left sidebar)

22                 (Next juror approached sidebar)

23             THE COURT:  And it is Ms. Loura.

24             THE JUROR:  I just get so nervous that I don't think I

25   will be able to even concentrate.  Like, I'm shaking right now.

1          THE COURT:  What do you do for living or have you done

2     for a living?

3          THE JUROR:  I'm a hairdresser, but right now I took

4     some time off to take care of my mother.  My mother is sick, so

5     I took time off to take care of her.  So, I have been so

6     nervous about that.

7          THE COURT:  Has that interfered in the past with your

8     ability?

9          THE JUROR:  I won't be able to even concentrate on --

10    I don't even know any terms of --

11         THE COURT:  Well, it is the responsibility of the

12    lawyers to teach you.

13         THE JUROR:  Right.  I can't concentrate.

14         THE COURT:  I guess my view is that I do not see that

15    as a disqualification here.

16         THE JUROR:  No?  Okay.  Because I've even lost, like,

17    ten pounds since I've been summonsed here.

18         THE COURT:  I think I am not going to excuse you --

19         THE JUROR:  No?  Okay.

20         THE COURT:  -- in the absence of some doctor's report.

21         THE JUROR:  My elderly mother, I have to get other

22    people to take care of her also.

23         THE COURT:  Right.

24         THE JUROR:  Okay.

25         THE COURT:  Thank you.

```
 1                      (Juror left sidebar)

 2                   (Next juror approached sidebar)

 3          THE JUROR:  My name is Dara Carvalho.

 4          THE COURT:  Ms. Carvalho is Juror No. 8.

 5          THE JUROR:  Your Honor, my English is -- I have a hard

 6  time to understand.

 7          THE COURT:  What do you do for a living?  Remind me.

 8          THE JUROR:  Oh, I used to work at a jewelry company,

 9  and then they shut down and I am not working right now.  I'm

10  unemployed.

11          THE COURT:  When you say worked at a jewelry company,

12  is it a costume jewelry place in the North Attleborough area?

13          THE JUROR:  Yeah, North Attleborough.

14          THE COURT:  I think I am going to excuse you from this

15  case.

16          THE JUROR:  Okay.

17          THE COURT:  You should take your card and go down to

18  the jury room, and you will get further instructions about

19  other cases.

20          THE JUROR:  Okay.  Thank you.

21          THE COURT:  But take the card and go down to the

22  second floor.

23          THE JUROR:  Okay.  Thank you.

24                      (Juror left sidebar)

25                   (Next juror approached sidebar)
```

1          THE COURT:  Can you tell us your name again.

2          THE JUROR:  Katrice Farris.

3          THE COURT:  Ms. Farris is Juror No. 6.

4          THE JUROR:  One of my friends just passed away, and my

5    attention span hasn't been that good, but a few months before

6    he passed away he was accused of stealing thousands of dollars

7    in electronics and cash and selling them, but it never got to,

8    like, trial because he passed away.  I am not sure if that

9    affects being on this jury.

10          THE COURT:  Well, I do not know.  When you say that he

11   was accused of stealing, was he working at a computer --

12          THE JUROR:  No, at an airport.

13          THE COURT:  At the airport?

14          THE JUROR:  Yes.

15          THE COURT:  Well, let me ask you, is that going to

16   affect your judgment in this case, that is the real issue,

17   either favor one side or the other as a result of this?

18          THE JUROR:  Probably, because it's one of my best

19   friends, so I will probably have a hard time.

20          THE COURT:  You are not saying that the Government

21   lawyers are your best friend, right?

22          THE JUROR:  No.

23          THE COURT:  Well, Mr. Kuc is not your best friend,

24   right?

25          THE JUROR:  No.

1          THE COURT:  So, we are talking about whether or not

2     that is going to spill over onto this case.

3          THE JUROR:  I'm not sure if I will have a hard time

4     separating it, because I haven't had to do that before, so I'm

5     not sure.

6          THE COURT:  Well, I will excuse you as a juror in this

7     case.  You are going to go down to the jury room.  You may get

8     instructions about other cases that you may have to serve on.

9          THE JUROR:  Thank you.

10               (Juror left sidebar)

11              (Next juror approached sidebar)

12          THE COURT:  Mr. Levangie, again.

13          THE JUROR:  Right, right.  I have atrial fibulation.

14     I was in the hospital about two weeks ago, Milton Hospital.  I

15     have been having tests, and I have had a stress test, and they

16     found some blips on it.  I'm going next Friday for a --

17          THE COURT:  The Friday after the holiday?

18          THE JUROR:  Correct, the 6th.  So, if this trial goes

19     that long, which hopefully it doesn't, that could be an issue

20     with me.

21          THE COURT:  In any event, we will not be sitting on

22     the 6th.

23          THE JUROR:  Okay, all right.

24          THE COURT:  Now, let me go to the atrial fib, though.

25     Is this something that you can feel coming on at any particular

1    time?

2              THE JUROR:  No.  I just had it for the first time in a

3    couple years, okay, and the doctor has said if I don't get to

4    the doctor, say, within 24 hours, then there's a problem.

5              THE COURT:  I do not see that as a problem.  We have a

6    nurse in the building and others who are capable of dealing

7    with cardiac matters.

8              THE JUROR:  Okay.  All right.

9              THE COURT:  So, it does not sound like we are going to

10   interfere with your schedule.

11             THE JUROR:  Okay.  All right.  Thanks.

12             THE COURT:  Thank you.

13                         (Juror left sidebar)

14                    (Next juror approached sidebar)

15             THE JUROR:  Hi.

16             THE COURT:  Can you tell us your name again for the

17   record.

18             THE JUROR:  Eugene Pettinelli, P-E-T-T-I-N-E-L-L-I.

19             THE COURT:  And you are Juror No. 13.

20             THE JUROR:  Hi.  I have a broken facial nerve which

21   makes it really hard for me to concentrate for a long period of

22   time.  I can do an hour or two, but I am just concerned that

23   I'm not at optimal.

24             THE COURT:  You are a teacher, right?

25             THE JUROR:  I am, right.

1    THE COURT:  So I am clear about this, we do take

2 breaks.  Generally we do not run longer than two hours.  Then

3 we have a break of 20 minutes and a snack and that kind of

4 thing.

5    THE JUROR:  Sure.

6    THE COURT:  Do you think that is going to be able to

7 deal with that issue?

8    THE JUROR:  This sort of happens randomly, and when it

9 happens I cannot focus for a minute or whatever.  It is hard.

10 I can probably do it, but I just --

11    THE COURT:  Let me ask you a different question, which

12 is, if you miss something, would you feel uncomfortable just

13 raising your hand and asking?

14    THE JUROR:  No, I can do that.

15    THE COURT:  For instance, jurors with back problems I

16 let stand up and that kind of thing.

17    THE JUROR:  Yeah, sure.

18    THE COURT:  If you think you have missed something,

19 then just raise your hand and we will go over it again.

20    THE JUROR:  Okay.

21    THE COURT:  And if you think breaks are not frequent

22 enough, we will deal with those as well.

23    THE JUROR:  Okay, sure.

24                    (Juror left sidebar)

25                  (Next juror approached sidebar)

1          THE JUROR:  Hi, your Honor.

2          THE COURT:  Can you tell us your name again.

3          THE JUROR:  Plankey, James.

4          THE COURT:  Mr. Plankey is Juror No. 30.

5          THE JUROR:  I have an enlarged prostate, and I have

6    trouble sitting for more than an hour and a half to two hours

7    without going to the bathroom.  I don't know whether the

8    schedule would --

9          THE COURT:  Well, we generally run -- we will start at

10   9:00 and take a break a little bit before 11:00.  That is the

11   general time period.  And I will add one other thing.

12         THE JUROR:  I have to go now.

13         THE COURT:  So, let me ask you -- I will ask you

14   another question, and then I will let you go.  Would you feel

15   uncomfortable simply raising your hand and indicating that you

16   would like to take a break earlier rather than --

17         THE JUROR:  No, as long as that is acceptable to the

18   Court.  I don't have any problem with that.

19         THE COURT:  It is fine with me, and if there is a

20   compelling reason, then you should.

21         Now, let me ask you another question, which is a

22   scheduling question, because I am going to let you leave the

23   room, and I am going to be asking this question of other

24   people.  We expect this case to be completed before the July

25   4th holiday.  In the event that it is not, we would not sit

1    until the following week.  That is, we would take the time, the

2    July 4th Wednesday, Thursday, Friday and weekend.  Is there

3    anything about that schedule that is going to interfere with

4    you?

5            THE JUROR:  Without making a long story, I am

6    unemployed and I am looking for a job, and I don't know what's

7    going to happen with that aspect of it.  But other than that,

8    no.  Obviously, I am unemployed.

9            THE COURT:  I think I probably would not excuse you on

10   that ground, simply because scheduling appointments can be done

11   in the afternoons on these other days.  In any event, we are

12   going into a time when people are distracted, in any event.

13           THE JUROR:  Okay.

14           THE COURT:  Now, the final question.  You may not be

15   here for the final question, so I will put it to you so at

16   least you can be thinking about it while you leave the room.  I

17   want you to put yourself in Mr. Kuc's shoes, or Mr. Garland's

18   shoes or Ms. Burkart's shoes.  You want a fair trial.  I have

19   asked a series of questions, but not a lot of them, and now we

20   are worried that we missed something.  So, is there anything

21   about your background, your training, your experience, anything

22   that if you were they you would want to know about before you

23   made your decision about picking a juror?  I am not going to

24   ask you to answer that yet.  Think about it.  But you should

25   feel free to take a break at this point.

1          THE JUROR:  Okay.  I may go to the restroom?

2          THE COURT:  Yes.

3          THE JUROR:  Thank you.

4     (END OF SIDEBAR CONFERENCE)

5

6          THE COURT:  Okay.  So, we will take a few more people.

7          THE CLERK:  Martin Nugent, that is Juror No. 43, will

8     you please come forward and take seat number 6 in the back row

9     of the jury box.

10         Annamaria Taudel, that is Juror No. 44, will you

11    please come forward and take seat number 8 in the back row of

12    the jury box.

13         Marc Baroni, that is Juror No. 45, will you please

14    come forward and take seat number 29 in the front row of the

15    spectator section.

16         THE COURT:  So, we will start with Mr. Nugent.

17         THE JUROR:  Martin Nugent, veterinarian, sole owner,

18    Woburn.  My partner is a lawyer.

19         THE COURT:  Thank you, Mr. Nugent.

20         And Ms. Taudel.

21         THE JUROR:  Annamaria Taudel, T-A-U-D-E-L,

22    kindergarten teacher, Swampscott.  My husband works at

23    Fabrizio, and he is a project manager.

24         THE COURT:  Thank you.

25         And Mr. Baroni.

1           THE JUROR:  Hi.  My name is Marc Baroni, B-A-R-O-N-I.

2    I am a photographer in the Boston area.  My spouse is a

3    self-employed attorney.

4           THE COURT:  Thank you.

5           So, the three of you, do any of the questions I have

6    asked so far apply to any of you?  I will see Mr. Nugent and

7    Ms. Taudel.

8

9    (SIDEBAR CONFERENCE AS FOLLOWS):

10          THE COURT:  Ms. Taudel.

11          THE JUROR:  Annmaria Taudel.  It's not an excuse,

12   except that my neighbors are Cooks, and I don't know if this

13   has anything to do with them.

14          THE COURT:  Remind me where.

15          THE JUROR:  Swampscott, and they both, the husband and

16   the son both have a computer businesses.

17          THE COURT:  Do you know how they spell their name?

18          THE JUROR:  C-O-O-K.

19          THE COURT:  Here the defendant's name is K-U-C.

20          THE JUROR:  Okay.  That's all.

21          THE COURT:  But is there any connection that the

22   parties are aware of with these families?

23          MS. BURKART:  Not that we are aware of.

24          THE COURT:  Thank you.

25                    (Juror left sidebar)

1              (Next juror approached sidebar)

2              THE JUROR:  From the standpoint of enduring the trial,

3      period, I have two reservations.  One was, medically I have a

4      bursitis in my right hip and peroneal neuropathy, so sitting

5      for that period of time might exacerbate those problems.

6              Secondly, I know this is a side issue.  I'm a sole

7      owner of a business which would be hurt by my presence here.

8              THE COURT:  Right.  I am going to ask that second

9      question as some other question, although I will forewarn you

10     that I am not generous with my excuses.

11             As to the medical issue, if you would feel more

12     comfortable if you stood up, you can feel free to stand up from

13     time to time.

14             THE JUROR:  Well, when I work I stand all day.  I

15     never sit.

16             THE COURT:  Would you feel uncomfortable doing that

17     here?

18             THE JUROR:  I could stand all day, yes.

19             THE COURT:  This is really a kind of personal, being

20     shy about it, kind of thing.  Would you feel comfortable

21     sitting in the jury box or standing in the jury box during the

22     course of the trial?

23             THE JUROR:  I would feel different.

24             THE COURT:  But would that affect you?

25             THE JUROR:  I have never done it before, so I don't

1    know.  It's hard to say.  But I stand all day, so I'm just

2    saying -- you're asking if I had any problems sitting.

3            THE COURT:  I am asking really a shyness question more

4    than anything else.

5            THE JUROR:  I see.  I am very shy, yes.

6            THE COURT:  About doing something like that?

7            THE JUROR:  I think it would make me feel, you know,

8    uncomfortable.

9            THE COURT:  Let me ask another question, the question

10   of schedule.  I generally, and I will here, give a kind of Boy

11   Scout speech about jury service and we want a fair

12   cross-section of the community.

13           THE JUROR:  I can't hear you.

14           THE COURT:  I give a Boy Scout speech about how we

15   want a fair cross-section of the community, and that includes

16   people who are self-employed and includes people with medical

17   backgrounds, and I assume that from time to time they have to

18   make rescheduling kinds of choices.  This case is likely to go

19   this week and maybe into next week and perhaps, but unlikely,

20   the following week.  Do you think you cannot do it?

21           THE JUROR:  Well, the difference for me is, I am the

22   only veterinarian.  It is true you can reschedule, but 50

23   percent of those appointments will have to go elsewhere because

24   they are not things that can be rescheduled, and my week is all

25   booked.  It's not like we can say, "You can come in the next

1    day."

2            THE COURT:  Let me tell you --

3            THE JUROR:  I guess my point would be I don't foresee

4    it being something I can manage, because I cannot get a relief

5    veterinarian to work for me in short notice.

6            THE COURT:  Well, I will tell you what I am going to

7    do, which is excuse you from this case.  That is not to suggest

8    that somebody else might have you for a shorter period of time,

9    but this is sufficiently uncertain that I am going to excuse

10   you here.

11           THE JUROR:  Okay.

12   (END OF SIDEBAR CONFERENCE)

13

14           THE CLERK:  Brian Hill, that's Juror No. 46, will you

15   please come and take seat number 6 in the back of the jury box.

16           THE COURT:  So, Mr. Hill, if you could introduce

17   yourself.

18           THE JUROR:  Yes.  Brian Hill, H-I-L-L.  I'm a

19   photographer.  I live in Lexington, and my wife is a landscape

20   architect.

21           THE COURT:  Thank you.  Does any question I have asked

22   so far apply to you?

23           THE JUROR:  Actually, I do have a concern.

24           THE COURT:  I will see you at the sidebar.

25

1    (SIDEBAR CONFERENCE AS FOLLOWS):

2                      (Juror approached sidebar)

3            THE COURT:  What aspect of the questions brings you

4    up?

5            THE JUROR:  My concern is my parents are 92, and I am

6    in constant contact with them.  I am concerned if I get stuck

7    in a trial there could be some health issues.

8            THE COURT:  Let me ask you, do they have people with

9    them at home now?

10           THE JUROR:  No.

11           THE COURT:  You work, what happens?  Do they call you,

12   is that what happens?

13           THE JUROR:  I'm in touch with them a couple of times a

14   day.  My mother fell and broke her hip, came back from rehab,

15   so I am helping them out all the time.

16           THE COURT:  Let me put it differently, which is, is

17   there any reason why you would feel you could not make a call

18   at a break, the way you do ordinarily, I assume, or have a

19   number here for Mr. Lovett to get and if there is some call we

20   can deal with that?

21           THE JUROR:  I am helping them out with transportation

22   an awful lot.  They live in Framingham, and my brother is a

23   money manager.  He is on the road all the time.  My sister is

24   in Mexico.  So, I am pretty much the only contact they have to

25   assist them.

1          THE COURT:  So, that is not workable, what I have just

2    suggested?  They are not in an acute state right now?

3          THE JUROR:  No, not in an acute state, but I am in

4    constant contact with them every day trying to help them out.

5          THE COURT:  Do you live in the Framingham area?

6          THE JUROR:  Lexington.

7          THE COURT:  Well, I will excuse you from jury service

8    for this case.  You should take your card.  You will go down to

9    the jury room.  You may get assigned to another matter.

10          THE JUROR:  Okay.

11          THE COURT:  Thank you very much.

12   (END OF SIDEBAR CONFERENCE)

13

14          THE CLERK:  Daniel Ryaboy, Juror No. 47, will you

15   please come forward and take seat number 6 in the back row of

16   the jury box.

17          THE COURT:  Mr. Ryaboy.

18          THE JUROR:  My name is Daniel Ryaboy, R-Y-A-B-O-Y.  I

19   am a branch manager for Enterprise Rent-A-Car, and I live in

20   Brighton, Massachusetts.

21          THE COURT:  Do any of the questions apply to you?

22          THE JUROR:  (Shaking head negatively).

23          THE COURT:  Let me begin what is the next-to-last

24   question this way.  In this country we have opportunities, and

25   particularly in this region we have some opportunities for

1    direct democracy; that is, that individual citizens can make

2    important governmental decisions.  We know that from town

3    meeting.  But, for the most part, there is no other point at

4    which citizens are directly involved in the Governmental system

5    as decision makers except in the jury system.  It is

6    fundamental to the way in which we conduct our business in this

7    country.

8           We learn from time to time that, just as war is too

9    important to leave to generals, we have come to the conclusion

10   that is embodied in our *Constitution* that the decision of

11   important factual matters, contested factual matters in

12   criminal cases and in civil, are too important to leave to

13   lawyers or judges.  We leave it to people with common sense.

14   That is what you are.  You are the common conscience of the

15   community, you provide common sense, you infuse this system

16   with what it needs, which is the balance that is provided by

17   people with various life experiences making important

18   decisions.

19          That may strike you, as it strikes my wife sometimes

20   when I explain it, as something of a Boy Scout speech, but I

21   feel it profoundly and see it and have seen it for a very long

22   time as the very essence of this country's approach to

23   important problems.

24          I provide it as a prelude to the scheduling question.

25   After consultation with the lawyers, they think that the case

1    can probably be completed by the end of this week, that it may

2    spill over to the following week.  I am acutely aware, of

3    course, that we have a holiday coming up, and so if it spilled

4    over to the following week we would not sit on Wednesday,

5    Thursday or Friday of the following week, but we would go on to

6    the next week.  I do not think that that is going to happen.  I

7    will be quite encouraging to the lawyers to make sure that it

8    does not happen.  But I tell you that as general background.

9         The way in which we sit, and I think I mentioned it to

10   you, is that ordinarily I hear cases for trial from 9:00 to

11   1:00 in the afternoon, take a break of about 20 minutes in the

12   middle of the day so you can stretch and have a snack, and then

13   you have got the afternoon free.  Today and tomorrow we are

14   going to sit the full day, because I want to be sure that we

15   get a head start on getting this case completed promptly.  So,

16   you will be facing a schedule that has you here the full day,

17   that is, to 4:00 today and 4:00 tomorrow, then 9:00 to 1:00

18   while we are receiving evidence, and then a full day again when

19   we are in deliberations, and I expect that the case will be

20   given to you no later than the beginning of next week and

21   perhaps before.

22        Having said that, the parties are entitled to people

23   who are not distracted, fundamentally distracted.  Now, if

24   someone tells me that Macy's is having a sale on Thursday

25   morning and you would prefer to be there, you can expect that I

1    will not be acknowledging that excuse, and I do not take it

2    personally, but I assume that, all other things being equal,

3    you would rather be somewhere else than spending some time with

4    me in the next week or so.  I am concerned about this:  I am

5    concerned about prepaid vacations, the kinds of appointments

6    you cannot get out of.  You should understand, I understand,

7    that people who are self-employed have a tougher time, but it

8    is important to have a fair cross-section of the community,

9    and, as a consequence, merely being self-employed is probably

10   not going to be enough to justify an excuse here.

11          But I need to know, the parties need to know, whether

12   any of you think that, given the austere approach that you can

13   see I have about this, that any of you are confronting

14   scheduling problems that would interfere with your ability to

15   give the parties what they are entitled to, which is a fair

16   trial by people who are paying attention and are capable of

17   resolving that dispute.

18          If any of you are facing scheduling problems that are

19   so severe as to compromise that, then I need know about it at

20   this point.  So, this is an opportunity for you to do that, and

21   I will see people at the sidebar.

22

23   (SIDEBAR CONFERENCE AS FOLLOWS):

24                      (Juror approached sidebar)

25          THE JUROR:  I'm sorry, but as part of my unemployment

1    I have to swear or acknowledge that I am available for work.

2              THE COURT:  Well, you are.  As far as I am concerned,

3    if anybody from -- whoever asks me, you are available for work

4    and you are doing jury service.

5              THE JUROR:  Very good.  Thank you.

6                        (Juror left sidebar)

7                  (Next juror approached sidebar)

8              THE COURT:  Can you tell us your name again for the

9    record.

10             THE JUROR:  Katherine Redfield.

11             THE COURT:  And Ms. Redfield --

12             THE JUROR:  28.

13             THE COURT:  -- is Juror No. 28.

14             THE JUROR:  Actually, I'm available all the time, but

15   I am moving to New York State on July 1st.  I have somewhere I

16   can stay in Boston next week, but I wasn't sure if that created

17   problems either.

18             THE COURT:  July 1st is a Sunday?

19             THE JUROR:  Monday, I think.

20             THE COURT:  Do you have to travel down there?

21             THE JUROR:  I don't have a train ticket.  My dad's

22   probably going to give me a ride, so it can happen any time of

23   the week.  I have nothing scheduled.

24             THE COURT:  You tell me.

25             THE JUROR:  I mean, I don't mind being here.  I am

1    actually planning on staying in the city anyway.  But legally I

2    will be in New York.

3              THE COURT:  Well, I am not going to excuse you, then.

4              THE JUROR:  All right.  Thank you.

5                        (Juror left sidebar)

6                     (Next juror approached sidebar)

7              THE COURT:  Good morning.

8              THE JUROR:  Maureen Mitchell.

9              THE COURT:  Right.

10             THE JUROR:  Mine isn't so much a scheduling problem as

11   it is that I take care of my grandchildren on a daily basis,

12   the youngest being nine months old.  We had arranged for the

13   other grandparents to watch her today.  The grandfather is now

14   in the hospital.  My daughter --

15             THE COURT:  Not as a result of taking care of the

16   children?

17             THE JUROR:  No, and, unfortunately, it's a serious

18   situation.

19             THE COURT:  Oh.

20             THE JUROR:  My daughter, unfortunately, is a single

21   mom, and she is home today.  I also have other grandchildren,

22   too, but they are older.

23             THE COURT:  Well, I will excuse you, but what I am

24   going to do is have you take your card down to the jury room.

25   You may get another case, a shorter case here.

1          THE JUROR:  Okay.

2          THE COURT:  But this is long enough so it is probably

3     a significant interference with the caregiving

4     responsibilities.

5          THE JUROR:  Thank you very much.

6          THE COURT:  So, take your card and go down to the jury

7     room.  Thanks very much, Ms. Mitchell.

8          THE JUROR:  Thank you.

9                    (Juror left sidebar)

10                   (Next juror approached sidebar)

11         THE JUROR:  Good morning.  David Hardt.  As I

12    mentioned earlier, I am a Professor of Mechanical Engineering.

13    We are running a special summer course this week, and I

14    rearranged my schedule to try to avoid conflict with this.

15         THE COURT:  What does it mean, the special summer --

16         THE JUROR:  I'm sorry.  It's a course where people

17    from the outside from the industry pay tuition to come in and

18    take an intensive two- or three-day course.

19         THE COURT:  What are your obligations?

20         THE JUROR:  I'm teaching Tuesday basically most of the

21    day.  I thought I could rearrange it to the afternoon, but you

22    had also mentioned that we would be running through the

23    afternoon tomorrow.

24         THE COURT:  Right.  I am going to excuse you for

25    probably two months.  You may get called back again.

1              THE JUROR:  Okay.

2              THE COURT:  Ordinarily, with teachers I do not

3      necessarily do that, but I understand the continuing

4      professional development courses require some intensity there.

5              THE JUROR:  Yes.

6              THE COURT:  So, take your card, go down to the jury

7      room, and they will be instructed that you will not be sitting

8      until two months from now.

9              THE JUROR:  Okay.  Thank you.

10                    (Juror left sidebar)

11                  (Next juror approached sidebar)

12             THE JUROR:  Hi.

13             THE COURT:  Remind me.  Mr. Goguen, is it?

14             THE JUROR:  Yes.  We are refinancing our house.  The

15     closing's tomorrow morning at 8:30.  It was scheduled for

16     today, and I postponed it till tomorrow.

17             THE COURT:  Well, you will get called back in about a

18     month or so, but I will excuse you.

19             THE JUROR:  Okay.

20             THE COURT:  You take the card and go down to the jury

21     room, and we will note that you should be called back no

22     earlier than a month, but I am not going to interfere with a

23     closing.

24             THE JUROR:  Well, thank you.  I appreciate that.

25                    (Juror left sidebar)

1          (Next juror approached sidebar)

2          THE JUROR:  Hi.

3          THE COURT:  Remind me again.

4          THE JUROR:  Prenovitz.  I am leading about a $10

5   million project at Phillips health care.  We have a kick-off

6   meeting that's coming Friday that I'm leading, so if I am not

7   there on Friday --

8          THE COURT:  You mean the whole day?

9          THE JUROR:  Yes, and if I'm not there, it gets delayed

10  for about three weeks.

11         THE COURT:  I will excuse you from this case.  The

12  note will say that you can be called back no earlier than a

13  month here.

14         THE JUROR:  Okay.

15         THE COURT:  But I am not going to interfere with that.

16              (Juror left sidebar)

17           (Next juror approached sidebar)

18         THE JUROR:  Hi.  Steve Herschlag.  Actually, this

19  Thursday and Friday my wife and I and my oldest daughter,

20  Emily, are scheduled to go to her college orientation.  I have

21  been there for every major event since she was born until --

22  dance events -- I'm going to cry.

23         THE COURT:  Don't talk anymore; you will talk me out

24  of it.  I will excuse you, but the note is going to say that

25  you can be called back no earlier than a month from now for

1    further cases.

2            THE JUROR:  Thank you.

3                        (Juror left sidebar)

4                    (Next juror approached sidebar)

5            THE JUROR:  I can't speak English.  I don't understand

6    English.

7            THE COURT:  Remind me what you do -- and you are.

8            THE JUROR:  Marie Simon.

9            THE COURT:  Ms. Simon, tell me what you do for a

10   living.

11           THE JUROR:  Living?

12           THE COURT:  What do you do for a living?  How are you

13   employed?

14           THE JUROR:  My employers?  I don't speak English

15   really well.  I don't understand.  I don't know.

16           THE COURT:  Do you have a job?

17           THE JUROR:  Yes.

18           THE COURT:  What is the job?

19           THE JUROR:  As a cook.

20           THE COURT:  Where is that?

21           THE JUROR:  For a high school.

22           THE COURT:  Do you think you simply cannot understand

23   the English language well enough to decide this case?  Are you

24   having a hard time understanding the English language?

25           THE JUROR:  Yeah.

1          THE COURT:  I think I am going to excuse you from this

2     case, because it is important to really understand the English

3     language, I think, for this case.

4          THE JUROR:  Yes.

5          THE COURT:  So, you should take the card from

6     Mr. Lovett and go down to the jury room down on the second

7     floor where you were before --

8          THE JUROR:  Okay.

9          THE COURT:  -- and they will give you further

10    instructions, okay?

11         THE JUROR:  Okay.

12         THE COURT:  Thank you.

13                    (Juror left sidebar)

14         THE COURT:  And that is Juror No. 33; is that right?

15         MS. BURKART:  I believe so, your Honor.  33, yes.

16         MR. SHEKETOFF:  33.

17                    (Next juror approached sidebar)

18         THE JUROR:  Hi.  I'm Mary Ellen Dugan.  I'm a

19    pediatrician.  I just have a huge problem with this schedule.

20    I am one of the pediatricians in an office.  I am the

21    chairperson, and we have someone out for a month with a retinal

22    detachment just as of last week, and someone else is having

23    gall bladder surgery today, and next week I know there are two

24    people on vacation.  I'm not on vacation, but it all falls to

25    me.  When people aren't there, I'll come in, I'll work extra.

1    I am supposed to work tomorrow night.  So, I feel badly saying

2    this, but it's a huge burden for me and what I do and the kids.

3    I am all booked the rest of the week -- not today and tomorrow,

4    I've cleared my schedule -- but then I am booked all week.  So,

5    I just feel like it's a huge burden, and I wish I didn't have

6    to be here for the whole week and maybe beyond.

7         THE COURT:  Right.  Well, my general view with doctors

8    or medical professionals is for shorter cases I probably would

9    not accept much of an excuse.  This one is a little bit

10   open-textured, and as a consequence I will, but you are going

11   to get called back relatively promptly here.

12        THE JUROR:  Okay.

13        THE COURT:  I will tell Mr. Lovett to say no earlier

14   than a month, but it may be within a month that you will get

15   called in again for this.  So, it is your choice.

16        THE JUROR:  Really?

17        THE COURT:  Really.

18        THE JUROR:  Even though I just did the State in

19   April --

20        THE COURT:  Yes.

21        THE JUROR:  -- for two days?

22        THE COURT:  That was in the state court, I suspect?

23        THE JUROR:  Yeah, in Lowell.  It's just a huge

24   disruption to bump all kinds of people and change their

25   appointments.

1            THE COURT:  I understand that.

2            THE JUROR:  So, when might it happen again?

3            THE COURT:  No earlier than a month.

4            THE JUROR:  That's probably not going to help me,

5    then.  There's all these vacations all summer.

6            THE COURT:  If you want me to put it out two months or

7    three months.

8            THE JUROR:  If you can put it out after the summer

9    vacation, that would work.

10            THE COURT:  Okay, three months.

11            THE JUROR:  Oh, boy.

12            THE COURT:  The thing is, I have not gone into this

13    yet.  I will.  I do a schtick that I do with the jurors about

14    peremptory challenges, but even judges get called in the state

15    court.  I was called on a case.

16            THE JUROR:  Yeah, I'm sure.

17            THE COURT:  I was expecting not to, because who would

18    be dumb enough to have a judge on a jury?

19            THE JUROR:  Yeah.

20            THE COURT:  Well, they did.  I take that as a

21    compliment.  They did, and I had to interrupt my jury trial so

22    I could sit on the jury.  I am glad they did it, because then I

23    can tell you the story.  But it works that way for all

24    professionals, and I try not to interfere, but this one is long

25    enough so it justifies.

```
1              THE JUROR:  Okay.  Thank you.

2                    (Jury left sidebar)

3                 (Next juror approached sidebar)

4              THE COURT:  Mr. Ryaboy, is it?

5              THE JUROR:  You got it.  So, obviously just being a

6    branch manager at the rental place I have two full-time

7    employees with no assistance.  A day I can miss, but for a full

8    week --

9              THE COURT:  I am not going to excuse you.  The car

10   companies have got to be able to deal with problems over a

11   period of time, so I am not going to excuse you.

12             THE JUROR:  No problem.

13             THE COURT:  Thank you.

14                    (Juror left sidebar)

15             THE COURT:  That was Mr. Ryaboy, who was in seat

16   number 6.  He is Juror No. 44.

17                   (Juror approached sidebar)

18             THE JUROR:  Good morning.

19             THE COURT:  Can you tell me your name again.

20             THE JUROR:  Steve Perreira, P-E-R-R-E-I-R-A.

21             THE COURT:  Mr. Perreira, did you introduce yourself

22   yet?

23             THE JUROR:  I did.

24             THE COURT:  Where are you sitting?

25             THE CLERK:  19.
```

1          THE JUROR:  In the first row at the end.

2          THE COURT:  Oh, I see.  Juror No. 19.

3          THE JUROR:  I do have a prescheduled, reserved family

4   vacation next week that goes through July, but, more

5   importantly, there is a piece that goes with that.  Working for

6   the Commonwealth, as I do, I am responsible for daily

7   operations as operations manager for two offices.

8          THE COURT:  When are your tickets?

9          THE JUROR:  They are for Saturday through Wednesday.

10         THE COURT:  Saturday of this --

11         THE JUROR:  This weekend coming up.

12         THE COURT:  I'm going to excuse you from this case,

13  but you should go down to the jury room.  You may get other

14  cases that you are assigned to.

15         THE JUROR:  Okay.  Thank you.

16                    (Juror left sidebar)

17               (Next juror approached sidebar)

18         THE JUROR:  Hi.

19         THE COURT:  Ms. Babineu.

20         THE JUROR:  So, my concern is I am a preschool

21  teacher, and I have a summer job.  I am paying for my own

22  condo.  I am in five courses right now all at once.  It's a

23  financial burden for me, and I do have responsibility of

24  running a preschool Monday through Friday, and the hours are --

25  well, actually, it's 7:15 to 12:00 every day.

1          THE COURT:  What did you do today?

2          THE JUROR:  I had to get coverage for today.  I didn't

3     assume I would be in the jury pool.

4          THE COURT:  Right.  Well, I will excuse you from this

5     case, but you are going to go down to the jury room.  You may

6     get other cases that you are assigned to here, but for this

7     case I will excuse you.

8          THE JUROR:  Okay.  Thank you.

9          THE COURT:  All right.  Take the card from Mr. Lovett.

10    (END OF SIDEBAR CONFERENCE)

11

12         THE CLERK:  James Garvey, that's Juror No. 48, will

13    you please come forward and take seat number 1 in the back row

14    of the jury box.

15         Randy Cooke, that is Juror No. 49, will you please

16    come forward and take seat number 3 in the back row of the jury

17    box.

18         Nicole Allen, that is Juror No. 50, will you please

19    come forward and take seat number 5 in the back row of the jury

20    box.

21         Jessica Beech, Juror No. 51, will you please come

22    forward and take seat number 10 in the front row of the jury

23    box.

24         Matthew Michela, that is Juror No. 52, will you please

25    come forward and take seat number 19 in the front row of the

1    spectator section.

2         James Brodman, that is Juror No. 53, will you please

3    come forward and take seat number 31 in the front row of the

4    spectator section.

5         Lawrence Epstein, that is Juror No. 54, will you

6    please come forward and take seat number 32 in the front row of

7    the spectator section.

8         Aileen Tubridy, will you please come forward and take

9    seat number 33 in the front row of the spectator section.

10        Charlman Dowell, that is Juror No. 56, will you please

11   come forward and take seat number 34 in the front row of the

12   spectator section.

13        THE COURT:  So, we will start with Mr. Garvey.

14        THE JUROR:  James Garvey.  I am a representative for

15   Comcast, and I live in Needham.

16        THE COURT:  And Mr. Cooke.

17        THE JUROR:  Randy Cooke, C-O-O-K-E.  Desktop

18   technician, and I live in Cambridge.

19        THE COURT:  And Ms. Allen.

20        THE JUROR:  Nicole Allen, A-L-L-E-N.  I live in

21   Allston, and I work at a box office.

22        THE COURT:  I'm sorry.  I am having a little

23   difficulty hearing.  You work in?

24        THE JUROR:  A box office.  I sell tickets.

25        THE COURT:  And the town you live in?

1            THE JUROR:  Allston.

2            THE COURT:  Thank you.

3            And Ms. Beech.

4            THE JUROR:  Jessica Beech, B-E-E-C-H.  I'm a student.

5      I live in Malden, I am single, and that's it.

6            THE COURT:  Thank you.

7            And Mr. Michela.

8            THE JUROR:  I'm Matthew Michela, M-I-C-H-E-L-A.  I am

9      a president of a company that provides clinical out-sourcing

10     services in the companies in the U.S.  I am from Hudson, and my

11     wife is a statistician who works with medical device companies

12     applying to the FDA.

13           THE COURT:  Fine, thank you.

14           And Mr. Brodman.

15           THE JUROR:  I'm James Brodman, B-R-O-D-M-A-N.  I am a

16     computer scientist, and I live in Newton.

17           THE COURT:  And Mr. Epstein.

18           THE JUROR:  Larry Epstein, E-P-S-T-E-I-N.  I'm a

19     commercial real estate broker downtown.  I live in Hopkinton,

20     and my wife is a stay-at-home mom.

21           THE COURT:  All right.  And Ms. Tubridy.

22           THE JUROR:  My name is Aileen Tubridy, T-U-B-R-I-D-Y.

23     I am a nurse, I live in Marblehead, and my husband's an

24     architect.

25           THE COURT:  Thank you.

1            And Mr. Dowell.

2            THE JUROR:  Charlman Dowell, D-O-W-E-L-L.  I am a

3    parent, I live in Boston, and I'm single.

4            THE COURT:  Thank you, Mr. Dowell.

5            So, for the folks who just introduced yourselves, do

6    any of the questions I have asked apply to you?

7            I see a couple of responses, so I will see you at the

8    sidebar.

9

10   (SIDEBAR CONFERENCE AS FOLLOWS):

11                    (Juror approached sidebar)

12           THE COURT:  Ms. Beech, is it?

13           THE JUROR:  Yeah.  I was involved in something

14   criminal.  My ex-boyfriend slashed my tires, and also I'm not

15   able to sit throughout.  I have a hard time focusing.  I don't

16   have the ability to --

17           THE COURT:  When you say you don't have the ability,

18   you said you were a student?

19           THE JUROR:  Yeah, I'm a student.  To sit and focus for

20   periods of times, I take all night classes so I don't have to

21   sit in a class and retain information like that.

22           THE COURT:  Do you have a doctor telling you that you

23   cannot do that?

24           THE JUROR:  No.  I know I can't do that personally.

25   Like, I can't even sit here now personally.  So, I don't feel

1      like I would be fair enough to have a fair judgment.

2              THE COURT:  I am not persuaded, but, in any event, I

3      am going to excuse you from this case, and you will receive

4      instructions about other cases that you may have to sit on, but

5      I will excuse from you this case.

6              THE JUROR:  Okay.

7              THE COURT:  Take the card and go down to the jury

8      room.  You will receive further instructions.

9              THE JUROR:  Go where?

10             THE COURT:  To the jury room on the second floor where

11     you were before.

12             THE JUROR:  Oh, okay.

13                          (Juror left sidebar)

14                     (Next juror approached sidebar)

15             THE JUROR:  Hi, Judge.

16             THE COURT:  It is Mr. Epstein, is it?

17             THE JUROR:  Yes.  How are you?

18             THE COURT:  If you can come forward a little bit.

19             THE JUROR:  I understand that financially, from a

20     self-employment standpoint, you are not leaning that way in

21     terms of excusing anyone, but I am self-employed basically,

22     even though I work for Colliers.  I'm a broker.  All I do is

23     show space downtown.  My wife doesn't work.  So, if I'm not

24     working and showing space, I'm not earning a living.

25             THE COURT:  Well, I am not going to excuse you from

1    this case.  The timing of the case and the fact that we have

2    afternoons free for at least a period of time is such that I

3    think this is one that you can serve on, because the

4    alternative will be to say that you cannot serve on any other

5    kind of case, and I do not agree with that.

6              THE JUROR:  Do you anticipate this thing ending

7    hopefully this week?

8              THE COURT:  The lawyers tell me that they think they

9    will submit the evidence by the end of this week.  It may spill

10   over into next week, but, in any event, we will not be sitting

11   on Thursday and Friday of next week, even if it does spill

12   over, not to mention the holiday.

13             THE JUROR:  Okay.

14                  (Juror left sidebar)

15                (Next juror approached sidebar)

16             THE COURT:  Turbridy, is it?

17             THE JUROR:  Turbriday, yes.  I have reservations to be

18   out of town on Thursday and Friday with my daughter at UMass

19   Amherst.  There was no other date, and when I tried to cancel,

20   that date was the date she leaves in August, so I have no

21   choice.

22             THE COURT:  What I will do is excuse you for, say, a

23   month.

24             THE JUROR:  Mm-hmm.

25             THE COURT:  And then you will get called back --

1          THE JUROR:  Mm-hmm.

2          THE COURT:  -- probably get called back, I can't be

3    sure of that, here to deal with that problem.

4          THE JUROR:  I know.  The only date on this one was the

5    time she leaves in August.  So, I would prefer to be with her.

6          THE COURT:  I may be able to put it out three months.

7          THE JUROR:  I would have no problem normally doing it,

8    but thank you very much.

9          THE COURT:  All right.

10                   (Juror left sidebar)

11              (Next juror approached sidebar)

12          THE COURT:  Mr. Michela.

13          THE JUROR:  A few things.  First, a question of

14   conflict.  My company was involved in a dispute with Dell.  We

15   have a subsidiary in India that ran the company operationally

16   and they had claimed that we had purchased some servers and

17   others which was stolen equipment, which we resolved and there

18   was no harm, but it took about a year to resolve and did a lot

19   of harm to my company and hurt our credit.

20          THE COURT:  Do you think that is going to interfere

21   with your ability to be fair and impartial here?

22          THE JUROR:  I don't think I am a fan of Dell, to

23   start.

24          THE COURT:  Well, the case is not about fan clubs, it

25   is about whether or not somebody can be fair and impartial.

1          THE JUROR:  I understand, I understand.  I would try

2   my best to be fair and impartial.

3          THE COURT:  But go ahead.

4          THE JUROR:  The second thing is the question of a

5   lawsuit.  I was involved in a lawsuit with my company, which

6   was just resolved in May.

7          THE COURT:  What was the nature of the dispute?

8          THE JUROR:  Unrelated to this.  It was an intellectual

9   property infringement lawsuit, which resolved, so we had a

10  breach of contract, breach of --

11         THE COURT:  So, this is someone who left the company?

12         THE JUROR:  No, it was a subsidiary we owned.

13         THE COURT:  And there was some dispute?

14         THE JUROR:  Exactly.  I sat on the Board.

15         A third and another legal, which is my son about two

16  or three years ago was involved in a criminal matter.  He was

17  charged with DUI, which was resolved.  But it was I would

18  consider it to be an unfair situation because he was actually

19  charged and he was innocent.  There was no issue.  It was a law

20  enforcement problem, as far as we were concerned.

21         THE COURT:  You have raised a smorgasbord of issues.

22         THE JUROR:  I am just trying to get it straight.

23         THE COURT:  The real issue for me is can you be fair

24  and impartial?

25         THE JUROR:  I think for the third issue I think my

1    standard for the prosecution would be a little higher than

2    probably reasonable doubt, because in this case my son was

3    really inappropriately prosecuted.

4         THE COURT:  Well, I am going to excuse you from this

5    jury.  Take the card and go down to the jury room, and you may

6    get further instructions about other cases.

7         THE JUROR:  That's fine.  Thank you.

8         THE COURT:  Thank you.

9                   (Juror left sidebar)

10                (Next juror approached sidebar)

11        THE JUROR:  Hi there.  Randy Cooke.

12        THE COURT:  Mr. Cooke, yes.

13        THE JUROR:  Typically, it would be very minor.  I'm

14   paid monthly at the end of the month.  I have little to no

15   money and I have a major vet bill last week for my dogs, and I

16   currently have somebody I could arrange for today.  I have no

17   money to get any sort of pet sitter in or anybody that's off

18   for the rest of the week for me to cover, and I won't have any

19   money until the first of the month to do anything with.

20   Typically, I know it's very minor and it wouldn't matter, but

21   it's mainly because it's at the end of the month and I have no

22   way to come up with the money to get anybody to cover with

23   recovering dogs at home.  I know it's minor, and I typically

24   would not expect --

25        THE COURT:  Well, I will excuse you from this case,

1  but you are going to get called back probably a month from now.

2           THE JUROR:  That's fine.  I will plan accordingly.

3           THE COURT:  Yes, you had better.

4           THE JUROR:  That I can do.

5           THE COURT:  And I will direct that you be called back

6  at the beginning, not the end of the month --

7           THE JUROR:  That would be appreciated, too.

8           THE COURT:  -- for this kind of problem.  So,

9  Mr. Lovett will just put down, Call back, say, a month from

10 now, but in the beginning of the month

11          THE JUROR:  Okay.  Thank you.

12                        (Juror left sidebar)

13          THE COURT:  Juror No. 49 in seat number 3.

14          MR. GARLAND:  Your Honor, I don't think it makes a

15 difference, but for Juror No. 53, Intel Corporation is the

16 victim of a case I have in front of Judge Saylor now in

17 sentencing.  It kind of involves the entire company.

18          THE COURT:  If it has not popped up to him I am not

19 going to introduce it.

20          MR. GARLAND:  I just wanted to make sure defense

21 doesn't have an issue with that.

22 (END OF SIDEBAR CONFERENCE)

23

24          THE CLERK:  Vincent Daily, that is Juror No. 57, will

25 you please come forward and take seat number 3 in the back row

1    of the jury box.

2            Steven Lopez, that is Juror No. 58, will you please

3    come forward and take seat number 10 in the front row of the

4    jury box.

5            Corey Fyfe, that is Juror No. 59, will you please come

6    forward and take seat number 19 in the front row of the

7    spectator section.

8            Kerry Solomon, that is Juror No. 60, will you please

9    come forward and take seat number 33 in the front row of the

10   spectator section.

11           THE COURT:  So, Father Daily.

12           THE JUROR:  I'm Vincent Daily, D-A-I-L-Y.  I am a

13   pastor of St. Gregory's Parish in Dorchester.

14           THE COURT:  All right.  Thank you.

15           And Mr. Lopez.

16           THE JUROR:  Steven Lopez, L-O-P-E-Z.  I am in the food

17   industry, and I live in Lynn.

18           THE COURT:  And Mr. Fyfe.

19           THE JUROR:  Corey Fyfe, F-Y-F-E.  I am a

20   microbiologist, and I live in Newton, and my wife is also a

21   scientist.

22           THE COURT:  Thank you.

23           Ms. Solomon.

24           THE JUROR:  I'm Kerry Solomon, S-O-L-O-M-O-N.  I am a

25   stay-at-home mom.  I live in Westwood, and my husband is an

1    investment professional.

2           THE COURT:  So, let me ask the four of you.  I know

3    Father Daily has an issue he wants to take up, but do any of

4    the other jurors have some other issue?

5           And, Ms. Solomon, I will see you too.

6

7    (SIDEBAR CONFERENCE AS FOLLOWS):

8                           (Juror approached sidebar)

9           THE JUROR:  I just wanted to say I was on a grand jury

10   once.  It was about 12 years ago.  And I was a witness, just to

11   tell you that.  I don't know how they bear on this.

12          The other fact --

13          THE COURT:  Let me just ask, you were on a grand jury?

14          THE JUROR:  Yes, I was, in Brockton.

15          THE COURT:  And you were a witness as well?

16          THE JUROR:  Yes.

17          THE COURT:  And was it a criminal or civil?

18          THE JUROR:  Criminal.

19          THE COURT:  Go ahead.

20          THE JUROR:  And the other consideration I want to

21   bring up was I am a pastor of a large parish.  We have a lot of

22   funerals.  Judging from my weekend experience there will be

23   some coming in soon.  I am also the guardian of a young woman

24   with Down's Syndrome, my sister.  So, I am flat out.  That is

25   all.  It might inhibit concentration.

1          THE COURT:  Let me just ask you this:  Do you think

2     you can serve on this jury or not?

3          THE JUROR:  Probably not.  It would be very difficult,

4     is the answer.

5          THE COURT:  Well, I am going to excuse you --

6          THE JUROR:  Thanks, I appreciate it.

7          THE COURT:  -- from the jury.

8          THE JUROR:  I appreciate it very much.  Thank you.

9                    (Juror left sidebar)

10         THE COURT:  Juror No. 57 in seat number 3.

11                  (Next juror approached sidebar)

12         THE JUROR:  Hi.

13         THE COURT:  So, what are your daycare arrangements?

14         THE JUROR:  Exactly.  Piecemeal.  So, for a day or two

15    I can put it together, but for that many days I don't have a

16    system in place.

17         THE COURT:  What kinds of kiddos do you have?

18         THE JUROR:  I have three, 7, 11 and 13.  They just got

19    out of school and swimming and tennis, *ad nauseam*.

20         THE COURT:  I am going to put it over for three

21    months.

22         THE JUROR:  Okay.

23         THE COURT:  Maybe it is more manageable at that point.

24    (END OF SIDEBAR CONFERENCE)

25

1          THE CLERK:  Mark Marrese, that is Juror No. 61, will

2    you please come forward and take seat number 3 in the back row

3    of the jury box.

4          And Karen Corday, that is Juror No. 62, will you

5    please come forward and take seat number 33 in the front row of

6    the spectator section.

7          THE COURT:  So, Mr. Marrese, if you could introduce

8    yourself.

9          THE JUROR:  My name is Mark Marrese, M-A-R-R-E-S-E.  I

10   am a computer programer, I live in Dedham, and my wife is a

11   Registered Nurse.

12         THE COURT:  And Ms. Corday.

13         THE JUROR:  Hi.  I am Karen Corday, C-O-R-D-A-Y.  I am

14   a librarian, and live in Medford.

15         THE COURT:  And let me ask the two of you, do any of

16   the questions I have asked so far apply to either of you?

17         So, the last question.  We have not been at this very

18   long, considering the complexities of the case, and I have

19   tried to ask questions that are pertinent and not too intrusive

20   into your private lives and the lives of your immediate

21   families, but this is the point at which I think the lawyers

22   and I know I feel this sinking feeling in my stomach, and it is

23   this:  I have tried to figure out what questions are pertinent

24   and not too intrusive, but we have not asked all the questions

25   we possibly could, and the sinking feeling is have we missed

1    something, something about your background, your training, your

2    experience, your predispositions, something that has come to

3    your mind as you sat here thinking about this case that we

4    should know about?  And the best way I know to frame that issue

5    for you is to put yourself in Mr. Kuc's shoes, or Ms. Burkart's

6    shoes, or Mr. Garland's shoes or Mr. Sheketoff's shoes.  We

7    have been sitting here thinking about who the jury is going to

8    be, we do not know very much about you, and we wonder if there

9    is something we would want to know.  So, if you were they, is

10   there something that you know about your background, your

11   training, your experience, your predispositions, something that

12   if you were in their shoes you would want to know before you

13   took the next step in the decision-making process about who the

14   members of the jury are going to be, something that we missed

15   here that would be, to you, in any event, pertinent?

16         So, if that applies to any of the persons who have now

17   introduced themselves, let us know.  And I see at least one

18   response, two responses, so I will see you at sidebar.

19

20   (SIDEBAR CONFERENCE AS FOLLOWS):

21                 (Juror approached sidebar)

22         THE JUROR:  Good morning, your Honor.

23         THE COURT:  If you could tell us your name again for

24   the record.

25         THE JUROR:  My name is Mark Baroni, B-A-R-O-N-I.  My

1    wife is an attorney.  We have been together about 12 years, and

2    one of the things that we have discussed and she has told me

3    many times, when it gets to this point the person is usually

4    guilty, whether it's federal or civil, and I have a tendency to

5    agree with her.

6            THE COURT:  I will not explore the tendency to agree

7    with one's wife about matters like this, but your wife does not

8    recognize the idea of presumption of innocence and proof beyond

9    a reasonable doubt, that someone is guilty before they even

10   introduce the evidence?

11           THE JUROR:  We discuss it most of the time, and we

12   usually agree if it gets to this point, especially when you

13   have the FBI agents here, I would say that that's guilty.

14           THE COURT:  I am going to excuse you because I am not

15   going to require somebody to do a peremptory challenge.  I find

16   that outrageous under the circumstances, to be perfectly

17   candid, and an affront to the system of justice that we have.

18   But I certainly cannot let you sit on this jury, so I am going

19   to excuse you.  You should take the card and go down to the

20   jury room.

21                   (Juror left sidebar)

22               (Next juror approached sidebar)

23           THE JUROR:  Gene Pettinelli, P-E-T-T-I-N-E-L-L-I.

24   Teaching is relatively new for me the last couple of years.

25   Prior to this I was in investments, particularly venture

1    capital.  I was the founding investor of two computer

2    companies, and I have been on the board of a dozen small

3    companies.  I don't think it affects my judgment, but I thought

4    I would let you know.

5         THE COURT:  It is important for us to know.  You have

6    answered the question, but I will put it again, which is,

7    whether that experience, having worked in the computer field,

8    is going to interfere with your ability to be fair and

9    impartial?

10        THE JUROR:  I don't think so.

11        THE COURT:  Fine.  Thank you.

12                   (Juror left sidebar)

13              (Next juror approached sidebar)

14        THE COURT:  Mr. Levangie for the third time.

15        THE JUROR:  You didn't have an issue with me being

16   arrested.  I didn't know if the lawyers did.

17        THE COURT:  What we are doing right now is deciding

18   the question of whether or not there is a cause on its own to

19   excuse you.  We will talk about the other dimensions of it.

20        THE JUROR:  All right, all right.  Thanks.

21                   (Juror left sidebar)

22              (Next juror approached sidebar)

23        THE COURT:  Ms. Swartwood.

24        THE JUROR:  Just because the FBI was mentioned with

25   regards to this, I worked for the Federal Government and before

1   being assigned to the Whitehouse I had to have an FBI

2   clearance.

3          THE COURT:  Forgive me, because I do not know your

4   background entirely, but where did you work in the Whitehouse?

5          THE JUROR:  I was working for the GSA as an interior

6   designer, and then when the Whitehouse transitioned from

7   Johnson to Nixon I was asked to go and be in that area.

8          THE COURT:  And were you in the GSA National Capital

9   Region?

10          THE JUROR:  Right, but I did various and sundry

11   federal office buildings, hospitals, BOQs all over the country.

12          THE COURT:  And that you were subject to an FBI

13   background check, is that going to interfere with your ability

14   to --

15          THE JUROR:  No, but I thought you guys might want to

16   know.

17          THE COURT:  Right.  It is precisely the kind of thing

18   I am looking to bring out.  The bottom line for me is whether

19   or not you think it is going to interfere with your ability to

20   be fair and impartial here.

21          THE JUROR:  No.

22          THE COURT:  Fine.  Thank you.

23          THE JUROR:  Oh, just one thing.  The scheduling.  If

24   it goes beyond the 4th of July into the week of the next week,

25   then I would have a problem.

1           THE COURT:  I do not think that the likelihood is

2    substantial enough for me to disqualify someone, but we will

3    deal with it at that point.

4           THE JUROR:  Okay, thanks.

5                       (Juror left sidebar)

6           MR. SHEKETOFF:  Judge, can I ask a question?

7           THE COURT:  Sure.

8           MR. SHEKETOFF:  I can't remember from our conference.

9    Are we picking alternates separately?

10          THE COURT:  Yes.

11          MR. SHEKETOFF:  So, the first 28 seats are in play, so

12   to speak?

13          THE COURT:  My view, I think, is that I am going to

14   let you probably have four alternates, so there are 16 seats

15   that are in play, ultimately, but you have two rounds.  You do

16   not get to back-strike them, but it is the first 12 seats that

17   are particularly important to you, but when you are thinking

18   about it, you are really thinking about the idea of there are

19   going to be 16 exercises.  So, it is the first 28 seats that

20   are potential and dramatically decreasing significance.

21          MR. SHEKETOFF:  If the two of us overlap, the two

22   sides overlap, and so there is a 28th juror left over, is that

23   person the first alternate?

24          THE COURT:  He is not the first alternate; the first

25   person to be considered for the next round, which is

1    alternates.

2              MR. SHEKETOFF:  I see.  I understand now.  Thank you.

3    (END OF SIDEBAR CONFERENCE)

4

5              THE CLERK:  John Zakian, that is Juror No. 63, will

6    you please come forward and take seat number 29 the front row

7    of the spectator section.

8              THE COURT:  And before you sit down.

9              THE JUROR:  Sure.  John Zakian, Z-A-K-I-A-N.  Pardon

10   my voice.  And I apologize ahead of time.  I have a long

11   occupation title.  I am a post-disaster long-term community

12   recovery specialist under contract to a firm that has a

13   contract with FEMA.  So, I'm deployed to disasters.

14             THE COURT:  Right.

15             THE JUROR:  New Bedford is my residence, and my wife

16   is the Department Director of Human Services for the City of

17   New Bedford.

18             THE COURT:  Do you have some issues?

19             THE JUROR:  Yes.

20             THE COURT:  I will talk to you.

21

22

23   (SIDEBAR CONFERENCE AS FOLLOWS):

24             THE JUROR:  I'm sorry for this.  None of them may

25   actually, but I just want everything out.

```
 1            THE COURT:  No.  It is important for us.

 2            THE JUROR:  First off, my father's 95th birthday is

 3     Sunday and he lives in Harrisburg.  That would be a challenge

 4     to get back here on Monday, so I don't know if that is a

 5     problem.

 6            THE COURT:  Well, I think I am not going to excuse you

 7     on that basis.

 8            THE JUROR:  Okay.

 9            THE COURT:  That is, it is a turnaround, there is no

10     question about that.

11            THE JUROR:  Okay.  On the law enforcement issue, I

12     have been in the past Chief Operating Officer for Westchester

13     County, New York, and one of the departments that reported to

14     me was the police department.  I have also been an Assistant

15     City Administrator in West Palm Beach, and one of the

16     departments that reported to me was the police department.

17            On that same question, two separate instances with two

18     different corporations.  I was the chief executive, and I

19     uncovered embezzlement by employees.  I had to file the

20     complaint.  They both confessed, so I was the complainant, but

21     I never had to testify and I wasn't subject to a --

22            THE COURT:  Let me ask you this.  Are you going to

23     lean toward one side or the other here?

24            THE JUROR:  To be honest, both of the embezzlement

25     experiences hurt me professionally.  I don't think so, but it
```

1    relates to something else I want to disclose.

2          I have a disability.  My right front brain lobe does

3    not function.  Obviously, it doesn't affect my career and it

4    hasn't affected me personally, but I do tend to have short-term

5    memory problems, although I remembered your earlier questions

6    today.  I, on occasion, am subject to making snap judgments,

7    and my emotions get into play.

8          THE COURT:  In a group setting?

9          THE JUROR:  In a group setting.

10          THE COURT:  You mean where it is a collective

11    judgment?

12          THE JUROR:  Yeah, and I do tend to talk quickly a lot

13    and very forcefully.

14          THE COURT:  Well, I appreciate your candor, and I

15    think I am going to excuse you from this case.  There is a

16    ganglion of issues that you present that I think may make this

17    a challenging case for you.

18          THE JUROR:  There was one other one.

19          THE COURT:  This will be the one that changes my mind.

20          THE JUROR:  Okay, then I'll shut up.

21          THE COURT:  No, no.  Not that I would not be

22    interested, but I think, having made the judgment, I think that

23    is the point at which --

24          THE JUROR:  I am sorry.

25          THE COURT:  I appreciate your candor about private

1    matters as well.  Thank you.

2            THE JUROR:  Okay.  Thank you.

3    (END OF SIDEBAR CONFERENCE)

4

5            THE CLERK:  Raymond Mansfield, that is Juror No. 64,

6    will you please come forward and take seat number 29 in the

7    front row of the spectator section.

8            THE JUROR:  Herman Mansfield.  I'm from Methuen,

9    Massachusetts, and I own my own flooring company.

10           THE COURT:  What is the company?

11           THE JUROR:  Flooring Installation Company.

12           THE COURT:  Do any of the questions apply to you?

13           THE JUROR:  Yes.

14           THE COURT:  I will see you at sidebar.

15

16   (SIDEBAR CONFERENCE AS FOLLOWS):

17           THE JUROR:  How are you doing?  I've had a couple of

18   felony convictions and I served time.

19           THE COURT:  What were the convictions for?

20           THE JUROR:  Armed Assault with Intent to Murder,

21   Assault by Means of a Handgun, Home Invasion, which was reduced

22   to Breaking and Entering.

23           THE COURT:  When did you stop serving?  I assume you

24   served time for this.

25           THE JUROR:  I was sentenced in 2003 and served until

1    2005.

2         THE COURT:  So, that is the seven years, isn't it, for

3    the disability, the felony disability?

4         THE JUROR:  Yes.

5         THE COURT:  These are state convictions?

6         THE JUROR:  I have a lot of other concerns.

7         THE COURT:  When were you released in the 2007?

8         THE JUROR:  I was released in 2005, and then I did

9    three years of probation until my final closing of the case,

10   was July 5th, 2008.

11        THE COURT:  I cannot tell whether under Massachusetts

12   law your civil rights, that is the right to serve on a jury,

13   would be open to you.  I think it is after seven years, but it

14   may be five.  I just do not know.  But go ahead.

15        THE JUROR:  The other thing is I have, like, a flight

16   and vacation planned for Friday, which I have had plans since

17   last year.

18        THE COURT:  Where are you going?

19        THE JUROR:  North Carolina every year.

20        THE COURT:  I am going to excuse you on this case.

21   What did the jury clerk say to you when you disclosed the

22   convictions?

23        THE JUROR:  He said that he wasn't clear on

24   Massachusetts ruling either.  He said he thought seven years

25   also.  He says Massachusetts works a lot differently.

1           THE COURT:  It does.  I just do not know when the

2    clock starts to run.  I am putting that to one side here,

3    because, ordinarily, if you have got your civil rights

4    restored, you can serve on a jury.  The parties may have other

5    views about that.  But I am going to excuse you on the other

6    grounds here.  I am going to talk to the jury clerks about

7    giving me a heads-up a little bit before you show up at the

8    sidebar.

9           THE JUROR:  I brought it up to them.

10          THE COURT:  Mr. Lovett did as well, but it is the kind

11   of thing that is touchy enough that requires research, but I

12   will excuse you, in any event.

13          THE JUROR:  All right.  Thank you.

14   (END OF SIDEBAR CONFERENCE)

15

16          THE CLERK:  Theodore Gaudreault, Jr., that's Juror

17   No. 65, will you please come forward and take seat number 29 in

18   the front row of the spectator section.

19          THE JUROR:  Good afternoon, your Honor.  Theodore

20   Gaudreault.  I am a banker.  I reside in Lynn, Mass.  My wife

21   is a school administrator.

22          THE COURT:  Do any of the questions apply to you?

23          THE JUROR:  No.

24          THE COURT:  So, what that means, ladies and gentlemen,

25   is that we move on to the next step of the jury process here,

1    which is the exercise of peremptory challenges.  I am going to

2    tell the individuals who are here as jurors, potential jurors,

3    that you are going to go back to the jury room at this time.

4    We have enough jurors now as a pool to pick the jurors in this

5    case.

6           So, Mr. Lovett is going to call out the names of the

7    remaining jurors, and the first person whose name is called

8    out, you will come up here and get the cards for everybody

9    else, and then you will go down to the jury room to receive

10   further instructions.  I want to thank you for your attendance

11   here this morning.

12          THE CLERK:  Dawn Marshall, Steven Prescott, Jason

13   Dillon, Joseph Nicastro, Jr., Gerald Inserra and Dean

14   Brostowin.

15          THE COURT:  So, Ms. Marshall will take your cards down

16   to the jury room on the second floor, and, again, thank you for

17   your attendance this morning and into the afternoon.

18          I think for the remaining persons who have been seated

19   here is the panel from which we will pick the jurors.  You

20   probably have received a video of some sort about peremptory

21   challenges.  If not, I will tell you about peremptory

22   challenges first.  Maybe I will be the first to tell you about

23   peremptory challenges.

24          Under our system, since ancient days, the lawyers and

25   the parties have had the right to ask that someone be excused

1    peremptorily, by which I mean they do not have to tell me why

2    at all.  They can do it as a matter of a gut instinct or

3    informed sociology, although I think it is closer to gut

4    instinct than it is informed sociology.  But it is a mechanism

5    by which the parties have a way of understanding that they have

6    shaped the jury panel, and they can act on whatever they think

7    is relevant and do not have to tell me why.  That is what it

8    means to be a peremptory.

9         I have observed this from this perspective for 26

10   years, I have done it myself, and there is no general theory of

11   peremptory challenges.  It is the essence of what lawyers call

12   arbitrariness and caprice, but it gives the system more of a

13   sense, I think, that there is a participation by those other

14   than the judge, and while I am being arch about this, judges do

15   not always have the feel for the case that the parties do, and

16   so this is their opportunity to affect the shaping of the jury.

17        I will tell you that in the state system everyone gets

18   called, including federal judges.  I get called every three

19   years, and, in fact, I ended up serving on a jury when I made

20   the mistake that some people make of thinking that if they just

21   show up for a day they will not get called and they can go

22   home.  I had to interrupt a jury that I had sitting so I could

23   sit on the state case and not ask for some special treatment.

24        But every three years I get called, and about maybe 10

25   years ago I showed up in Salem and looked around the panel, and

1    there was one of my colleagues, which was quite unusual,

2    because there are only 11 of us in Boston, so the chances of

3    two of us showing up on the same day in the same county in the

4    same shire town was fairly unusual.  That day I ended up

5    sitting up in the spectator area; I did not get into the jury

6    box or even into the front row.  He did, however.

7         It came time for peremptory challenges, and one of the

8    lawyers looked across at him, perhaps remembering some unhappy

9    experience in the Federal Court in Boston, and struck him, and

10   so he was asked to leave.  He walked down sadly through the

11   spectator area and turned to me and he said, "You know, this is

12   very embarrassing.  I am in the fairness business, and they

13   have just struck me peremptorily."

14        Now, I tell you that story not to hold my colleague,

15   who will remain nameless, up to shame and disrepute, but to

16   emphasize what I know is the case, that you will take it in a

17   much more mature fashion if you find yourself the subject of a

18   peremptory challenge.

19        You will understand that it is nothing personal, that

20   it is arbitrary and capricious, but very important for the

21   sense of full participation in the process, and so the lawyers

22   now, and Mr. Kuc, are looking through the list to think of

23   where they wish to exercise their peremptory challenges, and it

24   will take a few seconds for them.

25                        (Pause)

1         THE COURT:  Mr. Lovett will call out the jurors who

2    are excused in this first round, and then he will place the

3    other jurors in line there, and then I will see counsel at the

4    sidebar.

5         THE CLERK:  James Garvey, Judith Swartwood --

6         THE COURT:  Mr. Garvey, what you can do is take the

7    cards, and then the other folks who are excused will follow

8    along with you down to the jury room.  Again, to those who are

9    excused, thank you very much for your attendance here this

10   morning.

11        THE CLERK:  Mark Marrese, Angela Decker, Nicole

12   Allen --

13        THE COURT:  I will see counsel at sidebar.

14        THE CLERK:  -- Judith Johnson, Steven Lopez, Jennifer

15   Kindall, Eugene Pettinnelli, Frank Hardy, Diane Hogan, Tyler

16   McGowan, Erik Lauritzen, Thomas Levangie.

17

18   (SIDEBAR CONFERENCE AS FOLLOWS):

19        THE COURT:  Well, Mr. Lovett says that we have seven

20   remaining jurors.  I would like to have three, if it goes to

21   three, if I have to go to four or two peremptories for each of

22   you.  Would the parties be satisfied to exercise just two

23   apiece?

24        MR. SHEKETOFF:  Two apiece to go to --

25        THE COURT:  Down to three, ultimately end up with

1   three alternates.

2           MS. BURKART:  Yes, your Honor.

3           MR. SHEKETOFF:  Oh, for three or four we only get two,

4   so you are actually giving me more power to shape the jury.

5           THE COURT:  No.  For three -- no, that is right.  Yes,

6   I am.

7           MR. SHEKETOFF:  So, I'm not objecting.

8           THE COURT:  I had not realized I delegated that kind

9   of power to you.

10                          (Laughter)

11          THE COURT:  But, in any event, I would like to end up

12  with three, so you can have two more.

13          MR. GARLAND:  So, who is in play at this point, from

14  what range?

15          THE COURT:  I think it is the last seven people who

16  are there.  Mr. Levangie is knocked out of order.

17          MR. SHEKETOFF:  Thank you, Judge.

18  (END OF SIDEBAR CONFERENCE)

19

20          THE COURT:  So, we are going to go through one more

21  round of peremptory challenges, ladies and gentlemen, and we

22  will await the lawyers on that.

23          MR. SHEKETOFF:  Your Honor, could you tell us who the

24  highest number juror in the box is?

25          THE COURT:  Why don't I see you at the sidebar.

1

2    (SIDEBAR CONFERENCE AS FOLLOWS):

3            THE COURT:  Ms. Smulligan, who was in juror seat

4    number 26.

5            MR. SHEKETOFF:  Okay.

6            THE COURT:  Then we start with Ms. Redfield,

7    Mr. Plankey, Mr. Brodman, Mr. Epstein, Ms. Corday and

8    Mr. Dowell.  I leave it to you, but I don't think

9    Mr. Epstein will be a positive contributor to the jury in his

10   present mood, but if one of you does not excuse him, I might go

11   back down to two jurors.  But you use your own judgment on

12   this.

13   (END OF SIDEBAR CONFERENCE)

14

15           THE JUROR:  Mr. Lovett is going to call out the names

16   of the persons who have been excused in the second round of the

17   exercise of peremptory challenges, and I would ask the first

18   person whose name is called out to take the cards, go down to

19   the jury room for further instructions about other cases.

20           THE CLERK:  Theodore Gaudreault, James Brodman, James

21   Plankey, Lawrence Epstein and Charlman Dowell.

22           THE COURT:  Again, thank you for your attendance here

23   this morning.

24           So, if you could seat Ms. Redfield and Ms. Corday,

25   Ms. Redfield in back and Ms. Corday in the front.

1              (Pause)

2         THE COURT:  So, ladies and gentlemen, you are the

3    people who are going to decide this case, and what that means

4    is that you are going to be subject to a separate oath.  But,

5    as I indicated, we will take our break at 1:00.  You will go

6    into the jury room, which is through this door here, we will

7    have lunch for you there, and we will return here at 1:45 to

8    begin the trial.

9         There are a couple of things I should tell you right

10   now, and that is that you should not discuss this case even

11   among yourselves.  The evidence is going to come to you in bits

12   and pieces, and it will be immensely unfair to the parties if

13   you started to make even preliminary views in your own mind

14   about what the evidence shows, but what I am going to ask you

15   to do is just step back a bit.  Do not talk about this case.

16   You can talk about the Red Sox, if you would like, but do not

17   talk about this case, even among yourselves, during this time

18   period.

19        I will tell you now, and I am going to tell you at the

20   end of the day, do not do any research.  This is not an

21   opportunity for you to do background reading.  Everything that

22   is important to you is going to be brought to the courtroom by

23   the lawyers, and they will provide you with all the information

24   you need and that is properly before you for your determination

25   in the case.

1          Finally, do not discuss this case with anybody on the

2     outside, at home, or at work or anywhere else.

3          The important thing about this case is for the parties

4     to know what the evidence is that the jury is exposed to, and

5     that means you have to do everything that you possibly can to

6     avoid exposure to any other source of information,

7     conversations, or research or anything like that.

8          If you find yourself exposed to something like that,

9     you should tell Mr. Lovett, and we will deal with that.  But I

10    am going to ask you to do what is counterintuitive, I suppose,

11    when somebody is making decisions, and that is to reserve

12    judgment until you have heard all of the evidence in the case

13    and only make your judgment on the basis of what you hear in

14    the courtroom.

15         I told you there was going to be another oath, and you

16    will not take that oath until you come back, because the first

17    question I am going to ask you is did you discuss this case in

18    any way, and I know you will all say, "No," and then that will

19    be the time for Mr. Lovett to administer the oath as jurors in

20    the case.

21         So, now we will break for lunch.  We will be back at

22    1:45 to begin the trial with opening statements.

23         THE CLERK:  All rise for the jury.

24         THE COURT:  You are probably going to be sitting in

25    the same chairs when you come back in.

1          (The jury exited the courtroom at 1:00 p.m.)

2          THE COURT:  You may be seated.

3          I have had passed up to me this display of places.  Is

4    there a dispute about this?

5          MS. BURKART:  No, your Honor.  It is the chalk that

6    will be facing the jury, so I provided one to defense and one

7    to you.

8          THE COURT:  All right.  Anything else we need to talk

9    about before the jury comes in?

10          Will you open initially, Mr. Sheketoff, do you think?

11          MR. SHEKETOFF:  I think so, your Honor, but I wait to

12    make a final decision.

13          THE COURT:  I will assume that you are not until you

14    stand up, then.

15          MR. SHEKETOFF:  Okay.

16          THE COURT:  I will not ask you in front of the jury if

17    you are going to do it.  Just stand up and I will acknowledge

18    it.

19          MR. SHEKETOFF:  Fair enough.

20          And, your Honor, I have a procedural question on my

21    Motion to Suppress, which was denied.  Am I required to object

22    to those items that came as a result of the search in order to

23    preserve my rights on the Motion to Suppress?

24          THE COURT:  I do not believe so.  I think it serves

25    that purpose, but what I think I would like to do, so that the

1    record is clear, in case there is some other argument that is

2    going to be made about it -- well, let me step back.

3           Ordinarily, you are not, but you now know what the

4    Government's trying to introduce, and if you think that it came

5    within the scope of your Motion to Suppress, you can identify

6    it in some fashion.

7           MR. SHEKETOFF:  Right.  Because I have agreed to many

8    of these as unopposed exhibits --

9           THE COURT:  Right.

10          MR. SHEKETOFF:  -- on the theory that I did not have

11   to object to them to preserve my rights on the motion.

12          THE COURT:  So there is no misunderstanding about what

13   it is that you would otherwise object to on the basis of the

14   Motion to Suppress, I think I would like to have a list of

15   those matters that have been marked as exhibits that the

16   Government is going to use here in case there is some dispute

17   about whether or not it was picked up in some fashion that is

18   outside of what the Motion to Suppress dealt with.

19          MR. SHEKETOFF:  Fair enough.

20          THE COURT:  All right.  So, we will be back at 1:45.

21          Who is going to be doing the opening?

22          MS. BURKART:  I am, your Honor.

23          THE COURT:  All right.  We will be in recess.

24          THE CLERK:  All rise.

25       (The Honorable Court exited the courtroom at 1:05 p.m.)

1                        (Recess taken)

2              THE CLERK:  All rise.

3        (The Honorable Court entered the courtroom at 1:45 p.m.)

4              THE CLERK:  This Honorable Court is back in session,

5    you may be seated.

6              THE COURT:  Are we ready for the jury?

7              MR. GARLAND:  We are, your Honor.

8              MS. BURKART:  Yes, your Honor.

9              THE CLERK:  All rise for the jury.

10             (The Jury entered the courtroom at 1:47 p.m.)

11             THE CLERK:  You may be seated.

12             THE COURT:  So, ladies and gentlemen, before we

13   proceed, I have a question.  Have any of you discussed this

14   case with anyone?

15             I see no response to that, so I will ask Mr. Lovett to

16   administer the oath.

17             THE CLERK:  Members of the jury, will you please each

18   all rise and raise your right hand.

19                   (The jury was duly impaneled and sworn)

20             THE CLERK:  You may be seated.

21             THE COURT:  We begin the case, ladies and gentlemen,

22   with the opening statement of the Government.  To understand

23   opening statements, I think it may be helpful for you to think

24   about the top of a jigsaw puzzle box.  I told you that the

25   evidence was going to come to you in bits and pieces, and like

1    a jigsaw puzzle the Government is going to try to persuade you,

2    ultimately, that the pieces all fit together.  But if you have

3    had the same experience I have had with jigsaw puzzle boxes,

4    you know that sometimes not all the pieces are there and

5    sometimes they do not fit together the way you think they are

6    going to.

7            So, you listen to the opening statement as an outline

8    of what the Government thinks its case is going to look like at

9    the end, but what really counts is the evidence as it is

10   actually submitted here in court.  This is provided to you as a

11   kind of road map to let you understand where it is that the

12   Government thinks it is going with its case.

13           So, we will hear now from Ms. Burkart.

14                         OPENING STATEMENT

15   BY MS. BURKART:  This is a case about how Matthew Kuc found a

16   new way to commit an old crime.  Matthew Kuc stole.  He stole

17   by tricking people.  There's nothing new about that.  The new

18   part is the way he did it.  He stole using his home computer

19   and Internet.  What he stole was computer parts from computer

20   companies.  He tricked the companies into sending him these

21   parts, thousands and thousands of parts.  He stole millions of

22   dollars' worth of computer equipment that way, and what he did

23   with the equipment was turn around and sell it on the computer

24   on the website eBay.

25           For quite a while he got away with it, because the

1    Internet can allow you to hide, pretend to be someone you are

2    not, pretend to have something you don't have.  So, the

3    defendant sat at his home computer, and he played a game of cat

4    and mouse with the companies.  The companies started to figure

5    out what was going on, so he changed things up, working to stay

6    one step ahead of them.  But, at the end, it turned out that

7    the tools he used to commit his crime are what ended it,

8    because you cannot really hide on the Internet.  When you use a

9    computer, you leave a trail, and in this case the trail

10   literally led right to Matthew Kuc's door.

11          Good afternoon, ladies and gentlemen of the jury.  My

12   name is Amy Burkart, and I, along with my colleague, Scott

13   Garland, represent the United States in this case.  It's our

14   job to present to you the evidence that will show beyond a

15   reasonable doubt that Matthew Kuc, the defendant, did exactly

16   what he is charged with doing, committing Wire Fraud,

17   Aggravated Identity Theft and Possessing Stolen Goods.

18          As the Judge explained, the evidence will come in in

19   bits and pieces, so my job now is to explain to you what we

20   think the evidence will show at the end of the case.

21          In order to understand how the defendant tricked the

22   computer companies, it's important to understand their warranty

23   policies, because that's what he took advantage of.  The

24   computer companies that you are going to hear about are Dell,

25   Lenovo, Hewlett-Packard, also called "HP," and 3COM.  Someone

1    from each of these companies will come in to explain to you

2    that they had a very customer-friendly warranty policy.  If a

3    customer contacted them and said they had a computer that was

4    under warranty and it was broken, the company would get them

5    whatever replacement part they needed to fix it.  The company

6    would generally offer to have a computer tech come out with a

7    new part, put it in the computer, and ship the old broken part

8    back to the computer company.  They wanted these broken parts

9    because they were still valuable.  Sometimes they could fix

10   them.  Sometimes that part had been made by another company and

11   the computer company would actually have their own warranty on

12   that part, so they could get money back for it.  So, they

13   wanted the technicians to send back the broken parts, once

14   their replacement was done.

15        But some customers didn't want the computer tech to

16   come out; they knew how to install the part, they just needed a

17   replacement.  So, if that's what the customer wanted, the

18   company would just send out the replacement part, but they

19   still wanted the old part back.  So, they told the customer

20   when they got the replacement part, they should just send the

21   old part back to the company in the box that their replacement

22   came in.  The company would even provide the return label.

23        Now, the companies could have waited for the old

24   broken part to come back in before they sent out the new

25   replacement part, but they will tell you that when a customer's

1    computer breaks and it's under warranty, their customers don't

2    want to have to, first, mail in a broken part, wait for that to

3    be received and then have the new part come out; they wanted it

4    fixed as soon as possible, and the companies will tell you they

5    wanted to make their customers happy.

6           But it's this customer-friendly warranty policy that's

7    the foundation of defendant's scheme.  The evidence is going to

8    show that the scheme had three basic steps:  First, the

9    defendant would contact a computer company and claim that he

10   had a computer covered by their warranty, and tell that company

11   representative it wasn't working.  Sometimes he did this over

12   the phone, he would call them, but other times he would use

13   what's called a "chat."  It's like an instant message, an

14   e-mail that sort of goes back and forth faster.

15          He would give the company representative the service

16   tag number for the computer.  The service tag number is like a

17   code that's assigned to each computer system.  It has letters

18   and numbers in it.  That would let the company representative

19   know what computer he was talking about, and they could pull it

20   up in their system, see if the computer was under warranty.

21   That was generally it.

22          The customer service representatives were usually

23   supposed to also verify the owner information, but you will

24   find they often didn't do that.  They didn't actually have the

25   customer provide any other kind of proof, either.  Generally,

1    if the customer had the code, the service tag number, that was

2    enough.

3         Second step:  The defendant told them whatever they

4    needed to hear about the computer to decide that what he needed

5    was a replacement part.  For some companies all he really had

6    to do was give the code and say it was broken and the problem

7    could be fixed with a replacement part, and that was pretty

8    much it.  Other companies wanted to see if they could fix it

9    with him over the phone.  They would tell him different things

10   to try, called "troubleshooting," and he would say, "Yeah, I

11   tried that; it's still not working," the problem continued.

12        All of the companies will tell you that by the time

13   they were ready to send out a new part, they would ask the

14   customer what address it should be sent to, because even though

15   the company generally had an original owner in their database,

16   often their customer would want the part to go somewhere else.

17   So, at the end of the discussion they would just ask, "Where

18   should this go?"

19        So, those two steps were pretty easy.  Give a code and

20   a complaint, get a computer part sent.

21        But the person ordering a number of parts over and

22   over would attract attention, and the evidence will show that

23   the defendant did this thousands and thousands of times.

24        So, the third step:  He tricked the companies by

25   hiding the fact that all of these parts are going to the same

1    person.  At first it wasn't that hard.  These companies are

2    huge, and their requests aren't all coming in to one person or

3    one returns department; the requests are coming in to many

4    different people, spread out.  You will hear that Dell alone

5    sends around $2 million worth of computer equipment out a day

6    as replacements, and the overwhelming majority of these are to

7    legitimate customers.

8          So, the companies aren't individually keeping track of

9    this in their heads.  They have a database.  So, at first, all

10   the defendant had to trick was that database, and the way he

11   did it wasn't very hard, but it was very effective.  He changed

12   the information that he gave them enough so that the database

13   wouldn't recognize it was the same person, but he kept it close

14   enough to his real address so that the packages could still get

15   delivered.

16         Those changes, that's the heart of this scheme.  You

17   are going to hear a lot of evidence about it, so we will talk

18   about it a little bit more.

19         With names it was pretty easy.  The defendant's name

20   is Matthew Kuc, it's spelled K-u-c.  Sometimes he mixed it up

21   by spelling it Matthew Cook, C-o-o-k, or Mark Kuc or Matt

22   Cookie or Mark Conell.  Sometimes he used names that were very

23   similar to names of people he knew, his parents' names, people

24   he worked with, a friend of his named Francisco Samuel, and

25   sometimes he used names that were nothing like his own: Sam

1    Jenkins, Dan Summers, Rick Naples.  There could be many

2    different names, because it's not uncommon for multiple people

3    to receive mail at the same address.  The mail still gets

4    delivered.  But the addresses can't vary as much.  The

5    variations have to be close enough to the real address that the

6    package can get where he wants it to go.  The evidence is going

7    to show that Matthew Kuc started and ended his scheme at one

8    address, 36 Laurelwood Drive.

9           The defendant lived at 36 Laurelwood Drive, right here

10   (indicating), but if he changed the "Drive" to "Street," the

11   evidence will show that packages still got delivered, and if

12   you change the "u" in Laurelwood to a "v," well, that still

13   looks the same, and if you added extra vowels, put in hyphens,

14   it didn't matter.  If the zip code and town were right, it got

15   in the hands of someone who could figure out where it was

16   supposed to go, even if the spelling of "Laurelwood" was off.

17          And what evidence will you have that Matthew Kuc sat

18   in his home and played with different ways to write his home

19   address so that it was close enough?  You will have his own

20   notebook, because when the FBI eventually got to the house,

21   they found this notebook, and you can see the u's changed to

22   v's and the o's changed to a's in "Laurelwood."  But finding

23   this came later, because part of the cat and mouse game is that

24   as alarm bells started going off at the companies, the

25   defendant started branching out from 36 Laurelwood Drive.  So,

1    you will hear how he used other addresses.  He worked at

2    Sensible Computers, they are at 247 Maple Street, and you will

3    see how Maple became "Mapley" or "Maples," and the defendant's

4    friend, Francisco Samuel, he had an office at the Attleboro

5    Chamber of Commerce, and that was 42 Union Street.  Many

6    packages got delivered there for a time.  Finally, the

7    defendant opened a UPS box across the border at the UPS Store

8    in Cumberland, Rhode Island.  Again, the evidence will show

9    that he played with the address, because the company databases

10   would see "Mendons Road" or "Mondon Street" as different

11   addresses, but if it got to Cumberland, Rhode Island, the

12   person who was supposed to deliver it could figure out, Oh,

13   that's just the UPS Store on Mendon Road.

14        You will be able to see exactly how many variations

15   the defendant came up, because in addition to the ones you will

16   see in his notebook you will get a record from each of the

17   companies of all the times they had orders going to one of the

18   variations of these four addresses, and you can see thousands

19   of orders.  You can take these big records, these spreadsheets,

20   back to the jury room with you.  We will also have a witness at

21   the end of the trial who will go through the spreadsheets with

22   you and present some summaries, some analysis.

23        When you are back there, you can match up for

24   yourselves how the spreadsheet matches the notebook, and you

25   can see how some of the names that appear in that notebook also

1    show up on the spreadsheet and also showed up on the boxes of

2    equipment that were at the defendant's house when the FBI came

3    knocking.  Those are some of them right there (indicating).

4    Here's another one:  Rick Naples, 36 Lavrelwood Drive.

5            But we are not going to take you through each of the

6    thousands of transactions or even talk about each one of the

7    170 boxes that were found at 36 Laurelwood Drive that day.  We

8    are going to focus mainly on four transactions.

9            Remember the electronic trail, how the defendant used

10   a computer to trick the companies, and then that's how they

11   found him?  You will hear through these four transactions how

12   that happened.  There were four times we will talk about where

13   he opened up a chat session and started instant messaging,

14   sending messages back to a Dell technician.  Each time he

15   started off the same way:  "Hi, I'm one of the IT guys here."

16   He doesn't say where "here" is, and the company doesn't ask for

17   the original owner information.  You will see that in the chat

18   he opens it up by giving the service tag number and they go

19   from there.  He makes a complaint.

20           You will see the record of each chat, and you will see

21   that a customer using the name Mark Cook or Sam Jenkins or some

22   other name would convince Dell that they needed a new part

23   sent, and you will see where he told them to send it, one of

24   these four addresses (indicating).  You will hear from Dell

25   that they had a record of the original owner, but when they

1    received a request from what they thought was a customer with a

2    problem, they sent out the computer part where the customer

3    said they wanted it to go.  But those people that Dell had

4    listed as the original owners, you will hear from them too,

5    because they have flown here from Colorado and Texas, New York

6    and Louisiana to testify to you.  Each of them will show you a

7    picture they just took of their computer with that code, that

8    service tag number, still visible.  And they will tell you they

9    have had it since they bought it, it was never broken, and they

10   don't know a Matt Kuc.

11        The other part of the trail you will see through these

12   chats is the IP address.  It's basically an address for

13   computers.  When Dell has a chat with a customer, they record

14   the IP address of the computer that the customer is using to

15   reach out to them, and the IP address in each of those four

16   chats traces back to 36 Laurelwood Drive.  The customer also

17   gives a phone number in each of the chats.  It turned out to be

18   a phone number that uses the Internet to get phone service.

19   You can do phone service over the Internet using your cable

20   modem.  All four of those phone numbers trace back to 36

21   Laurelwood Drive.

22        So, for a while the defendant was doing a pretty good

23   job staying a step ahead of the companies, but they were

24   beginning to notice how many parts were being requested from

25   these addresses, and while sometimes old parts were returned,

1    in a vast majority of cases nothing came back.  So the

2    companies tried to pursue the names of the people who had

3    sought these replacement parts, asking that they either return

4    the broken part or pay for a new one.  They sent out bills,

5    they made calls.  You will actually get to hear some of the

6    voicemails they left, because that computer-over-the-Internet

7    service means that the voicemails are recorded in the computer,

8    so when they searched the house they got the computer and we

9    got the voicemails.

10         You will also hear from a company representative who

11   actually talked to Matt Kuc.  She got so frustrated she Googled

12   him, found him at work, called him and said, "Please, send back

13   these old parts."  He did not.

14         The companies will tell you that they began to notice

15   from the reports in their databases that these addresses were

16   very similar, and they, of course, began to suspect that

17   whoever was seeking replacement parts and generally wasn't

18   returning them didn't have the computer parts at all.

19         You will hear evidence as well of what happened to

20   those parts, because someone from the North Attleborough Police

21   Department will tell you he was watching the defendant's eBay

22   website, it's called "Total Asset Recovery," and he was seeing

23   how much computer equipment was being sold on the eBay website,

24   equipment from Dell, Lenovo, HP and 3COM, among others.  This

25   witness will testify to you, show you the printouts he made of

1    the store.  You will be able to see for yourself what the

2    defendant was selling and what companies he was selling

3    computer equipment from.  And, of course, there is the

4    electronic trail from eBay as well.  You will be able to see

5    the records of all of the computer equipment that defendant was

6    selling in this eBay store and the volume of the parts that

7    were sold.

8         Hewlett-Packard got so frustrated that when they saw

9    an order come in from John Reynolds at 36 Lavrelwood Drive, or

10   something very similar to that, they went out with the North

11   Attleborough Police Department and took a videotape of the

12   package being delivered.  So, you will get to see the videotape

13   and see the defendant accepting and signing for that package.

14        As the electronic trail grew stronger, as the volume

15   of requests for computer equipment continued to grow, and as

16   the sales of computer equipment on eBay continued, soon it

17   wasn't just HP and the local police at defendant's door.  When

18   the FBI came to 36 Laurelwood Drive one morning with a search

19   warrant, all of the pieces came together, 36 Laurelwood Drive,

20   where a plaque hung on the wall declaring Matthew Kuc the

21   President of Total Asset Recovery, the defendant's eBay store,

22   Total Asset Recovery, which sold over $1 million worth of

23   merchandise, computer equipment, 36 Laurelwood Drive, which was

24   full of boxes, these are just some of them, of computer

25   equipment and shipping labels, boxes addressed to variations of

1   36 Laurelwood Drive and variations of these other addresses,

2   and the notebook showing him playing with address variations,

3   and, of course, the defendant's computer, the source of the

4   electronic trail.

5          The computer evidence will show, because computers

6   hold onto things really for a long time, that the defendant

7   checked out some of the company websites.  He was able to try

8   different codes and the service tags right on the company

9   websites to see if that computer part was under warranty.  The

10  computer also had little scripted complaints that the defendant

11  kept handy right on the desktop of his computer so he would see

12  them when he turned it on.  They all started, "I'm one of the

13  IT guys here," and they went on to describe a problem that

14  could be only fixed with a replacement part.  The evidence will

15  show that these stock complaints worked to cut to the chase in

16  these conversations and get to the point where the technician

17  would send him a new part.  How will you know this?  Because

18  some will match up, in some cases word for word, with the

19  complaints in the chat sessions that we are going to show you

20  for the four complaints we are focusing on, the four requests.

21         So, the pieces are all going to come together at

22  36 Laurelwood Drive, and for Matthew Kuc the cat and mouse game

23  was over.  While the evidence will show that Matthew Kuc had a

24  complicated way of doing it, in the end he stole.  He tricked

25  people and he stole from them and, ultimately, he got caught.

1          At the end of the trial, we expect the evidence will

2    support only one conclusion, and we will ask you to use your

3    common sense and return the only verdict consistent with the

4    evidence:  guilty.

5          THE COURT:  Thank you, Ms. Burkart.

6          Mr. Sheketoff.

7          MR. SHEKETOFF:  Thank you, your Honor.

8                         OPENING STATEMENT

9    BY MR. SHEKETOFF:  If it please the Court, Madam and

10   Mr. Prosecutor, Mr. Kuc, and ladies and gentlemen of the jury.

11         The Judge told you that an opening is like the cover

12   to a jigsaw puzzle with a picture.  It serves a second purpose

13   too, at least from my perspective, which is to focus your

14   attention on what is at issue in the case.  That Matthew Kuc

15   used different variations of his name, that he had different

16   addresses where he received computer parts, these are all

17   conceded.  This is not an issue in the case.  That there was a

18   cat and mouse game, it's conceded.  There was a cat and mouse

19   game.  So, I'm making this opening to focus your attention on

20   what is at issue.

21         In order to make this a crime, you have to have, and

22   the Judge will instruct you at the end of the case, a specific

23   intent to defraud.  Now, if Matthew Kuc had parts that were

24   under warranty, whether they were one part or 10,000 parts, he

25   didn't draw up these warranties, he didn't tell Dell what to

1    write in a warranty, how to run their warranty program.  He

2    didn't tell Lenovo or HP or any of these other companies.  They

3    set their warranty program, and if he had a right under their

4    warranty program to get a replacement part, he had that right,

5    and that's where I'm going to ask you to focus your attention.

6    Did he have those parts?  Was he entitled under the warranty

7    program to request a replacement part?  Did Dell have some sort

8    of cutoff, if you request five replacement parts you are cut

9    off, or did their warranty permit any person that had the part

10   while it was still under warranty to request a replacement

11   part?  That is the focus that I am going to ask you to think

12   about during the course of this trial.  You are going to learn

13   a lot of things about computer companies and how they run their

14   business, what they ask for and don't ask for.

15          This is not a blame-the-victim issue.  I'm not

16   suggesting that the incompetence of any computer company is

17   what's at issue here.  I'm suggesting that Matthew Kuc's state

18   of mind is what is at issue here.

19          You will learn that this warranty program that Dell

20   had changed over time and changed in different ways.  Sometimes

21   Dell would tell a person who held a part that was under

22   warranty, "Don't return it."  Sometimes they told them, "You

23   must return it, and if you don't return it, you will be billed

24   for it."

25          You are going to learn something else about the

1    technicalities of computers.  One of the things that the

2    Government focused on is these four instances where they say,

3    We can prove to you that Matthew Kuc had nothing to do with the

4    computers, nothing at all, but he made a claim and, therefore,

5    you know, based on that claim, that this was a part of a

6    pattern, that he had never had these parts.

7         You are going to learn that a motherboard can be

8    programmed with a different tag number.  Dell can program a

9    motherboard with any tag number it wants, and because you have

10   a computer sitting in Colorado with one tag number and you have

11   a different computer sitting in North Attleborough,

12   Massachusetts, it can have the exact-same tag number, the

13   exact-same tag number.

14        So, ladies and gentlemen, focus on what is at issue

15   here.  It is not whether there was a cat-and-mouse game,

16   because he has the right to play a cat-and-mouse game to get

17   what he is entitled to under the warranty.  It is whether or

18   not he was stealing, and I suggest to you at the end of the

19   case, I am going to come back to you and say there is no

20   evidence that he was stealing.  You must acquit.

21        Thank you.

22        THE COURT:  Thank you Mr. Sheketoff.

23        The Government's first witness.

24        MS. BURKART:  Yes, your Honor.  The Government calls

25   Robert Long.

1          ROBERT LONG, DULY SWORN BY THE CLERK

2              THE CLERK:  Please state your full name, spelling your

3     last.

4              THE WITNESS:  Robert Paul Long, L-O-N-G.

5              THE COURT:  You may proceed.

6                      DIRECT EXAMINATION

7     BY MS. BURKART:

8     Q.    Good afternoon, Mr. Long.  Where do you work?

9     A.    I work for Dell, Incorporated.

10    Q.    And how long have you been at Dell?

11    A.    16 1/2 years.

12    Q.    What is your current title?

13    A.    Senior Supply Chain Manager.

14    Q.    And how long have you been in this role?

15    A.    Three years.

16    Q.    What are your responsibilities in this role?

17    A.    I manage a team of individuals who are responsible for

18    recovering the defective parts that are left over when we

19    repair a product for Dell.

20    Q.    And, broadly, what did you do at Dell before your current

21    position?

22    A.    I've worked at a number of positions, including technical

23    support, product development, commercial services program

24    manager, and global contact center operations.

25    Q.    Are you familiar with the warranty policies offered by

1    Dell?

2    A.    I am.

3    Q.    Could you just generally explain for us, first, what is a

4    warranty?

5    A.    A warranty is a contract that is purchased typically at

6    the time that a product is purchased that entitles the customer

7    or the purchaser to receive a replacement for any defective or

8    other incidents that may occur with the product.

9    Q.    How can a customer tell if a product that they had of

10   Dell's was under warranty?

11   A.    At the time that they purchased the product their invoice

12   will show a line for the contract that may have been attached

13   to that purchase, and it will give specifics regarding the

14   amount of time for which the product is under warranty.

15   Q.    If they don't still have that information, how could they

16   check to see if a system they still have is still under

17   warranty?

18   A.    They can do it in a number of ways.  They can go to the

19   website.  We have a warranty status web page that would enable

20   someone to look up their warranty, or they may call Dell and

21   provide the information, or they may chat with someone at Dell

22   and provide the information and then be told how much warranty

23   times remains.

24   Q.    If a customer wanted to use the online tool that you

25   described, what would they enter on the Dell website to check?

1    A.   They would need to put in just the service tag number.

2    Q.   And what information would they see once they entered the

3    service tag number?

4    A.   Typically, when they put in the service tag number they

5    will receive a listing of what type of product it is, the

6    subcomponents that would be within the product, if it were a

7    computer, for example, and the amount of time for any warranty

8    that would remain for the product.

9    Q.   I am going to show you what's marked as Exhibit W.  It

10   should come up on your monitor.  Do you recognize that?

11   A.   I don't see anything yet.  Do I need to turn it on?

12   Q.   Yes.

13   A.   There we go.  I do.

14   Q.   What is it?

15   A.   That is the Dell Warranty Status page.

16   Q.   And are you familiar with that page from your work at

17   Dell?

18   A.   I am.

19        MS. BURKART:  Your Honor, I would move to admit this

20   as Exhibit 71.

21        MR. SHEKETOFF:  Your Honor, I object for a reason we

22   discussed before, and it's Exhibits 70 to 79 and 45 to 66 that

23   I'm objecting to just on those grounds, and I have no further

24   objection.

25        THE COURT:  I understand the objection.  I have ruled

1    on it before trial, so it is received.

2                    (Exhibit No. 71 received into evidence)

3    BY MS. BURKART:

4    Q.   Directing your attention to the first page, Mr. Long, what

5    page is this, the page where the customer enters the

6    information or the page that just shows the results?

7    A.   This is the output page.  It's the result of someone

8    having entered information in.

9    Q.   Can you take a look and tell me what the service tag

10   number is?  I may need to zoom in for you.

11   A.   The service tag is 472 Foxtrot Victor Hotel 1.

12   Q.   And what type of equipment is being checked here?

13   A.   A Dell Precision Work Station T3400.

14   Q.   What is the warranty status of that product?

15   A.   As of the time that this report was run, it shows that

16   there are 594 days of warranty remaining.

17   Q.   I am going to direct your attention to the second page.

18   What is the service tag on this page?

19   A.   479 Foxtrot Victor Hotel 1.

20   Q.   Do you know how that compared to the previous service tag

21   number we just reviewed?

22   A.   It appeared that the first few characters were slightly

23   different.

24   Q.   And is this product also under warranty?

25   A.   Yes, with 593 days left as of the time that this was run.

1   Q.   Have you previously reviewed the remaining three pages of

2   the exhibit?

3   A.   I have.

4   Q.   Did you see any pattern with the service tag numbers?

5   A.   Yes.  It appeared that the numbers were very close to each

6   other in sequencing, that they were off from each other by only

7   a few characters.

8   Q.   I am going to turn back -- thank you -- to the discussion

9   about how the warranty replacement works.  If a customer

10  experiences a problem with their computer and it's under

11  warranty, how would that customer reach out to the company?

12  A.   They may either contact us via telephone, send us an

13  e-mail or chat with us.

14  Q.   And you were in charge of the technical support centers at

15  one time; is that right?

16  A.   That is correct.

17  Q.   Are these the centers that handle warranty replacement

18  parts?

19  A.   They are.

20  Q.   Approximately how many customer support centers were there

21  in the 2005 to 2010 time frame?

22  A.   Dell experienced a lot of growth during that time period,

23  so the number would have shifted, but during that time frame

24  there would have been anywhere from 35 to 50 global contact

25  centers dedicated to providing support.

1  Q.  Staying generally with this time frame through the next

2  set of questions, 2005 to 2010, where were they located?

3  A.  They were located in a variety of locations in the U.S.

4  For example, we have a contact center in Round Rock Texas just

5  outside of Austin, we have one in Nashville Tennessee, we have

6  some in Salt Lake City, some in Tampa, Florida.

7  Q.  Were any of these centers in Massachusetts or Rhode

8  Island?

9  A.  No.

10  Q.  Approximately how many technicians were working at these

11  centers, cumulatively?

12  A.  The total number would be between 6- to 10,000 employees

13  during this time frame.

14  Q.  And how many replacement parts get sent out by Dell, again

15  generally?

16  A.  Generally, currently on each day in the United States

17  alone we send about 1 1/2- to $2 million worth of parts out

18  every day.

19  Q.  And how do customers contact these technical support

20  centers?

21  A.  Via telephone, e-mail or chat.

22  Q.  Could you briefly describe what a "chat" is?

23  A.  A "chat" is an interface similar to Yahoo chat or Facebook

24  chat that someone may access by going to the Dell web page and

25  clicking the "Chat with a Technician" button, and that will

1    then prompt them for information.  Then they will be connected

2    to a technician.

3    Q.   What information do they need to enter before they are

4    connected with a technician?

5    A.   They will be asked to provide the service tag number,

6    which is the unique identifier for their product, as well as

7    their name and their contact info, typically telephone or

8    e-mail.

9    Q.   Once they are in touch with a technical support person,

10   how do they determine what the problem is?

11   A.   They perform troubleshooting.  The technician will perform

12   troubleshooting with the end user or customer.

13   Q.   What is troubleshooting?

14   A.   Troubling-shooting is narrowing down the list of

15   possibilities of what could be wrong with the product.  So, you

16   start out very generally, and then you work your way, as you

17   are able to exclude things, to more specific issues until you

18   finally identify what you believe is wrong with the product.

19   Q.   And if a technician determines that a new replacement part

20   is needed, what happens next?

21   A.   If they've reached the diagnosis that a part is bad, then

22   they will verify contact information regarding where the part

23   should be shipped, and they will send the part to the end user.

24   Q.   Do they always just send the part to the end user?

25   A.   No, depending upon the type of warranty that was purchased

1    with the product.  Our default warranty tends to be for what is

2    called "Next business day on-site service," so that would have

3    a Dell vendor, a technician, come out with the part, they would

4    replace the part, and then return the defective part to Dell.

5    Q.   Why would the technician return the defective part to

6    Dell?

7    A.   Defective parts have value to Dell, and so when you have a

8    failure, let's say your video card goes out or your monitor

9    dies, we don't get the part back and throw it in the trash.

10   The part actually -- we have warranty terms with vendors who

11   make those parts for us.  We may be able to either return the

12   part to the vendor and get another replacement part that is

13   like new, we may be able to repair the part and, at a lesser

14   cost than buying a new one, put it back into service, or we may

15   be able to return it for a credit for another part.

16   Q.   So, if a technician doesn't come out, if the customer

17   wants just the part sent, then what happens to the broken part?

18   A.   If the technician does not come out?

19   Q.   Yes.

20   A.   Then we instruct customers to follow the instructions that

21   are sent in the box.  In every shipment that we send out there

22   is a packing slip that provides instructions on how to return

23   the product, and there is also a return airway bill that

24   enables the customer to slap it on the box and send it back.

25   Q.   So, send it back in the box it came from?

1    A.    That is correct.

2    Q.    How long does it take for the part to go out to the

3    customer?

4    A.    Parts shipped out to customers are next business day.

5    Q.    And why does Dell send out the replacement part without

6    first waiting for the old part to be received?

7    A.    This is the model that we have adopted since Dell started

8    25 years ago as a business.  Our goal, when customers

9    experience issues or failures with their products, is to get

10   the customer up and running as quickly as possible, so we want

11   them to experience the minimum of downtime.  We send the parts

12   out as fast as we can.

13   Q.    Do other companies do it this way as well?

14   A.    I'm not aware of the full outlook of the competitive

15   landscape, but from my understanding the majority of companies

16   do provide next business day or a similar service.

17   Q.    How does Dell get the address to send the part to?

18   A.    We have the address that was stored in our records from

19   the original order that was purchased, but we also verify at

20   the time that the dispatch is set up if there is an alternate

21   address that the customer is going to be requesting.

22   Q.    Why are they asking for an alternate address if they

23   already have an address for the customer?

24   A.    We don't want to assume, so at the time the technician is

25   talking to the end user, they will say, "We are going to send a

1    part," they'll say, "Okay."  "Would you like me to send this to

2    the address that is on the account?"  And it's at that point in

3    time that the end user would provide an alternate, if one

4    existed.  People move, businesses may have multiple offices or

5    locations.

6    Q.   Does Dell require the customer to provide any verification

7    of who they are?

8    A.   They do.  When the customer or a customer calls in to

9    request service, before a dispatch can occur they are required

10   to ask the customer to provide contact information that would

11   then match what is on the system that we have.

12   Q.   Does that always happen?

13   A.   Unfortunately, it does not.  Given the number of

14   technicians, as described, 6- to 9,000 individuals, human error

15   does sometimes creep in, and you find that there are some

16   technicians who don't follow the rules as stringently as they

17   should.

18   Q.   Does Dell require anything else from a customer before

19   they send the part out?

20   A.   No.

21   Q.   Do they request a credit card?

22   A.   We do not.  We are one of the few companies that does not

23   do that at this time.

24   Q.   Why does Dell not request a credit card?

25   A.   I think, historically, it has been viewed as perhaps a

1    time-saver.  In not asking for a card we don't keep the

2    customer on the phone for as long, and we don't have the sense

3    of lack of trust with the customer.  I do feel, though, that's

4    something that is going to be changing in the future.

5    Q.   You said that the technician either takes the old part or

6    they send the old part back.  Does Dell request that all old

7    parts be returned?

8    A.    We don't.  We have a number of parts that are called "NRP"

9    or nonreturnable parts.  There are varying thresholds and

10   characteristics of parts that may make Dell decide that it is

11   not a worthwhile part to return.  So, for example, if there is

12   a plastic piece or rubber foot that goes on the bottom of your

13   computer, that part may cost Dell a quarter, and if we ask for

14   the old rubber feet to come back, then we would spend more in

15   shipping than the part is worth.

16   Q.   Does Dell keep track of when a customer returns a part?

17   A.    We do.  At our receiving centers we open each box that

18   comes back, we scan the Dell product support number on the

19   outside of it, and then we track the contents of the box to

20   determine what came back.

21   Q.   If a computer is resold by someone, a computer under

22   warranty is resold to someone, is there a way to update the

23   ownership information?

24   A.    Yes.  You may either contact technical support over the

25   phone to request that it be updated, or you may go online and

1    use our ownership transfer form.

2    Q.    And what verification is required when you go online and

3    change the ownership of a piece of computer equipment?

4    A.    Well, that varies.  Prior to November of 2011, you were

5    supposed to have provided the original owner info, but

6    unfortunately we discovered there was a loophole in the

7    product, in the online tool, that allowed people to provide

8    nothing and put just the tag number and the new owner

9    information and assume ownership of that product.  We have

10   since corrected that.

11   Q.    Was that loophole open in the 2005 to 2010 time frame?

12   A.    Yes, it was.

13   Q.    Where does Dell keep the information about the service

14   requests that come in?

15   A.    We maintain that in a tool called "DPS," which stands for

16   "Dell Product Support," and we also have a data warehouse

17   called "D3."

18   Q.    What does "D3" stand for?

19   A.    It stands for Dell Data Direct.

20   Q.    What information is contained within the D3 system?

21   A.    Pretty much anything imaginable related to our products

22   and the dispatches, so time of request, time of purchase, agent

23   name, customer name, product ID, part number.

24   Q.    Are there any systems in place within D3 to try to prevent

25   fraud or detect fraud?

1   A.   We have a number of teams at Dell whose jobs, including

2   members of my team, are to analyze data from D3 and look for

3   trends or correlations between addresses, part numbers, phone

4   numbers, etc.  There's nothing automated at this point.  It is

5   a manual exercise.

6   Q.   Are there any challenges or limitations to this system?

7   A.   There are.  I think that, as it stands currently, the

8   system is open to gaming by someone who is shifting or changing

9   spelling or names.

10   Q.   When you say "changing spelling," could you give an

11   example of that?

12   A.   There's a phrase called "fuzzy logic" that would enable a

13   computer to look at two different addresses and say they are

14   close to each other.  But the way our system currently stands,

15   if someone ships something to 123, space, Main Street, M-A-I-N,

16   our computer will not see or our routines would not see that as

17   the same address if someone puts 123, space, M-A-I-N-E.  It may

18   be that no M-A-I-N-E street exists, but the Post Office knows

19   that and they deliver it anyway, but that looks different to

20   our computer systems that says those aren't a match, so it

21   makes matching such things difficult.

22   Q.   So, what does that mean in terms of fuzzy logic, the term

23   you used?  Does the computer use it or not use it?

24   A.   Ours does not.  We are working to implement that, but as

25   it stands now slight spelling variations can throw us off.

1   Q.   What does Dell do when computer parts that they're

2   expecting to come back, broken parts, are not returned?

3   A.   If the part ages beyond 90 days, then Dell takes a

4   financial loss that is known as a write-off.  That basically

5   shows up as a negative for the accounting books for that period

6   of time.

7   Q.   Does Dell wait 90 days and then write it off, or do they

8   take some steps before they are willing to write it off?

9   A.   We take a number of steps.  So, immediately when a part is

10  sent out, we will send e-mails to the address that we have on

11  file, the e-mail address.  Up to day 15 we make a number of

12  emails and automated phone calls to the customer, saying, "Hi,

13  we've sent you a part.  Please follow the instruction in the

14  box to return the part."

15       If the person has not returned the part by day 15,

16  then we engage a vendor to make live phone calls that they then

17  continue for the remainder of that 90-day period to attempt to

18  return the part, assuming, of course, that the contact

19  information that's provided is valid.

20  Q.   Does Dell send invoices or bills to the customers?

21  A.   We have in the past.  In the 2005 to 2010 time frame we

22  did.  We would send at approximately day 30 a paper invoice

23  that would show the amount of the parts due and outstanding.

24  It's a practice that we have ceased momentarily but are about

25  to pick up again.

1    Q.   You referred to the Dell Data Direct or D3 system.  Are

2    you familiar with the reports that can be created from that

3    system?

4    A.   I am.

5    Q.   What type of reports can that database generate?

6    A.   That database can be used to generate reports that show

7    the number of parts received, or the number of parts

8    outstanding or the types of data specific to any given

9    dispatch.

10   Q.   Are the reports a result of a process and system you know

11   to produce accurate results?

12   A.   Yes.

13   Q.   Have you had the opportunity before you came to court

14   today to carefully review documents marked Exhibits A through

15   D?  We're going to put up A on the screen for you as well.

16   A.   I have.

17   Q.   Just focusing you on A right now, do you recognize this?

18   A.   I do.  This is an output from the D3 system.

19   Q.   And did you have an opportunity -- is it the output

20   itself, or is it another form of that output?

21   A.   This is a condensed version of the output.

22   Q.   Did you have the opportunity to compare the condensed

23   version with the full output of the system?

24   A.   I did, and so there are a reduction in some number of

25   fields, but the primary data sets are linked, they match.

1    Q.   How large is the full output, length of pages?

2    A.   Oh, it would be several pages wide, because there are a

3    vast number of columns that are associated with each incident.

4    Q.   Did the data from the full spreadsheet match the data from

5    the more condensed version?

6    A.   It did.

7         MS. BURKART:  Your Honor, I would move to admit this

8    as Exhibit 5.

9         THE COURT:  Any objection?

10        MR. SHEKETOFF:  No, your Honor.

11        THE COURT:  All right.  It is received.

12            (Exhibit No. 5 received into evidence)

13   BY MS. BURKART:

14   Q.   Directing your attention to the title box, first, of

15   Exhibit 5, what is this?

16   A.   This indicates that this report was made based upon

17   dispatches that were sent to the address for 36 Laurelwood

18   Drive, North Attleborough, Massachusetts.

19   Q.   Next, I am going to direct your attention to the headings.

20   I'm going to introduce a number of these spreadsheets.  So, if

21   we could just scroll through.  If you could tell us what each

22   of the headings is so we understand the spreadsheet, that would

23   be helpful.

24   A.   "Service Request Create Date" would be the day or the date

25   that the technician who took the phone call or the chat would

1     have created the request for a part.

2            The "DPS Number Incident Request."  As mentioned

3     previously, "DPS" stands for "Dell Products Support."  Whenever

4     a request for service is created, a unique number is assigned

5     to that so that we can use it for later reference, and that is

6     that number.  The "Service Tag ID" is the unique identifier for

7     each product that enables us to track warranty entitlement and

8     components for that specific product.  The "Service Request Alt

9     Comp Name," some companies may have alternate names that are

10    used, so this gives the ability to store that.  The "Service

11    Request Contact Name" is the name of the person who made the

12    request for service, so the end user that would have called

13    Dell, it's the name that was given.  "Address 1 and 2" are

14    those addresses provided to which the service is to be sent.

15    "City," I think, is self-explanatory, as is "State" and "Zip

16    Code."  Those are the items for the request itself.  "Contact

17    Phone" as well.  The "Operational Product Description" would be

18    Dell's descriptor of the product, so, for example, a Precision

19    Workstation or Latitude product.  The "Service Request Creator"

20    is the name of the Dell employee that created the request.

21    Q.    Is that the person on the other end of the chat?

22    A.    It is.  It is the person that would be handling the phone

23    for Dell or the chat for Dell.

24            The "Service Order Amount" is the market or fair

25    market value of the part that is being requested, and the

1    "Order FPC" cost is Dell's cost, which typically there is a

2    fairly significant difference in that, given that Dell is able

3    to receive parts at a lower cost.

4    Q.   All right.  I'm going to direct your attention to page 110

5    of this spreadsheet to show an example.  I'm pulling up a box

6    to magnify on some of the requester names.  Do you see any

7    variations of names and addresses?

8    A.   I do.  In looking through this sheet previously, I have

9    seen a number of variations that were apparent.  On what is

10   highlighted here I don't see any presently, but the spelling

11   changes slightly, and in some instances the hyphen is missing

12   or the spelling is slightly different.

13   Q.   Thank you.  Just focusing you now on the requester name on

14   page 110 -- can you scroll down there -- all of those are the

15   same requester name.  Does that mean it was the same person on

16   the other end of the chat?

17   A.   This particular set of data involves our battery recall

18   that occurred in late 2006.  When Dell discovered that there

19   was an issue with their batteries and made the public

20   announcement, they provided a website that people could use to

21   request replacements for those batteries.  Part of the back end

22   of that website was that someone created a macro or an

23   automated tool that would automatically dispatch these parts.

24   The way the Dell tool works is that, in order to dispatch a

25   part, you have to have an account.  So, someone assigned the

1    account of John Leggit (ph) to be the macro-driven dispatcher

2    for these battery requests.

3    Q.   Just to make sure we understand that, the 2006 battery

4    recall, was that a unique situation?

5    A.   It was unique for this particular instance.  Any company

6    experiences a number of recalls.  In this particular instance,

7    it was discovered there was an industry-wide issue with certain

8    battery products.  Other companies initiated their own similar

9    recalls.  Dell made the announcement and then provided the

10   means for people to replace those.

11   Q.   So, was the replacement process for batteries during the

12   battery recall different than the standard Dell process you've

13   described before?

14   A.   It was.  Typically, in order to replace any product you

15   would go through the same troubleshooting that we described

16   previously, but in this instance, since there was a known issue

17   with those particular items, people could go to the website,

18   enter the product descriptor or the unique number for that

19   product and the address to which they would like it shipped,

20   and then one would automatically be dispatched.

21   Q.   To the extent that there is a lot of John Leggits on the

22   spreadsheet, does that mean one person named John Leggit was

23   taking in request after request?

24   A.   It does not.  It would have been physically impossible for

25   John to have created so many.  It was macro-driven.

1    Q.   And with the exception of the John Leggits that relate to

2    the battery recall, did you see a large number of variations of

3    the service requester Dell employee name on the other end of

4    those chats?

5    A.   I did, with the exception of John Leggit.

6    Q.   Mr. Long, directing your attention to the Exhibits B

7    through D, did you have the opportunity to review those as

8    well?

9    A.   I did.

10   Q.   And did you recognize them?

11   A.   I did.  They are output from our D3 system, and they are

12   for differing addresses.

13   Q.   Are those similarly condensed versions of the output?

14   A.   They are.

15   Q.   Did you have the opportunity to review them and compare

16   them to the original output that you have provided to us?

17   A.   I did.

18   Q.   Were they fair and accurate summaries of the data that you

19   previously provided?

20   A.   Yes, they were.

21        MS. BURKART:  I move to admit Exhibits B through D as

22   6 through 8, your Honor.

23        THE COURT:  Any objection?

24        MR. SHEKETOFF:  No, your Honor.

25        THE COURT:  All right.  They are received.

1          (Exhibit Nos. 6 through 8 received into evidence)

2     BY MS. BURKART:

3     Q.   Mr. Long, after you reviewed all of the data sets, did you

4     have the opportunity to see if any computer parts were returned

5     by Mr. Kuc?

6     A.   I did.  I requested the data person on my team run a query

7     to determine what, if any, parts had come back.

8     Q.   Were any of those parts returned?

9     A.   We did have a number of parts that had been returned.

10    Q.   Did you see any pattern between 2005 and 2010 in the

11    number of parts of equipment that were returned?

12         MR. SHEKETOFF:  Well, objection.

13         THE COURT:  No.  I will permit him to answer this

14    question.  He may answer it.

15    A.   I did.  There is a descending curve in returns.  So, in

16    2005 there were several hundred parts returned.  That number

17    dropped dramatically and steadily to where in the final year

18    there were only 15 parts returned.

19    BY MS. BURKART:

20    Q.   I'm going to show you now what is marked as Exhibit N.  Do

21    you recognize this?

22    A.   I do.

23    Q.   What is it?

24    A.   This is a list of requests summarized even further for

25    specific addresses.

1    Q.   Directing your attention to pages 2 and 3, do you

2    recognize those?

3    A.   I do.  Those are very detailed output from the D3 system,

4    multiple-page output.

5    Q.   So, are page 2 and 3 the full output from the D3 system?

6    A.   Yes, that is correct.

7    Q.   And page 1 is a summary of the same information?

8    A.   This is correct.

9    Q.   Is it a fair and accurate summary of the full information?

10   A.   It is.

11        MS. BURKART:  Your Honor, I would like to move to have

12   Exhibit N admitted as Exhibit 26.

13        THE COURT:  Any objection?

14        MR. SHEKETOFF:  With the Court's indulgence?

15        THE COURT:  Yes.

16                         (Pause)

17        MR. SHEKETOFF:  Yes, your Honor.  I object to the

18   first page of it.

19        THE COURT:  The heading, you mean?

20        MR. SHEKETOFF:  Yes.

21        THE COURT:  Well, I am going to have it redacted, but

22   I do have a question.  With respect to these lettered exhibits,

23   they are, at least initially, opposed, but they are being shown

24   to the jury, and I do not want to have them shown to the jury

25   until they have been admitted here.

1    MS. BURKART:  Yes.

2    THE COURT:  So, I will ask Mr. Lovett to make that

3  modification.

4    In any event, I will order that this be redacted to

5  take the secondary heading out of it.

6    The reason for this, ladies and gentlemen, is one

7  could say that the document is argumentative, it is arguing the

8  Government's case by making certain relationships here, and

9  that is not something that is appropriate to have as an

10  exhibit.  You have had it flashed in front of you.  It will

11  look a little bit different when it is finally admitted to you,

12  but it will be received as Exhibit 26 in redacted form.

13    MS. BURKART:  Thank you, your Honor.

14    (Exhibit No. 26 received into evidence)

15  BY MS. BURKART:

16  Q.   I am going to ask you, we are going to be switching back

17  and forth to the substance of Exhibit 26 in the next set of

18  exhibits, but now I am going to direct your attention to the

19  four chats.  We will be showing you what is marked first as

20  Exhibit 1, which is unopposed.  Do you recognize this?

21  A.   I do.  This is a transcript of a chat log for a Dell

22  technician interaction with a customer.

23  Q.   And how can you tell it's a Dell service chat?

24  A.   I can tell because of the structure and formatting as well

25  as the fact that in the log the technician identifies himself

1    as a Dell employee and also uses Dell dispatch number

2    information.

3            MS. BURKART:  Your Honor, would you like me to move to

4    admit it as Exhibit 1?

5            THE COURT:  Yes, just so the record is clear on it.  I

6    understand this is unopposed.

7            MS. BURKART:  I move to admit it as Exhibit 1, please.

8            THE COURT:  All right.  It is received.

9            (Exhibit No. 1 received into evidence)

10   BY MS. BURKART:

11   Q.   Mr. Long, I am going to direct your attention to the line

12   that says "IP Address."

13   A.   Okay.

14   Q.   What is an IP address?

15   A.   IP address.  "IP" stands for "Internet Protocol," and it

16   is a unique number assigned to any computer that wants to get

17   on the Internet or the Web, similar to a street address or a

18   driver's license number.  It allows the computers to go to the

19   web and receive information back.

20   Q.   And what IP address did this chat originate from?

21   A.   76.19.186.143.

22           MS. BURKART:  Your Honor, may I ask that the

23   stipulation be read into the record at this time?

24           THE COURT:  Yes, if you want to do it.

25           MS. BURKART:  Sure, I'm happy to do it.

1          "The parties agree that on various dates and times

2     between February 2010 and November 2010, according to records

3     from Comcast and Yahoo, the IP address 76.19.186.143 was

4     assigned to 36 Laurelwood Drive in North Attleborough,

5     Massachusetts."

6          THE COURT:  Just so it is clear, when the parties

7     stipulate, it basically means they agree, and you are entitled

8     to take that agreement as evidence in this case without looking

9     any further at it, if you choose to do so.

10    BY MS. BURKART:

11    Q.   To begin this chat, what did the customer enter?

12    A.   The customer would have had to have entered their service

13    tag ID number and their contact information.

14    Q.   Is there a service tag visible in the chat?

15    A.   There is.

16    Q.   What is that service tag?

17    A.   8 Kilo 72 Golf Charlie 1.

18    Q.   And what customer name was provided?

19    A.   Tod Clark.

20    Q.   And what color are the communications from Mr. Clark?

21    A.   Red.

22    Q.   What is Mr. Clark's first line?

23    A.   "Sure."

24    Q.   And what does he say next?

25    A.   "I'm one of the IT guys here."

1   Q.   In general in this chat, how did Mr. Clark describe his

2   problem?

3   A.   He described an issue with his tape drive, saying that it

4   appeared to have no power and was unable to function at all.

5   Q.   Was Mr. Clark's problem resolved in this one chat?

6   A.   No.  There were two chats in this particular interaction.

7   Q.   I am going to direct your attention to the second page of

8   the exhibit.  Is this the second part of the chat?

9   A.   It is.

10  Q.   So, what happens?  Can you tell from the chat what went

11  wrong?

12  A.   It appears that the session was disconnected, and so the

13  person initiating this chat created a new session or a new

14  request.

15  Q.   What is the name of the Dell representative who takes the

16  second chat?

17  A.   Cliff Parmele (ph).

18  Q.   And how does Mr. Parmele resolve Mr. Clark's problem?

19  A.   He dispatches a replacement tape drive.

20  Q.   And where does the customer ask Dell to have that tape

21  drive sent?

22  A.   To 247 Maple Street, in Attleboro, Massachusetts.

23  Q.   Was it sent?

24  A.   It was sent.

25  Q.   Did you check to see if a broken component was returned

1    for this service tag?

2    A.    I did.

3    Q.    Was it?

4    A.    There was not a return.

5    Q.    Do you find any data that corresponds to this chat in the

6    exhibit you've previously reviewed, Exhibit 26?

7    A.    I did.

8    Q.    If we could jump back to 26, please.

9          Could you show us the line that corresponds to the

10   chat we just discussed?

11   A.    This is line number 1, where we see Cliff Parmele as the

12   service request creator employee.  The address where the

13   product was sent to was 247 Maple Street, as indicated in the

14   chat log, the service requester was Tod Clark, and the service

15   tag and dispatch number match what was provided in the chat log

16   as well.

17   Q.    Who do the Dell records identify as the owner who

18   purchased this computer?

19   A.    Louisiana State University.

20   Q.    Thank you.  I am going to show you next what's marked as

21   Exhibit 2.  Do you recognize it?

22   A.    I do.

23   Q.    What is it?

24   A.    It is a Dell chat transcript.

25         MS. BURKART:  Your Honor, I would move to admit

1    Exhibit 2.

2              THE COURT:  It is received.

3                   (Exhibit No. 2 received into evidence)

4    BY MS. BURKART:

5    Q.   Is this format the same as the one we looked at before?

6    A.   It's not.  It appears that this one was, the columns were

7    formatted differently.  It's effectively the same output, but

8    the columns are wider, so it makes it look a little bit odd.

9    Q.   Why is it different?

10   A.   Whoever ran the report structured the formatting

11   differently.

12   Q.   What IP address does this chat originate from?

13   A.   76.19.186.143.

14   Q.   What is the customer's name here?

15   A.   Andrew Finegold.

16   Q.   What color are Mr. Finegold's communications?

17   A.   Red.

18   Q.   And what is his first line?

19   A.   "Hi, I'm one of the IT guys here."

20   Q.   What is the name of the company representative in this

21   chat?

22   A.   Cory Adkins.

23   Q.   And what color are his communications?

24   A.   Blue.

25   Q.   And what, generally, is Mr. Finegold's complaint in this

1  chat?

2  A.   He is saying that his motherboard on his laptop is dead.

3  Q.   How is that complaint resolved?

4  A.   Through the dispatch of a replacement motherboard.

5  Q.   And where does the customer ask Dell to send that?

6  A.   To 2130 Mendon Road, Suite 3-377, Cumberland, Rhode

7  Island.

8  Q.   Was it sent?

9  A.   It was.

10 Q.   Did you check to see if the broken component was returned?

11 A.   I did.

12 Q.   Was it?

13 A.   It was not.

14 Q.   I'm going to switch you back to 36, please.  Could you

15 show us if there is any data that corresponds with the second

16 chat on this spreadsheet?

17 A.   Yes, line number 2.  That data matches the data that we

18 just covered, with Cory Adkins as the tech, Andrew Finegold as

19 the requester, and 2130 Mendon Road as the address.

20 Q.   Who do the Dell records identify as who purchased this

21 computer?

22 A.   Texas Propane.

23 Q.   Thank you.  I am going to show you next what is marked as

24 Exhibit 3.  Do you recognize this?

25 A.   I do.  This is a Dell chat.

1           MS. BURKART:  Move to admit Exhibit 3.

2           THE COURT:  It is received.

3                (Exhibit No. 3 received into evidence)

4    BY MS. BURKART:

5    Q.    What IP address did this chat originate from?

6    A.    76.19.186.143.

7    Q.    And what is the customer's name here?

8    A.    Mark Cook.

9    Q.    What color are Mr. Cook's communications?

10   A.    Red.

11   Q.    And what is his first line?

12   A.    "Faulty processor."

13   Q.    What is the first line that Mr. Cook says?

14   A.    On this document it appears to be "Faulty processor."

15   Q.    What is the second line?

16   A.    "Hi, I'm one of the IT guys here."

17   Q.    And what is the name of the company representative he is

18   speaking with?

19   A.    Shivanand Ramphal (ph).

20   Q.    And how does Mr. Ramphal resolve the complaint that

21   Mr. Kuc is talking about here?

22   A.    He replaces the processer.

23   Q.    Where does the customer ask Dell to have that component

24   sent?

25   A.    To 2130 Mendon Road, in Cumberland.

1    Q.    Was that component sent to that address?

2    A.    It was.

3    Q.    Did you check to see if a broken component was returned

4    for this service tag?

5    A.    I did.

6    Q.    Was it?

7    A.    There were no returns.

8    Q.    I am going to ask you again to check Exhibit 26 and see if

9    you can find data that matches the chat that we just discussed.

10   A.    I can.  It's on line 3.  The Dell technician was Shivanand

11   Ramphal, and the tag number and dispatch number match, and it

12   was sent to 2130 Mendon Road.

13   Q.    And who do the Dell records identify as the owner who

14   purchased this computer?

15   A.    Ear Studio in New York, New York.

16   Q.    Finally, looking at the second and third page of

17   Exhibit 26, before we move on to the last chat, is this the

18   page with the full D3 data?

19   A.    It is.

20   Q.    Looking at page 3, do you see the name "Francisco Samuel"?

21   A.    I do, in "Service Request Contact Name."

22   Q.    Why would the database identify someone else other than

23   Mark Cook in this field?

24   A.    When a dispatch is set up by default, it puts in the name

25   of the original owner of the product, and so, if the technician

1    is speaking to someone other than the original owner, they will

2    typically change that name to the person to whom they're

3    speaking.  In this instance, it appears that they left the

4    original owner name.

5    Q.   Is there any other way the original owner name could be

6    different in this D3?

7    A.   Not that I'm aware of.

8    Q.   Would the online ownership transfer tool be a way to

9    change that information?

10   A.   It would be, correct.  So, if they were to process the

11   ownership transfer, then that would change the ownership info,

12   and this would show that here.

13   Q.   Finally, I am going to show you what's marked as Exhibit

14   4.  Do you recognize this chat?

15   A.   Yes.  This is a Dell chat.

16           MS. BURKART:  Move to admit Exhibit 4.

17           THE COURT:  It is received.

18               (Exhibit No. 4 received into evidence)

19   BY MS. BURKART:

20   Q.   And what IP address does this chat originate from?

21   A.   76.19.186.143.

22   Q.   What is the customer name here?

23   A.   Sam Jenkins.

24   Q.   And what color are Mr. Jenkins' communications?

25   A.   Red.

1    Q.   What is his first line?

2    A.   "Hi, I'm one of the IT guys here."

3    Q.   What, generally, is Mr. Jenkins' complaint?

4    A.   That his computer has a dead hard drive.

5    Q.   Do you see the name of the company representative that

6    Mr. Jenkins is speaking with?

7    A.   Yes.  Matthew Clammert (ph).

8    Q.   How does Mr. Clammert resolve the complaint?

9    A.   He dispatches a replacement hard drive.

10   Q.   And where does the customer ask Dell to send that

11   replacement hard drive?

12   A.   To 2130 Monden Street, in Cumberland, Rhode Island.

13   Q.   Did you check to see if a broken component was returned

14   for this service tag?

15   A.   I did.

16   Q.   Was it?

17   A.   No.

18   Q.   Did you find any data that corresponded with this chat on

19   the spreadsheet?

20   A.   I did.

21   Q.   Where?

22   A.   The final item, number 4.

23   Q.   Let's just jump back to that for a moment, No. 26.  And

24   how did you know it was the same?

25   A.   By comparing the DPS number incident request and service

1    tag number, and then from there validating that the service

2    request creator employee and service request contact were the

3    same.

4    Q.   And who do the Dell records identify as the owner who

5    purchased this computer?

6    A.   The Larimer County Sheriff's Office in Fort Collins,

7    Colorado.

8    Q.   Thank you, Mr. Long.  One last topic.  Was there a service

9    tag associated with each of the four Dell computers that were

10   the subject of these four chats?

11   A.   Yes.

12   Q.   And is that service tag assigned to the whole system, or

13   do individual components within the computer have their own

14   service tag numbers?

15   A.   So, when a product is built, the service tag for it or the

16   unique identifier is put on the outside on the chassis, and

17   then in the case of computers, if there is a motherboard within

18   the product, the motherboard also has the service tag for that

19   product on it.  The other piece parts, the processors, the

20   video cards, do not have the service tag on them.

21   Q.   When you say "on them," do you mean externally; you can

22   see a tag right on it?

23   A.   They do not.  They have a unique identifier called a PPID,

24   a Piece Part Identification, but they do not have the service

25   tag itself attached to them.  Only the chassis of the product

1    and the motherboard have the service tag embedded in them.

2    Q.   When you say "chassis," what is a "chassis"?

3    A.   "Chassis" is the frame.  If you have a desktop computer or

4    a portable computer, it's the frame that holds the components

5    inside.

6    Q.   For chat two, do you remember what type of replacement

7    part was being requested and was sent?

8    A.   Chat two was a motherboard -- processor.  I don't

9    remember.

10   Q.   Would you like to see it again?

11   A.   I don't remember.

12   Q.   You can certainly see it again.  We'll put it up for you.

13   A.   Okay.  So, the motherboard in this instance.

14   Q.   How big is a motherboard?

15   A.   A motherboard is roughly the size of one of these

16   notebooks.  Not as deep but about that size, and they can be

17   slightly larger or smaller, depending on the product.

18   Q.   Would the motherboard have its own service tag number, or

19   would it be unique?

20   A.   It would have the same service tag as the main product

21   has, so every system that has a unique ID.  So, if the service

22   tag is ABC123 on the outside of the chassis, then inside the

23   motherboard is going to have ABC123.

24   Q.   Does Dell reuse the same service tags?

25   A.   We do not.

1    Q.   Is it possible for there to be two motherboards sent out

2    that have the same service tag number?

3    A.   Only in the case of an operational error, which validation

4    steps are performed to prevent that from happening.  So I won't

5    say that it could never happen, but given human error it could.

6    But in the normal business of things there are not two

7    simultaneous tags existing.

8    Q.   Are you ever aware of it happening that there were two

9    motherboards sent out with the same service tag number?

10   A.   Not personally aware, but I have heard of isolated

11   incidents in which they were discovered.

12   Q.   If a customer with a computer under warranty needs a new

13   motherboard and a technician brings out a motherboard to

14   replace it, what happens with the service tag on the

15   motherboard, the new one?

16   A.   In the replacement motherboards that we send out, they are

17   stored in our finished goods stockroom with no tag on them at

18   all, so it is blank.  Our on site technicians have a utility

19   they use to put the tag of the system in which they are putting

20   the product, they put that tag number onto the bios of the

21   motherboard.

22   Q.   So, just to clarify, if it goes through the mail, then

23   does Dell put a service tag on it?

24   A.   We do not it.  It comes out blank.

25   Q.   And if the technician comes on site and makes the

1    replacement, then how does the service tag number get put on

2    the new piece?

3    A.   Our vendors, the people that we use to perform on site

4    work, have a utility that we provide them, a proprietary tool

5    that enables them to put the tag onto the system's electronic

6    memory.

7    Q.   When you say it's a proprietary tool, is that something

8    that someone can buy in a store?

9    A.   You cannot.  It's something that our engineering

10   department has made available for them to use.

11   Q.   Is it possible for someone who wanted to find a way to get

12   that kind of tool to find one?

13   A.   Unfortunately, yes.  There are hacker websites that have

14   made this utility available.

15   Q.   Have you personally seen that?

16   A.   I have.

17   Q.   Turning to chat three, what type of part is being sent out

18   here?

19   A.   A processor.

20   Q.   Does a processor have a unique service tag number?

21   A.   It has a unique PPID number but not a unique service tag

22   number.

23   Q.   So, does it internally have a source tag number or no?

24   A.   It does not.

25   Q.   What about chat one?  What type of part was sent out here?

1    A.    A tape drive.

2    Q.    Does a tape drive have a service tag number?

3    A.    It does.  Tape drives have their own service tag numbers.

4    Q.    Is it possible to change the service tag number on a tape

5    drive the way you've described doing it on a motherboard?

6    A.    It is not.  We don't make a utility available to do that.

7    If you have a tape drive that fails, then the product that you

8    receive has its own new service tag number on it.

9    Q.    Finally, on chat four, what type of part was sent out

10   here?

11   A.    A hard drive.

12   Q.    And does a hard drive have a service tag number?

13   A.    It does not.

14         MS. BURKART:  Thank you.

15         THE COURT:  I think, ladies and gentlemen, we will

16   take a break here for ten minutes or so, our kind of afternoon

17   break at this point, so you will go back to the jury room.

18         THE CLERK:  All rise for the jury.

19         (The jury exited the courtroom at 3:05 p.m.)

20         THE COURT:  You will want to try to be back promptly

21   at 3:20, so we can keep going.

22         MR. SHEKETOFF:  At what time, your Honor?

23         THE COURT:  3:20.  I am using that clock up there, for

24   what it is worth.  I assume that there are not too many more of

25   the quasi-argumentative documents here.

1          MS. BURKART:  I don't think so, your Honor.  I'm

2    sorry.  I missed that title.

3          THE COURT:  In any event, if you are introducing an

4    alphabetical exhibit, I want to get it clarified before it gets

5    to the jury so it does not get shown to them.

6          So, we will be in recess.

7          THE CLERK:  All rise.

8      (The Honorable Court exited the courtroom at 3:05 p.m.)

9                        (Recess taken)

10          THE CLERK:  All rise.

11     (The Honorable Court entered the courtroom at 3:20 p.m.)

12          THE CLERK:  This Honorable Court is now in session.

13    You may be seated.

14          THE COURT:  Ready to go with the jury?

15          MR. GARLAND:  Your Honor, I had one question about

16    just housekeeping.  So, if we get to another witness, the next

17    witness that we would call this afternoon would be Special

18    Agent DeLair.  She would be testifying about those boxes there.

19    Would you want us to have those boxes next to her before she

20    goes on the stand?  We could do it now.

21          THE COURT:  However you want to choreograph it.

22          MR. GARLAND:  If we could take a moment to bring those

23    over, just in case she does take the stand.  We will do that

24    now.  Thank you.

25          MR. SHEKETOFF:  Your Honor, have I met your request

1    that I identify the exhibits by number --

2              THE COURT:  Yes.

3              MR. SHEKETOFF:  -- so, I don't have to renew?

4              THE COURT:  Yes, if that is the universe of the ones

5    that are contested.

6              MR. SHEKETOFF:  It was my sister that gave me that

7    list, which was very nice of her.  She already knows my

8    abilities.

9              THE COURT:  I suspect that she has got some idea of

10   what your concerns might be.

11             THE CLERK:  All rise for the jury.

12                  (The Jury entered the courtroom at 3:25 p.m.)

13             THE CLERK:  You may be seated.

14             THE COURT:  You may inquire Mr. Sheketoff.

15                       CROSS-EXAMINATION

16   BY MR. SHEKETOFF:

17   Q.   Good afternoon, Mr. Long.

18   A.    Hello.

19   Q.   Are you a technical expert, as well, with computers?

20   A.    I don't know if I would use the term "expert," but I spent

21   five years of my career at Dell either personally

22   troubleshooting or managing those who troubleshot Dell

23   products.

24   Q.   So, you at least have some significant familiarity with

25   the way computers work?

1    A.    Yes.

2    Q.    And you told us towards the end of your examination by the

3    prosecutor that there is unfortunately, I think you put it,

4    pirated software out there that allows somebody out there to

5    change the IP or tag number -- I'm sorry -- the tag number on a

6    motherboard after it has left Dell's manufacturer?

7    A.    That is correct.

8    Q.    All right.  Have you ever actually tried that pirated

9    software to see if it works?

10   A.    I have not.  I have seen the link to the software but have

11   not yet personally downloaded it and tested it.

12   Q.    When did you first notice that there was some sort of

13   pirated software out there that would allow somebody to change

14   the tag number on a Dell motherboard?

15   A.    I noticed this approximately a month ago as a result of a

16   case I was working with the Secret Service, in which the Secret

17   Service Agent told me, "You should look at this website," and I

18   found this.

19   Q.    So, about a month ago you became aware of it for the first

20   time?

21   A.    That is correct.

22   Q.    And it's your understanding from reading what's ever up on

23   the website that whoever posted it purports to be able to

24   change a Dell motherboard's tag number?

25   A.    The description that is on the site given to me by the

1    Secret Service Agent is very similar to that of the internal

2    description we use for the product that we use to change the

3    ID.  It uses the same name of the product, etc.  So, it looked

4    very convincing and realistic on the surface.

5    Q.   Right, on the surface, but you haven't tested it to see if

6    it works?

7    A.   That's correct.

8    Q.   So, as you sit here today, you can't tell us with any

9    degree of certainty whether or not that pirated software could

10   change a tag number?

11   A.   That's correct.

12   Q.   And the way a tag number would work on a motherboard, you

13   turn your computer on, you hit the F2 key or some similar kind

14   of procedure, and information about your computer comes up on

15   the screen, correct?

16   A.   That is one way to access the information, yes.

17   Q.   And there is your tag number, correct?

18   A.   Correct.

19   Q.   And that tag number should correspond to the tag number

20   that's on the chassis?

21   A.   That is correct.  As designed, that is how we ship our

22   product.

23   Q.   And the tag number that's on the chassis, is that stamped

24   into the chassis?  Is it attached to the chassis in some way?

25   A.   It's a label that is printed and then applied to the

1    chassis.

2    Q.    Is it possible to peel that label off?

3    A.    It is.

4    Q.    Do you know of any instances where people have peeled off

5    labels and put different labels on chassis?

6    A.    We have.  We have seen some instances of that, yes.

7    Q.    Now, you talked about tape drives, you did with the

8    prosecutor, and you said that a tape drive has a service tag

9    number.

10   A.    Yes.  Tape drive units have their own unique service tag

11   number.  We call that a "tagged product."

12   Q.    And the tape drive service tag number when it leaves the

13   Dell manufacturer is the same service tag number that's on the

14   motherboard and the same service tag number that's on the label

15   that's on the chassis of the computer?

16   A.    No.  So, tape drives are considered standalone products

17   separate from any computer you may have purchased separately,

18   or even if you bought them at the same time.  A tape drive unit

19   is going to have its own separate tag number.

20   Q.    Unconnected to what's on the chassis or the motherboard?

21   A.    Of different products.  Are you talking about the chassis,

22   or the motherboard or the tape drive unit?

23   Q.    Yes.  No, no.  When I purchase a computer from Dell I am

24   going to get in it a tape drive, correct?

25   A.    No.  A tape drive is, typically, although there are some

1    exceptions, typically a standalone product that you put tapes

2    into.

3    Q.   And you said that the hard drive has no service tag

4    number?

5    A.   That is correct.  Every Dell part has a PPID, a unique

6    identifier, but it does not have a service tag number assigned

7    to it.

8    Q.   All right.  So, if I had a hard drive, I would have some

9    sort of number associated with it that Dell put on it?

10   A.   Correct.

11   Q.   Is that also a label that can be peeled off?

12   A.   It is.

13   Q.   Now, I notice from the exhibits that were introduced

14   through you that the IP address that we have stipulated

15   belonged to Laurelwood Drive is the same IP address again and

16   again and again, correct?

17   A.   Yes.

18   Q.   It's the identical IP address?

19   A.   Correct.

20   Q.   And if Dell wanted to stop interacting with a person with

21   an IP address, why wouldn't Dell put a block on that IP

22   address?

23   A.   I think Dell would first have to know that there was

24   something that they wanted to stop.

25   Q.   So, whatever name was being used for that IP address,

1    whatever address was associated with a delivery from a request

2    from that IP address, whatever part was being ordered, it was

3    the same IP address again and again and again, correct?

4    A.   That's correct.

5    Q.   All right.  Now, I believe you told us that Dell ships out

6    1 1/2- to $2 million worth of replacement parts daily?

7    A.   Every business day, approximately 265 days a year.

8    Q.   And does that mean that Dell ships many computers that

9    have defective parts?

10   A.   No.  It means that Dell has a tremendous amount of systems

11   in the field, and when you have so many systems in the field,

12   any one or two percent rate of failure, or even five percent

13   rate of failure, depending on what it is, is going to generate

14   a significant amount of parts.

15   Q.   Well, what is the rate of failure, is it one or two

16   percent, is it five percent or is it ten percent?

17   A.   It varies from product to product.  We have, depending on

18   the product, we have a two to eight percent failure rate,

19   depending upon the type of product.

20   Q.   When you say a two to eight percent failure rate, you're

21   saying if you sold 100 computers there would be two to eight,

22   depending on the product that failed?

23   A.   That may experience some type of failure at some point in

24   its life.

25   Q.   By the way, does Dell have a written warranty?

1    A.    We do.

2    Q.    And did that written warranty change over the period from

3    2005 to 2010?

4    A.    It is possible that it did.  I have not kept track of all

5    the various changes, but there are modifications and addendums

6    made over time.

7    Q.    Does Dell keep a record of the warranty that it issues

8    when it sells computers and computer components?  In other

9    words, could you go to some archive somewhere, whether it's a

10   Dell data system or an old file cabinet, and find the

11   warranties as they existed from 2005 to 2010?

12   A.    I am not aware of any archive that's made available, but I

13   do know that when you purchase a product there is a copy of

14   your warranty included, typically, within a Dell folder on your

15   computer that you can reference.

16   Q.    And does Dell have a written policy about if a part is

17   complained about by a customer whether or not that part is

18   going to be replaced with a technician or whether it is just

19   going to be shipped to the customer?

20   A.    I think that would vary from department to department.

21   So, we do have different types of support units.  We have our

22   consumer support units, our enterprise or our large account

23   support units, and it would depend upon the situation and the

24   nature of the customer to whom you're speaking.  If they're

25   speaking to a person who purports themselves to be an IT

1   manager, then that would be a different conversation than with

2   someone who said, "This is the first computer I have ever had."

3   Q.    Right.  But I guess my question was, is there a written

4   policy that directs the technicians as to whether or not to

5   suggest that a technician comes out with the part or the part

6   is simply shipped?

7   A.    I think that over time that policy has been written and

8   has varied back and forth.  I personally recall having seen the

9   policy that said, You must receive managerial approval to send

10  parts only for something that normally requires a tech.

11  Q.    For something that normally requires a tech?

12  A.    Correct.

13  Q.    Now, if I called up and I said that I was the IT person,

14  would Dell want to send a tech, or would Dell prefer to just

15  ship the part?

16  A.    Dell wants to do the best thing for the customer, so it

17  would really only be a matter of how confident the customer

18  felt in their ability to replace the part.

19  Q.    Does it cost Dell more money to send a tech or to ship the

20  part?

21  A.    It does cost more to send the tech.

22  Q.    So, isn't it fair to say that there is a financial

23  advantage to Dell to not send a tech if the customer seems

24  competent?

25  A.    There is a financial advantage to Dell, but that is not a

1    metric or a measure that is applied to our phone technicians.

2    Q.   So, Dell is not interested in the bottom line; Dell is

3    interested in customer satisfaction?

4    A.   Dell is interested in the bottom line, but we have

5    discovered that customer satisfaction is a major impacter of

6    the bottom line.

7    Q.   So, the fact that it costs money to send a tech, more

8    money than putting the part in the mail, is not a major concern

9    to Dell, and what is more of a concern to Dell is whether or

10   not the person seems to be confident that they can replace the

11   part themselves?

12   A.   Is that a question?

13   Q.   Yes, it is.

14   A.   I am not saying that Dell is not concerned about the

15   bottom line or about the number of times we send technicians

16   out.  What I am saying is that we do value the customer

17   experience, and it is an individual decision for each

18   technician as to how they feel about the interaction with the

19   customer.

20   Q.   Does Dell keep records of the directions or the packing

21   slip material that goes out with the part that is sent?  In

22   other words, let's take the motherboard that was one of the

23   examples, the four examples that the prosecutor went through

24   with you.  You said that you can find the records for the

25   request for this motherboard, you can give the address, etc.

1   Is there some record as to what kind of direction was sent to
2   the customer as to whether or not to return that motherboard?
3   A.   There is a record of whether or not the hardcopy
4   documentation would have been sent.  We don't retain records of
5   the actual hardcopy documentation, but there is a flag field;
6   it's that nonreturnable part field that I mentioned.  So, if
7   the nonreturnable part is set to "No," that triggers our
8   systems to automatically include the hardcopy documentation
9   that would say this product is required to be returned.
10  Q.   All right.  Was there a notice with the motherboard
11  request to the customer saying, "Do return this motherboard, we
12  want it back"?
13  A.   Yes, with that part there would have been.
14  Q.   And how do you know that?
15  A.   I know that because the part is listed as a returnable
16  part in our system.
17  Q.   Are all motherboards returnable parts?
18  A.   99.99 percent of them are.
19  Q.   How about hard drives?
20  A.   All hard drives are returnable parts.
21         MR. SHEKETOFF:  May I approach, your Honor?
22         THE COURT:  You may.
23  BY MR. SHEKETOFF:
24  Q.   Sir, do you recognize this document?
25  A.   I do.  This is a, "Keep your hard drive" warranty service

1    that was purchased.  This is a slip that would have gone out.

2    And so, in this instance, even though, as I mentioned, all hard

3    drives are returnable parts, customers may purchase at

4    additional cost a warranty called "Keep your hard drive," which

5    enables those who are concerned about personal data or

6    sensitivity of their data to not have to return the part.  Even

7    though it's a part that Dell desires back, the original

8    warranty enables them to keep it.

9    Q.   All right.  So, not all hard drives are returnable parts,

10   correct?

11   A.   No.  All hard drives are returnable parts, but you may

12   purchase the ability to not return them.

13   Q.   How about the hard drive that the prosecutor asked you

14   about?  Was that hard drive a returnable part, or was a notice

15   like that given with that hard drive?

16   A.   I need to look.  I do not know on that particular system

17   whether the "Keep Your Hard Drive" service was purchased.

18   Q.   Where would you have to look?

19   A.   I would have to look at our recording system, our record

20   system.

21   Q.   Now, Dell wants these parts back why?

22   A.   Why do we want any part back?

23   Q.   Yes.

24   A.   Depending upon the type of part.  Hard drives, for

25   example, we can return those for a credit from the vendor

1  towards the purchase of a new drive.  So, by receiving the

2  defective drive, we save ourselves the cost of purchasing

3  another drive.  For other parts, we may be able to repair the

4  parts and put them back into our refurbished stock for future

5  repairs.

6  Q.   Okay.  Do you remember being interviewed by the FBI in

7  early June of this year and being asked about return policy to

8  Dell, why Dell wanted this stuff back?

9  A.   I do.

10  Q.   Do you remember saying that it was a two-step process that

11  Dell engaged in as to whether or not it wanted a returned item,

12  wanted the item returned?

13  A.   I don't recall the specific context.

14  Q.   Do you remember saying, "The first process is the scrap

15  process.  Under this process Dell takes into account,

16  consideration, environmental regulations to determine if the

17  damaged part should be returned to Dell"?

18  A.   I do remember that, yes.

19  Q.   "The second process is to ensure that the" -- strike that.

20  "If the damaged part could hurt the environment, Dell would

21  request the damaged part back to ensure that the part was

22  disposed of properly"?

23  A.   That is correct.

24  Q.   But now you are saying that you don't want the part back

25  because of the environment al impact, you want the part back

1    because it might help you make a claim against the manufacturer

2    of that part for you?

3    A.    No.  There are categories of parts, so the scrap process

4    that you are describing and, as I referenced earlier, let's say

5    a rubber foot, 50 cent rubber foot.  Before we can declare that

6    part a nonreturnable part, it has to be evaluated to see if it

7    should, instead, become a scrap part.  If that rubber foot

8    contained mercury, for example, then it would become a scrap

9    part, and even if it cost us more money to bring it back than

10   it was worth, in order to dispose of it properly we would

11   require that part to be shipped back.

12   Q.   So, you are talking there about only parts that generally

13   you wouldn't want back?

14   A.   The scrap parts tend to be parts that we almost always

15   would not want back, but in order to be good corporate

16   citizens, we do request them back.

17   Q.   And how do you dispose of that stuff?

18   A.   We have certified recycle facilities that will take care

19   of those and dispose of them in the proper manner.

20   Q.   In the United States?

21   A.   That is correct.

22   Q.   Now, sir, if I purchase a Dell computer and it has a

23   warranty associated with it, can I give that computer to

24   somebody else or sell that computer to somebody else and the

25   warranty goes along with that sale or gift?

1    A.    Yes, you may.

2    Q.    So, Dell has an ownership transfer policy that allows the

3    owner of a product to transfer the warranty for the product to

4    whoever they give it or sell it to, correct?

5    A.    That is correct.

6    Q.    And does Dell sell on the secondary market?  Does Dell

7    sell, let's say, line pulls or defective products of one kind

8    or another to wholesalers?

9    A.    Yes.  If we have parts that come back that aren't

10   reasonable for our Dell customers, then one of the parts of the

11   scrap process I described is that there may be a sale to a

12   reseller, a third-party reseller or wholesaler.

13   Q.    Now, I am going to show you this document and ask you if

14   you have ever seen it before.

15         MR. SHEKETOFF:  And I move 46 in, your Honor.  I don't

16   think there's an objection.

17         MS. BURKART:  And, your Honor, just one point.  Excuse

18   me.  The original is actually with the Clerk, so we had

19   proposed 46 as the original.  It would be produced as an

20   exhibit.

21         I don't know if you would prefer that, Mr. Sheketoff.

22         MR. SHEKETOFF:  If it's an exact copy, I don't care.

23         THE COURT:  Well, for present purposes we will receive

24   this one and substitute the original one, if necessary, but it

25   is received.

1          (Exhibit No. 46 received into evidence)

2     BY MR. SHEKETOFF:

3     Q.   What is this document?

4     A.   This appears to be one version of our return paperwork.

5     Q.   Do you know when this version was created?

6     A.   Well, there is a date on it that says it was 3/10/2009, so

7     I'm assuming that was the day.

8     Q.   Do you know for what period of time it was used?

9     A.   From this document alone, I can't tell you at what time it

10    might have been replaced with the previous -- or with another

11    version, rather, because revisions occur constantly as errors

12    are discovered or as processes are changed.

13    Q.   Do you know if these are revisions of substance or of

14    grammar and things of that nature?

15    A.   Typically, revisions are revisions of substance, unless

16    there's just an egregious grammar or spelling error that's

17    discovered.

18    Q.   What is this document?  Could you explain it to the Court

19    and jury?

20    A.   This is the document that would be sent out with a product

21    indicating to customers what instructions they should follow or

22    how they should go about returning the defective product to

23    Dell.

24    Q.   And does it tell the customer what will happen if the

25    customer does not return the product to Dell?

A.   It does on page 3.  It says, "You must return the

defective part to avoid being invoiced."

Q.   So, as I understand it, I would receive this document when

I had ordered a replacement part under warranty and Dell

shipped it to me without a technician coming to my address, I

would get this in the packing material that came with the part?

A.   That's correct.  And even if a technician did come, this

would still be in the packing material.

Q.   Would the technician be expected to leave with the part?

A.   Yes.

Q.   Then, why would you need this?

A.   It's part of our automated process.  The fulfillment

center puts it in based on an automated decision.

Q.   In any event, is it fair to say that you assume that this

item or some similar item was sent to my client every time he

got a replacement part from Dell?

A.   That is correct.  Unless the shipment that was received

only contained nonreturnable parts, then the system

automatically generates a request to drop in information about

returns and a return-way bill in every package that goes out.

Q.   So, if it was a part that Dell wanted back, he would have

gotten this or something similar to this, correct?

A.   Correct.  And we have three different fulfillment centers

in the United States.  There are some slight variations,

depending on the type of product.

1    Q.    I believe you told the prosecutor, when she was asking you

2    questions, that, in fact, during this period, 2005 to 2010,

3    Dell would invoice people that did not return the product

4    within 90 days.

5    A.    That's correct.

6    Q.    Was Matthew Cook ever invoiced between 2005 and 2010?

7    A.    I don't have records that indicate that.  That was prior

8    to my tenure in the position.  Given that that process was in

9    place and it was automated, I don't see how it could not have

10   happened.

11   Q.    All right.  So, you're saying that he definitely was

12   invoiced, but you don't have a single scrap of paper to show

13   that he ever was?

14   A.    The term "invoice" indicates that a sheet would be sent

15   out with, basically, a balance saying, "This is the amount that

16   is outstanding."  It does not mean that anything was placed

17   into a financial system or that any collections activities took

18   place beyond that.

19   Q.    But I'm asking a slightly different question now.  You

20   told me just now, and correct me if I'm wrong, that you don't

21   have a single piece of paper that shows that he was ever

22   invoiced, but you believe he was.

23   A.    Correct, based upon my understanding of how the system's

24   operated.

25   Q.    And this is how the system operated before you arrived?

1    A.    That's correct.

2    Q.    When did you arrive?

3    A.    In July of 2009.

4    Q.    All right.  From July of 2009 through the end of 2010, was

5    Matthew Kuc ever invoiced?

6    A.    That system was not in place at that time.

7    Q.    You mean, by July of 2009 Dell never invoiced anybody?

8    A.    I mean that these automated sheets that I described had

9    been halted and were not going out.

10   Q.    Was that your decision?

11   A.    It was not my decision, and it was made sometime prior to

12   my joining or taking the role that I currently have.

13   Q.    So, as of July of 2009, it's fair to say you have no

14   evidence of any kind that Matthew Kuc was ever invoiced for any

15   part that he ordered from you?

16   A.    Those sheets did not go out, correct.

17   Q.    Well, even if the sheets didn't go out, when you say the

18   "sheets," you mean actual invoices being sent after the part

19   has not been returned within the 90 days?

20   A.    That's correct.  I'm distinguishing that from phone calls

21   or e-mails that would have gone out saying, "Please return

22   this."

23   Q.    All right.  So, the phone calls would be automated phone

24   calls saying, "Please return this"?

25   A.    In addition to live phone calls after 15 days, yes.

1    Q.    "Please return this," "Please return this," or did they

2    include the claim that an invoice would come if you didn't

3    return it?

4    A.    The scripts varied.  Some of the scripts may have said,

5    "You may be invoiced."

6    Q.    Now, even before July of 2009, when invoices were sent

7    out, it's your testimony that Dell never made any effort to

8    actually collect on the invoice?

9    A.    That is correct.

10   Q.    So, Dell would send an invoice saying, "You owe 'X,'" and

11   then they would just never try and collect the money?

12   A.    That is correct.

13   Q.    And Dell did that because why?

14   A.    The belief, from my understanding, and this is conjecture

15   on my part, but is that the majority of people want to and will

16   do the right thing, and so, to that end, by sending the

17   reminders most people are spurred to return the part, and

18   receiving a paper invoice spurs an even more percentage of the

19   population.  To the extent that our write-offs or our losses

20   are approximately 5 percent overall for the volumes that we

21   ship out, which, given that there are no actual dire

22   circumstances, we considered at the time a good number.

23   Q.    So, let me see if I understand that.  It's your testimony

24   that about 5 percent of the time people do not ship back the

25   product?

1    A.    Correct.

2    Q.    And we are not talking about the non-returnable items,

3    we're talking about items that you want returned?

4    A.    That is correct.

5    Q.    Five percent of the time they don't send it back?

6    A.    That's correct.

7    Q.    And what percentage did the invoicing change?  You mean it

8    went from 10 percent that don't send it back right away, and

9    then you invoice and it goes down to 5 percent?

10   A.    I don't have the gradient curve for the invoicing.

11   Q.    All right.  That's conjecture.  Whether the invoicing

12   worked at all is conjecture?

13   A.    It is.  I am assuming at the time.

14   Q.    When you say "5 percent," do you mean 5 percent in dollar

15   volume of the 1.5- to $2 million a day?

16   A.    I am.  I am referring to dollar volume.

17   Q.    So, you are not referring to the number of people that

18   ignore it, you are referring to the dollar volume?

19   A.    I am referring to 5 percent dollar write-off loss.

20   Q.    All right.  Looking at this exhibit again, what does Dell

21   say they are going to invoice at?  In other words, they are

22   telling the customer, We are going to invoice at what, at our

23   cost?  At what?

24   A.    They don't say that.

25   Q.    What do they say?  What is the language they use?

1    A.    It says, "You must return your defective part within 10

2    business days in order to avoid being invoiced for the

3    replacement equipment."

4    Q.    And there is no other part of that document that suggests

5    what you will be billed at?

6    A.    I don't see anything, unless I'm overlooking something.

7    Q.    In any event, 5 percent or so of the dollar volume is

8    written off by Dell, you said?

9    A.    Correct.

10   Q.    And in one of these exhibits you had two cost columns.

11   Let's see what the names of them were.  I don't recall.  Do you

12   recall the two different pricing --

13   A.    One column is the market price, effectively, and the other

14   column is Dell's FPC or standard cost.

15   Q.    Isn't it fair to say that the threat to invoice that Dell

16   was employing was a threat to invoice at the fair market value

17   of the defective product as opposed to the cost to Dell?

18   A.    I can't speak to that.  I'm not sure on what figure they

19   used those invoices to be sent out.  I know I received,

20   actually as a Dell customer, a couple of those in the mail, but

21   I can't remember at what value or what type of value they were

22   using.

23   Q.    You mean at some earlier stage through July of 2009 you

24   received an invoice yourself?

25   A.    Right.  I bought some Dell product, and I had a part that

1    needed to be returned, and I hadn't, and when I saw that I sent

2    it back.

3    Q.   You mean because it was at a high value as opposed to the

4    cost to Dell?

5    A.   Oh, no, I don't remember what the value was.  It just

6    reminded me that the part needed to be returned.

7    Q.   Were you working for Dell at the time?

8    A.   I was.

9         MR. SHEKETOFF:  Your Honor, is this a good time or

10   not?

11        THE COURT:  I take it you are not going to finish the

12   witness today.

13        MR. SHEKETOFF:  I don't think so.

14        THE COURT:  So, we will break for the day, ladies and

15   gentlemen.

16        Bear in mind my instruction of not talking to anyone

17   about this case.  You have only heard the beginning of the

18   evidence in the case.

19        I want to make one additional observation.  One of the

20   consequences of the rise of technology is the rise of social

21   media of various kinds, Twitter and Facebook, and people

22   unburden themselves about what they are up to and what they are

23   involved in.  Do not do it.  Do not do anything that touches on

24   this case.  I say it not just as a warning, but because we have

25   had experience in it.

1          I tried a case about two years ago, it was a long

2     case, it went 15 days, and it was not completed when we learned

3     that two of the jurors were sharing their observations about

4     the case on Facebook, and I had to declare a mistrial.  As you

5     can imagine, that is very expensive for the system.  It also

6     means that you have taken the time of your colleagues that is

7     useless.

8          So, please, just insulate yourself from the case.  You

9     have heard a little bit.  Now think about other things.  Come

10    back here around 8:45 tomorrow morning, so that you are in the

11    jury room and we can get started promptly at 9:00.  You can

12    understand that there are a number of us.  If one of us is

13    late, everyone is late.  Don't you be the person to make us

14    late.  So, we will see you tomorrow morning.  We will be back

15    in the courtroom at 9:00, but you will be in there at 8:45.

16    Thank you.

17          THE CLERK:  All rise for the jury.

18          (The jury exited the courtroom at 4:00 p.m.)

19          THE COURT:  Is there anything else we need to talk

20    about before tomorrow morning?

21          MR. SHEKETOFF:  No, your Honor.

22          MS. BURKART:  No, your Honor.

23          THE COURT:  We will be in recess.

24          THE CLERK:  All rise.

25       (The Honorable court exited the courtroom at 4:00 p.m.)

1      (WHEREUPON, the proceedings adjourned at 4:00 p.m.)

2

3                    C E R T I F I C A T E

4

5

6          I, Brenda K. Hancock, RMR, CRR and Official Reporter

7      of the United States District Court, do hereby certify that the

8      foregoing transcript constitutes, to the best of my skill and

9      ability, a true and accurate transcription of my stenotype

10     notes taken in the matter of United States of America v.

11     Matthew Kuc, No. 1:11-cr-10014-DPW-1.

12

13

14

15

16

17     Date:   January 28, 2013        /s/ Brenda K. Hancock

18                                     Brenda K. Hancock, RMR, CRR

19                                     Official Court Reporter

20

21

22

23

24

25