UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


THE UNITED STATES OF AMERICA        )
                                    )
                                    )
                                    )
vs.                                 )   No.
                                    )   1:11-cr-10014-DPW-1
                                    )
MATTHEW J. KUC,                     )
                                    )
                    Defendant.      )


BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK


DAY TWO OF JURY TRIAL




John Joseph Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, MA 02210
Tuesday, June 26, 2012
9:00 a.m.




Brenda K. Hancock, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way
Boston, MA 02210
(617)439-3214

1    APPEARANCES:

2         UNITED STATES ATTORNEY'S OFFICE
          By:  AUSA Amy H. Burkart
3              AUSA Scott Garland
          Suite 9200
4         Boston, MA 02210
          On behalf of the United States of America
5
          ROBERT L. SHEKETOFF, ESQ.
6         One McKinley Square
          Boston, MA 02109
7         On behalf of the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I   N   D   E   X

2    WITNESSES:          DIRECT     CROSS      REDIRECT    RECROSS

3    ROBERT LONG
     (RESUMED)
4    By Ms. Burkart     146
     By Mr. Sheketoff              185
5

     MARK OLSON
6    By Mr. Garland      30

7    BENJAMIN RUBIN
     By Ms. Burkart      36
8    By Mr. Sheketoff              41

9    MICHAEL WISENER
     By Mr. Garland      43
10   By Mr. Sheketoff              49

11   MORGAN BACKHAUS
     By Ms. Burkart      51
12   By Mr. Sheketoff              55

13   SARAH DE LAIR
     By Mr. Garland      57                    98
14   By Mr. Sheketoff              89                      101

15   APRIL WILLIAMS
     By Mr. Garland     102
16   By Mr. Sheketoff             110

17   LEANNE FARRELL
     By Mr. Garland     111                    124
18   By Mr. Sheketoff             119                      129

19   EMANUEL VELASCO
     By Ms. Burkart     130
20   By Mr. Sheketoff             162

21   JOSEPH FALLON
     By Mr. Garland     167
22   By Mr. Sheketoff             195

23   KENNETH McCARTHY
     By Ms. Burkart     206
24   By Mr. Sheketoff             213

25                    (CONTINUED NEXT PAGE)

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WILLIAM ATWELL | | | | |
| By Ms. Burkart | 218 | | | |
| By Mr. Sheketoff | | 236 | | |
| | | | | |
| THOMAS ZAPPALA | | | | |
| By Ms. Burkart | 242 | | | |

E X H I B I T S

| No. | In Evd. Page |
|---|---|
| 24 & 25 | 16 |
| 44 | 35 |
| 43 | 40 |
| 41 | 49 |
| 42 | 53 |
| 50 | 62 |
| 51 | 64 |
| 52 | 65 |
| 53 | 66 |
| 54 | 66 |
| 55 | 67 |
| 57 & 58 | 69 |
| 59 | 70 |
| 49 | 72 |
| 47 | 74 |
| 61 | 75 |
| 62 | 76 |
| 45 | 77 |
| 63 thru 65 | 79 |
| 48 & 56 | 80 |
| 60 | 84 |
| 66 | 86 |
| 22 | 105 |
| 67 | 126 |
| 70 | 140 |
| 75 | 142 |
| 73 | 147 |
| 72 | 149 |
| 76 | 151 |
| 76 thru 79 | 158 |
| 10 | 174 |
| 9 | 180 |
| 12 | 194 |
| 20 | 211 |
| 13 | 226 |
| 14 | 229 |
| 15 | 233 |
| 68 | 245 |

1                    P R O C E E D I N G S:

2           THE CLERK:  All rise.

3        (The Honorable Court entered the courtroom at 9:00 a.m.)

4           THE CLERK:  This Honorable Court is back in session.

5    You may be seated

6           THE COURT:  Ready for the jury?

7           MR. SHEKETOFF:  Yes, your Honor.

8           MR. GARLAND:  Yes, your Honor.

9           THE COURT:  Bring them in.

10          THE CLERK:  All rise for the jury.

11           (The jury entered the courtroom at 9:00 a.m.)

12          THE CLERK:  You may be seated.

13          THE COURT:  Good morning, ladies and gentlemen.  We

14   will continue with the examination of Mr. Long.

15          ROBERT LONG, PREVIOUSLY DULY SWORN BY THE CLERK

16                  CONTINUING CROSS-EXAMINATION

17   BY MR. SHEKETOFF:

18   Q.   Good morning, Mr. Long.

19   A.   Good morning.

20   Q.   I didn't ask you this yesterday, but obviously you are

21   employed by Dell, correct?

22   A.   Yes, I am.

23   Q.   You receive a salary and benefits from Dell?

24   A.   I do.

25          MR. SHEKETOFF:  Mr. Quigley, could I have Exhibit 46?

1    BY MR. SHEKETOFF:

2    Q.   I was asking you about this yesterday afternoon right

3    before we broke.  Do you recall?

4    A.   Yes.

5    Q.   And I asked you if you could look at it and find in there

6    what dollar amount or what price, cost or fair market value or

7    whatever Dell was saying it was going to charge if you didn't

8    return the product, and you said you can't find anything in

9    there.  Do you remember that?

10   A.   I do.

11        MR. SHEKETOFF:  May I approach, your Honor?

12        THE COURT:  You may.

13   BY MR. SHEKETOFF:

14   Q.   I am going to show you this document and ask you if you

15   recognize this document.

16   A.   I do.

17   Q.   What is it?

18   A.   It's a packing slip that we include with shipments for

19   service parts that are sent out.

20   Q.   Okay.  And on the back of that document is there some

21   language that's similar to Exhibit 46?

22   A.   Yes, there is.

23   Q.   All right.  And on this document does Dell tell the

24   customer what it's going to charge if you don't return the

25   product?

1  A.   Yes.  It says if we do not receive the original part

2  within 10 days we will charge to your credit card or invoice

3  you the then current standard price for that part.

4  Q.   What does Dell mean, if you know, by the "then current

5  standard price," the cost to Dell or what Dell could sell it

6  for on the open market?

7  A.   What Dell means by that is neither.  It would be a price

8  that is greater than our cost but less than the fair market

9  value cost.

10  Q.   How does Dell determine that cost?

11  A.   That is determined by adding a percentage modifier to the

12  Dell standard cost.

13  Q.   Do you know what that modifier is?

14  A.   It's typically 20 percent.

15  Q.   And, typically, Dell marks up its components a lot more

16  than 20 percent, correct?

17  A.   If they are being sold, that's correct.

18        MR. SHEKETOFF:  Could I have Exhibit 26, please,

19  Mr. Quigley?  And I think it is the second page.  I apologize.

20  It's the third page.

21  BY MR. SHEKETOFF:

22  Q.   Is that screen clear enough for you to see that there are

23  two prices listed?

24  A.   Yes.  We have the service order amount and the FPC cost.

25  Q.   Those are significant markups, well above 20 percent,

1    correct?

2    A.    That is correct.  The volumes at which Dell does business

3    means that we get very good prices, but our pricing in the

4    market is consistent with our competitors.

5    Q.    Well, some of those items listed on that the markup is,

6    like, 400 percent.

7    A.    Agreed.

8    Q.    So, you are saying that when Mr. Kuc did not return the

9    items, the items listed on this document, the threat was he was

10   going to bill the cost plus 20 percent, not the fair market

11   value that's listed there?

12   A.    Correct.

13   Q.    Now, you told us yesterday that when customers don't

14   return the products, and that happens in about 5 percent of the

15   dollar volume, you write it off?

16   A.    That's correct.

17   Q.    All right.  By that did you mean we simply ignore it,

18   forget about it, or did you mean an accounting concept that you

19   take a deduction from your profits?

20   A.    It's an accounting concept.

21   Q.    All right.  And what deduction do you take, the fair

22   market value or the cost?

23   A.    The cost.

24   Q.    And you're certain of that?

25   A.    I'm positive of that.

1    Q.    Now, by the way, does Dell limit the number of warranty

2    claims that a customer can make?

3    A.    There is no systematic way to do that.  It is at the

4    discretion of the technician.  If they receive a call in which

5    they observe that there are numerous open calls, they would

6    likely counsel their customer to wait for the resolution of

7    those issues before opening a new issue.

8    Q.    Well, I guess what I'm asking is, if I buy 2,000 Dell

9    computers and I find that all 2,000 of them are faulty, am I

10   allowed, under your warranty policy, to make a claim on all

11   2,000?

12   A.    You are.

13   Q.    And has Dell ever had that problem, where someone has

14   purchased 2,000 computers and claimed that all 2,000 were

15   faulty?

16   A.    I'm not aware of whether that specific scenario has

17   occurred, but we don't look in the aggregate unless we see a

18   larger trend occurring.  If there is, for example, let's say --

19   one of the jobs of our technicians is to observe if they see

20   the same types of issues occurring, and if they say, "Well, I'm

21   seeing an awful lot of calls on this particular hard drive,

22   that would be routed through liaisons back to our product

23   development team, and that might initiate some actions on our

24   side, some corrective actions.

25   Q.    Well, the 2,000 example, isn't that from a federal lawsuit

1    in North Carolina involving Dell and Advanced Internet

2    Technologies, where they claim that all 2,000 computers you

3    gave them were faulty?

4    A.    I'm not familiar with that lawsuit.

5    Q.    In any event, there is no limit on the number of warranty

6    claims that I can make if I own the Dell product, correct?

7    A.    That is correct.

8    Q.    Now, I would like to ask you about the assembly of these

9    computers, because you have told us yesterday that there are

10   line pulls; in other words, a computer is going through the

11   line and there is a problem with it and it just does not go

12   into normal distribution, it might get sold to a wholesaler or

13   something like that.

14   A.    Are you referring to new manufacturing or to a product

15   that is returned for repair?

16   Q.    New manufacturing.

17   A.    New manufacturing has a different process, one with which

18   I am not completely familiar, but if a computer or a product

19   that's on the line experiences a failure as it's being prepared

20   to be shipped new, then it is pulled aside and it is repaired

21   with new parts to bring it up to working functionality.  I am

22   not aware of or don't have any personal information on whether

23   or not there could be a failure of such severity that they

24   would pull it off the line entirely.

25   Q.    Okay.  By the way, where are these computers assembled?

1    A.   I don't know specifically where they are.  That's not my

2    side of the business.  I know at different points in time some

3    of them are assembled in our Austin area, depending on the type

4    of product line, some in Nashville, Tennessee, and then some

5    are assembled outside of the United States.

6    Q.   In China?

7    A.   In China, or in Taiwan or other locations.

8    Q.   So, we know that there is a service tag that gets put on

9    the chassis, and that's some sort of sticker that you can just

10   stick right on or peel off, correct?

11   A.   It is a sticker that is printed at the time that the

12   product is built, correct.

13   Q.   And we know that the service tag is electronically

14   embedded in the motherboard, correct?

15   A.   That is correct.

16   Q.   So, if I hit F2 or some other -- you can tell I'm not an

17   expert at computers -- but you can get your information about

18   your computer, and that will include the service tag number?

19   A.   That's correct.

20   Q.   So, in the process of putting this together, whether it's

21   in Austin Texas, Nashville, Taiwan or China, wherever it is,

22   which gets done first?

23   A.   I'm not aware of the order in which it occurs.  If I were

24   to conjecture, I would say that it would be that it's placed

25   electronically on the board, and then from there the label is

1    generated to put on the outside of the chassis.

2    Q.   Do you know what process is in place to make sure that the

3    label that's put on after the board has been electronically

4    programmed matches?

5    A.   I don't.

6    Q.   Now, you told us yesterday that, even though the packing

7    slip that I just showed you talks about credit cards, and there

8    was a policy at some point in time that credit cards could be

9    asked for, and I think you said that you are going to go to

10   that in the future, or you are trying to go to that in the

11   future, but at the time, 2005 to 2010, your explanation for why

12   credit card information was not asked most of the time was that

13   it's time-consuming.

14   A.   It's time-consuming.  I don't believe we had a tool that

15   was adequate to accepting those as well.  So, there were

16   basically a number of reasons why it was decided to not pursue

17   the credit card at the time of the dispatch.

18   Q.   So, you're telling us that Dell made a companywide

19   decision at some point in time not to ask for credit cards when

20   somebody called up and said, "I want a replacement part for a

21   computer that's under warranty?"

22   A.   That's correct.

23   Q.   And one is that it's time-consuming, correct?

24   A.   Correct.

25   Q.   Sometimes these chats, especially with people who don't

1   know what it is exactly they're dealing with, a consumer, go on

2   for hours.

3   A.   Agreed.

4   Q.   So, how much time do you think it would take to ask a

5   customer for their credit card?

6   A.   I think it can take between five to ten minutes, depending

7   upon the interaction or the specific customer.

8   Q.   It could take a lot less than that, couldn't it?

9   A.   It could.

10   Q.   I mean, you use websites all the time where you have to

11   enter credit card information.  It takes a minute, correct?

12   A.   I agree.

13   Q.   You agree?

14   A.   I agree.  However, in the interaction with the technician,

15   the technician is taking the number, processing it and then

16   providing information back to the customer.  Those website

17   interactions are automated, and these involve human

18   interaction.

19   Q.   And the other reason that you guys didn't take credit card

20   information is because you weren't set up for it?

21   A.   That's correct.  So, the tool that we use to dispatch

22   parts did not and does not currently have the capability to

23   accept credit cards.

24   Q.   Well, how long would it take a company like Dell to fix

25   that problem?

1    A.    I am in the process of finding out.

2    Q.    All right.  So, when that particular packing slip went out

3    in 2010, no one was taking credit card information, even though

4    it was saying it on the packing slip?

5    A.    That's correct.  This is terminology that was prior

6    terminology from the time that that capability existed.

7    Q.    And how much did you say Dell was losing each calendar

8    year in non-returned parts?

9    A.    Approximately 5 percent of the parts that are shipped out,

10   based on dollar value.

11   Q.    All right.  And you said that the parts that are shipped

12   out are 1.5- to $2 million a day?

13   A.    Correct.

14   Q.    And there are 260 business days a year, because you said

15   it was business days?

16   A.    That's correct.

17   Q.    So, we're talking something over $20 million?

18   A.    That is correct.

19   Q.    And with your database you could know that exact figure,

20   correct?

21   A.    That's correct.

22   Q.    And do you know the exact figure for 2009, or 2010 or

23   2011?

24   A.    I know the exact figure for 2012 -- 2011, I'm sorry.

25   Q.    What's the exact figure for 2011?

1    A.    $33 million.

2    Q.    $33 million.  And is that figure based on multiplying the

3    5 percent times the 260 times the cost to Dell of producing the

4    product or the fair market value of the product?

5    A.    It's the cost.

6    Q.    So, if I returned a hard drive to Dell in 2009 or 2010,

7    what would Dell do with it?

8    A.    We would receive it and credit the open dispatch so that

9    that dispatch would then be closed and no further expectation

10   would be made from the customer to return the part.  The part

11   itself would then be routed back to the vendor who made the

12   drive for Dell for credit.

13   Q.    And what credit would you get, the cost credit?

14   A.    The terms vary, depending upon the individual hard drive

15   vendor, but typically it's a dollar-value credit based on the

16   value of the drive.

17   Q.    Well, is the value of the drive higher than the cost?

18   A.    No.  So, the cost, correct.  So, what we purchase the

19   drive for from the vendor, we would receive a credit for some

20   percentage of that amount back from the vendor.

21   Q.    Thank you, sir.

22         THE COURT:  Ms. Burkart.

23         MS. BURKART:  Just as a housekeeping matter first, can

24   we have those two exhibits admitted as 24 and 25 that

25   Mr. Sheketoff showed the witness?

1        THE COURT:  Yes.  The ones that were introduced in

2   connection with 46?

3        MS. BURKART:  Exactly.  I reserved 24 and 25 so we

4   could use those numbers.

5        THE COURT:  All right.  So, they will be received.

6        MS. BURKART:  Thank you.

7        (Exhibit Nos. 24 and 25 received into evidence)

8                      REDIRECT EXAMINATION

9   BY MS. BURKART:

10  Q.   Good morning, Mr. Long.

11  A.   Good morning.

12  Q.   You just mentioned that in 2011 Dell sent out replacement

13  parts totalling $33 million; is that correct?

14  A.   No.  We taken sustained a write-off or financial loss of

15  $33 million.

16  Q.   I see.  In parts that did not come back?

17  A.   That is correct.

18  Q.   Do you know how many parts were sent out, the dollar value

19  of the parts that were sent out overall for 2011?

20  A.   For 2011, I think the figure was approximately

21  $450 million.

22  Q.   So, $450 million worth of parts were sent out as

23  replacements in 2011?

24  A.   Correct.  And then we sustained a loss on $33 million

25  worth.

1    Q.   You mentioned the concept of writing off losses.  Is that

2    common in retail, the idea of writing off a loss?

3    A.   It is.  If you have a product that's damaged, or a product

4    that is not saleable or a product in this case that is not

5    returned, then you take a financial loss indicating that you

6    lost value for those products.

7    Q.   Okay.  So, if a kid smashes a vase in Pottery Barn or

8    something, is that a write-off?  Is that how that's handled?

9    A.   I'm not too familiar with how it would work in that

10   context, but I suspect it would be something similar.

11   Q.   Yesterday Mr. Sheketoff asked you about cutting off IP

12   addresses, the possibility of cutting off IP addresses.  Just

13   to clarify, is the same IP address assigned to a household

14   forever?

15   A.   If someone chooses to pay for what is called a "static

16   IP," "static" as in it remains in place, then they can have

17   that IP assigned to them until they have stopped paying for it.

18          But, otherwise, there's typically a scenario called

19   "dynamic IPs," and so, when you log on -- let's just say you go

20   to your house, plug in your computer and boot it up.  You will

21   be assigned a dynamic IP and it will have a lease or duration

22   on it.  That IP will remain with you until the lease expires,

23   and once it expires it may be that you are assigned that IP

24   again or you may be assigned an entirely different IP, and the

25   telecom companies typically keep records of to whom the IP

1    addresses are assigned at any given time based on those leases.

2    Q.   Would a customer even know if their IP address was

3    changing?

4    A.   If they were tech savvy enough, they could use some

5    commands in their Windows console to determine their IP

6    address.  Most folks have no idea, though.

7    Q.   So, it wouldn't be obvious that your IP address was

8    changing?

9    A.   It would not.

10   Q.   If an IP address is no longer with one household, would it

11   be assigned to another?

12   A.   It could.

13   Q.   Mr. Sheketoff also asked you about changes to the warranty

14   policy over time.  Focusing on the 2005 to 2010 time frame, was

15   the policy generally the way you described it yesterday when

16   you spoke?

17   A.   With some, perhaps, minor variations.  Since I've been

18   employed at Dell, starting in 1995, the policy has been

19   approximately the same in that we request people return parts

20   within an "X" period of time.  I think that date has changed

21   over time.  I think it moved from 15 to 10 days in the 16 years

22   I've been at Dell.  But they ask that parts be returned by a

23   certain period of time, or, as mentioned, there may be invoices

24   sent or there may be charges made.

25   Q.   So, the efforts taken to pursue replacement parts that

1   haven't been returned have been changed slightly, but otherwise

2   the general idea is still the same?

3   A.   It is.

4   Q.   I believe you said on cross that Dell resells used parts;

5   is that right?

6   A.   I don't know if "resell" is the right term, but maybe it

7   is.  Let's say we get back a number of parts and we say these

8   parts are not in the condition that we want to use for our Dell

9   customers, so we may sell those by the pallet to wholesalers or

10  the open markets so that they can use them for their own

11  purposes.  They are not allowed to represent them as being

12  provided by Dell in that they can't say, "I'm selling for Dell

13  a part."  They can say, "I have a 2005 model Dell hard drive."

14  And typically those are white-labeled or they are sold with no

15  warranty; people buy them at their own risk.

16  Q.   Are these parts broken, or have they been fixed in some

17  way?

18  A.   Well, when we sell them they are typically in a state of

19  disrepair, and then the persons who are purchasing them would

20  repair them or refurbish them to their own standards.

21  Q.   What happens to their service tag numbers?  Do they keep

22  their old service tag numbers?

23  A.   We have a process through which we are supposed to have

24  all of those tags removed.  I can say that it does not entirely

25  always function that way; sometimes the tags remain.

1    Q.    But the general process is what?

2    A.    Is to have the tags removed.

3    Q.    You described a number of steps that Dell took to pursue

4    items that were supposed to be returned, including sending

5    emails, auto calls, live calls.  Who does this?

6    A.    A team that I manage, a third-party vendor.  I own the

7    contracts and we pay them to perform these functions for us.

8    Q.    So, you pay a third-party vendor a separate cost?

9    A.    That is correct.

10   Q.    And would they also be paid a separate cost to do billing?

11   A.    They would and will be.

12   Q.    You mentioned that you once got a replacement part from

13   Dell and forgot to send back an item and you got an invoice for

14   it yesterday, or Dell, asking you to either return the part or

15   pay for the replacement; is that right?

16   A.    That's correct.

17   Q.    How many replacement parts did Mr. Kuc request from Dell

18   between 2005 and 2010, generally?

19   A.    I don't have the exact numbers.

20   Q.    Do you recall if it was in the hundreds or the thousands?

21   A.    Oh, it was in the thousands.

22   Q.    And do you recall approximately what percentage Mr. Kuc

23   returned of those?

24   A.    I don't have the approximate number, no.

25   Q.    Do you have a ballpark of whether it was 10 percent or 50

1    percent or 80 percent returned?

2    A.    It would have been below 10 percent.

3    Q.    Mr. Sheketoff asked you about service tag numbers and the

4    possibility of duplicate service tag numbers, the same number

5    being used twice.  Does Dell have safeguards in place to make

6    sure that doesn't happen?

7    A.    We do.  As each product that is manufactured goes out the

8    line, there are a number of scanners, both automated scanners

9    and manual human scans, where they wield a scanner gun and scan

10   the product.  They keep track of the tag numbers as they are

11   going off the line to verify that if any given tag is scanned

12   there is not another scan for the same tag.

13          There is also -- tag numbers are assigned to our

14   manufacturing companies in banks, and so they would receive a

15   bank in a linear series of tag numbers, and as they work

16   through them and they are get getting close to using them all

17   up, they will have another bank assigned to them.  The banks

18   are set up that way so that you can't have cross or overlap

19   from one vendor to the next that is making these products for

20   us.

21   Q.    What would be the result to Dell if mistakes happened more

22   than rarely, if there was more than a very rare instance where

23   a service tag would be repeated?

24   A.    If two different customers receive the same service tag,

25   then we would have a confusion scenario over to where parts

1    should be sent.  We would have somehow also received two

2    different payments for a product that would look effectively

3    the same.  So, it's a scenario we definitely want to avoid as

4    much as possible.

5    Q.   You talked about taking credit card information and

6    estimated the amount of time it would take to take a customer's

7    credit card information.  How long would it take to take a

8    customer's credit card information if they didn't have their

9    credit card near them?

10   A.   This is conjecture, and so these are actually some

11   scenarios that we're modeling in preparation for beginning to

12   take credit cards again, but we estimate that it can take up to

13   five minutes, depending upon the customer.  Sometimes you have

14   aged or infirm people or people that may say, "I need to go get

15   it," or, "I need to go ask my wife for the card," or whatever.

16   It could take between five to ten minutes.  Those are the time

17   bands that we're allowing.

18   Q.   In your experience with the modeling, do you find that

19   people will begin a chat not expecting that they will need to

20   have their credit card information handy?

21           MR. SHEKETOFF:  Objection, your Honor.

22           THE COURT:  Well, no, I am going to permit this.

23   A.   I'm sorry.  Could you repeat the question?

24   BY MS. BURKART:

25   Q.   In the experience that you described with modeling how

1    long this will take, have you found that when people begin a

2    chat they may not expect to have their credit card information

3    handy?

4    A.   I haven't observed that.  I think across the industry in

5    the analysis that we have performed we are one of the only

6    companies in our competitive market that does not currently ask

7    for cards.  So, I think it's really an expectation that people

8    have, or, at the very least, if they are asked for it, they are

9    so used to it happening elsewhere, it doesn't surprise them.

10   Q.   Fair enough.  You estimated five to ten minutes, based on

11   your modeling; is that right?

12   A.   Correct.

13   Q.   And how many chats would this five to ten minutes be

14   incorporated into?

15   A.   Into a fair percentage.  At least into 40 to 50 percent of

16   the chats as they exist until we expanded the rollout further.

17   Q.   So, could you do some rough math about how much time that

18   would add to overall the amount of time Dell was spending?

19   A.   I can tell you that our average interaction with a

20   customer is, depending upon the nature of the failure, but, on

21   average, is 10 to 15 minutes, and so it would increase by

22   potentially a third the interaction, and so the costs are

23   relatively significant.  It's one of the, again,

24   counter-arguments that some at Dell have made against taking

25   credit cards.

1    Q.    The final thing I would like to ask you to do is, we

2    discussed the chats in the four different components that were

3    requested in Exhibits 1 through 4, and then we have talked a

4    little bit about the service tag numbers and how they work.  I

5    would like just to run through them with you quickly and ask

6    you about each of the components how that service tag works.

7    A.    Okay.

8    Q.    So, directing you, first, to Exhibit 1, please, page 4 in

9    the second line, what type of equipment is the customer working

10   with in chat one?

11   A.    It says this is a standalone external SAS tape drive.

12   Q.    What is an external SAS tape drive?

13   A.    "SAS" stands for "Serial Architecture SCSI."  It's an

14   enterprise product, something you would find at large

15   corporations or IT departments would use to store or back up

16   their users or their server's data.  It's a high-end item.

17   Q.    Is it something you can buy alone?

18   A.    It is.

19   Q.    Does it have a service tag affixed on it?

20   A.    My understanding is that the majority of our tape drives,

21   our standalone tape drives, are service tagged.

22   Q.    Does that mean the sticker on the outside?

23   A.    It does.

24   Q.    Does it also have some type of internal marking of the

25   service tag?

1    A.    My understanding is that is correct.  I think that may

2    vary from model to model.

3    Q.    Is this one of the codes that can be changed with the

4    software that we discussed yesterday?

5    A.    I'm not aware of any way to change the service tag on a

6    tape drive outside of being within the Dell manufacturing

7    environment.

8    Q.    So, the tape drive has its own sticker, and that's what's

9    on the outside, and that's it?

10   A.    That's it, and no changing it in the field.

11   Q.    Moving on to chat two, what type of equipment is the

12   customer working with in chat two?

13   A.    It appears he is requesting a motherboard for a laptop.

14   Q.    And directing you to the second page in blue, the

15   technician confirms what type of laptop.  Do you see that?

16   A.    A Latitude D630.

17   Q.    What does the customer say the problem is with the laptop,

18   what piece of equipment isn't working?

19   A.    The motherboard.

20   Q.    Is the motherboard inside the laptop?

21   A.    It is.

22   Q.    So, where are the service tag stickers for the type of

23   product we are talking about in chat two?

24   A.    So, there would be a sticker on the outside of the

25   system's chassis on the bottom of the portable.  Then on the

1    inside, typically after removing 30 to 40 screws, we would be

2    able to access the motherboard, and there should be a sticker

3    on the motherboard as well with the tag number on it.

4    Q.   So, we have got the sticker on the outside of the laptop,

5    the sticker on the motherboard, and then is there anything

6    inside the motherboard that is programmed in to tell you what

7    the service tag number is?

8    A.   There is electronic memory that is somewhat the equivalent

9    of flash memory or your camera's SD memory that has the tags

10   stored in there as well.

11   Q.   And is this the type of software that can be reprogrammed?

12   A.   On motherboards, yes.  This is where the asset utility is

13   used to reprogram them.

14   Q.   I am going to direct you to the third page of chat three.

15   What is the customer told to do with this motherboard by the

16   technician?

17           MR. SHEKETOFF:  Well, objection, your Honor.

18           THE COURT:  Grounds?

19           MR. SHEKETOFF:  Scope.

20           THE COURT:  I think that is fair, so we will move on.

21           MS. BURKART:  Okay.

22   BY MS. BURKART:

23   Q.   What type of equipment does the customer say they are

24   working with in chat three?  And I direct you to Exhibit 3,

25   please.

1    A.    A processor.

2    Q.    And what is the processor in?  You might have to move to

3    the second page.

4    A.    It's in a workstation.

5    Q.    And what is a workstation?

6    A.    Well, it could be a generic term for any computer, but

7    typically we do have a workstation line of product, our

8    Precision Workstation, and those can be either portables or

9    desktops.

10   Q.    So, a workstation is like a computer that we are used to

11   seeing?

12   A.    It is.

13   Q.    Where is the service tag on the workstation?

14   A.    It's similar to the laptop.  If it's a laptop it's going

15   to be on the bottom.  If it's a desktop, then it will be either

16   on the back or on the top on the sticker.

17   Q.    And does the processor have a sticker on it, too?

18   A.    The processor has a PPID sticker, a Piece Part

19   Identification sticker, but it does not have a service tag

20   sticker.

21   Q.    How big is a processor?

22   A.    Roughly the size, depending on the product, of a packet of

23   sugar.

24   Q.    So, it has its own little code but not the service tag?

25   A.    Correct.  We typically, since those items are small, put

1    those little square bar codes on them that you can scan with

2    your camera, the little-bitty bar codes that we then scan.

3    Q.   What service tag would that processor go with?

4    A.   It would go with the product in which the computer had

5    originally been manufactured.  So, at the time that we build a

6    product.  As mentioned, each part within that computer has its

7    own unique serial number, and we associate the serial numbers

8    for those parts with the service tag on the product in which it

9    was placed.

10   Q.   And can that processor be reprogrammed, the service tag

11   number on the processor?

12   A.   No.

13   Q.   Is it in there internally at all?

14   A.   No.

15   Q.   So, it's just a part of the bigger component; is that

16   right?

17   A.   That's correct.

18   Q.   And then, finally, chat four.  What type of equipment does

19   the customer say they are working with in chat four?

20   A.   A hard drive.

21   Q.   What is a hard drive?

22   A.   It is a data storage device.  It typically has moving

23   parts that is used to store all the data that someone is saving

24   on their computer.

25   Q.   Can you buy that separately?

1  A.   You can.

2  Q.   Does is it have its own service tag number?

3  A.   It does not.

4  Q.   If it comes with a computer, does it go with the service

5  tag number of the computer?

6  A.   It's associated, as per all the other parts, with the

7  service tag number based on its PPID.

8  Q.   Yesterday Mr. Sheketoff showed you what's now been marked

9  as Exhibit 24, something called "Keep Your Hard Drive"

10  directions.  Do you recall that?

11  A.   I do.

12  Q.   I'm going to focus you on the line in this chat here where

13  "Keep Your Hard Drive" is discussed.  What is the customer told

14  to do here?

15  A.   It says, "You have Keep Your Hard Drive, so you do not

16  need to return the old drive."

17  Q.   And the policy that you described yesterday, does that

18  require a separate fee for "Keep Your Hard Drive"?

19  A.   It does.  There is an additional warranty that you may

20  purchase at the time that you buy the system that allows you to

21  keep your drive.  Some people are so concerned about their data

22  or their private info that they elect to purchase this.

23  Q.   So, a person who is concerned about identity theft in

24  returning an old hard drive would be able to keep the broken

25  hard drive but pay Dell a fee; is that right?

```
1    A.    That is correct.

2    Q.    Okay.  Thank you, Mr. Long.

3              THE COURT:  Mr. Sheketoff, anything?

4              MR. SHEKETOFF:  No, your Honor.

5              THE COURT:  All right.  You may step down, Mr. Long.

6    Thank you.

7                        (Witness stepped down)

8              MR. GARLAND:  Your Honor, the Government calls Mark

9    Olsen to the stand.

10             THE CLERK:  Please rise and raise your right hand.

11                  MARK OLSON DULY SWORN BY THE CLERK

12             THE CLERK:  Please state your full name, spelling your

13   last.

14             THE WITNESS:  Mark Lane Olson, O-L-S-O-N.

15             THE COURT:  You may be seated, Mr. Olson.

16                         DIRECT EXAMINATION

17   BY MR. GARLAND:

18   Q.    Mr. Olson, good morning.  Can you state the city and state

19   that you live in?

20   A.    Fort Collins, Colorado.

21   Q.    Where do you work?

22   A.    Larimer County Sheriff's Office.

23   Q.    What part of the Sheriff's Department do you work in?

24   A.    I work in the IT Department.

25   Q.    What does the IT Department do?
```

1   A.    We support all the laptops and desktop computers for our

2   patrol officers and jail facility.

3   Q.    What's your position within the Department?

4   A.    I'm the Computer Services Manager.

5   Q.    How many people do you manage?

6   A.    Four.

7   Q.    What are your specific responsibilities, then?

8   A.    Just maintenance of 911, computer systems and patrol cars,

9   investigations and the jail.

10   Q.    How long have you had this position?

11   A.    Eighteen years.

12   Q.    Does the Sheriff's Office have any Dell computer

13   equipment?

14   A.    Yes, we do.

15   Q.    What's your familiarity with that equipment?

16   A.    We are a total Dell shop, servers and workstations and

17   laptops.

18   Q.    I want to discuss with you a particular piece of

19   equipment, a Dell workstation with a hard drive.  Does the

20   Sheriff's Office have Dell workstations with hard drives?

21   A.    Yes.

22   Q.    What is a workstation?

23   A.    Just a desktop workstation for a user in the office

24   environment.

25   Q.    I would like you to look at Exhibit 4, which has been

1    previously admitted into evidence, and I would like you to look

2    at the first paragraph that's in red, please.  If it's too

3    small, there are some binders there that will give you the

4    document full size.  Do you see that?

5    A.    Mm-hmm.

6    Q.    What does the first paragraph in red say?

7    A.    "Hi, I'm one of the IT guys here.  This workstation has a

8    dead hard drive.  The hard drive will not detect in the bios.

9    I have tried resetting all the cables, still the same issue,

10   and also tried running the Dell diagnostics, and diagnostics

11   won't even detect."

12   Q.    If you could then turn to page 2, do you see a service tag

13   for the workstation that's being discussed in that chat?

14   A.    Yes.

15   Q.    What is the service tag you see?

16   A.    CL5JVH1.

17   Q.    Does the Sheriff's Department or Sheriff's Office have a

18   workstation with that service tag number?

19   A.    Yes, we do.

20   Q.    Approximately, when was it purchased?

21   A.    September of 2009.

22   Q.    What's it used for there?

23   A.    It's one of my system administration employee's computers.

24   Q.    How far away is it from you on a normal basis?

25   A.    In my office, direct office area.

1    Q.    Have you looked at it recently?

2    A.    Yes.

3    Q.    When was the last time that you looked at it?

4    A.    About a month ago.

5    Q.    Has the Sheriff's Office ever had any equipment repaired,

6    serviced or replaced by anybody using the name of Sam Jenkins?

7    A.    No.

8    Q.    Do you see on page 1 where Sam Jenkins says that he is an

9    IT guy?

10   A.    Yes.

11   Q.    Has the Sheriff's Office ever employed a guy named Sam

12   Jenkins in the IT Department?

13   A.    No, we have not.

14   Q.    Let me go out a little bit more broadly.  Has the

15   Sheriff's Office ever employed somebody named Matt Kuc, spelled

16   K-U-C, to work on its computer equipment?

17   A.    No, we have not.

18   Q.    Let's have you look at the e-mail address that Sam Jenkins

19   uses on the second page of Exhibit 4.  Do you see that e-mail

20   address?

21   A.    Yes.

22   Q.    Can you read it, please?

23   A.    "Sjenkins," J-E-N-K-I-N-S, at cyonisp, C-Y-O-N-I-S-P, dot

24   net.  Cyonisp.

25   Q.    Has the Sheriff's Office ever employed anybody from

1   cyonisp.net to work on its computers?

2   A.    No, we have not.

3   Q.    What about Cyon Data Systems?

4   A.    No.

5   Q.    Total Asset Recovery?

6   A.    No.

7   Q.    Sensible Computers?

8   A.    No.

9   Q.    What about anybody at 2130 Monden Street, 3-377,

10  Cumberland, Rhode Island?

11  A.    No.

12  Q.    What about anybody in Rhode Island or Massachusetts

13  whatsoever?

14  A.    No.

15  Q.    In fact, outside of this trial have you ever heard of any

16  of the people or companies that I just mentioned to you?

17  A.    No, I have not.

18  Q.    That workstation that we were talking about, the hard

19  drive in it with service tag CL5JVH1, has that ever been

20  repaired, serviced or replaced?

21  A.    No, it has not.

22  Q.    Does the Sheriff's Office still have the workstation and

23  the hard drive?

24  A.    Yes, we do.

25  Q.    I am going to show you Exhibit 44, which I believe is

1   unopposed.  Do you recognize this exhibit?

2   A.   Yeah.  It's the pictures that I took of the equipment in

3   our equipment room.

4   Q.   When did you take that?

5   A.   Approximately a month ago.

6        MR. GARLAND:  Your Honor, I move to admit Exhibit 44.

7        THE COURT:  It is received.

8             (Exhibit No. 44 received into evidence)

9   BY MR. GARLAND:

10  Q.   Were the workstation and hard drive working the last time

11  that you saw them?

12  A.   Yes, they were.

13  Q.   By the way, if the Sheriff's Office were going to have

14  that workstation and that hard drive repaired, who would you

15  ask to do it?

16  A.   It would be serviced by our own internal people.

17  Q.   Thank you.  No further questions.

18       THE COURT:  Mr. Sheketoff.

19       MR. SHEKETOFF:  I have no questions.

20       THE COURT:  All right.  You may step down, Mr. Olson.

21  Thank you.

22                  (Witness stepped down)

23       MS. BURKART:  The Government calls Ben Rubin, please.

24            BENJAMIN RUBIN, DULY SWORN BY THE CLERK

25       THE CLERK:  Please state your full name, spelling your

1    last.

2              THE WITNESS:  Benjamin Rubin, R-U-B-I-N.

3              THE COURT:  You may be seated.

4                        DIRECT EXAMINATION

5    BY MS. BURKART:

6    Q.   Good morning, Mr. Rubin.

7    A.   Good morning.

8    Q.   Mr. Rubin, what is your occupation?

9    A.   I'm an artist.

10   Q.   What type of art do you create?

11   A.   I create public art, sculptures, often in public places,

12   such as building lobbies and such.

13   Q.   Do you have a business or company name?

14   A.   Yes.  Ear Studio, Incorporated.

15   Q.   Ear is E-A-R-S?

16   A.   E-A-R Studio, Incorporated.

17   Q.   Thank you.  Do you use any Dell computer equipment in your

18   work?

19   A.   I do.

20   Q.   What type of equipment do you use?

21   A.   I use some workstation computers.

22   Q.   I want to discuss with you a particular workstation.  Do

23   you have a Dell Precision Workstation with a service tag

24   75MKLD1?

25   A.   Yes.

1    Q.   Are you familiar with that workstation?

2    A.   Yes, I am.

3    Q.   Approximately when was it purchased?

4    A.   It was purchased in the Spring of 2007.

5    Q.   And what do you use it for?

6    A.   That machine is actually at the heart of a very prominent

7    artwork.  It is a machine that does data processing for an

8    artwork that sits in the *New York Times* building.  And so, in

9    the lobby of the *New York Times* building there is this very

10   large artwork with 560 small screens, and the workstation that

11   you just mentioned sits above in a control room, and it is

12   receiving data feeds from the *New York Times* website, and it

13   contains also the *New York Times* archives, and it's processing

14   that data, all those news stories, and placing fragments of

15   them on these 560 screens, and so that's visible to the public

16   every day.

17   Q.   So, there's 560 screens in the lobby of the *New York Times*

18   building?

19   A.   Correct.

20   Q.   And that's in Manhattan, right?

21   A.   Yes.

22   Q.   It projects the words, and the projection is happening

23   from the computer; is that right?

24   A.   The computer is controlling the projections.  In fact, the

25   computer that we are talking about is actually making the lists

1    of phrases and words that are then shown on these screens, and

2    then, yes, these words and phrases from news stories from

3    today's *New York Times* or from the archives are displayed then

4    in various sequences on these screens.

5    Q.   And where does the computer itself sit?

6    A.   The computer sits on the second floor.  It's in a control

7    room there.

8    Q.   And who has access to that control room?

9    A.   That control room is locked at all times.  I have a key

10   and a couple of the technicians who work for me have keys.  The

11   only other access to that room other than about those three or

12   four people is the building and security and engineering staff.

13   Q.   Do you maintain a service contract over that computer?

14   A.   Yes, I do.

15   Q.   Why is that?

16   A.   The owners of the building have contracted with my company

17   to maintain the artwork, because it's a very specific

18   configuration of technology, and we are the best qualified to

19   keep it operational.  So, we have an ongoing service contract

20   since the work was installed.

21   Q.   Thank you.  I am going to show you what's marked as

22   Exhibit 43.  Do you recognize this exhibit?

23   A.   Yes, I do.

24   Q.   What is that?

25   A.   That is the control room.  That's the rack of equipment

1   that controls the artwork, and down and to the right is the

2   workstation with the tag number that you mentioned earlier.

3   Q.    And did you take these pictures?

4   A.    I did.

5   Q.    Is it a fair and accurate representation of the equipment

6   as you last saw it?

7   A.    Yes, it is.

8   Q.    Do you see the service tag number on the computer?  We can

9   pull that up.

10   A.    Yes, I do.

11   Q.    Let's magnify it for you.  If you could read that service

12   tag number, please.

13   A.    It is 75MKLD1.

14   Q.    Based on your service contract that you have just

15   described, would you be familiar with whether this piece of

16   equipment has ever been repaired, serviced or replaced?

17   A.    Yes.

18   Q.    How so?

19   A.    Well, if the equipment ever had a problem, I would be

20   notified by the building security or engineering staff that the

21   artwork had stopped functioning, and then I would either go

22   myself or send someone to the control room to see what was

23   going on.

24   Q.    I'm going to ask you to look at Exhibit 3, please, page 3.

25   If we could just magnify the service tag number again.  Would

1    you please read the service tag number in this document?

2    A.   It is 75MKLD1.

3    Q.   Do you recognize that service tag number?

4    A.   Yes.  That's the same machine.

5        THE COURT:  You are making the connection, I gather,

6    that Exhibit 43 is offered?

7        MS. BURKART:  I apologize, your Honor.  Yes, I would

8    like to.

9        THE COURT:  It is received.

10        (Exhibit No. 43 received into evidence)

11        MS. BURKART:  Thank you.

12   BY MS. BURKART:

13   Q.   Did you contact Dell to have someone service this

14   workstation?

15   A.   No, I did not.

16   Q.   Did anyone contact Dell on your behalf?

17   A.   No.

18   Q.   If you could magnify the company name Abacus there.  Do

19   you recognize this company name?

20   A.   I do not.

21   Q.   What about a company called Total Asset Recovery?

22   A.   No.

23   Q.   Sensible Computers?

24   A.   No.

25   Q.   Cyon Data Systems?

1   A.   No.

2   Q.   If you could magnify the name in red here, please.

3        Do you recognize the name Mark Cook?

4   A.   I do not.

5   Q.   Have you ever had any other person service this computer?

6   A.   No.

7   Q.   Have you ever had anyone contact Dell on your behalf about

8   this computer?

9   A.   No, I haven't.

10  Q.   Outside of this trial have you ever heard the names of any

11  of the people or companies I just mentioned?

12  A.   No.

13  Q.   That's all I have.  Thank you, Mr. Rubin.

14  A.   Thank you.

15       THE COURT:  Mr. Sheketoff.

16       MR. SHEKETOFF:  Thank you, Judge.

17                    CROSS-EXAMINATION

18  BY MR. SHEKETOFF:

19  Q.   Good morning, Mr. Rubin.

20  A.   Good morning.

21  Q.   Sir, how do you know that your computer has associated

22  with it the service tag 75MKLD1?

23  A.   Well, I know that because I was asked some months back to

24  take those photographs that you saw earlier.

25  Q.   Okay.  So, basically you look at the tag or label that's

1    on the outside of the computer, and that's what you conclude,

2    that that's your computer with that tag number?

3    A.    Yes.  I also at that time checked the invoice that I had

4    received from Dell just so I would be sure.  I did that,

5    actually, first, because I didn't know tag numbers off the top

6    of my head.  So, I went back through my Dell order records, and

7    we have only ordered about four or five Dell computers ever, so

8    I wanted to figure out which one it was -- then I could see

9    that it was that machine.  Then I went to the *New York Times*

10   and went there and physically verified that that was the tag on

11   the machine.

12   Q.    Did you play with the machine to see what the machine

13   itself identified its tag number to be?

14   A.    No, I did not.

15   Q.    All right.  You were the original purchaser of this

16   particular item?

17   A.    Yes.

18   Q.    And if there was a problem with this item, you would have

19   looked at the outside tag number and used that in calling Dell?

20   A.    Yes.

21   Q.    Thank you, sir.

22           THE COURT:  Ms. Burkart.

23           MS. BURKART:  I have nothing, your Honor.

24           THE COURT:  All right.  You may step down, Mr. Rubin.

25           THE WITNESS:  Thank you.

1          MR. GARLAND:  Your Honor, the Government calls Michael

2     Wisener to the stand.

3                    MICHAEL WISENER DULY SWORN BY THE CLERK

4          THE CLERK:  Please raise your right hand.

5          THE WITNESS:  Witness duly sworn by the Clerk.

6          THE CLERK:  Please state your full name, spelling your

7     last.

8          THE WITNESS:  May I sit?  First name is Michael, Mike,

9     last name is Wisener, W-I-S-E-N-E-R.

10                        DIRECT EXAMINATION

11    BY MR. GARLAND:

12    Q.   Good morning, Mr. Wisener.  What state and city do you

13    live in?

14    A.   I live in Baton Rouge, Louisiana.

15    Q.   Where do you work?

16    A.   I work at Louisiana State University?

17    Q.   What part of LSU do you work in?

18    A.   The department I work for, sir, is called Law Enforcement

19    Online.

20    Q.   What does that group do?

21    A.   This group provides support services.  We are a federal

22    contractor.  I'm an LSU employee.  So, we provide support,

23    information technology services.

24    Q.   What's your title there?

25    A.   I'm an IT Manager.

1    Q.    So, what are your responsibilities as an IT manager?

2    A.    I manage the local area network there.  We have 85 to 90

3    PCs, 10 servers.  So, I manage the information technology

4    infrastructure there.

5    Q.    You just used a couple of terms, "PCs" and "servers."

6    What's a PC and what's a server, and what's the difference?

7    A.    A PC is just a desktop computer, much as what you see

8    here.  A server is just a larger system that does, generally,

9    the same thing.

10   Q.    Does your group use any Dell equipment?

11   A.    Exclusively Dell.

12   Q.    And what's your personal familiarity with your group's

13   Dell equipment?

14   A.    I manage that equipment, build it, main it, take care of

15   it, service it, support it.

16   Q.    And are these pieces of equipment used for the mission

17   that you were talking about before of your group?

18   A.    Yes.

19   Q.    I want to discuss with you a particular piece of

20   equipment, a Dell tape drive.  Does your group also use Dell

21   tape drives?

22   A.    Yes, I have three of those.

23   Q.    I want to show you Exhibit No. 1, which has been

24   previously admitted into evidence.  I would like you to take a

25   look at that.  The first thing I would like you to do -- can

1    you see it on your screen?

2    A.    Yes.

3    Q.    Can you see the name of the person who is typed in the

4    text in red?

5    A.    Yes, I see the name.

6    Q.    And what is that name?

7    A.    Todd Clark.

8    Q.    And if we go to page 2, do you see a listing for the tape

9    drive's serial number or service tag number?

10   A.    Can you blow it up just slightly?  I see it at the top.

11   Q.    And what number is that?

12   A.    8K72GC1.

13   Q.    Does LSU have a tape drive with that service tag number?

14   A.    Yes, we do.

15   Q.    Approximately when was it purchased?

16   A.    The Spring of 2007.

17   Q.    And what does your group use it for?

18   A.    It's an external tape drive.  It's used to make a backup

19   of one of the servers on the premises there.

20   Q.    Where does LSU normally keep it?

21   A.    This tape drive is located in Johnston Hall, Room 416.  My

22   office is 414, right next door.

23   Q.    So, you are personally familiar with that tape drive?

24   A.    Yes.  I see it every day when I go into the server room,

25   which is right next door.  I am in the server room at least

1   once or twice a day.

2   Q.   Have you looked at it recently?

3   A.   Yes.

4   Q.   Now, if we can go back up to the beginning of this chat

5   right here, I believe that top part says there is something

6   wrong with it.  If we can just blow up that text, and if you

7   can read that.

8   A.   I see that.  I mean, that's not something that I did or --

9   Q.   Can you just go ahead and read that.  What does it say?

10  A.   Sure.  "Hi.  I was in a chat session before I got

11  disconnected.  The tape drive appears to be completely dead, it

12  will not power on.  I have tried different power cords and

13  outlets, and same issue, no power."

14  Q.   Has LSU ever had any computer equipment serviced, replaced

15  or repaired by anybody named Todd Clark?

16  A.   No.

17  Q.   Does your group employ anybody named Todd Clark as an IT

18  person?

19  A.   No.

20  Q.   Has it ever employed somebody named Todd Clark?

21  A.   No.

22  Q.   Has LSU ever had computer equipment serviced by anybody

23  named Matt Kuc, spelled K-U-C?

24  A.   No.

25  Q.   I want you to look at the e-mail address that's listed for

1    Todd Clark.  Do you see that?

2    A.    todo@cyonds.com.

3    Q.    Are you familiar with that cyonds.com organization?

4    A.    No.

5    Q.    I am just going to run a couple of other names in front of

6    you.  Has the equipment ever been repaired or serviced by

7    anybody at Cyon Data Systems?

8    A.    No.  This piece of equipment has never been sent in for

9    warranty repair.

10   Q.    Are you familiar at all with Cyon Data Systems, Total

11   Asset Recovery or Sensible Computers?

12   A.    No, I am not.

13   Q.    On the first page of this chat there is an address given

14   by Todd Clark.  If we can blow that up.  Do you see that

15   address, 247 Maple Street, in Attleboro?

16   A.    Yes.

17   Q.    Are you familiar with that address at all?

18   A.    No, I'm not.

19   Q.    Has LSU ever had anybody in Rhode Island or even

20   Massachusetts repair, or service, or replace any of its

21   equipment?

22   A.    No.

23   Q.    If you were going to have somebody repair or replace your

24   equipment, who would you ask to do that?

25   A.    Dell Computer Corporation from Austin, Texas.

1    Q.   And how would you have them do that?

2    A.   I would first contact them by phone, by toll free

3    telephone.  I have two toll free telephone numbers.  I would

4    call the direct line and report the issue and go through a

5    diagnostic check.  There is a process.  It would be by

6    telephone.

7    Q.   Would you have a Dell service technician come out and

8    repair it?

9    A.   We have in the past.  Sometimes when we diagnose a piece

10   of equipment that needs repair we will talk on the phone and

11   make an exchange that way.  But I have had on-site personnel,

12   yes.  It's always Dell.

13   Q.   When was the last time you looked at this particular piece

14   of equipment?

15   A.   Just last week.

16   Q.   What condition was it in?

17   A.   It's operational, it's in production.

18   Q.   I want to show you Exhibit No. 41, which I understand to

19   be unopposed.  Do you recognize this?

20   A.   Yes.

21   Q.   What is it?

22   A.   This is my LSU external tape drive.  It's a Dell LTO tape

23   drive for -- it's an external tape drive.  It's our tape drive

24   that's housed in Johnston Hall, 416.

25   Q.   Do you see a service tag number on that?

1    A.   Yes, I do.

2    Q.   What is that service tag number?

3    A.   8K72GC1.

4    Q.   Is that the same tape drive service tag number that you

5    saw in the chat?

6    A.   Yes.

7    Q.   When did you take these pictures?

8    A.   Approximately two weeks ago, three weeks ago.

9    Q.   Is this a fair and accurate representation of what you saw

10   when you took the pictures?

11   A.   Yes.

12           MR. GARLAND:  Your Honor, I move to admit Exhibit 41.

13           THE COURT:  It is received.

14               (Exhibit No. 41 received into evidence)

15           MR. GARLAND:  I have no further questions.

16                          CROSS-EXAMINATION

17   BY MR. SHEKETOFF:

18   Q.   The service tag number that's on Exhibit 41, which is your

19   external tape drive, has on it itself "Property of LSU" or

20   something like that, correct?

21   A.   Correct.

22   Q.   Is that a sticker that you put on it?

23   A.   Yes.  It's an LSU property tag, yes.

24   Q.   So, the computer did not come with that particular

25   sticker, that's something that LSU puts on to be able to

1    identify its own property?

2    A.   "Property of LSU," yes.  That number, 648788, is an LSU

3    property tag.  Whenever a piece of equipment is purchased, it

4    is tagged by LSU.

5    Q.   So, could you show us on the part the sticker that came

6    directly from Dell that wasn't put on by LSU?

7    A.   The service tag 8K72GC1.

8    Q.   So, it's just that little strip at the top?

9    A.   Yeah.  The service tag is a serial number, and that's

10   there from the manufacturer.

11   Q.   And the thing right above the service tag that says, "Made

12   in Singapore," do you know what that is?

13   A.   Again, that's an identifying -- that's a manufacturer tag.

14   Q.   Do you know if that's a Dell tag or if that's the tag that

15   whoever sold this part to Dell put on it?

16   A.   I have no way of knowing that.  It's a Dell number.  I'm

17   sure the piece of equipment is manufactured in Singapore, and

18   that's a bar code of some sort.  But the unique thing about

19   this is the service tag number.  That's a serial number.

20   Q.   Right.  And that's on the sticker?

21   A.   Yes, 8K72GC1.  The only thing that LSU added to this piece

22   of equipment when it was purchased is the property tag

23   "Property of LSU."  That's the only thing that was added by

24   LSU.  Everything else was direct from the manufacturer.

25                 MR. GARLAND:  No further questions from the

1    Government, your Honor.

2              THE COURT:  But Mr. Sheketoff --

3              MR. SHEKETOFF:  He finished me.  Thank you.

4              THE COURT:  And I assume there are no further

5    questions from the Government.

6              MR. GARLAND:  No.  Nothing came up, your Honor.

7              THE COURT:  All right.  You may step down,

8    Mr. Wisener.

9              THE WITNESS:  Thank you.

10                   (Witness stepped down)

11             MS. BURKART:  The Government calls Morgan Backhaus.

12             MORGAN BACKHAUS DULY SWORN BY THE CLERK

13             THE CLERK:  Please state your full, spelling your

14   last.

15             THE WITNESS:  Morgan Backhaus, B-A-C-K-H-A-U-S.

16             THE COURT:  You may be seated, Ms. Backhaus.

17                   DIRECT EXAMINATION

18   BY MS. BURKART:

19   Q.   Good morning, Ms. Backhaus.

20   A.   Good morning.

21   Q.   What state do you live in?

22   A.   Texas.

23             THE COURT:  Ms. Backhaus, if you could move the

24   microphone a little bit closer to you so it can pick up your

25   voice a little better, or you can move closer to the microphone

1    if you want.

2              THE WITNESS:  Okay.  Is that better?

3              THE COURT:  Yes.

4    BY MS. BURKART:

5    Q.   What is your occupation?

6    A.   Human Resources and Recruiter.

7    Q.   And what did you do before that?

8    A.   I was in construction.

9    Q.   And before that?

10   A.   I went to Texas A&M.  I was a student.

11   Q.   When did you graduate from Texas A&M?

12   A.   2009, in December.

13   Q.   And do you own any Dell computer equipment?

14   A.   Yes.  I have two laptops.

15   Q.   Does one of your laptops have the service tag 28DKLD1?

16   A.   Yes.

17   Q.   When was it purchased?

18   A.   2007.

19   Q.   Who purchased it?

20   A.   My parents.

21   Q.   What are your parents' names?

22   A.   Karen and Gordon Todd.

23   Q.   How do you spell Todd?

24   A.   T-O-D-D.

25   Q.   Where does your father work?

1    A.    He owns Texas Propane in Rockdale, Texas.

2    Q.    Thank you.  What did you use this laptop for?

3    A.    When I was in school for schoolwork, and then once I

4    graduated, just regular Internet usage, pretty much.

5    Q.    And have you had it continuously since it was purchased?

6    A.    Yes.

7    Q.    When was the last time you looked at it?

8    A.    This morning.

9    Q.    And I am going to show you what's marked as Exhibit 42.

10   Do you recognize this exhibit?

11   A.    I do.

12   Q.    What is it?

13   A.    That is my laptop.

14   Q.    Did you take the pictures?

15   A.    I did.

16   Q.    Is it a fair and accurate representation of the equipment

17   as you last saw it?

18   A.    Yes.

19         MS. BURKART:  I would like to move to admit Exhibit

20   42, your Honor.

21         THE COURT:  It is received.

22            (Exhibit No. 42 received into evidence)

23   BY MS. BURKART:

24   Q.   Do you see the service tag number on the laptop in the

25   photo?

1   A.   Yes.

2   Q.   What is it?

3   A.   28DKLD1.

4   Q.   Was the laptop working in June 2010?

5   A.   It was, yes.

6   Q.   And is it working now?

7   A.   Yes.

8   Q.   Have you ever taken a laptop apart and looked at any of

9   the pieces inside of the laptop?

10  A.   No.

11  Q.   Would you be familiar with whether the equipment has ever

12  been replaced, or repaired or serviced in any way?

13  A.   Yes.

14  Q.   How so?

15  A.   It's been in my possession since my parents bought it for

16  me.

17  Q.   I would like to show you what's been previously marked as

18  Exhibit 2.  Is this you?

19  A.   No.

20  Q.   Did you participate in creating this?

21  A.   No.

22  Q.   Have you ever contacted anyone at Dell to have that piece

23  of equipment repaired?

24  A.   No.

25  Q.   Have you ever had someone contact Dell on your behalf?

```
 1   A.    No.
 2   Q.    I ask to have the name in red magnified, please.
 3             Do you know anyone named Andrew Finegold?
 4   A.    No.
 5   Q.    Have you ever heard of the company Total Asset Recovery?
 6   A.    No.
 7   Q.    Sensible Computers?
 8   A.    No.
 9   Q.    Cyon Data Systems?
10   A.    No.
11   Q.    Have you ever had anyone in Massachusetts or Rhode Island
12   do anything with your computer?
13   A.    No.
14   Q.    And outside of this trial, have you ever heard the name of
15   any of the people or companies that I have just mentioned to
16   you?
17   A.    No.
18   Q.    Thank you, Ms. Backhaus.  That's all I have.
19             THE COURT:  Mr. Sheketoff.
20             MR. SHEKETOFF:  Thank you, your Honor.
21                       CROSS-EXAMINATION
22   BY MR. SHEKETOFF:
23   Q.    Good morning.  Did you ever turn on your computer and look
24   to see how itself identified its tag?
25   A.    No.
```

1    Q.    Do you know that you can turn on your laptop and see

2    things about your own computer?

3    A.    I would assume you could, yeah.

4    Q.    But you haven't done it?

5    A.    No.

6    Q.    So, you don't know what registers on your computer when

7    you turn it on as the electronic tag on the motherboard?

8    A.    No.

9    Q.    So, you recognize the number associated with your computer

10   just by that service tag that's on the outside?

11   A.    Mm-hmm.

12          MR. SHEKETOFF:  Thank you.

13          THE COURT:  Ms. Burkart, anything?

14          MS. BURKART:  Nothing, your Honor.

15          THE COURT:  You can step down, Ms. Backhaus.  Thank

16   you.

17                    (Witness stepped down)

18          MR. GARLAND:  Your Honor, the Government calls Special

19   Agent Sarah De Lair.

20          THE COURT:  All right.

21          THE CLERK:  Please raise your right hand.

22          SPECIAL AGENT SARAH DE LAIR DULY SWORN BY THE CLERK

23          THE CLERK:  Please state your full name, spelling your

24   last.

25          THE WITNESS:  My name is Sarah, S-A-R-A-H, last name

1    name is D-E, space, capital L, A-I-R.

2                MR. GARLAND:  May I inquire, your Honor?

3                THE COURT:  You may.

4                        DIRECT EXAMINATION

5    BY MR. GARLAND:

6    Q.    Good morning.  What do you do for a living?

7    A.    I am a Special Agent with the FBI.

8    Q.    How long have you been a Special Agent?

9    A.    Over eight years.

10   Q.    What did you do before becoming a Special Agent?

11   A.    I worked at a pharmaceutical company in a microbiology

12   lab.

13   Q.    What's your educational background?

14   A.    I have an undergraduate degree in Environmental Science

15   from the University of North Carolina at Wilmington, and a

16   master's degree in Oceanography from the Florida Institute of

17   Technology.

18   Q.    Just very briefly, what sort of training did you receive

19   to become a Special Agent?

20   A.    We did a 17-week course in Quantico, went over a bunch of

21   different aspects of the job, to include interrogations,

22   firearms, defensive tactics, and how to put a case together.

23   Q.    And have you received any specialized agent training?

24   A.    Yes.  I am a Cyber Career Path Special Agent, so I have

25   received training in computers and introduction to computer

1    cases.  I've done webinars in managing digital evidence, and

2    also I have completed an A+ certification course in Linux for

3    LEOs.

4    Q.   Have you obtained and executed search warrants in the

5    past?

6    A.   I have.

7    Q.   Approximately how many?

8    A.   Over 40.

9    Q.   Did any of those cases involve computer searches?

10   A.   Yes.

11   Q.   What's been your role in the investigation into Matthew

12   Kuc?

13   A.   I assisted with the photo log on the day of the search

14   warrant, as well as I was the evidence custodian.

15   Q.   What area did you search?

16   A.   I was collecting evidence, so I entered the house and went

17   around the entire how to see where the evidence was, but I was

18   situated in one room to collect the evidence.

19   Q.   I want to take a step back.  What address were you

20   searching?

21   A.   Oh, I apologize.

22   Q.   No problem.

23   A.   36 Laurelwood Drive, North Attleborough, Massachusetts.

24   Q.   When was the warrant executed?

25   A.   December 14th, 2010.

1    Q.    What type of neighborhood is 36 Laurelwood Drive located

2    in?

3    A.    It's a residential neighborhood.

4    Q.    What does it look like from the outside?

5    A.    It's a two-story property with a two-car garage.

6    Q.    Did you have a specific role during the search?

7    A.    I did.  I assisted with the photo log and also was the

8    evidence custodian.

9    Q.    So, can you describe, generally, what steps you took

10   during the day of that search?

11   A.    Yes.  Initially, when I arrived I helped with clearing the

12   house, finding out how many occupants were there.  Then I

13   walked around the house to see where items were located that

14   potentially would be seized.  Because I was the evidence

15   custodian, I needed to see where most of the items were so I

16   could set up a computer in order to log those items of

17   evidence.

18   Q.    You said "evidence custodian."  What does an evidence

19   custodian do at a search?

20   A.    I'm the one that agents will bring evidence to, and I will

21   log them into the database to include a description of the

22   item, who found the item, where the item was found.

23   Q.    And what would you do when agents would bring you items?

24   A.    I would enter that data into a computer in order to

25   document those items.

1  Q.   Did you have any responsibility for the items after the

2  search was concluded?

3  A.   Yes.

4  Q.   What was your responsibility at that point?

5  A.   I assisted with taking those items out to a box truck and

6  then taking them to a location that was controlled by the FBI

7  for storage.

8  Q.   Does the FBI have standard procedures for gathering,

9  seizing and maintaining evidence at and after a search warrant?

10  A.   Yes.

11  Q.   Are you familiar with those procedures?

12  A.   Yes.

13  Q.   Were they followed in this case?

14  A.   Yes.

15  Q.   So, you said, I believe, that you went inside 36

16  Laurelwood Drive?

17  A.   I did.

18  Q.   Did you go throughout the entire house?

19  A.   I did.

20  Q.   What were you doing when you did so?

21  A.   I was going through the house to see where items were

22  located, just to kind of get an idea of what items were there

23  and what might be seized to determine what kind of truck we

24  would need at the end of the day.

25  Q.   Did you see anybody living there?

1    A.    I did.

2    Q.    Who did you see?

3    A.    I saw Matthew Kuc and his parents.

4    Q.    Could you identify Matthew Kuc, if you saw him again?

5    A.    Yes.

6    Q.    Do you see him in court?

7    A.    I do.

8    Q.    Can you point to him and identify a distinctive piece of

9    clothing that he is wearing?

10   A.    Yes.  He is wearing a black suit with a tie, black and

11   yellow and white.

12          MR. GARLAND:  Your Honor, may the record reflect that

13   Agent De Lair has identified the defendant?

14          THE COURT:  It will without objection.

15   MR. GARLAND:

16   Q.   Let's take the jury through the house, so they can

17   understand the interior arrangement.

18          First of all, did you or another agent take

19   photographs of the house during the search?

20   A.    Yes.

21   Q.    For what purposes?

22   A.    We always take entry and exit photos when executing search

23   warrants.

24   Q.    When you entered the house through the front door, what

25   did you see right in front of you?

1    A.    Stairs going to the second floor.

2    Q.    What could you see off to your right?

3    A.    A room with boxes.

4    Q.    I am going to show you what's been marked as Exhibit 50.

5    Do you recognize this?

6    A.    I do.

7    Q.    What is it?

8    A.    It's the room to the right when you enter the residence.

9    Q.    Is this one of the photographs that was taken during the

10   search?

11   A.    Yes.

12   Q.    Is it a fair and accurate representation of what you saw

13   in that room during the search?

14   A.    Yes.

15         MR. GARLAND:  Your Honor, I would move to admit

16   Exhibit 50.

17         THE COURT:  It is received.

18              (Exhibit No. 50 received into evidence)

19   BY MR. GARLAND:

20   Q.    Do you see the gray and black rectangle that's down and to

21   the right of center?

22   A.    Yes.

23   Q.    Do you know what it is?

24   A.    Yes.

25   Q.    What?

1    A.    It's a Dell computer tower.

2    Q.    Now, was all of this -- if we can take the magnified piece

3    off -- was all of this visible right when you entered the

4    house?

5    A.    Yes.

6    Q.    What room do we see on the left-hand side of Exhibit 50?

7    A.    The kitchen.

8    Q.    What other rooms were on the first floor, if you continued

9    going around the house in a counterclockwise direction?

10   A.    After the kitchen there is a dining room and a bathroom,

11   and then if you continue on it's a living room.

12   Q.    Did the house have a basement?

13   A.    Yes.

14   Q.    How could you enter the basement from the house?

15   A.    To the left of the dining room and bathroom are stairs to

16   the basement.

17   Q.    Did you go down to the basement?

18   A.    Yes.

19   Q.    And did agents take any photographs of that area?

20   A.    Yes.

21   Q.    Was there any computer equipment down there?

22   A.    Yes.

23   Q.    I show you what's been marked as Exhibit 51.  Are you

24   familiar with this photograph?

25   A.    Yes.

1    Q.    When was it taken?

2    A.    During the execution of the search warrant.

3    Q.    Where was it taken?

4    A.    In the basement.

5    Q.    When you were down there, did you see this part of the

6    basement?

7    A.    I did.

8    Q.    What are we looking at here?

9    A.    A rack of computer laptops.

10   Q.    Is this a fair and accurate representation of what you saw

11   at that time?

12   A.    Yes.

13             MR. GARLAND:  Your Honor, we move to admit Exhibit 51.

14             THE COURT:  It's received.

15                 (Exhibit No. 51 received into evidence)

16   BY MR. GARLAND:

17   Q.    I show you what's been marked as Exhibit 52.  Are you

18   familiar with this photograph?

19   A.    Yes.

20   Q.    When was it taken?

21   A.    During the execution of the search warrant.

22   Q.    What does it depict?

23   A.    Boxes stacked up.

24   Q.    Is it a fair and accurate representation of what you saw?

25   A.    Yes.

1          MR. GARLAND:  We move to admit Exhibit 52.

2          THE COURT:  That is received.

3              (Exhibit No. 52 received into evidence)

4     BY MR. GARLAND:

5     Q.   So, moving out of the basement, past the first floor, did

6     you take the stairs up to the second floor?

7     A.   Yes.

8     Q.   What did you see on the second floor?

9     A.   On the second floor when you go up the stairs there is a

10    bedroom, and then an office and then a bathroom, another

11    bathroom and then a room above the garage and then another

12    bedroom.

13    Q.   Did you spend any time in the room above the garage?

14    A.   Yes.

15    Q.   About how much time did you spend there?

16    A.   Most of the search, so several hours.

17    Q.   How big was the room?

18    A.   Approximately 30 by 30.

19    Q.   How was it furnished?

20    A.   There was a couch and a desk, like a workspace.

21    Q.   Was there anything else in the room?

22    A.   Lots of boxes.

23    Q.   Did you see what was in the boxes or what the boxes looked

24    to contain?

25    A.   Yes.  The boxes had names like "Dell," "3COM," "HP" listed

1    on the outside of the box.

2    Q.   I want to show you Exhibit 53 and Exhibit 54.  Exhibit 53

3    is on the left-hand part of the screen, Exhibit 54 I believe is

4    on the right-hand part of the screen.  Are you familiar with

5    these photographs?

6    A.   Yes.

7    Q.   What do they depict?

8    A.   They depict the workspace or the desk area that's when you

9    enter that room on the left.

10   Q.   Is this a fair and accurate representation of what you saw

11   that day?

12   A.   Yes.

13   Q.   And were these photos taken during the search?

14   A.   Yes.

15        MR. GARLAND:  Your Honor, we move to admit Exhibits 53

16   and 54.

17        THE COURT:  They are received.

18             (Exhibit Nos. 53 and 54 received into evidence)

19   BY MR. GARLAND:

20   Q.   Agent De Lair, we are going to magnify the screen of the

21   computer on Exhibit 54.  Do you see the screen?

22   A.   I do.

23   Q.   It's a little blurry.  Do you remember what was on the

24   screen that day?

25   A.   Yes.

1    Q.    What was it?

2    A.    There was a square that has a dog and then the name "Matt"

3    and then a box where you could put your password.

4    Q.    I want to stay in that room.  I am going to show you

5    Exhibit 55.  Are you familiar with Exhibit 55?

6    A.    Yes.

7    Q.    What does it depict?

8    A.    This depicts the boxes that were located in that room as

9    soon as you walk into that room.

10   Q.    Was this photograph taken during the search?

11   A.    Yes.

12   Q.    And is it a fair and accurate representation of what you

13   saw?

14   A.    Yes.

15          MR. GARLAND:  Your Honor, we move to admit Exhibit 55.

16          THE COURT:  It is received.

17              (Exhibit No. 55 received into evidence)

18   BY MR. GARLAND:

19   Q.    Agent De Lair, can you explain to the jury where those

20   boxes were located in the room in relation to the computer that

21   we just saw.

22   A.    Yes.  When you initially walk through the room, this is

23   what you saw, these boxes.  So, this was located more towards

24   the back of the residence, and the desk area is to the left of

25   this towards the front of the residence.

1   Q.   I am going to put up Exhibits 53 and 55 on the screen

2   simultaneously, 53 on the left and 55 on the right.  Is this,

3   essentially, how the room appeared?  Is this the configuration?

4   A.   Yes.

5   Q.   Were there any indications of which occupant in the house

6   used that room?

7   A.   Yes.

8   Q.   What were the indications?

9   A.   The computer screen on the computer monitor indicated that

10  Mathew Kuc used that desk area.

11  Q.   Did investigators find anything at the house indicating

12  any businesses that Matthew Kuc was involved with?

13  A.   Yes.

14  Q.   What businesses?

15  A.   Cyon Data Systems and also Total Asset Recovery.

16  Q.   I'm going to show you what's been marked as Exhibit 57.

17  Do you recognize this?

18  A.   Yes.

19  Q.   What is it?

20  A.   This is a photo that depicts a framed eBay certificate,

21  and on the bottom there is, like, a name tag area that says

22  "Matthew Kuc, President/CEO Total Asset Recovery."

23  Q.   Where was this found?

24  A.   This was found on the second floor.  When you're going up

25  the stairs there was a bedroom and then an office.  So, this

1  was in the office upstairs.

2  Q.   Did you observe this during the search?

3  A.   I did.

4  Q.   Is this a fair and accurate representation of the

5  certificate that you saw that day?

6  A.   Yes.

7         MR. GARLAND:  Your Honor, we move to admit Exhibit 57.

8         THE COURT:  It is received.

9            (Exhibit No. 57 received into evidence)

10  BY MR. GARLAND:

11  Q.   Let's move to Exhibit 58.  Do you recognize that?

12  A.   Yes.

13  Q.   What is it?

14  A.   It's checks held at Citizens Bank in the name of Total

15  Asset Recovery.

16  Q.   Where were these checks found?

17  A.   In the basement.

18  Q.   Is this a fair and accurate representation of the checks

19  that you found that day?

20  A.   Yes.

21         MR. GARLAND:  Your Honor, we move to admit Exhibit 58.

22         THE COURT:  It is received.

23            (Exhibit No. 58 received into evidence)

24  BY MR. GARLAND:

25  Q.   Moving on to Exhibit 59, do you recognize this?

1    A.    Yes.

2    Q.    Where was it found?

3    A.    In the second floor office that the other certificate was

4    found.

5    Q.    What is it?  What does it depict?

6    A.    This is a photo of a framed certificate from Apple, Inc.,

7    and the nameplate on the bottom says "Matthew Kuc,

8    President/CEO Cyon Data Systems, Incorporated."

9    Q.    Is this a fair and accurate representation of the

10   certificate?

11   A.    Yes.

12         MR. GARLAND:  Your Honor, we move to admit Exhibit 59.

13         THE COURT:  That is received.

14             (Exhibit No. 59 received into evidence)

15   BY MR. GARLAND:

16   Q.   Were any of the boxes at 37 Laurelwood Drive seized that

17   day?

18   A.   36 Laurelwood Drive.  Yes, they were seized that day.

19   Q.   From which rooms were they seized?

20   A.   From throughout the house, predominantly from the room

21   above the garage and the basement.

22   Q.   Let's talk about what was inside the boxes.  Well, first

23   of all, about how many boxes were seized that day from the

24   residence?

25   A.   Approximately 170.  185, approximately, items of evidence.

1    Q.   Let's talk about what's inside the boxes.  Could you see

2    from the outside what the boxes were supposed to contain?

3    A.   Yes.

4    Q.   What did they say?

5    A.   They said Lenovo monitors, Dell towers and various

6    computer parts, and also items from other companies as well.

7    Q.   Did you and other agents actually open up the boxes and

8    search through them?

9    A.   Approximately, the first 20 were opened, and then after

10   that we just documented who they were being sent to.

11   Q.   Did you at any later point open up all the boxes that were

12   seized and search through them?

13   A.   Yes.

14   Q.   What was in the boxes?

15   A.   Computer parts, computer towers, power supplies.

16   Q.   We are going to move away from the boxes for a second.  I

17   would like to show you what's been marked --

18          MR. GARLAND:  This is an opposed exhibit, your Honor.

19   It's Exhibit S, and I believe the clerk has the original, which

20   we would prefer to use, if we could, for a moment.

21          While we are doing that, your Honor, could we have

22   Exhibit S brought up on the monitor just for the witness,

23   electronically?

24          THE COURT:  Yes.

25   BY MR. GARLAND:

1    Q.    Are you familiar with what's on your screen right now?

2    A.    Yes.

3    Q.    What is it?

4    A.    This is a photo of a notebook that was found in the room

5    above the garage.

6          MR. GARLAND:  Your Honor, I'm sorry.  I misspoke.  I

7    believe that that exhibit is actually Exhibit U.

8          THE COURT:  Yes.

9          THE WITNESS:  Thank you.

10   BY MR. GARLAND:

11   Q.    Where was that notebook found?

12   A.    In the room above the garage.

13   Q.    And just describing generally the contents, what is in the

14   notebook?

15   A.    It's a notebook that contains the name "Matt Kuc" and a

16   company and different addresses, but also, other than Matt Kuc,

17   there are other names as well and companies.

18         MR. GARLAND:  Your Honor, we move to admit this

19   exhibit as exhibit, I believe, 49.

20         THE COURT:  Grounds for objection?

21         MR. SHEKETOFF:  Only the pretrial grounds.

22         THE COURT:  So, it is received.

23              (Exhibit No. 49 received into evidence)

24   BY MR. GARLAND:

25   Q.    Let's take a look at the first page of Exhibit 49.

1          MR. GARLAND:  Your Honor, we also ask that be

2    displayed on the jurors' screens, if it could be.

3          THE COURT:  All right.

4    BY MR. GARLAND:

5    Q.   So, what is the address that you see and the name there?

6    A.   It's "Matt Cook, Iron Data, 2130 Mendon Road, Suite No.

7    3-377 Cumberland, Rhode Island, 02864."

8    Q.   Was anything found matching the person, company and

9    address on that page at the search?

10   A.   Yes.

11   Q.   I'm going to show you what's been marked as Exhibit 47,

12   which I believe is unopposed.  Do you see that?

13   A.   Yes.

14   Q.   Are you familiar with what's being depicted there?

15   A.   Yes.

16   Q.   What is it?

17   A.   It's a packing slip that was shipped to Iron Data with the

18   address that I just listed from the notebook, and it says "Sold

19   to Matt Cook" at a separate address.

20   Q.   How is "Cook" spelled there?

21   A.   C-O-O-K.

22   Q.   And is it spelled that way on the first page of the

23   notebook as well?

24   A.   Yes.

25   Q.   Where was Exhibit 47 found, that packing slip?

1    A.    In the basement.

2                MR. GARLAND:  Your Honor, we move to admit Exhibit 47.

3                THE COURT:  It is received.

4                    (Exhibit No. 47 received into evidence)

5    BY MR. GARLAND:

6    Q.    I would like you to turn to the third page of that

7    notebook, Exhibit 49.  What person, company and address do you

8    see on that page?

9    A.    It says "Silver Fig, Dan Summers, 2130 Mendon Road, Suite

10   3-377 Cumberland, Rhode Island."

11   Q.    Was anything else found in that search matching person,

12   company and address?

13   A.    Yes.

14   Q.    I would like you to take a look, there are some boxes over

15   there, and tell me whether you see any boxes that have that

16   name on them.

17   A.    Okay.  I do.

18                THE WITNESS:  Can I bring it, your Honor, to the

19   table?

20                THE COURT:  All right.

21   BY MR. GARLAND:

22   Q.    Can you look at the label on that box.

23   A.    Yes.

24   Q.    What does it say?

25   A.    "Silver Fig Tech, Dan Summers, 2130 Mendon Road, 3377

1    Cumberland, Rhode Island."

2    Q.   Now, on that box is there any writing on the outside of

3    the box that might have been put on by the FBI during the

4    search and logging of the evidence?

5    A.   Yes.

6    Q.   That would have been put on by FBI agents at that time; is

7    that correct?

8    A.   Yes.

9         MR. GARLAND:  Your Honor, we move to admit this box as

10   Exhibit 61.  It has not been marked yet.

11        THE COURT:  Any objection?

12        MR. SHEKETOFF:  I would just like to see the writing

13   that's on it.

14        THE COURT:  Pardon?

15        MR. SHEKETOFF:  I would like to see the writing that's

16   on it.

17        THE COURT:  Sure.

18                     (Pause)

19        MR. SHEKETOFF:  Other than the pretrial objection, I

20   have no objection.

21        THE COURT:  All right.  It is received.

22             (Exhibit No. 61 received into evidence)

23   BY MR. GARLAND:

24   Q.   Where was this box found?

25   A.   This box was found in the basement.

1    Q.   If you can put that to the side, and then we will move to

2    page 8 of Exhibit 49, back to the notebook.

3    A.   Page 8?

4    Q.   Yes.  What name, person, company and address do you see on

5    there?

6    A.   It says, "Rick Naples, 36 Lavrelwood Drive, Transdyne

7    (ph), North Attleborough, Massachusetts, 02760."

8    Q.   Were any boxes found matching that name and address?

9    A.   Yes.

10         MR. GARLAND:  Your Honor, may the witness step down to

11   the boxes?

12         THE COURT:  She may.

13   BY MR. GARLAND:

14   Q.   Are you familiar with this box?

15   A.   Yes.

16   Q.   What's in it?

17   A.   An HP hard drive.

18   Q.   Where was it found?

19   A.   In the basement.

20         MR. GARLAND:  Your Honor, we move to admit Exhibit 62.

21         THE COURT:  With the same reservation?

22         MR. SHEKETOFF:  Yes, your Honor.

23         THE COURT:  Yes, it is received.

24             (Exhibit No. 62 received into evidence)

25   BY MR. GARLAND:

1   Q.   What is the name, company and address on the shipping

2   label?

3   A.   "Rick Naples, Transdyne, 36 Lavrelwood Drive, North

4   Attleborough, Massachusetts."

5   Q.   Were there other boxes found with that name and address

6   and company at the search?

7   A.   Yes.

8   Q.   I am going to show you what's been marked as Exhibit 45,

9   which I believe is unopposed.  This is a four-page document.

10  Are you familiar with these?

11  A.   Yes.

12  Q.   What are they?

13  A.   They are packing slips that are addressed to "Transdyne,

14  36 Lavrelwood Drive, North Attleborough, Massachusetts."

15       Could you go back to the first page, please?  To "Rick

16  Naples."

17  Q.   Where were they found?

18  A.   In the room above the garage.

19  Q.   Were they found separate from boxes or on top of boxes,

20  inside of boxes?

21  A.   Within boxes.

22       MR. GARLAND:  We move to admit Exhibit 45, your Honor.

23       THE COURT:  They are received with the same

24  reservation by the defendant.

25            (Exhibit No. 45 received into evidence)

1    BY MR. GARLAND:

2    Q.   I have a few more boxes for you to identify, if you can.

3    You probably have three more there.

4         MR. GARLAND:  Your Honor, may the witness step down

5    from the stand?

6         THE COURT:  Yes.

7    BY MR. GARLAND:

8    Q.   Were these boxes also found during the search?

9    A.   Yes.

10   Q.   If you can read off the names, companies and addresses

11   from each of the shipping labels.

12   A.   Okay.  This says "A Plus IT, Sam Jenkins, 2130 Monden

13   Street, 3-377, Cumberland Rhode Island, 02864."

14   Q.   And the next box?

15   A.   This says, "Francisco Samuel, Abacus Solutions, 42 Union

16   Street, Attleboro, Massachusetts."

17   Q.   And the next box?

18   A.   "Matt Cook, Cyon ISP, 36 Laurelwood Drive, North

19   Attleborough, Massachusetts."

20   Q.   Thank you.  And how is "Matt Cook" spelled on that last

21   one?

22   A.   Cook is spelled C-O-O-K.

23   Q.   What was in these boxes?

24   A.   The first one I read is a computer board.  The next one is

25   an APC power supply.  Actually, that one isn't.  This one is

1      the APC power supply, and this one is a Lenovo monitor.

2      Q.   Where were these boxes found during the search?

3      A.   In the room above the garage.

4           MR. GARLAND:  Your Honor, we would move to admit,

5      please, Exhibits 63, 64 and 65.

6           THE COURT:  Yes, they are received, subject to the

7      same reservation.

8           (Exhibit Nos. 63, 64 & 65 received into evidence)

9      BY MR. GARLAND:

10     Q.   There are a few other exhibits related to boxes I would

11     like you to look at.  If you could take a look at Exhibits 48

12     and 56.  Are you familiar with these?

13     A.   Yes.

14     Q.   What are they?

15     A.   The one on the left is a shipping order from IBM to

16     Francisco Samuel at Abacus Solutions.

17     Q.   What is the one on the right?

18     A.   The one on the right is the box in which that came in.

19     Q.   Is that a photograph of the shipping label?

20     A.   Yes.  I'm sorry.

21     Q.   And, in fact, is that the shipping label on one of the

22     boxes right there that you just read to us?

23     A.   Yes.

24     Q.   If we can just zoom in on that.  So, which address was

25     that to, and which person?

1    A.    That was sent to Francisco Samuel, Abacus Solutions, 42

2    Union Street, Attleboro, Massachusetts.

3           MR. GARLAND:  Your Honor, we move to admit Exhibits 48

4    and 56.

5           THE COURT:  They are received, again with the same

6    reservation.

7             (Exhibit Nos. 48 and 56 received into evidence)

8           MR. GARLAND:  Your Honor, I believe that Exhibit 46

9    was already admitted by the defendant during Mr. Long, but we

10   have the original at the clerk, which we would like Agent

11   De Lair to show.

12          THE COURT:  All right.

13   BY MR. GARLAND:

14   Q.    Agent De Lair, have you seen this before?

15   A.    Yes.

16   Q.    Can you hold it up, the first page, and just turn it

17   towards the jury so they can see.  Where was this found?

18   A.    In the basement.

19   Q.    Does that say "Dell" on it and "Stop" on it?

20   A.    It does.

21   Q.    Thank you.  So, that's already been admitted, so I won't

22   move to admit it at this point.

23          But I do want to ask you whether the packing slips,

24   the equipment-related documents and boxes, were those the only

25   ones that were there at the search during that day?

1  A.   No.

2  Q.   I think you might have testified to the number of boxes

3  that were seized of computer equipment, but how many were

4  there?

5  A.   We seized 170 boxes and 185 total items of evidence.

6  Q.   The boxes of computer equipment -- first of all, the boxes

7  that looked like they had computer equipment, did they actually

8  have computer equipment inside of them?

9  A.   Yes.

10  Q.   And had they been sent by individuals to the various

11  addresses or by companies?

12  A.   By companies.

13  Q.   And from which companies?

14  A.   HP, 3COM, Dell, Lenovo.

15  Q.   Did you and the agents who looked through those boxes

16  there and afterwards prepare a chart that summarizes who the

17  boxes were from, who they were addressed to and what they

18  contain?

19  A.   Yes.

20  Q.   I would like to show you Exhibit 60, which I believe is

21  unopposed.  Have you seen this before?

22  A.   Yes.

23  Q.   What is this?

24  A.   This is a spreadsheet that denotes the items that were

25  seized that day during the search warrant.  It lists the ship

1    or delivery date, the shipping company, the shipping street,

2    city and state, the recipient, recipient company, and recipient

3    address, but this spreadsheet continues on to another page,

4    which lists the description of the item.

5    Q.   I see.  How many pages are in this exhibit?

6    A.   Is this the last page?  Six.

7    Q.   I want you to just look at the first column for a second.

8    Do you see where it says, and if we can just blow that up,

9    where it says "Evidence Item Number," does that evidence item

10   number correspond to the exhibit stickers that may have been

11   placed on the boxes in the courtroom?

12   A.   No.

13   Q.   What does the evidence number say?  What does it

14   correspond to?

15   A.   The evidence item number corresponds with the number that

16   was assigned during the execution of the search warrant when

17   those items were seized.

18   Q.   If we can then just blow up the shipping street.  As you

19   went through the boxes and catalogued them, did you notice that

20   any boxes were addressed to any particular addresses more

21   frequently than others?

22   A.   Yes.

23   Q.   What addresses did you see?

24   A.   We saw 36 Laurelwood Drive, North Attleborough,

25   Massachusetts, 247 Maple Street, Attleboro, Massachusetts, 42

1    Union Street, Attleboro, Massachusetts, and 2130 Mendon Road,

2    Suite 3, Cumberland Rhode Island.

3    Q.   Now, these addresses, are you personally familiar with

4    those addresses and the buildings there?

5    A.   Yes.

6    Q.   How so?

7    A.   I went to each of them and also took photographs of them.

8    Q.   Are you familiar with how Laurelwood and Mendon Roads are

9    spelled?

10   A.   Yes.

11   Q.   Do you see entries with Laurelwood or Mendon misspelled on

12   this spreadsheet?

13   A.   Yes.

14   Q.   Can you identify a row when you see that, and perhaps just

15   say the evidence item number for that row.

16   A.   Evidence item 1, Mendon Road is spelled "Monden Street."

17   Q.   If any of these entries on this spreadsheet for the

18   recipient street column spelled Laurelwood or Mendon

19   differently, where would that misspelling have been?  Would

20   that have just been a typing error when agents compiled the

21   spreadsheet?

22   A.   No.  We took the address off the boxes that were found at

23   the residence and dictated or, you know, transcribed exactly

24   what was on those labels.

25   Q.   Do you see columns entitled "Content" and "Service Tag" or

1    "Part Number" or "Serial Number"?

2    A.    Yes.

3    Q.    Where did that information come from?

4    A.    Either from the box or actually on the item.

5    Q.    Were any of the boxes that were seized that day addressed

6    using the defendant's name as Matthew Kuc, K-U-C?

7    A.    Can we go back to the first page, please, and scroll down,

8    if you don't mind?

9                        (Pause)

10   A.    I don't see any with the actual spelling of K-U-C.

11   Q.    Thank you.

12         MR. GARLAND:  Your Honor, we move to admit Exhibit 60.

13         THE COURT:  And that is received.

14              (Exhibit No. 60 received into evidence)

15   BY MR. GARLAND:

16   Q.    In addition to seizing computers and computer parts that

17   were contained in boxes, did you seize any computers that were

18   on desks and appeared to be in use?

19   A.    Yes.

20   Q.    From your training and experience with cyber

21   investigations, are there special procedures for seizing such

22   equipment?

23   A.    Yes.

24   Q.    To the best of your knowledge, were the computers at the

25   house seized by agents with training in those procedures?

1    A.   Yes.

2    Q.   What did investigators do with those computers after the

3    search?

4    A.   After the search, they were brought to a storage location

5    and logged into the Evidence Control Unit.  After that they

6    were sent to Headquarters, where they were examined by a

7    computer forensic expert.

8    Q.   When you say "Headquarters," where was headquarters

9    located?

10   A.   In Washington, DC.

11   Q.   Who was the expert that they were sent to?

12   A.   Emanuel Velasco.

13   Q.   Did investigators focus specifically on any particular

14   computer that was seized and sent out to Quantico?

15   A.   Yes.

16   Q.   Which one?

17   A.   The computer where you could see the computer screen on

18   when we arrived.

19   Q.   Was that the one that you identified as saying "Matt" on

20   it on the screen?

21   A.   Yes.

22   Q.   One more item that I would like you to look through.  You

23   have mentioned the 2130 Mendon Road in Cumberland, Rhode Island

24   address.  Did you find a room or a suite or a mailbox number on

25   any boxes that were addressed to 2130 Mendon?

1   A.   Yes.

2   Q.   What was that mailbox number?

3   A.   It was Suite 3, Mailbox 377.

4   Q.   Have you been to that address before?

5   A.   Yes.

6   Q.   What's located there?

7   A.   The UPS Store.

8   Q.   Did investigators find anything in the search that

9   indicated who was at that mailbox or who was renting that

10  mailbox?

11  A.   Yes.

12  Q.   What did they find?

13  A.   A UPS rental agreement.

14  Q.   For what?

15  A.   A mailbox.

16  Q.   Was it for mailbox 377?

17  A.   Yes.

18  Q.   I am going to show you what's been marked as Exhibit 66.

19  Are you familiar with this?

20  A.   Yes.

21  Q.   What is it?

22  A.   It's the mailbox service agreement for the UPS Store.

23  Q.   If we can just zoom in on the name, company, address and

24  city.  Who does it appear to have been rented by?

25  A.   Matthew J. Kuc, Cyon Data Systems, 36 Laurelwood Drive,

1    North Attleborough.

2    Q.   And just for the record, how is "Kuc" spelled in this

3    document?

4    A.   K-U-C.

5    Q.   If we can go to the second page, do you see a signature on

6    this agreement?

7    A.   Yes.

8    Q.   Where was this found?

9    A.   In the residence.

10              MR. GARLAND:  Your Honor, we move to admit Exhibit 66.

11              THE COURT:  That is received.

12                   (Exhibit No. 66 received into evidence)

13   BY MR. GARLAND:

14   Q.   Just a couple more questions about the UPS Store in

15   Cumberland, Rhode Island.  First of all, have you been there?

16   A.   Yes.

17   Q.   And have you driven from that Cumberland UPS Store to the

18   Kucs' house in North Attleborough?

19   A.   Yes.

20   Q.   How long does the drive take?

21   A.   Approximately, 10 to 15 minutes.

22   Q.   Have you looked into whether there were any other UPS

23   Stores in North Attleborough?

24   A.   Yes.

25   Q.   Where is that located?

1    A.    11 Robert Toner Boulevard, Suite 5, in North Attleborough.

2    Q.    And have you driven from there to the Kucs' residence?

3    A.    Yes.

4    Q.    How close is it to the Kucs' residence?

5    A.    Less than three miles.

6    Q.    Was the North Attleborough UPS Store in the same location

7    in 2010?

8    A.    Yes.

9          MR. GARLAND:  No further questions.

10         THE COURT:  All right.  I think maybe we will take a

11   break at this point.  So, we will take our morning break,

12   ladies and gentlemen.  We will take about 20 minutes, and we

13   will be back here, I hope, around 11:10.

14         THE CLERK:  All rise for the jury.

15           (The jury exited the courtroom at 10:50 a.m.)

16         THE COURT:  Anything we need to take up before the

17   break?

18         MR. GARLAND:  No, your Honor.

19         THE COURT:  Will be in recess.

20         THE CLERK:  All rise.

21      (The Honorable Court exited the courtroom at 10:50 a.m.)

22                         (Recess taken)

23         THE CLERK:  All rise.

24      (The Honorable Court entered the courtroom at 11:05 a.m.)

25         THE CLERK:  This Honorable Court is back in session.

1    You may be seated.

2             THE COURT:  Ready for the jury?

3             MR. GARLAND:  Yes, your Honor.

4             THE COURT:  Bring them in.

5             THE CLERK:  All rise for the jury.

6             (The jury entered the courtroom at 11:05 a.m.)

7             THE CLERK:  You may be seated.

8             THE COURT:  Mr. Sheketoff.

9             MR. SHEKETOFF:  Thank you, your Honor.

10                        CROSS-EXAMINATION

11   BY MR. SHEKETOFF:

12   Q.   Good morning, Special Agent.

13   A.   Good morning.

14   Q.   Now, you and a team of other agents searched Mr. Kuc's

15   home.  Do you remember the date?

16   A.   December 14th, 2010.

17   Q.   And you were armed with a search warrant, correct?

18   A.   Yes.

19   Q.   And inside the home you found Mr. Kuc and his parents?

20   A.   Yes.

21   Q.   And you can recognize his parents.  They are in the

22   courtroom, correct?

23   A.   Yes.

24   Q.   And you have already told us that you recognize Mr. Kuc.

25   A.   Yes.

1    Q.    How many agents participated in the execution of the

2    search warrant?

3    A.    I believe, approximately, ten.

4    Q.    And how long did you spend inside the home?

5    A.    Approximately from 6:00 in the morning until about 12:30

6    in the afternoon.

7    Q.    So, six-plus hours or so?

8    A.    Correct.

9    Q.    And you came with a laptop to record what items were

10   taken?

11   A.    Correct.

12   Q.    And you were in charge of the custody of the evidence in

13   this case, correct?

14   A.    Yes.

15   Q.    You told us that you took about 170 boxes.

16   A.    Correct.

17   Q.    And, subsequently, you made a chart that has been

18   introduced as an exhibit listing everything that you found in

19   those boxes?

20   A.    Yes.

21   Q.    Did you take other items besides the 170 boxes?  We know

22   about the notebook.

23   A.    Yes.

24   Q.    Besides the 170 boxes and the notebook, did you take other

25   items?

1    A.   Yes.

2    Q.   What types of other items?

3    A.   Computers and computer equipment.

4    Q.   So, you took the computer that we saw a picture of that

5    had the dog and "Matt"?

6    A.   Yes.

7    Q.   And you took other computers from the home, too?

8    A.   Yes.

9    Q.   How many other computers?

10   A.   I don't know the exact number.

11   Q.   Are we talking a dozen or three or four, or are you simply

12   not sure?

13   A.   I'm not sure.

14   Q.   Did you take anything else besides the boxes, computers

15   and the notebook?

16   A.   Yes.  We took documents.

17   Q.   Did you take packing slips that were separate and apart

18   from the boxes?

19   A.   They may have been comprised in the documents, but I am

20   not sure.

21       MR. SHEKETOFF:  And could I have, Mr. Quigley, Exhibit

22   51?  It's a photograph.

23   BY MR. SHEKETOFF:

24   Q.   You have already testified that this is a fair and

25   accurate representation of some portion of the home, correct?

1    A.    Yes.

2    Q.    And what's depicted in Exhibit 51?

3    A.    It looks like laptop computers.

4    Q.    And were any of those taken?

5    A.    I don't believe so.

6    Q.    Was there a reason that none of them were taken, at least

7    from your perspective?

8    A.    I was just collecting the evidence, so it would just be an

9    opinion.

10   Q.    So, you weren't in charge of deciding what items would be

11   taken and what items would not be taken?

12   A.    No.

13   Q.    About how many laptops do you think are depicted in that

14   photograph?

15   A.    Probably over 30.

16   Q.    And were there other areas of the house that you saw that

17   are not in this picture where laptops were also there?

18   A.    There were definitely computer components in other places

19   of the house.

20   Q.    And were those components taken?

21   A.    Not all of them.

22   Q.    Only some?

23   A.    Yes.

24   Q.    Now, at some point last week did you come to my office to

25   examine two different pieces of equipment?

1    A.    Yes.

2    Q.    And it's fair to say that you and I had a discussion, and

3    I am not going to go into the details of it, but we had a

4    discussion?

5    A.    Yes.

6    Q.    And one of pieces of equipment was a laptop?

7    A.    Yes.

8    Q.    Do you know if it's depicted in Exhibit 51, the laptop

9    that I showed you last week?

10   A.    I don't know if it's one of these computers.

11   Q.    It's hard to know, based on that photographic evidence?

12   A.    Correct.

13   Q.    And we turned that on, correct?

14   A.    Yes.

15        MR. GARLAND:  Objection.

16        THE COURT:  Grounds?

17        MR. GARLAND:  The grounds are that the equipment that

18   was shown to --

19        THE COURT:  No, no.  Just the grounds, not an

20   argument.

21        MR. GARLAND:  Authentication of the item that was

22   observed.

23        THE COURT:  I am going to hear more of the testimony

24   before I rule on that.

25   BY MR. SHEKETOFF:

1    Q.   We turned it on, correct?

2    A.   Yes.

3    Q.   And I hit the F2 key?

4    A.   Correct.

5    Q.   And the computer displays its tag number, correct?

6    A.   Correct.

7    Q.   You didn't take it, and you didn't examine the actual

8    motherboard that's in there; is that fair to say?

9    A.   Yes.

10   Q.   But you did see what the computer generated as its own tag

11   number, correct?

12   A.   Yes.

13   Q.   Is that a number that you recognize from this case?

14   A.   Yes.

15   Q.   And do you recall what that number was?

16   A.   I could guess.  It starts with a "2."

17        MR. SHEKETOFF:  May I approach, your Honor?

18        THE COURT:  You may.

19   BY MR. SHEKETOFF:

20   Q.   I give you this document and ask you if you can read it to

21   yourself and see if it refreshes your memory as to what tag

22   number that motherboard displayed.

23   A.   Yes.

24   Q.   And what was it?

25   A.   28 Delta Kilo Lima Delta 1.

1    Q.   Is that, in your mind, associated with one of the counts

2    in this case?

3    A.   Yes.

4    Q.   And which count is that?

5    A.   I don't know the count off the top of my head.

6    Q.   Okay.  Which computer -- is it associated with a

7    motherboard that we heard about with a witness from this

8    morning?

9    A.   Yes.  Well --

10   Q.   You're not sure?

11   A.   -- I wasn't in the room, but you guys heard a witness, I

12   believe.

13   Q.   And the second piece of equipment I showed you required

14   more apparatus to turn on, correct?

15   A.   Yes.  There was no monitor or power cord.

16   Q.   I am not asking you what it was, but I suggested that when

17   it was powered on it would display --

18          MR. GARLAND:  Objection.

19          THE COURT:  I will listen to the question.

20   BY MR. SHEKETOFF:

21   Q.   -- it would display a tag number from the motherboard,

22   correct?  I suggested that?

23   A.   Yes.

24   Q.   All right.  But did I offer that you could remove both

25   items?

1    A.    Yes.

2    Q.    All right.  I'm sure it wasn't your decision alone, but

3    was a decision made not to take either item?

4    A.    Yes.

5    Q.    Thank you.

6          MR. SHEKETOFF:  Oh, I'm sorry, your Honor.  There is

7    one other area.

8    BY MR. SHEKETOFF:

9    Q.    When the prosecutor was asking you questions about what

10   happened with the computer with the name "Matt" on it, you said

11   something about following normal procedures and then sending it

12   to Washington?

13   A.    Yes.

14   Q.    Does that mean that here in Boston it was imaged in some

15   way and the tapes of those images were sent to Washington for

16   examination?

17   A.    That does happen.  I don't know in this case.  It was just

18   submitted into the evidence control unit.  And actually I

19   misspoke in regards to Washington.  It was sent to Quantico.

20   Q.    Maybe I misspoke.

21   A.    No, I think I did.

22   Q.    In any event, do you know who has custody of that

23   computer, the one that said "Matt" on it?

24   A.    It's in the Evidence Control Unit.

25   Q.    So, the FBI here in Boston has it?

1    A.    Correct.

2    Q.    Do you know what the service tag number was on that unit?

3    A.    I don't know off the top of my head.

4    Q.    If I showed you -- do you know if it was a Dell power --

5    I'm sorry.  Was it a Dell Precision 690?

6    A.    Yes.

7          MR. SHEKETOFF:  May I approach, your Honor?

8          THE COURT:  You may.

9    BY MR. SHEKETOFF:

10   Q.    I am showing you this document, which you are not the

11   author of, and I am asking you if it indicates what the service

12   tag number was.

13   A.    Yes.

14   Q.    Even looking at that, do you have a memory of what the

15   service tag number was?

16   A.    From looking at this, now I do.

17   Q.    And what was the service tag number on the computer that

18   we saw the picture of that was on the desk in the working area

19   of Mr. Kuc's residence?

20   A.    9 Quebec 6 Charlie 3 Charlie 1.

21   Q.    And that was a Dell product?

22   A.    Correct.

23   Q.    And that service tag is something that you saw when you

24   logged that into evidence, correct?  In other words, you saw

25   the sticker on the computer?

1   A.   Yes.

2   Q.   Do you know when that computer was turned on if the

3   service tag generated electronically from the motherboard had

4   the same service tag number as the service tag on the outside

5   of the computer?

6   A.   I don't know.

7   Q.   But you still have custody of that computer?

8   A.   Yes.

9   Q.   Thank you.

10          THE COURT:  Mr. Garland.

11          MR. GARLAND:  Thank you, your Honor.

12                    REDIRECT EXAMINATION

13   BY MR. GARLAND:

14   Q.   Agent De Lair, the search occurred, I believe you said, on

15   December 14, 2010, correct?

16   A.   Yes.

17   Q.   So, when was the first time that you saw the computer or

18   computers that Mr. Sheketoff was just asking you about.  Not

19   the "Matt" computer, but the ones that he showed you in his

20   office?

21   A.   I forgot if it was yesterday.  It must have been yesterday

22   or Friday.  I don't recall.

23   Q.   And had anybody contacted you about those two computers

24   before that?

25   A.   No.

1   Q.   Do you know where those computers came from?

2   A.   No.

3   Q.   One was a laptop, correct?

4   A.   Yes.

5   Q.   And one was some other computer that wasn't even connected

6   to a monitor, correct?

7   A.   Yes.

8   Q.   So, sitting here, do you have any idea what was on that

9   second computer?

10   A.   No.

11   Q.   Do you have any idea where either of those computers had

12   been before Mr. Sheketoff's office?

13   A.   No.

14   Q.   The next question I have for you is, are you trained at

15   all, with the training that you have gotten from the FBI or

16   from other sources, in how to read service tag numbers off of

17   motherboards in laptops of Dell computers?

18   A.   Not off of motherboards.  I know that if you look at the

19   bios, you sometimes see a service tag number in regards to Dell

20   products.

21   Q.   Did you have the opportunity, or did you at that time, to

22   examine that computer to find out what had been done with that

23   computer before?

24   A.   No.

25   Q.   Have you looked at any software that had been installed on

1    that computer?

2    A.    No.

3    Q.    Had you looked at whether any software had been installed

4    and deleted from that computer?

5    A.    No.

6    Q.    Did you see anything on that computer to suggest where it

7    had been purchased from?

8    A.    No.

9    Q.    So, sitting here right now, the only thing that you can

10   tell us about that computer is that it was turned on, and a

11   button was pushed and you saw that service tag number, correct?

12   A.    Yes.

13   Q.    Did you do anything to verify whether the screen or the

14   process that was operating at that time was actually the bios

15   displaying that to you or something that could have been

16   written to just display something that looked as if it were the

17   bios displaying that to you?

18   A.    I don't know which one it was.

19   Q.    You got some questions at the very end about the "Matt"

20   computer, the one with the dog on the screen, and that was sent

21   off.  Did you examine that computer yourself?

22   A.    No.

23   Q.    Did you do any sort of forensic analysis of that computer?

24   A.    No.

25   Q.    What was your role in regard to that computer and the

1   search and the processing of that computer?

2   A.   I seized it, and from that point it was submitted to

3   Evidence Control, and then I don't know if Boston CART made an

4   image, or if it was just sent straight to Quantico.

5          MR. GARLAND:  May I take a moment, your Honor?

6          THE COURT:  You may.

7          MR. GARLAND:  Your Honor, no further questions.

8          THE COURT:  All right.

9          Mr. Sheketoff.

10          MR. SHEKETOFF:  Just briefly, your Honor.

11                     RECROSS-EXAMINATION

12   BY MR. SHEKETOFF:

13   Q.   One of the documents I put in front of you is called an

14   "FBI 302," correct?

15   A.   Yes.

16   Q.   That's a standard FBI report.  When an agent does

17   something, he or she often writes an FBI 302.

18   A.   Yes.

19   Q.   Could you use that document to refresh your memory as to

20   when it was that you came into my office?

21   A.   Yes.  It was June 21st, 2012.

22   Q.   All right.  Do you remember which day that was last week?

23   A.   So, that was Thursday.

24   Q.   Thursday of last week.  And is it fair to say that I

25   offered to let you leave with those two computers?

1    A.   Yes.

2              THE COURT:  You may step down.  Thank you.

3              THE WITNESS:  Thank you.

4              MR. GARLAND:  The United States calls April Williams.

5              THE CLERK:  Will you please raise your right hand.

6                  APRIL WILLIAMS, DULY SWORN BY THE CLERK

7              THE WITNESS:  April Williams, W-I-L-L-I-A-M-S.

8              THE COURT:  You may be seated.

9                         DIRECT EXAMINATION

10   BY MR. GARLAND:

11   Q.   Good morning, Ms. Williams.  Ms. Williams, what city and

12   state do you live in?

13   A.   Pawtucket, Rhode Island.

14   Q.   Where do you work?

15   A.   At the UPS Store in Cumberland.

16   Q.   What's the address of the UPS Store?

17   A.   2130 Mendon Road.

18   Q.   How close is that to North Attleborough?

19   A.   I would say five to ten miles, not even ten.

20   Q.   How long would it take to drive there?

21   A.   Ten minutes.

22   Q.   What does the store do?

23   A.   At the UPS Store we send packages out, we take in mail,

24   copies, laminate, binding.  It's like a small office.

25   Q.   Do you receive packages for people as well?

1    A.   Yes.

2    Q.   Do you charge people for that?

3    A.   No, not if they have a mailbox.

4    Q.   And do you charge people for opening up a mailbox there?

5    A.   Yes.  We do offer mailbox services.

6    Q.   How long have you been working at the UPS Store?

7    A.   Eight years.

8    Q.   Between 2005 and 2010 did the store rent a mailbox to

9    somebody in the name of Matthew Kuc, spelled K-U-C?

10   A.   Yes.

11   Q.   Can you possibly move the microphone a little closer to

12   you.

13   A.   (Witness complied).

14   Q.   Thank you.  How are you familiar with that mailbox and

15   that account?

16   A.   He did own a mailbox with his father at the store.

17   Q.   How are you familiar, how do you know that he did?

18   A.   I opened up the mailbox.

19   Q.   Let's talk about that.  I am going to show you what has

20   been admitted as Exhibit 66.  Do you recognize this?

21   A.   Yes.

22   Q.   What is it?

23   A.   That is our mailbox agreement.

24   Q.   Again, if we can zoom in on the upper left-hand corner.

25   A.   Mm-hmm.

1    Q.    Do you see the name of the person who rented that mailbox

2    in there?

3    A.    Yes.

4    Q.    Who is it?

5    A.    Matthew Kuc.

6    Q.    How is the last name spelled?

7    A.    K-U-C.

8    Q.    What's the name of the company that was used to open that

9    account?

10   A.    Cyon Data Systems.

11   Q.    Do you remember the people who were there to open the

12   account?

13   A.    Yes.  It was Matthew Kuc and his dad.

14   Q.    Did you verify their identities on that day?

15   A.    Yes, I did.

16   Q.    How did you do that?

17   A.    Upon opening any mailbox, we require two forms of

18   identification.

19   Q.    And did you ask for that identification that day?

20   A.    Yes.

21   Q.    Did you do anything with those IDs?

22   A.    We copied them.

23   Q.    I am going to show you what has been marked as Exhibit 22,

24   which I believe is unopposed.  Do you recognize this?

25   A.    Yes.

1    Q.   What is it?

2    A.   Those are the two forms of ID we received to open the

3    mailbox.

4    Q.   And if we can zoom in on the right-hand picture, the

5    right-hand identity, actually, whose identity was this?

6    A.   Matthew's.

7    Q.   And if we go to the left one, whose identity was this?

8    A.   His dad.

9    Q.   Were they both there standing in front of you when they

10   gave you their identities?

11   A.   Yes.

12   Q.   What types of identities are below those driver's

13   licenses?

14   A.   Triple A cards.

15            MR. GARLAND:  Your Honor, I move to admit Exhibit 22.

16            THE COURT:  It is received.

17                 (Exhibit No. 22 received into evidence)

18   BY MR. GARLAND:

19   Q.   Then, I want to turn back to Exhibit 66.  As you go

20   through this document, we can enlarge any part of it that you

21   would like to, do you see any prices on there for the service

22   of offering a mailbox?

23   A.   No.

24   Q.   Are you familiar with why that might be?

25   A.   It's a standard UPS form.  All the stores have them.  We

1    just give the fee verbally over when they open up their

2    accounts.

3    Q.   And then I want to turn you to page 2 of the contract,

4    towards the bottom.  Do you see a date down there in the lower

5    right-hand corner?

6    A.   Yes.

7    Q.   What's the date that you see there?

8    A.   June 2nd, 2010.

9    Q.   Is that around when you recall opening up that account for

10   Matthew Kuc?

11   A.   It's the date.  That's what prints on the form on the day

12   we do it.

13   Q.   And then what was the mailbox number that was rented out

14   to Mr. Kuc?

15   A.   377.

16   Q.   I want you to look at the first page of the contract.  Do

17   you see a place where it says "Mailbox Size"?

18   A.   Yes.

19   Q.   In June 2010 what mailbox sizes were available for rent?

20   A.   Small, medium and large.

21   Q.   What size did the defendant rent?

22   A.   Medium.

23   Q.   About how big was a medium mailbox?

24   A.   6 by 6 by 6.  Like, a little square.

25   Q.   So, when you say "6 by 6 by 6," is that inches?

1    A.    That is inches.  It's actually longer to hold a letter.

2    Q.    Were you around when shipments were delivered for that

3    mailbox?

4    A.    Yes.

5    Q.    And in 2010 about how many days a week would you work at

6    the UPS Store?

7    A.    Five days.

8    Q.    What sort of shift did you usually work?

9    A.    On the average, from 11:30 in the afternoon until 6:30 at

10   night.

11   Q.    How often did packages come for that mailbox?

12   A.    I want to say probably three or four a day.

13   Q.    On a heavy day how many boxes might come in?

14   A.    It could have been four.

15   Q.    And what is it that came in for that mailbox?  Was it just

16   letters or other things?

17   A.    No.  There were boxes.  They looked like computers.

18   Q.    So, when you testified that three or four things came in a

19   day for that mailbox, those were packages that you were

20   referring to?

21   A.    Yes.

22   Q.    About how big were those packages?

23   A.    They did range in size.  Most of them were big ones,

24   probably 24 inches by 18.

25   Q.    So, bigger than that medium mailbox?

1    A.    Yes.  Oh, a lot bigger.

2    Q.    Given the number of packages and the sizes that were

3    coming in for that mailbox, if they wouldn't fit in there,

4    where would you store the packages?

5    A.    Most of the times the dad did come in to receive them as

6    soon as they came in, but if he weren't expected to come in, we

7    would just put a key, an alternate key in his mailbox to

8    reroute him to another one that would fit him.

9    Q.    Now, you mentioned the father a couple of times.  Do you

10   know whether Matt Kuc authorized the father to pick up those

11   packages?

12   A.    Oh, he didn't have to authorize it.  He was on the account

13   as a joint owner.

14   Q.    You testified before that the mailbox number was 377.

15   From your experience at the UPS Store, would there be any

16   reason for a package addressed to that mailbox to be addressed

17   and sent to, say, 3-377?

18   A.    Yes.

19   Q.    What would that reason be?

20   A.    It's because we are Suite 3 and the mailbox number is 377.

21   Q.    So, to indicate both the suite that you are in and then

22   the mailbox you might see 3-377?

23   A.    Correct.

24   Q.    And if it were addressed to 3377, without the dash, would

25   that still get to the store and to that mailbox?

1    A.    Yes.

2    Q.    And if it were addressed as just Suite 377, would that

3    also, essentially, get to the store and into that mailbox?

4    A.    Yes.

5    Q.    Did anything on the boxes that you saw, the packages that

6    were received for that account, indicate what was inside of

7    them?

8    A.    Some of them had, like, just computer names:  "Dell"

9    mostly, I think "HP."  There were various names.  I don't

10   recall all of them.

11   Q.    Had the boxes been shipped from Dell and Hewlett-Packard

12   or from other people and other companies?

13   A.    I don't recall.

14   Q.    Did the boxes appear to be in new or in used condition?

15   A.    They looked new.

16   Q.    Did you ever notice the packages' shipping labels?

17   A.    Well, some of them had his name on it or a company name.

18   Q.    Were all of the packages addressed to Matthew Kuc, K-U-C?

19   A.    No.  Some of them were misspelled, but we knew it was

20   probably going to be his.

21   Q.    And why did you know that?

22   A.    Because people misspell names all the time.

23   Q.    Did you see other names on packages or receive packages

24   for that mailbox addressed to other names and to other

25   companies than Matt Kuc and Cyon Data Systems?

1   A.   Yes.

2   Q.   If a package were addressed to somebody other than Matt

3   Kuc and Cyon Data Systems, how did you know to put it aside for

4   him?

5   A.   Because he had companies that were coming in under

6   different names.

7   Q.   Did that mailbox receive anything other than packages?

8   A.   It received a couple of pieces of mail.

9   Q.   From where?

10  A.   Dell.

11           MR. GARLAND:  Your Honor, may I take a moment to

12  confer with counsel?

13           THE COURT:  You may.

14           MR. GARLAND:  No further questions for Ms. Williams.

15           THE COURT:  All right.

16           Mr. Sheketoff.

17           MR. SHEKETOFF:  Thank you, your Honor.

18                        CROSS-EXAMINATION

19  BY MR. SHEKETOFF:

20  Q.   Good morning, Ms. Williams.

21  A.   Hi.

22  Q.   Exhibit 66, please.  Exhibit 66 has a date on it that was

23  shown to you, June 2nd of 2010, or something like that.  When

24  the prosecutor was asking you questions initially, he said that

25  he had a mailbox there from 2005 to 2010 and you said, "Yes."

1        Does this document refresh your memory that he opened

2    the mailbox in June of 2010?

3    A.   If that's the date that printed, we did open it that day.

4    Q.   Thank you.

5            THE COURT:  Anything further?

6            MR. GARLAND:  Nothing further.

7            THE COURT:  You may step down, Ms. Williams.  Thank

8    you.

9                    (Witness stepped down)

10           MR. GARLAND:  Your Honor, the Government calls Leanne

11   Farrell.

12           THE COURT:  All right.

13               LEANNE FARRELL, DULY SWORN BY THE CLERK

14           THE COURT:  Please state and spell your full name for

15   the record.

16           THE WITNESS:  Leanne Farrell, L-E-A-N-N-E,

17   F-A-R-R-E-L-L.

18           THE COURT:  You may be seated, Ms. Farrell.

19                      DIRECT EXAMINATION

20   BY MR. GARLAND:

21   Q.   Good morning, Ms. Farrell.  Where do you work currently?

22   A.   OnProcess Technology.

23   Q.   In what city and state?

24   A.   Ashland, Mass.

25   Q.   What does OnProcess Technology do?

1    A.    We do product collections for major companies.

2    Q.    What do you mean by "product collections"?

3    A.    If you have a broken part, say you have a broken computer,

4    you call up the company and they'll send you out a replacement,

5    and then you send your defectives back.

6    Q.    What type of companies do you do this for?  Is it just

7    computer companies?

8    A.    No.  We do it for cable companies, medical technology.

9    Q.    What do you do specifically at OnProcess?

10   A.    I manage a team of 20 people who do these collection

11   calls.

12   Q.    How long have you worked at OnProcess?

13   A.    About a year and a half.

14   Q.    Where did you work before that?

15   A.    Hewlett-Packard.

16   Q.    What did you do there?

17   A.    I worked with account reps that dealt with, like, the

18   major accounts trying to get product back.

19   Q.    So, essentially, product collections there?

20   A.    Yes.

21   Q.    And from what dates did you work at Hewlett-Packard doing

22   that?

23   A.    It was April of 2010 to January of 2011.

24   Q.    And before that, where did you work?

25   A.    For 3COM.

1    Q.    What business is 3COM in?

2    A.    3COM was computer parts also.

3    Q.    What types of computer equipment?

4    A.    All different.  We had telephones, we had switches, we had

5    servers, all different computer parts.

6    Q.    What was your title at 3COM?

7    A.    I was a Logistics Coordinator.

8    Q.    What were your responsibilities as a logistics

9    coordinator?

10   A.    I did the product collections.  I handled product

11   collections for North America and for Europe.

12   Q.    For both North America and Europe?

13   A.    Yes.

14   Q.    How long were you at 3COM?

15   A.    I started in September of 2008 until we got bought out by

16   Hewlett-Packard in April of 2010.

17   Q.    Is that why you then went to Hewlett-Packard?

18   A.    Yes.

19   Q.    What did you do before you worked at 3COM?

20   A.    I was an assistant controller at a manufacturing company

21   for 10 years.

22   Q.    What does an assistant controller do?

23   A.    I do all kinds of accounting, accounts receivable,

24   payable, collections, payroll.

25   Q.    In your role at 3COM obtaining the computer parts, were

1    you familiar with the company's warranty policies?

2    A.   Yes, I was.

3    Q.   What were the warranty policies for 3COM?

4         MR. SHEKETOFF:  Objection.

5         THE COURT:  Well, she can testify to it, if she knows.

6    A.   I'm not sure exactly what you mean.  Can you be more

7    specific?

8    BY MR. GARLAND:

9    Q.   What were the warranties?  What was the policy for how

10   long equipment was in warranty for?

11        MR. SHEKETOFF:  Can I have a continuing line of

12   objection to these questions?

13        THE COURT:  Well, not a continuing line, but if the

14   witness understands the question, she can answer it.

15   A.   If somebody had a computer part and it was under warranty,

16   they could just call in and get a replacement or open one up on

17   the computer online.

18   BY MR. GARLAND:

19   Q.   And when you say open it up online, how would a person do

20   that?

21   A.   They would log onto 3COM, and they would put in the

22   computer part that they had that was defective, and then they

23   would get an advanced replacement shipped out to them.

24   Q.   What does an "advanced replacement" mean?

25   A.   It means whatever you have that's broken, we're going to

1    send you out a replacement that works before we get the

2    defective back.

3    Q.   Why would that be done?

4    A.   It's customer service, good customer service.  And a lot

5    of times, too, I mean, something could start to be going.  It

6    could be, say, in a school system or if it was in a phone

7    system, say, for a hospital, they needed to get something, the

8    new part, before they could actually take the old one out.

9    Q.   How would 3COM know where to send the new part to?

10   A.   The customer would give the address.

11   Q.   Did 3COM have any way to verify whether the name or

12   address were accurate?

13   A.   No, because people could have bought the parts too through

14   a third party.

15   Q.   Were customers required to return their broken parts to

16   3COM?

17   A.   Yes, they were.

18   Q.   Did the company keep track of which customers actually

19   returned their broken parts?

20   A.   Yes, they did.

21   Q.   How would they do that?

22   A.   There was an open RMA report, which is, the parts that

23   come back, it's a Returned Merchandise Authorization.  We had

24   reports like that.  They had a specific number.  When they

25   returned the defective part the number was associated with it

1    so that we knew how to close it out.

2    Q.    And would you have to look at the packages as they were

3    coming in to try to match up the packages coming in with the --

4    I think you called them RMAs before.

5    A.    Mm-hmm.

6    Q.    And is that what was done?

7    A.    Yes.  Sorry, I'm nervous.  I'm talking loud.

8    Q.    What was your role in that process, then, of trying to get

9    parts back that were represented by people as being broken?

10   A.    I would send out the e-mails requesting them back if we

11   didn't get them back within 10 days, and then I would start a

12   call process and call the customers and say, "Hi, this is

13   Leanne calling, we haven't received your defective part back

14   yet, you only have so long to return it," and then I would

15   invoice.

16   Q.    Between 2008 and 2010 did 3COM have any specific problems

17   with people from Massachusetts or Rhode Island ordering

18   warranty parts and then not returning broken parts?

19   A.    Yes.

20   Q.    Who, in particular?

21   A.    Matthew Kuc.

22   Q.    Under what names had Mr. Kuc ordered the equipment?

23   A.    You mean spellings?

24   Q.    Yes.

25   A.    It was Matt Kuc spelled like C-U-K, C-U-C-K, C-O-O-K,

1  C-O-O-K-E.  Some of it was Matt, some of it was Matthew.

2  Q.    How expensive was the equipment?

3  A.    There were switches.  I mean, the list price was anywhere,

4  depending on the switch, 3- to $7,000 apiece.

5  Q.    Did 3COM try to get Mr. Kuc to return those parts?

6  A.    Yes, we did.

7  Q.    Who was in charge of trying to get those parts back?

8  A.    I was.

9  Q.    What steps did you take in order to get Mr. Kuc to return

10  the equipment that had been represented as broken?

11  A.    I sent e-mails, I made phone calls, I spoke to him

12  directly on the telephone.  I provided him with a prepaid UPS

13  label to ship parts back.

14  Q.    Now, you mentioned that you called him.  Where did you get

15  the telephone numbers to do that?

16  A.    He provided the phone numbers to start with when he opened

17  up the RMA, and then I Googled him.

18  Q.    Did you connect with him when you made those phone calls?

19  A.    Yes, I did.

20  Q.    How did you know that you were talking to Matt Kuc?

21  A.    One of the times I called was at a company he worked at,

22  and I asked to speak to Matt Kuc, please, and somebody yelled,

23  "Matt, the phone's for you," and he came on the line.

24  Q.    Was it a male's voice on the line at that time?

25  A.    Yes, it was.

1    Q.   You said one of the times.  How did you know the other

2    times that you were talking to Matt Kuc?

3    A.   It was the number that had been provided to us.

4    Q.   And when you called, did a male's voice answer?

5    A.   Yes.

6    Q.   What did you say to the person, generally, on these phone

7    calls that you understood to be Matt Kuc?

8    A.   I said, "Hi, this is Leanne Farrell calling from 3COM.

9    I'm calling on the RMAs that we were looking for.  I still

10    haven't seen these parts come back.  Have you had a chance to

11    ship them back yet?  You didn't use the labels provided.  Did

12    you have another number?"

13    Q.   Did you ask him to return the parts?

14    A.   Yes, I did.

15    Q.   How did Mr. Kuc respond?

16    A.   I got a few different answers different times.  Sometimes

17    he would say, "Oh, I already returned them, I didn't keep my

18    tracking," "Oh, I thought they shipped back already, you just

19    keep your eyes out."  I would get a chuckle here and there.

20    Q.   What was his manner when talking to you about this?

21    A.   I felt it was very casual.

22    Q.   Did he say whether he was going to return those parts?

23    A.   Mm-hmm.  He acted like he would return them or they had

24    already been returned.

25    Q.   And did he return any parts?

1    A.    I want to say some came back eventually, but I'm not

2    positive.

3    Q.    How many times did you call him?

4    A.    Oh, I called numerous times.

5    Q.    Did 3COM continue to send him warranty replacement parts?

6    A.    I think -- I mean, I know that I had put a stop to it so

7    he couldn't get any more, but I think something was worked out

8    that I wasn't a part of with security to send pieces out, but I

9    wasn't a part of that.

10   Q.    When you say worked out with security, what do you mean?

11   A.    I think security did something to send him out parts just

12   to make sure, because we found them on eBay, so they sent parts

13   out to match it up.

14          MR. SHEKETOFF:  Move to strike that.

15          THE COURT:  Yes, I am going to strike the answer.  The

16   witness does not seem familiar with this.

17          So, the jury will disregard that last comment.

18          MR. GARLAND:  If I can just consult with counsel.

19          No further questions.

20          THE COURT:  All right.  Mr. Sheketoff

21                         CROSS-EXAMINATION

22   BY MR. SHEKETOFF:

23   Q.    Good morning.

24   A.    Good morning.

25   Q.    Just prior to the merger between 3COM and Hewlett-Packard,

1   did 3COM begin dumping a lot of its product onto the market?

2   A.   Not that I know of.

3   Q.   Is it your testimony that the inventory that 3COM had was

4   retained and went to Hewlett-Packard on the day of the merger?

5   A.   Yes.

6   Q.   Now, 3COM, before it merged with Hewlett-Packard, had a

7   warranty process, correct?

8   A.   Yes.

9   Q.   How long was the warranty for?

10   A.   I think they had to be back within 30 days.

11   Q.   No, not the return.  How long was the warranty good for?

12   A.   I'm not sure.

13   Q.   You don't know if 3COM offered a lifetime warranty, or a

14   30-day warranty or a one-year warranty?

15   A.   I'm not sure.

16   Q.   Do you know what sort of material 3COM would send to a

17   customer who was seeking a replacement part in terms of packing

18   slips, return labels, things of that nature?

19   A.   There was a packing slip with every replacement that went

20   out, and there was also return instructions with it, and if it

21   was a contracted customer, they got a prepaid return label.

22   Q.   Isn't it fair to say that customers were told that if they

23   didn't return the defective product within 15 days of receiving

24   the replacement their failure to do so would result in an

25   invoice for the list price, no discounts apply, being issued?

1   A.   They didn't go out at day 15, no, but they did get

2   invoiced.

3        MR. SHEKETOFF:  May I approach, your Honor?

4        THE COURT:  You may.

5   BY MR. SHEKETOFF:

6   Q.   I am going to show you this document.  Just look at it

7   yourself and tell me if you recognize it as being a 3COM

8   document.  You might not.

9   A.   Sorry.  This isn't one of my e-mails, so I just want to

10  read it over.

11  Q.   Right.  What I'm asking is, do you recognize it as a

12  standard 3COM e-mail that would be sent to a customer who was

13  requesting a replacement part?

14  A.   Yes.

15  Q.   So, you have seen e-mails like this before, even though

16  this one is not your e-mail?

17  A.   Correct.

18  Q.   Could you turn to the second page and just read to

19  yourself that area that I was talking about just now and see if

20  that refreshes your memory that 3COM would send e-mails telling

21  people if they didn't return it within 15 days they would be

22  invoiced without a discount?

23  A.   Mm-hmm.  Yes.

24  Q.   So, that was standard practice, at least in 2009, before

25  the merger with Hewlett-Packard?

1   A.   Yes.

2   Q.   And was Matt Kuc ever invoiced?

3   A.   Yes, he was.

4   Q.   And how do you know that?

5   A.   Because I created the invoices.

6   Q.   You created them and sent them to him?

7   A.   I certainly did.

8   Q.   Do you have a copy of any of those?

9   A.   No, I don't.

10  Q.   Did Matt Kuc ever pay any invoice?

11  A.   No, he did not.

12  Q.   And how do you know that?

13  A.   There was a specific P.O. Box for the invoices I created,

14  and when they were paid I did get a copy of the checks.

15  Q.   So, your testimony is you have a memory that Matt Kuc

16  never paid an invoice?

17  A.   Yes.

18  Q.   And you have a memory that he never returned a computer

19  part?

20  A.   That I'm not positive on.  He didn't return one that I was

21  looking for.  Like I said, there was things go on with security

22  that I wasn't a part of.

23  Q.   Do you have any records of any kind that show that there

24  was an invoice sent to Matt Kuc that never got paid?

25  A.   No, I don't.

1    Q.   Do you know who has 3COM's business records?

2    A.   I would think HP.

3    Q.   You think HP?  Okay.

4         Now, you heard at some point something about 3COM

5    security going onto the Internet and trying to buy parts that

6    3COM thought might have been sold or given to Matt Kuc as

7    replacement parts?  You heard something about that?

8    A.   Yes.

9    Q.   But you don't know anything about it, personally?

10   A.   No.

11   Q.   Do you know who from 3COM was involved in trying to do

12   this operation to buy parts off of the Internet that had been

13   sent to Matt Kuc?

14   A.   The security team.

15   Q.   And do you know the names of the people that were

16   involved?

17   A.   I want to say it was Matt Vaughan and Wade Newman.

18   Q.   Identifiable people that you have disclosed to the

19   Government?

20   A.   Yes.

21   Q.   Thank you, ma'am.

22        THE COURT:  Mr. Garland.

23        MR. GARLAND:  Thank you, your Honor.  I'll be brief.

24

25                     REDIRECT EXAMINATION

BY MR. GARLAND:

Q.   Ms. Farrell, when was the last time that you worked for 3COM?

A.   Let's see.  April of 2010.

Q.   When was the last time that you worked for HP?

A.   January of 2011.

Q.   Did you make any efforts to obtain any records that you had had from 3COM either from former 3COM or HP personnel?

A.   I spoke to a couple of people.  Joe Fallon of Security asked me if I had anything, and I had provided it at the time when I went to 3COM security, but I didn't have anything further from that.

Q.   And did you have any other records, possibly among your own, that you had retained on your own that you provided to the Government in terms of records involving Matt Kuc and 3COM?

A.   I had one list and one old list of nine or ten parts that he had not returned.

        MR. GARLAND:  Your Honor, may I show something to Mr. Sheketoff, please?

        THE COURT:  You may.

        MR. GARLAND:  May I approach the witness, your Honor?

        THE COURT:  You may.

BY MR. GARLAND:

Q.   I would like to ask you to take a look at this document. Are you familiar with this document?

1    A.    Yes.

2    Q.    What is it?

3    A.    It's a list of outstanding RMAs that I showed I still had

4    that were for Matt Kuc.

5    Q.    Is this what you provided the Government?

6    A.    Yes.

7    Q.    When you say "outstanding RMAs," what does that mean?

8    A.    That they were never returned.

9          MR. GARLAND:  Your Honor, may I consult with

10   co-counsel?

11         THE COURT:  Yes.

12         MR. GARLAND:  Your Honor, I move to admit that as 67.

13         MR. SHEKETOFF:  Well, objection.

14         THE COURT:  Grounds?

15         MR. SHEKETOFF:  Hearsay.

16         THE COURT:  Pardon me?

17         MR. SHEKETOFF:  Hearsay.

18         THE COURT:  Overruled.  If you want to lay a further

19   foundation for business record, you can.

20         MR. GARLAND:  Okay.

21   BY MR. GARLAND:

22   Q.    Ms. Farrell, where did you obtain these records from?

23   A.    I still had them on my computer when I went to HP.

24   Q.    Where did you obtain them from before that?

25   A.    They were on my 3COM computer.

1    Q.   And how were they maintained?

2    A.   They came from a database.  This was my open RMA reports,

3    so I knew daily who I had to call, what parts were outstanding.

4    Q.   And did you use that database in the normal course of your

5    business?

6    A.   Yes, I did.

7    Q.   And were these the types of records that you would rely on

8    and create in the normal course of your business?

9    A.   Yes, they are.

10         MR. GARLAND:  Your Honor, on that basis I move to

11   admit these as Exhibit 67.

12         THE COURT:  They are received over the objection.

13         It has not been prenumbered.  How do you propose to

14   number it?

15         MS. BURKART:  67 is available, your Honor.

16         THE COURT:  So, we will call it 67.

17             (Exhibit No. 67 received into evidence)

18         MR. GARLAND:  There is one e-mail that was attached to

19   that by which they were transmitted.  I would ask that that be

20   pulled from that.  Just the records themselves.

21         THE COURT:  Yes, just the records themselves.

22         MR. GARLAND:  May I approach so I can put that on the

23   document camera?

24         THE COURT:  Yes.

25         MR. GARLAND:  If the video could be switched over to

1    the document camera, with the Court's permission.

2         THE COURT:  Yes.

3    BY MR. GARLAND:

4    Q.   What is this showing here?

5    A.   Outstanding RMAs that were due back for the Americas

6    region.

7    Q.   What does the "Days" mean in the third column?

8    A.   That's how old they are.  So, if it was shipped, that's

9    from November 4th.  So, like, that first part was shipped 90

10   days prior.

11   Q.   And then going down further, is this just basically

12   internal data that 3COM would use to track these, this

13   information?

14   A.   Yeah.  That's just part numbers.

15   Q.   So, I am going to turn the page and go to the second page.

16   For the record, what I put on the screen was a page that's

17   numbered MK003262.  Now I am going to turn to page MK003263.

18   Do you see this, what's on the screen now?

19   A.   Yes.

20   Q.   When it says "Product Name," am I correct that it says

21   "Switch 4500 G" with some other information after that?

22   A.   Yes.

23   Q.   What are switches?

24   A.   They are very expensive computer parts.  They're inside of

25   like a whole unit inside of a server or something.

1    Q.   As I go over, what customer names and addresses do you see

2    there?

3    A.   Medit (ph) Corp. and Cyon Data at Maple Street and

4    Laurelwood Drive.

5    Q.   And as I go further, what name and address do you see that

6    they were ordered to?

7    A.   Some of them went to Maple Street to Mathew Cookie, and

8    there is another one that goes to Laurelwood Drive to Matt

9    Cook, and then Laurelwood address again with Dan Conners.

10   Q.   What customer names are showing there?

11   A.   What do you mean?

12   Q.   On the column that says "Customer Name."

13   A.   Medit Corp. and then Cyon Data.

14   Q.   Now, this data that I am showing you right here, is this

15   the entirety of the records that you had at 3COM when you were

16   there concerning Mr. Kuc?

17   A.   That's all I have left.  There was a lot more.

18   Q.   I am going to show you what now is page marked MK3264, and

19   what e-mail addresses do you see there as corresponding to

20   those entries in the 3COM records?

21   A.   medit@cyonds.com, and then matt@cyonisp.net.

22   Q.   And what telephone numbers do you see there?

23   A.   781-688-0093 and 508-809-9179.

24   Q.   And where it says at the end, the last column, "RMA Create

25   Date," does that RMA correspond to the -- what was the title

1    that the abbreviation is for?  What does "RMA" stand for?

2    A.   Oh, Returned Merchandise Authorization.

3    Q.   Were the numbers that I just read to you, is that where

4    you got the numbers to call Mr. Kuc?

5    A.   Yes.

6              MR. GARLAND:  I have no further questions.

7                        RECROSS-EXAMINATION

8    BY MR. SHEKETOFF:

9    Q.   Now, it's your memory that on each of these ten, I think

10   it is, items, you sent Mr. Kuc an invoice?

11   A.   I'm not sure if I sent them on all of them.  I can

12   remember at least two definite.

13   Q.   Two of the ten you sent him an invoice?

14   A.   That I can remember definitely, yes.

15   Q.   All right.  And, of course, you don't have a copy of that

16   invoice?

17   A.   No, I don't.

18   Q.   But 3COM would have?

19   A.   Yes.

20   Q.   And where are you supposed to return the 3COM parts that

21   you are returning?

22   A.   They went to Smyrna, Tennessee.

23   Q.   All right.  Thank you.

24             THE COURT:  You may step down.

25             THE WITNESS:  I'm all done?

1          THE COURT:  Yes.

2          THE WITNESS:  Thank you.

3                    (Witness stepped down)

4          MS. BURKART:  The Government calls Emanuel Velasco,

5     your Honor.

6          EMANUEL VELASCO, DULY SWORN BY THE CLERK

7          THE CLERK:  Please state your full name, spelling your

8     last.

9          THE WITNESS:  Emanuel Velasco, V-E-L-A-S-C-O.

10         THE COURT:  You can take a seat.

11                    DIRECT EXAMINATION

12    BY MS. BURKART:

13    Q.   Mr. Velasco, could you please describe for the jury your

14    educational background.

15    A.   Yes.  I have a bachelor's degree in Computer Science.  I

16    received that from the City College of New York in May 2005.  I

17    have a master's degree in Computer Forensics.  I received that

18    from John Jay College of Criminal Justice in May 2007.

19    Q.   And could you briefly describe what you studied as part of

20    these programs?

21    A.   My master's degree in Computer Forensics is half criminal

22    justice courses and half computer forensic courses.

23    Q.   And what are computer forensics?

24    A.   Computer forensics is the examination of digital media to

25    extract data that can be used as evidence.

1    Q.    What position did you start after you finished your

2    master's degree in -- what year did you say that was?

3    A.    In May 2007.

4    Q.    In 2007.  What was your first position?

5    A.    My first position was with a company called Business

6    Intelligence Associates.  I was a forensic technician.

7    Q.    And what did you do there as a forensic technician?

8    A.    I would receive digital media as evidence, I would

9    duplicate that media, and then I would prepare it for the

10   examiner to examine.

11   Q.    What did you do after that?

12   A.    After that I worked for a company called Kroll Ontrack.

13   Q.    And what was your title and responsibilities at Kroll?

14   A.    I held three positions at Kroll Ontrack.  My first

15   position was similar to the previous one, where I was a

16   forensic technician.  I would receive evidence and duplicate it

17   and prepare it for the examiner.

18         My second position was in data collections.  I would

19   go travel to our client locations, duplicate the media there,

20   and then bring it back to the lab for examination.

21         And my final position there was a computer forensic

22   examiner, where I examined the digital media that arrived at

23   the lab.

24   Q.    Mr. Velasco, where did you work after Kroll Ontrack?

25   A.    After Kroll, I got hired with the FBI's Computer Analysis

1    Response Team.

2    Q.    What is your position at the FBI?

3    A.    Currently, I am a Forensic Examiner.

4    Q.    And where is your office?

5    A.    In Quantico, Virginia.

6    Q.    When did you begin at the FBI?

7    A.    I started October 2009.

8    Q.    And what was your title when you first began?

9    A.    I started as a Forensic Examiner Trainee.

10   Q.    When did you receive the title of full Forensic Examiner?

11   A.    May 1st, 2012.

12   Q.    What training have you received from the FBI since you

13   began in October 2009?

14   A.    The first training was called CART 101, Computer Analysis

15   Response Team 101, and that's when we learn about our role with

16   the FBI, our standard operating procedures, and where we learn

17   how to forensically duplicate media.

18   Q.    What other type of training did you receive?

19   A.    After that I took a course called Access Data Boot Camp,

20   and that course taught us how we use our main forensic

21   examination tool.  And the third class is called Access Data

22   Windows Forensics.  That's where we learned how to find

23   forensic artifacts in the Windows operating system.  The fourth

24   class was called Access Data Internet Forensics.  That's where

25   we learned how to find forensic artifacts in Internet files.

1    And the fifth class was CART Practicals, and that's where we

2    get a mock exam where we would practice everything that we

3    learned so far on that exam.  And the last training was CART in

4    Court, where we would provide testimony on the case that we

5    examined.

6    Q.   You used the term "CART" a few times.  Is that an acronym

7    that's used by the FBI in this area?

8    A.   Yes.

9    Q.   What is it, again?  Could you say it slowly?

10   A.   CART is the Computer Analysis Response Team.

11   Q.   Response team?

12   A.   Yes.

13   Q.   In your work at the FBI, did you become familiar with the

14   name "Matthew Kuc"?

15   A.   Yes.

16   Q.   When was that?

17   A.   That was July 26, 2011.

18   Q.   What FBI group first contacted you about Mr. Kuc?

19   A.   The CART Unit in the Boston Field Office.

20   Q.   The Boston CART team contacted you?

21   A.   Yes.

22   Q.   And when was that?

23   A.   They put in a request about July 2011.

24   Q.   Did you receive anything from that?

25   A.   I received 12 tapes from them.

1    Q.    What are tapes?

2    A.    Tapes are a media that can store data similar to -- it

3    looks similar to a VHS tape, but instead of holding pictures

4    it's holding data.

5    Q.    What type of data was it holding?

6    A.    The data it contained were forensic images of five

7    computers.

8    Q.    So, you received 12 tapes that had information from five

9    computers?

10   A.    Yes.

11   Q.    And what is a "forensic image"?

12   A.    A forensic image is an exact copy of the hard drive that

13   was in the computer.

14   Q.    How do you know it's an exact copy?

15   A.    We run it through a mathematical algorithm called an "MD5

16   hash."  So, we would put in data, and the output is a

17   mathematical answer, if you will, that is so unique that we

18   consider it a digital fingerprint for that specific data.

19   Q.    So, is that how you make sure that what you are looking at

20   is a copy of what you got?

21   A.    Yes.

22   Q.    I am going to direct your attention to one particular

23   computer that was part of this examination.  Did you examine a

24   forensic image of a Dell Precision 690 computer?

25   A.    Yes.

1    Q.   When you first received the forensic image in Quantico,

2    were you able to examine it?

3    A.   Not right away.

4    Q.   Why?

5    A.   Something was wrong with the image.  It was incomplete.

6    Q.   So, what did you do?

7    A.   I requested the original computer from the Boston field

8    office.

9    Q.   Were you able to work on it then?

10   A.   Yes.

11   Q.   How?

12   A.   I made a copy of the hard drive that was missing, and I

13   was able to examine it then.

14   Q.   How much data was on this computer?

15   A.   Approximately 1.8 terabytes.

16   Q.   Could you describe 1.8 terabytes in terms of paper?

17   A.   In paper that's about 32 times the size of the Empire

18   State Building, if I stacked it up from the bottom to the top.

19   Q.   So, it's a lot of data?

20   A.   Yes, it is.

21   Q.   How do you examine that much data?

22   A.   We use a forensic tool that will assist us with examining

23   that data.

24   Q.   And what is that tool?

25   A.   It's called "Access Data Lab."

1    Q.   Access Data Lab?

2    A.   Yes.

3    Q.   Is this a tool that you previously described being trained

4    on?

5    A.   Yes.

6    Q.   And how do you do that?  What do you do with Access Data

7    Lab?

8    A.   We put in the forensic image into that program, and the

9    program does several things to process that data.  For example,

10   it takes all the files in the hard drive and sorts it by file

11   category, and it also lets us search the hard drive.  It

12   creates an index.  It finds all words in documents and keeps

13   track of their location.  That makes it easier for us to search

14   for that data later on.

15   Q.   So, it pulls the data all together and organizes it in a

16   way that you can search it; is that fair?

17   A.   Yes.

18   Q.   And how do you search it?

19   A.   We just put text into an input box and hit "Search," and

20   it finds it for us.

21   Q.   Kind of look Google searching around?

22   A.   Similar.

23   Q.   So, what words did you put in to search?

24   A.   I received words from the FBI agent that was investigating

25   the case.  I searched for the companies Dell, HP,

1  Hewlett-Packard and Lenovo.  I was also asked to search for

2  addresses that began with 36, 42, 2130 and 247.

3  Q.   And did you run those searches?

4  A.   Yes.

5  Q.   And what did you find?

6  A.   I reviewed the data, and I bookmarked those files so that

7  the case agent could review it later.

8  Q.   And what areas of the computer was the search going

9  through?

10  A.   The search goes through the entire hard drive from

11  beginning to end, including the files that are on it.

12  Q.   So, if something was on the desktop of the computer, would

13  that be part of the search?

14  A.   Yes.

15  Q.   What about things that were in other areas, free space?

16  A.   Yes.

17  Q.   What is "free space"?

18  A.   "Free space" is space on the hard drive that either never

19  had any data on it, or it had data previously but then it was

20  deleted.

21  Q.   So, if something is deleted, how could it still be part of

22  what you're searching?

23  A.   Because when you delete a file in Windows, Windows is not

24  actually deleting the file, the file contents remain there.

25  All it's saying is the address where that file was located is

1    now available for use.  So, because the file is still there, we

2    can find it.

3    Q.    Okay.  So, what did you do once you had bookmarked certain

4    things that came up in your search?

5    A.    I let the case agent review that data.

6    Q.    Was this computer divided into different User accounts?

7    A.    You can create several user accounts.

8    Q.    Can you describe what a "User account" is, first?

9    A.    In Windows, when you create a User account, you are just

10   separating your data with other people that use the computer.

11   Q.    And was this data separated into User accounts?

12   A.    There was only one User account on this computer.

13   Q.    What was the name of that User account?

14   A.    Matt, M-A-T-T.

15   Q.    When you went through the process of searching, did you

16   find any documents that had search term hits under the User

17   name "Matt"?

18   A.    Several.

19   Q.    And were any of those on the Desktop?

20   A.    Yes.

21   Q.    What is the significance of a document being on someone's

22   desktop?

23   A.    When you first log into Windows, the Desktop is the main

24   screen that you see.  People generally put stuff on the Desktop

25   for quick access to those files.

Q.   So, when you turn on your computer what do you see for

things that are on the Desktop?

A.   You will see icons and the name of the file under that

icon.

Q.   And how would you open those files?

A.   You just double click it.

Q.   I would like to show just the witness opposed Exhibit No.

V, the letter V.

        Do you see it?

A.   I don't see anything on the screen.

Q.   Do you recognize this file?

A.   Yes, I do.

Q.   What is it?

A.   This was a text file on the Desktop called "Address dot

text."

Q.   What was it called?

A.   "Address dot text."

Q.   What does the "dot text" part mean?

A.   That's just a text file.  It's a document without any text

formatting.

Q.   And what is the "address" part?

A.   That's the first name on the file.

Q.   Did you name the file?

A.   No.

Q.   And, generally, what does this document contain?

1    A.   It contains several addresses, names and company names.

2         MS. BURKART:  I would like to move to admit this as

3    Exhibit No. 70.

4         MR. SHEKETOFF:  Just the pretrial objection.

5         THE COURT:  So, we will mark that, should we say 68?

6         MS. BURKART:  I believe it's 70, your Honor.  It has

7    been premarked.

8         THE COURT:  70, yes.

9         MS. BURKART:  Thank you.

10             (Exhibit No. 70 received into evidence)

11        MS. BURKART:  I would ask to publish that, please, to

12   the jury.

13        THE COURT:  Yes.

14   BY MS. BURKART:

15   Q.   You said the file is named "addresses dot text," yes?

16   A.   "Address dot text," singular.

17   Q.   Can I just direct your attention to one of those addresses

18   there.  Could you please read that for the jury.

19   A.   "Superior Power Systems, Adam Donald, 36 Lourelwoods

20   Drive, North Attleborough, Massachusetts, 02760.

21   Q.   Thank you.  This exhibit -- how many pages is it?

22   A.   Two pages.

23   Q.   How many pages was it in the document that you found?

24   A.   You can't tell how many pages until you print it.

25   Q.   So, how does a text file work, exactly?  In other words,

1    is it like Microsoft Word?

2    A.    Yeah, similar.  You create a text file.  It's a blank

3    document with no text formatting.  It's a very basic version of

4    Word, where you just type in text but you can't format it in

5    any way.

6    Q.    Okay.  So, it would all be on one, and the way you

7    originally found it was all in one file, all the addresses

8    together; is that correct?

9    A.    Yes.

10   Q.    Thank you.  I would like to show you what's previously

11   been marked as opposed Exhibit Double A just to the witness,

12   please.

13         Do you recognizes this file, Mr. Velasco?

14   A.    Yes.

15   Q.    What is it?

16   A.    This is a file also on the user's Desktop.

17   Q.    Was it one file or multiple files?

18   A.    Right now I'm looking at one page.

19   Q.    If we could just page through for you.  How many pages do

20   you see?

21   A.    Eight.

22   Q.    And was it one file or multiple files?

23   A.    No.  Each of the pages was their own file.

24   Q.    Directing your attention to pages 1 through 7, what type

25   of files were those?

1    A.    Those are text files.

2    Q.    And page 8?

3    A.    That was a Word document.

4         MS. BURKART:  I would like to move to admit this

5    document as Exhibit No. 75, please.

6         THE COURT:  Same objection?

7         MR. SHEKETOFF:  Yes, your Honor.

8         THE COURT:  Yes.  All right.  It is received as

9    Exhibit 75, right?

10        MS. BURKART:  Yes.  Thank you, your Honor.

11             (Exhibit No. 75 received into evidence)

12   BY MS. BURKART:

13   Q.    I would like to direct your attention to page 1 first,

14   just the top part of page 1.  What is the very first visible

15   line there?

16   A.    "CPU replacement dot text."

17   Q.    Is that what the user would have seen when they opened

18   this file?

19   A.    No.  When they opened this file they would only see the

20   text inside.

21   Q.    So, why is "CPU replacement dot text" on there?

22   A.    When you print this page, that is the title of the file.

23   It's the file name.

24   Q.    So, the file name moves to the top of the page?

25   A.    Yes.

1    Q.   But the icon on the screen on the computer, what would

2    that say underneath it?

3    A.   It would say, "CPU Replacement."

4    Q.   So, the user would see that file if they wanted to open

5    it, what it was named?

6    A.   Yes.

7    Q.   So, what is the first line of text that the user would

8    have seen when they opened this file?

9    A.   They would see, "Hi, I'm one of the IT guys here.  This

10   workstation appears to have a defective processor."

11   Q.   I would like to direct you to the second page, please.

12   Similarly, could you please read me the first line of text?

13   A.   It says, "I'm one of the IT guys here.  The drive on IDU

14   appears to be completely dead."

15   Q.   Is that the first page that the user would have seen or

16   the first line?

17   A.   Yes.

18   Q.   What was the title of this file?

19   A.   "Server HD replacement dot text."

20   Q.   Again, is that what would have appeared on the icon?

21   A.   Yes.

22   Q.   The third page, please.

23   A.   It says --

24   Q.   I'm sorry.  Again, what was the title of the document

25   here?

1   A.   "Server MB replacement dot text."

2   Q.   And what was the first line?

3   A.   "This is standalone server that appears to have a dead

4   motherboard."

5   Q.   And the next page, please.  Again, if you could read the

6   whole first sentence, that would be great, but, first, I would

7   like you to read the title.

8   A.   "Video card replacement dot text.  I'm one of the IT guys

9   here.  This workstation has a bad video card."

10   Q.   And, again, this is the title on the first line, correct?

11   A.   Yes.

12   Q.   Okay, thank you.  And the next page, please.

13   A.   "Hard drive replacement dot text."  "Hi, I'm one of the IT

14   guys here.  This workstation has a dead hard drive."

15   Q.   Okay.  Thank you.  And the next page, please.

16   A.   "CPU server dot text."  "I'm one of the IT guys here.  The

17   processor in this server is defective."

18   Q.   Thank you.  And the next page, please.

19   A.   "LCD replacement dot text."  "I'm one of the IT guys here.

20   The monitor that is with this system appears to be completely

21   dead."

22   Q.   Okay.  And I believe, finally, the next page.

23   A.   This is a Word document that was titled "Mother

24   Replacement dot doc X."

25   Q.   So, the title was "Mother Replacement dot doc X," but you

1    don't see it on the exhibit; is that right?

2    A.    Yes.

3    Q.    And why is that?

4    A.    In a Word document, when you print it the file name is not

5    automatically placed on the top.

6    Q.    How would it appear in the icon on the desktop?

7    A.    You would see an icon that looks like a Word document, and

8    under that it would say "Mother Replacement dot doc X."

9    Q.    When you say it would look like a Word document, how would

10   you know that it was a Word document?

11   A.    Microsoft Word documents have their own icon that looks

12   different from a text file icon.

13   Q.    And how would you open the Microsoft Word icon?

14   A.    You would double click it to open it.

15   Q.    If a user wanted to do something with the words that are

16   in a text file, move them one place or another, how could they

17   do that?

18   A.    You can open the text file, you can copy it, the data in

19   it.  The way you would do that is you would select where you

20   wanted to start, and you drag your mouse to where you want to

21   end, and you either press "Control C" to copy it or right click

22   your mouse and select "Copy."

23   Q.    You would copy it that way, and then where could you move

24   it?

25   A.    Any other document that accepts text.

1   Q.   So, could you move it from one text file to another?

2   A.   Yes.

3   Q.   Or a text file to a Word file?

4   A.   Yes.

5   Q.   Could you move text into a chat?

6   A.   Yes.

7   Q.   And how would you do that?

8   A.   You would just, again, copy the text from the text file,

9   click on the chat text box that accepts the input and either

10  press "Control V" to paste it or right click and select

11  "Paste."

12  Q.   What are "Control C" and "Control V"?

13  A.   Those are just keyboard shortcuts that Windows uses to

14  copy and paste.

15  Q.   Why does Windows use shortcuts?

16  A.   To make it quick to do those actions.

17  Q.   Okay.  And I would like to next direct your attention to

18  what has been previously marked as opposed Exhibit Y.  If we

19  can show that to the witness, please.

20       Do you recognize this document, Mr. Velasco?

21  A.   Yes.

22  Q.   What is it?

23  A.   This is an Excel template.

24  Q.   What is a "template"?

25  A.   A "template" is a document with a predesigned layout and

1    text.  It allows you to create documents similar to this easily

2    without starting with a blank document.

3            MS. BURKART:  I would like to move to please admit

4    this exhibit as No. 73.

5            THE COURT:  Same objection?

6            MR. SHEKETOFF:  (Nodded head affirmatively).

7            THE COURT:  So, it will be received as 73.

8                (Exhibit No. 73 received into evidence)

9    BY MS. BURKART:

10   Q.   Mr. Velasco, under what user name did you find this

11   template?

12   A.   This was under the "Matt" user account.

13   Q.   And is this something that had been automatically created

14   by Windows, or had the user created this?

15   A.   The user can either download a template or create a

16   template.  It would automatically save to this location.

17   Q.   I'm going to direct your attention, first, to the date box

18   in the corner.  What date do you see there?

19   A.   "June 18, 2012."

20   Q.   Is that the date you found this document?

21   A.   No.

22   Q.   What type of field is that date field?

23   A.   This date automatically updates to the date that you open

24   the file.

25   Q.   And I would also like to direct your attention now to the

1    upper left-hand corner.  What type of field is that?

2    A.    These are text fields.

3    Q.    And how do text fields get updated?

4    A.    You just click it and then enter the text that you want to

5    overwrite on this.

6    Q.    So, if somebody wanted to enter a company name, they would

7    enter it in this field?

8    A.    Yes.

9    Q.    How?

10   A.    Again, they would click on the text file that says "Your

11   company name," and the program will let them enter text in that

12   location.

13   Q.    Okay, thank you.  Did you see any other files that were

14   similar to this file on the computer?

15   A.    Yes.

16   Q.    How were they different?

17   A.    They were different because the company name, the dates,

18   the address and the "Bill to" and the description and amount

19   had their data fields entered with data.

20   Q.    I'm going to direct your attention to what's been

21   previously marked as opposed Exhibit X.  Do you recognize this,

22   Mr. Velasco?

23   A.    Yes.

24   Q.    What is it?

25   A.    This is a document found under the Google cache location.

1          MS. BURKART:  I would like to move to admit this

2    exhibit as No. 72, please.

3          THE COURT:  That will be admitted over the same

4    objection.

5          MR. SHEKETOFF:  Yes, your Honor.

6               (Exhibit No. 72 received into evidence)

7    BY MS. BURKART:

8    Q.   Mr. Velasco, you said you found it in the Google cache

9    folder.  What does that mean?

10   A.   Google makes a web browser similar to your Microsoft

11   Internet Explorer or your Apple Safari.  It's a program that

12   lets you view web pages.  They call it "Google Chrome."

13        When you visit a website, your computer, behind the

14   scenes, when you type, for example, www.yahoo.com your computer

15   is actually connecting to the Yahoo server and is requesting a

16   copy of that file that's on that server.  Before you can view

17   that web page, your computer makes a copy and transfers it

18   locally to the cache and then displays it to you.

19   Q.   So, just to make sure we understand, when you say

20   "transfers it locally," what does that mean?

21   A.   It means that it's just making a copy of that web page and

22   placing it into your own computer.

23   Q.   So, does a user have to actively save the web page for it

24   to be retained?

25   A.   Can you rephrase that?

1    Q.   Yes.  The process you described, is that something that

2    the user is just doing?  Are they sort of hitting a "Save"

3    button to make sure they keep on it the web page?

4    A.   No.  That process is done automatically by the program,

5    the web browser.

6    Q.   And where exactly did you find this document?

7    A.   The Google cache under the "Matt" user account.

8    Q.   And if you could just page through it, please.  How many

9    pages, how many files was this exhibit?

10   A.   This is three pages, but there were two files.

11   Q.   And what is on each of these pages?  What does it appear

12   to be, in your experience?

13   A.   It looks like a Lenovo warranty lookup page.

14   Q.   And was it associated with a particular user name, this

15   document?

16   A.   Yes.  This was saved under the "Matt" user account.

17   Q.   I would like to direct your attention now to Exhibit 71,

18   which has been previously admitted.

19        Do you recognize this, Mr. Velasco?

20   A.   Yes.

21   Q.   What is it?

22   A.   These are web pages that are stored under the Microsoft

23   Internet Explorer temporary Internet files.

24   Q.   What is the Microsoft Explorer temporary Internet files?

25   A.   It's similar to the way the Google Chrome web browser

1    works.  When you use Internet Explorer, your computer is

2    connecting to the company server, making a copy of that file to

3    your own computer into this temporary Internet files folder.

4    Q.   Could you just page through this exhibit, please, for me.

5    How many files was this exhibit?

6    A.   Five.

7    Q.   Was each page that you see a separate file?

8    A.   Yes.

9    Q.   Again, was this something that was actively saved by the

10   user?

11   A.   No.  This is done automatically by the web browser.

12   Q.   I would like to now show you what's marked as opposed

13   Exhibit Z, as in Zebra.  Do you recognize this document?

14   A.   Yes.

15   Q.   What is it?

16   A.   These are HP support chat files, chat fragment files.

17   Q.   Where did you look at them?

18   A.   These were found under a file called "Pagefile.Sys."

19   Q.   We'll get to that.

20        MS. BURKART:  I would like to move these as Exhibit

21   No. 74, please.

22        THE COURT:  Again, subject to the same objection, it

23   will be received.

24             (Exhibit No. 76 received into evidence)

25   BY MS. BURKART:

1    Q.    What was that file name you just gave us?

2    A.    Pagefile.sys, S-Y-S.

3    Q.    And what is a "Pagefile.Sys"?

4    A.    When you run programs or open files it uses memory.  If

5    you run out of memory, the computer temporarily writes that

6    data onto a file called Pagefile.Sys.  So, the data that we

7    obtained here are portions of data from memory.

8    Q.    I would like to direct your attention to the second page

9    there.  Were these two files one file or multiple files?

10   A.    They were fragments found in one file.

11   Q.    And how do you know they are fragments?

12   A.    Because I manually extracted this data.  What you don't

13   see are the data after and before it, and what they looked like

14   were just text that I couldn't understand or it's not humanly

15   readable.  It's just something that the computer just notes

16   from memory.

17   Q.    So, it's just like bits and pieces of data sort floating

18   around in a space; is that fair?

19   A.    Yes.

20   Q.    How did you find it?  How did you find it using the search

21   terms that we've discussed previously?

22   A.    There was an e-mail that had serial numbers in it.  I

23   searched for one of those serial numbers, and an HP chat

24   fragment similar to these had one of those serial numbers in

25   it, and from there there was code behind this text.  Now, when

1   this text is displayed to you, behind the scenes a program is

2   loading code to display that to you.  Well, I searched for that

3   code and found other HP chat fragments similar to this.

4   Q.   So, you found a serial number which led you to the code

5   and the code led you to the chats?

6   A.   Yes.

7   Q.   I have shown you two chats here.  Approximately, how many

8   did you find?

9   A.   I found over 200.

10  Q.   Focusing, then, just on the one that I have shown you

11  here, could you please read this chat to the jury.  There is a

12  portion I am going to ask you about.

13  A.   You want me to read the entire?

14  Q.   Yes, that would be helpful.  It's pretty short.

15  A.   Rick Naples says, "I have already provided you with the

16  troubleshooting steps I took."  And then he continues, "Also

17  that is a lie, since I have had hard drive replacements sent to

18  me before, since we have over 300 servers at this location."

19       And the technician says, "Please run the ADU.  It will

20  provide the last failure details."

21       Rick Naples responds:  "I just said I can't run ADU,

22  since the server is in production and the OS is not supported

23  by HP.  What do you not understand?"

24  Q.   That's the sentence I would like you to explain, because

25  it's a little confusing.  What is going on there?  In your

1    training and experience, do you understand what they are

2    talking about?

3    A.    Yes.  The technician is asking Rick Naples to run a

4    diagnostic tool, and --

5    Q.    Could you stop for a moment.  What is a diagnostic tool?

6    A.    It's a tool that troubleshoots something that's wrong with

7    a computer part in this case.

8    Q.    Thank you.  Okay.

9    A.    And Rick Naples was responding that he cannot run that

10   tool because his computer is currently in production, which

11   means that it's running and the OS is not supported, which

12   means it's not a standard operating system that can run that

13   program.

14   Q.    So, what does it mean that something is in production,

15   running?  How would that affect a diagnostic tool?

16   A.    Well, the diagnostic tool most likely here runs under the

17   Windows operating system.  So, Rick Naples is saying that he is

18   not running under a Windows operating system, and since it's in

19   production he cannot shut down the computer.

20   Q.    So, he can't run the tool to figure out what's wrong

21   because the computer is running; is that fair?  Is that what

22   you're saying?

23   A.    Say that one more time.

24   Q.    The tool can't be run because the computer is on, it's

25   working?

A.   No.  The computer is running an operating system that
cannot run this tool.

Q.   It cannot run the tool?

A.   Yes.

Q.   So, he cannot run the tool the technician is asking him to
run?

A.   That's correct.

Q.   Okay, thank you.  Could you complete the chat, please?

A.   The technician continues:  "In this case, I would request
you please use the start CD and run the ADU offline."

     Rick Naples responds:  "That means I have to shut down
the server?  It's in production.  Read."

     The technician says, "Please schedule a down time and
try it.  Please do understand I am following the correct
process of shipping the parts."

     And Rick Naples says:  "What are you talking about?  I
had a hard drive replaced on another server yesterday.  I want
to speak to your manager now."

Q.   Okay.  Thank you.  Is that the end?

A.   Of this chat, yes.

Q.   And does it appear to be the end of the conversation?

A.   I don't know it if -- it does not appear.  It looks like
it continues on.

Q.   But you didn't recover any more?

A.   No.

1    Q.   Finally, I have four voicemails that have previously been

2    marked as BB through EE.  They are opposed, but I believe under

3    the same standing objection they have been premarked Exhibits

4    76 to 79.

5         You previously listened to the voicemails labeled with

6    those titles, Mr. Velasco?

7    A.   Am I supposed to see something on the screen?

8    Q.   No.  I'm asking if you previously listened to the

9    voicemails that were labeled Exhibit 76 through 79.

10   A.   Yes.

11   Q.   Did you recognize them?

12   A.   Yes.

13   Q.   How did you recognize them?

14   A.   When I was looking for files, I listened to those audio

15   files.

16   Q.   And where did you find them?

17   A.   In the temp file, the Windows temp file under the "Matt"

18   user account.

19   Q.   Why would there be audio files in a Windows temp file?

20   A.   Well, these came from an Internet browser that saved it to

21   the temp file.

22   Q.   What does that mean, an Internet browser, why would it

23   save?

24   A.   Again, similar to the way you would view web pages, these

25   voicemails were stored on a voiceover IP service, and to listen

1    to those voicemails, it has to download it or copy it locally

2    from their server to your computer into this location before

3    you can listen to it.

4    Q.   So, you said "voiceover IP," or something that's called

5    "VoIP;" is that correct?

6    A.   Yes.

7    Q.   If somebody has VoIP, how does that work for their phone?

8    A.   It's basically a phone service that uses your Internet

9    connection instead of your standard phone line.

10   Q.   Do you still have a regular phone?

11   A.   You can still use a regular phone.

12   Q.   But instead of running over the cable wires, it's running

13   over the Internet; is that right?

14   A.   Yes.

15   Q.   So, why are voicemails for somebody who is using VoIP

16   saved on their computer?

17   A.   Because those voicemails, when you want to listen to them,

18   they are initially stored on the VoIP servers, and for you to

19   obtain that, for you to listen to it, you would log onto their

20   website, click on a link that copies that audio file to your

21   computer, and then you can listen to it.

22   Q.   Are these all of the voicemails that you recovered on the

23   computer?

24   A.   No.

25   Q.   Approximately, how many voicemails did you recover?

1    A.   Over 70.

2         MS. BURKART:  I would like to admit these, your Honor,

3    as Exhibit 76 through 79.

4         THE COURT:  Subject to the same objection; is that

5    correct?

6         MR. SHEKETOFF:  Yes, your Honor.

7         THE COURT:  So, we will receive them as 76 through 79

8    and you can play them.

9         (Exhibit Nos. 76, 77, 78 and 79 received into evidence)

10        MS. BURKART:  Could you play number 76 first, please.

11                     (Voicemail played)

12   BY MS. BURKART:

13   Q.   Mr. Velasco, who was that message for, what was the name?

14   A.   Dan Clark.

15        MS. BURKART:  I would like to play Exhibit 77, please.

16                     (Voicemail played)

17   BY MS. BURKART:

18   Q.   Again, who was that Voicemail for?

19   A.   Dan Clark.

20   Q.   And what was the address that the delivery person was

21   trying to drop off the package to?

22   A.   247 Maple Street.

23   Q.   Thank you.

24        MS. BURKART:  I would like to play Exhibit No. 78,

25   please.

```
 1                        (Voicemail played)

 2    BY MS. BURKART:

 3    Q.   And who was that Voicemail for?

 4    A.   Tom.

 5    Q.   And where was the person calling from?

 6    A.   I'm sorry.  What was that?

 7    Q.   Where was the representative calling from?

 8    A.   I'm going to have to listen to it again.

 9    Q.   You can hear at the beginning, and you can let us know

10    when you know.

11                        (Voicemail played)

12    A.   HP.

13    Q.   Thank you.  And, finally, Exhibit No. 79, please.

14                        (Voicemail played)

15    Q.   Did you hear who that message was for, Mr. Velasco?

16    A.   Francisco.

17    Q.   And who was calling?

18    A.   Somebody from Hewlett-Packard.

19    Q.   Approximately how many voicemails did you recover on the

20    computer?

21    A.   Over 70.

22    Q.   And how many of them did you listen to?

23    A.   All of them.

24    Q.   Were these representative of the ones that you found?

25    A.   Yes.
```

1    Q.   Finally, while we have you on the stand -- well, probably

2    not finally -- what is an IP address?

3    A.   An IP address is a unique address for a computer, similar

4    to the way we have home addresses for ourselves.

5    Q.   Is an IP address assigned to a residence for the long

6    term?  How long is it there for?

7    A.   It depends on how you have it set up.  You can buy an IP

8    address, what's called a "static IP address."  Typically, if

9    you own a company you want a static IP address so that when

10   somebody logs onto your website they are consistently

11   connecting to your IP address, to your computer.

12   Q.   For a regular residential customer who is using Comcast,

13   how does the IP address assignment system work?

14   A.   The IP address is called "leased IP addresses."  That

15   means you are just borrowing an IP address for a certain amount

16   of time.

17   Q.   Would Comcast let you know when they are going to change

18   your IP address?

19   A.   No, it is done automatically.

20   Q.   Are IP addresses visible to the consumer if you are just

21   using your Internet?  Are you going to know what your IP

22   address is while you're using it?

23   A.   No, unless you look for it.  No.

24   Q.   And would you know if Comcast had changed your IP address?

25   A.   No.

1    Q.   Would you know if an IP address had been assigned to

2    somebody else?

3    A.   No.

4    Q.   Mr. Velasco, when did you receive the tapes in Quantico

5    that had been recovered in the search?

6    A.   July 26, 2011.

7    Q.   2011?

8    A.   Yes.

9    Q.   So, approximately a year ago; is that correct?

10   A.   Yes.

11   Q.   How long did it take you to complete your forensic exam?

12   A.   It took about ten months.

13   Q.   And why was that?  Why does it take so long?

14   A.   There is a lot of data to go through.  The case agent also

15   has to review the data.

16   Q.   Are there, in general, a number of procedures that need to

17   be followed in order for you to forensically examine a piece of

18   equipment?

19   A.   Yes.  We have standard operating procedures.

20   Q.   And how are those memorialized?

21   A.   We have them in notes.  Is that what you're asking?

22   Q.   Yes.  Like, does the FBI have procedures for how certain

23   things need to be done?

24   A.   Well, the FBI has their own standard operating procedures

25   in the document that we follow.

1  Q.    Thank you.

2          MS. BURKART:  Just a moment, please.  May I have a

3  moment, your Honor?

4          THE COURT:  Yes.

5          MS. BURKART:  That's all, your Honor.

6          THE COURT:  All right.  Mr. Sheketoff.

7                          CROSS-EXAMINATION

8  BY MR. SHEKETOFF:

9  Q.    Good afternoon, sir.

10  A.    Good afternoon.

11  Q.    Sir, the computer that you forensically examined in

12  Quantico, who has custody of that computer now?

13  A.    I brought it to our evidence control and they sent it to

14  the Washington field office.  I don't currently know where it

15  is.

16  Q.    So, you don't know if it's in Boston, or in Washington or

17  anywhere else?

18  A.    I sent it to the Boston field office.

19  Q.    Oh, okay.

20  A.    I don't know what happened to it after that.

21  Q.    All right.  So, to the best of your knowledge, the last

22  you knew, it was located in the Boston field office?

23  A.    Yes.

24  Q.    Now, it took you approximately ten months to complete your

25  review all of the data on the hard drive computer, correct?

1    A.    All five of the computers.

2    Q.    All five different computers?

3    A.    Yes.

4    Q.    And during that period of ten months, was this your sole

5    task?

6    A.    No.

7    Q.    How many hours would you estimate it took you to go

8    through five separate computers, all of the hard drives?

9    A.    I don't have the exact number.  They varied.

10   Q.    So, are we talking about 40 hours of work over a ten-month

11   period, 500 hours of work?  Do you have any estimate at all for

12   the entire project of all five computers?

13   A.    No, I don't have a good estimate.

14   Q.    Can you estimate in any way?  In other words, would it

15   have taken an entire week of work to do all this, or more, or

16   less, or you just can't even estimate?

17   A.    Well, it takes time to process.  For example, the Dell 690

18   took about two days to create the image and two days to process

19   and to examine.  I don't have an exact number, because I would

20   look at some of the files, and I just don't keep track of the

21   time that I spend.

22   Q.    In any event, what you were examining was data on hard

23   drives, correct, in five separate computers?

24   A.    Yes.

25   Q.    You were not looking for electronic tags on motherboards?

1   A.   No.

2   Q.   Now, you said that with a service like Comcast your IP

3   address might change with the lease that you have with Comcast

4   without your knowledge, correct?

5   A.   Yes.

6   Q.   Isn't it fair to say, sir, that you can request Comcast

7   hard code into your router your IP address?

8   A.   You can request a static IP address, yes.

9   Q.   From Comcast?

10  A.   Yes.

11  Q.   And do you know if Matt Kuc ever requested such a static

12  address from Comcast?

13  A.   I don't recall.

14  Q.   When you say you don't recall, are you saying based on

15  your review of the hard drive this might have been in there

16  somehow, or are you saying that you might have talked to

17  somebody at Comcast?

18  A.   I believe there was an e-mail regarding a communication

19  between the user of the computer and Comcast or a

20  representative of Comcast.

21  Q.   So, there might have been something in the data that you

22  looked at that suggested one way or the other whether a static

23  address was requested?

24  A.   Yes.

25  Q.   All right.  Would you know if Comcast would ordinarily

1    keep business records indicating when and if somebody had a

2    static IP address?

3    A.   I don't know that.

4             MR. SHEKETOFF:  Thank you, sir.

5             THE COURT:  Ms. Burkart, anything?

6             MS. BURKART:  No, your Honor.

7             THE COURT:  All right.  You may step down.  Thank you.

8                       (Witness stepped down)

9             MR. GARLAND:  Your Honor, would this be a good time to

10   break for lunch?  We have another witness who is available who

11   we can start on.

12            THE COURT:  So, we will break for lunch, ladies and

13   gentlemen, and we will be back here around 1:30.

14            THE CLERK:  All rise for the jury.

15                  (The Jury exited the courtroom at 12:50 p.m.)

16            THE COURT:  You may be seated.  Based on current pace,

17   what does it look like?

18            MS. BURKART:  I would say we are moving along nicely,

19   your Honor.  I think that we will be able to finish up, I would

20   expect, if things go well, tomorrow, but there is a potential

21   for a longer cross of one of the witnesses tomorrow, so that

22   could push us into Thursday.

23            THE COURT:  Does that seem like a realistic schedule?

24            MR. SHEKETOFF:  I think so.

25            THE COURT:  So, there is some possibility that we

1    could be getting the case to the jury on Friday?

2        MS. BURKART:  I think there is a nice possibility of

3    that, your Honor.

4        THE COURT:  All right.  So, you should, as I will,

5    plan for Friday to submit it to the jury.  I might hold you

6    harmless as of tomorrow for Thursday.

7        MS. BURKART:  We hope very much to be in that

8    position, your Honor, obviously, subject to things we cannot

9    control.

10       THE COURT:  Life always is, so we will see you back

11   here around 1:30.

12       THE CLERK:  All rise.

13       (The Honorable Court exited the courtroom at 12:50 p.m.)

14                      (Lunch recess taken)

15       THE CLERK:  All rise.

16       (The Honorable Court entered the courtroom at 1:40 p.m.)

17       THE CLERK:  This Honorable Court is back in session.

18   You may be seated.

19       THE COURT:  Ready for the jury?  Got your next

20   witness?

21       MS. BURKART:  Yes, your Honor.

22       MR. GARLAND:  Yes.  Shall we call the witness and just

23   have him up at the stand?

24       THE COURT:  It would be helpful.

25       MS. BURKART:  The United States calls Joseph Fallon.

1          THE COURT:  Mr. Fallon, if you would go over to the

2     witness box.

3          THE CLERK:  All rise for the jury.

4          (The Jury entered the courtroom at 1:50 p.m.)

5          THE CLERK:  You may be seated.

6          THE COURT:  If you would swear in the next witness,

7     Jarrett.

8               JOSEPH FALLON, DULY SWORN BY THE CLERK

9          THE CLERK:  Please state your full name, spelling your

10    last.

11         THE WITNESS:  Joseph Michael Fallon, F-A-L-L-O-N.

12         MR. GARLAND:  Your Honor, may I inquire?

13         THE COURT:  You may.

14                   DIRECT EXAMINATION

15    BY MR. GARLAND:

16    Q.   Good afternoon, Mr. Fallon.  What city and state do you

17    live in?

18    A.   Scituate, Massachusetts.

19    Q.   Where do you work?

20    A.   I work for Hewlett-Packard.

21    Q.   Is Hewlett-Packard often referred to as "HP"?

22    A.   Correct.

23    Q.   What does Hewlett-Packard do?

24    A.   They sell computers, servers and computer products.

25    Q.   What types of computers and servers and products?  Are

1    they for businesses or for individuals?

2    A.    All.  They have personal computers for home use, personal

3    computers or desktops for business use, servers for mainly

4    business use, printers for personal use, printers for high

5    commercial use.  So, they are the largest computer manufacturer

6    in the world.

7    Q.    What is your title at HP?

8    A.    I'm the Growth Markets Manager.

9    Q.    What do you do as the Growth Markets Manager?

10   A.    I review warranty in emerging market countries and decide

11   what risk there is to the company in those countries and how

12   warranty is delivered.

13   Q.    How long have you had that title?

14   A.    This particular title, since February of 2012.

15   Q.    What did you do before that?

16   A.    I was the Worldwide Investigations Manager for Warranty

17   Fraud.

18   Q.    At Hewlett-Packard?

19   A.    At Hewlett-Packard.

20   Q.    What were your responsibilities in that title?

21   A.    I supervised seven investigators around the world looking

22   into warranty fraud.

23   Q.    Have you had any other titles or responsibilities at HP

24   before that?

25   A.    Before that, I was the Americas investigation manager for

1    two years, and before that I was a contractor investigator for

2    Hewlett-Packard.

3    Q.   What did you do before you joined HP?

4    A.   I was a criminal investigator in the federal government

5    for Internal Revenue Service and ended my career with Treasury

6    Inspector General for Tax Administration.

7    Q.   How long were you in law enforcement?

8    A.   Twenty-six years.

9    Q.   Are you familiar with HP's warranty policies between 2005

10   and 2010?

11   A.   Generally.

12   Q.   What were they, generally?

13   A.   It depends on the product.

14        MR. SHEKETOFF:  Objection.

15        THE COURT:  Well, no.  If that is an objection, I am

16   going to overrule it and let that answer stand.

17        MR. SHEKETOFF:  It was an objection.

18   BY MR. GARLAND:

19   Q.   So, you said that the warranty varied by product?

20   A.   Product and time, yes.

21   Q.   How did they vary by product and time?

22        MR. SHEKETOFF:  Well, objection.

23        THE WITNESS:  Some products are one-year --

24        THE COURT:  Just a moment.  I will permit this general

25   kind of commentary.  If it becomes more specific, then I am not

1    sure that this witness is in a position to testify.

2              MR. GARLAND:  Understood.

3              THE COURT:  But as general background, I will permit

4    it.

5    BY MR. GARLAND:

6    Q.   You may answer the question, sir.

7    A.   Some products are one-year warranty, some are three, some

8    are lifetime.  It depends on the product.

9    Q.   Are you personally familiar with how somebody would ask HP

10   to ship out a warranty replacement part?

11   A.   Yes.

12   Q.   How would they contact HP?

13   A.   They can contact by telephone and talk to one of our call

14   centers, they can use their computer and use our web-based

15   customer service, or they can go to an HP partner and request

16   warranty service.

17   Q.   Would HP try to determine whether the part was actually

18   broken?

19   A.   Yes.

20   Q.   How would they do that?

21   A.   Each call center has a script, depending on the product,

22   and they try to diagnose the problem.  If they feel it's a

23   software problem, they resolve it that way, or if it's a part

24   problem, they'll send one out.

25   Q.   How would the HP employee try to ensure that the person

1  asking for a part to be replaced actually had a broken part

2  that was an HP part?

3  A.    Through the serial number on that unit.

4  Q.    How would HP know where to send the new part to the

5  customer?

6  A.    During both the call or the web base, the customer gives a

7  name, address, e-mail, telephone number and where they want the

8  part shipped.

9  Q.    Is that the name and the address that HP would ship that

10  part to if it warranted a replacement part?

11  A.    Correct.

12  Q.    Did HP have any way to verify whether the name or address

13  were accurate?

14  A.    HP is set up on a trust system, so unless they have reason

15  to think otherwise, they trust all the information given to

16  them as accurate, unless told differently.

17  Q.    Did HP keep a list of people who had purchased things from

18  them?

19  A.    Oh, they do.

20  Q.    Would they necessarily know where each part had gone to

21  originally?

22  A.    Yes.

23  Q.    And could those parts be resold to other people?

24  A.    They could be.  "Warranty" is to fix a product.

25  Q.    So, would the warranty travel with the product if it was

1 resold to somebody else?

2 A.   That's the trust.  That's the way it's supposed to be

3 done.

4 Q.   A customer who was reporting a broken part to HP, was he

5 required to return the broken part to HP?

6 A.   In most circumstances, yes.

7 Q.   In what circumstances would it be no?

8 A.   It basically is based on cost.  Mice and keyboards are

9 nonreturnable, but once you get to hard drives and server

10 parts, they are all returnable.

11 Q.   So, if a customer contacted HP and asked for a replacement

12 part and HP thought that it was broken or trusted the customer

13 that it was broken and was going to send out a replacement,

14 would the customer have to return the broken part before HP

15 would send out the replacement?

16 A.   No.  Again, trust.  It's one-day service.  They get the

17 part first with instructions that they are required to return

18 the part.  The way it works, as soon as the part is sent out,

19 they get an e-mail saying, "The part has been sent out, expect

20 it, this is the tracking number, you must return this part with

21 instructions on how to return it."  Then the package has

22 instructions on how to return the returnable part.

23 Q.   And where would that information be located?

24 A.   On the package?

25 Q.   Yes.

1   A.   Depending on the parts, either the side or the back,

2   because you use the package to return the returnable part.

3   Q.   I want to show you, Mr. Fallon, what has been marked as

4   Exhibit 10, which I believe is unopposed.  Can you take a look

5   at that for a minute?  Are you familiar with Exhibit 10?

6   A.   Yes.

7   Q.   What is it?

8   A.   It's basically you accept this part, and it instructs you

9   on how to return the defective one.

10   Q.   And where would the instructions be printed?

11   A.   Again, depending on the product, on the side or the bottom

12   of the package.

13   Q.   Was this on a form or on some sort of a label that would

14   go on a box?

15   A.   It's a label.

16   Q.   And this big, blown up rectangle here (indicating), does

17   that come from a shipping label, then?

18   A.   Correct.

19   Q.   Could you read for the jury what it says there, what those

20   instructions are?

21   A.   "On acceptance of this replacement part, an agreement has

22   been made to return the defective part to Compaq Computers

23   Manufacturing, Ltd.  Please follow the following process to

24   ensure the defective part is returned:  1) Remove top part of

25   shipping label for your receipt; 2) Peel off return tag and

1    place in the box with defective part being returned; 3) To

2    arrange pickup of the defective part, please call your local

3    UPS carrier on the telephone number below and quote the account

4    number.  And on the left it says, "Return tag.  Detach and

5    include in box with returned part."

6    Q.   Would this label be put on HP replacement parts as they

7    were shipped out to customers?

8    A.   Yes.

9    Q.   Do you see where the label mentions Compaq Computers?

10   A.   Yes.

11   Q.   If this is an HP label, why does it mention Compaq?

12   A.   HP purchased Compaq back in the '80s.

13        MR. GARLAND:  Your Honor, I move to admit Exhibit 10.

14        THE COURT:  It is received, subject to the same

15   reservation.

16        (Exhibit No. 10 received into evidence)

17   BY MR. GARLAND:

18   Q.   Mr. Fallon, what would HP do with broken parts that were

19   returned to them?

20   A.   They'd refurbish them and use them again either as a

21   warranty replacement or sell them for out-of-warranty repairs

22   to customers.

23   Q.   Did HP have any specific problems with people from

24   Massachusetts and Rhode Island ordering warranty parts and then

25   not returning the broken parts to HP?

1    A.    Yes.

2    Q.    What was the first address in Massachusetts that you

3    remember that HP had problems with?

4    A.    Well, there were two on the same day, but the first one

5    was 42 Union Street in Attleboro, Massachusetts, and also on

6    the same day 36 Laurelwood Drive in North Attleborough, Mass.

7    Q.    And were there any other addresses you became concerned

8    about for the same reason?

9             MR. SHEKETOFF:  Objection, your Honor.

10            THE COURT:  I am going to sustain the objection to

11   that question.

12   BY MR. GARLAND:

13   Q.    What types of products were being ordered to these

14   addresses?

15   A.    Initially, kind of a wide range, from hard drives to

16   memory and then to server parts.

17   Q.    Did you have any responsibility for investigating

18   shipments to these addresses?

19   A.    Yes.

20   Q.    Did you do an investigation?

21   A.    Yes.

22   Q.    Did you notice anything to suggest that shipments to these

23   addresses had anything in common?

24   A.    Yes.

25   Q.    What?

1   A.   The types of parts was starting to become a little

2   inconsistent.  There were commercial parts being shipped to a

3   residence, the majority that didn't make sense.

4        MR. SHEKETOFF:  Move to strike that last part, your

5   Honor.

6        THE COURT:  No.  I am going to permit it as his

7   investigative hypothesis.  Whether it is true or not is

8   something for the jury to decide.

9   BY MR. GARLAND:

10  Q.   Did HP compile any records of warranty replacement that

11  was requested and/or shipped to those addresses?

12  A.   Yes.

13  Q.   And did HP provide those records to the Government?

14  A.   Yes.

15  Q.   Are you familiar with those records?

16  A.   Yes.

17  Q.   How so?

18  A.   I pulled them, or at least a bunch of them.

19  Q.   I am going to show you --

20       MR. GARLAND:  This is an opposed exhibit, your Honor.

21  BY MR. GARLAND:

22  Q.   -- Exhibit E.  I know that the print on your monitor is

23  probably small, but do you recognize this?

24  A.   It's an Excel sheet that I summarized the claims.

25  Q.   How was this information generated, or where was it pulled

1   from?

2   A.   When a claim is made there is over a hundreds fields in

3   our system that tells you everything from the part to the date

4   to where it was sent, to product to -- you know, it goes on

5   forever.  So, what I attempted to do in this spreadsheet is

6   make it so it's key fields on the parts that were sent out not

7   returned and the person was not entitled to them.

8   Q.   And then was this information also further condensed by

9   the Government and then given to you for verification?

10  A.   Yes.

11  Q.   And did you verify it?

12  A.   Yes.

13  Q.   Was it accurate?

14  A.   Yes.  The -- well --

15  Q.   Go ahead.

16  A.   The space you see there, it's the same address, etc. that

17  didn't come up, but that was probably my fault.  But, yeah,

18  everything here is accurate, and it is just missing address

19  information.

20  Q.   Just so I understand it and so the jury, more importantly,

21  understands it, when you say that it is missing address

22  information, what are you referring to specifically?

23  A.   That blank box should be "36 Laurelwood Drive."  It's

24  under "Address" and an "Address To."  When I was combining the

25  information I didn't populate that area.

1    Q.   I would like you to page through, or we will have the

2    document paged through as well.  In fact, it may be easier for

3    you, there's a binder right next to you, if you go to one,

4    there should be a tab for E.  That may be easier on your eyes.

5    Do you see that?

6    A.   Yes.

7    Q.   Why don't you go ahead and pop that out of your binder so

8    you just have the easiest access to it available.

9         Are there other spaces on pages that have fields

10   blank?

11   A.   Here and there, yes.

12   Q.   And is there any information that should have been in

13   those fields?

14   A.   Again, it would have been the street address.

15   Q.   And the last question about this, before I move to admit

16   it, what addresses does this document reflect shipments to?

17   A.   There's four.  I mean -- let me think.

18                         (Pause)

19   A.   Well, there's five general addresses with multiple

20   variations of them.

21   Q.   What addresses are those?

22   A.   The address of 36 Laurelwood Drive in North Attleborough,

23   247 Maple Street in Attleboro, 42 Union Street in Attleboro,

24   and 2130 Mendon Road in Cumberland, Rhode Island.

25   Q.   I think just a moment ago you said that there were five

1    addresses and variations therein.  I think I just counted four.

2    A.   Oh, I'm sorry.  Four, yes.

3             MR. GARLAND:  Your Honor, I move to admit Exhibit E as

4    Exhibit 9.

5             MR. SHEKETOFF:  Objection.  Hearsay.

6             THE COURT:  Well, let me see you at sidebar.

7

8    (SIDEBAR CONFERENCE AS FOLLOWS):

9             THE COURT:  I am not sure I understand the hearsay

10   objection.

11            MR. SHEKETOFF:  I just don't think it's a business

12   record.

13            THE COURT:  It is a summary.

14            MS. BURKART:  1006.

15            THE COURT:  It is based upon business records.  Is

16   there any dispute about that?

17            MR. SHEKETOFF:  No.

18            THE COURT:  So, it's a summary under Rule 1006.

19            MR. SHEKETOFF:  I think you're right.

20            THE COURT:  I just want to be sure I am not missing

21   the objection.

22            MR. SHEKETOFF:  No.  I missed the grounds of

23   admission.

24            THE COURT:  Some of us stop at 800 and move on.

25                          (Laughter)

1    (END OF SIDEBAR CONFERENCE)

2

3            THE COURT:  I will permit this document into evidence.

4            MR. GARLAND:  I believe it's marked as Exhibit 9, your

5    Honor.

6            THE COURT:  Yes.  It is received as 9.

7                (Exhibit No. 9 received into evidence)

8            MR. GARLAND:  If that could be published to the jury.

9    BY MR. GARLAND:

10   Q.   I want to take you through this -- what information, if we

11   can just magnify the headers of the columns -- what information

12   is presented on this document?

13   A.   The date the part was shipped, the serial number of the

14   product, the case number.  The case number is every time you

15   call regarding something at HP it gives you a case number.  The

16   part number that was sent, the name given by the customer, the

17   company name given by the customer, the address given by the

18   customer who calls in, the address as if it was like an

19   apartment or something, city it was sent to, state it was sent

20   to, zip code it was sent to, home telephone number obtained

21   from the customer and a description of the part.

22   Q.   Now, the information that I am going to circle -- there we

23   go.

24   A.   And the price is the last one.  Sorry.

25   Q.   Thank you.  The things like the name, the company, the

1    address, city, state, zip, home phone, where would that

2    information come from?

3    A.    From the person who calls in on the phone and from the

4    person who keystrokes in the information on our web-based

5    system.

6    Q.    So, let's look at this a little bit more closely.  Now,

7    you have got the printed exhibit right up there, right?  How

8    many pages are in that exhibit?

9    A.    Twelve.

10   Q.    Does each entry represent a request for warranty

11   replacement parts for one of the addresses in there?

12   A.    Correct.

13   Q.    Do they also all represent shipments of warranty

14   replacement parts to those addresses?

15   A.    Yes.

16   Q.    Did the customer return defective parts for each of those

17   requests and for each of those shipments?

18   A.    No.

19   Q.    I want to talk, first, about the addresses to which the

20   parts were ordered in a little bit more detail.  If we go to

21   the first page, what is the first address that you see listed

22   there?

23   A.    36 Laurelwood Drive, North Attleborough, Mass.

24   Q.    How is Laurelwood spelled there?

25   A.    L-A-U-R-E-L-W-O-O-D, D-R period.

1    Q.    Now, is that the only spelling of Laurelwood on that page?

2    A.    No.

3    Q.    What are the other spellings that you see?

4    A.    Well there's a 3-6 Laurelwood Drive, there's a 36

5    Laurel-Wood, L-A-U-R-E-L, dash, capital W, O-O-D Drive,

6    D-R-I-V-E spelled out.  Then there's --

7    Q.    If we go ahead further down the page, just focusing on the

8    word "Laurelwood," do you see any other spelling of Laurelwood?

9    A.    Yes, L-A-R-E-L-W-O-O-D Drive.

10   Q.    Now I would like you to turn to page 8 of that exhibit.

11   If we can just zoom in on that field again of "Address."  Do

12   you see any other spellings of Laurelwood on that page?

13   A.    Yes.  36 Larel, L-A-R-E-L, and then capital W O-O-D-S

14   Drive.

15   Q.    Any others that you see?

16   A.    Well, then there is Laurel Wood, L-A-U-R-E-L, space, Wood,

17   W-O-O-D.

18   Q.    Let's turn to page 9.  Do you see similar misspellings or

19   alternate spellings of Laurelwood on that page?

20   A.    Yes.  It varies, but one is L-O-U-R-E-L-W-O-O-D.

21   Q.    And if you look at your monitor, do you see other ones as

22   well?

23   A.    Oh, yes.  Those three there, yeah.

24   Q.    Okay.  So, we have talked about Laurelwood Drive.

25             I want to flip you back to page 1, and I think that

1    you mentioned 247 Maple Street.

2    A.   Right.

3    Q.   Do you see an address that corresponds to 247 Maple Street

4    on that page?

5    A.   Yes.

6    Q.   And we can blow that up for you on the screen.  Now we can

7    make the print bigger for you.  How is it spelled there?

8    A.   247 M-A-P-L-E-S, S-T-R-E-E-T.

9    Q.   And then if you go to page 2, again just focusing on the

10   word "Maple" rather than anything else, do you see any other

11   spellings of Maple on this page?  Again, you can look on your

12   monitor.

13   A.   All right.

14   Q.   Do you see other spellings of Maple on this page?

15   A.   Different characters used.

16   Q.   The first one you saw, did it have an "S" at the end of

17   Maple?

18   A.   Oh, yeah, yeah.  I'm sorry.  Yes, that's correct.

19   Q.   And is there an "S" on the end of Maple on the second

20   page?

21   A.   No.

22   Q.   If you can move to page 9, do you see any addresses that

23   start with "247" there?

24   A.   Yes.

25   Q.   And just, again, concentrating only on the word that

1    starts with "M," what spellings do you see there?

2    A.    M-A-P-L-I Street.

3    Q.    Now I want to move to page 10.  Do you see deliveries

4    there to 42 Union Street and 2130 Mendon Road?

5    A.    Yes.

6    Q.    And going to page 11, do you see any more shipments to

7    2130 Mendon Road on page 11?

8    A.    Yes.

9    Q.    How is Mendon spelled there?

10   A.    M-E-N-D-O-N Road, R-O-A-D or R-D.

11   Q.    Now, what about on page 12?  Do you see any shipments to

12   Mendon Road there?

13   A.    Yes.

14   Q.    How is it spelled?

15   A.    M-E-N-D-A-N-S R-O-A-D.

16   Q.    All right.  Now, we are talking about four addresses and

17   variations on this spreadsheet right here across 12 pages.

18   Were all of the orders ordered by people using the same name

19   and company names?

20   A.    They varied.

21   Q.    I am going to stick with what is 2130 Mendon Road.  On

22   page 10 at the bottom there are some orders for 2130 Mendon

23   Road.  Do you see them?

24   A.    Yes.

25   Q.    Whose name were used for those?

1   A.   Iron Data is one to Mendon Road.

2   Q.   The personal names.

3   A.   Oh, the personal name.  Matt Cook.

4   Q.   And Cook is spelled how?

5   A.   C-O-O-K.

6   Q.   Now, if we turn to page 11, and, again, looking at orders

7   for 2130 Mendon, what names were used there?

8   A.   Mark Conners, C-O-N-N-E-R-S.

9   Q.   And any other names you see there for 2130 Mendon?

10  A.   Rick Naples -- No.  Mark Porter, P-O-R-T-E-R.

11  Q.   I want you to look now at page 12 towards the top.  Do you

12  see an entry there for an order by Dan Summers?

13  A.   Yes.

14  Q.   If you look at your screen it may be a little bit easier

15  to see, maybe not.  Who is the company that Dan Summers was

16  supposedly working for when that order was made?

17  A.   Silver Fig, Incorporated.

18  Q.   And that was ordered to what address?

19  A.   2130 Mendon Road in Cumberland, Rhode Island.

20  Q.   What was the date?

21  A.   August 24th 2010.

22  Q.   I want you to go down a few lines and see if you see

23  another entry for Dan Summers.

24  A.   I do.

25  Q.   Who was Dan Summers supposedly working for for that entry?

1    A.    Data 3 Networks at 23 Mendon Road, Cumberland, Rhode

2    Island.

3    Q.    And when was that ordered?

4    A.    September 9, 2010.

5    Q.    Now, if you go down to the bottom of this spreadsheet at

6    page 12, do you see at the bottom an entry that refers to 3COM?

7    A.    Yes.

8    Q.    What does that entry represent?

9    A.    The loss to 3COM of nonreturned parts.

10   Q.    And why does HP have that information?

11   A.    Because in April 2010 HP purchased 3COM.

12   Q.    Now, I think that you testified before that these entries

13   were not being met with returned parts, broken parts.  If they

14   weren't being honored with a return, why was HP continuing to

15   send parts to these addresses?

16   A.    Our system is set up on trust, and as we, being global

17   security and the reverse logistics people learned that

18   fraudulent activity was taking place, we put stops on

19   addresses.  It's very inexact.  Our systems are designed

20   towards trust, not really to stop everything.  So, we put a

21   stop on one address and what was occurring -- the parts were

22   being shipped out on just a slight variation of the same

23   address, which our systems allowed at that time.

24   Q.    Would HP do anything to detect and prevent this sort of

25   fraud?

1          MR. SHEKETOFF:  Objection to that question.

2          THE COURT:  No.  I will permit the answer.

3     A.    That was my job.  We tried to develop both proactive and

4     reactive procedures to detect and stop.  We have what they call

5     a "service delivery instruction" to give to call centers that

6     advises them, "Do not ship a part to this address."  It is

7     keyed either on address or name.  Also with those instructions

8     they are told if the person calls back from that address or

9     name, they are to contact me, Joseph Fallon, and there is a

10    number given.  It's a 24/7 thing.

11    BY MR. GARLAND:

12    Q.    Is that system foolproof?

13    A.    No.

14    Q.    Did HP do anything to try to get these parts that had been

15    sent out to these addresses returned to them?

16    A.    Yes.

17    Q.    And when I say "returned," the broken parts that

18    supposedly had failed.

19    A.    Defective, right.

20    Q.    What sort of methods or efforts did HP make?

21    A.    It starts off with an e-mail, then a telephone call, and

22    if the telephone number is invalid it immediately comes to us,

23    or after a period of time if there is no response to an e-mail

24    they will call us, "us" being Global Security.

25    Q.    And did HP, in particular, ever ask the person that it

1    understood to be ordering these parts on this spreadsheet to

2    provide any sort of proof of ownership beyond the serial

3    number?

4    A.   Yes, they did.

5    Q.   What did they ask the person to do?

6              MR. SHEKETOFF:  Well, objection.

7              THE COURT:  If this is a matter of custom and practice

8    I will permit it.  Custom and practice, not the particulars of

9    this case; is that it?

10             MR. GARLAND:  No.  This is directly trying to --

11             THE COURT:  Then, you are going have to do it through

12   a particular transaction.

13             MR. GARLAND:  Through a particular transaction?

14             THE COURT:  Yes.

15             MR. GARLAND:  May we approach, your Honor?

16             THE COURT:  Yes.

17

18   (SIDEBAR CONFERENCE AS FOLLOWS):

19             MR. GARLAND:  I can probably take him through his

20   investigative report and refresh his recollection about at what

21   point that was asked for.

22             THE COURT:  If you want to talk to this defendant, you

23   are going to have to do it to particular transactions.  If you

24   want to do it as a kind of custom and practice of what they did

25   there and leave it at that, you can do it that way, but in the

1    shadow you have got to get the individual transaction.

2            MR. GARLAND:  Okay.

3            MR. SHEKETOFF:  I think they have a problem with the

4    individual transaction, because the person that's supposedly

5    engaged in the transaction with him is not available.

6            THE COURT:  That having been said, I am telling you

7    what the evidentiary rule is and the boundaries of the

8    evidentiary rule on this thing.

9            MR. GARLAND:  Okay.

10   (END OF SIDEBAR CONFERENCE)

11

12   BY MR. GARLAND:

13   Q.   I would like you to turn back to Exhibit 9 and turn to

14   pages 9 and 10.  Do you see on these pages entries for

15   September and October 2009?

16   A.   Yes.

17   Q.   What name was being given most frequently for parts to be

18   delivered to 36 Laurelwood during that period?

19   A.   The name of John Reynolds.

20   Q.   Did you ever try to figure out, you, personally, ever try

21   to figure out who John Reynolds was?

22   A.   I asked to have it done.

23   Q.   And what did you do?

24   A.   I wanted to see who the original purchaser of the unit

25   was.

```
 1    Q.   And what did you find out?

 2         MR. SHEKETOFF:  Objection.

 3    A.   It wasn't John Reynolds.

 4         MR. SHEKETOFF:  I withdraw that objection.

 5         THE COURT:  That objection is withdrawn?

 6         MR. SHEKETOFF:  Yes, your Honor.

 7    BY MR. GARLAND:

 8    Q.   And did you try to follow any specific packages ordered

 9    for John Reynolds?

10    A.   Yes.

11    Q.   Do you recall when that specific package had been ordered?

12    A.   End of October.

13    Q.   Would it help you to look at the spreadsheet to narrow

14    that down any further?

15    A.   October 29.

16         THE COURT:  Just a moment.

17         MR. SHEKETOFF:  I was just going to say I don't mind

18    leading for this kind of --

19    A.   Yeah, October 29.

20    BY MR. GARLAND:

21    Q.   And did you do anything to follow that package?

22    A.   Yes.  I arranged between North Attleborough Police

23    Department, UPS, Security for what we call a "controlled

24    delivery."

25    Q.   And what is a "controlled delivery"?
```

1   A.   When I get notified a part of a person of interest to us

2   is going to be shipped, we work with our carrier, which is UPS,

3   that it goes to UPS, and their security person then meets us,

4   and we deliver the package, and it's controlled from date of

5   shipping to UPS to the address and to whatever happens to the

6   package.

7   Q.   Now, this package that we are talking about, you said it

8   was ordered on October 29th, 2009?

9   A.   Right.

10   Q.   What name was used?

11   A.   John Reynolds.

12   Q.   To what address was it?

13   A.   36 Laurelwood, North Attleborough, Mass.

14   Q.   I want to talk to you now about your effort to follow that

15   package.  Did you ever see that package personally?

16   A.   Yes, when UPS brought it to North Attleborough Police

17   Department.

18   Q.   So, I want to talk to you about November 4th, 2009.  What

19   were you doing that day?

20   A.   Working the controlled delivery with North Attleborough

21   Police Department and UPS.

22   Q.   Where did you start out?

23   A.   I started out at North Attleborough Police Department.

24   Q.   And what did you do there?

25   A.   Took note of the package.  The UPS driver was instructed

1    to do whatever he normally does.  He drove to 36 Laurelwood

2    Drive in North Attleborough.  Myself and a detective from North

3    Attleborough PD were in a truck, and we drove a little bit

4    earlier so that we could see the residence of 36 Laurelwood

5    Drive in North Attleborough.

6    Q.   Did you see the package before you went to 36 Laurelwood

7    Drive?

8    A.   Yes.  I saw it in the truck and took note of it when it

9    left.

10   Q.   And did that label say "John Reynolds, 36 Laurelwood

11   Drive"?

12   A.   Yes.

13   Q.   When you went to 36 Laurelwood Drive, what did you do when

14   you got there?

15   A.   We set up at just -- there's like an empty lot a little

16   further from the house.  The detectives started videotaping the

17   house.  Then the UPS truck came.  The driver went to the house,

18   rang the bell, knocked on the door, something similar to that.

19   A white male came to the door, the landing in front of the

20   house, took the package, signed what appeared to be a

21   signature, and went in the house.

22   Q.   Where were you when all this was taking place?

23   A.   In the truck with the detective probably 60 yards away.

24   Q.   What type of truck was it?

25   A.   A pickup truck.

1   Q.   Did you have an unobstructed view of 36 Laurelwood Drive?

2   A.   Yes.

3   Q.   Do you know who delivered the package?

4   A.   Meehan (ph) from UPS Security.

5   Q.   Did anybody record the delivery on videotape?

6   A.   Detective Mike Elliot from North Attleborough Police

7   Department.

8          MR. GARLAND:  Your Honor, we would like to show just

9   the first frame of the video to Mr. Fallon.  It is Exhibit 12,

10  which I believe is unopposed.

11         THE COURT:  All right.

12  BY MR. GARLAND:

13  Q.   So, starting off, is this what you saw that day before any

14  delivery?

15  A.   Yes.

16         THE COURT:  Just so I am clear, this is unopposed, so

17  is it available to the jury now?  It can be shown to the jury?

18         MS. BURKART:  Yes, your Honor.

19  BY MR. GARLAND:

20  Q.   So, what are we looking at in this scene right here?

21  A.   That's 36 Laurelwood Drive in North Attleborough, Mass,

22  the front door.

23  Q.   Have you seen this video before?

24  A.   Yes.

25         MR. GARLAND:  Your Honor, we move to admit Exhibit 12.

1          THE COURT:  All right.  It is received.

2          MR. GARLAND:  And, your Honor, we would ask permission

3    to play it.  I think there are probably 10 or 15 seconds up

4    front that we can skip past, because they have no events going

5    on.

6                    (Videotape played)

7          MR. GARLAND:  If we can stop the video right there.

8    BY MR. GARLAND:

9    Q.   Mr. Fallon, did you see somebody carrying a package off

10   the right-hand side of the screen?

11   A.   Yes.

12   Q.   Do you know who that is?

13   A.   Yeah.  That's Meehan from UPS Security.

14   Q.   Was that the person that you had arranged the controlled

15   delivery with?

16   A.   Correct.

17          MR. GARLAND:  If we can continue playing.

18                    (Videotape played)

19          MR. GARLAND:  Thank you.  I can't remember whether I

20   moved to admit Exhibit 12, but if not, I move to so admit.

21          THE COURT:  Yes, it is received.

22              (Exhibit No. 12 received into evidence)

23   BY MR. GARLAND:

24   Q.   Is this a fair and accurate representation of what you saw

25   that day?

1   A.   Yes.

2   Q.   The package that you saw delivered, was that the size and

3   appearance of the package that you had seen back in the police

4   station?

5   A.   Correct.

6   Q.   And did you see whether that package was still in UPS's

7   possession after the delivery?

8   A.   It wasn't in the truck.

9        MR. GARLAND:  May I confer with co-counsel?

10       THE COURT:  Yes.

11       MR. GARLAND:  No further questions for the moment,

12  your Honor.

13       THE COURT:  All right.

14                      CROSS-EXAMINATION

15  BY MR. SHEKETOFF:

16  Q.   Good afternoon, Mr. Fallon.

17       MR. SHEKETOFF:  Mr. Quigley, could we have Exhibit 9.

18  BY MR. SHEKETOFF:

19  Q.   As I understand your testimony, Exhibit 9 is an Excel

20  spreadsheet that you created from data that is available in

21  some sort of databank that HP keeps?

22  A.   It's called "WFM," yes.

23  Q.   It's called "WFM"?

24  A.   Right.

25  Q.   What is that?

1  A.   It's the customer service database.

2  Q.   All right.  So, you have several different databases.

3  This is one of them, the customer service database?

4  A.   At this time this is the one that tracks all calls to HP.

5  It comes out daily, but it's the same database, correct.

6  Q.   Well, you have a large database --

7  A.   Right.

8  Q.   -- and you can go into that database and pull out things

9  you are interested in, correct?

10  A.   Correct.

11  Q.   And that's how you created this spreadsheet, you went into

12  the database and pulled out things that you were interested in,

13  correct?

14  A.   Yes.

15  Q.   Well, does this spreadsheet indicate, to the best of your

16  ability, all the different deliveries that were made to the

17  defendant in this case, Matt Kuc?

18  A.   I'm sure I missed some, but, to my knowledge, the best

19  that I could find, but it wasn't easy to tell.

20  Q.   Okay.  So, you made your best efforts --

21  A.   Right.

22  Q.   -- based on addresses, variations of names, to create this

23  spreadsheet, correct?

24  A.   Yes.

25  Q.   And you believe that you captured most, probably not all,

1    but most of the deliveries that were made to Matt Kuc?

2    A.    Correct.

3    Q.    How many deliveries were made, approximately?  I don't ask

4    you to count them out.

5    A.    About 80.  I would say about that.  80 or more.

6    Q.    Well, isn't each line of this --

7    A.    Yeah.  Well, I'll let you know.

8    Q.    I'm just asking for your best estimate.

9    A.    All right.  Well, there's over 300.

10    Q.    And how many are on each page, approximately?

11    A.    There's about 35 or 40.

12    Q.    And, by the way, is the controlled delivery that we saw

13    depicted on that video one of the ones on this spreadsheet?

14    A.    Yes.

15    Q.    That's the October -- it's an entry for October 29 --

16    A.    Correct.

17    Q.    -- 2009.  A delivery actually made on November 4th of

18    2009, correct?

19    A.    Right.

20    Q.    Now, from the 300-plus, or whatever the number is exactly,

21    deliveries here, can I tell from looking at this spreadsheet

22    how many parts were returned?

23    A.    None were.

24    Q.    None?  Zero?

25    A.    Right.

1    Q.    He never returned a part to HP?

2    A.    No, but he didn't return these parts.

3    Q.    Okay.  So, these are not all the parts that were delivered

4    to Matthew Kuc; these are all the parts that you say were not

5    returned?

6    A.    Correct.

7    Q.    How many parts were delivered to Matthew Kuc, several

8    thousand?

9    A.    I didn't determine that many at HP.  It was around 300.

10   Q.    All right.  Correct me if I'm wrong, I think you're saying

11   that you did this spreadsheet only for parts that were not

12   returned.

13   A.    Correct.

14   Q.    Did you ever do a spreadsheet for all parts?

15   A.    No.

16   Q.    Do you have any idea whether 300 is 10 percent of the

17   parts that were sent to Matthew Kuc, 20 percent, 80 percent?

18   A.    I have no idea.

19   Q.    Could it be that Matthew Kuc returned thousands of parts

20   to HP?

21   A.    Possible.

22   Q.    But this is not, necessarily, a subject matter that

23   requires guesswork.  You actually have a database that will

24   allow you to figure this out, correct?

25   A.    Well, what I'm interested in.

1    Q.   Right.  But you could go to the same database that you

2    picked these 300 or so deliveries from and pick out every

3    delivery that was made, including deliveries that resulted in

4    returned parts?

5    A.   It would be very difficult because of the various names

6    and addresses.  It would be very hard.

7    Q.   Well, how about if we just limited it to the names and

8    addresses that appear on this exhibit, Exhibit 9?  You would

9    have been able to do that, correct?

10   A.   Theoretically.

11   Q.   Well, you were able to do it for Exhibit 9.

12   A.   For non-returned parts, which is my job.

13   Q.   Okay.  So, you are used to doing it for non-returned

14   parts, and you are not sure what the process would be for doing

15   it for all parts, returned or not?

16   A.   That information is not referred to me, because there is

17   no fraudulent activity.

18   Q.   Well, as you sit here today, do you know whether or not

19   Matthew Kuc returned thousands of parts to HP?

20   A.   I do not.

21   Q.   All right.  Does HP have a written warranty policy?

22   A.   Yes.

23   Q.   And when I buy an HP computer, I am given a copy of the

24   written warranty policy?

25   A.   It's in the packaging.

```
 1    Q.    Can I access it online?

 2    A.    Yes.

 3    Q.    Has it changed over the period 2005 to 2010?

 4    A.    Depends on the product.

 5    Q.    All right.  So, for some products it has remained

 6    constant, and for some products it has been modified?

 7    A.    Correct.

 8          MR. SHEKETOFF:  Mr. Quigley, could I have Exhibit 10.

 9    BY MR. SHEKETOFF:

10    Q.    The only thing approaching a written policy for HP in

11    terms of returned parts or anything else, warranty or anything

12    else, is Exhibit 10, correct?

13    A.    That is not correct.

14    Q.    Well, it's the only thing that you gave to the Government;

15    isn't that correct?

16    A.    Not correct.

17    Q.    You gave the Government copies of written warranties?

18    A.    E-mails explaining the warranty.

19    Q.    The Government has copies of e-mails explaining the

20    warranty policy of HP?

21    A.    Actually, I did that for the defense, and actually, when I

22    think of it, I'm not sure if the Government has that.  Defense

23    has it.

24    Q.    Defense?

25    A.    Yeah, under discovery.
```

1    Q.   Oh, you think there's something that went to the defense

2    that didn't go to the Government?

3    A.   I assume it went to both.

4    Q.   You were a federal agent?

5    A.   Yeah.  You know, I prepared documents that show the

6    explanation of the general warranty policy, and, again, it was

7    general because each product is different, and that was

8    provided, correct.

9    Q.   Well, didn't you provide it to the Government?

10   A.   Yes.

11   Q.   So, there are things that HP either does by e-mail or by

12   written warranty or by packing slip besides Exhibit 10?

13   A.   This is instructions on how to return a part.  It has

14   nothing to do with warranty.

15   Q.   Right.  But these are instructions for Compaq computers.

16   It's not even an HP product.

17   A.   Compaq, 3COM, HP.  It's all HP.

18   Q.   In other words, this Exhibit 10 was created by HP after it

19   acquired Compaq, and it gives this for all returns requested

20   for HP products, whether they are HP, Compaq or 3COM?

21   A.   This particular instruction is sent with this part because

22   at this time -- I'm not positive, but there was a certain time

23   when Compaq stopped putting their names on parts and products

24   and HP started.  I don't know what that date is.

25   Q.   Do you think it was before 2000 that HP acquired Compaq?

1   A.   I'm not sure.  I wasn't working there.

2   Q.   Do you have any idea how long it's been since HP stopped

3   producing equipment with the name "Compaq" on it?

4   A.   I do not.

5   Q.   How long have you been with HP?

6   A.   As an employee, since 2008, and I was a full-time contract

7   investigator in 2006.

8   Q.   So, let's take from when you became an employee in 2008.

9   Was Compaq equipment still being produced with that name by HP?

10   A.   I don't know.

11   Q.   All right.  Let's go to the controlled delivery that

12   occurred on November 4th of 2009.  Some product was put in a

13   box, and you guys followed it to Matthew Kuc's home, and you

14   watched him, and you videotaped him come out and accept the

15   product, correct?

16   A.   Yes.

17   Q.   Were there packing instructions included in that package?

18   A.   How to return a defective part was in that package.

19   Q.   And what did those packing instructions say?

20   A.   That this part has to be returned, that you use the

21   shipping label that was in the package to put on the box with

22   the defective part and either call UPS or come pick it up or

23   drop it off, etc.

24   Q.   All right.  That's your best memory of what was on the

25   packing slip?

1    A.    Right.

2    Q.    Did anyone take a picture or save a copy of what was in

3    the packing slip for that delivery?

4    A.    No.

5    Q.    Well, by the time that delivery was made, if not earlier,

6    didn't HP say to its customer that "You must return this part,

7    and if you don't we're going to bill you for it"?

8    A.    That comes later, correct.

9    Q.    No.  I'm talking about right in the shipping notice.

10   A.    Yes.  If you don't return it, you're going to pay for it.

11   Q.    Does it say at what price you're going to have to pay for

12   it?

13   A.    It does not.  You have to call and find it out.  This is

14   my best recollection of that.

15   Q.    In any event, the warranty travels with the product,

16   correct?

17   A.    To the end user.

18   Q.    So, if my father buys me an HP computer and sells it to

19   me, the warranty is now mine, correct?

20   A.    If that's a laptop, yes.  It will be different for other

21   products.

22   Q.    Well, does the warranty travel with the product or not?

23   A.    It depends on the product.

24   Q.    For what product does the warranty not travel with the

25   product?

1    A.    Servers.

2    Q.    Anything else?

3    A.    That's all that I'm aware of.

4    Q.    All right.  So, if my father buys me a workstation and

5    gives it to me, the warranty has traveled with the product?

6    A.    Correct.

7    Q.    And if he sells it to me, the warranty has traveled with

8    the product?

9    A.    Yeah.

10   Q.    And if I turn around and give it to my daughter, the

11   warranty has traveled with the product?

12   A.    For the workstation.

13   Q.    For the workstation?

14   A.    Yes.

15   Q.    Because we are not talking about a server now.

16   A.    Right.

17   Q.    And if my daughter gives it to a classmate or friend, the

18   warranty has traveled to that person?

19   A.    Correct.

20   Q.    And it doesn't matter whether I bought that product or was

21   given that product or picked it up from a wholesaler or in some

22   bin of some kind in a flea market.  If it's under warranty,

23   it's under warranty?

24   A.    For the desktop, yes.

25   Q.    For anything other than a server.  Now you -- I'm sorry.

1   A.   Go ahead.

2   Q.   I'm sorry.  I didn't mean to cut you off.  You told us

3   that servers --

4   A.   It really depends.  I mean, I'm not an expert on

5   warranties, because with printers there's exceptions as well,

6   the high-end commercial printers.

7   Q.   Now, this group of non-returns in Exhibit 9, the 300-plus,

8   are these phone contacts with HP, or are these online contacts,

9   chat room contacts?

10  A.   They are both.

11  Q.   They're both.  Now, you said that the people manning the

12  call centers have scripts that they are to follow when they

13  engage in these chats with customers, correct?

14  A.   Yes.

15  Q.   Are the scripts in a format so that they can just paste

16  them right into the chat?

17  A.   No.

18  Q.   They're just directions?

19  A.   A guide.

20  Q.   They're a guide.  So that when you are chatting with

21  somebody at the other end, they're, in effect, scripted what it

22  is they are supposed to say to you?

23  A.   Guided.

24  Q.   Guided.  Now, did the Government ever ask you for a

25  packing slip that actually says "HP" on it that gets sent with

1   a replacement part so we can see exactly what it says?

2   A.   Not to my memory, from me, anyhow.

3           MR. SHEKETOFF:  Thank you, Mr. Fallon.

4           THE COURT:  Mr. Garland.

5           MR. GARLAND:  No further questions at this time, your

6   Honor.

7           THE COURT:  All right.  You may step down.

8                   (Witness stepped down)

9           MS. BURKART:  Your Honor, the Government calls Ken

10  McCarthy.

11          THE COURT:  Mr. McCarthy, right over there.

12          THE CLERK:  Please raise your right hand.

13           KENNETH McCARTHY, DULY SWORN BY THE CLERK

14          THE CLERK:  Please state and spell your full name for

15  the record, spelling your last.

16          THE WITNESS:  My name is Kenneth McCarthy,

17  M-C-C-A-R-T-H-Y.

18          THE COURT:  You may be seated, Mr. McCarthy.

19          THE WITNESS:  Thank you.

20                   DIRECT EXAMINATION

21  BY MS. BURKART:

22  Q.   Good afternoon, Mr. McCarthy.

23  A.   Good afternoon.

24  Q.   What do you do?

25  A.   I work at the Massachusetts Attorney General's Office

1    where I am a Digital Forensic Analyst.

2    Q.    And how long have you been at the Attorney General's

3    Office?

4    A.    I've been there eight months.

5    Q.    What did you do before that?

6    A.    I worked for the North Attleborough Police Department.

7    Q.    And what was your position at the North Attleborough

8    Police Department?

9    A.    I was the Assistant IT Director for the Town of North

10   Attleborough.  I was stationed at the North Attleborough Police

11   Department as the Computer and Computer Network Systems

12   Administrator.

13   Q.    Did you have a title at the North Attleborough Police

14   Department?

15   A.    Not really a title, just an all-around type guy.  I did

16   the forensic examinations and the investigations on

17   computer-related crime.

18   Q.    Were you also a special police officer there?

19   A.    I was.

20   Q.    Do you have any special investigative training?

21   A.    I have digital forensic training.

22   Q.    What is that?

23   A.    Digital forensics is the detailed examination of digital

24   evidence, such as computers, iPhones, iPads.

25   Q.    When you were at the North Attleborough Police Department,

1    were you involved in the investigation of Matthew Kuc?

2    A.    I was.

3    Q.    When did you get involved?

4    A.    October 2009.

5    Q.    And what did you do, generally, as part of the

6    investigation?

7    A.    I did the research on the technology part background,

8    where it was a computer-related crime, dealing with eBay.

9    Q.    What is eBay?

10   A.    EBay is an online auction site.

11   Q.    I'm sorry.  An online what site?

12   A.    Auction site.

13   Q.    Can you describe that, please.

14   A.    When you go to a place like eBay, you can have items for

15   sale.  You can either put them up for auction and people bid on

16   them, and the highest bidder usually gets the item, or you can

17   have a storefront, where you have items for sale that they can

18   buy instantly.

19   Q.    So, just to clarify, this storefront, what does that mean?

20   If I went onto eBay, how can I get onto a storefront?

21   A.    On the storefronts, usually if you are just advertising

22   items on eBay, you have an individual item, let's say a laptop,

23   and you advertise a laptop for sale, when people search for a

24   laptop they can see a lot of items, a lot of different laptops

25   from different people.  When you have a storefront you have a

1    lot of items on your storefront.  It's just your items.

2    Q.    Do you get to name your storefront?

3    A.    Yes, you do.

4    Q.    Have you ever been to a storefront called "Total Asset

5    Recovery"?

6    A.    I have.

7    Q.    When did you do that?

8    A.    Probably December of 2009.

9    Q.    Why did you go there?

10   A.    We were advised by one of the investigators --

11          MR. SHEKETOFF:  Well, objection, your Honor.

12          THE COURT:  Well, I think I am going to sustain the

13   objection.

14   BY MS. BURKART:

15   Q.    Generally can you explain the context of why you were

16   looking at the site, without explaining who told you to go

17   there.

18   A.    I was just looking to see what items were for sale at the

19   site.

20   Q.    I'm going to show you what's been marked as Exhibit L,

21   opposed Exhibit L, so just the defendant (sic), please.

22          Also, if you want to flip into the binder there's a

23   hard copy of Exhibit L as well.  You are welcome to remove

24   that, if it's easier for you, or keep it in the binder.

25   A.    I'm just going to look at it with my glasses.  I am there.

1   Q.   Do you recognize that exhibit?

2   A.   I do.

3   Q.   How?

4   A.   It's a printout from an eBay site that I printed.

5   Q.   Have you seen it before?

6   A.   Yes, I have.

7   Q.   How do you know it's one you have seen before?

8   A.   I have initialed it and dated each page.

9   Q.   And what is the date that you gave it?

10  A.   June 14, 2012.

11  Q.   And what date does that represent?

12  A.   The date I met with you.

13  Q.   And you looked at the document?

14  A.   And I looked at the document.

15  Q.   Thank you.  And had you previously provided that document?

16  A.   Yes.

17  Q.   And how did you create that document?

18  A.   Going to the eBay site, I printed it out.

19  Q.   What dates did you visit the site?

20  A.   I visited in December 2009, and April of 2010 and various

21  times in between.

22  Q.   Okay.

23            MS. BURKART:  I would like to move to have this

24  document admitted as Exhibit No. 20.

25            THE COURT:  Any objection?

1          MR. SHEKETOFF:  No objection.

2          THE COURT:  It is received as Exhibit 20.

3               (Exhibit No. 20 received into evidence)

4    BY MS. BURKART:

5    Q.   I am going to direct your attention to the upper left-hand

6    corner of the document.  What name do you see there?

7    A.   On the upper left, "Constable1212."

8    Q.   And who is "Constable1212"?

9    A.   That's my eBay user name.

10   Q.   When did you print out the pages from the document?  If

11   you just go to the lower right-hand corner of this particular

12   page that's on the screen.

13          MS. BURKART:  If we could magnify the lower right-hand

14   corner, please.

15   A.   This particular page was printed out on April 6th, 2010.

16   BY MS. BURKART:

17   Q.   If you want to flip through the document in front of you,

18   can you tell me what dates you printed out the other pages of

19   the document?

20   A.   There's April 21, 2010, April 27, 2010.

21   Q.   Does this represent all of the times that you reviewed the

22   website?

23   A.   No, it does not.

24   Q.   How often did you review the website?

25   A.   During the course of the investigation I frequented it

1    quite often during the month of December through April of 2010.

2    Q.   And what did you see when you visited the Total Asset

3    Recovery storefront on eBay?

4    A.   There was a lot of computer-related items for sale,

5    network items, such as network switches, motherboards, CPUs,

6    tape backup machines.

7    Q.   Do you recall any particular types of manufacturers?

8    A.   HP, Dell, Lenovo, 3COM.

9    Q.   I'm going to show you one of the pages, in particular.

10   This is page 18 of the document.  We can also pull it up.  If

11   we could just magnify a few of those products.

12        Could you describe the products that you see through

13   the next one down?  Right there.  Moving through from there,

14   please.

15   A.   That's a voice over IP phone from 3COM.

16   Q.   And moving down through others, you are also welcome to

17   look on the page, if that's easier for you.

18   A.   I will go through the screen.  It will be quicker.

19   Q.   Okay.

20   A.   Dell monitors, Lenovo monitors, Dell laptop batteries.

21   Q.   And is that generally typical of the types of products

22   that you saw when you visited the Total Asset Recovery

23   storefront on eBay?

24   A.   It was.

25        MS. BURKART:  May I have just a moment, please, your

1    Honor?

2              THE COURT:  Yes.

3    BY MS. BURKART:

4    Q.   Do you have any rough estimate of the kind of quantity of

5    materials you saw on eBay, computer equipment?

6    A.   Dozens.

7              MS. BURKART:  Thank you.

8              THE COURT:  Mr. Sheketoff.

9                        CROSS-EXAMINATION

10   BY MR. SHEKETOFF:

11   Q.   Good afternoon, Mr. McCarthy.

12   A.   Good afternoon.

13             MR. SHEKETOFF:  Mr. Quigley, could I have Exhibit 20,

14   the first page.

15   BY MR. SHEKETOFF:

16   Q.   Can you see Exhibit 20 on your screen?

17   A.   I can.

18   Q.   Underneath the big picture of that piece of computer

19   equipment, power ball (ph), there's three little pictures.  Do

20   you see that?

21   A.   I do.

22   Q.   And did you know that when you were on that site you could

23   click on that and get a blowup?

24   A.   Yes, I did.

25   Q.   Did you click on any of those to see what the number, tag

1    number of that item was?

2    A.   I don't know if I clicked on that particular page, but I

3    did click on them.

4    Q.   So, you clicked on photographs depicted on this to get tag

5    numbers?

6    A.   To see if there was any identifying --

7    Q.   Well, like a tag number?

8    A.   Like a tag number.

9    Q.   Did you take down any tag numbers?

10   A.   No, I did not.

11   Q.   Was there a reason you did not take down any tag numbers?

12   A.   They weren't identifiable, or I didn't see any service tag

13   numbers.

14   Q.   So, on all of the items that you clicked on there was no

15   tag number associated with it?

16   A.   The ones I looked at.

17   Q.   And how many individual ones did you look at?

18   A.   Dozens.

19   Q.   Dozens?

20   A.   Yes.

21   Q.   And you never saw a tag number?

22   A.   Not to my recollection that I could understand or read.

23   Q.   So, are you saying you saw tag numbers on occasion but it

24   wasn't clear enough to read it, or you never saw a tag on the

25   back of a machine?

1  A.   I saw numbers on the back of machines.  I'm not sure what

2  you mean by just tags.

3  Q.   Do you know what a tag number is?  For instance, on a Dell

4  product they put some sort of sticker on the back of the

5  product with letters and numbers as a way to identify it.

6  A.   Yes.  Service tags and --

7  Q.   Service tag numbers?

8  A.   Yes.

9  Q.   Did you notice any service tag numbers on any of the items

10 that you looked at?

11 A.   I did not.

12 Q.   So, I will ask you again.  Is it your memory that there

13 were no service tag items on the photographs that you looked

14 at, or that you couldn't read them?

15 A.   That's my memory, that there were no service tags that I

16 could read.

17 Q.   Thank you.

18      MS. BURKART:  I have nothing, your Honor.

19      THE COURT:  All right.  You may step down,

20 Mr. McCarthy.

21      THE WITNESS:  Thank you.

22                     (Witness stepped down)

23      THE COURT:  I think, ladies and gentlemen, we will

24 take our afternoon break, maybe 15 minutes or so.  So, try and

25 be back here at 5 past 3:00.

1          THE CLERK:  All rise for the jury.

2          (The jury exited the courtroom at 2:50 p.m.)

3          THE COURT:  You may be seated.  I have had passed up

4    to me what I guess is a kind of draft of the indictment that

5    the Government proposes to submit to the jury.  I have a couple

6    of comments on it, and, of course, I want to hear from

7    Mr. Sheketoff.

8          I think I would like to have the heading modified, so

9    instead of saying "Amended Superseding Indictment," make it

10   "Indictment for Jury Use," and center that point.

11         Am I correct in understanding -- I do not have the

12   Superseding Indictment with me -- but that what appears here as

13   Count Five is the former Count Six, and what appears as Count

14   Six is the former Count Seven?  Is that correct?

15         MR. GARLAND:  That's correct.  What we did is, since

16   we dismissed Three, everything above that just got renumbered.

17         THE COURT:  I am sorry.  Three.

18         MR. GARLAND:  Four became Three, Five became Four, Six

19   became Five and so on.

20         THE COURT:  If you just have a chart that is submitted

21   at the same time, so it is clear from the record what is going

22   on.

23         Then, finally, just preliminarily, the forfeiture

24   allegations will not be going to the jury, and so I do not see

25   it necessary to attach it to this now "Indictment for Jury

1    Use."

2            Now, if there are other changes and corrections,

3    Mr. Sheketoff, just bring them to the Government's attention.

4            MR. SHEKETOFF:  I don't see any others, your Honor.

5            THE COURT:  Pardon?

6            MR. SHEKETOFF:  I don't see any others.

7            THE COURT:  All right.  So, you will make that

8    modification there and submit a kind of codex, I guess is what

9    you would call it, for the Superseding Indictment.

10           MR. GARLAND:  Would the codex be for the jury, or I

11   assume it will just be for the Court's purposes?

12           THE COURT:  It is for the Court and for any other

13   persons who have to kind of work their way through the

14   documents.

15           MR. GARLAND:  Your Honor, would it make sense also to

16   take off the signature page?

17           THE COURT:  Yes.  It should end at what is on here as

18   Count Six, the things that the jury are going to be asked to

19   deal with.

20           MR. GARLAND:  We will make those changes, your Honor.

21           THE COURT:  All right.  So, we will be back in 10

22   minutes.

23           MR. GARLAND:  Thank you, your Honor.

24           THE CLERK:  All rise.

25        (The Honorable Court exited the courtroom at 2:55 p.m.)

1              (Recess taken)

2         THE CLERK:  All rise.

3      (The Honorable Court entered the courtroom at 3:15 p.m.)

4         THE CLERK:  This Honorable Court is back in session.

5    You may be seated.

6         MS. BURKART:  The Government calls William Atwell.

7         THE CLERK:  All rise for the jury.

8              (The jury entered the courtroom at 3:18 p.m.)

9         THE CLERK:  You may be seated.

10             WILLIAM ATWELL, DULY SWORN BY THE CLERK

11        THE CLERK:  Please state your full name, spelling your

12   last.

13        THE WITNESS:  William Atwell, A-T-W-E-L-L.

14                   DIRECT EXAMINATION

15   BY MS. BURKART:

16   Q.   Good afternoon, Mr. Atwell.

17   A.   Good afternoon.

18   Q.   Where do you work?

19   A.   Lenovo Group, Ltd.

20   Q.   What do you do there?

21   A.   I'm a Corporate Investigator.

22   Q.   How long have you been at Lenovo?

23   A.   Two years.

24   Q.   What did you do before that?

25   A.   I was a Special Agent for the United States Drug

1   Enforcement Administration for over 26 years.

2   Q.   What is your educational background?

3   A.   I have a master's of science degree.

4   Q.   Where is that from?

5   A.   Virginia Commonwealth University.

6   Q.   What are your responsibilities as a Corporate Investigator

7   for Lenovo?

8   A.   Well, I respond to all the -- any incidents or crimes that

9   affect Lenovo internally or externally.

10  Q.   In your work at Lenovo are you familiar with the warranty

11  policies, generally, at the company?

12  A.   Yes.

13  Q.   And what are the general warranty policies?

14  A.   The warranty policy, in general, states that if a part is

15  defective Lenovo will get you a new part at no charge.

16  Q.   If it's under warranty?

17  A.   If it's under warranty.

18  Q.   How would a customer know if a computer part or a computer

19  was under warranty?

20  A.   Well, if they want to check on it they can go to the

21  Lenovo website and put in your model number and your serial

22  number, and it will tell you if it's under warranty or not and

23  how long the warranty is for.

24  Q.   When you say "serial number," what exactly are you

25  entering into the Lenovo website?

1   A.   It's a number on the back of the computer.  It's a

2   numerical or an alphabetized and numerical series of letters

3   and numbers that are unique to that computer.

4   Q.   Does Lenovo ever call that number a "service tag" as well?

5   A.   I haven't heard it called that.

6   Q.   Okay.  I'm going to show you what was previously admitted

7   as Exhibit No. 72.  Open that on page 2, please.  Are you

8   familiar with this?

9   A.   Yes.

10  Q.   What is it?

11  A.   That's the page on the website where you can check to see

12  if your machine is under warranty.

13  Q.   The one we were just referring to?

14  A.   Yes.

15  Q.   Was this online tool available, generally, in the 2005 to

16  2010 time frame?

17  A.   Yes.

18  Q.   We are looking at page 2 of the exhibit.  What information

19  would a customer enter in order to check if their product is

20  under warranty?  Where would they put that?

21  A.   Where it says "Type," that's where you put in the model

22  number.  The model number is also called "machine type number,"

23  but that refers to the model number.  You would put in the

24  model number, and then next to that, the "Serial Number," you

25  would put in that series of numbers unique to your machine, and

1   then it would tell you the status of your machine as far as

2   warranty.

3   Q.   So, Lenovo calls it a "serial number," the number that

4   tracks the machine and tells you whether it's under warranty?

5   A.   That's correct.

6   Q.   Where do you enter that number on the screen?

7   A.   Right in that box where it says "Serial Number."

8   Q.   And then flipping to Exhibit 1, please, what information

9   is being provided on this page?

10   A.   That's showing a model number, a serial number for a

11   machine and the status of the warranty, if it was under

12   warranty or not.  It says "In Warranty" and it gives an

13   expiration date of the warranty, so the machine would be good

14   through that date for warranty service.

15   Q.   So, in the example we are looking at, the product is under

16   warranty?

17   A.   Yes.

18   Q.   And is this an example of the kind of results you might

19   see if you entered in what we have just seen on that back page?

20   A.   Yes, it is.

21   Q.   Once a customer determines that a part was under warranty,

22   how would they request a replacement part?

23   A.   Well, there are a number of ways you can do it.  You could

24   have an onsite repair.  If you go to a depot, to a huge

25   facility where you just send your machine, it gets fixed and

1    they send it back.  Or you can do what we call a CRU process,

2    C-R-U, which stands for Customer Replaceable Unit.  If you know

3    how to fix your machine and you know what parts you need and

4    it's under warranty, you can call our call center that's manned

5    by representatives, and once you give them your model number

6    and serial number and they verify that it's under warranty,

7    Lenovo will send a part out the same day.  Hopefully, it will

8    get to you the next day and the machine's back running again.

9    Q.   Focusing on this option where the customer is just seeking

10   a replacement part, you said that they could use a call center.

11   Can they also contact Lenovo by chat?

12   A.   They can do it online, too, yeah, through the website.

13   Q.   What role does IBM play in the process?

14   A.   Well, IBM services all our warranty process, so any

15   warranty process is handled by IBM.

16   Q.   If a customer is requesting a replacement part, at what

17   point does IBM step in?

18   A.   Well, they are in the process immediately.  They are the

19   first and last step in the process.  They handle the whole

20   warranty service process for Lenovo.

21   Q.   So, in other words, when a customer reaches out to say, "I

22   need a replacement part," are they actually contacting Lenovo,

23   or is Lenovo routing them to IBM?

24   A.   It's going to IBM.

25   Q.   So, IBM is making the determination for Lenovo as to

1   whether a replacement part is appropriate or necessary?

2   A.    That's correct.

3   Q.    What information does IBM request from the company?

4   A.    Well, they will ask --

5   Q.    Excuse me.  From the customer.

6   A.    They would ask for the model number, the serial number and

7   first determine whether a warranty status exists.  They would

8   then ask for the name, address, where do you want the part

9   sent, where do you want the mail correspondence sent, if

10   different from the delivery address.

11   Q.    I'm just going to stop you for a moment.  You didn't

12   mention anything about trying to figure out if they could fix

13   the computer over the phone.  Does IBM ask them to do that?

14   A.    I think they do see if they can resolve it over the phone,

15   technicians might, if they have somebody qualified to do that,

16   and if that's not available or it can't be done, then the part

17   would be sent once the warranty status is established.

18   Q.    So, as a general matter, if the product is under warranty

19   does IBM pretty much send out the part?

20   A.    Absolutely.

21   Q.    How do they figure out where to send it?

22   A.    Well, the shipping address is given by the caller.

23   Whoever the customer is, the person who owns the machine will

24   provide the address they want the part sent to.

25   Q.    And how does the customer know what to do with the old

1    part?

2    A.    Well, when you order a Lenovo machine, the minute you turn

3    the machine on and start to boot it up for the first time, that

4    warranty contract is there, and you have to acknowledge that

5    you've read and understand it before the boot process even

6    continues.  If you order a part for your machine subsequent to

7    that, the part comes in, you receive it hopefully the next day,

8    in the box with the new part is that policy again of having to

9    return the old defective part.  A label is also put in the box

10   that you can use that Lenovo pays for to get the defective part

11   back.  So, you put the defective part and the label on the box

12   the new part came in and ship it back.

13   Q.    And does IBM keep track of what parts are ordered?

14   A.    Yes.

15   Q.    How?

16   A.    Part of their warranty services contract with us mandates

17   that they have to keep a listing of all the parts that come and

18   go and the details of what happens to them.

19   Q.    Do they keep this in a computer database?

20   A.    Yes.

21   Q.    Are there any weaknesses that you are aware of through

22   your job in terms of how they keep track of these requests?

23   A.    Yes.  Unfortunately, it's a very exploitable system.

24   There are a number of problems with it, yes.

25   Q.    What types of problems?

A.   Well, there is what we call a "Do not CRU list."  A "Do

not CRU list" is a list of addresses that we don't want to send

parts to because parts have not been returned.  The fraud

filters in IBM are supposed to catch addresses that we are not

supposed to be shipping to, but if you change a digit, if you

put an extra space in, if you change a spelling of a street or

you make any minute change, unfortunately the software doesn't

acknowledge that, and it will send the part out and say it's a

good service.

Q.   I am going to show you, first, what's marked as Exhibit G,

and this is an opposed exhibit.  You can move to it in your

binder, if you would like, or it also will be coming up on your

screen.

A.   Oh, okay.

Q.   Are you familiar with this exhibit?

A.   Yes.

Q.   What is it?

A.   It's an Excel spreadsheet that IBM constructed for Lenovo.

Q.   Where did the information come from?

A.   It came from IBM records, warranty service records.

Q.   How did IBM obtain the information?

A.   That's in our database.  It's subsequent to filling

service orders.

Q.   Is this a reformatted version of what came out of that

database?

1    A.    Yes, it is.

2    Q.    Have you had the opportunity to compare this exhibit with

3    the original spreadsheet from the database?

4    A.    Yes.

5    Q.    And how does it compare?

6    A.    It's the same information.

7            MS. BURKART:  Your Honor, I would like to move to have

8    this exhibit admitted as Exhibit No. 13.

9            MR. SHEKETOFF:  I am going to withdraw my objection.

10           THE COURT:  Pardon me?

11           MR. SHEKETOFF:  No objection.

12           THE COURT:  All right.  It will be received, then, as

13   Exhibit 13.

14                (Exhibit No. 13 received into evidence)

15   BY MS. BURKART:

16   Q.    When you reviewed this spreadsheet, did you see any

17   addresses that you were familiar with?

18   A.    Yes.

19   Q.    How were you familiar with them?

20   A.    Well, I am just familiar with the Laurelwood Drive

21   address.  I have seen it just during fraud screening on

22   warranty service spreadsheets.  This address, obviously, came

23   up a lot.

24   Q.    I am going to direct you to page 8.

25   A.    Okay.

1    Q.   We are going to focus on a few of those addresses and just

2    kind of scroll through them.   Are these addresses that you

3    recognize?

4    A.   Yes.

5    Q.   How?

6    A.   They are from the Laurelwood Drive investigation.

7    Q.   Do you notice anything about these addresses?

8    A.   Yes.   There appear to be alterations in the spelling or

9    the way the address is entered.

10   Q.   How did the activities and orders coming out of

11   36 Laurelwood Drive trigger the attention of your fraud unit?

12   A.   Well, I was initially contacted by an investigator with

13   IBM.   He had mentioned that there was a fraud investigation

14   going on.

15           MR. SHEKETOFF:   Well, objection.

16           THE COURT:   Just a moment.   I think we will skip over

17   simply that he began an investigation.

18           MS. BURKART:   Fair enough.

19   BY MS. BURKART:

20   Q.   I'm going to show you what's marked as Exhibit H?

21           THE COURT:   This has not --

22           MS. BURKART:   It's an opposed exhibit, yes.

23   BY MS. BURKART:

24   Q.   Are you familiar with this exhibit?

25   A.   Yes.

1    Q.    Do you see the letters "CRU" on that?

2    A.    Right.

3    Q.    Is that the process that you described earlier?

4    A.    Yes.  The "Do not CRU" list, yes.

5    Q.    Who uses the "Do not CRU" list?

6    A.    Well, IBM uses that.  That's the list of addresses that

7    they should not be shipping parts to.

8    Q.    Is it used by IBM in the ordinary course of their

9    business?

10   A.    Yes.

11   Q.    Where do the addresses come from that are put on the "Do

12   not CRU" list?

13   A.    Well, IBM in their screening process would add addresses

14   to the list they feel are suspect, or we can request them on

15   the Lenovo side.  If anybody in Lenovo Warranty Services or

16   Worldwide Services for any reason would want to add an address

17   to that list, they could do that.

18   Q.    And they do that in the ordinary course of their business?

19   A.    Yes, sure.

20   Q.    Are those addresses added at or near the time it is

21   determined that the company will not send products to those

22   addresses?

23   A.    Yes.

24   Q.    Is it prepared by a group that has knowledge of who should

25   be on that list?

1   A.   Yes, it is.

2   Q.   And is it prepared and kept in the ordinary course of

3   business, in other words, not for the trial?

4   A.   No, no.  It's just regular business for IBM.

5          MS. BURKART:  I would like to move to have this

6   admitted as Exhibit No. 14, please.

7          MR. SHEKETOFF:  I have no objection.

8          THE COURT:  All right.  It is received as Exhibit 14.

9              (Exhibit No. 14 received into evidence)

10  BY MS. BURKART:

11  Q.   Mr. Atwell, is the "Do not CRU" list organized by state?

12  A.   Yes.

13  Q.   I would like to direct your attention here to page 1.

14  What state is this for?

15  A.   That's Massachusetts.

16  Q.   Directing your attention, skipping the first address for

17  Massachusetts, do you recognize the other addresses under

18  "Massachusetts"?

19  A.   Yes.

20  Q.   And what are those?

21  A.   It's the Laurelwood Drive address.

22  Q.   Directing your attention to the next page, do you see any

23  other addresses that you recognize?

24  A.   Yes.  They all are similar addresses, slightly different

25  spelling or punctuation.

1    Q.   Moving through, just move through all of them, and just

2    scroll through each of them there.  You let me know if you see

3    any.  Are each of the entries a different variation?

4    A.   Yeah.  They all seem to be variations of the same address,

5    yes.

6    Q.   Moving to the next page, please.  Similarly, what do you

7    see here?  We can magnify that, if that's helpful for you, or

8    if you can prefer to have it --

9    A.   Again, it appears to be the Laurelwood Drive address.

10   Q.   And then moving through to the next page, what do you see

11   here?

12   A.   Yes, the same address, just different spellings or

13   shortenings of words, things like that.

14   Q.   Would each of them be unique here on the page?

15   A.   They would be.

16   Q.   And then moving right below Laurelwood Drive, what is the

17   next address that you see?

18   A.   The Maple Street address.

19   Q.   And are you familiar with that address as well?

20   A.   Yes.

21   Q.   How?

22   A.   It's associated with the same account.  It's associated

23   with the Laurelwood Drive address.

24   Q.   Okay.  And then moving to the next page of the document,

25   what state is this about?

1   A.    Rhode Island.

2   Q.    And is this, again, an excerpt from the larger "Do not

3   CRU" list?

4   A.    Yes, it is.

5   Q.    What addresses do you see there?

6   A.    That's the Mendon Road in Cumberland, Rhode Island

7   address.

8   Q.    Are you familiar with that address?

9   A.    Yes.

10  Q.    How?

11  A.    That's also associated with the Laurelwood Drive address.

12  Q.    If you would look at that just last page, please,

13  similarly, what do you see there?

14  A.    Same thing.  The Mendon Road address in Cumberland, just

15  with different changes to the address.

16  Q.    So, could you explain, please, what the "Do not CRU" list

17  was intending to accomplish?

18  A.    Well, the intention of it is to not ship parts to people

19  who haven't fulfilled the contract of not returning defective

20  parts that they've ordered.  It is intended to do that, but,

21  unfortunately, it is a software program that apparently is

22  easily exploitable, and you can get around it fairly easily if

23  you try hard enough.

24  Q.    So, did the "Do not CRU" list resolve the problems with

25  these addresses?

1    A.    No, not at all.

2    Q.    Why is that?

3           MR. SHEKETOFF:  Well, objection, your Honor.

4           THE COURT:  No.  I will permit him to answer.

5    A.    Well, as I stated previously, if you change the address in

6    any way, the slightest change, the computer doesn't recognize

7    that.  It doesn't see it as not the same address, and it will

8    just bounce right over and send a part out.  You can add

9    apartment, suite, number, spell "Street" out, put a period at

10   the end, don't put a period.  The minutest change,

11   unfortunately, voids the "Do not CRU" list, and the computer

12   thinks that it's a good address.

13   BY MS. BURKART:

14   Q.   Are you familiar with the procedures that IBM uses to

15   follow up on non-returned items?

16   A.    Yes.

17   Q.    What are those?

18   A.    If a defective part is not returned within 30 days, an

19   invoice is sent to the owner of the machine, well, to the

20   person claiming they need a part.  After the 30 days, at 35

21   days, 45, 55 and 65 days reminder letters are sent out saying,

22   "You need to pay this invoice or return the defective part."

23   After 95 days when we don't get a response it's written off as

24   a loss.  It's a financial loss for Lenovo.

25   Q.    When you say "written off as a loss," what does that mean?

1    A.    It means they write it off that it's not collectible,

2    unless it's a very expensive part.  Very expensive parts are

3    sent to a collection agency, and how effective they are I don't

4    know.

5    Q.    Were any invoices sent to Mr. Kuc?

6    A.    Yes.

7    Q.    How do you know?

8    A.    I contacted Warranty Services in Lenovo, who was in

9    constant contact with IBM Warranty Services, and I was told

10   that invoices were regularly sent out.

11           MR. SHEKETOFF:  Objection.

12           THE COURT:  Sustained.  The jury will disregard what

13   he heard someone else say.

14   BY MS. BURKART:

15   Q.    I am going to show you what's marked as Exhibit No. 15.

16   This is unopposed.  Are you familiar with this document?

17   A.    Yes.

18   Q.    What is it?

19   A.    It's an invoice that's sent out to warranty service

20   customers.

21           MS. BURKART:  I would like to move to have this

22   unopposed exhibit admitted as Exhibit 15, please.

23           THE COURT:  Yes, it will be.

24           (Exhibit No. 15 received into evidence)

25   BY MS. BURKART:

1    Q.    I'm going to direct your attention to the first addressee

2    for the invoice on page 1.  If we could just magnify that.

3    Thank you.

4    A.    Sure.

5    Q.    Do you recognize this address?

6    A.    Yes.

7    Q.    How?

8    A.    That's the Laurelwood Drive address, and the Avaka

9    Software is a name that I have come to know to be associated

10   with that address.

11   Q.    I am going to show you the next page.  What is the

12   addressee for this invoice?

13   A.    That is the Maple Street address in Attleboro.

14   Q.    And what is the address specifically?

15   A.    It's 247 Maple Street, Suite 1.

16   Q.    And who is it addressed to?

17   A.    Matt Cook.

18   Q.    And what is the company name given?

19   A.    Cyon ISP.

20   Q.    Are you familiar with that address?

21   A.    It looks like many addresses associated with Maple Street

22   or the Laurelwood Drive address.

23   Q.    Thank you.  Turning to page 3, do you recognize this

24   address?

25   A.    Yes.

1    Q.    How?

2    A.    It's the Mendon Road, Rhode Island, Cumberland, Rhode,

3    Island address associated with Matt Cook and the Laurelwood

4    Drive address also.

5    Q.    And, finally, to the last page of the exhibit, do you

6    recognize the addressee on this invoice?

7    A.    Yes.  Again, it's the Mendon Road with a suite number

8    added onto it from Cumberland, Rhode Island.

9    Q.    Okay.  And are these four examples all of the invoices

10   that were sent to Mr. Kuc?

11   A.    No.  There were many more.

12          MS. BURKART:  Just a moment, please.

13   BY MS. BURKART:

14   Q.    On the invoices that I have just shown you, how was

15   Mr. Kuc's name spelled?

16   A.    It's spelled usually -- I've seen it as C-O-O-K.

17   Q.    Have you seen it spelled other ways as well?

18   A.    Yes, many other ways.

19   Q.    Do you know if any of these invoices were ever paid by

20   Mr. Kuc?

21   A.    No, they weren't.

22   Q.    How do you know?

23   A.    Checking with Warranty Services, I was notified that they

24   hadn't been.

25          MR. SHEKETOFF:  Move to strike, your Honor.

1          THE COURT:  Yes.  I think I am going to have to strike

2     that last --

3          The reason I am doing it, ladies and gentlemen, is

4     that you are entitled, as a regular manner, to have the person

5     who actually made the observations speak to you, testify here,

6     and they are subject to cross-examination.  Mr. Atwell has

7     indicated that he did not make that observation, he asked

8     somebody else, and he heard what that other person said.  That

9     is what is called the "hearsay rule."  There are exceptions,

10    but none of them apply here.  So, we will exclude what

11    Mr. Atwell heard.

12         Mr. Sheketoff.

13         MR. SHEKETOFF:  Thank you, your Honor.

14                        CROSS-EXAMINATION

15    BY MR. SHEKETOFF:

16    Q.   Good afternoon, Mr. Atwell.

17    A.   Good afternoon.

18    Q.   Does Lenovo or did Lenovo have a written warranty policy?

19    A.   Yes.

20    Q.   And that policy, you said, would come up automatically,

21    and you would have to sign off on it before you could boot the

22    computer up for the first time?

23    A.   Yes.

24    Q.   Did you provide a copy of that written policy to the

25    Government?

1    A.    I think they were given a copy, yes.

2    Q.    And you say that that same policy is included in shipping

3    instructions when a customer requests a replacement part?

4    A.    Yes.

5    Q.    And did you give a copy of an example of the shipping

6    instructions to the Government?

7    A.    Well, Agent Heitkamp was in correspondence with Worldwide

8    Service of Lenovo, and I believe they did.

9    Q.    So, you believe that Lenovo provided a copy of the typical

10   shipping instructions to the Government?

11   A.    I feel like they did.

12   Q.    Okay.  You believe that they did, correct?

13   A.    Yes.

14   Q.    Have you, personally, seen the shipping instruction that

15   is standard fare when a replacement part is sent out?

16   A.    I did.  At the beginning of the investigation I saw a copy

17   of it, but I haven't looked at it since then, probably.

18   Q.    Does it say anything about what will happen if you don't

19   return the part within a certain period of time?

20   A.    I believe there is a reference to the invoice, that an

21   invoice will be sent for the price of the part.

22   Q.    Does it tell you what the price is that you will have to

23   pay, in other words, a cost price, a cost plus some percentage,

24   or a fair market value price?

25   A.    I'm not sure what the price would reflect.

1   Q.   All right.  In any event, it's IBM that sends out any

2   invoicing that's done?

3   A.   Yes.

4   Q.   And it's IBM that sends out any e-mails or voicemails that

5   might precede invoicing?

6   A.   Yes.

7   Q.   And it's IBM that keeps those records?

8   A.   Yes.

9   Q.   And it's IBM that decides whether or not to put the claim

10  into some sort of civil lawsuit?

11  A.   Those decisions are made by Lenovo Legal.  They would make

12  those decisions.  IBM is a subcontractor, they work for Lenovo,

13  and decisions at that level would be made by Lenovo personnel.

14  Q.   And then IBM would be in charge of bringing the lawsuit?

15  A.   No.

16  Q.   Lenovo would?

17  A.   Yes.

18  Q.   Has Lenovo ever sued anybody for parts that are not

19  returned, civilly sued?

20  A.   I've only been there two years.  I haven't been involved

21  in any.  Not that I know of.

22  Q.   All right.  Is there somebody at Lenovo who would know for

23  certain?

24  A.   Sure.

25  Q.   And whether or not any invoices were paid is records kept

1    by IBM?

2    A.   Yes.

3    Q.   Is there somebody at IBM that could tell us with certainty

4    how much Mr. Cook was invoiced and how much, if anything, he

5    paid?

6    A.   Yes, they have records of that.

7    Q.   Now, have you ever used or seen how the Google search

8    engine works, and if you spell something wrong it automatically

9    corrects it or makes a suggestion to you?

10   A.   Sure.

11   Q.   But IBM or Lenovo didn't have anything like that?

12   A.   Well, IBM, they control the whole process, and I guess

13   not.

14   Q.   Now, does Lenovo's warranty policy preclude a person from

15   getting replacement parts on more than 10, or 20, or 50 or 100

16   occasions?

17   A.   I don't understand the question.

18   Q.   Is there some limit on the number of times you can request

19   a replacement part on your warranty?

20   A.   Well, I don't know if there is any limit to how many parts

21   you can get on a machine that is under warranty, if it's truly

22   defective.  The requirement is that you send the defective

23   product back.

24   Q.   Or get invoiced?

25   A.   Or get invoiced, true.

1    Q.    So, if I had 50, 100 or 1,000 different Lenovo systems and

2    there was something wrong with each one of them, I could claim

3    it under warranty?

4    A.    Yes.  Lenovo's service goal is to satisfy the customer as

5    quickly as possible, and they understand the risk involved in

6    that, but their goal is to get a part to a legitimate customer

7    who has got a legitimate defective machine overnight, and

8    that's how the process was constructed.

9    Q.    You said that Lenovo doesn't use a tag system, they use a

10   serial number system?

11   A.    Right.

12   Q.    Is that serial number on a sticker, or is it embedded into

13   the chassis of the unit?

14   A.    It's on a label on the back of the machine.

15   Q.    You mean a sticker that you can pull off?

16   A.    Well, I don't think you can pull them off, I never tried

17   to, but it's considered a permanent label.

18   Q.    Are you saying that it can't be taken off, or you would

19   destroy it taking it off?

20   A.    I don't know.

21   Q.    You're not sure, okay.  Is the first person that contacted

22   you about Mr. Kuc a man by the name of Bill Fallon?

23   A.    No.  My recollection is that Dan Mallard (ph) called me

24   from IBM, and that was the first contact I had regarding this

25   case.

1    Q.   Do you remember being interviewed on June 5th of 2012 by

2    U.S. Attorneys and Special Agent Sarah De Lair of the FBI?

3    A.   Yes.

4    Q.   And do you remember saying at that time you weren't sure

5    whether it was someone from Lenovo or Joe Fallon from HP?

6    A.   I can't remember the sequence of contact between IBM, the

7    FBI, myself and HP, but someone had contacted me initially.

8    Subsequent to that conversation I went to my e-mails and

9    checked, and the earliest e-mail I have is from a Dan Mallard,

10   who's with IBM.  He made some reference to contacting either an

11   Agent Heitkamp or Joe Fallon about a warranty case.

12   Q.   So, in the very first e-mail that you had on the topic,

13   Joe Fallon's name came up, to the best of your memory?

14   A.   I don't remember.  I just know it was from an IBM

15   investigator.

16   Q.   Thank you, sir.

17            THE COURT:  Ms. Burkart, anything further?

18            MS. BURKART:  Nothing further, your Honor.

19            THE COURT:  All right.  You may step down, Mr. Atwell.

20   Thank you.

21            MS. BURKART:  Your Honor, our next witness is a little

22   bit lengthy.  Would you like to get started with him?

23            THE COURT:  Yes.

24            MS. BURKART:  The Government calls Thomas Zappala.

25            THOMAS ZAPPALA, DULY SWORN BY THE CLERK

1           THE DEPUTY CLERK:  Please state your full name,

2    spelling your last.

3           THE WITNESS:  My name is Thomas Zappala.  The spelling

4    is Z, as in Zebra, A-P-P-A-L-A.

5                        DIRECT EXAMINATION

6    BY MS. BURKART:

7    Q.   Good afternoon, Mr. Zappala.

8    A.   Good afternoon.

9    Q.   Where do you work?

10   A.   I work for the United States Attorney for the District of

11   Massachusetts.

12   Q.   And what is your educational background?

13   A.   I have an undergraduate degree in Economics from Boston

14   College and a Master's in Business Administration from Babson

15   College that I earned at night.

16   Q.   Before you came to work at the U.S. Attorney's Office,

17   what was your employment background?

18   A.   I worked in the banking industry for approximately 10

19   years at two institutions.  I started out as a staff auditor at

20   BayBank, and I left there about four years after that to take a

21   position as a general auditor at a savings bank.  I worked in

22   that position for about six years, and then I was managing some

23   of the retail banking operations at that bank.

24   Q.   And then you came to the U.S. Attorney's Office?

25   A.   I did, about 20 years ago.

1   Q.   In your position as an auditor for the U.S. Attorney's

2   Office, have you examined records related to the Matthew Kuc

3   case?

4   A.   I have.

5   Q.   When did you begin doing that?

6   A.   It was about a month ago, perhaps it was five or six

7   weeks.

8   Q.   And what type of documents did you look at?

9   A.   Primarily I looked at records, spreadsheets provided by

10  several vendors:  Dell, Hewlett-Packard, Lenovo.  I looked at

11  some chat logs that I was provided with.  I reviewed the

12  indictment in this matter and some other papers related to the

13  case.

14  Q.   You described some spreadsheets that you reviewed.  Very

15  generally, what did you do with the spreadsheets?

16  A.   Well, I looked at them on my computer, and in order to

17  make them a little more user-friendly, I moved some of the

18  columns, changed the font and justified some of the columns so

19  they were a little bit easier for me to look at and analyze.  I

20  moved off to the right, and then, for working purposes,

21  eliminated some of the columns that I didn't feel were

22  necessary for my review.

23  Q.   We will be discussing the spreadsheets in a moment.

24       MS. BURKART:  But I would like to introduce, your

25  Honor, an exhibit that I passed up to the Clerk and I provided

1    to Mr. Sheketoff.  It is one we planned to use and we thought

2    was unnecessary.  It would be Exhibit No. 67 that I would

3    offer.  May I approach the witness and show it to him?

4             THE COURT:  You may.  When you say "67," I think we

5    have already marked the RMA records.

6             MS. BURKART:  You're right.  68, your Honor.

7    BY MS. BURKART:

8    Q.   Have you previously seen this document, Mr. Zappala?

9    A.   I have not.

10   Q.   Would you take a moment to take a look at it.

11            MR. SHEKETOFF:  Your Honor, I do not object to this

12   document.

13            MS. BURKART:  I would like to move to have it

14   admitted, then, as Exhibit 68.

15            THE COURT:  Well, let us get some idea if this witness

16   can do it.

17            MS. BURKART:  Sure.

18   A.   Okay.

19   BY MS. BURKART:

20   Q.   What is this document?

21   A.   It's a letter from Comcast to Special Agent Kenneth

22   Heitkamp providing certain information with respect to an IP

23   address.

24   Q.   Does it appear to be a subpoena response?

25   A.   It is a response to a subpoena.

1        MS. BURKART:  I would like to move to have it admitted

2   as Exhibit No. 68, please.

3        THE COURT:  All right.  It is received.

4            (Exhibit No. 68 received into evidence)

5   BY MS. BURKART:

6   Q.   I'm just going to direct your attention to one line here,

7   under "IP Assignment" on the left-hand column.

8        THE COURT:  Can you put that up, now that it has been

9   admitted.

10       MS. BURKART:  It hasn't been loaded, your Honor, I

11  apologize.

12       THE COURT:  Well, why don't you use the document

13  camera, then.

14  A.   Yes, I see that.

15  BY MS. BURKART:

16  Q.   And what does that say after "IP Assignment," Mr. Zappala?

17  A.   It says, "Dynamically Assigned."

18  Q.   Thank you.  I am next going to direct your attention,

19  please, to -- we'll move to the documents previously admitted

20  as Exhibits 5 through 8, please.

21       Mr. Zappala, you should have a large binder there, but

22  we can also pull them up on the screen, and we will start with

23  Exhibit 5.  We can make the title a little bit larger for you.

24       Do you recognize this exhibit?

25  A.   I do.

1   Q.   How do you recognize it?

2   A.   This is a document that I helped prepare by taking the

3   spreadsheet, Excel spreadsheet provided by Dell with respect to

4   Laurelwood Drive, reformatting it, and I printed it so that it

5   printed on one-page wide and 120 pages long.

6   Q.   And how big was it wide before you reformatted it?

7   A.   Well, the font size was larger, but it was about three or

8   four 8 1/2 by 14-inch pages wide.

9   Q.   Did you change any of the data when you created this

10  spreadsheet?

11  A.   I did not.

12  Q.   I will direct your attention to Exhibits 6, 7 and 8 as

13  well.  Those will be the next ones after that.  Do you

14  recognize each of those exhibits, Mr. Zappala?

15  A.   I do.  These are spreadsheets that I have prepared also

16  for transactions at 247 Maple Street, as reflected in Exhibit

17  6, 2130 Mendon Road in Exhibit 7, and 42 Union Street in

18  Exhibit 8.  These are spreadsheets or exhibits that I prepared

19  based on the spreadsheets provided by Dell for those

20  properties.

21  Q.   And were each of those spreadsheets coming from sources

22  that were similarly large?

23  A.   They were.

24  Q.   And for each of these spreadsheets did you change any of

25  the underlying data?

1    A.    I did not.

2    Q.    I'm going to show you what's been marked as Exhibit 9.   We

3    can zoom on it on the screen as well, please.   Do you recognize

4    this document?

5    A.    I do.

6    Q.    What is it?

7    A.    This is the data provided in a spreadsheet format by

8    Hewlett-Packard.

9    Q.    And does this exhibit contain all of the data that was

10   originally produced?

11   A.    It does.

12   Q.    Is it simply a more readable version?

13   A.    I primarily changed the font, I justified some of the

14   columns, and I believe I moved the date to the left-most column

15   just to make it a little bit more user-friendly.

16   Q.    Thank you.   Finally, I am going to show you what's marked

17   as Exhibit 13 of this set.   What is that?

18   A.    This is a spreadsheet.   Again, I printed it and prepared

19   it based on a spreadsheet provided by Lenovo containing data

20   relating to certain transactions.

21   Q.    And did you change any of the data in this spreadsheet?

22   A.    I did not.

23   Q.    Did you include all of the data that Lenovo had provided?

24   A.    I did.

25   Q.    Did you simply, again, make it a more usable version?

1    A.    Yes.

2    Q.    In addition to creating these more condensed versions of

3    each of the company's spreadsheets, did you create any other

4    charts that summarized or analyzed the data?

5    A.    I did.

6    Q.    I'm going to show you another chart, which has been marked

7    as Exhibit No. 26.  Are you familiar with that chart?

8    A.    I am.

9    Q.    What is that?

10   A.    This is a chart that I prepared summarizing data relating

11   to four particular transactions that were Dell transactions.  I

12   extracted certain information for these specific transactions

13   from the Dell spreadsheets and in some instances matched the

14   data up to the information on chat logs that I reviewed.

15   Q.    You referred to chat logs.  We'll circle back to that in a

16   moment, but from the Dell spreadsheets that you created this

17   from, I'm going to direct your attention to pages 2 and 3.  Are

18   these output of the Dell spreadsheet that you used to create

19   the first page?

20   A.    Yes.  These are spreadsheets that I prepared, which are

21   extracts of the information from those Dell spreadsheets

22   provided.  I believe there are two of the Dell spreadsheets

23   that the data is taken from.

24   Q.    Okay.  This exhibit has two pages, so we are looking now

25   at page 2.  If we can flip to page 3, as well.  Each of those

1    pages has four lines.  If we could move them next to each

2    other, does that all relate to the same four lines?

3    A.    It does.  There is a number 1, 2, 3, 4 in the left column

4    that is a reference point for the second page, if you will.

5    Q.    So, 1 on the second page is the same information about the

6    same transaction as 1 on the third page, and, similarly, 2 and

7    3 and 4?

8    A.    It is.

9    Q.    And are those also corresponding with numbers 1, 2, 3 and

10   4 on the first page?

11   A.    It is.

12   Q.    So, pages 2 and 3, then, are the full download of data

13   from the Dell spreadsheet that you received, and page 1 is the

14   condensed version; is that correct?

15   A.    Yes.

16   Q.    Thank you.  You said you matched these with some chat

17   transcripts; is that correct?

18   A.    That's correct.

19   Q.    I will direct your attention to what's been previously

20   admitted as Exhibits 1 through 4.  I believe those are in the

21   smaller binder to your right.  If we can pull that up for the

22   jury, please, just pull up Exhibit 1.  Is this one of the chats

23   that you reviewed to match the information on this spreadsheet?

24   A.    It is.

25   Q.    What information did you match from the chats to Exhibit

1    26?

2    A.   Well, I matched the date, the --

3    Q.   We can move to Exhibit 26.  That might be helpful for you.

4    Yes, a split screen would also be a wonder of technology.

5         Is that helpful, Mr. Zappala, or would you like us to

6    leave it on 26?

7    A.   You know, I have a copy of it here.  May I look at that as

8    well?

9    Q.   Sure.

10   A.   Thank you.  So, I looked at the date in the first three

11   transactions.  I looked at the DPS number, the incident

12   request, which is a number that appears on the Dell

13   spreadsheets.  I looked at the name, the service request

14   address, the service request contact phone, the service request

15   creator employee and the company name and address.  That was

16   all information that I took from the data provided by Dell.

17        And then I reviewed Exhibits 1, 2, 3 and 4 and matched

18   up the information from the Dell spreadsheets to these Exhibits

19   1, 2, 3 and 4.  But note that not all the information was on

20   there.  For example, at number 4, the incident request number

21   was not on there, however, there was a service tag number that

22   was referenced, and when I reviewed the data provided by Dell,

23   that was the only transaction with that service tag number.

24   Q.   Okay.  Similarly, did you find that some of the chats

25   didn't contain the service tag number?  And I believe

1  specifically chat 3 may have been without a service tag number.

2  A.   I believe transaction number 3 does have the service tag

3  number in it.

4  Q.   I apologize.  To the extent that you found that there was

5  missing information on one or another column, were you able in

6  each case to verify that the chat matched up with the Dell

7  spreadsheet by matching the other information available in the

8  chat?

9  A.   Yes, except transaction three.  The data on the

10  spreadsheet reflected a contact of Fransico Samel at Abacus,

11  and it provided a phone number of 508-342-5390, and I noted

12  that the chat reflected a different name, Mark Cook, and a

13  different phone number.

14  Q.   And in that case have you put the information of both

15  sources onto the first page of Exhibit 26?

16  A.   I did.

17  Q.   Thank you.  I'm going to stay with those phone numbers,

18  for a moment, but direct you, first, to opposed Exhibit M, to

19  be shown, please, first to the witness.

20      Do you recognize this, Mr. Zappala?

21  A.   I do.

22  Q.   What is it?

23  A.   I recognize it as one page of account records provided

24  during the course of the investigation pursuant to a subpoena

25  from Vonage.

1    Q.   And just flipping through to the next page, do you see who

2    the subscriber is for this Vonage service?

3    A.   I do.  It's Matthew Cook.

4    Q.   And flipping to the next page, what is the billing

5    address?

6    A.   The billing address is 2130 Mendon Road, Cumberland, Rhode

7    Island.

8              MS. BURKART:  I would like to move to have these

9    records admitted, please, as Exhibit No. 23.

10             MR. SHEKETOFF:  Well, I object, your Honor.

11             THE COURT:  Grounds?

12             MR. SHEKETOFF:  403.

13             THE COURT:  I am not sure I understand that.

14             But I think what we will do is, we will break for the

15   day, ladies and gentlemen, so I can discuss this with the

16   lawyers, and we will be back tomorrow morning at 9:00.

17             Have a good afternoon.

18             THE CLERK:  All rise for the jury.

19             (The jury exited the courtroom at 4:00 p.m.)

20             THE COURT:  You may be seated.  I am not sure I

21   understand what 403 has to do with this.

22             MR. SHEKETOFF:  Well, I told the Government that I did

23   not object to them using any phone number that they thought was

24   relevant to this case.  But to just show that he has got 30

25   different phone numbers I didn't think it had any probative

1    value.  If they have got a number that they want to connect him

2    to because it has something to do with this case, I said I

3    wouldn't object to it coming in.

4         MS. BURKART:  Your Honor, the spreadsheets have

5    thousands of different transactions and there's a number of

6    different places where phone numbers appear.  We have matched

7    up, certainly, the four in the chats, but there is a number of

8    other areas where we've seen exhibits that have phone numbers,

9    and we will be able to match those up as we go.

10        We think because the jury is going to have all of the

11   spreadsheets back and it's all relevant to the fraud scheme

12   that's charged in the indictment, it's important for the jury

13   to have access to the phone numbers.

14        THE COURT:  Let me understand these documents, first.

15   Are these all the Vonage accounts that Mr. Kuc had, or have

16   there been selections made?

17        MS. BURKART:  No, your Honor.  It's the subpoena

18   returns that we received from Vonage, and they show 32 unique

19   phone numbers that Mr. Kuc had, which tie back to this original

20   account.

21        THE COURT:  Each of these phone numbers is somehow

22   reflected in a spreadsheet somewhere?

23        MS. BURKART:  Your Honor, we haven't gone back to

24   verify for each phone number that it ties into this

25   spreadsheet, but what we have done is each time we found a

1  transaction that was of interest and at issue, we would look to

2  the Vonage records to see if it matched up, and we found out in

3  each case that it has.  So, as different phone numbers have

4  been introduced through different exhibits, we see it tying

5  back to the Vonage records.  Our concern about limiting, your

6  Honor, was that with the jury having all of the sort of pieces

7  of the puzzle back in the jury room, we wouldn't want them to

8  come across one of the exhibits that had a phone number and

9  then not be able to trace it back to the Vonage records, and we

10  have all of them there.

11  THE COURT:  Perhaps.  I guess the question is who does

12  the first filter, and it strikes me that the Government should.

13  That is to say, if you represent that there is in the other,

14  call them spreadsheets, a particular number, then that seems

15  fine.  If, by contrast, there are some that do not appear here,

16  then I am not sure it is so fine.

17  MS. BURKART:  Your Honor, the other grounds we would

18  offer is that each of the 32 phone numbers, the fact of having

19  32 phone numbers, is part of the fraud scheme, part of the --

20  THE COURT:  Oh, I do not think so.  People can have

21  lots of phone numbers.  The fraud scheme is the one that is

22  demonstrated in the spreadsheets, so the phone numbers have to

23  be tied to the spreadsheets in some fashion.

24  MS. BURKART:  Okay.

25  THE COURT:  People collect jelly jars and beer mugs

1  and perhaps even phone numbers.

2          MS. BURKART:  Okay, fair enough.  But we will endeavor

3  to tie them back and then limit the ones that are not --

4          THE COURT:  Yes, and I think they should be redacted

5  to reflect those that are reflected in one of spreadsheets.

6  So, to that degree, I am allowing it.  So, you will work to get

7  that straightened away.

8          MS. BURKART:  And to the extent that if we are able to

9  tie them all back, then we would just admit the exhibit as is?

10          THE COURT:  Yes.  If you can show that they are all

11  tied in there, that is a different matter.  I understand,

12  however, that that is not clear yet.

13          MS. BURKART:  Okay.  We will run through that.  Thank

14  you, your Honor.

15          THE COURT:  Now, let me understand where we stand,

16  again, because I may revise my view.  Based on the pace that we

17  are going at, do you think we will complete the evidence

18  tomorrow?

19          MS. BURKART:  I'm hopeful we can, your Honor.  It

20  would depend on the cross-examination.

21          THE COURT:  It always does, but I used the phrase "on

22  the pace we are going."

23          MS. BURKART:  Yes, your Honor.  The Government plans

24  to just finish with Mr. Zappala and then three additional

25  witnesses, your Honor.

1          THE COURT:  Who will they will be?

2          MS. BURKART:  They will be Francisco Samuel, who is

3    the only one that I expect, based on what Mr. Sheketoff has

4    said, that there will be cross of some degree on, and then we

5    will have two other witnesses, Ray Di Ciacco and Ruth Forrand.

6          THE COURT:  Who are they?

7          MS. BURKART:  They are people who worked with Mr. Kuc

8    at Sensible Computers in Attleboro.

9          THE COURT:  So, the plan, at least right now, is three

10   more witnesses in addition to Mr. Zappala?

11         MS. BURKART:  That's right.  I expect they will be

12   short witnesses for Mr. Di Ciacco and Ms. Forrand as well,

13   relatively.

14         THE COURT:  I cannot control myself.  Brief witnesses.

15                          (Laughter)

16         MS. BURKART:  Not in stature, your Honor.

17         THE COURT:  Right, right.

18         Do you think we will finish tomorrow?

19         MR. SHEKETOFF:  I do.

20         THE COURT:  So, can we put it to the jury on Thursday?

21         MR. SHEKETOFF:  I don't see why not, if we finish

22   tomorrow, your Honor.

23         THE COURT:  I just do not want to keep the jury any

24   longer than I have to, and it sounds to me like there may be

25   some mopping-up exercises on Thursday, but basically the case

1 | will be ready to go to them, so I think you should be prepared

2 | to do it.

3 | MR. SHEKETOFF:  If we do get the case to the jury on

4 | Thursday, how late would you let them stay?  I ask because it's

5 | my wife's birthday.  We have dinner reservations at 6:30 in

6 | Lowell with a large number of my in-laws.

7 | THE COURT:  There are some conflicting strains running

8 | through that representation.

9 | (Laughter)

10 | THE COURT:  When do you want to leave?  How late do

11 | you want to go, without interfering with that event?

12 | MR. SHEKETOFF:  5:30 would be no problem.

13 | THE COURT:  Ordinarily, I tell the jury that they do

14 | not sit past 5:00 if they have not returned a verdict there.

15 | Does that work out?

16 | MR. SHEKETOFF:  That's perfectly acceptable, your

17 | Honor.

18 | THE COURT:  So, that is what we will be thinking

19 | about.

20 | MR. GARLAND:  So, we can plan to close on Thursday,

21 | your Honor?

22 | THE COURT:  Yes.  Then, for purposes of instructions,

23 | I do not mean to diminish the case or demean it in any way, but

24 | it seems plain vanilla to me.  Are there any instruction issues

25 | that I should be looking out for?

1          Let me tell you how I do instruction charging

2    conferences, which is, you ask me what I am going to do.  I do

3    not go through each charge request.  I view the charging

4    conference as a way to warn you off areas where I might

5    undercut you with the instructions afterwards, but it is not a

6    preview or dress rehearsal.

7          MR. GARLAND:  Your Honor, I think that there are only

8    two places that the Government is going to be asking.  One is,

9    we had submitted a proposed instruction that comes out of a

10   First Circuit case for mail and wire fraud, and it's a very

11   short instruction that basically says that it's not a defense,

12   basically, if there are shortcomings in the computer company's

13   internal systems for fraud detection.

14         THE COURT:  That is your supplemental instruction?

15         MR. GARLAND:  That was a supplemental instruction.  As

16   I said, we basically took it out of two First Circuit cases and

17   modified it to apply to this case.

18         THE COURT:  I will look at this more carefully.

19   Because intent is an issue, I would be likely to deal with

20   something like this, that is, make an instruction something

21   like this, but if there is an objection about it, I want to

22   know about that, too, ahead of time.

23         MR. SHEKETOFF:  I don't intend to argue that as a

24   defense.  I think I said in my opening that it wasn't a

25   defense.  But that is different than having the Court

1    specifically instruct on it.

2         THE COURT:  Right.

3         MR. SHEKETOFF:  So, I probably object to it.  I know

4    in federal court there is a lot more leeway to sort of, quote

5    unquote, comment on the evidence than there is in state court.

6         THE COURT:  I cannot be sure whether I am going to do

7    it in the closing argument.  I believe it to be a correct

8    statement of the law, but my instructions, generally, are

9    directed at what the parties have presented in a case, and so I

10   try not to engage in gratuitous instructions, unless the jury

11   simply is going to be sitting there thinking about it all night

12   themselves.  So, I will listen to it and see where it goes.

13        MR. SHEKETOFF:  I am pretty sure I am going to concede

14   in closing argument also that the gullibility of the computer

15   companies is not an issue in the case.

16        MR. GARLAND:  Your Honor, the second issue I think

17   that may come up is, as you are aware, there's a charge that

18   says that Francisco Samuel's identity was used by the

19   defendant.  That is under 18 U.S.C. 1028A.  I believe we have

20   to prove to the jury that Mr. Kuc used that identity, the name,

21   the address, without lawful authority.

22        We'll see how the testimony and the cross-examination

23   comes out tomorrow.  I believe that the testimony of Mr. Samuel

24   will be that of course he gave Mr. Kuc permission to have

25   packages delivered to his office, but it's going to develop as

1   well that he didn't know that companies were pursuing him, and,

2   in fact, even if he did -- so, it's one theory of why there was

3   no lawful authority there, was that, to the extent that

4   Mr. Samuel gave permission to use that address, he didn't know

5   what he was getting into at the time.  He didn't realize it

6   was --

7           THE COURT:  Well, a theory of without lawful authority

8   is that the scope of the tender of the address was more limited

9   than the use of the name; is that it?

10          MR. GARLAND:  Basically, just to put it into a drug

11  context, your Honor, we have had people of all types, and this

12  happened:  "I didn't know at the time the person asked me to do

13  this that that's what I was getting myself into."  The second

14  thing is that, even --

15          THE COURT:  I am not sure what that means, that, "Yes,

16  I let him use it, but if I had known that he was engaging in

17  fraudulent transactions I would not have done that."  So, it

18  will be the extent of the authorization was the use of it for

19  lawful means.

20          MR. GARLAND:  That's correct.  And then the second

21  thing is that there should be evidence and testimony tomorrow

22  that Mr. Samuel's name was used by Mr. Kuc on packages that

23  were not delivered to 42 Union Street, and in that regard I

24  believe he will testify that there was never any authority

25  given to use that name during that time.

1          Now, the law is also that, let's say that -- and the

2     Government doesn't believe this to be true -- but let's say,

3     hypothetically, that Mr. Samuel knew exactly what he was

4     getting into, that he knew that Mr. Kuc was engaging in a

5     scheme to defraud at that point.  The law is, I believe, that

6     if he was doing so, that's also not lawful authority.  That is,

7     that you cannot give somebody else your identity and say, "Go

8     ahead, here, use this identity and commit fraud with it."

9          What we plan to do is to refine an instruction on

10    that, cite you to the relevant case law in the First Circuit

11    and elsewhere.

12         THE COURT:  Yes, I would like to see that.  I

13    relatively recently looked at aggravated identity theft

14    actually in the context of the Greig case and came away with a

15    sense that the case law is not as rigorous as it should be.

16    "Flabby" would be another way of describing the case law among

17    the Circuits, a kind of unhelpful language that does not think

18    through exactly what it is saying, and so I would be interested

19    to see what you have to say on that.

20         My general view of it is one can authorize someone

21    else to use one's name, and the real question is what the scope

22    of the authorization is.  I have a harder time with the idea

23    that someone can be charged with aggravated identity theft or

24    fraud by using legal authorization within the scope of the

25    authorization.  I may have to rethink that, because the statute

1    says "aggravated identity theft," but it is clear that the case

2    law is not talking simply about theft but about fraud.  So, I

3    guess the theory is that someone who lends his name or her name

4    for purposes of a fraudulent scheme is an aider and abettor,

5    maybe even a principal in aggravated identify theft, although

6    it is hard to believe that somebody could engage in identify

7    theft or fraud with one's own name, but that is a different

8    issue.

9         It is something I want to think about more carefully,

10   and I am unlikely to wander over to the borders of the statute

11   here.  But I will listen to what Mr. Francisco Samuel says.

12        MR. GARLAND:  The Court is correct that it is

13   aggravated identity theft, and that's the title.  I think this

14   is going to be one of those cases and one of those statutes

15   where the title of the statute doesn't necessarily define

16   what's going on inside of the statute.

17        THE COURT:  It may not, but it has to be pudding with

18   a theme, and the theme cannot be that aggravated fraud consists

19   of exercising authorization.  But I will look at it carefully.

20   Perhaps it does if the authorization is to engage in fraud.

21        MR. GARLAND:  Thank you, your Honor.

22        THE COURT:  So, those are the two that are out there.

23        Anything that is on your mind, as far as instructions

24   are concerned, apart from a good dinner Thursday night?

25        MR. SHEKETOFF:  Well, we will see how good the dinner

1    is.  No.

2                              (Laughter)

3            THE COURT:  I will not ask for a report, I can assure

4    you.

5            So, I am going to be acting under the assumption for

6    my own planning purposes that I am going to be charging on

7    Thursday.

8            MS. BURKART:  Thank you, your Honor.

9            THE COURT:  All right.  We will be in recess.

10           THE CLERK:  All rise.

11        (The Honorable Court exited the courtroom at 4:25 p.m.)

12         (WHEREUPON, the proceedings adjourned at 4:25 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3          I, Brenda K. Hancock, RMR, CRR and Official Reporter

4     of the United States District Court, do hereby certify that the

5     foregoing transcript constitutes, to the best of my skill and

6     ability, a true and accurate transcription of my stenotype

7     notes taken in the matter of United States of America v.

8     Matthew Kuc, No. 1:11-cr-10014-DPW-1.

9

10

11

12

13

14     Date:     February 14, 2013          /s/ Brenda K. Hancock

15                                          Brenda K. Hancock, RMR, CRR

16                                          Official Court Reporter

17

18

19

20

21

22

23

24

25