1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     THE UNITED STATES OF AMERICA      )
                                        )
5                                       )
                                        )
6     vs.                               )  No.
                                        )  1:11-cr-10014-DPW-1
7                                       )
      MATTHEW J. KUC,                   )
8                                       )
                        Defendant.      )
9


10

      BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
11

12

                          DAY THREE OF JURY TRIAL
13

14

15

            John Joseph Moakley United States Courthouse
16                      Courtroom No. 1
                        One Courthouse Way
17                      Boston, MA 02210
                        Wednesday, June 27, 2012
18                          9:00 a.m.

19

20

21               Brenda K. Hancock, RMR, CRR
                      Official Court Reporter
22        John Joseph Moakley United States Courthouse
                      One Courthouse Way
23                      Boston, MA 02210
                        (617)439-3214
24

25

1    APPEARANCES:

2        UNITED STATES ATTORNEY'S OFFICE
         By:  AUSA Amy H. Burkart
3            AUSA Scott Garland
         Suite 9200
4        Boston, MA 02210
         On behalf of the United States of America

5
         ROBERT L. SHEKETOFF, ESQ.
6        One McKinley Square
         Boston, MA 02109
7        On behalf of the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I  N  D  E  X</u>

<u>PAGE</u>

MOTIONS FOR JUDGMENT OF ACQUITTAL......110


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THOMAS ZAPPALA (RESUMED) | | | | |
| By Ms. Burkart | 4 | | 41 | |
| By Mr. Sheketoff | | 29 | | |
| FRANCISCO SAMUEL | | | | |
| By Ms. Burkart | 44 | | 80 | |
| By Mr. Sheketoff | | 65 | | |
| RAYMOND DI CIACCIO | | | | |
| By Mr. Garland | 81 | | 109 | |
| By Mr. Sheketoff | | 100 | | |


<u>E  X  H  I  B  I  T  S</u>

| No. | In Evd. |
|---|---|
| 26A | 6 |
| 23 | 7 |
| 27 | 9 |
| 28 | 10 |
| 29 | 13 |
| 30 | 16 |
| 31 | 19 |
| 32 | 21 |
| 18 | 27 |
| 19 | 28 |
| 80 | 55 |

1                     P R O C E E D I N G S:

2              THE CLERK:  All rise.

3        (The Honorable Court entered the courtroom at 9:00 a.m.)

4              THE CLERK:  This Honorable Court is back in session.

5    You may be seated.

6              THE COURT:  Are we ready for the jury?

7              MR. GARLAND:  We are, your Honor.

8              MR. SHEKETOFF:  Yes.

9              THE CLERK:  All rise for the jury.

10             (The jury entered the courtroom at 9:00 a.m.)

11             THE COURT:  Good morning, ladies and gentlemen.  We

12   will continue with the testimony of Mr. Zappala.

13         THOMAS ZAPPALA, PREVIOUSLY DULY SWORN BY THE CLERK

14                  CONTINUING DIRECT EXAMINATION

15   BY MS. BURKART:

16   Q.   Good morning, Mr. Zappala.

17   A.   Good morning.

18   Q.   Shortly before we broke yesterday we were discussing

19   Exhibit No. 26.  Do you recall that?

20   A.   I do.

21   Q.   And after we broke, did you review Exhibit No. 26 again?

22   A.   I did.

23   Q.   Was there anything you wanted to address about Exhibit 26?

24   A.   There are two things I wanted to address.  The first is, I

25   recall you asked me if there was a service tag associated with

1    each of the four transactions on that page, and you

2    specifically referred me to item number 3.  I reviewed the chat

3    and saw that there was, in fact, a service tag there.

4    Subsequently, I reviewed the chat log for item number 2.  For

5    that transaction there is no service tag indicated on the chat

6    log, although there is an incident request or a confirmation

7    which I used to tie the chat to the item on the Dell

8    spreadsheet.

9    Q.   Thank you.  So, for -- I'm sorry.  Continue, please.

10   A.   The second item, in reviewing the two-page attachment or

11   page 3 of Exhibit 26, I noticed the heading of the last column

12   is incorrect.  It reads, "Service Order Shipping Waybill," and

13   these four transactions came from two of the Dell spreadsheets.

14   There was actually no waybill information for these four

15   transactions, and in preparing the headings the last two

16   columns were Express Service Code and Service Waybill.

17           In order to format it better, I chopped off the last

18   column, as there was no data, however, the heading ended up

19   incorrect, and it should say "Express Service Code" in the last

20   column on the third page of Exhibit 26.  That was just an error

21   that I made.

22   Q.   Thank you.  And do either of these errors change the

23   testimony you gave yesterday regarding whether you were able to

24   match up the four chats with the records provided by Dell?

25   A.   It does not.

1    Q.    Thank you.

2            THE COURT:  Just a moment.  Is there any reason why

3    Exhibit 26 should not be modified to reflect the witness's

4    testimony?

5            MS. BURKART:  We can, your Honor.  We had previously

6    admitted that exhibit through Robert Long, so I wasn't sure if

7    you would like us to change it or --

8            THE COURT:  Unless there is an objection, we can call

9    it 26A.

10           MS. BURKART:  Right.

11           THE COURT:  And that may be the one that the jury

12   reviews.

13           MS. BURKART:  Sure.  Thank you.

14           (Exhibit No. 26A received into evidence)

15   BY MS. BURKART:

16   Q.   I would like to now direct your attention, again, to what

17   was previously marked as Exhibit M, and we were talking about

18   this before we broke yesterday.

19           MS. BURKART:  That would be Exhibit 23 for your

20   records, Robert.

21   A.    Yes, I recognize this.

22   BY MS. BURKART:

23   Q.    And have you reviewed those materials?

24   A.    I have.

25   Q.    And what are they?

1    A.    These are telephone subscriber records provided by Vonage,

2    a telephone service provider.

3              MS. BURKART:  Your Honor, I have spoken with

4    Mr. Sheketoff about our discussion yesterday, and at this point

5    I would like to move to admit Exhibit 23, which I believe is

6    now unopposed.

7              THE COURT:  All right.

8              MR. SHEKETOFF:  That's correct.

9              THE COURT:  Then we will receive it.

10             (Exhibit No. 23 received into evidence)

11   BY MS. BURKART:

12   Q.   Mr. Zappala, did you do any analysis with regards to

13   Exhibit 26 and this record in front of you, Exhibit 23?

14   A.   I did, yes.

15   Q.   What did you do?

16   A.   Well, I reviewed Exhibit 26 as to the telephone numbers

17   specifically in the column marked "Service Request Contact

18   Phone," and I determined that each of the five telephone

19   numbers reflected on Exhibit 26 appear on this Vonage record

20   that's on the screen.

21   Q.   And did you compare the telephone numbers in Exhibit 26

22   with any other records that have been admitted in this case?

23   A.   Yes.  I compared the phone numbers on this Vonage page to

24   the spreadsheets provided by Dell for each of the four property

25   addresses, Hewlett-Packard and Lenovo.  I believe those are

1    Exhibits 5 through 8, 9 and 13, and I saw that each of the

2    numbers that appear on this page appears somewhere in those

3    spreadsheets.

4    Q.   And directing your attention to the second page of the

5    Vonage records, what is the subscriber billing information for

6    this Vonage account?

7    A.   Well, it provides an account number, a credit card

8    payment.  The name is Matthew Kuc, and there are two addresses

9    listed.  One is 247 Maple Street, and the other is

10   36 Laurelwood Drive in North Attleboro.

11   Q.   Thank you.  I would like to now ask you to look at what's

12   been marked as opposed Exhibit O to be shown to the witness,

13   please.

14   A.   Yes, I see it.

15   Q.   Do you recognize this exhibit?

16   A.   I do.

17   Q.   What is it?

18   A.   This is a chart that I prepared based on the spreadsheets

19   provided by Dell, Hewlett-Packard and Lenovo marked as Exhibit

20   Exhibits 5 through 8, 9 and 13.

21   Q.   Does the information in this chart come from a large

22   number of documents containing a great deal of data?

23   A.   It does.  It comes from those spreadsheets, yes.

24   Q.   And does this chart accurately reflect the results of your

25   analysis?

1    A.    It does.

2            MS. BURKART:  I would like to move to admit this

3    document as Exhibit No. 27, your Honor.

4            THE COURT:  Is there an objection to it?

5            MR. SHEKETOFF:  I have no objection.

6            THE COURT:  So, it is received.

7                (Exhibit No. 27 received into evidence)

8    BY MS. BURKART:

9    Q.    What does this chart show, Mr. Zappala?

10   A.    It shows, by property address, the number of vendor

11   orders; that is, for each of these three vendors, Dell,

12   Hewlett-Packard and Lenovo, it shows the number of transactions

13   they reported by street address.

14            In the matter of Dell, they provided four spreadsheets

15   by property address.  That information came directly from those

16   spreadsheets.  In the case of Hewlett-Packard and Lenovo, I

17   sorted the information by property address and then tallied the

18   number for each address, or there are a number of variations of

19   spellings of some of the addresses, but I grouped them together

20   and I just noted Hewlett-Packard had a number of transactions

21   for which they did not provide an address, and so not all of

22   the Hewlett-Packard transactions are listed there.

23   Q.    Okay.  Thank you.  And looking at the far right column

24   total, what is this the total of, what does this represent?

25   A.    Those are the total orders for each of those addresses, 36

1    Laurelwood, 247 Maple, 42 Union Street and 2130 Mendon Road,

2    and then, finally, I just totalled them all, all the total

3    number of orders.  These orders are from 2003 through 2010.

4    Q.   Okay.  And if you wanted to look at the total number by

5    vendor, how would you do that?

6    A.   You would just look at the column under the vendor name.

7    Q.   Thank you.  Directing your attention next to what's been

8    marked as opposed Exhibit P, if we can show that just to the

9    witness, please, do you recognize this exhibit, Mr. Zappala?

10   A.   I do.  This is a chart that I prepared again based on the

11   information provided by the three vendors.  There are actually

12   three pages, and it takes the number of transactions and just

13   breaks it down into calendar quarter for the years 2005 through

14   2010.

15   Q.   And, again, does this information and the chart come from

16   a large number of documents containing a great deal of data?

17   A.   It does.

18   Q.   Does the chart accurately reflect the results of your

19   analysis?

20   A.   It does.

21        MS. BURKART:  I'd like to move to have this admitted,

22   your Honor, as Exhibit 28.

23        MR. SHEKETOFF:  I have no objection.

24        THE COURT:  All right.  It is received.

25             (Exhibit No. 28 received into evidence)

1    BY MS. BURKART:

2    Q.   Mr. Zappala, you said that the exhibit has three pages.

3    Just focusing, first, please, on the first page, looking at

4    just across the top, sort of the first quarter there, if we

5    could just enlarge or magnify that, could you explain to the

6    jury what that shows, looking across the first top couple of

7    rows?

8    A.   Sure.  It just simply reports in that first quarter ended

9    March 31st, 2005 Dell reported there were 238 transactions or

10   incidents, and they were for the property at 36 Laurelwood, and

11   there were no transactions for the other three property

12   addresses.

13   Q.   And then looking down to the end of the period here, sort

14   of focusing on the bottom rows, and pulling that out, what do

15   you see for the transactions broken out by the last few

16   quarters you analyzed?

17   A.   Well, I see the last few quarters the transactions are

18   primarily in the --

19   Q.   I apologize.  Just a moment, Mr. Zappala.  If we could

20   just enlarge the last few quarters.  Thank you.  Perfect.

21   Thank you.

22   A.   Thank you.  Most of the activity occurs at the Mendon Road

23   property, 2130 Mendon, where there are 369 transactions in

24   2000, the last three quarters of 2010, and there are a lesser

25   number of transactions in the other property addresses.

1    Q.    Thank you.  Pulling back out, please, to drop the

2    magnification, overall what pattern did you see when you did

3    this analysis?

4    A.    Well, what I saw, looking at this, is that the

5    transactions initially occurred at 36 Laurelwood.  Subsequent

6    to that, transactions began at the end of 2005 and Maple

7    Street.  Next I saw with respect to Dell in March, in the

8    quarter ended March 31, 2008 there were a number of

9    transactions at 42 Union Street, and then, as I said, at 2130

10   in the last three quarters of 2010.

11   Q.    Thank you.  Looking to the next page for Hewlett-Packard,

12   what pattern did you see there?

13   A.    It was similar, although the number of transactions was

14   lesser.  The activity with Hewlett-Packard commenced in the

15   second quarter of 2008, again at Laurelwood.  Then, subsequent

16   to that, there were transactions at Maple Street.  At the same

17   time there were transactions at Laurelwood, and then in the

18   second quarter of 2010 there were transactions both at Union

19   Street and at Mendon Road.

20   Q.    Thank you, Mr. Zappala.  And, finally, the last page of

21   the exhibit, the Lenovo transactions, did you notice any

22   pattern there?

23   A.    Again, the pattern was similar, in that the activity began

24   at Laurelwood, the next transaction at Maple Street, and then

25   Union Street, and then finally at Mendon Street.

1    Q.    Thank you.  I would like to direct your attention to

2    opposed Exhibit Q, just to the witness, please.  Do you

3    recognize this exhibit?

4    A.    I do.

5    Q.    What is it?

6    A.    This is an exhibit or a chart that I prepared which shows

7    the variations of the name that I understand to be Francisco

8    Samuel throughout the Dell, Hewlett-Packard and Lenovo

9    spreadsheets.

10   Q.    And did you create this chart from a large amount of

11   documents containing a large amount of data?

12   A.    I did.  I took the information provided by the vendors in

13   Exhibits 8, 9 and 13, sorted it by name and then extracted the

14   names and tallied the number of instances that particular

15   iteration of the either spelling, or punctuation or spacing

16   occurred.

17   Q.    And does this chart accurately reflect the results of that

18   analysis?

19   A.    It does.

20          MS. BURKART:  I would like to move to have this

21   admitted as Exhibit 29, your Honor.

22          MR. SHEKETOFF:  I have no objection.

23          THE COURT:  It will be received.

24               (Exhibit No. 29 received into evidence)

25   BY MS. BURKART:

1    Q.   Mr. Zappala, how many different variations of Francisco

2    Samuel's name did you capture in this exhibit?

3    A.   There are 26 variations.  I would note one of the

4    variations includes simply an extra space between the name

5    Francisco and Samuel.  That is, I think it's in the sixth line

6    down from the top, there's one instance where it's Francisco,

7    space, space, Samuel; and then next to the line, where there

8    are 42 transactions, it's Francisco, space, Samuel, just with

9    one space.  I just captured the specific iterations as they

10   appeared.

11   Q.   Were there any other variations where the only difference

12   was a space?

13   A.   I don't believe that was the case with these names here,

14   no.

15   Q.   What other types of variations did you see in Mr. Samuel's

16   name?

17   A.   Well, I saw first the name was initialized.  The first

18   name, it was F, period, with the various spellings of the last

19   name Samel or Samal or Samul.  I also saw that the name was

20   reversed, and so it was Samel Francisco and Francisco Samel.

21   Q.   How many times did you see the name used accurately?

22   A.   Forty-three.

23   Q.   Thank you.  And how many times was the name used overall

24   for the Dell exhibits?

25   A.   628.

1    Q.    Pardon, the Dell shipments.  Thank you.  And in looking at

2    the next two pages of the exhibit, first, the second page for

3    Hewlett-Packard, how many times was the name used for

4    Hewlett-Packard shipments?

5    A.    Three times.  It was used all the same.

6    Q.    Was that also a variation of the correct spelling of

7    Mr. Samuel's name?

8    A.    It was, as I understand the correct spelling of his name.

9    Q.    Thank you.  And, finally, the third page of the exhibit,

10   Lenovo orders, how many times did you see a variation of

11   Mr. Samuel's name used for Lenovo shipments?

12   A.    Well, there were seven variations and four times where I

13   believe it was the proper spelling.

14   Q.    Thank you.  I would like to direct your attention to what

15   has been previously admitted as Exhibit 49.  Have you seen this

16   before, Mr. Zappala?

17   A.    I have.

18   Q.    Did you use this exhibit as the basis of any analysis?

19   A.    I did.

20   Q.    Generally, what did you do with it?

21   A.    I looked at the names that were recorded in this document

22   and the companies, and I looked through the spreadsheets that

23   were provided by Dell, Hewlett-Packard and Lenovo to see if the

24   names and the companies showed up in that data.

25   Q.    Thank you.  I would like to direct your attention, please,

1    to what's opposed Exhibit R, just to the witness.  Do you

2    recognize this, Mr. Zappala?

3    A.    I do.

4    Q.    What is it?

5    A.    This is a chart that I prepared listing the number of

6    transactions for selected individuals whose names appeared in

7    that notebook.

8    Q.    Does the information in this chart come from a large

9    amount of data?

10   A.    It does.

11   Q.    And does the chart accurately reflect the results of your

12   analysis of that data?

13   A.    It does.

14          MS. BURKART:  I would like to move to admit this, your

15   Honor, as Exhibit 30.

16          THE COURT:  Any objection?

17          MR. SHEKETOFF:  No objection.

18          THE COURT:  It is received.

19              (Exhibit No. 30 received into evidence)

20   BY MS. BURKART:

21   Q.    If we could have a split screen, please, showing that

22   exhibit and Exhibit 49, and specifically page 3 of 49.  Thank

23   you.

24          Mr. Zappala, what does this exhibit show?

25   A.    So, this exhibit shows that for Dan Summers at Silver Fig

1   there were 39 -- in the body of records I reviewed there were

2   39 instances where the contact person was Dan Summers and the

3   company name was Silver Fig.

4   Q.   And when you say "other variations," what do you mean

5   there?

6   A.   I saw that the name Dan Summers appeared in four other

7   instances, and there were different company names that are

8   associated with that name.  I believe at least three of those

9   were RI IT Tech.

10  Q.   Thank you.  Looking to Rick Naples, which I believe is on

11  split screen you should look at page 6 of Exhibit 49.  Is that

12  correct?

13  A.   Yes.  I am not certain of the page number.

14  Q.   Sorry.  Page 7, I believe.

15  A.   But I see Rick Naples at Transdyne (ph), and that was the

16  name I looked for in the records.  I saw 32 instances where

17  that name and company were used, and one other instance where

18  the name was used with a different company.

19  Q.   Do you recall where Rick Naples was working in that

20  example?

21  A.   I believe it was also RI IT Tech.

22  Q.   And, finally, Sam Jenkins.

23  A.   Yes.  I followed the same procedure.  I reviewed the

24  records to see if Sam Jenkins was with an associated company,

25  and "A Plus IT" showed up in the records, and it did so 250

1    times, by my account using the name with that company, and it

2    showed up in seven other instances using other company names.

3    Q.   Do you recall any of the other company names that Sam

4    Jenkins was associated with?

5    A.   I recall that one was Dell, and the other six instances I

6    don't recall.  I know that it was not RI IT Tech.

7    Q.   Thank you.  And when you say the body of data you looked

8    at, just to make sure we're clear, was that for any one vendor,

9    or was that for a combined set of all the vendors?

10   A.   That was for the three vendors, Dell, Hewlett-Packard and

11   Lenovo.

12   Q.   Did you have any data from 3COM for that analysis?

13   A.   I did not, no.

14   Q.   Thank you.  Next, I would like to direct your attention to

15   what has been marked as opposed Exhibit S, just to the witness,

16   please.

17   A.   Yes, I see it.

18   Q.   Do you recognize this?

19   A.   I do.

20   Q.   What is it?

21   A.   This is a chart that I prepared based on my review of the

22   records Dell provided in particular relating to the property at

23   2130 Mendon Road.

24   Q.   And does the information in this chart come from a large

25   number of documents containing a great deal of data?

1    A.    It does.

2    Q.    Does the chart accurately reflect the results of your

3    analysis of that data?

4    A.    It does.

5          MS. BURKART:  I would like to move to have this

6    admitted as Exhibit 31, please.

7          THE COURT:  Any objection?

8          MR. SHEKETOFF:  No, your Honor.

9          THE COURT:  It is received.

10          (Exhibit No. 31 received into evidence)

11   BY MS. BURKART:

12   Q.    Mr. Zappala, why did you analyze the Mendon Road address

13   variations as opposed to one of the other three variations?

14   A.    Well, first of all, the amount of data was manageable.  I

15   think there was some 6,000 transactions for Laurelwood, and the

16   369 at Mendon seemed to be more manageable.  I noted that the

17   Union Street property, there were not many variations of the

18   address, and Mendon Road it seemed like there were a number of

19   spellings of the name, and so that's why I did this analysis.

20   Q.    And how many times did you see the Mendon Road address

21   used overall there?

22   A.    40 times.

23   Q.    And what was the total number of shipments received at

24   Mendon Road addresses?

25   A.    369.

1    Q.   Did you treat spaces in punctuation as different or the

2    same for this analysis?

3    A.   I treated them as different transactions.  I used a

4    literal string that was of words and letters.  I did ignore

5    capitalization, but to the extent that -- and I used the two

6    address fields, as you see at the top, 2130 Mendons Road and

7    then Suite 337.  To the extent that there was a variation in

8    one of those fields, I just captured it.  I initially thought

9    about applying some logic, but I decided I would just leave it

10   as it was presented by the data.

11   Q.   So, this chart represents a very technical analysis of the

12   data with no variations or sort of saying, "This is the same as

13   this; we'll just put those in the same count as the very

14   technical breakdown;" is that correct?

15   A.   Yes, that's correct.

16   Q.   But the one thing that you sort of did do is, to the

17   extent this was in all capitals or using capital and lower

18   case, you would treat that as all the same?

19   A.   I did, yes.

20   Q.   Thank you.  For your last summary I would like to direct

21   you to what has been marked as opposed Exhibit T.  Do you

22   recognize this?

23   A.   I do.

24   Q.   What is it?

25   A.   This is a chart that I prepared using data captured on a

1   spreadsheet by the FBI agents in this case regarding certain

2   inventory of goods, and I matched certain information up from

3   the records on that spreadsheet to the information found in the

4   records provided by Dell and Hewlett-Packard in Exhibits 5

5   through 8 and 9.

6   Q.   Does the information on this chart reflect your analysis

7   of a large number of documents with a great deal of data?

8   A.   It does.

9   Q.   Does your summary accurately capture the results of that

10  analysis?

11  A.   It does.

12  Q.   Thank you.

13        MS. BURKART:  I would like to have this admitted as

14  Exhibit 32, please, your Honor.

15        MR. SHEKETOFF:  Without objection.

16        THE COURT:  It is received.

17            (Exhibit No. 32 received into evidence)

18  BY MS. BURKART:

19  Q.   Just looking across the top two lines of data,

20  Mr. Zappala, if we could just move through them, and getting

21  the heading as well, please, if possible, would you please walk

22  the jury through what each of the columns is and where you got

23  the information for that part of the spreadsheet.

24  A.   Certainly.  The first column is Evidence Item Number, and

25  that was a number I understand assigned by the FBI on their

1    inventory list.  The second column, Ship Date, Delivery Date,

2    again was captured by the FBI with the exception of the data

3    for box or Evidence Item Number 150, for which I reviewed an

4    invoice.

5    Q.   I'm just going to pause you for a moment there,

6    Mr. Zappala.  When you say that it was captured by the FBI, was

7    that Exhibit 60 that we have previously reviewed?

8    A.   That's correct.

9    Q.   And do you understand that to be a chart created at the

10   search of 36 Laurelwood Drive?

11   A.   That's correct.

12   Q.   Thank you.

13   A.   Created at or after.  I'm not sure when it was prepared.

14   Q.   Thank you.

15   A.   Anyway, again from that chart, Exhibit 60, the shipping

16   company, shipping street, shipping city and town, state, zip

17   code, the recipient, recipient company name, street, city and

18   town, recipient state and zip code and phone number came from

19   Exhibit 60, the chart prepared by the FBI.  And the last

20   column, the Order Amount, is data I captured from the Dell

21   spreadsheets, Dell and Hewlett-Packard spreadsheets, Exhibits 5

22   through 8 and 9 after relating the shipping information

23   recorded on Exhibit 60 with information that's on the

24   spreadsheets, and I was able to match the items that appear on

25   this Exhibit 32.  I note here there were at least 170 boxes.  I

1    was not able to match a number of the boxes.  This chart here

2    reflects the ones where I was able to look at the raw data in

3    the spreadsheets provided by Dell and match it to the shipping

4    label.

5    Q.    Thank you, Mr. Zappala.  I do recall that on Exhibits 5

6    through 8 there were two different prices provided by Dell.

7    A.    That's correct.

8    Q.    What were those two different prices?

9    A.    One was the order amount and the other was the cost.

10   Q.    And what did you understand those two amounts to

11   represent?

12   A.    My understanding is one is the price or the list price,

13   and the other is the cost to Dell or the cost of the equipment.

14   Q.    And what choice did you use for your spreadsheet here in

15   Exhibit 32?

16   A.    I used the order amount or the price.

17   Q.    And what information was provided by Hewlett-Packard

18   regarding price?

19   A.    They just provided the price amount, the order amount, and

20   not the cost.

21   Q.    And for this analysis, just focusing you on the last

22   column, what did you get as a total using the Hewlett-Packard

23   information and the Dell information for the cost of the goods

24   that were at 36 Laurelwood Drive for the ones that you were

25   able to get information?

A.   There was no cost information for the Hewlett-Packard.

Hewlett-Packard, I think the total orders are on the

spreadsheet.  Roughly, they broke out 6,000 for Hewlett-Packard

and 32,000 for Dell in round numbers.  The cost associated with

the Dell numbers I calculated, it was just over 13,000.

Q.   Thank you.  I apologize.  I misspoke before.  I meant to

ask you what on the chart was the total amount for the list

price or what Hewlett-Packard and Dell represented would be

their amount that they listed it for.  Is that what's

represented on this chart?

A.   It is.  I want to note in one transaction, which is box

number six, Dell provided a cost but not an order amount.

There was a zero in that column, and so I used the cost amount

for item number three.  But the total is $40,628.81.

Q.   And did you also explain you used a more conservative

estimate using just the cost to Dell and just using Dell

because you didn't have that information for Hewlett-Packard?

A.   Yes.  I didn't prepare a chart in it, but I looked at the

number.  It was just over 13,000.

Q.   So, 13,000 for the cost to Dell of the materials that were

at the search of 36 Laurelwood Drive?

A.   That were identified on this spreadsheet.

Q.   And there were additional items that weren't identified on

the spreadsheet, because you couldn't match them up; is that

correct?

1    A.   That's correct.

2    Q.   Thank you.  Mr. Zappala, did each of the spreadsheets that

3    you reviewed from the vendors, the four Dell spreadsheets, the

4    Hewlett-Packard spreadsheet and the Lenovo spreadsheet, have a

5    total amount on the spreadsheet of what basically was the total

6    order amount for that vendor?

7    A.   If they didn't have a total I totalled them.

8    Q.   How did you total them when they didn't have a total?

9    A.   There were Excel spreadsheets and I added up using a

10   computer function all of the items from line 2 through however

11   many there were, where line 1 was the heading.  So, I summed

12   them.

13   Q.   Did you also have information regarding 3COM and what they

14   estimated were the cost of the items they had shipped to these

15   addresses?

16   A.   I did.  It was included in the Hewlett-Packard records,

17   although there was no detail.

18   Q.   Do you have any understanding of why the 3COM number is on

19   the Hewlett-Packard spreadsheet?

20   A.   I don't know, but I understand that Hewlett-Packard

21   acquired 3COM.

22   Q.   Thank you.  Did you total the amounts for each of the

23   spreadsheets that are in evidence to get a total amount of

24   materials shipped?

25   A.   I did.

1    Q.    What figure did you arrive at?

2    A.    The number was $3,576,000 and change, just under

3    3.6 million, in the total cost or total order amount.

4    Q.    Did you also recently have the opportunity to review some

5    return information from Dell?

6    A.    I did.

7    Q.    And how many items were returned between June 1st, 2005

8    and December 2005?

9              MR. SHEKETOFF:  Objection.  Can we see you, your

10   Honor?  Objection.

11

12   (SIDEBAR CONFERENCE AS FOLLOWS):

13             MR. SHEKETOFF:  I just know don't know where this is

14   coming from.  Have I seen these records?

15             MS. BURKART:  Yes.  I produced it to you an hour after

16   I got it.  I got it -- Long brought some information, I

17   produced it to you and wrote you a letter, brought you a letter

18   summarizing what he gave me.

19             MR. SHEKETOFF:  I haven't seen it, that's all.  I'm

20   not saying it's her fault.

21             MS. BURKART:  It was about an hour after I got it.

22             THE COURT:  Well, the short of it is, are you

23   maintaining the objection?

24             MR. SHEKETOFF:  Yes, because I haven't had a chance to

25   see it yet.

1          THE COURT:  Well, then, we can't do it without the

2     foundation for it.  It is back and forth.

3          MS. BURKART:  That's fine.

4     (END OF SIDEBAR CONFERENCE)

5

6     BY MS. BURKART:

7     Q.   I'm going to show you what's marked as Exhibit 18.  Did

8     you review it?

9     A.   Yes, I have.

10    Q.   What is it?

11    A.   This is a bidding history for Total Asset Recovery from

12    eBay.

13    Q.   Do you understand this to be provided by eBay?

14    A.   I do.

15         MS. BURKART:  Your Honor, I believe this is unopposed,

16    and I would like to move to admit it as Exhibit 18.

17         THE COURT:  All right.  It is received.

18              (Exhibit No. 18 received into evidence)

19    BY MS. BURKART:

20    Q.   Mr. Zappala, did you review this spreadsheet to see if

21    Mr. Kuc had purchased any computer equipment on eBay?

22    A.   I did.

23    Q.   And did you see if he bought any other items as well

24    outside of computer equipment?

25    A.   I did.

1    Q.    And did he?

2    A.    He did, yes.

3    Q.    I would like to also show you what's marked as Exhibit K.

4    This is opposed, so just show the witness, please.

5          Did you review those?

6    A.    I did.

7    Q.    What is it?

8    A.    So, this is a spreadsheet provided by eBay reflecting a

9    listing history of items for Asset Recovery by eBay.

10   Q.    And when you say "listing history," do you have an

11   understanding what that means?

12   A.    I believe these were items sold on eBay.

13   Q.    And what company was that for?

14   A.    Total Asset Recovery.

15         MS. BURKART:  Your Honor, I would like to move to

16   admit this as Exhibit No. 19.

17         MR. SHEKETOFF:  No objection.

18         THE COURT:  All right.  It is received.

19         (Exhibit No. 19 received into evidence)

20   BY MS. BURKART:

21   Q.    Mr. Zappala, what types of items did Mr. Kuc list on eBay,

22   or what types of items were listed for Total Asset Recovery?

23   A.    It appeared to be a variety of computer equipment.

24   Q.    Did you notice what vendors there was computer equipment

25   from?

1    A.    I noticed there was a variety, but it included Dell.

2    Q.    Did you generally compare this to the spreadsheets of Dell

3    that they provided or any of the other computer companies to

4    see if there were similar types of equipment?

5    A.    I didn't do an analysis of it, but I did look at it

6    generally.   It appeared to be similar types of equipment.

7    Q.    And do you have a total for the number -- for the listing

8    activity on this spreadsheet on the final page?  I believe it's

9    about 260-some-odd pages, but maybe we can just move to the

10   last page.  I don't know if there is a total there.  Did you

11   calculate the total?

12   A.    I did calculate the total.

13   Q.    And how did you calculate that?

14   A.    Again, by just summing the column.

15   Q.    Using Excel?

16   A.    Using Excel, that's correct.

17   Q.    And what was the total?

18   A.    $1,322,066.92.

19   Q.    Thank you, Mr. Zappala.  That's all I have.

20          THE COURT:  Mr. Sheketoff.

21          MR. SHEKETOFF:  Thank you, your Honor.

22                    CROSS-EXAMINATION

23   BY MR. SHEKETOFF:

24   Q.   Good morning, sir.

25   A.   Good morning.

1    Q.    That last exhibit, Exhibit 19, and that total of

2    $1,322,066, that's, from your understanding, products sold on

3    eBay by Mr. Kuc?

4    A.    That's my understanding.

5    Q.    And you said there was a variety of computer equipment

6    involved?

7    A.    Yes.

8    Q.    Anything else besides computer equipment, phones, things

9    of that nature?

10    A.    There were a variety of things, yes.

11    Q.    And you said that they were from a variety of companies,

12    including Dell?

13    A.    Yes.

14    Q.    Including Lenovo, do you recall?

15    A.    I didn't say that.  I don't recall, but I would be happy

16    to look at that chart and see.  I just don't recall, as I sit

17    here.

18    Q.    All right.  And how about HP?

19    A.    Again, I don't recall as I sit here.

20    Q.    In any event, there's 126 or so pages of it?

21    A.    That's correct.

22    Q.    Now, I would like to go back to where you started, which

23    is Exhibit 26, I believe.  Sorry, it's page 1, and it's item 3.

24          As I understood your testimony, you looked at the

25    chats, which are Exhibits 1 to 4?

1    A.    That's correct.

2    Q.    And you looked at the other materials provided by Dell,

3    and you created this chart?

4    A.    That's correct.

5    Q.    All right.  Now, on number 3 -- which, by the way,

6    corresponds to Count Three in the indictment, correct?

7    A.    Yes.

8    Q.    All right.  On number 3 you have under the heading

9    "Service Request Contact Name and Company," you have, and you

10   told us about this, "Francisco Samel" and in parentheses "Mark

11   Cook" underneath, correct?

12   A.    That's correct.

13   Q.    The Mark Cook comes from the actual chat, correct?

14   A.    Yes.

15   Q.    If you read the chat, which is Exhibit 3, there's no

16   mention of the name Francisco Samel; is that fair to say?

17   A.    That's fair to say.

18   Q.    On all the other chats that we have, 1, 2 and 4, there's

19   no difference between the Dell records and the actual chat; is

20   that fair to say?

21   A.    That's fair to say.

22   Q.    But on this one with the name Francisco Samel there is a

23   difference, correct?

24   A.    Correct.

25   Q.    Where does the Dell record come from?  How did they get

1   the name Francisco Samel to put into that big spreadsheet?  Do

2   you have any idea?

3   A.   I do not, no.

4   Q.   There's nothing in the chat that suggests that name,

5   correct?

6   A.   There is not.

7   Q.   Did you have a chance to actually speak with the

8   representative from Dell?

9   A.   I spoke with -- at some point a number of weeks ago I was

10   on a conference call with someone from Dell.  I did not speak

11   to anyone about this particular chat or this particular issue.

12   Q.   All right.  Let's take the spreadsheets that Dell has

13   provided and that you used as the basis for a lot of your

14   summary analysis.  What did those spreadsheets represent, to

15   your understanding?

16   A.   They represented incident requests where there were orders

17   or parts shipped based on a service call.

18   Q.   Are they all-inclusive?  Do they list every service

19   request for those addresses?

20   A.   I know from my review there were some transactions for

21   which there were no shipments made that were identified in a

22   separate portion of the spreadsheet that were not captured in

23   Exhibits 5 through 8, but my understanding is that they

24   attempted to capture all the shipments that they made.  That

25   was my understanding.

1   Q.   So, the totals that you come up with for shipments and the

2   totals that you come up with for deliveries to these different

3   addresses, those are the total number of times that Dell

4   delivered to those addresses?

5   A.   That's my understanding.

6   Q.   Whether or not they received an item back?

7   A.   Yes.

8   Q.   All right.  How about with Hewlett-Packard?  You used

9   their spreadsheet for your analysis, correct?

10  A.   I did.

11  Q.   And was it your understanding that every item on that

12  spreadsheet was an occasion that Hewlett-Packard shipped to

13  some address associated with Matt Kuc?

14  A.   That was my understanding.  As I testified, there were

15  some transactions for which Hewlett-Packard did not list an

16  address, and so in some of the summaries I omitted those

17  transactions.  But, yes, my understanding is that that was

18  their record.

19  Q.   And that would include all occasions when the items were

20  shipped to those addresses, whether or not the items were

21  returned?

22  A.   That's my understanding.

23       MR. SHEKETOFF:  Could I have Exhibit 29, please.

24  BY MR. SHEKETOFF:

25  Q.   You took every instance that you could find of something

1   that approached the name Francisco Samuel and called it a

2   variation of that name, correct?

3   A.   I did.

4   Q.   Is Sheketoff Robert my name?

5   A.   It might be.

6   Q.   Is R Shekky my name?  It sounds similar, correct?

7   A.   It does.

8   Q.   Since you know who I am, you might think such names were

9   referring to me, correct?

10  A.   Yes.

11  Q.   But they may actually have nothing to do with me, correct?

12  A.   They may not.

13  Q.   Right.  Your view here was that he had taken a name that

14  you know a real person has and he had made changes in that

15  name, so you assume that those are just variations of a real

16  person's name, correct?

17  A.   Well, I'm not sure what I assume.  What I tried to do here

18  was capture names that appeared to be similar, and this is the

19  result of that, the data that I captured.

20  Q.   Most of these entries have nothing to do with the real

21  person Francisco Samel, correct?

22  A.   I'm not sure I understand the question.

23  Q.   Well, if I introduce myself as Sheketoff Robert, do you

24  think of me as the same person as Robert Sheketoff?

25  A.   Well, on that particular instance I would, since I know

1    you.

2    Q.   Since you know me well.  All right.  In any event, do you

3    think I could get by security downstairs with the name

4    Sheketoff Robert?

5    A.   I'm not sure if I understand the question.

6    Q.   Okay.  If someone called themselves Robby Shekky, would I

7    assume -- would you think it would be fair for me to assume

8    that they have stolen my identity?

9    A.   No.

10                         (Pause)

11         MS. BURKART:  Objection, your Honor.

12         THE COURT:  There was a time lapse, I think.

13         MS. BURKART:  There was.  I'm sorry.

14         THE COURT:  I am going to let it stand in light of the

15   time lapse.

16   BY MR. SHEKETOFF:

17   Q.   Now, could I have Exhibit 32, please?  Now, these are the

18   list of items taken from the search, according to the FBI

19   record, at my client's home?

20   A.   For which I was able to associate an order amount based on

21   my review of the records provided by Dell and Hewlett-Packard.

22   It's not a complete list of the inventory of records.

23   Q.   Only if you could find a shipping entry in the Dell or

24   Hewlett-Packard records for these items would you have given a

25   cost associated with the item, correct?

1    A.    That's correct.

2    Q.    Were there Dell and Hewlett-Packard items in boxes that

3    you were not able to find a shipping record for?

4    A.    There were.

5    Q.    Do you recall how many such items there were?

6    A.    I don't recall, but as I testified, I know there is a box

7    170, so it would be the difference between 170 and the number

8    of items here.

9    Q.    And how many items do you think are there, approximately?

10   A.    Thirty-one, by my account.

11   Q.    So, there are about 140 boxed items that you couldn't

12   match up to Dell or Hewlett-Packard shipping records that were

13   provided?

14   A.    I believe there were some Lenovo items as well.

15   Q.    So, some of them could, I suggest -- correct me if I'm

16   wrong -- would be explained by they weren't Dell or

17   Hewlett-Packard items, correct?

18   A.    Yes.

19   Q.    But I'm focusing on the ones that were Dell and

20   Hewlett-Packard items.  How many do you estimate of the 140 or

21   so that you couldn't match up actually had Dell or

22   Hewlett-Packard that were in Dell or Hewlett-Packard boxes but

23   did not appear to be shipped by Dell or Hewlett-Packard,

24   according to the records they provided?

25   A.    Two parts.  I think most of the items that were on the

1    spreadsheet of the 170 were Dell or Hewlett-Packard.

2    Q.   Okay.

3    A.   And they appeared to be shipped by Dell or

4    Hewlett-Packard, however, I was not able to ascertain from the

5    information that appeared on the box really in the agent's

6    spreadsheet and other information that they were able to gather

7    and match it with the inventory, the records that Dell had.

8    Q.   Okay.  So, is it conceivable to you that some of these

9    items were shipped originally by Dell or Hewlett-Packard to

10   somebody else and ended up in that --

11        MS. BURKART:  Objection.  Calls for speculation.

12        THE COURT:  Yes.  Sustained.

13   BY MR. SHEKETOFF:

14   Q.   All right.  Did the items that you were not able to match

15   up, most of the 140, did they have either serial numbers or

16   identification numbers or tag numbers on them?

17   A.   They had information on them, including who they were

18   shipped to and what address.  I believe they were shipped to

19   these four addresses that have been the subject of my testimony

20   and to individuals that were sort of associated with those

21   addresses.  They had, I understand, certain information that

22   the agents collected, such as serial numbers and other numbers

23   associated with the shipments.  I was not able to match those

24   numbers with the information that was on the Dell spreadsheets

25   that I reviewed, and, therefore, I didn't associate a cost with

1    them.

2    Q.   The Dell spreadsheets have tag numbers, ID tag numbers, on

3    them, correct?  The Dell spreadsheets that you looked at

4    actually have the tag number?

5    A.   They have service tag numbers on them, yes.

6    Q.   And looking at those tag numbers you were not able to

7    match in some percentage of the 140 any shipping order from

8    Dell?

9         Let me put it this way:  Is it fair to say that

10   because you have a box in your house it doesn't mean that

11   what's in the box now is what came in the box when it was first

12   sent to you?

13        MS. BURKART:  Objection, your Honor.  This calls

14   for --

15        THE COURT:  Sustained.

16   BY MR. SHEKETOFF:

17   Q.   Why weren't you able to match up about 140 of them?

18   A.   When I was working with the spreadsheet provided by the

19   agents, there was one transaction I testified about where there

20   was not an address indicated in the spreadsheet, and so I

21   sought to see if there was a shipping order for that.  I was

22   able to find one and, therefore, I captured the date and

23   actually used that shipping order to match up the information

24   to the spreadsheet.

25        I think if I had more of the shipping orders available

1    for my review, perhaps if I had gone through the boxes I might

2    have seen something, but I used the spreadsheet and identified

3    the ones that I could match up based on my review from my desk,

4    is how I approached it.  It may be possible to match up more

5    with more time and more review of other documents, however, I

6    did not do that.

7    Q.   All right.  So, are you saying the ones that were readily

8    recognizable are the ones you stopped with, and the others may

9    or may not be on those spreadsheets that would have just taken

10   more work, might have required examination of the actual

11   content of the boxes?

12   A.   My understanding is that the agents reviewed the content

13   of the boxes and captured certain information with serial

14   numbers.  I am saying, based on my review, I couldn't associate

15   those numbers with things on the spreadsheets, and so I didn't

16   include them.

17   Q.   Okay.

18   A.   I included the ones that I could associate.

19   Q.   The last area I want to touch on is the total order amount

20   that you put at about $3.6 million.

21   A.   Yes.

22   Q.   In other words, if you added up the list price, that Dell

23   and Hewlett-Packard only gave a list price, if you added up all

24   of those list prices for items sent to addresses associated

25   with Mr. Kuc, there was a total of $3.6 million sent?

1   A.   Yes.  3.5, 7, 6, something like that.

2   Q.   That's over what period of time?

3   A.   That was from 2003 through 2010.

4   Q.   Did you do a quote, unquote, conservative calculation on

5   actual cost?  I know you couldn't do it with Hewlett-Packard,

6   because they didn't give actual cost, but with Dell?  Did you

7   do a conservative estimate or summing to see what -- in other

8   words, did Dell have a cost of $1 million, $500,000,

9   $3.4 million?  I mean, what's their markup on this, 300

10  percent?

11  A.   I totalled the order amount for Dell, and I ordered (sic)

12  the cost amount for Dell, the magnitude, the cost amount -- or

13  the order amount was 2.8 million.  The cost amount was

14  approximately 1.4 million.  The margin or the percentage was

15  49 percent.  That's based on the information on the

16  spreadsheets.

17  Q.   What do you mean "49 percent"?

18  A.   Well, I just added up the cost of all the Dell items.

19  Q.   Right.  So, if the cost of all the Dell items is

20  1.4 million and they sell it for 2.8 million, that's a 50

21  percent markup?

22  A.   Well, the cost is 50 percent of the order amount.

23  Q.   Oh, I see what you're saying.

24  A.   It's half.

25  Q.   It's half?

1    A.    Yes, sir.

2    Q.    They sell it for twice what it costs them on average?

3    A.    Based on the information on these spreadsheets, yes.

4    Q.    Based on the information on the spreadsheets?

5    A.    Yes.

6    Q.    Okay.  Thank you, sir.

7              MS. BURKART:  Just briefly, your Honor.

8                        REDIRECT EXAMINATION

9    BY MS. BURKART:

10   Q.   Mr. Zappala, we spoke about Exhibit 60, so I thought it

11   might be helpful just to briefly take a look at that.  I'm just

12   going to direct your attention to the pages where there's

13   information regarding information about the computers there.

14   It may be a little bit difficult to see on the screen because

15   we have got sort of two pages, I believe, for each line, but

16   does looking at this document either here or in the spreadsheet

17   refresh your recollection about what serial numbers were

18   provided by Dell, if there were any serial numbers that

19   Mr. Sheketoff spoke about?

20   A.    Well, in some of the equipment there was service tags, in

21   others there did not appear to be service tags, on the

22   information provided by Dell.

23   Q.    And you did not prepare Exhibit 60; is that correct?

24   A.    I did not.

25   Q.    Who prepared that?

1    A.    I believe it was Sarah De Lair, an FBI agent.

2    Q.    Were you ever looking through any of these boxes?

3    A.    No.

4    Q.    And with the exception of the one time you testified about

5    looking at a shipping label, did you have the complete

6    information for each of these boxes?

7    A.    Well, there were two transactions on the list that I had

8    identified where there was a part number on a Hewlett-Packard

9    shipment.  The Hewlett-Packard spreadsheet included a part

10   number, and when I looked at the spreadsheet the part number

11   didn't match the form of the parts indicated on the

12   Hewlett-Packard spreadsheet, and so I followed up with

13   Ms. De Lair and had her check the record to see if the

14   information was correct on her spreadsheet.  I understand it

15   was an earlier iteration of the spreadsheet that I was working

16   with, and this reflects the proper number here, Exhibit 60.

17          On the second one I looked at a packing slip, which

18   also gave me the correct serial number.  There was a suffix of

19   011 that was recorded in the part number, and the actual was

20   001.  I used those part numbers to match up the information on

21   the Hewlett-Packard spreadsheet.

22   Q.    So, would it be fair to say that in those instances you

23   essentially caught Agent De Lair's typo?

24   A.    Yes.

25   Q.    And you were able to in that case match it up to the

1    spreadsheet?

2    A.   That's correct.

3    Q.   And other than that, you worked off of Agent De Lair's

4    spreadsheet that she created of the documents found at the

5    search and compared them to the spreadsheets you had from Dell;

6    is that correct?

7    A.   I did.

8    Q.   Thank you.  I would just like to next address briefly

9    Exhibit 19, which is the eBay listing activity.  Do you have an

10   understanding of how the prices are derived here on the eBay

11   records?  In other words, is that the price the consumer, the

12   person on eBay who is bidding on the auction item or buying the

13   item on eBay, is that what they paid?

14   A.   My understanding is that's the final bid, is what they

15   paid.

16   Q.   Okay.  Thank you, Mr. Zappala.  No further questions.

17            THE COURT:  Mr. Sheketoff, anything?

18            MR. SHEKETOFF:  No, your Honor.

19            THE COURT:  You may step down, Mr. Zappala.

20                    (Witness stepped down)

21            MS. BURKART:  Your Honor, the Government calls

22   Francisco Samuel.

23                        (Pause)

24            THE COURT:  Ms. Burkart.

25            THE COURT SECURITY OFFICER:  We are looking for him,

1    your Honor.

2                        (Pause)

3            THE CLERK:  Please raise your right hand.

4    FRANCISCO SAMUEL, DULY SWORN BY THE CLERK

5            THE CLERK:  Please state your full name, spelling your

6    last for the record.

7            THE WITNESS:  Francisco Samuel, F-R-A-N-C-I-S-C-O,

8    Samuel, S-A-M-U-E-L.

9            THE COURT:  You may inquire.

10                        DIRECT EXAMINATION

11   BY MS. BURKART:

12   Q.   Mr. Samuel, what do you do?

13   A.   I'm an Internet consultant.

14   Q.   Where do you work?

15   A.   I have an office at 42 Union Street in Attleboro.

16   Q.   And what is 42 Union Street in Attleboro?

17   A.   It's the address of the United Regional Chamber of

18   Commerce.

19   Q.   And do you have a relationship with the Chamber of

20   Commerce?

21   A.   I have served on the Board of Directors for about 12

22   years, and I help them with technical issues.

23   Q.   And how long have you had an office there?

24   A.   I don't recall exactly, but I think it was around 2007

25   when I started working there permanently.

1    Q.   And do you have a name that you use for your Internet

2    consulting?

3    A.   Yes.  My business is a d/b/a, and it's Abacus Software

4    Systems.

5    Q.   Thank you.  Do you know Mr. Kuc?

6    A.   Yes, I do.

7    Q.   Could you please identify him for the jury.

8    A.   He is sitting right there (indicating).

9    Q.   When did you first meet Mr. Kuc?

10   A.   I would say it was around 2001, 2002.

11   Q.   And what was the nature of your relationship?

12   A.   It was friendly and it was -- he was a, you know,

13   technical computer consultant, and so somebody that I could use

14   for my own business as a resource.

15   Q.   How is what Mr. Kuc does different from what you do?

16   A.   Well, Mr. Kuc had different businesses, but I do, for the

17   most part, like, 95 percent of my business is all

18   Internet-related, so building websites, databases, things like

19   that, and Mr. Kuc, I don't believe, did any of that.

20   Q.   Do you use a lot of computer equipment in your work?

21   A.   Very little.

22   Q.   Why?

23   A.   Well, in building websites you just -- you buy a server

24   and the server is hosted somewhere, and I use a laptop for my

25   own use.

1    Q.    You referred to Mr. Kuc's "businesses," plural.  What

2    businesses did you know him to have?

3    A.    To my knowledge, he had three businesses, so he had a

4    hosting business that I used for my own hosting.

5    Q.    What was that called?

6    A.    It was called Cyon ISP.  He also did work for a company

7    called Sensible Computers, and I believe he also did some of

8    their work on his own, where he was a network technician and he

9    did troubleshooting of computers.  And then he had another

10   business I believe that was called Total Asset Recovery that he

11   sold used parts.

12   Q.    Was Total Asset Recovery a storefront?  Could you go into

13   Total Asset Recovery?

14   A.    The only thing I knew about Total Asset Recovery was that

15   it was an eBay store.

16   Q.    Did you ever visit the eBay store?

17   A.    Yes.

18   Q.    How does eBay work?  What happened when you went on the

19   eBay store?

20   A.    Well, it's a bidding site, so you bid for products.

21   Q.    Did you ever win any products on Total Asset Recovery?

22   A.    Yes, I did.

23   Q.    How did that happen?

24   A.    Mr. Kuc asked me to bid on some products for him.

25   Q.    And why did he ask you to do that?

1          MR. SHEKETOFF:  Well, objection.

2          THE COURT:  Well, I will sustain the objection in that

3    form.

4          MS. BURKART:  Sure.

5    BY MS. BURKART:

6    Q.   Specifically what did Mr. Kuc ask you to do?

7    A.   He asked me to --

8          MR. SHEKETOFF:  Objection.  Can we see you at sidebar

9    on this?

10         MS. BURKART:  I apologize.  I can rephrase.  I'm

11   sorry, not rephrase.  I could show him an exhibit.

12         THE COURT:  Well, I will see you at sidebar.

13

14   (SIDEBAR CONFERENCE AS FOLLOWS):

15         THE COURT:  Why isn't this an admission?

16         MR. SHEKETOFF:  But it's other crimes, so it has

17   nothing to do with this case.

18         MS. BURKART:  I don't think it's a crime.  I'm going

19   to show him Exhibit 19, the eBay records, and it shows his name

20   as one of the bidders.

21         MR. SHEKETOFF:  I thought you were going to get into

22   the topic of, "Didn't he ask you to bid --"

23         THE COURT:  Let me understand this.  He is an

24   accommodation bidder; is that what the deal is?

25         MR. SHEKETOFF:  Yeah.

1          MS. BURKART:  Is that a crime?

2          THE COURT:  Well, it may be, to pump up a price in an

3     auction.

4          MS. BURKART:  I was using it more to explain why his

5     name is in the eBay records which have been admitted into

6     evidence.

7          THE COURT:  Why the?

8          MS. BURKART:  The eBay records have been admitted into

9     evidence, his name appears on it a number of times, so the jury

10    has a basis for understanding.

11         THE COURT:  I am going to let it come in, but if it

12    starts to morph into suggestions that there is some wrongful

13    manipulation of the eBay process, then I will revisit it, but

14    it seems to me to be pretty attenuated from that.

15    (END OF SIDEBAR CONFERENCE)

16

17    BY MS. BURKART:

18    Q.   Mr. Samuel, I am going to show you what's been marked as

19    Exhibit 19.  Do you recognize that?

20    A.   It was shown to me last week.

21    Q.   And what is it?

22    A.   I understand it to be a document with all the sales of the

23    eBay store.

24    Q.   And did you bid on items on the eBay store there?

25    A.   Yes.

1    Q.   Thank you.  And when you say it was shown to you last

2    week, did I show it to you?

3    A.   Yes.

4    Q.   Thank you.  Had you seen it before that?

5    A.   No.

6    Q.   I am going to ask you about the Attleboro Chamber of

7    Commerce.

8    A.   I'm sorry.  That used to be called the Attleboro Chamber

9    of Commerce.  It's now called the United Regional Chamber of

10   Commerce.

11   Q.   Thank you.  And what was the address of that location

12   again?

13   A.   42 Union Street.

14   Q.   And did Mr. Kuc ever ask you to accept packages for him at

15   42 Union Street?

16   A.   Yes, he did.

17   Q.   When was this?

18   A.   It was shortly after I got the office there, so shortly

19   after 2007.  I don't recall exactly.

20   Q.   And what did you do when he asked you to do that?

21   A.   When the packages came in, they would just sit in the

22   office in a corner somewhere, and I would either call him or he

23   would call me and he would come by and get them.

24   Q.   Why did you agree to accept packages for Mr. Kuc at

25   42 Union Street?

1    A.   Well, he was looking for me to help him, because at his

2    own office the person who works there didn't show up until

3    around 11:00 or 12:00.

4    Q.   When you say "his own office," what office do you mean?

5    A.   I believe that to be the office where Sensible Computers

6    is, and I don't recall that address off the top of my head.

7    Q.   Who were the packages addressed to that arrived at

8    42 Union Street?

9    A.   The packages seemed to be addressed to my name.

10   Q.   And did you allow Mr. Kuc to have packages sent to 42

11   Union Street using your name?

12   A.   I assumed that my name was the delivery address, otherwise

13   they wouldn't have known that those packages would arrive at

14   the right place.

15   Q.   Did you explicitly discuss it with Mr. Kuc?

16   A.   No, I did not.

17   Q.   And how did you say you got these packages to Mr. Kuc?

18   A.   I would call him, or he would call me and he would come by

19   and get them.

20   Q.   Did you ever bring them to his home?

21   A.   On a couple of occasions I did.

22   Q.   Where was that?

23   A.   I don't recall the address off the top of my head.

24   Q.   I'm showing you what's been previously admitted as Exhibit

25   8.  If you can magnify the title, please.  Do you recognize

1    this document?

2    A.    Yes.

3    Q.    Have you seen it before?

4    A.    Yes.

5    Q.    Did you have a chance to review it?

6    A.    Yes.

7    Q.    Who showed it to you?

8    A.    You did.

9    Q.    I'm directing your attention to the "Name" column.

10   A.    Yes.

11   Q.    How did these names compare with your own?

12   A.    It's misspelled.

13   Q.    I'm going to direct your attention to the "Date" column,

14   please.  Did you have the opportunity to review this "Date"

15   column of these records?

16   A.    Yes.

17   Q.    There is a hard copy there available for you, if you would

18   like to review it.  Do you recall when the majority of the

19   boxes were sent to 42 Union Street?

20   A.    From what I recall, January of 2008.

21   Q.    Through?

22   A.    Well, there were packages delivered also in February, and

23   it seemed like the bulk of the packages were delivered during

24   that time.  There were other packages delivered, from what I

25   remember looking at the document, after that as well.

1    Q.   Mr. Samuel, did you ever receive any phone calls from any

2    computer companies?

3    A.   IBM called.

4    Q.   When?

5    A.   I want to say sometime between 2009 or 2010.  I don't

6    recall exactly.

7    Q.   Without saying what anyone said specifically, what was the

8    call about, generally?

9    A.   They were looking for parts.

10   Q.   And what type of parts were they looking for?

11   A.   I'm assuming that --

12        MR. SHEKETOFF:  Well, objection.

13        THE COURT:  Yes.  Sustained.

14   BY MS. BURKART:

15   Q.   What did you do as a result of that call?

16   A.   I told Mr. Kuc that IBM had called, and that there was an

17   issue with whatever he had requested.

18   Q.   And did you speak about it again further after that?

19   A.   He eventually -- he told me that he had taken care of the

20   problem, and that was the end of that discussion.

21   Q.   Mr. Samuel, what type of computers do you use?

22   A.   I use mostly laptops.

23   Q.   And what type of laptop, what manufacturer?

24   A.   Dell.

25   Q.   Did you ever order a part from Lenovo, or also called IBM,

1   3COM or Hewlett-Packard?

2   A.   No.

3   Q.   Have you ever requested a new Dell computer part to

4   replace one under warranty?

5   A.   I'm sure I have.

6   Q.   And how many times a year did you order from Dell?

7   A.   Since I only have one or two laptops to my name, it was

8   maybe once a year, if that.

9   Q.   If you ordered from Dell a replacement part, what name did

10  you provide them?

11  A.   My name.  Either my name or my company name, whichever one

12  I would use to purchase.

13  Q.   And what address would you have provided them?

14  A.   When I did work on my laptops they would send a technician

15  to wherever I was working, so it would either be at my house in

16  North Attleborough, or it could be at the Chamber, or it could

17  be at any of the locations where I did work.  But normally they

18  wouldn't send the part there, they would send a technician.

19  The technician would replace the part and then just leave.

20  Q.   Why did you have a technician come instead of just having

21  a part shipped to you?

22  A.   Because it's in a laptop, and that's not my expertise,

23  replacing parts in a laptop, and that's the warranty that I

24  buy.  So, they would come, they would replace the part, take

25  the old one, and then, you know, my computer is up and running

1    by the time that they leave.

2    Q.   Thank you.  I would like to have a split screen, please,

3    of Exhibit No. 56 and Exhibit No. 48 previously admitted.

4         Mr. Samuel, if we could magnify the shipping address

5    on this box and this shipping label.

6    A.   Yeah.

7    Q.   What name are these boxes shipped to?

8    A.   It says "Francisco Samuel," but then it says "Abacus

9    Solution," and the name of my company is Abacus Software.

10   Q.   And dropping that, do you see the return label, who it's

11   shipped from?

12   A.   I can't read it.

13   Q.   We can magnify it for you.  Thank you.

14   A.   I don't recognize that name.

15   Q.   And looking at the top of the other exhibit, can you see

16   who that is from?

17   A.   From IBM.

18   Q.   Are these products that you ordered, Mr. Samuel?

19   A.   No.

20   Q.   If an IBM product arrived at 42 Union Street with your

21   name on it, what would you do with it?

22   A.   I would assume that it was Matt's.

23   Q.   And what would you do then?

24   A.   I would call him and say, "You have a part here."

25   Q.   You said you have occasionally been to Mr. Kuc's home; is

1    that right?

2    A.    Correct.

3    Q.    Did you ever store any computer parts or products there?

4    A.    On occasion, I asked Matt to work on some of my computers,

5    so I would bring a computer over and he would work on it and

6    then give it back to me.

7          MS. BURKART:  I would like to show the witness what

8    has been marked as Exhibit 80.  It's a new exhibit.  I provided

9    it to the Court.  It was also the chalk that I used the other

10   day.  I believe it's unopposed by Mr. Sheketoff.

11         MR. SHEKETOFF:  That's correct.

12         THE COURT:  All right.  So, this was the chalk used in

13   the opening?

14         MS. BURKART:  It is, your Honor.

15         THE COURT:  But it had not been introduced yet?

16         MS. BURKART:  It had not.

17         THE COURT:  So, it is received.

18              (Exhibit No. 80 received into evidence)

19         MS. BURKART:  Thank you.

20   BY MS. BURKART:

21   Q.    Mr. Samuel, do you recognize Mr. Kuc's home in that photo?

22   A.    Yes.

23   Q.    Where is it?

24   A.    It's on the top left.

25   Q.    And how many times, approximately, would you say you have

1   been there?

2   A.   Over the course of 10 years, I don't know, 20, 30 times.

3   Q.   Do you recognize the building on the top right?

4   A.   Yes.

5   Q.   What is that?

6   A.   That's the entrance to Sensible Computers.

7   Q.   Have you ever been to Sensible Computers?

8   A.   Yes.

9   Q.   When?

10  A.   Since that's where my server was stored, and on occasion I

11  went there, even if just to meet Matt to go to lunch, maybe 20

12  or 30 times.

13  Q.   Can you describe to the jury what you mean when you say

14  that's where your server was stored?

15  A.   Well, I said previously that my web server was at Cyon

16  ISP, and it's physically at that building, so on a rare

17  occasion that something needed to be done, you know, I've been

18  there.

19  Q.   Did you do any repairs to your computer server there or

20  order any parts for your computer server there?

21  A.   No.

22  Q.   I am going to show you what's marked as Exhibit 6

23  previously introduced.  Can we magnify the title, please.  Have

24  you seen this before?

25  A.   Yes.

1    Q.   Did you get a chance to review it?

2    A.   Yes.

3    Q.   I'm going to direct your attention to page 6.  If we could

4    magnify the requester name and scroll, just scroll down there.

5    If you could let me know when you see a name that resembles

6    your own.

7    A.   Yes.

8    Q.   I would like to take you through each of these lines

9    through Exhibit 6 -- I'm sorry -- page 6, down through the

10   bottom and then onto the next page, please.  We are just going

11   to magnify it and run through the names so that you can see,

12   and then at the end I will ask you a question about what you

13   have seen.

14   A.   Okay.

15   Q.   So, this is page 7, I believe.  Starting at the top and

16   magnifying down.  Thank you.  Page 8, please.  If we can do a

17   bigger box, maybe, or larger.  Thank you.

18          And without magnifying, if I could direct your

19   attention to page 9.  Can you see the requester name without

20   magnifying and doing the scroll?  Can you see it?

21   A.   Yes.

22   Q.   We can put up the whole thing, if you would like.  Page

23   10.

24   A.   Okay.

25   Q.   Page 11.

1    A.   Okay.

2    Q.   And page 12.

3    A.   Okay.

4    Q.   Mr. Samuel, are you aware of any reason why your name

5    would appear on a spreadsheet for 247 Maple Street for this

6    many orders for Dell products?

7    A.   No.

8    Q.   Did you give Mr. Kuc permission to use your name or the

9    name of Abacus for orders at 247 Maple Street?

10        MR. SHEKETOFF:  Objection.

11        THE COURT:  Overruled.  He may answer that question.

12   You may answer the question.

13   A.   I'm sorry.  What was the question again?

14   BY MS. BURKART:

15   Q.   Did you give Mr. Kuc permission to use your name for

16   orders to 247 Maple Street?

17   A.   No.

18   Q.   I'm going to direct your attention back to Exhibit 80,

19   please.  I asked you about the photo in the top left and the

20   top right.

21   A.   Correct.

22   Q.   The bottom left, please.

23   A.   That's where my office is.

24   Q.   And do you recognize the address on the bottom right?

25   A.   No.

1    Q.   Do you recognize that storefront at all?

2    A.   No.

3    Q.   Mr. Samuel, I'm going to show you what's marked as Exhibit

4    7 and magnify the title for you, please.  Have you seen this

5    before?

6    A.   Yes.

7    Q.   Did you get a chance to review it?

8    A.   Yes.

9    Q.   I'm going to direct your attention to the requester name

10   and column number and show the Matt Kuc working at Abacus.  If

11   you can magnify that.

12        Is there a Matt Kuc working for you at Abacus?

13   A.   No.

14   Q.   Moving further down the page where there's a Mark Cook

15   listed for Abacus, do you know anyone named Mark Cook?

16   A.   No.

17   Q.   Anyone working at Abacus named Mark Cook?

18   A.   No.

19   Q.   Moving on to page 2, do you see your name there,

20   Mr. Samuel?

21   A.   Yes.

22   Q.   Did you order any products to be delivered to 2130 Mendon

23   Road?

24   A.   No.

25   Q.   Scrolling down, there is a Finegold Andrew listed at

1   Abacus Solutions or a variation of Abacus.  Do you know anyone

2   named Finegold Andrew or Andrew Finegold?

3   A.   No.

4   Q.   How many people work at Abacus, Mr. Samuel?

5   A.   I do, and I consult or contract with people from time to

6   time.

7   Q.   Any of those names?

8   A.   No.

9   Q.   Did you ever give Mr. Kuc permission to have products sent

10  in your name or the name of Abacus to 2130 Mendon Road?

11  A.   No.

12  Q.   I'm going to direct your attention to what's been

13  previously marked as Exhibit 3.  Mr. Samuel, are you familiar

14  with what a chat is?

15  A.   Like a computer chat?

16  Q.   Yes.

17  A.   Yes.

18  Q.   Please take a look at Exhibit 3.  Have you previously seen

19  this?

20  A.   No.

21  Q.   You can see the entire exhibit, if you would like, on the

22  bench as well.  It is a smaller binder next to you.  It's

23  marked as No. 3.  I would like to ask you to read it starting

24  from "Hi."  Read it aloud, please.

25  A.   Where would I find it?

1    Q.   The smaller binder to your left, under tab 3.  First, who

2    is the person identified in red speaking?

3    A.   Mark Cook.

4    Q.   Could you start reading Mr. Cook's lines starting with

5    "Hi"?

6    A.   It says, "Mark Cook," and then, "Faulty processor"?

7    Q.   Yes.  Could you read the chat as if you were Mr. Cook

8    there reading that line?

9    A.   "Faulty processor."

10   Q.   Continue, please, reading through the whole thing.  No,

11   I'm sorry, Mr. Samuel.  Please read it aloud to the jury.

12   A.   What's in red?

13   Q.   Yes.  Starting with what's in red, the line "Hi" and going

14   from there, please.

15   A.   There's no "Hi" on here.  It just says "faulty processor."

16   Q.   Sorry, page 2.  Sorry, Mr. Samuel, starting on page 2,

17   where it says "Hi."

18   A.   "Hi, I'm one of the IT guys here.  This workstation

19   appears to have a defective processor.  The workstation will

20   not post.  I stripped the workstation down to just memory video

21   card and same issue.  I also tried swapping those parts with

22   known good ones.  I then finally swapped processors from

23   another workstation and this workstation came up and posted and

24   booted to WINXP without issue.  I then tried the questionable

25   processor in that known good workstation and same result no

1    post."

2    Q.    Who is the person identified with that text, Mr. Samuel?

3    A.    Mark Cook.

4    Q.    And then what does the technician say in response to

5    Mr. Cook's complaint?

6    A.    "May I have the company name the system is registered to

7    and that you are contacting us about?"

8    Q.    And continue on to the next page of Exhibit 3.  What does

9    Mr. Cook reply?

10   A.    "I also notice the number 3 LED diagnostic light on the

11   rear of the system light up and then Abacus.  So, it appears I

12   need a processor replacement to be sent.  Parts only is fine,

13   since I can replace the processor myself."

14   Q.    And what does the tech reply?

15   A.    "Just to verify the service tag is 75MKLD1 and the machine

16   is a Dell workstation 690 with Windows XP, right?  I'm so sorry

17   about the issues you're having on your machine.  May I have

18   your full name, e-mail address and phone number, please?  I

19   look forward to taking care of all of your issues.  Correct.

20   Okay.  Not a problem.  May I have the company name the system

21   is registered to and that you are contacting us about?"

22            "Abacus."

23   Q.    And who says "Abacus" again?

24   A.    Mark Cook.

25   Q.    Were you Mark Cook on the other end of that chat?

1    A.    No.

2    Q.    Do you know a Mark Cook?

3    A.    No.

4    Q.    Why is there a chat saying Mark Cook from Abacus is

5    contacting Dell?

6    A.    I have no idea.

7    Q.    Did you ever tell Mr. Kuc that he could do this on your

8    behalf?

9    A.    No.

10   Q.    Did you know Mr. Kuc was doing this?

11   A.    No.

12   Q.    Next page, please.

13   A.    "Going over the warranty, Mark, there is coverage until

14   2010/09/03.  May I have your full name, e-mail address and

15   phone number, please? "

16   Q.    What does Mr. Cook reply to that?

17   A.    "2130 Mendon Road, Suite 3-377, Cumberland, Rhode Island,

18   02864, 401-515-4556."

19   Q.    Mr. Samuel, you can stop there.  Were you having products

20   sent to 2130 Mendon Road?

21   A.    No.

22   Q.    Were you involved in this?

23   A.    No.

24   Q.    What's happening here?

25         MR. SHEKETOFF:  Well, objection.

1           THE COURT:  Sustained.

2  BY MS. BURKART:

3  Q.   Thank you.  I would like to direct your attention to

4  Exhibit 29.  Have you seen this before, Mr. Samuel?

5  A.   I don't recall.

6  Q.   Can you take a moment to take a look at it.

7  A.   Okay.

8  Q.   What does that appear to be to you?

9  A.   It says, "Summary of Dell orders for Francisco Samuel,"

10  and then it has my name in different variations, it looks like.

11  Q.   And what is the total there on the bottom of the screen?

12  A.   I can't make it out.  It looks like 628.

13  Q.   Did you know that Mr. Kuc used your name 628 times?

14           MR. SHEKETOFF:  Well, objection, your Honor.

15           THE COURT:  Well, I will sustain that.

16  BY MS. BURKART:

17  Q.   Did you allow Mr. Kuc to use your name 628 times?

18           MR. SHEKETOFF:  Well, objection.

19           THE COURT:  No, overruled.  You may answer that

20  question.

21  A.   No, I did not.

22           MS. BURKART:  Just a moment, please.

23           Thank you, Mr. Samuel.

24           THE COURT:  Mr. Sheketoff, do you want to start now or

25  is this a good point to take a break?

1      MR. SHEKETOFF:  Whatever you say.

2      THE COURT:  Well, let us start.

3      MR. SHEKETOFF:  You want to start?

4      THE COURT:  Yes.

                    CROSS-EXAMINATION

6    BY MR. SHEKETOFF:

7    Q.    Good morning, sir.

8    A.    Good morning.

9    Q.    You are how old?

10   A.    I am 46 years old.

11   Q.    And do you have a wife and kids?

12   A.    I do.

13   Q.    And Mr. Kuc is how old?

14   A.    I believe he's in his early 30s.

15   Q.    And you have been friends since he was in his early 20s

16   and you were in your late 30s?

17   A.    Correct.

18   Q.    And by "friends," you mean you do things together?

19   A.    We mostly talked about, you know, computer stuff, and we

20   went out to lunch on occasion.

21   Q.    Well, didn't you play golf together?

22   A.    We played golf a couple of times.

23   Q.    Didn't he buy you expensive golf clubs?

24   A.    No.

25   Q.    Did you go to strip clubs together?

1          MS. BURKART:  Objection, your Honor.

2          THE COURT:  Overruled.

3     A.   Yes, a few times.

4     BY MR. SHEKETOFF:

5     Q.   How many is "a few"?

6     A.   Five, six, seven.

7     Q.   Didn't you go to dinners together?

8     A.   We went mostly to lunches.

9     Q.   Well, let's assume, for a second, you went mostly to

10    lunches.  Did you go to dinners together?

11    A.   A few times, I'm sure.

12    Q.   Well, what's "a few times"?

13    A.   Maybe two or three.

14    Q.   In ten years you went to dinner two or three times?

15    A.   Probably.

16    Q.   Do you recall where those dinners occurred?

17    A.   One at the Colonel Blackinton Inn in Attleboro.  I don't

18    recall any others.

19    Q.   Well, there was only one other, right?

20    A.   I don't recall.

21    Q.   Did you ever ask him to sit for your house when you went

22    away to Portugal?

23    A.   No.  Well, no, he didn't sit at my house.  I think --

24    Q.   I didn't ask if he sat.  I asked if you ever asked him to

25    babysit your house when you and your family went to Portugal?

1    A.    No.  I can explain.

2    Q.    All right.  Explain.

3    A.    I told him I was going to Portugal, and I told him that he

4    could come by the house and check out the pool if he wanted to

5    on occasion.  I did ask another high school kid who lived

6    nearby to housesit at the house, but not Mr. Kuc.

7    Q.    You didn't ask Mr. Kuc first and then ask the high school

8    kid when Mr. Kuc said, "No"?

9    A.    No.

10   Q.    You had shirts made up that had your business logo and his

11   business logo on the same shirt?

12   A.    Yes.  He made up the shirts.

13   Q.    Well, how many of those did he give you?

14   A.    Five or six.

15   Q.    Five or six.  How many times did you say you were at his

16   home?

17   A.    I'm going to say 20 or 30 times.  That's what I said

18   before.  I don't recall.

19   Q.    Do you recognize his parents in the front row?

20   A.    Yes.  They're right there (indicating).

21   Q.    How many times did you see his mother in 2010?  Once a

22   week?

23   A.    No.  I was never at his house that often.

24   Q.    Once a month?

25   A.    Probably, if she was home.

1   Q.   You mean you were there on occasions when she wasn't home?

2   A.   Yeah.  Normally his dad was home.

3   Q.   Do you know his girlfriend?

4   A.   I knew his girlfriend at the time, yes.

5   Q.   Did you do work for his girlfriend?

6   A.   Yes.  I volunteered to do a website for her.

7   Q.   Simply put, weren't the two of you good friends?

8   A.   "Good friends" is, I guess, a subjective thing.  I would

9   say we were friends.  We went to lunch, we talked about

10  computer stuff.

11  Q.   Did he host your web server?

12  A.   Cyon ISP hosted my web server, that's correct.

13  Q.   And who is Cyon ISP?

14  A.   I believe that that was him and Ray Di Ciaccio from

15  Sensible.

16  Q.   Weren't you charged a fraction of the real cost in

17  consideration of the friendship?

18  A.   I would say the cost is on par with what's charged

19  outside.

20  Q.   So, did you believe you were getting a discount because of

21  your friendship?

22  A.   No.

23  Q.   What did you pay a month?

24  A.   I paid $100 a month.

25  Q.   And that's standard fare?

1    A.    I paid $100 a month and I bought my own equipment.  I

2    currently host with a company and I pay $100 a month, and I

3    don't provide my own equipment.

4    Q.    And how many years did you host there?

5    A.    I don't recall exactly, but maybe in 2003, 2004, maybe, is

6    when I started hosting.

7    Q.    With Cyon?

8    A.    Correct.

9    Q.    And when did you stop?

10   A.    I haven't stopped.  I still have a server there, and I

11   still have two or three domains left.

12   Q.    All right.  Did you ever get any equipment from Matt Kuc?

13   A.    When I did some work for him, Matt Kuc did give me some

14   equipment.

15   Q.    What did he give you?

16   A.    He gave me a couple of monitors and, on occasion, if I

17   needed, you know, spare parts type of thing, he would give them

18   to me.

19   Q.    Did he charge you for it?

20   A.    No.

21   Q.    Did he solve technical problems for you when you had a

22   customer and you couldn't solve the problem yourself?

23   A.    Yes, he did.

24   Q.    Did he charge you for it?

25   A.    No.

1    Q.   Did he ever give you any cash?

2    A.   No.

3    Q.   Now, when you first came to speak to the United States

4    Attorney's Office, you were given what is called "Miranda

5    warnings," correct?

6    A.   I don't remember.

7    Q.   Well, were you told that you had a right not to talk?

8    A.   I do not recall that.

9    Q.   How many boxes do you say you remember getting at the

10   Chamber of Commerce with your name on it?

11   A.   My recollection was 2- to 300 boxes.

12   Q.   And having had your recollection refreshed by the

13   Government prior to your testimony today, how many boxes was

14   it?

15   A.   I have absolutely no idea.

16   Q.   But it's hundreds, correct?

17   A.   I'm assuming so.

18   Q.   Well, you remember 2- to 300, correct?

19   A.   That's what I'm guessing.

20   Q.   Hundreds of boxes?  And some of them heavy boxes?

21   A.   They were what looked like to be computer-related boxes.

22   Q.   Well, it had the Dell logo on the box, correct?

23   A.   Right.

24   Q.   You are in the computer business.  You might not do the

25   hardware, but you're in the business, correct?

1    A.    Yes.

2    Q.    So, there were Dell boxes, there were HP boxes?

3    A.    I remember mostly Dell boxes.  I'm sure there were HP.

4    Q.    And how often would you deliver these boxes to Mr. Kuc's

5    home?

6    A.    I only went to his home to deliver boxes a few times, two,

7    three, four, maybe five times.

8    Q.    And what year was that?

9    A.    I'm assuming it was when the boxes were delivered, which

10   was 2008.

11   Q.    2008.  And why would you bring boxes to his home?

12   A.    My kids go to school nearby, so if I was going to the

13   school to pick up my kids or drop off my kids, I would say,

14   "You have boxes here, so if you're around I'll drop 'em off."

15   Q.    Now, did you expect free lunches, free dinners, free golf

16   clubs, free golf rounds and things of that nature as a result

17   of accepting these boxes?

18   A.    No, I did not, and I paid for my share of lunches, and I

19   paid for golf once as well.

20   Q.    Well, how many times did you golf together?

21   A.    We only golfed twice.  I paid once, he paid the other

22   time.

23   Q.    Now, at some point you had a conversation with Matt Kuc

24   about accepting boxes at the Chamber, correct?

25   A.    Yes.

1    Q.   And how many years had you known each other at that point?

2    A.   Six or seven.

3    Q.   And what did he say to you, and what did you say to him?

4    A.   He said, "Can I have some boxes dropped off at your

5    office?  Ruth doesn't get in until around 11:00 and 12:00, so

6    there is nobody there to get the boxes, so do you mind if the

7    boxes get delivered there?"  And I said, "No."

8    Q.   And that was the only conversation you ever had on the

9    topic?

10   A.   Yes.

11   Q.   That was it?

12   A.   Yes.

13   Q.   Did you know who he meant by Ruth?

14   A.   Yes.

15   Q.   And who was Ruth?

16   A.   Ruth works at Sensible Computers.

17   Q.   Do you know her personally?

18   A.   I know her from dealing with her if there was an issue

19   with the server that I needed to call in for.  So, I know her

20   more on a business level, but I know who she is.

21   Q.   Well, you talked to her?

22   A.   Yes.

23   Q.   And you've been around Sensible Computers?

24   A.   Yes.

25   Q.   And does she get in at 11:00 or 12:00?

1    A.   Yes.

2         THE COURT:  Mr. Sheketoff, is this a place we can

3    break?

4         MR. SHEKETOFF:  Sure, your Honor.

5         THE COURT:  So, we will take our morning break, ladies

6    and gentlemen, about 20 minutes.  We will be back about 11:15.

7         THE CLERK:  All rise for the jury.

8              (The jury exited the courtroom at 10:50 a.m.)

9         THE COURT:  Anything else we need to take up before

10   the break?

11        MR. SHEKETOFF:  I don't think so.

12        THE COURT:  So, we will be back here at 11:15.

13      (The Honorable Court exited the courtroom at 10:50 a.m.)

14                        (Recess taken)

15        THE CLERK:  All rise.

16      (The Honorable Court entered the courtroom at 11:15 a.m.)

17        THE CLERK:  This Honorable Court is back in session.

18   You may be seated.

19        THE COURT:  Are we ready for the jury?

20        MS. BURKART:  Yes, your Honor.

21        THE COURT:  One thing I will ask is, you can think

22   about it, but I do not see aiding and abetting in this case.

23        MS. BURKART:  I think that's right, your Honor.

24        THE COURT:  So, probably take that out of the

25   indictment, too.

1          MR. GARLAND:  We will do that, your Honor.

2          THE CLERK:  All rise for the jury.

3          (The jury entered the courtroom at 11:16 a.m.)

4          THE CLERK:  You may be seated.

5          THE COURT:  You may continue, Mr. Sheketoff.

6          MR. SHEKETOFF:  Thank you, your Honor.

7    BY MR. SHEKETOFF:

8    Q.   Sir, before the break I asked you a series of questions

9    about your relationship with Matt Kuc.  Do you remember

10   testifying to the grand jury and saying -- this is at page

11   12 -- "So, I bought a server and I put it in his facility for

12   hosting websites and, you know, I became friendly with him, and

13   my dealings with him over the past, you know, three, four years

14   were more of friendship, going out to lunch type of thing than

15   business"?

16   A.   Yeah.

17   Q.   Do you remember saying that?

18   A.   I don't remember, but I am sure I said that.  That would

19   be something I would say.

20   Q.   And the word "friendship" came out of your mouth at the

21   grand jury, correct?

22   A.   Yes.

23   Q.   Do you remember at the very beginning of that grand jury

24   appearance, which was in January of 2011, being given your

25   warnings about the fact that you didn't have to say anything?

1   A.   Yes.

2   Q.   You could have a lawyer and all that stuff?

3   A.   Yes.

4   Q.   Do you remember that now?

5   A.   Yes.

6   Q.   Is that the first time any federal law enforcement officer

7   said anything like that to you?

8   A.   Yes.

9   Q.   The kind of thing that might stick in your mind?

10   A.   Yes.

11   Q.   In any event, you had this one conversation with Matt Kuc

12   about receiving packages, correct?

13   A.   Yes.

14   Q.   Once?  And you never discussed it with him again?

15   A.   I don't recall discussing it.  The packages showed up, and

16   I would just call him and say, "You have packages here."

17   Q.   Hundreds of packages showed up, correct?

18   A.   Yes.

19   Q.   And you never discussed it with him again?

20   A.   No.

21   Q.   On these hundreds of packages, there was something

22   approximating your name on many of them, correct?

23   A.   Yes.

24   Q.   Didn't it strike you as unusual that your actual name

25   wasn't on many of these packages?

1    A.    No.

2    Q.    Why is that?

3    A.    My name's always been misspelled my whole life.

4    Q.    Well, do you remember telling the grand jury that it

5    didn't strike you as unusual because Matt Kuc was a horrible

6    speller?

7    A.    Well, that, yes.  Normally, when I dealt with Matt and

8    there were e-mails back and forth, you know, I always found

9    typos.  So, between my name being misspelled by everyday people

10   and, you know, me thinking that Matt was a bad speller, it

11   never --

12   Q.    So, hundreds and hundreds of packages showed up, but you

13   never discussed it with him?

14   A.    No.

15   Q.    You had no curiosity about these packages?

16   A.    They were computer parts.  No, I didn't have a curiosity.

17   Q.    By the way, did you ever, yourself, get on the phone with

18   Dell or a chat session and try and return a defective part from

19   a computer that was under warranty?

20   A.    I got on Dell chat to inquire about problems or

21   difficulties that I have had.  I don't believe I ever got a

22   part that way, that I can recall.  I would normally call them

23   on the phone.

24   Q.    So, did you ever call Dell on the phone and try and get a

25   replacement part that was defective for a computer that was

1   still under warranty?

2   A.   Yes.

3   Q.   And did you tell the law enforcement agents that

4   interviewed you on June 7th of this year that every time you

5   got on the phone with Dell they asked you for a credit card

6   number?

7   A.   They said normally if they were shipping a part to me,

8   that I would have to put up a credit card number, and then

9   after I returned the bad part they would, you know, release or

10  whatever it is that they do.

11  Q.   But I'm asking if you told the law enforcement agent that

12  interviewed you on June 7th of this year, just a few weeks ago,

13  that every time you returned a part to Dell they asked you for

14  a credit card number.

15  A.   That I can remember, yes.

16  Q.   Did you ever ask Matt Kuc to return defective parts for

17  your machines?

18  A.   There might have been some occasions.  I know my server

19  broke down once, I believe it was a hard drive and it might

20  have been something else that needed to be replaced, so he

21  would have done that.  And there might have been a couple of

22  occasions when I brought computers to his home to get fixed

23  that might have needed replacement parts, and he would have

24  ordered those, or he would have exchanged those.

25  Q.   Well, how about in November of 2010?  Would there have

1    been a reason for you to be giving Matt Kuc your model and tag

2    number?

3    A.    Yes.  My computer was overheating, and he said that he

4    could help me return that.

5    Q.    So, you gave him your computer and tag number?

6    A.    I gave him my tag number to find out what the warranty was

7    and the likelihood of fixing this problem with overheating.

8    Q.    What made you think that he would know how to figure out

9    from your model number and tag number whether or not you were

10   still under warranty and whether or not he could get you a

11   replacement part?

12   A.    Because this is part of what he did for his company.

13   Q.    So, you have been on the eBay site of his store?

14   A.    I only went on his eBay site when he asked me to bid on

15   items.

16   Q.    Well, but you bid on the eBay site?

17   A.    Correct.

18   Q.    Did you ever check it out?

19   A.    Not really.

20   Q.    Well, what do you mean by "not really"?

21   A.    He asked me to bid on items for him, and that's what I

22   did.

23   Q.    This is a friend of ten years.  You didn't bother to

24   scroll down and see what he had for sale?

25   A.    I basically knew from time to time him talking about

1   stuff, or I assumed I knew.

2   Q.   So, you didn't do it?

3   A.   Did I go looking through his website to see --

4   Q.   Yeah.

5   A.   No.

6   Q.   Did you ever have a discussion with him about his website?

7   A.   Well, I knew he sold stuff.  I knew he had a website.  I'm

8   sure I had a discussion.  I'm sure I might have said, you know,

9   "What do you do on the eBay store?"  And he said, "I sell

10  parts," that kind of thing.  I'm paraphrasing.  I'm sure that

11  could have happened, but I don't recall.  That wasn't something

12  I was interested in.  I was interested more in the hosting and

13  the web stuff.

14  Q.   What is the name of your business?

15  A.   Abacus Software Systems.

16  Q.   And is that a formal name that you have registered as a

17  corporation?

18  A.   It's a d/b/a.

19  Q.   Can you explain to us what a d/b/a is?

20  A.   It's a doing business as.  You go to town hall and you say

21  "I'm doing business as Abacus Software Systems," and they write

22  you a certificate, if you will.

23  Q.   So, that's your official name in the Town of North

24  Attleborough?

25  A.   The d/b/a is in Attleboro.

1    Q.   I'm sorry.  In Attleboro?

2    A.   Yes.

3    Q.   Do you ever use any variation of that name?

4    A.   I use "Abacus Software" without the "Systems" at the end.

5    Q.   Why do you do that?

6    A.   It's just shorter.

7    Q.   And your name is Francisco Samuel?

8    A.   Correct.

9    Q.   S-A-M-U-E-L?

10   A.   Correct.

11   Q.   Thank you, sir.

12          THE COURT:  Ms. Burkart.

13          MS. BURKART:  Just very briefly, your Honor.

14          THE COURT:  Yes.

15                    REDIRECT EXAMINATION

16   BY MS. BURKART:

17   Q.   Mr. Samuel, Mr. Sheketoff asked you about golf, strip

18   clubs, dinners, and house-sitting; is that right?

19   A.   Yes.

20   Q.   Did you, as a result of any of that, agree to allow him to

21   send packages using your name or the name of Abacus to

22   247 Maple Street or 2130 Mendon Road?

23   A.   No.

24   Q.   Thank you.  No further questions.

25          THE COURT:  Anything further?

1          MR. SHEKETOFF:  No, your Honor.

2          THE COURT:  You may step down, Mr. Samuel.  Thank you.

3                (Witness stepped down)

4          MR. GARLAND:  The United States calls Ray Di Ciaccio.

5          THE COURT:  It is that witness box there,

6     Mr. Di Ciaccio.

7          THE WITNESS:  Up here?

8          THE COURT:  Yes.

9          RAYMOND DI CIACCIO, DULY SWORN BY THE CLERK

10         THE CLERK:  Please state and spell your full name for

11    the record.

12         THE WITNESS:  My name is Raymond Di Ciaccio,

13    R-A-Y-M-O-N-D, last name is D-I, space, capital C, I-A-C-C-I-O.

14         THE COURT:  Thank you.  You may be seated.

15         MR. GARLAND:  May I inquire, your Honor?

16         THE COURT:  You may.

17                DIRECT EXAMINATION

18    BY MR. GARLAND:

19    Q.   Good morning, Mr. Di Ciaccio.  What do you do for a

20    living?

21    A.   I am the owner of Sensible Computer in Attleboro,

22    Massachusetts.

23    Q.   What did you do before starting Sensible Computer?

24    A.   I worked for five years for a company called Unisys.

25    Burroughs.  It became Unisys, which is a main frame, which is a

1    big type of computer, in sales, and then I was a sales manager

2    for a local Rhode Island company for about a year.

3    Q.    What does Sensible Computer do?

4    A.    We provide services for companies that can't afford to

5    have, like, computer IT -- well, we call it "IT," but a

6    computer department on staff.  There are a lot of small

7    companies that everybody needs a computer to run, they can't

8    afford to have somebody full time, so companies like ours help

9    them when they have problems.  We go out there, we repair

10   things, solve various kinds of problems that can happen.

11   Q.   Do customers come into Sensible Computers just to buy

12   computer parts from you?

13   A.    Yes.  I mean, just buy parts -- not a whole lot of just,

14   "I want to buy part."  Usually it's because there's something

15   wrong with their computer, and so we might have to fix

16   something.  It's not too often that they're just buying a part

17   straight out.

18   Q.   Do you have any partners?

19   A.   No.

20   Q.   How many customers does Sensible Computers have?

21   A.   Business customers, we service about 80 to 90, you know,

22   on an annual basis, regular customers we have had for quite a

23   while, then home customers, which is a part of our business,

24   there could be hundreds of those that could come in in a year.

25   Q.   Where is Sensible Computers located?

A.    We are at 247 Maple Street in Attleboro.

        MR. GARLAND:  If we could display Exhibit 80, which
has been previously admitted.

BY MR. GARLAND:

Q.    Do you see Sensible Computer on this exhibit?

A.    Yes, right where it says "Sensible Computer," right there
with the brick.

Q.    How long has it been located at that address?

A.    We have been there I think since about 2005.

Q.    Do you spend most of your time in the office or outside of
the office?

A.    Outside of the office.

Q.    What's your service area?

A.    Primarily, I mean, we go as far north as Boston.  We have
some customers on the Cape, but within, I would say, a
30-minute radius of Sensible Computer of Attleboro is where the
bulk of our customers are.

Q.    Do people ever send computers to Sensible Computers to be
fixed by mail?

A.    No.

Q.    When Sensible Computer fixes equipment, is that equipment
usually under warranty or with an expired warranty?

A.    I'm sorry.  Can you repeat that?

Q.    When Sensible Computer fixes computer equipment, is that
equipment usually mostly covered by a warranty, or has the

1   warranty expired?

2   A.   I would say in most cases there's no warranty.  We are

3   there to fix the problem.  But, on occasion, one of the things

4   we do as a general rule is, we try to look up to see if the

5   product is still under warranty because, obviously, the

6   customer could get it repaired either free or something to that

7   effect.  The part free, anyway.

8   Q.   Why are most of your repairs on equipment whose warranties

9   have expired?

10  A.   Because I think, for the most part, equipment is very

11  reliable these days.  A lot of warranties are only a year,

12  sometimes even 90 days.  It's not uncommon for a computer to

13  last well beyond a year or two.  It would be outside the

14  parameters of the warranty.

15  Q.   If the warranty has expired, will the manufacturer send

16  you a free replacement part?

17  A.   No.  You mean, if it's out of warranty?

18  Q.   Yes.

19  A.   No.  No, because they wouldn't.  You couldn't even put a

20  warranty claim in.

21  Q.   In the 2005 to 2010 time frame what types of equipment,

22  spare parts, would Sensible Computer keep around for

23  out-of-warranty repairs?

24  A.   I mean, the common things that go wrong with computers are

25  things like hard drives, things like power supplies, you know,

1    the relatively inexpensive items.  We always have keyboards and

2    mice, you know.  Video card, but even that's very little,

3    because less and less computers really have those as parts.

4    But I would say, you know, those kind of things.  We might have

5    a motherboard here or there, but not a whole lot.

6    Q.   So, if you needed to get a part for an out-of-warranty

7    repair, where would you buy that part?

8    A.   Well, we had a distributor that in Norwood we did some

9    work with, but more and more we have been getting stuff from

10   eBay, because there's just a lot of selection and a lot of good

11   prices.

12   Q.   Would you ever buy parts from somebody named Matt Kuc?

13   A.   I have, yes.

14   Q.   And was it directly from him or from a company that he was

15   working for or owning?

16   A.   I mean, I would buy them -- I guess it depends.  In other

17   words, because I would see Matt, and sometimes we would be in a

18   situation where somebody's got something broken, and it might

19   be like, "Hey, do you have one of these," you know, kind of

20   things.  So, in the sense of buying it, I mean, I talked to

21   Matt directly about it.

22        So, I don't know what you mean, I guess.  I guess

23   maybe I don't understand the question, because I wasn't going

24   to a company because it didn't make sense for me to, if you

25   know what I mean.

1    Q.    If you bought a piece of equipment from him, would he

2    issue you an invoice?

3    A.    Yes.

4    Q.    And was there a corporate name on the invoice?

5    A.    Yeah.  A lot of times there were, yeah, if I remember

6    right.  I don't handle the payables, but I believe there was

7    company names on the invoices.

8    Q.    And what was the name that was used?

9    A.    I believe it was Total Asset Recovery, but there also may

10   be some invoices that just said "Matt Kuc" on them, too.  I

11   don't know.  I don't know.

12   Q.    Have you ever ordered warranty parts from Dell, or Lenovo

13   or HP?

14   A.    Yes.  Or helped in the warranty process, yes.

15   Q.    What names would you give Dell or Lenovo or HP when you

16   asked for the parts to be delivered?

17   A.    Well, I mean, you have to understand the way the process

18   works.  I'll talk about more recently, but typically you would

19   either be on the phone or you would be on a chat session.  The

20   first thing when you get on there, you would say what your name

21   is.  So, in that case, "I'm Ray Di Ciaccio," so you would put

22   "Ray Di Ciaccio," and a person would come on and say, "Hi, Ray,

23   how can I help you?"  Then you would go through the process of

24   explaining the problem, the equipment that was affected, the

25   serial number or whatever, service tag number.  And then along

1    in that chat we would determine if there was a part needed, and

2    if it was under warranty, then they would send us -- they would

3    say, "We are going to send you a part to such and such an

4    address," and usually they had a return box that they would

5    tell you you've got to take the label that we put in the box so

6    you can return the part.

7    Q.   And when you ordered equipment through this process, did

8    you use your name, or did you use anybody else's name?

9    A.   No, we used our name.  We use our name when we're ordering

10   things.

11   Q.   Did Matthew Kuc ever work for you?

12   A.   Yeah.

13   Q.   How old was he when he started working for you?

14   A.   I think 18 years old.

15   Q.   In the 2005 to 2010 time frame, what was his role at the

16   company?

17   A.   From 2005 to 2010 he was an outside technician.

18   Q.   Was he good at his job?

19   A.   Yeah.  He did good work for us, yeah.

20   Q.   How many days a week did he work?

21   A.   Three:  Monday, Tuesday and Thursdays.

22   Q.   And on those days -- was it Mondays, Tuesdays and

23   Thursdays, you said?

24   A.   Mm-hmm.

25   Q.   What were his hours?

1    A.    Typically, around 9:30 to about 5:00.  But, you know,

2    sometimes in our industry you can't always predict what's going

3    to happen.  Sometimes we would have a bigger project, so it

4    could go later, sometimes we would start earlier.  But, for the

5    most part, that was it most days.

6    Q.    About how many computers would he fix in a typical week?

7    A.    I would say probably five or six service calls were made.

8    Because it's more than just fixing computers, you know.  There

9    are other things we would get involved with.  But, yes.  I

10   would say about five or six customers he could help in a week a

11   lot of times, maybe more some weeks.

12   Q.    How much was he paid?

13   A.    He was paid -- I think his take-home check was, like,

14   about $340, $350, and then he had an allowance for mileage and

15   I think cell phone.

16   Q.    I want to talk to you for a moment about Total Asset

17   Recovery.  To your knowledge, did the defendant have any

18   partners in Total Asset Recovery?

19   A.    Not in 2005 to 2010, no.

20   Q.    How did the company work?

21   A.    What do you mean by that?

22   Q.    Did it sell only just products only to you, or were you

23   aware of it selling products to anybody else?

24   A.    Oh, no.  I had understood it to be a company that sold

25   things on eBay.

1    Q.    Did he ever ask permission to have packages sent to

2    Sensible Computers?

3    A.    Yes.

4    Q.    Did you give permission?

5    A.    Yes.

6    Q.    And were those packages that were for Sensible Computers'

7    business or for Total Asset Recovery's business?

8    A.    They were for Total Asset -- Matt would process some

9    warranty things for customers, too, that would come to Sensible

10   Computer, but the bulk of them were not for Sensible Computer.

11   Q.    Why did you give permission for Total Asset Recovery to

12   receive packages there?

13   A.    Well, I mean, there was times like I can remember,

14   where -- because a lot of times things would go to his house,

15   but sometimes it was either his parents were going to be away

16   and he was expecting something, so it would be like, "Hey, my

17   parents are going to be away," or, "I have a big shipment

18   coming in," and maybe we had a little bit more space to handle

19   it.  But mainly it was I think nobody was going to be home for

20   some shipments to come in.

21   Q.    When you gave permission for Total Asset Recovery to

22   receive packages at 247 Maple Street, were you aware at the

23   time that computer companies that were sending those parts had

24   not received numerous returned parts from Matthew Kuc?

25            MR. SHEKETOFF:  Objection.

1          THE COURT:  The question is whether.  I will permit

2     it.

3     A.   Could you repeat the question, please?

4     BY MR. GARLAND:

5     Q.   When you gave permission for Total Asset Recovery to have

6     packages delivered to the 247 Maple Street address, were you

7     aware whether computer companies had received computer parts

8     back from the defendant?

9     A.   No, I wouldn't have any idea of that.

10    Q.   How often would you personally order a part under

11    warranty?

12    A.   Maybe a handful of times a year, maybe, you know.

13    Q.   And would those be under your name, then, Raymond

14    Di Ciaccio or Ray Di Ciaccio?

15    A.   They would.  But sometimes the manufacturer, because they

16    knew that the product was owned by a person, would ship the

17    product to Sensible Computer with the customer's name, because

18    that's how their system worked.  I do remember in a handful of

19    situations where if I was ordering something for -- I don't

20    know; I'm just going to make up a name -- Fred Jones had the

21    warranty, then the part may come to Fred Jones at Sensible

22    Computer.

23    Q.   Are you familiar with 36 Laurelwood Drive in North

24    Attleborough?

25    A.   Yes, I am.

1    Q.    What is that address?

2    A.    That's where Matt lived.

3    Q.    Did Sensible Computers ever have computer parts sent

4    there?

5    A.    Not that I'm aware of.

6    Q.    I am going to show you Exhibit No. 5.  Mr. Di Ciaccio, if

7    you would look at the heading of this exhibit.

8    A.    Okay.  Dell Transactions.  Okay, I can see that.

9    Q.    And you have reviewed this exhibit before, have you not?

10   A.    Yeah, I believe I have.

11   Q.    I want to turn to page 118.  If we can zoom in on the

12   orders from November 17th to November 20th.

13   A.    Are you going to zoom in?  Because this is hard to see,

14   I'm sorry.  It's awfully small.

15   Q.    Why don't you pull out Exhibit 5.  It's in your binder

16   there.  It may be easier for you to read.

17   A.    Here?

18   Q.    Yes.

19   A.    Are you talking about in this big binder here?

20   Q.    Yes.  It should be under Tab A.

21   A.    Tab A, okay.

22   Q.    In fact, I think that the relevant portions of that

23   exhibit are now on your monitor.  Can you see them there?

24   A.    Yeah, I can see them a little better now.

25   Q.    Do you see a number of orders for Sensible Computer to

1    36 Laurelwood Drive?

2    A.   Yeah.  I see at least three on this little section here.

3    Q.   And did you make those orders?

4    A.   No.  Not that I know of, no.

5    Q.   Who does it list there as the Sensible Computer employee?

6    A.   Well, it says "Mark Connell," and the other one says "Tom

7    Schneider."

8    Q.   Were either of those people Sensible Computer employees?

9    A.   No.

10   Q.   Were either of them Sensible Computer customers at the

11   time?

12   A.   Not that I know of.

13   Q.   Are you familiar with the customers that you had?

14   A.   Excuse me?

15   Q.   Are you familiar with your customers, generally?

16   A.   Oh, yeah, yeah.

17   Q.   Let's turn to page 119 and zoom in on orders from January

18   1 through January 26, 2010.  Do you see that on your screen?

19   A.   Mm-hmm.

20   Q.   Do you see Dell orders for Sensible Computer to

21   36 Laurelwood Drive there?

22   A.   Yes.

23   Q.   And, again, I will ask you did you make these orders?

24   A.   Well, there's one on there -- not that I'm aware of.

25   Actually, I'm sorry.

```
1    Q.   I'm sorry.  Did I --

2    A.   Yeah, I'm sorry.  I guess there was a second one.  I

3    didn't notice that.  I'm sorry.  I thought there was only one.

4    Q.   Do you see the one under 1/26/2010?

5    A.   Mm-hmm.

6    Q.   It says, "Sensible Computer, Mark Zeffer (ph)"?

7    A.   Mm-hmm.

8    Q.   Are you familiar with Mark Zeffer?

9    A.   No, I am not.

10   Q.   Has he ever worked for Sensible Computer?

11   A.   No.

12   Q.   I want you to look at now Exhibit 13, and if you would go

13   to page 4 and page 5, just generally --

14   A.   Okay.

15   Q.   -- I would like you to tell me whether you see any entries

16   for orders for Lenovo parts being delivered to Sensible IT at

17   36 Laurelwood Drive.

18   A.   I'm sorry.  What would you like me to do?

19   Q.   If we can just magnify those, the name and the company.

20   A.   Yes.  I see "Sensible IT" and the names, yeah.

21   Q.   First of all, has there ever been a branch of Sensible

22   Computer at 36 Laurelwood Drive?

23   A.   No.

24   Q.   Have you ever had somebody named "Jay Cook" working at

25   Sensible Computer?
```

1    A.    No.

2    Q.    Have you ever had Lenovo parts delivered to or ordered for

3    delivery to 36 Laurelwood Drive?

4    A.    No.

5    Q.    Have you ever had anybody named "Jay Cook" as a Sensible

6    Computer customer?

7    A.    No.

8    Q.    I want to move on to Cyon or Cyon Data Systems.  Are you

9    familiar with Cyon Data Systems?

10   A.    Yes, I am.

11   Q.    What is Cyon Data Systems?

12   A.    Cyon Data Systems was an Internet service provider, known

13   as an ISP, and provided, like, web postings so companies could

14   have, like, their web pages displayed.  It handled a lot of

15   e-mail and provided off-site backup, people that wanted to have

16   their files stored offsite in case there was a fire or a flood.

17   Q.    Was Cyon Data Systems in the business of repairing other

18   people's computers?

19   A.    No, only the computers for itself.

20   Q.    And I should ask you who owns Cyon Data Systems, or I

21   should ask you in 2005 to 2010 who owned Cyon Data Systems?

22   A.    Matt was a primary partner, I was a partner.  I can't

23   remember back in 2005.  I know initially there were three minor

24   partners, me and two other people, and then the primary partner

25   was Matt.

1    Q.   Where was it located?

2    A.   Originally 81 West Street in Attleboro, which was also an

3    address we had at one point, but I can't remember when we -- I

4    know when we moved to 247 Maple Street for a short time it was

5    still at 81 West Street until the landlord needed that space,

6    so then it eventually got moved into a little office within our

7    office.

8    Q.   Back at 247 Maple Street?

9    A.   247 Maple Street, yeah.

10   Q.   Did Cyon Data Systems use computers?

11   A.   Yeah.

12   Q.   How many did it have?

13   A.   There was probably -- there could be, I'm going to say,

14   around ten, give or take.  Maybe not that many, but right

15   around there.

16   Q.   Let's look back at Exhibit 13 and turn to page 6.  Again,

17   Exhibit 13 is a list of Lenovo warranty parts that were ordered

18   to various addresses.  I would like you to look at the top

19   third of page 6.

20   A.   Yeah.

21   Q.   Do you see orders for "Cyon DS"?

22   A.   Yes.

23   Q.   Who are those being ordered by?

24   A.   Matt Cook.

25   Q.   Now I would like you to look at Exhibit 9.  I think you

1    have seen this before on this occasion.  This is a list of HP

2    warranty parts that were ordered for delivery to addresses,

3    including 247 Maple Street.  Actually, if you can just page

4    through pages 2 through 7, I would like you to look at the

5    names and the people, and you should be able to find it in your

6    binder right there.

7    A.    Which exhibit is it?

8    Q.    This is Exhibit 9.  It might be under Tab E.

9    A.    Tab E?

10   Q.    Yes.

11   A.    Okay, yeah.  HP shipments.  Okay, yes.

12   Q.    Starting on page 2, I would like you to flip through pages

13   2 through 7 and take a moment, as you go through, to look

14   through the names and the company names that the parts were

15   being ordered to.

16   A.    You mean, like the customer name, too?

17   Q.    That's right.  Do you see a number of orders -- if we can

18   just make that bigger, just magnify a smaller rectangle.  Do

19   you see a number of orders to "CDS IT"?

20   A.    Mm-hmm.

21   Q.    By someone named Mark Connell or Connell?

22   A.    Right.

23   Q.    And do you see other entries for orders to CDS IT?

24   A.    Mm-hmm.

25   Q.    And CDS?

1     A.    Yeah.

2     Q.    Do you see that throughout pages 2 through 7?

3     A.    Yeah, I do.

4     Q.    What I wanted to ask you about this is, first of all, did

5     anybody name Mark Connell work for Cyon Data Systems?

6     A.    No.

7     Q.    Now, these were Lenovo and HP parts.  What type of

8     computers did Cyon Data System use?

9     A.    I thought we only had Dell in there.

10    Q.    Now I want to move on to an address called 2130 Mendon

11    Road.  I am going to show you what's been entered into evidence

12    earlier as Exhibit 66.  Have you ever seen this before?  And,

13    again, since the print is small it might be easier --

14    A.    No, I can see it, that's not a problem, but I don't know

15    what that is.

16    Q.    You haven't seen it before, then?

17    A.    No.

18    Q.    We are going to magnify what's in the upper left-hand

19    corner of Exhibit 66.

20    A.    Mm-hmm.

21    Q.    Do you see that "Matthew J. Kuc"?  And what company does

22    it say?

23    A.    Cyon Data Systems.

24    Q.    Were you aware before this investigation that Mathew Kuc

25    had opened up a mailbox for Cyon Data Systems in Cumberland,

1    Rhode Island?

2    A.    No, I was not.

3    Q.    Did Cyon Data Systems have any operations in Rhode Island?

4    A.    No.

5    Q.    I want to show you Exhibit 7 now.  This is a spreadsheet

6    showing shipments from Dell to the defendant's mailbox at 2130

7    Mendon Road in Cumberland, Rhode Island.  Do you see Dell

8    shipments to the mailbox rendered for Cyon Data Systems in

9    Rhode Island generally throughout?

10   A.    Well, I mean, it looks like they are all -- at least on

11   this page they're all going there.

12   Q.    And were you aware that Cyon Data Systems was ordering

13   equipment to this address of 2130 Mendon Road in Cumberland,

14   Rhode Island?

15   A.    No.

16   Q.    I want you to go to page 2 now, and there should be an

17   entry there for an order on August 11, 2010.  Do you see that?

18   A.    Yes.

19   Q.    It's magnified in the upper left-hand corner.

20   A.    Yes.

21   Q.    Do you see an entry for 8/11/2010 indicating that a part

22   was ordered, a Dell part was ordered for Sensible Computers by

23   Ray Di Ciaccio, you, to 2130 Mendon Road in Cumberland, Rhode

24   Island?

25   A.    I see that.  I can't see what the part was, though.

1    Q.   Well, did you ever order anything to be delivered to 2130

2    Mendon Road?

3    A.   I didn't, because I didn't even know that address existed.

4    Q.   I want you now to look at Exhibit 9.  You looked at this a

5    little bit before.  This is an HP shipments worksheet that

6    shows entries of HP warranty replacement products.  If you go

7    to the last page, I want you to take a look.  Do you see any

8    names, particularly frequent names of people ordering parts

9    there supposedly?

10   A.   Could you expand it, please?

11   Q.   Yes.  If we go down further.  If we can scroll down.

12   A.   Yeah.  I mean, I see a name "Rick Naples" that's over and

13   over again, if that's what you're asking.

14   Q.   So, you see Rick Naples?

15   A.   Yeah.

16   Q.   And then if we go backwards in that document, page back,

17   there should be a page that has a number of John Reynolds.  I'm

18   going to ask you a question as we find that page.  Are you

19   aware of a person named John Reynolds?

20   A.   Yeah.  I have a friend of mine, John Reynolds, who brought

21   his laptop in at one point.

22   Q.   Do you see these orders right here that are up on the

23   screen for John Reynolds?

24   A.   Well, kind of, yeah.  I mean, I see his name, yeah.  I

25   mean, he only had one laptop.

1    Q.    What type of laptop was that?

2    A.    Compaq.  I mean, if it's the same John Reynolds.

3    Q.    Did John Reynolds work for Med IT Corp?

4    A.    No.

5          MR. GARLAND:  May I just confer with co-counsel?

6          THE COURT:  You may.

7          MR. GARLAND:  No further questions, your Honor.

8          THE COURT:  All right.

9          Mr. Sheketoff.

10         MR. SHEKETOFF:  Thank you.

11                    CROSS-EXAMINATION

12   BY MR. SHEKETOFF:

13   Q.   Good afternoon.  Now, you have a certain amount of real

14   world practical experience out there in the computer field,

15   correct?

16   A.   I don't know what you mean by that.  I work in the

17   computer field, and it is a real world.  I guess I don't

18   understand what you mean.

19   Q.   Well, you are not an executive with Dell or with HP or

20   anyplace like that.  You run a small business.

21   A.   Correct.

22   Q.   And you deal with these big corporations from time to

23   time.

24   A.   Absolutely.

25   Q.   Do you remember that in January of 2011 you were called

1   before the grand jury by the prosecutors in this case and gave

2   testimony before the grand jury?

3   A.   Yes.

4   Q.   And one of the things they asked you about was your

5   experience dealing with returns for defective parts.  Do you

6   recall some conversation about that at the grand jury?

7   A.   I believe so, yeah.  I was asked a lot of things that day.

8   Q.   Do you remember telling the prosecutors on that occasion

9   that you were surprised by the return policies of some of the

10  companies because they wouldn't want stuff back, that surprised

11  you?

12  A.   What I remember saying that day was I was asked whether

13  there was ever situations where somebody wouldn't want a

14  returned part back, meaning Dell or HP, and what I remember is

15  I said only one time do I remember them -- one time do I

16  remember them saying, "We actually don't need the part back."

17  That's what I remember saying.  I was surprised by that.  I

18  actually remember the situation.  It was a Hewlett-Packard and

19  it was a little hard drive probably worth about $30.  That's

20  the one time, and I was surprised by that.  Unless they were

21  asking me, "Were you surprised to hear that people wouldn't

22  want them back?"  I would be surprised by that if they didn't

23  want them back.

24  Q.   Oh, I see.  Do you remember being asked this question, and

25  this is at page 29:  "What was Dell's policy?"

1      And answering:  "Dell's policy was just ship it."

2      Question by the prosecutor:  "They would ship it, but

3  they would make it explicit there was an understanding that you

4  would ship the defective part back?"

5      Answer:  "Some parts.  There were some parts that they

6  would say, 'We don't need to get them back.'"

7      Question:  "What was that, what type of part?"

8      Answer:  "I think, like, hard drives."

9  A.   Mm-hmm.

10  Q.   "We had some motherboards, which were kind of surprising.

11  I've only had that happen a few times, but they would say, 'We

12  actually do not need the return.'  HP I remember with hard

13  drives.  If the hard drive went bad for whatever reason they

14  didn't want it back."

15  A.   Mm-hmm.  That's the one that I was just referring to, is I

16  remember that situation there.

17  Q.   Do you remember being asked those questions and giving

18  those answers?

19  A.   I don't remember the first part that you said, but I do

20  remember the second part.  And I don't have page 29 in front of

21  me, so I'm not really looking at anything.

22      MR. SHEKETOFF:  May I approach, your Honor?

23      THE COURT:  You may.

24  BY MR. SHEKETOFF:

25  Q.   I show you page 29 and ask you to read it to yourself and

1    see if it refreshes your memory that that's what you were asked

2    and those were the answers that you gave.

3    A.   Okay.  Well, it starts off on, I guess, previous to page

4    29.  It says, "You always had the guaranty with a credit card,"

5    meaning a lot of times if we needed something we had to

6    guaranty it with a credit card, because if you didn't return

7    it, it would hit your credit card, okay?  So, that's how they

8    kind of had some leverage over you.

9          So, in other words, I'm reading, "We'll send you the

10   part.  You've got to give us a credit card just in case we

11   never see the part."  We have companies that deal with it that

12   way, you know, because what some companies would say is, 'Look,

13   if you want us to ship you the part before, you know, you send

14   us back the part, then we have to have some kind of guaranty.'"

15         "What was Dell's policy?"

16         "Dell's policy would just ship it.  They would ship

17   it, but they make it explicit that there was -- "

18         Okay, Question:  "They would ship it, but they make it

19   explicit there was an understanding that you would ship the

20   defective part back?"

21         "Some parts.  There were some parts that they would

22   say, 'We don't need to get them back.'"

23         "What was that, what type of part?"

24         Okay.  "I think, like, hard drives.  We had

25   motherboards, which was kind of surprising.  I only had that

1    happen a few times, but they would say we actually do not need

2    to return HP, I remember, with hard drives.  If the hard drive

3    went bad for whatever reason, they didn't want it."

4              "Any other equipment HP -- Dell wanted?"

5              "I would guess probably in 70 percent of the cases

6    they wanted the part back, but there were a few times -- "

7              Okay.  So, I guess that's what I said that day.

8    Q.   You also, when you just read it, even though I didn't ask

9    you to, that 70 percent of the time, that was your estimate --

10   A.   Yeah.

11   Q.   -- the company would want the part back?

12   A.   Yeah.

13   Q.   Seventy percent of the time?

14   A.   Yeah.  You know, I would say now, because even though you

15   asked that question at the time, you don't have a lot of time

16   to think about it.  I'm actually surprised I said "70 percent."

17   Q.   Do you think it's higher than that?

18   A.   It probably was a little higher.  But, I mean, I can't

19   quantify it, because it's not like I get involved with it that

20   often.

21   Q.   Okay.  Now, have you ever been to an auction with Matt

22   Kuc?

23   A.   Yes.

24   Q.   And what kind of auction were you at?

25   A.   We went to an auction, I want to say it was at some

1    industrial building, and I don't remember exactly where it was,

2    but we went to an auction where they were auctioning off

3    everything, a lot of stuff.

4    Q.   You mean computer stuff?

5    A.   Oh, yeah, computer stuff, desks, everything.

6    Q.   And were there pallets full of computer stuff, you could

7    just buy a whole bin, so to speak?

8    A.   The one auction that I remember happening they actually

9    had computers, individual computers, like, with numbers on

10   them, and you could bid on those computers.  Sometimes they had

11   like a cubicle full of stuff, just random stuff that they would

12   say, "Lot 50."  They didn't have pallets inside the offices.

13   Maybe they were palletized later, but there weren't pallets

14   when we went to the auction.

15   Q.   I said "pallets," and you're saying "lots."

16   A.   A lot is just a number that said "Lot 50."  If this was up

17   for auction (indicating) there would be a sticker on it that

18   said "Lot 50."

19   Q.   All right.  And were there lots, whether it was 50 or some

20   other number, that had multiple items in them?

21   A.   Oh, yeah.

22   Q.   Hundreds of items?

23   A.   Again, I remember just going to one auction, and alls I

24   remember is, I can visualize a cubicle that had a bunch of

25   boxes with a bunch of random things in it.  That's what I

1    remember as far as quantity.  Other than that, what I remember

2    is just individual computers at this one auction.

3    Q.    Where was this auction?

4    A.    As I said, I don't really remember where it was.  If I had

5    to guess, it might have been Avon or Brockton, but I'm

6    guessing, I really am.

7    Q.    Do you know who ran the auction?

8    A.    There was this company that used to run all these

9    auctions.  The location we went to see might have been where I

10   said, Avon, but the actual auction was held a few days later

11   that we went to Foxborough for.  So, in other words, what they

12   do is they exhibit the materials at the office, they actually

13   hold the auction later, and the auction itself took place in

14   Foxboro.

15   Q.    Right.  This is an auction that you went to with Matt Kuc?

16   A.    Yes.

17   Q.    Have you ever gone to another auction without him?

18   A.    No.

19   Q.    Did he buy anything at the auction that you were together

20   with him at?

21   A.    No.  No.  I think I bought two or three computers.

22   Q.    I thought you just said you didn't buy anything.

23   A.    I didn't buy anything with him.  What do you mean by

24   "him"?  I took that as meaning that we went in on it sharing

25   money together.

1    Q.    No.

2    A.    I, Sensible Computer, Ray Di Ciaccio, bid on some items

3    and won some items.

4    Q.    And did Matt Kuc bid on some items?

5    A.    I don't remember if he did or not.  I only know what I

6    did.

7    Q.    Had you ever had discussions with him about auctions that

8    he attended before he got you to go to this auction with him?

9              MR. GARLAND:  Objection.

10             THE COURT:  Grounds?

11             MR. GARLAND:  Hearsay.  It's calling for hearsay of

12   the defendant.

13             THE COURT:  I am going to permit it.

14             THE WITNESS:  I'm sorry.  Am I answering the question?

15             THE COURT:  You may answer the question.

16             This is really not going to the truth of whatever Mr.

17   Kuc said but the fact of the interaction.

18             THE WITNESS:  So, can you ask the question again?

19   BY MR. SHEKETOFF:

20   Q.    Was there a discussion about other auctions that he said

21   he had attended that led to you going to this auction with him?

22   A.    Yes.

23   Q.    And had he suggested to you that he had been very

24   successful at these auctions?

25   A.    Yes.

1    Q.   And it was out of curiosity that you went to one of them?

2    A.   No.  It was out of his encouragement because he said he

3    thought it would be a good idea because he had been successful.

4    Q.   And did you, in fact, you told us you did, purchase some

5    items at this auction?

6    A.   Yeah.

7    Q.   And what did you do with them?  Did you resell them?

8    A.   Yes.

9    Q.   And did you make a profit?

10   A.   Yeah.

11   Q.   And did it turn out that any of the items that you bought

12   were under warranty?

13   A.   I don't believe so.  It wasn't even an issue.

14   Q.   It wasn't an issue?

15   A.   In other words, when I bought them warranty wasn't an

16   issue.  It was simply I bought an item that I thought would be

17   helpful to our customers and we resold it.  Warranty wasn't

18   even part of the consideration.

19   Q.   So, you don't know if the items that you bought were, in

20   fact, under warranty or were not?

21   A.   No, and I didn't care.

22   Q.   And you didn't care.  Thank you, sir.

23           THE COURT:  Mr. Garland.

24           MR. GARLAND:  Very briefly.

25

REDIRECT EXAMINATION

BY MR. GARLAND:

Q.   Mr. Di Ciaccio, did you ever order a warranty replacement part from a manufacturer and they required you to return the part, but you forgot to return the part?

A.   I think yes, it happened, you know, once or twice.  I don't know.

Q.   Did the manufacturer ever contact you about the part?

A.   Yes.  You usually either got a phone call or you got some kind of e-mail, but I think usually it was some kind of phone call.

Q.   And what would you do when you got that e-mail or that phone call?

A.   Well, we would find -- we would go search for the part, and then -- it usually came with a package to return it with, so we would match those things up and send it off.  But it happened so infrequently.  I mean, even just the whole returns thing was very infrequent.

            MR. GARLAND:  No further questions, your Honor.

            THE COURT:  Anything else?

            MR. SHEKETOFF:  No, thank you, your Honor.

            THE COURT:  You may step down, Mr. Di Ciaccio.  Thank you.

                        (Witness stepped down)

            MS. BURKART:  Your Honor, the prosecution rests.

1        THE COURT:  All right.

2        Mr. Sheketoff, anything?

3        MR. SHEKETOFF:  Can we go to the sidebar, please?

4        THE COURT:  Yes.

5

6    (SIDEBAR CONFERENCES AS FOLLOWS):

7        MR. SHEKETOFF:  I didn't bring a writing with me

8    today, but could I orally move for judgments of acquittal?

9        THE COURT:  Right.

10        MR. SHEKETOFF:  And I will file it.

11        THE COURT:  You can reduce it to a writing.

12        MR. SHEKETOFF:  Yeah, and file it electronically.

13        THE COURT:  Mm-hmm.

14        MR. SHEKETOFF:  I don't know if I will get to it

15    today, but certainly before the end of the week I would file it

16    in writing.

17        THE COURT:  I consider it to be filed.

18        MR. SHEKETOFF:  Thank you.  The Aggravated Identity

19    Theft is the only one I want to be heard on, and I believe I am

20    going to rest, but I would like to check with him one more time

21    before I do it.

22        THE COURT:  I will hear argument on Aggravated

23    Identity Theft at a later point, not now.

24        MR. SHEKETOFF:  Fair enough.

25        THE COURT:  But if you want to check with your client

1    and see what else you want to do.

2          MR. SHEKETOFF:  Yes.  Can I actually get a five-minute

3    recess?

4          THE COURT:  Sure.

5    (END OF SIDEBAR CONFERENCE)

6

7          THE COURT:  So, ladies and gentlemen, what that means

8    is the Government's case in chief is completed, and so we are

9    going to take a brief recess to see where we go from here.  So,

10   maybe five minutes or so.

11         THE CLERK:  All rise for the jury.

12            (The jury exited the courtroom at 12:10 p.m.)

13         THE COURT:  So, we will take about five minutes.

14         MR. SHEKETOFF:  Thank you.  All rise.

15         THE CLERK:  All rise.

16     (The Honorable Court exited the courtroom at 12:10 p.m.)

17                        (Recess taken)

18         THE CLERK:  All rise.

19     (The Honorable Court entered the courtroom at 12:20 p.m.)

20         THE CLERK:  This Honorable Court is back in session.

21   You may be seated.

22         THE COURT:  So, Mr. Sheketoff?

23         MR. SHEKETOFF:  We are going to rest also.

24         THE COURT:  It is my practice, generally, in cases

25   when the defendant is choosing not to testify simply to ask a

1    couple of questions of the defendant.

2            MR. SHEKETOFF:  I have no objection.

3            THE COURT:  Mr. Kuc, you understand that the choice to

4    testify or not is a very important strategic judgment that you

5    have to make in the case?

6            THE DEFENDANT:  Correct.

7            THE COURT:  Have you had an adequate opportunity to

8    discuss fully with Mr. Sheketoff the pros and the cons?

9            THE DEFENDANT:  Correct.

10           THE COURT:  And you have reached the conclusion that

11   you are not going to testify in this case; is that right?

12           THE DEFENDANT:  Correct.

13           THE COURT:  All right.  You may be seated.

14           We will bring the jury back in, and I will send them

15   home for the day.

16           I will formally inquire of you regarding the

17   defendant's case.

18           MR. SHEKETOFF:  Yes, your Honor.

19           THE CLERK:  All rise for the jury.

20           (The jury entered the courtroom at 12:20 p.m.)

21           THE CLERK:  You may be seated.

22           THE COURT:  So, Mr. Sheketoff, does the defendant have

23   a case that he wishes to put on?

24           MR. SHEKETOFF:  No, your Honor.  We rest also.

25           THE COURT:  So, what that means, ladies and gentlemen,

1    is the evidence is completed in the case.  It does not mean the

2    case is over.  What it does mean is that all of the evidence

3    that you need to make your judgment has been submitted to you,

4    but you do not have all that you need to make your judgment.

5         First, you are going to have to hear the closing

6    arguments of counsel, which will put into, I think, a framework

7    for you the really relevant issues in this case, and you are

8    going to have to hear my instructions on the law, which tell

9    you what it is that you have to consider as a legal matter

10   before you render your judgment.  We are going to do that

11   tomorrow morning.

12        The case will be presented to you with closing

13   arguments and then my instructions, and then we will give you a

14   jury verdict slip, and we will send you out and you are going

15   to do the job that we asked you to do, which is decide whether

16   or not the Government has proved beyond a reasonable doubt each

17   essential element of any offense that they charge.

18        Now, it is at this point, I think it is probably

19   almost like hydraulic pressure, you would like to talk about

20   this case with someone.  Do not do it.  You have not heard all

21   that you need to know to make your own decisions in this case.

22        I have advice.  My advice is enjoy the afternoon, get

23   a good night's sleep so that you come back here bright-eyed and

24   bushy-tailed to address the issues that we are going to present

25   to you.  You do not have to do anything else except to prepare

1    yourself in the sense of getting a good night's sleep before

2    you begin this very important dimension to your trial.

3          So, you are free to go.  We will see you tomorrow

4    morning around 9:00.

5          THE CLERK:  All rise for the jury.

6              (The jury exited the courtroom at 12:25 p.m.)

7          THE COURT:  So, what I thought, unless there is

8    something more you want to chat about right now, is simply to

9    get together at 8:45 tomorrow morning, and I will have a more

10   refined idea of what I want to say about Aggravated Identity

11   Theft, and the rest of it I think, as I said, is pretty plain

12   vanilla in terms of instructions here.  I tend not to instruct

13   in a way that addresses any arguments that the parties have

14   made.  I do not try to limb the parties' arguments or reinforce

15   them.  So, my instructions will be fairly straightforward as

16   least as to the legal matters.

17         Now, are there any other things that you want to talk

18   about?

19         MR. SHEKETOFF:  Since I have never tried before you,

20   your Honor -- although I remember the first time I met you; one

21   of my kids had just thrown up in my hands and I ran up to your

22   -- I don't know if you remember that incident.

23         THE COURT:  This is the kind of thing -- I probably

24   suppressed that.

25         MR. SHEKETOFF:  You laughed at me, thought it was

1    funny, and it was.

2          THE COURT:  I forget the things that are funny.  The

3    things that are sad I remember.

4                    (Laughter)

5          MR. SHEKETOFF:  So, I don't know if you let us argue

6    reasonable doubt and a presumption of innocence.

7          THE COURT:  No, not in the sense of providing

8    linguistic assistance to the jury.  I use the expanded language

9    from United States versus Cleveland that Judge Keeton used; it

10    is in Judge Hornby's *Pattern Instructions*.

11          The First Circuit has indicated that the jury has

12    *a priori* knowledge of what "reasonable doubt" is, and,

13    consequently, you do not have to explain it to them.  This

14    appears to have been -- now I will give an historical lesson --

15    the result of several Judges on the Court of Appeals who

16    thought that one could not open one's mouth about reasonable

17    doubt and not subtract from the sum of human knowledge when you

18    do so.

19          But, nevertheless, they blessed Judge Keeton's

20    language, and my view is that reasonable doubt expressed with a

21    stern and solemn manner conveys the concept.  You can say that

22    they have met their burden beyond a reasonable doubt, but you

23    cannot say in most important decisions in life and that sort of

24    thing.

25          MR. SHEKETOFF:  Am I allowed to say it's a very high

1    level of proof that the Court will explain to you?

2         THE COURT:  Yes, yes, just as a trailer for my main

3    feature.

4         MR. SHEKETOFF:  I understand.

5         THE COURT:  The other aspect of it is I do charge, and

6    pretty hard, on the defendant's choice not to testify, and I

7    tie that into the idea that the burden rests with the

8    Government, and the jury is not going to consider in any

9    fashion that the defendant did not testify, because we are here

10   to decide whether or not the Government has met its burden, and

11   he has the Constitutional right to choose not to testify and

12   shape and frame that issue directly.  So, I will do something

13   like that.

14        Anything else?

15        MS. BURKART:  Just a brief housekeeping matter, your

16   Honor.  We have admitted these five boxes as exhibits.  I have

17   checked with Mr. Sheketoff, and I would propose, and I believe

18   it's unopposed, that we be able to photograph both the outside

19   and the contents of those boxes to preserve that as a

20   substitute exhibit for the record so that these could go back

21   to the jury, but then, for subsequent preservation purposes, we

22   would have a substitute exhibit.

23        THE COURT:  Sure.

24        MS. BURKART:  Thank you.

25        THE COURT:  Do you know that we use the JIRS system,

1  that is, a computer system for this kind of thing?

2          MS. BURKART:  Yes.

3          THE COURT:  One other thing.  I mentioned redacting

4  the indictment for jury use, take out the Aiding and Abetting.

5  So, let me just go through what I think you have to take out

6  here, which is in the violation line on page 1.  There may be

7  other stuff, but I just want to be sure that you have got the

8  benefit of my thoughts on this.

9          In Counts One through Four, the line identifying the

10  statute should have a single section and strike "two."  The

11  charge language at the end of page 5, make "section" singular

12  and strike "two."  Page 6, strike one of the section signs, and

13  strike "two" in the heading, and in the charging language

14  strike the plural and strike "two," and similarly in Count Six.

15          I think that cleans it up, but if there is anything

16  else that either of you see, share it among yourselves.  I will

17  be accommodating, I think, but I think that is down to its

18  barebones now.

19          Anything else?

20          MS. BURKART:  Nothing, your Honor.

21          MR. SHEKETOFF:  No, your Honor.

22          THE COURT:  See you tomorrow morning.

23          THE CLERK:  All rise.

24     (The Honorable Court exited the courtroom at 12:30 p.m.)

25          (WHEREUPON, the proceedings adjourned at 12:30 p.m.)

1                          C E R T I F I C A T E

2

3          I, Brenda K. Hancock, RMR, CRR and Official Reporter

4    of the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of United States of America v.

8    Matthew Kuc, No. 1:11-cr-10014-DPW-1.

9

10

11

12

13

14   Date:    February 19, 2013          /s/ Brenda K. Hancock

15                                       Brenda K. Hancock, RMR, CRR

16                                       Official Court Reporter

17

18

19

20

21

22

23

24

25