1                   UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3

4    THE UNITED STATES OF AMERICA     )
                                      )
5                                     )
                                      )
6    vs.                              )  No.
                                      )  1:11-cr-10014-DPW-1
7                                     )
     MATTHEW J. KUC,                  )
8                                     )
                     Defendant.       )
9

10

     BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
11

12

                        DAY FOUR OF JURY TRIAL
13

14

15

            John Joseph Moakley United States Courthouse
16                      Courtroom No. 1
                        One Courthouse Way
17                      Boston, MA 02210
                     Thursday, June 28, 2012
18                        9:05 a.m.

19

20

21             Brenda K. Hancock, RMR, CRR
                     Official Court Reporter
22        John Joseph Moakley United States Courthouse
                        One Courthouse Way
23                      Boston, MA 02210
                        (617)439-3214
24

25

1    APPEARANCES:

2         UNITED STATES ATTORNEY'S OFFICE
          By:  AUSA Amy H. Burkart
3              AUSA Scott Garland
          Suite 9200
4         Boston, MA 02210
          On behalf of the United States of America
5
          ROBERT L. SHEKETOFF, ESQ.
6         One McKinley Square
          Boston, MA 02109
7         On behalf of the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I   N   D   E   X

2

3                                            Page

4

JURY CHARGE CONFERENCE            4

5

CLOSING ARGUMENT
6   By Mr. Garland                   18
By Mr. Sheketoff                 41

7

REBUTTAL CLOSING ARGUMENT
8   By Ms. Burkart                   52

9   JURY INSTRUCTIONS                59

10   QUESTION FROM JURY               90

11   JURY VERDICT                     96

12   BAIL HEARING                     99

13

14                      E   X   H   I   B   I   T   S

15
                                                   Page
16   Jury Exhibit No. 1 - Question from the Jury      95

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | P R O C E E D I N G S: |
| 2 | THE CLERK:  All rise. |
| 3 | (The Honorable Court entered the courtroom at 9:05 a.m.) |
| 4 | THE CLERK:  This Honorable Court is back in session. |
| 5 | You may be seated. |
| 6 | THE COURT:  I am going to ask Mr. Lovett to give you a |
| 7 | copy of the verdict slip.  I do not think there is an issue, |
| 8 | but if there is, tell me.  I had filed the second iteration of |
| 9 | the Indictment for Jury Use. |
| 10 | Any objection to it, Mr. Sheketoff? |
| 11 | MR. SHEKETOFF:  There is no objection. |
| 12 | THE COURT:  So, let us focus on the question of |
| 13 | Aggravated Identity Theft. |
| 14 | Do you wish to be heard on that, Mr. Sheketoff? |
| 15 | MR. SHEKETOFF:  On the Motion for Judgment of |
| 16 | Acquittal? |
| 17 | THE COURT:  Well, yes. |
| 18 | MR. SHEKETOFF:  Or just a general discussion? |
| 19 | THE COURT:  Really more language for purposes of |
| 20 | charging the jury. |
| 21 | MR. SHEKETOFF:  Well, the indictment, as I recall, |
| 22 | limits it to Francisco Samuel -- |
| 23 | THE COURT:  Right. |
| 24 | MR. SHEKETOFF:  -- and variations thereof or something |
| 25 | like that.  I don't know that you could convict somebody of |

1    Identity Theft from using variations of somebody else's

2    identity.

3            The way I read the statute, your Honor, I think the

4    intent was that you assume somebody, whether it's by theft, or

5    the case law seems to be it doesn't have to be by theft, but

6    you assume somebody's identity, and you do that by using some

7    sort of identifying characteristics of that person, I think

8    what they had in mind, and all the stuff gets expanded beyond

9    the position that I would ever want to take, is a Social

10   Security card, a credit card, a driver's license, some

11   identifying data.

12           I'm not sure that just using somebody's name -- if I

13   said I was Bob Smith when I introduced myself to you, and I

14   know a Bob Smith, and I did that in connection with some sort

15   of fraud, I'm not sure that that is Aggravated Identity Theft.

16   That would be my position, that I would have to do something

17   more than that to be guilty of Aggravated Identity Theft.  So,

18   I don't think using somebody's -- I am just repeating myself.

19           THE COURT:  Well, the language that the First Circuit

20   has used is taking without the right or permission, acting on a

21   person's behalf that is contrary to the law, regardless of how

22   the means of identification is actually obtained.  It does not

23   talk in terms of traditional vehicles of identity, like Social

24   Security cards or anything like that.  It is the appropriation

25   of somebody's identity for some purpose that is illegal, and if

1    it is illegal, you cannot do it with permission.

2          MR. SHEKETOFF:  Well, to me, then, "without lawful

3    authority" is written out of the statute.

4          THE COURT:  No, it is not.  It is without lawful

5    authority if you take somebody's passport and use it, even if

6    they say, "Go ahead and take my passport and use it."  That is

7    without lawful authority.  Then there are circumstances in

8    which somebody says, "You can use my identity for purposes of

9    delivering things to this particular address," and they left

10   unstated the other address.

11         Now, here, that has got two violations, two potential

12   violations.  One is that it is part of a scheme that, known or

13   unknown to the person whose name is used, is illegal, that is,

14   the use of a false identity for that purpose.  But, second

15   here, the scope of the permission is limited to the one

16   location and not multiple ones.

17         More troubling, I guess, for me, is the question of

18   what the jury is going to find, and I do not understand what

19   the Government's theory is here.  The jury is asked to find

20   that he used the name.

21         Do they have to agree on which time, which one of

22   these acts of Mail Fraud or Wire Fraud?

23         MR. GARLAND:  I don't believe so, your Honor.  I think

24   that they have to just find that there is a use of a means of

25   an identification during and in relation to.  I think that the

1    during and in relation to in that language means that it can be

2    any time during that --

3           THE COURT:  So, three jurors could say it was at

4    Mendon Road, and three could say it was at some other location,

5    and three could say yet another location and that would satisfy

6    it?

7           MR. GARLAND:  Well, I think that the Government's

8    argument is actually not going to be as broad as that.  The

9    Government's --

10          THE COURT:  It might not be, but we are dealing with

11   the charge that is laid here, and the charge that is laid here

12   is a kind of generalized use in connection with Mail Fraud.

13   Mail Fraud is charged here, customarily, in One through Four as

14   individual mailings, and so you have got this spreadsheet of

15   mailings for Aggravated Identity Theft, and it is unclear to

16   me, and probably unclear to the jury, what they are being asked

17   to decide as a body, and so it has problems of multiplicity, I

18   suppose, as a charge.

19          MR. GARLAND:  Well, I think that, first of all, there

20   is one use of Francisco Samuel's real name, not variations, on

21   one of the boxes that was at the house during the search.  That

22   was on December 14th, 2010.

23          THE COURT:  Well, but, see, you have to charge it, and

24   you did not.  You did not charge one box at the house.  You

25   charged means of identification of another person and business

1  name and business address and variants thereof.  So, what I

2  have is this free-form amalgam of Aggravated Identity Theft,

3  not a particularly charged identity theft.

4      MR. GARLAND:  Well, I think that the case law says

5  that no particular incidents of Mail Fraud, for example, has to

6  be charged, and when you are charging 1028A --

7      THE COURT:  It may not be, but how does it address the

8  question of multiplicity?

9      MR. GARLAND:  We would be content if the Court were to

10  instruct the jury that if they found that the real name, no

11  variations of the name of Mr. Francisco Samuel --

12      THE COURT:  So, I should constitute myself as the

13  grand jury and amend the indictment?

14      MR. GARLAND:  I think that the Court has the ability

15  to narrow the charges by saying that we are not relying on any

16  of the shipments that had Mr. Samuel's real name on it going to

17  42 Union Street.  The argument is going to concentrate on the

18  shipments to the other addresses.

19      THE COURT:  Well, but you see, the indictment is the

20  charging document; it is not constructively amended by

21  arguments to the jury.  The question I have is a more

22  fundamental one, which is whether or not this is charged in a

23  fashion that could pass muster as not multiplicitous, and you

24  tell me that you do not have to charge a particular act of Mail

25  Fraud.  That may be right, but you do have to charge something

1    that is a unit of charge.

2         MR. GARLAND:  It may be that a unanimity instruction

3    would be an appropriate manner to charge them that --

4         THE COURT:  I will amend the indictment to say that

5    the Government is moving only with respect to what?

6         MR. GARLAND:  No.  My suggestion would be that the

7    Court instruct the jury that they need to be unanimous when

8    they go back there as to which incident of the use of

9    Mr. Francisco Samuel's true name, along with his address or

10   variation on it that were the company name that he used.  They

11   have the evidence right there that shows in summary form and in

12   very particular form all of those uses in there, and if they

13   don't find unanimously on a particular incident, then they

14   shouldn't return a verdict on that.

15        THE COURT:  That addresses the question of unanimity.

16   It does not address the question of multiplicity, that is, a

17   multiplicitous charge.  Now, perhaps multiplicity can be

18   avoided by a unanimity instruction, but I think this is an

19   embedded question, I suppose, here.

20        MR. GARLAND:  I think that the Court is correct that

21   the multiplicity question is addressed by the unanimity

22   instruction.  There's certainly no question that the defendant

23   is on notice ahead of time that any of the uses of Mr. Samuel's

24   name during any of the dates alleged for the scheme and also

25   that are alleged in the Aggravated Identity Theft Charge are in

1    play.  So, there is not a notice issue.  The question now is

2    how is the jury to figure out and render a verdict on that, and

3    I think by giving a unanimity instruction and having the

4    evidence in front of them so that they can look at it and point

5    to the one that they agree on, I think that actually benefits

6    the defendant at that point.

7          THE COURT:  Well, no.  The standard is not benefit the

8    defendant or not benefit the defendant.  That is an incident.

9    The question is whether or not what is charged here is a charge

10   that meets the standards of charging generally for criminal

11   events.  So, I think what I am going to do is give the

12   unanimity instruction and leave it open whether or not the jury

13   returns a verdict on Aggravated Identity Theft we have a

14   problem.

15         MR. GARLAND:  Would the Court want to possibly ask the

16   jury in their deliberations to do some sort of a special

17   verdict on that actual incident that they are unanimous about,

18   just terms of if there is some sort of appellate record?

19         THE COURT:  No, I do not think I would do that.  We

20   have more special questions nowadays because there are, among

21   other things, Apprendi issues that are related.  But the

22   fundamental law of the First Circuit is not favorable to

23   special questions, in fact, they are dangerous as a way of

24   marching the jury to a conclusion, as United States versus

25   Spock indicated.  So, I raise the issue *sua sponte*, and I will

1    deal with this, at least for now, with a unanimity instruction.

2         MR. GARLAND:  Your Honor, let's assume that there is a

3    verdict that is favorable to the Government, a guilty verdict

4    afterwards.  Will the Government have a chance afterwards to

5    address that in writing?

6         THE COURT:  Of course.  It is at that point that I

7    will deal with a question of new trial or Motion for Judgment

8    of Acquittal on that count or any other count they raise.

9         MR. GARLAND:  Okay.  Thank you, your Honor.

10        THE COURT:  Is there anything else here?

11        The Identity Theft or Fraud language is pretty broad.

12   The First Circuit has a what I will call latitudinarian

13   approach to the statute in Ozuna-Cabrera.

14        Is there anything else, other than you can go ahead

15   and take somebody's name if it is not in an official document?

16        MR. SHEKETOFF:  Well, I don't think a means -- the

17   statute does use the language "means of identification," and

18   it's my position that just using somebody's name can't be

19   enough.

20        They are asking you to say variants thereof to the

21   business address and things of that nature.  I don't think they

22   are variants thereof either.  If you are appropriating

23   somebody's identity, it seems to me it has to be not a variants

24   thereof but the actual identity, and do they have an instance

25   where he used the correct name, the correct business name and

1    an address that was not authorized?

2         MR. GARLAND:  Your Honor, I believe that we do, and I

3    would just note for the record that the very definition of the

4    term "means of identification" means any name or number that

5    may be used alone or in conjunction with any information to

6    identify a specific individual.  That indicates that whether it

7    was written well or by Congress too broadly that it answers the

8    question that Mr. Sheketoff poses.

9         THE COURT:  I am not sure it does, but I will spend

10   some time thinking about it, if I am required to.  It seems to

11   me that the particular name probably has to be there, but I do

12   not know.  So, we are at the point at which I am charging the

13   jury and I am going to give a unanimity instruction.  Do you

14   want to provide another hostage to fortune in some other

15   cautionary instruction?

16        MR. GARLAND:  None is coming to mind, your Honor.

17        THE COURT:  Pardon me?

18        MR. GARLAND:  I said, "None is coming to mind."  I

19   mean, I will say that it may be that in the instruction in

20   1028A -- the Government's position is not that if -- using the

21   example that Mr. Sheketoff used before, that if a nickname of

22   Mr. Francis Samuel was used that would be sufficient.  But the

23   Government's position is if he used his real name, no

24   misspellings, no variations, that that's fair game under the

25   statute, and that's what the statute was used for.

1          THE COURT:  So, what does "variants thereof" mean?

2          MR. GARLAND:  "Variants thereof" was intended to refer

3    to the business name and the business address.

4          THE COURT:  What is "being appropriated"?

5          MR. GARLAND:  The means of identification of the name

6    used in conjunction with that other information.

7          THE COURT:  Well, Aggravated Identity Theft is, I am

8    sure, an attractive charging device, but it has the potential

9    for creating a Rube Goldberg machine that, as machines

10   sometimes do, may break down.

11         So, I will charge as the Government requests.  It is

12   your own petard, and we will see where it leads.

13         But I am not going to act on the Motion for Judgment

14   of Acquittal here.  You have heard what I am going to do with

15   the instructions in this case.  I will give a unanimity

16   instruction, and we will see what the jury does with it.

17         MR. SHEKETOFF:  And, your Honor, to go back to another

18   point, I don't consider this critical right now, but as long as

19   we are on the topic, I wanted the record to reflect that I

20   addressed it, without lawful authority, I think the First

21   Circuit by saying, well, whenever you use it whether it is with

22   the person's permission or not with the person's permission, to

23   commit a fraud, it is without lawful authority.  Then, when is

24   it with lawful authority?  I mean, what do those words in the

25   statute mean?

1          THE COURT:  When you are not committing a crime.

2          MR. SHEKETOFF:  When you're not committing a crime.

3    So, it's completely superfluous or surplusage as an element of

4    this --

5          THE COURT:  No.  It says if you want to commit a

6    crime, do not use anybody else's identity because you are going

7    to get nailed with a second charge.

8          MR. SHEKETOFF:  But "without lawful authority," it

9    says.  Why put that in?

10         THE COURT:  Well, I guess that is a question for the

11   First Circuit.

12         MR. SHEKETOFF:  Okay.

13         THE COURT:  But the language is pretty clear from

14   Ozuna-Cabrera, I will read it in specific to make sure I am

15   fully understood.  Section 1028A(a)(1) reasonably proscribes

16   the transfer, possession or use of another person's means of

17   identification absent the right or permission to act on the

18   person's behalf in a way that is not contrary to the law.

19         I do what I am told.  That is what I am told.

20         MR. SHEKETOFF:  I understand.  So, I will save my

21   rights at the end of the charge.

22         THE COURT:  All right.  Anything else we need to talk

23   about before the jury is brought in?

24         MR. SHEKETOFF:  I think either at the final pretrial

25   conference or sometime before openings you told us that we have

1    20 minutes for closing.

2          THE COURT:  There was a preacher at Yale around the

3    turn of the 19th Century, a visiting preacher, who asked the

4    individuals in charge of Battell Chapel, "How long should my

5    sermon be?"  And the response was, "There are no souls saved

6    after 20 minutes."

7          MR. SHEKETOFF:  I am not arguing for more time, your

8    Honor.  I'm just asking if that is, in fact, our limit.

9          THE COURT:  I give that as a cautionary, preparatory

10   instruction, but I will not bring out the hook if you go

11   longer.  On the other hand, if you turn into the fellow who

12   knows how to spell "banana" but does not know when to stop, I

13   might make some observations about moving along.

14         MR. SHEKETOFF:  Fair enough.

15         THE COURT:  All right.  So, are we ready for the jury?

16         MR. GARLAND:  Your Honor, if I could just have a

17   minute to bring over the chalk, which I would like to use?

18         THE COURT:  All right.  Is anybody going to be using

19   the podium?  In which case, it needs to be pushed over.

20         MR. GARLAND:  Oh, I assumed you wanted us to address

21   the jury from the podium.

22         THE COURT:  Anywhere you want, just as long as you are

23   not in the jury box.

24         MR. GARLAND:  I am going to want to move it over here.

25         THE COURT:  All right.

1          MS. BURKART:  Your Honor, as a housekeeping matter, I

2     have 26A, which we discussed yesterday.  I can provide it to

3     Mr. Lovett and would just submit that as the amended exhibit

4     that we discussed yesterday when Mr. Zappala was testifying.

5          THE COURT:  Do the parties want to have both of those

6     Exhibits in the --

7          MR. BURKART:  I believe that that would be

8     appropriate, your Honor, since Mr. Long -- it was admitted

9     before Mr. Zappala had wanted to make an adjustment.

10          THE COURT:  All right.

11          MS. BURKART:  I provided it that way to the jurors.

12          THE COURT:  Ready to go?

13          MR. GARLAND:  Yes, your Honor.  Your Honor, may I put

14     the exhibits here that I intend to use?

15          THE COURT:  Yes.

16          So, I am assuming there is no objection to the verdict

17     slip here --

18          MR. GARLAND:  I have none.

19          THE COURT:  -- the copies of that.

20          MR. SHEKETOFF:  There is no objection, your Honor.

21          MR. GARLAND:  Your Honor, may I access one of these

22     notebooks?  There is an original here that I would like to use.

23          THE COURT:  Sure.

24          MR. GARLAND:  Thank you, your Honor.

25          THE CLERK:  All rise for the jury.

1          (The jury entered the courtroom at 9:30 a.m.)

2          THE CLERK:  You may be seated.

3          THE COURT:  This is just one housekeeping matter.  Are

4   there sufficient copies of the indictment for the jurors made

5   up?

6          MR. GARLAND:  I'm sorry, no, we didn't print those

7   out, your Honor.

8          THE COURT:  So, someone is going to have to do that

9   while you are charging the jury.

10          MS. BURKART:  No problem, your Honor.  I will take

11   care of that.

12          MR. GARLAND:  May it please the Court?

13          THE COURT:  Not yet.  It will, but not at this point.

14          Ladies and gentlemen, we have reached that point at

15   which you hear the arguments of counsel.  As I said yesterday,

16   it is the effort that counsel has and the opportunity to

17   persuade you from the evidence in the case.  It is very, very

18   helpful, that is why it pleases the Court, to have arguments of

19   counsel, to focus you on what is really in issue in the case,

20   what it is that the parties are trying to do.

21          You understand that the Government bears the burden of

22   proving each essential element beyond a reasonable doubt.  You

23   have to find that, but there are emphases in the evidence that

24   become critically important, and this is the opportunity for

25   counsel to address that for you.

1          We hear, first, from the Government, then we will hear

2     from the defendant, and then I will give you the charge, the

3     framework under which you are going to evaluate this case.

4          One thing you should recognize is that it is the

5     evidence that really counts, and so if you hear in closing

6     argument something that you do not think you heard in evidence,

7     well, of course, you will disregard it.  It is only what

8     appeared here in court and was received in evidence that is

9     going to be the basis for your determination.

10          So, we will hear, first, from Mr. Garland, and then we

11     will hear from Mr. Sheketoff.

12                          CLOSING ARGUMENT

13     BY MR. GARLAND:  Good morning, ladies and gentlemen.

14          The evidence in this case proves beyond a reasonable

15     doubt that Mr. Kuc did exactly what Ms. Burkart told you that

16     he did on Monday; that he lied to the computer companies

17     repeatedly in order to get as many valuable computer equipment

18     parts as he could without paying for them so he could turn

19     around and sell them on the Internet and pocket the profits,

20     and Mr. Kuc used whatever names, companies, addresses that he

21     could come up with, including those that belonged to his

22     friends and his colleagues.

23          Now, you have heard suggestions throughout the trial

24     that this might have been just a misunderstanding, that maybe

25     Mr. Kuc didn't know that he had to pay for the parts or return

1    them.  Ladies and gentlemen, this idea of getting something up

2    front and then paying for it later is not a complicated

3    concept.  When you visit a nice restaurant your server doesn't

4    ask for a credit card up front, and from that you don't just

5    assume that you can sit down, eat the meal and get up and walk

6    away without paying for it.  You know that when you finish you

7    have to pay, and if your server doesn't bring you your check,

8    you know that you should ask for it.

9         Mr. Kuc ordered valuable computer parts and then

10   didn't return the broken parts or pay for them.  He did this

11   hundreds, if not thousands, of times.  He didn't just forget to

12   pay the bill at the end of a meal or misunderstand the

13   transaction.

14        How do you know?  Mr. Kuc was in the computer

15   business.  He was in the computer repair business since he was

16   18 years old.  He was President and CEO of Total Asset Recovery

17   and Cyon Data Systems, both computer companies, and he was a

18   computer repair person in a third computer company, Sensible

19   Computers.  With his industry expertise, Mr. Kuc knew exactly

20   what was going on.

21        Now, Ray Di Ciaccio ordered only a handful of warranty

22   parts every year, and even he knew how the system worked.  When

23   he didn't return a broken part, a company contacted him and he

24   returned it.  Now, in contrast with Mr. Di Ciaccio, who ordered

25   only a handful of parts a year, to Mr. Kuc who ordered

1    thousands of parts a year, Mr. Kuc knew that he had to return

2    the broken parts or pay.

3         Now, on top of that you have also heard the computer

4    companies tell you their efforts to get Mr. Kuc to pay or to

5    return what he had gotten or the broken parts.  They sent him

6    packages with labels, prepaid labels, they sent him e-mail

7    reminders, they sent him voicemail reminders, about 70

8    voicemail reminders, according to Mr. Velasco.  Those are just

9    the ones that were found on Mr. Kuc's computers.

10        Dell sent him a big red "Stop" sign.  This is what it

11   looks like (indicating).  This was in Mr. Kuc's house.  Even a

12   little kid knows what this red "Stop" sign means.

13        They also telephoned him and they sent him invoices,

14   too.  Leanne Farrell called him on the telephone multiple

15   times.  If Mr. Kuc didn't know that he was supposed to return

16   broken parts or pay for the ones that he had gotten from them,

17   he must have been closing his eyes and closing his ears, too.

18   He sat down at that table time and time again and ordered a

19   meal without the intent to pay.  That's not a misunderstanding.

20   That's a scheme to defraud, and that's an intent to defraud,

21   and the lies that he told during that scheme are exactly what

22   we are here about, because Mr. Kuc is charged with a scheme to

23   defraud.

24        Let's talk about Mr. Kuc's motive and opportunity to

25   commit the crime.  Now, we know what the motive was here:

1   Money.  Money and lots of it.  Mr. Zappala told you that Total

2   Asset Recovery made about $1.3 million, and that the parts, as

3   they were valued by the companies that he took, were valued as

4   much as $3.5 million.  Now, even if the numbers had been half

5   of that, it still would have been astonishing.

6          So, what gave Mr. Kuc the opportunity to commit the

7   scheme to defraud?  The computer companies' business response

8   to our love/hate relationship to computers.  We love computers.

9   We love computers because they let us work more efficiently, to

10  get great quantities of information, to keep in touch with

11  people halfway around the Globe, to basically surf the

12  Internet.  But we also hate our computers, because when they

13  break our work comes to a standstill and we don't know how to

14  fix them.  Normal people don't know how to fix computers, and

15  that makes us mad.

16         So, the computer companies told you that they came to

17  a business decision, and that business decision was to keep

18  their customers happy with the advanced warranty policy.  To

19  have their customers up and running as quickly as possible they

20  would send out a replacement part to you if you could show that

21  you had a piece of equipment, that it was broken and that you

22  promised to return the broken part.  After all, you learned

23  that even broken parts are still valuable.

24         Now, what Mr. Kuc exploited was this business decision

25  not to require a deposit or a credit card up front.  Now, you

1    might agree with this decision, you might disagree with it, but

2    really it doesn't matter, because that decision was the

3    company's decision to make.

4         Their business decision is not on trial here, and

5    their collection efforts are not on trial, either.  What is on

6    trial here is Mr. Kuc's exploitation of that business decision

7    through his scheme to defraud, and Mr. Kuc was the perfect

8    person to exploit this system.

9         Remember those voicemails on Mr. Kuc's computer that

10   you heard, where one of the companies called him up and wanted

11   to get a part back, and at the end they thanked him for being a

12   quote, unquote, "Valued customer"?  Mr. Kuc's industry

13   expertise helped him convince the computer companies that he

14   was a valued customer, even when he was stealing from them left

15   and right.

16        How did Mr. Kuc do this?  Well, the first thing that

17   he convinced the computer companies was that he had equipment

18   under warranty.  And how did he do that?  You have heard about

19   it before, by giving them a valid service tag or a serial

20   number for equipment he didn't have or he didn't have the right

21   to service.

22        How do you know that Mr. Kuc didn't have the

23   equipment?  Let's start with the four chats that we have talked

24   about so much over this past few days, those four charts in

25   which Mr. Kuc pretended to be Tod Clark, Andrew Finegold, Mark

1   Cook and Sam Jenkins and said that he had broken equipment.

2   Now, you know that Mr. Kuc didn't have that broken equipment or

3   any equipment having those service tag numbers, because Morgan

4   Backhaus, Ben Rubin, Mark Olson and Michael Wisener flew in

5   from New York, Colorado, Texas and Louisiana, and they told you

6   that he didn't have that equipment.  They showed you those

7   pictures of that equipment, and what did those pictures show

8   you?  That that equipment was working in fine condition, each

9   as late as last week for some of these people.  Mr. Kuc did not

10  have that equipment.  And they also told you that they didn't

11  know him, they didn't know anybody that he was connected with.

12      How else was Mr. Kuc making it up?  Do you remember

13  how several witnesses testified that you could check whether a

14  part was under warranty by going into a company website, and

15  you could enter in a service tag or a serial number, and you

16  could check to see whether that was for a valid part and

17  whether it was under warranty or not?  As an experienced

18  computer repair person, Mr. Kuc must have known that you could

19  do this.  Mr. Di Ciaccio knew how to do this.  In fact, you

20  don't have to guess whether Mr. Kuc knew how to do this.  You

21  saw him do it with your own eyes.  You saw him do it from

22  evidence from his own computer.

23      Do you remember what Forensic Examiner Velasco told

24  you?  Mr. Kuc's own computer kept snapshots of him checking out

25  numbers on Dell's and Lenovo's websites, and those snapshots

1    show you that Mr. Kuc knew some valid numbers, checked out

2    related numbers and figured out which ones worked.  Those

3    snapshots are in Exhibits 71 and 72.

4         Now, when you go back into the jury room, you are

5    going to have a chance to look at all of the evidence, but I am

6    going to suggest to you throughout this argument a few things

7    that you might want to do and take a special look at.  This is

8    the Lenovo chat.  This is, I think, Exhibit 72.  When you go

9    back to the jury room, take Exhibit 71.  This is the snapshots

10   of the Dell warranty look-up website, and take a look at the

11   numbers that were looked up by Mr. Kuc.  This is the numbers

12   here.  There's 472FVH1, 479FVH1, 662FVH1, 665FVH1, 655FVH1.

13   Mr. Kuc looked each of these numbers up and found out that they

14   were under warranty.

15        Well, what's going on here?  What's going on is that

16   Mr. Kuc has figured out that if you put a combination of three

17   numbers, not just any three numbers but certain three numbers

18   in front of FVH1, it has a valid service tag, and you could use

19   that service tag in a chat without buying the equipment that

20   has that service tag number.  With that valid service tag

21   number he could start the chat and was on his way to getting a

22   new part sent to him.

23        What else did Mr. Kuc tell the computer companies so

24   they would give him equipment?  Well, he had a magic phrase.

25   Do you remember that magic phrase?  "I'm one of the IT guys

1    here."  You heard it over and over again.  You will find it in

2    each of the chats in Exhibits 1 through 4.  You saw them on the

3    screen, but this is what they look like, if you want to look at

4    them in paper copies.  You will have paper copies of these.

5         Well, why is he saying that "I'm one of the IT guys

6    here?"  Because it sounds impressive.  It sounds like he is at

7    a big industrial facility or a multi-office company that has a

8    lot of computers.  It sounds like he's one of the people there

9    who has to make sure the computers are running so that business

10   is operating.  Because when he says that "I'm one of the IT

11   guys here," he doesn't actually have to specify where "here"

12   is.

13        Now, you are going to want to look at how Mr. Kuc

14   added to the illusion in Exhibit 74.  This went by a little bit

15   quickly when you were hearing Mr. Velasco testify to you.  But

16   these are the HP chat fragments that were recovered by him off

17   of the defendant's computers, and he adds to the illusion in

18   these two things.  If you look at the first page, it says that

19   he has 700-plus, it looks like "computers," at this location.

20   On the second page, it's about 11 hours earlier, and what he

21   says is that he has 300-plus servers at that location, and then

22   he says that he can't do certain things that he is being asked

23   to do because the server that is being talked about here is in

24   production.  What you were told is that "in production" means

25   that it's live, it can't be shut down at this point.  He even

1    demands to speak, and you will see this in here, he demands to

2    speak to the chat operator's manager so that he can bump the

3    system up a little bit and try to get these free parts for him.

4           What's going on here is he is pretending to be an

5    irritated customer, and he is doing that because he's saying

6    that he needs these warranty parts five minutes ago, and he is

7    doing this so that the company will give him these return

8    replacement parts.

9           Folks, let's be perfectly clear here.  What Mr. Kuc

10   was doing was painting a picture of being at someplace that he

11   wasn't, because when he told the companies, "I'm the IT guy

12   here," or he told them that he had 300-plus or 700-plus

13   servers, you know from his IP address, which we talked about a

14   few days ago, that all of these chats that we were talking

15   about before, Counts One through Four, came back to his

16   computer.  And where was that computer?  His computer wasn't at

17   some facility, like a big facility.  It was that room above the

18   garage of 36 Laurelwood Drive (indicating), the room over his

19   parent's garage.  And what was he doing in there?  He wasn't

20   trying to fix computers to get some kind of system working,

21   some company working.  He was planning to obtain more

22   equipment.

23          So, in addition to a valid service tag number and

24   making it look like he was at a legitimate company, what else

25   did he have to tell the computer companies?  Well, he had to

1  trick them into believing that the part that he claimed to have

2  was broken and wouldn't respond to any fixes, and this is where

3  he used those scripts. Do you remember the scripts that

4  Mr. Velasco told you about were taken from the defendant's

5  computer? That's Exhibit 75, which you will also have a chance

6  to look at. Let's see how Mr. Kuc used the last script in

7  Exhibit 75 to craft the Andrew Finegold chat in Exhibit No. 2.

8  This is the script that was found on his computer. It's the

9  last page you were told by Mr. Velasco, this was a separate

10  file. I'm just going to read it:

11      "Hi, I'm one of the IT guys here. The motherboard on

12  this laptop is dead. I have tried different AC adaptors and

13  also stripped the laptop down to just memory and same issue. I

14  finally swapped the memory from a known good laptop and still

15  laptop will not power on. It appears to be a defective

16  motherboard. Please ship parts only, since I can replace it

17  myself. I also understand if I damage anything I am

18  responsible." That was the script. This is the chat.

19      This is Mr. Kuc pretending to be Andrew Finegold, and

20  this is the cat. "Hi, I'm one of the IT guys here. The

21  motherboard on this laptop is dead. I have tried different AC

22  adaptors, also stripped the laptop down just to memory and same

23  issue. I finally swapped the memory from a known good laptop

24  and still the laptop will not power on. It appears to be a

25  defective motherboard. Please ship parts only, since I can

1   replace it myself.  I also understand if I damage anything I am

2   responsible."

3           Ladies and gentlemen, those are the same sentences.

4   Those are the same sentences word for word, and of course it

5   was word for word, because Mr. Velasco told you that these

6   chats, these individual text files and this last one being a

7   Word file, were on the Desktop of Mr. Kuc's computer.  That

8   means that it was only basically a mouse click away from being

9   able to be copied and pasted into anything, including a chat

10  conversation.

11          How else can you tell that it was copied?  Well, I

12  suggest that when you get both of these exhibits back there,

13  look at the last sentence of this chat right here (indicating).

14  "It appears to be a defective motherboard."  This is the last

15  sentence:  "Please ship parts only, since I can replace it

16  myself.  I also understand if I damage anything I am

17  responsible."

18          In that last sentence he uses the word "I" four times.

19  The last three times he uses the word "I," it's a capital

20  letter.  The first time that he uses the word "I" it's a lower

21  case letter.  I suggest that when you look at the same sentence

22  in Chat Number 2, you are going to see the same pattern of

23  capitalization and lower case letters.  That's click and copy.

24          Now, ask yourself, what is Mr. Kuc doing here?  Why

25  would he use these scripts?  After all, when you tell your

1    mechanic that there's something wrong with your car, you don't

2    read to him a script or anything; you just tell him what you've

3    noticed at that point.  Well, using your common sense, you know

4    why he used those scripts, because he was in a volume business.

5    The faster he could operate, the more business he could do and

6    the more parts he could sell.

7            In fact, let's actually take a look at how long it

8    took Mr. Kuc in this Chat Number 2 to get a part.  You are

9    going to see when you have you this back in there that there

10   are timestamps there that record when everything happens here.

11   It looks like from this that 6/29/10 the chat begins at 1:22

12   and 10 seconds in the afternoon.  As you go down, the decision

13   that's made to give him a part is made at 1:24:37.  Folks,

14   that's less than two and a half minutes to get a decision from

15   Dell to send him a part.  And the chat ends at about 1:30,

16   1:31.  In about eight minutes Mr. Kuc has convinced Dell to

17   send him a part that's worth hundreds of dollars, if not more.

18   Eight minutes of work for several hundred dollars.  That is

19   nice work, if you can get it.  That's why Mr. Kuc used those

20   scripts, to speed up the process.

21           Now, what's the final thing that Mr. Kuc had to give

22   the computer company if he wanted to get valuable computer

23   equipment?  He needed to give a name and an address.

24           Now, when you order something online, let's say from

25   amazon.com, what name and address do you give?  You give your

1    real name and your real address.  And why do you do that?

2    Because you want that stuff to be delivered to you and not to

3    somebody else.  Any ambiguity in that label risks that it's

4    going to be sent to somebody else.

5           Well, did Mr. Kuc do that?  Did he use his real name,

6    his real address, his real company?  Rarely.  Instead, he used

7    names and addresses like the ones that are found in the chats

8    and that are found in this notebook, which you have seen

9    before, names like Matt Cook, C-O-O-K, Dan Summers, Silver Fig,

10   Rick Naples, another spelling of Rick Naples here.

11          You'll have a chance to have this actual notebook, not

12   just the electronic version, but you'll have a chance to page

13   through it.

14          Now, how do you know that those names and those

15   addresses are all fake?  How do you know that the other names

16   and the addresses and the companies that are in the company

17   spreadsheets are fake?  Well, you know because the one company

18   that Mr. Kuc almost never used to order these parts was the

19   name of his pride and enjoy:  Total Asset Recovery.  If these

20   were legitimate orders from Dell, Lenovo, HP and 3COM, they

21   would have shown that Matt Kuc was ordering parts for shipments

22   for Matt Kuc, K-U-C, at Total Asset Recovery.

23          But when you get those company spreadsheets back with

24   you in the jury room, spend some time looking for when Mr. Kuc

25   told the computer companies that he was at Total Asset

1    Recovery.  Out of all the thousands of orders what you are

2    going to see is you are going to find that Total Asset Recovery

3    was used by Mr. Kuc only four or five times.  Those four or

4    five times are listed in Exhibit 5.  And they were ordered for

5    Matt Kuc, and those orders, the only orders for Total Asset

6    Recovery throughout this entire time period, came in 2004, a

7    year before this scheme.

8            Now, imagine that.  Mr. Kuc was so proud of owning

9    Total Asset Recovery that he had a certificate in his office

10   that proclaimed him to be the President and the CEO.  That

11   company made him over $1 million on eBay.  So, yet, he doesn't

12   tell the computer companies that that's who they are dealing

13   with?  Well, why not?  Ladies and gentlemen, you know why not.

14   Mr. Kuc did not mention Total Asset Recovery to the computer

15   companies because he didn't want them tracing back on the

16   Internet on eBay seeing that the parts that they were sending

17   him, supposedly for warranties, were being sold there by him

18   and he was pocketing the proceeds.

19           And the other reason he didn't use real names,

20   addresses and companies is because Mr. Kuc knew, with his

21   computer industry experience, he knew that by varying the names

22   and the addresses and companies just by a letter here, a number

23   there, change a street to a road, change a 247 to a 2-47, that

24   those fraud screens get confused.  All the fraud screens see is

25   a new customer to help with each variation.

1          Now, these variations weren't the result of a mistake,

2     or weren't the result of an accident, a typo, a

3     misunderstanding.  How do you know?  One is the sheer volume of

4     variations.

5          If a guy takes a book out of a library one time and

6     doesn't bring it back, that might be an accident.  If it's two

7     times that he does it, well, maybe it's a coincidence.  Three

8     or fewer times he doesn't return a book to the library, maybe

9     he's forgetful or accident-prone.  Seven or eight books?  Now

10    you suspect it was fraud.  After 10 or 20, you would know it

11    was a scheme to defraud.  If the guy started taking out books

12    from a library and starts getting new library cards using other

13    names, other addresses and variations of those, there would be

14    no doubt that's fraud.  That guy would have gone from taking

15    books out of the library to building a library on his own, and

16    if he starts selling the books he's not running a library, he's

17    running a book store.

18         Ladies and gentlemen, that's what happened here, only

19    Mr. Kuc wasn't taking out library books.  He was getting

20    valuable computer equipment that he was selling on eBay.  And

21    it didn't happen 10 or 20 times.  It happened thousands of

22    times.

23         Mr. Kuc's intent to defraud is evident in so many

24    other ways.  The evidence that he carefully plotted his scheme

25    out is overwhelming.  How do you know that?  You know that

1    because of the notebook.  You are going to go back there and

2    you are going to see how he is playing with some of the letters

3    in here.  You will see where in his own handwriting he is kind

4    of playing with it and seeing, well, Maplis -- you know, Maple,

5    we can have that in one word, but if I stick an "i" in there it

6    looks a little different, if there is an "s" there, it's a

7    little bit different.  That's intent to defraud.  That's

8    sitting there and planning to do a scheme.

9         How else do you know that he plotted the scheme out?

10   Well, you know from the addresses, you know from going through

11   Exhibit 27 that there were a number of shipments, and there are

12   other exhibits in here which show the pattern of the addresses

13   that were used.  Mr. Zappala testified to that before, and what

14   he told you, and you will be able to verify this yourselves, is

15   that initially most of the shipments go to 36 Laurelwood, to

16   his house, and then he phased in shipments to 247 Maple at

17   Sensible Computers, then he stuck with 36 Laurelwood for a

18   while, then he started using 42 Union Street for a little bit,

19   Francisco Samuel told you, and then he moved on to

20   2130 Mendon Road, the UPS Store.

21        So, what's going on here?  To evade detection, Mr. Kuc

22   is going from taking shipments from one address to moving them

23   to another address, giving different addresses at different

24   times, sometimes going back again.  This is part of the cat and

25   mouse game, "Catch me if you can."

1          You also know that Mr. Kuc plotted his scheme through

2     all the telephone numbers that you saw that Mr. Zappala talked

3     to you about.  That is going to be in Exhibit 23.  All 30 of

4     the telephone numbers Mr. Zappala testified to were used in

5     this scheme.  Well, imagine that:  thirty telephone numbers.

6     They are listed on multiple pages here.

7          Most of us get upset if we have to switch a cell phone

8     carrier and we have to lose our cell phone number.  Why?

9     Because everybody knows us by that number.  We stick with that

10    number, it's part of our identity, people know us by that

11    number.  But using 30 different telephone numbers during a

12    scheme all coming back to one computer?  That's intent to hide

13    Mr. Kuc's identity.

14         And when Leanne Farrell of 3COM tracked Mr. Kuc down

15    by Google, telephoned him directly and asked him to return

16    parts back, what did Mr. Kuc do?  He chuckled.  Why did he

17    chuckle?  He must have thought that he was winning this game.

18         Ladies and gentlemen, when you go back into the jury

19    room, you are going to be asked to render a verdict on the

20    counts that are listed in the Indictment for Jury Use.  It has

21    three types of charges.  It has Wire Fraud, which covers the

22    first four counts, the Dell chats, it has Receipt, Possession

23    and Storage of Stolen Property in Interstate Commerce and also

24    Aggravated Identity Theft.

25         I am going to take just a couple of minutes talking

1    with you about what you will have to find in order to find

2    Mr. Kuc guilty of these charges.  In a few minutes Judge

3    Woodlock will explain the law to you.  I just want to talk to

4    you about the facts and how they apply.

5           The four Wire Fraud counts are numbered Counts One

6    through Four, and they correspond to the four Dell chats in

7    Exhibits 1 through 4.  You are going to have to find four

8    things beyond a reasonable doubt.  The first is a scheme to

9    defraud computer companies out of money or property by means of

10   false or fraudulent pretenses.  Was there a scheme to defraud

11   here?  Of course.  We have talked about that for a while now.

12   It was a scheme to defraud the computer companies of their

13   property that is valuable warranty replacement parts.

14          The second thing is did it involve false statements,

15   representations or concealment of material facts?  Of course it

16   did.

17          You will also have to find that Mr. Kuc participated

18   in the scheme knowingly and willfully and with intent to

19   defraud and, again there, we have just spent the last few

20   minutes talking about that.  The evidence proves all this

21   beyond a reasonable doubt.

22          And, finally, you are also going to have to find that

23   the use of the interstate wire communications on or about the

24   dates alleged in the indictment furthered the scheme.

25          Now, here the wire communications were each of those

1    chats.   Exhibit 1 corresponds to Count One, Exhibit 2

2    corresponds to Count Two, and so on up to Count Four.   These

3    were interstate wires, because they went over the Internet and

4    because the chat's IP address showed you that they were traced

5    back to the computer that Mr. Kuc had in the top room over the

6    garage.   That was in Massachusetts.   When Mr. Long was here, he

7    testified to you that the chat operators were in another state.

8    Those chat sessions, therefore, crossed state lines, and,

9    therefore, you have interstate wires for each of those counts,

10    and each of those chats, obviously, furthered the scheme to

11    defraud.

12          Now, Count Five alleges the Receipt, Possession and

13    Storage of Stolen Property in Interstate Commerce on December

14    14th, 2010.   What do you remember about December 14th, 2010?

15    That was the date that Agent De Lair told you the FBI came to

16    the defendant's house and found all those boxes there.   For you

17    to find him guilty of Count Five, you will have to find beyond

18    a reasonable doubt that on the day of the search Mr. Kuc

19    received, possessed or stored goods, wares or merchandise, and

20    in this case that's computer equipment.

21          You saw the computer equipment in the pictures, you

22    saw computer equipment over there before, when it was admitted

23    into evidence, and you also saw the computer equipment listed

24    by the agents and summarized for you by the agents in Exhibit

25    60, 170 boxes of computer equipment.

1           There is no doubt that Mr. Kuc received, possessed or

2    stored computer equipment.

3           Now, you are also going to have to find beyond a

4    reasonable doubt that the computer equipment was stolen or

5    converted.  It's just a fancy name to say that it was turned to

6    an unlawful use.  Here the evidence proved that because it was

7    taken, obtained through the scheme to defraud.

8           You are also going to have to find that he knew that

9    it was stolen or converted, but that's, obviously, also been

10   proven because of the scheme to defraud.

11          Now, you are going to have to find as well beyond a

12   reasonable doubt that the equipment moved in interstate

13   commerce between the time it was stolen and the time Mr. Kuc

14   received it.  When you review Exhibit 60, you are going to find

15   the shipping, who it was shipped from.  It has the street

16   address, it has the shipping city or town and also the shipping

17   state as well.  You will find, as you go through here, that all

18   of the equipment was sent either to Rhode Island or

19   Massachusetts from states that were not Rhode Island or

20   Massachusetts; therefore, all of the equipment was shipped in

21   interstate commerce.  It was stolen at the time that they

22   shipped the equipment, and, therefore, you can find beyond a

23   reasonable doubt that that element is satisfied.

24          Now, you are also going to have to find that the

25   computer equipment had a value of $5,000 or more.  That was

1   what the testimony that Mr. Zappala was talking to you

2   yesterday was about.  What he did was he took Exhibit 32 and

3   created it.  He took a subset of the things that were in

4   Exhibit 60.  He then got the information that he could from the

5   other spreadsheets and he gave you two estimates.  The one on

6   Exhibit 32 is a high-end estimate of $40,000 for just a subset

7   of the equipment, and that was taken from the list value.  He

8   told you also that he computed the value of that equipment,

9   just that subset of equipment, and it was $13,000 that was

10  computed at Dell's cost.  So, the evidence proves that.

11          Now, let me talk about the Aggravated Identity Theft

12  charge.  To find Mr. Kuc guilty of Aggravated Identity Theft,

13  you are going to have to first conclude that he was guilty of

14  Wire Fraud or Mail Fraud.  Now, Wire Fraud we have already

15  talked about.  Mail Fraud is essentially the same thing as Wire

16  Fraud.  The only difference is that instead of having to look

17  at interstate wires you have to look at whether the fraud was

18  done through using the mail or private interstate carriers like

19  UPS or FedEx, and that's how the boxes of computer equipment

20  got to his house.  They were shipped, you'll see the shipping

21  labels on some of them, and you will see the shipping

22  information on here as well, that it came over state lines.

23  So, the evidence proved beyond a reasonable doubt that Mr. Kuc

24  committed Mail and Wire Fraud.

25          The next thing you are going to have to conclude

1    beyond a reasonable doubt is that during and in relation to

2    Mr. Kuc's Mail or Wire Fraud he knowingly possessed or used

3    without lawful authority a means of identification of another

4    person.  Now, the indictment says that the means of

5    identification is the name of F.S.  and at this point in the

6    trial you understand that "F.S." stands for "Francisco Samuel,"

7    and the indictment says that it's his name alone -- I want to

8    clarify as well that it is his name, only his real name, the

9    use of his real name with no alterations, that is being charged

10   here alone or in conjunction with his business name or his

11   business address or variations of the business name or the

12   address.  And you know from Mr. Zappala's testimony and from

13   Exhibit 29 that Mr. Kuc used Mr. Samuel's name, his real name,

14   and also variations of it as well, and address and business

15   name hundreds of times.

16        Let's talk about Mr. Samuel.  You saw him yesterday

17   and how shaken up he was.  There was a little confusion that

18   came up here.  You understood from Mr. Samuel what happened.

19   You understood from Mr. Samuel that he gave the defendant

20   permission to have packages delivered to his place of business

21   at 42 Union Street.  What Mr. Samuel said as well was that he

22   never gave the defendant permission to use his name, his real

23   name, for delivery of packages at any other address.  You have

24   seen the evidence, and you will have it in front of you that

25   shows that that is exactly what the defendant did.  This was

1    part of Mr. Kuc's pattern.

2          You saw how Mr. Kuc misused the name of Mr. Di Ciaccio

3    with a delivery to someplace other than 247 Maple Street.  You

4    saw how he misused Sensible Computers' name, Cyon Data Systems'

5    name, John Reynolds' name, too.  Why?  Because Mr. Kuc must

6    have realized that if you're going to start using other

7    people's names, aliases, you are much better off using a real

8    person's name.

9          All this proves that beyond a reasonable doubt Mr. Kuc

10   uses Mr. Samuel's name, his real name, and the other

11   information during and in relation to this fraud without lawful

12   authority.

13         You will also have to conclude that the name

14   "Francisco Samuel" belonged to a real person.  You saw

15   Mr. Samuel testify before you yesterday, and obviously you have

16   to find that Mr. Kuc realized that he was a real person; but,

17   again, they had lunch together, and Mr. Kuc knew that Francisco

18   Samuel was a real person.

19         The evidence proves beyond a reasonable doubt that

20   Mr. Kuc is, as well, guilty of Aggravated Identity Theft as

21   alleged in Count Six.

22         In a few minutes you will have the chance to sift

23   through the evidence and put that puzzle together yourself, and

24   when you do I will ask that you return the only verdict that is

25   consistent with the evidence in this case and find beyond a

1    reasonable doubt that Mr. Kuc is guilty on all counts.

2         Your Honor, may the Government reserve five minutes

3    for rebuttal?

4         THE COURT:  Yes, so long as it is rebuttal.

5         MR. GARLAND:  Yes.  Thank you.

6         THE COURT:  Thank you, Mr. Garland.

7         Mr. Sheketoff.

8         Perhaps, unless Mr. Sheketoff wants to use the

9    demonstrative, you can take that down.

10         MR. SHEKETOFF:  I am not going to use it.

11         THE COURT:  Mr. Garland, if you would like to take it

12    down.

13         MR. GARLAND:  I'm happy to, your Honor.  Thank you.

14                         CLOSING ARGUMENT

15    BY MR. SHEKETOFF:  Good morning.  This is my final opportunity

16    to address you.  The Judge is supreme on the law, so I am not

17    going to deal with the law at all, and you are supreme on the

18    facts.  So, if I say anything about the facts that does not

19    comport with your memory, I apologize.  I am going to try and

20    recite the facts as best I can, obviously from my perspective.

21         One of the advantages of getting a little bit older is

22    that you notice that when people have a point of view, a goal

23    in their mind, they tend to not see the whole picture.  I am

24    going to suggest to you throughout this closing argument that

25    there are a lot of things missing here, and most of them are

1    explainable by this blinder set that the Government put on in

2    this case and right through closing argument never took off.

3         $33 million in 2011 Dell, their company

4    representative, told you they lost.  He said they sent out

5    $480 million worth of replacement parts in 2011, and he said

6    also, and we are talking about corporate spokespeople here,

7    that that was 5 percent.  Well, 33 million is not 5 percent of

8    480.  It's more like 7 percent.  5 percent would be 5 percent

9    of $660 million.

10        Dell set up this system.  They don't care.  They don't

11   care because these parts are not valuable to Dell because they

12   write them off.  They don't care because they put stupid little

13   sticky stickers on.  This is not a car where they actually put

14   a VIN into the car.  They put these stupid little stickers on

15   that can be peeled off.  They don't care.

16        Now, I said in my opening that it doesn't matter

17   whether the quote, unquote, victim cares or doesn't care.  It

18   doesn't matter whether the quote, unquote victim is gullable or

19   not gullable.  Wouldn't you have liked to have known from the

20   Government what percentage of Dell computers fail?  They told

21   you about 10,000-or-so transactions that my client was involved

22   in.  Wouldn't you like to know how many of those transactions

23   Dell said to him and the other companies, "Do not return the

24   product?"  Wouldn't you like to know how many of those he did

25   return the product?  If he returned the product in 7,000 of

1    those or 5,000 of those or 8,000 of those, would that change

2    the context?

3         Now, two important things I suggest to you happened

4    during this trial that are illustrative of the problem for the

5    Government.  Let's get their theory absolutely clear, because I

6    want to confront it.  Their theory is that he did not have

7    these parts, he didn't have them, he made it up, and to prove

8    that to you, out of 10,000 or so transactions they brought in

9    four.  That's Counts One through Four.  Four transactions they

10   say they can prove he did not have the part, four out of

11   10,000.

12        And here is the number one event during this trial

13   that I ask you to pay particular attention to.  I have the FBI

14   Agent on the stand on cross-examination, and I say to her, "Did

15   I invite you to my office to look at two computers?"  "Yes."

16   "Did you go there?"  "Yes."  "Was one of them a laptop?  Did we

17   turn it on?"  "Yes."  "Did it have an identifying number in it,

18   the electronic tag number?"  "Yes."  "What was that number?"

19   And she told you what the number was, and I actually wrote it

20   down, I can never remember it, 28DKLD1, whatever it was.

21   That's the exact-same number on Morgan Backhaus's computer.

22   That's the exact-same number.

23        So, on one of the four you know that my client had

24   that.  And what does the Government do?  I asked the agent,

25   "Did I offer to let you take both computers?"  You don't know

1   what the other one said, because it would have been under the

2   rules of hearsay, it would have been hearsay to ask her what

3   the other one said.  It couldn't be fired up, it wasn't

4   connected.  I offered her both computers, and she didn't make

5   this decision on her own.  She said, "No, I'm not taking them."

6   Two out of the four incidents where they say he did not have

7   it, this proves it.  Two out of the four they went, "No," I

8   don't want to see it.

9        And during the course of the trial they said two

10  things about it.  They had their expert on the stand, the guy

11  that said there was enough data in that computer if you stacked

12  it up, I forget if he said two empire state buildings, three

13  empire state buildings, whatever.  "How much time did it take

14  you to go through that hard drive in five different computers,"

15  ten months?"  So, that was suggestion number one.  "We didn't

16  get it till Thursday.  If we took it on Thursday it would have

17  taken us ten."  That's nonsense.  They could have taken it on

18  Thursday, they could have put a witness on the witness stand

19  who said, "You know, I've looked at it.  To really examine this

20  it would take me ten months, therefore, I couldn't do it."

21  They didn't do that.  They didn't want to go down that road.

22  They didn't want it in their hands.

23       And they had another possibility, which is this guy,

24  Robert Long, from Dell, who was on the stand I forget -- their

25  very first witness, maybe.  He said, "Well, I heard that

1    there's a website with pirated software that would allow you to

2    change the number on the Dell computer motherboard," you know,

3    you would fire it up and it would have a number and you could

4    change it.  Pirated software.  And I asked him directly, "Have

5    you ever tried that?"  "No, never tried it, but it looks

6    similar to our code."  "Looks similar."  Two out of the four,

7    and we're talking four out of 10,000.

8           All Dell has to do is say, "Give me your credit card

9    number," and this allegation could not even be made.  It

10   protects the person that has the part and it protects the

11   company.  But they won't do it.  Even today Robert Long says to

12   you, "Well, it would take us five to ten minutes."  Do you know

13   anywhere in the world you can go on the Internet and order

14   something and have them not take a credit card?  This is not a

15   restaurant.  What Mr. Kuc is saying is, "You gave me a

16   horrendous meal, it made me sick, it doesn't work."  He's not

17   saying, "Thanks for the good food; I would like to come back

18   and eat it again for free every time."

19          Their basic theory is he does not have these parts.

20   And that mountain of data on his computer, which they seized

21   without warning executing a search warrant in December, they

22   gave you two times that he visited sites to check on numbers?

23   Maybe the thing was wrinkled a little bit, maybe it was

24   scratched, the sticker.  Wouldn't you expect that he would have

25   gone to sites thousands and thousands of times?  Wouldn't you

1    like to know from these spreadsheets?  Dell has these massive

2    databanks.  They could have asked for anything on these

3    spreadsheets.  They could have produced a spreadsheet for you

4    that showed you exactly how many parts he returned and exactly

5    how many parts he didn't return.

6         Warranty fraud, and the Government does not put in one

7    written warranty in the entire case?  "Stop" -- you saw it.

8    I'm the one that showed it to the witness first -- "or you will

9    be billed."  Is there one invoice from Dell, one in this entire

10   case, one?  No.

11        What is the warranty policy that he supposedly

12   violated?  Is it illegal to make a claim for a part that's

13   broken with Dell?  No, it's not illegal.  Is there a number of

14   times you can do that?  No.  These warranties run with the

15   computer.  It doesn't matter if he got it from a wholesaler, if

16   he got it from an auction, if he got it on eBay.  It doesn't

17   matter.  He has the warranty now, if he has got it.  But Dell

18   will accuse you of being a fraud artist if you make too many

19   claims, and they will cut you off.

20        And I told you at the beginning that he engaged in a

21   cat and mouse game with Dell.  The question is was that a cat

22   and mouse game about getting his rights under the warranty, or

23   was that a cat and mouse game to defraud Dell?

24        These warranties do not require you to send these

25   parts back.  They just say, "If you don't, we're going to bill

1    you for it."  And I said to the Dell guy, Robert long, "What do

2    you bill them at, the cost or the price that you can sell it

3    for, supposedly, on the open market?"  He said, "Cost plus 20

4    percent."  Where did that come from, if they don't actually do

5    it?  Well, they never did it with Mr. Kuc.

6            And there was another major event during this trial, I

7    suggest to you, though I'm not suggesting this was a very

8    exciting trial, and that was when they had Mr. Zappala on the

9    stand, and Mr. Zappala said that he had checked with the FBI

10   Agent about a certain number of these items, because he

11   couldn't quite tie them in, but he didn't really look in all

12   the boxes, he didn't do everything like that.  He's only been

13   on the case for a month and a half or so.  Well, there are 170

14   boxes there.  You might expect the Government to be able to

15   explain where those 170 boxes came from.  They can explain 40

16   of them.  They supposedly gave you the line sheets for every

17   time he made a request to Dell to send a replacement part, but

18   they can only explain 40 of the boxes.  If you look at the

19   list, you will see there's about 100 boxes from Dell.

20   Mr. Zappala said most of the remaining boxes were from Dell.

21   There's about 60-something boxes from Dell that they can't

22   explain.

23            As the prosecutor said in closing, they've had those

24   things since December 14th of 2010.  They can look inside, read

25   the numbers, look at the box.  There are shipping instructions

1   in every one of these boxes.  They can trace it down.  They

2   don't want to trace it down, because it didn't come from Dell,

3   it came from a wholesaler, I suggest you can find, or some

4   other source.

5        My client had a right to make a living based on his

6   ability to buy in bulk what other people considered to be

7   garbage but what he knew would be valuable, because Dell made

8   this policy:  "We give you a warranty, you can execute on it."

9        All right.  The prosecutor said in closing that my

10  client made $1.3 million on eBay, which is illustrative, again,

11  of the blinders.  They, obviously, had the ability to get all

12  the eBay records that they wanted to.  Did they give you one

13  record about what he spent on eBay, what he purchased on eBay,

14  and, for that matter, did they give you one financial record of

15  any kind from him?  They showed you a picture of Total Asset

16  Recovery checks.  Did they do any work at all to see whether or

17  not he had other sources of supply?

18       Did they put on the case agent in this case to say --

19  he made a big thing in closing about he's hiding Total Asset

20  Recovery because he doesn't want them to go to Total Asset

21  Recovery and grab some of this stuff and see if it corresponds

22  to what he did with Dell.  Well, did they put on the case

23  agent?  Did the case agent go to Total Asset Recovery?  Did he

24  make an attempt to tie anything?  The closest they come is

25  saying, "Well, Mr. Zappala, do the things look similar?  Is he

1   selling similar kinds of things?"  Please.

2         Where are these written warranties?  Where are they?

3   Why do they not give us the written warranties?  Why does

4   Hewlett-Packard produce a Compaq packing slip?  They can't

5   produce an actual packing slip from one of the things they sent

6   to Matt Kuc or in general?  They have to produce a single

7   packing slip from Compaq, which is not even at issue in this

8   case?

9         Look, here is the basic structure.  They tell you you

10  can return this part or suffer the consequences, and Matt Kuc

11  on some percentage of these said, "I'll suffer the

12  consequences," and they didn't bill him.  He should have begged

13  Dell to bill him?

14        This is a cat and mouse game about getting Dell to

15  live up to its warranties.  It is not a cat and mouse game

16  about fraud.  Dell will cut him off, as they told you.  If he

17  says, "It's Matt Kuc again, it's Total Asset Recovery again,"

18  they'll cut him off, not because they can prove he committed

19  fraud, but because they are not going to live up to their

20  warranty, because no one should be in this business, as far as

21  Dell is concerned, no one but them.

22        There were lots of other ways to find out whether he

23  had the product or not, and they ignored them all.

24        I would like to talk about the circumstantial evidence

25  that they point to with scripts.  He did thousands of these

1    transactions.  He *is* an expert in fixing computers.  He knows

2    whether the motherboard is dead or not.  He doesn't have to go

3    through a chat with a technician in India, "Did you try this,

4    did you try that, did you try that?"  He doesn't have to do

5    that.  He knows the motherboard is dead, he knows the tape

6    drive is no good, he knows the capacitor's not working.  Why

7    shouldn't he have a canned response to their canned

8    questioning?  Their questioning is scripted, too.  He is doing

9    what he can to get through the process because he knows that

10   the thing doesn't work.

11         He has 50 telephone numbers.  Well, they all come back

12   to his name at Vonage.  What difference does it make whether

13   you have 50 or 25?  He was engaged in a cat and mouse game with

14   them.  Was it to get them to live up to their warranty, or was

15   it to defraud them?

16         I would like to talk about Francisco Samuel at the

17   end, too.  One of the things you do, as jurors, is you bring

18   your common sense and your worldly experience to the jury box,

19   and you get to evaluate the credibility of people.

20         Now, Robert Long, for instance, told you that with the

21   hard drives it's 100 percent return policy, 100 percent.  I

22   showed him a form from Dell, in fact, it's in the same chat

23   that got introduced through him, that says, "You have a special

24   warranty; this hard drive you don't have to return at all."  He

25   is a corporate spokesman.  You have to take him with a grain of

1    salt.

2            Francisco Samuel:  "Yeah, I had a conversation with

3    Matt one time in my life about these boxes, and then

4    400-and-something boxes show up at my place of employment where

5    I have my office at the Chamber of Commerce, and I never have a

6    second discussion with him, ever have a second discussion with

7    him about it."  Is that a credible person?  Is that something

8    you believe?  The prosecutor repeated again in closing, "Oh,

9    yeah, they had lunches together."  They had lunches together.

10   Okay.

11           Ladies and gentlemen, whether it's the failure to

12   explain the refusal to take the two computers in my office,

13   whether it's the failure to produce the written warranties,

14   whether it's the failure to produce all the line sheets that

15   would show all the times that he returned product to them,

16   whether it's the problem with not understanding and giving to

17   you an explanation of all these different boxes at his house,

18   not just sort of putting your head in the sand about them,

19   whether it's these cheap tags that can easily come off or be

20   scratched or lost, whether it's their refusal to give you any

21   financial information about Matthew Kuc at all, whether it's

22   the refusal to give written warranties, even though this is a

23   warranty fraud case, this case is like Swiss cheese.  It's full

24   of holes.

25           If you believe that Matthew Kuc had two of the

1   computers that are in Counts One to Four after all this time

2   and was still able to produce for the Government two of the

3   four computers, their whole case evaporates.

4           Thank you.

5           THE COURT:  Thank you, Mr. Sheketoff.

6           Ms. Burkart.

7                   REBUTTAL CLOSING ARGUMENT

8   BY MS. BURKART:  These companies didn't care?  They didn't care

9   because they didn't take the credit card number?  Were you

10  confused about the warranty policies?  There were four people

11  from four different companies that came up and told you if the

12  part was broken and it was under warranty, they would replace

13  it.  That's a warranty.  It wasn't confusing.  It was a basic

14  idea for all of them.  They mentioned some exceptions, a

15  program called "Keep Your Hard Drive."  That wasn't confusing.

16  Under that program you could keep your hard drive.  You paid

17  extra for that.

18          The companies told you about the different tactics

19  that they used to try to get their parts back.  Sometimes they

20  called, sometimes they hired people to call, sometimes they

21  used billing.  There are people whose whole job it was to trace

22  these non-returned parts.

23          Was it confusing about whether the companies wanted

24  their parts back or not?  They had black lists if that didn't

25  work.

1           These companies aren't on trial here.  We're not in

2     some type of business school class trying to figure out, Oh,

3     maybe if they could have done it this way or they could have

4     done it that way.  At the end of the day they tried to get

5     their parts back, and he didn't return them because he was

6     stealing from them.  They were supposed to bill him?  Who were

7     they supposed to bill, Rick Naples on Monden Road?  This isn't

8     a contract dispute about what some confusing terms mean in a

9     warranty.  This is a case where the message was very clear:

10    "Stop.  We want you to return this part."  Mr. Kuc wasn't

11    confused about that.  He is an experienced computer consultant

12    who figured out a way to take advantage of a warranty policy

13    and use it to steal.

14          Another thing Mr. Sheketoff brought up is that you

15    might want to hear more about returns.  You did hear about

16    returns.  Some of the people told you that the records that

17    they have were items that weren't returned, because their whole

18    job is to track back items that weren't returned.  Dell told

19    you they gave you the full shipment.  To get the whole picture

20    they printed out every shipment that went to one of the four

21    addresses.  But they also told you that between 2005 and 2010

22    that 10 percent of the items were returned.  So, there is your

23    return information.  They also told you it dramatically

24    decreased during that time period.

25          Does the fact that there were returns make you wonder

1    whether there was some type of confusion here?  There was no

2    confusion.  Doesn't it make sense that if people were pursuing

3    Mr. Kuc to try to get these parts back that sometimes he would

4    return some parts?  There's no question that he was an

5    experienced computer person, that he had access to parts.

6    Leanne Farrell told you that sometimes she would get so

7    frustrated she Googled Mr. Kuc, tracked down alternate numbers

8    trying to find him.  Some of the computer people whose job it

9    was to track down these items, they would take measures to try

10   to pursue him, and sometimes he would send things back.  That

11   doesn't undermine the fraud scheme, that supports it.

12         You know the four items that were charged in the Wire

13   Fraud count weren't returned, not only because Mr. Long told

14   you he checked the records, those items weren't returned you

15   know because the people who owned them came in here and talked

16   to you about them.

17         And those boxes, those boxes that the FBI found when

18   they came into Mr. Kuc's house in December of 2010, were those

19   boxes just about to be returned, he was going to open those up

20   and send back the replacement pieces or the broken pieces that

21   those were the replacement for?  You didn't see any evidence of

22   that.

23         Finally, Mr. Sheketoff brings up a theory about some

24   phantom evidence, some phantom computers.  We have heard

25   questions and speculation about maybe there's some computer out

1   there perhaps sitting in a conference room right now that would

2   clear up this whole confusion.  A computer was shown to the FBI

3   Agent last Thursday.  The house was searched in December 2010,

4   but somehow that's the critical piece of evidence that's

5   missing here.

6          Well, that's not in evidence, but what is in evidence

7   is that there is one kind -- of the four kinds of computer

8   equipment we are talking about here, there is one kind that you

9   heard evidence from Mr. Long who said not that he heard about

10  it, but that he saw it, and that he heard of it happening, and

11  he saw it right there on the Internet last week when he

12  checked.  There was software available on pirated websites

13  where you can change the service tag on the motherboard.

14  Coincidently, that's the one piece where now Agent De Lair

15  suddenly sees, "Oh, look there's that number on the

16  motherboard."  The one piece of the four, it's the one piece

17  that you have heard evidence can be changed.

18          And for this speculation that there could be

19  duplicates out there floating out there, poor inventory control

20  for Dell, that's what this is all about.  For that to be true

21  lightning would have to strike again and again and again and

22  again.  Because all that matters is the Wire Fraud count, is

23  that when Matthew Kuc, pretending to be somebody else, sat at

24  that chat session traced back to 36 Laurelwood and said, "Hi,

25  I'm one of the IT guys here, I have a broken part and need a

1   replacement," it's only not fraud if he's entitled to a

2   replacement part.  The only way he is entitled to a replacement

3   part is if he has the actual computer, the actual computer's

4   under warranty, it's broken, he's entitled to a replacement

5   part.  So, that's what the defendant would have you believe.

6   He happened to have matching service tag numbers for those

7   pieces.  So, lightning struck on June 29th, 2010, when Matthew

8   Kuc at 36 Laurelwood, claiming to be Andrew Finegold, told Dell

9   that he had a laptop with a broken motherboard and he was

10  entitled to a new one.  Well, Morgan Backhaus at Texas A&M had

11  a laptop with that same service tag number.

12       And lightning struck again on July 6th, 2010, when

13  Matthew Kuc, calling himself "Mark Cuk," spelled with a "C"

14  from Abacus had a Dell work station and it was faulty, and it

15  happened to have the same service tag number as a Dell

16  workstation that was locked in a control room in the *New York*

17  *Times* building in Manhattan running a piece of artwork that was

18  created by Ben Rubin.

19       And lightning struck again on March 29th, 2010, when

20  he called himself "Tod Clark" and he gave a service tag number

21  saying he needed a new tape drive to replace his broken tape

22  drive.  Coincidently, Dell had incorrectly created another tape

23  drive with that same service tag number, and that was sitting

24  at LSU where Michael Wisener saw it every morning.

25       And, yet again, lightning struck when Matthew Kuc

1    called himself "Sam Jenkins" and got on the computer and

2    chatted with Dell on October 3rd, 2010 and said he had a hard

3    drive and it needed to be replaced because it wasn't working.

4    Well, the hard drive with the same service tag number was

5    working nicely at the Larimer County Sheriff's Office.

6         You saw evidence that Dell had good recordkeeping,

7    because when they tried to track down the original owners of

8    those items, they went to their databases, they put in the

9    service codes, they found the owners and they came to speak

10   with you.  They showed you pictures of those pieces of computer

11   equipment with those service tag numbers.  And you have heard

12   from Robert long that Dell has controls in place to make sure

13   that the service tags are assigned once to one computer system.

14   That's the evidence.

15        The defendant asks you now to speculate that there

16   could be so many duplicates out there that Matthew Kuc had

17   legitimate warranties on computers that have the same service

18   tag numbers as these four people, and that each of those

19   computers legitimately broke and he was just legitimately

20   ordering replacement parts using fake names.

21        What does your common sense tell you is going on here?

22   Is lightning striking again and again and again and again?

23   What about the thousands of other times?  That's fraud.

24        Ladies and gentlemen, don't let Mr. Sheketoff distract

25   you.  When you are deliberating, keep your eyes on the ball.

1    There is a lot of conjecture that just happened.  What matters

2    is what you decide when you look at the evidence.

3            I stood here on Monday, and I told you that the

4    evidence would show that Matthew Kuc's scheme was a little

5    complicated, but at the end he stole from people.  He stole

6    from them because he tricked them.  Ultimately, he got caught.

7            Now it's time for you to go back, use your common

8    sense, and return the only verdict that's consistent with the

9    evidence here: guilty.

10           THE COURT:  Thank you, Ms. Burkart.

11           I think, ladies and gentlemen, what we will do is take

12   a ten-minute break before the instructions on the law.  It is

13   very important that you not discuss the case at this point, in

14   particular.  So, what we will do is take a ten-minute break and

15   stretch, and we will continue with the instructions.

16           THE CLERK:  All rise for the jury.

17              (The jury exited the courtroom at 10:35 a.m.)

18           THE COURT:  Anything before the break?

19           MR. GARLAND:  Nothing from the Government, your Honor.

20           THE COURT:  By way of breaking news, the Supreme Court

21   upheld the mandate recommended by the Chief Justice.

22           We will take a ten-minute break.

23           THE CLERK:  All rise.

24       (The Honorable Court exited the courtroom at 10:35 a.m.)

25                    (Recess taken)

1          THE CLERK:  All rise.

2      (The Honorable Court entered the courtroom at 10:55 a.m.)

3          THE CLERK:  This Honorable Court is back in session.

4    You may be seated.

5          THE COURT:  Ready for the jury?

6          MR. GARLAND:  Yes, your Honor.

7          MR. SHEKETOFF:  Yes.

8          THE COURT:  I would note that I misspoke using

9    multiplicity when using duplicity.  I think the parties

10   understand the distinction.

11         THE CLERK:  All rise for the jury.

12         (The Jury entered the courtroom at 11:00 a.m.)

13         THE CLERK:  You may be seated.

14                        JURY CHARGE:

15         THE COURT:  So, ladies and gentlemen, now that you

16   have heard all the evidence in the case and you have heard the

17   arguments of counsel, it becomes my obligation to instruct you

18   on the law.  Of course, I have been instructing you since

19   Monday regarding the law; various aspects of the rulings that I

20   have made are meant to instruct you.  But this is the

21   opportunity to kind of pull it all together at the end.

22         I am going to start where we began.  The crux of a

23   criminal case is to put the Government to its proof.  The

24   Government must prove each essential element of an offense

25   charged beyond a reasonable doubt, and the defendant does not

1   have to do anything at all.  What that means is that the

2   defendant comes here cloaked in a presumption of innocence,

3   that the burden rests with the Government, and the burden is a

4   very heavy one:  proof beyond a reasonable doubt.

5        Now, you will consider all of the evidence, the

6   cross-examination that was introduced here of various

7   Government witnesses, but this is the point at which I want to

8   make a very fundamental comment.

9        The defendant chose not to testify.  That is his

10   Constitutional right.  It is embodied in the Fifth Amendment to

11   the Constitution.  It is not merely a specific Constitutional

12   right; it puts in graphic display what our criminal justice

13   system is all about.  The burden rests with the Government.

14   The defendant does not have to do anything at all.  Faced with

15   criminal accusation, a defendant can decline to testify, as he

16   did here, and we have to put it out of our minds.  We simply do

17   not consider it.  You only consider the evidence that was

18   actually introduced during the course of trial.

19        Those, call them background principles, are

20   fundamental to the way in which we conduct our criminal

21   business in this country, and it is your obligation to keep

22   them in line as you focus on the more specific questions that

23   are presented.

24        Now, let me talk a bit about proof beyond a reasonable

25   doubt.  It is a concept that the Courts have felt is deeply

1    embedded in the minds of most Americans, a heavy burden, and

2    there are some Courts that have suggested that a jury need not

3    be instructed with any specificity about what "reasonable

4    doubt" is.  I have a somewhat different view about it.  I think

5    it may be helpful for me to talk a bit about reasonable doubt.

6    But you will understand that it is addressed to you and your

7    sense of the proper place for the proper burden, the place of

8    the Government.

9         As I have said, the burden of proof beyond a

10   reasonable doubt is placed upon the Government to show that

11   they have proved the defendant is guilty of the charge.  It is

12   a strict and heavy burden.  It does not mean that the

13   defendant's guilt must be proved beyond all possible doubt.

14   Nevertheless, it does require that the evidence exclude any

15   reasonable doubt concerning the defendant's guilt.  A

16   reasonable doubt may arise not only from the evidence that is

17   actually produced but also from the lack of evidence.

18   Reasonable doubt exists when, after weighing and considering

19   all of the evidence, using reason and common sense, jurors

20   cannot say that they have a settled conviction of the truth of

21   the charge.

22        Of course, a defendant is never to be convicted on

23   suspicion or conjecture, and if, for example, you come to the

24   conclusion that the evidence reasonably permits either of two

25   conclusions, one that the defendant is guilty of the charge,

1    the other that the defendant is not guilty, you must find the

2    defendant not guilty.

3         It is not sufficient for the Government to establish a

4    probability, though a strong one, that a fact charged is more

5    likely to be true than not true.  That is not enough to meet

6    the burden of proof beyond a reasonable doubt.

7         On the other hand, I want to emphasize that there are

8    very few things in this world that we know with absolute

9    certainty, and in criminal cases the law does not require proof

10   that overcomes every possible doubt.

11        So, in concluding my observations about reasonable

12   doubt, let me instruct you that what the Government must do to

13   meet its heavy burden is to establish the truth of each part of

14   each offense charged by proof that convinces you and leaves you

15   with no reasonable doubt and, thus, satisfies you that you can,

16   consistently with your oath as jurors, base your verdict upon

17   it.  If you so find as to a particular charge against the

18   defendant, you will return a verdict of guilty on the charge.

19   If, on the other hand, you think there is a reasonable doubt

20   about whether the defendant is guilty of a particular offense,

21   you must give the defendant the benefit of the doubt and find

22   the defendant not guilty of that offense.

23        Now, I have been talking about the evidence in this

24   case, telling you you have got to focus on the evidence that is

25   actually presented here and not bring to bear things from the

1    outside.  I want to emphasize that again by talking a little

2    bit about the evidence in the case.

3         You have had testimony, sworn testimony, of witnesses

4    here.  You have gotten a chance to size them up, and while, to

5    some degree, a large number of the witnesses were business

6    people who were testifying about business matters, you still

7    have to make an evaluation of their credibility.

8         The evaluation of their credibility, basically their

9    believability, is something that I always feel embarrassed to

10   instruct jurors about.  The reason we hired you is because you

11   have a range of life experiences.  Every day someone is trying

12   to sell you something, and you size them up.  You say, "Does

13   this person seem to know what they are talking about?  Do they

14   seem to be able to express with clarity what it is that is on

15   their mind and they want to convince me about?  Do they have a

16   bias or a prejudice?"  Now, bias or prejudice here is not

17   disqualifying, but it is something that you take into

18   consideration.

19        So, you listen to the business people who come in and

20   discuss the nature and practices that they have, the kinds of

21   summaries that they pull together, the documents that they look

22   at, and you ask yourself, "Is that compelling?  Do I, under

23   these circumstances, believe that I will be receiving evidence

24   on which I can base a verdict?"

25        Laying not too far below the surface in this case you

1      might find is a certain embarrassment on the part of the

2      computer companies who seem to have a certain tension.  On the

3      one hand, they want to make the customer happy, not irritate

4      the customer.  On the other hand, they say they want to be sure

5      that, in proper circumstances, they get parts back after they

6      have given new parts.

7            Now, emphasized by both of the parties in the case is

8      the idea that, even if the computer companies are sloppy or

9      they have not very effective forms of control, we do not blame

10     the victim, if you find them to be victims, as I will talk

11     about in a minute.  The focus here is on what Mr. Kuc intended.

12     But to understand what Mr. Kuc intended, you have got to

13     understand what it was that the computer companies were

14     communicating in words and actions to customers or others who

15     phoned in, or dialed in, or chatted in under the larger

16     warranty principles that the companies had.

17            So, you will understand that, while it seemed as dry

18     as the small print on the warranty to listen to the testimony

19     of some of these business people, that, nevertheless, lurking

20     beneath it, and not very far beneath it, is an important

21     feature of this case:  What do you understand were the

22     obligations of those who sought to return parts and get parts,

23     and what do you understand those witnesses to have told you

24     about that, and did they tell you clearly in an understandable

25     fashion, in a fashion that permits you to rely upon it, having

1    in mind, of course, that they have got bias and prejudice?

2         Now, you have had people who testified as percipient

3    witnesses, percipient in the sense that they perceived

4    something.  You have the four individuals who had control over

5    the computer equipment that the Government says was at issue in

6    Counts One through Four, and you can size them up as well.

7    Whether or not they knew where their equipment was, whether or

8    not it had been sent back, whether or not they made warranty

9    claims for it, those are the kinds of things that you can size

10   up, and you size them up, as I said, by doing what you do every

11   day in your life, kind of get a sense of the person.

12        The reason I am embarrassed to talk about it is that

13   no one is ever self-conscious about doing that, but you do it,

14   and that is why we want you as jurors.

15        You had an individual like Mr. Samuel, who seems to

16   present himself in a somewhat embarrassed way -- it is up to

17   you to decide whether that is the case -- but was uneasy.  You

18   have Mr. Di Ciaccio, same thing, people you meet every day in

19   your life who have found themselves drawn into a larger

20   controversy with their own perspectives on it.  And so, you

21   think about, How much can I rely upon this?  And you have in

22   mind the observation made by one of the witnesses, whose name I

23   forget at the moment, who at one point said she was embarrassed

24   -- maybe she said, "I'm embarrassed --" but in any event, that

25   she felt uncomfortable on the witness stand.

1          Going on a witness stand in a court is not an everyday

2     occurrence.  It is kind of like going on stage for people who

3     are not professional actors.

4          So, you will filter all of this live testimony through

5     your understanding of how people act under similar

6     circumstances, and what they have to say is reflected by their

7     background and their training and their experience and their

8     predispositions and maybe the position that they occupy in the

9     dispute.

10          Now, you have also had a series of summaries

11     summarizing vast amounts of documents or voluminous amounts of

12     documents.  You understand that a summary is only as good as

13     the documents it is based on and the protocol that is used to

14     create the summary.  So, you will evaluate that as well.  Was

15     it exhaustive, is it rigorous, can I rely upon it?

16          We could, or the parties could, bring in boxes and

17     boxes and boxes of documents, and we could go through them one

18     by one, but the law of evidence permits summaries to be used,

19     and you can rely upon those summaries to the degree that you

20     think it is appropriate based on your idea of the integrity, in

21     the broadest possible sense, of the summarizing process.  But,

22     again, you are using your common sense.

23          We did see some documents.  A document in some ways is

24     just a person's observations reduced to writing.  So, you will

25     apply the same kind of discriminating evaluation to the

1    documents that you would to the person who actually appeared,

2    although you have to do a little bit of extrapolation to figure

3    out exactly who it was who is appearing in this document, who

4    wrote it, who it is addressed to, what is the interchange.  But

5    it is another form of this careful analysis of the interactions

6    that people have with their environment.

7         There are stipulations, or one or two, in which the

8    parties agreed that something is true, the ISP number for

9    Mr. Kuc's computer, that kind of thing, and you are entitled to

10   rely upon that as well.

11        But having told you what the trees are, let me step

12   back and talk about the forest.

13        Lawyers and judges generally put evidence into two

14   categories.  One type of evidence is "direct evidence;" the

15   other is what is called "circumstantial evidence."  "Direct

16   evidence" is pretty clear to understand.  It has various

17   manifestations.  If someone says that they were standing at the

18   intersection and they saw the traffic accident, actually saw it

19   occur, or they observed a document or a piece of equipment,

20   that is direct evidence.

21        What is "circumstantial evidence"?  Well, it is really

22   the exercise of common sense.  Let us assume that ten minutes

23   after you hear a big crash you come to the intersection and you

24   see two cars tangled together.  That is not direct evidence, or

25   you do not have direct evidence that there was an accident ten

1    minutes ago, but you can put bits and pieces together.  You

2    heard a bang, you see the wreckage.  You can draw the

3    conclusion that an accident took place.

4         One way of thinking about it, and with the heat wave

5    coming up this weekend it is kind of an attractive way to

6    fantasize, is to think about that time of year at which you go

7    to bed at night, let us say it is December, you look out over

8    your lawn and it is all clear, you hit the sack at 10:00, you

9    wake up at, say, 7:00 in the morning, and you look out again,

10   out at the sky and it is all clear, and then you look down on

11   the lawn and there is snow all over the lawn.

12        Now, the way I set this hypothetical up is that there

13   was not any snow when you went to bed at 10:00, there was no

14   snow at 7:00, and it is not snowing.  So, do you have direct

15   evidence that it snowed?  No, you do not.  You have

16   circumstantial evidence.  It was not there before, it is there

17   now.  You can draw the conclusion, common sense, what the

18   logicians call the "use of inference."  Lawyers and judges, who

19   like more syllables, call it "circumstantial evidence."  But it

20   is the same thing.  It is the way in which you try to

21   reconstruct reality.

22        Now, let us take the snow out there on the lawn a

23   little farther.  Let us assume you look down and you see

24   footprints in the snow.  Perhaps you can draw the conclusion, I

25   would suggest it is not unreasonable, but it is up to you, to

1    say somebody has been walking around your front lawn between

2    the hours of 10:00 and 7:00, and maybe you look at the

3    footprints and you say those are big footprints, it must have

4    been a man.  Or maybe at a time in our nation's history in

5    which teenage girls wear Doc Martens to the prom you might

6    think, "I cannot be sure."  Could you say there was a man or a

7    woman with glasses on?  I suggest that that would be a strain.

8          So, what it is is the exercise of common sense,

9    pulling together bits and pieces of direct evidence, to draw

10   conclusions.

11         I want to emphasize as much as I can that you are the

12   final finders of fact.  You can believe anything that you have

13   heard or pulled together, you can believe nothing of it or bits

14   and pieces.  It is up to you.  But what we are asking you to do

15   is use your common sense, because you function as the

16   conscience of the community in making these kinds of

17   determinations.

18         Now, this is a case in the way in which it was

19   presented, I think, that you might say involves following the

20   footprints in the snow, seeing where it leads you, what

21   conclusions you reach, whether or not those footprints are

22   sufficient to get you to the destination that the Government

23   would like you to get to.  We leave it to you to make those

24   kinds of determinations in light of the evidence that is

25   involved in this case.

1          Now, there are some things that are not evidence.  I
2     told you about them a little bit when we started.  First, the
3     rulings as rulings, or the manner of ruling that I deliver in
4     the case.  I told you at the outset I have no view about this
5     case.  I am not supposed to have a view about this case.  It is
6     up to you to have a view about this case.  So, you cannot draw
7     any conclusions about the way in which I ruled on some matter
8     or instructions I gave to counsel.  That is not evidence in the
9     case.

10          I have always thought that jurors are a little bit
11    like the people with the seats at the front of the theater, but
12    they are over on one side or the other, and they cannot only
13    see what is on stage, but they can also see backstage.  They
14    can see the director telling people to stand in line to get on
15    stage.  You see the stage directions.  It probably does not
16    detract from your sense of what the play was that you saw some
17    of this stuff.  The play is what occurred on the stage, not
18    what you see backstage, although you have been exposed to it.
19    So, what you do is you just put that kind of thing out of your
20    mind.

21          Of course, you follow my instructions.  Sometimes I
22    said you have got to disregard certain kinds of statements that
23    were made by witnesses, and you will disregard that.  But,
24    ultimately, it is the individual pieces of evidence that I have
25    permitted to come in in the sense that I have sponsored it and

1    created an environment in which the parties introduce it.

2          You understand that the opening statements of the

3    lawyers, the closing arguments, that is not evidence.  It is

4    them telling you what they think the evidence first is going to

5    be and then it is what they say it was.

6          Finally, there is a charging document in this case.  I

7    am going to ask Mr. Lovett to pass that out, together with the

8    verdict slip, because that brings us to the next phase of our

9    instructions.

10                         (Pause)

11         THE COURT:  We will go through the material parts of

12   this together, but at the risk of seeming dismissive, this is

13   just a bunch of pieces of paper.  It is not evidence.  It is

14   simply the document that the Government uses to bring the

15   charges, and it frames your evaluation here.

16         Now, the Government has made, as the closing argument

17   indicated, three separate types of charges, and I want to go

18   through them in the way in which they appear in the indictment

19   itself.

20         If you turn to page 4 of the indictment, you will see

21   Counts One through Four recognized.  The pages 1 through 3

22   explain what it is that the Government alleges is the scheme

23   involved here.  In a nutshell, the scheme is found in

24   paragraphs 6 and 7, that by using false and fraudulent

25   representations and pretenses, that is, failing to disclose

1   true names, that Mr. Kuc got the computer companies to ship him

2   replacement components, and that he fraudulently obtained those

3   replacement components in order to obtain money.  At least,

4   that is what the Government says happened.

5        Now, there is a way for the federal law to deal with

6   this, and one of them is a statute that makes it a crime to

7   engage in Wire Fraud.  That is what is alleged in Counts One,

8   Two, Three and Four.

9        The elements of Wire Fraud can be broken down, anyway,

10  into four pieces.  The first is a scheme substantially as

11  charged in the indictment that you have here to defraud or

12  obtain money or property by means of false or fraudulent

13  pretenses; second, that scheme has to involve a false

14  statement, or representation or a concealment of material

15  facts; third, the defendant's knowing and willful participation

16  in that scheme with the intent to defraud; and, fourth, the use

17  of interstate wire communications on or about the dates that

18  are alleged in the indictment in furtherance of the scheme.

19       Not to draw you too much into the difference between

20  federal and state courts, I think you will understand that the

21  federal courts basically are concerned with matters of

22  interstate commerce, and the use of wires, that is, computer

23  wires or computer-generated wires is one way that commerce is

24  conducted between states.  So, that is why it is here as

25  opposed to, say, state court prosecution for fraud.

1          I will tell you, to explain a little bit those four

2    elements, that interstate wire communications can include

3    telephone communications, or e-mail transmissions, or other

4    Internet communications from one state to another.  When we

5    talk about a scheme we are talking about a plan, or a pattern

6    or course of conduct, and the term "defraud" means to deprive

7    someone of something of value by means of deception or

8    cheating.  A scheme to defraud is ordinarily accompanied by a

9    desire or purpose to bring about some gain or benefit to

10   oneself or some other person, or by a desire or purpose to

11   cause loss to some other person.

12         Here, the Government's contention is it was an effort

13   to obtain things of value or things that could be transferred

14   into money by Mr. Kuc from certain computer companies.  When we

15   say that we are talking about the use of false or fraudulent

16   pretenses, that means any false statements or assertions that

17   concern a material aspect of the matter in question that were

18   either known not to be true when they were made or made with

19   reckless disregard of whether or not they were true and made

20   with the intent to defraud.  They can include actual, direct

21   false statements as well as half-truths or the knowing

22   concealment of facts.

23         To satisfy its burden of proof that a fact is

24   material, the Government is not required to show that the fact

25   or matter in fact influenced or deceived the decisionmaker to

1    whom it was addressed.  Rather, a fact or a matter is material

2    if it has a natural tendency to influence or is capable of

3    influencing the decisionmaker to whom it is addressed.  Here we

4    are talking about the people who send replacement parts.

5           Now, at the core of the response that is made on

6    behalf of Mr. Kuc in the defense of this case is the question

7    of whether or not he can be said to have knowingly and

8    willfully engaged in this scheme.  The Government has to prove

9    each essential element, but the focus here has been made on the

10   idea of what we generally call "intent," what did he intend.

11          The Government has to prove that he acted knowingly,

12   that is, he was conscious or aware of his actions, he realized

13   what he was doing and what was happening around him, and he did

14   not act because of some ignorance or mistake or accident.  When

15   the Government has to prove something is willful, as they do

16   here, they have to prove that it was done voluntarily and

17   intentionally with the specific intent to do something the law

18   forbids or with the specific intent to fail to do something

19   that the law requires, that is, to act with a bad purpose

20   either to disobey or disregard the law.

21          At the core of the case is Mr. Kuc's intent.  Did he

22   intend unlawfully to take from the computer companies equipment

23   that he should have paid for?

24          Now, we talked about this before.  I will talk about

25   it again.  Sloppiness on the part of the computer companies is

1    not a defense here.  The focus is on Mr. Kuc, and you are

2    asking yourself whether or not he was aware of his obligation

3    to return equipment or pay for replacement equipment, and

4    knowing of that obligation, if you find that he had one, he,

5    nevertheless, chose not to.

6            The idea of intent or knowledge is the ultimate in

7    circumstantial evidence.  We do not have a means like an

8    autopsy to look into someone's brain.  You have to make a

9    determination concerning how someone intended something at a

10   particular time by considering all statements that they may

11   have made or acts that they may have done or things that they

12   did not do.  You consider all the facts and circumstances to

13   make a determination of the defendant's knowledge or intent.

14   You can infer, but as I emphasized in my discussion of the

15   snowy day in December, you are certainly not required to infer

16   that a person intends the natural and probable consequences of

17   some act that they have undertaken or knowingly done or

18   knowingly admitted.  It is entirely up to you to decide where

19   the footprints lead you here.

20           But when we talk about "acting with the intent to

21   defraud," we mean acting willfully and with the specific intent

22   to deceive or cheat for the purpose of causing some financial

23   loss to another or to bring about some financial gain to

24   oneself.  As a consequence, if the defendant acted in good

25   faith, without full knowledge or intent to exploit some

1    difficulty or limitation in the return policies and warranty

2    principles of the companies he cannot be found guilty.  The

3    burden of proof as to intent, as with the other elements of the

4    case, rests with the Government.

5         Now, the Government is not required to prove all of

6    the details concerning the precise nature and purposes of the

7    scheme, or that the material transferred by wire was itself

8    false and fraudulent, or that the alleged scheme actually

9    succeeded in defrauding anyone, or that the use of wire

10   communications in interstate commerce was intended as the

11   specific or exclusive means of accomplishing the fraud, but

12   what they must prove beyond a reasonable doubt is that the

13   defendant knowingly devised and intended to devise a scheme to

14   defraud substantially as it is alleged in the indictment that

15   you have in your hands, and that the use of wire communications

16   in interstate commerce on or about the date alleged was closely

17   related to the scheme because the defendant either made or

18   caused to be made an interstate wire communication in an

19   attempt to execute or carry out the scheme.

20        When we talk about "cause" in this context with

21   respect to an interstate wire communication, we are talking

22   about doing an act with knowledge that an interstate wire

23   communication will follow in the ordinary course, or that a

24   wire transfer will reasonably be foreseen.  Wire communication

25   that is designed to lull a victim into a false sense of

1    security, postpone complaints or inquiries, or make the

2    transaction less suspect are communications in furtherance of a

3    scheme to defraud.

4         So, you have got this broad fraud scheme that is

5    alleged in Counts One, Two, Three and Four, and you will

6    consider each one of them separately.  Just because you may

7    make a determination with respect to guilt or innocence on

8    Count One, does not mean that that is necessarily the same

9    determination you make as to Count Two.  You have got to break

10   it down step by step.

11        Now we turn to Count Five.  Count Five is another one

12   of these issues that you may ask what the federal government is

13   doing in this.  It is talking about being in receipt,

14   possessing or storing stolen property, and the essence of this

15   is two, at least as far as the Federal Government is concerned.

16   The first part is that this property had moved in interstate

17   commerce or was part of interstate commerce.  The second part

18   is it has to be $5,000 or more.  Those are two ways that

19   Congress had for limiting the Federal Government's involvement

20   in basic property theft kinds of cases.

21        But what the Government must prove here on this charge

22   is that on or about December 14, 2010, which was when the

23   search took place, that Mr. Kuc received, or possessed, or

24   stored goods, wares, or merchandise that were stolen or

25   converted or taken by fraud.  So, what the Government is

1   undertaking to do here is say there was property at his home

2   that was found there and it was taken fraudulently pursuant to

3   the scheme that is alleged in Counts One, Two, Three and Four.

4   They have to show that the defendant actually received,

5   possessed or stored the property, that is, it was under his

6   control, and that the property first moved in or was part of

7   interstate commerce; and here the Government says look at the

8   boxes, they are coming from somewhere else, look at some of the

9   other evidence, it is coming from someplace outside of

10  Massachusetts, because the focus here is on the property that

11  was the subject of the search.

12       They have to show that the value was in excess of

13  $5,000, actually, more precisely, $5,000 or more, and that the

14  defendant knew the property had been stolen, converted or

15  unlawfully taken.  You will have in mind, again, the focus of

16  the defense here is knowledge, both with respect to the scheme

17  and knowledge with respect to whether or not it was stolen.

18       So, you are looking into Mr. Kuc's mind to decide,

19  with the evidence that has been provided, whether or not the

20  Government has proved that he knew that this merchandise, these

21  dozens of boxes of computer equipment, had been stolen, or

22  converted or fraudulently and unlawfully taken.

23       That brings us to Count Six.  This is a count called

24  "Aggravated Identity Theft."  Aggravated Identity Theft is kind

25  of a heading for this federal crime.  It is a federal crime

1    because it is tied to engaging in this kind of activity when

2    the underlying crime is a federal crime.

3            Here, by way of larger understanding, what Congress

4    has done has made it illegal to transfer, or possess, or use

5    another person's means of identification without the right or

6    the permission to act on that person's behalf in a way that is

7    contrary to the law.

8            Here we are dealing with Mr. Samuels.  In one sense it

9    makes no difference how the means of identification is actually

10   obtained, if it was obtained in a way that is contrary to the

11   law, obtained or used in a way that is contrary to the law, and

12   I will get to this in just a moment.  But the idea is that a

13   person's identity may not be passed on for an unlawful purpose

14   or appropriated for an unlawful purpose.

15           So, what does the Government have to prove?  First,

16   that the defendant committed Wire or Mail Fraud.  You will note

17   that I say "Mail Fraud" at this point, because that is what is

18   alleged in the indictment, but also because there are

19   allegations that there were mailings involved in furtherance of

20   the scheme to defraud.  There is a separate statute for Mail

21   Fraud separate from Wire Fraud.  They are not quite identical

22   twins, but they are in the same family, they are siblings, and

23   the elements that the Government has to prove for Wire Fraud

24   are that we discussed in conjunction with Counts One through

25   Four, that is, a scheme substantially as charged in the

1    indictment to defraud or obtain money or property by means of

2    false or fraudulent pretenses; second, that the scheme involved

3    a false statement or representation or concealment about

4    material facts; third, the defendant's knowing and willful

5    participation in the scheme with the intent to defraud.  You

6    can break it into two parts:  the use of interstate wire

7    communications, as alleged in Counts One Through Four, or it

8    can be the use of the mails as a means of communication in

9    furtherance of the scheme.

10            So, here the Government has alleged that both wire and

11   mail was used here, that is, that the defendant engaged in both

12   Wire Fraud and Mail Fraud; second, that during and in relation

13   to the crime of Wire Fraud or Mail Fraud the defendant

14   knowingly possessed or used a means of identification as

15   described in the superseding indictment without lawful

16   authority.

17            Now, let us look at what the indictment says was the

18   means of identification.  If you look at page 7 it says in the

19   second-to-last line before we get to the line that tells you

20   what section of the United States Code is violated, "the name

21   of F.S.," that is, Francisco Samuel, "either alone or in

22   conjunction with Mr. Samuel's business name and business

23   address and variants thereof," but it has to be Mr. Samuel's

24   name, Francisco Samuel, as charged here.

25            There is another dimension.  There are lots and lots

1    and lots of occasions that the Government says Mr. Samuel's

2    name was used, and there is a danger when the evidence supports

3    something like that, and the danger is this:  that two of you

4    will say, "Well, you know, I think it was the box that went

5    down to Rhode Island," and somebody will say, "Well, I think it

6    was the box that was in the house," a few more, but you are not

7    unanimous, and I will come to this in the end.  But you have to

8    be unanimous, and you have to be unanimous with respect to this

9    count as to at least one occasion on which the name of

10   Mr. Samuel was used here in connection with the Wire or Mail

11   Fraud.

12        Now, when we say "without lawful authority," there are

13   two parts of that that you will consider.  The first part is

14   Mr. Samuel testified -- but it is your recollection that

15   counts -- that he gave authority to use his name in connection

16   with the delivery to his office but not beyond it.  So, you

17   will consider whether or not there was authorization to use his

18   name.  That is one branch.

19        The second branch is whether or not the authorization

20   was used, whatever the authorization was, in furtherance of a

21   crime, that is, without lawful authority.  You do not get to

22   take -- if someone gives you something that is in itself lawful

23   by way of identity, you do not get to use it in an unlawful

24   fashion.  That also constitutes Aggravated Identity Theft.  And

25   when I say "theft," as I said, the heading on the statute is

1    "Identity Theft."  It means, more broadly, theft or fraud, that

2    kind of thing.

3         The Government has to prove that the means of

4    identification belonged to another real person.  Here, the real

5    person is said to be Mr. Samuel.  And, finally, the Government

6    must show that the defendant knew that the means of

7    identification belonged to another real person, that is, he

8    knew he was using Mr. Samuel's name in connection with and in

9    relation to the crime of Wire Fraud or Mail Fraud.

10        The Government has to prove those four things, and I

11   go back to the point of unanimity.  You have to agree upon at

12   least one occasion in which Mr. Samuel's identity, to wit, his

13   name, was used in this fashion.  You cannot split up and some

14   of you agree to one thing and some of you agree to another.

15   You have you to focus on a single event in order for the

16   Government to have satisfied its burden.

17        Now, before I go any further, I want to talk to the

18   lawyers, and then I am going to give you some instructions

19   about how you conduct your business.

20

21   (SIDEBAR CONFERENCE AS FOLLOWS):

22        THE COURT:  Anything else from the Government?

23        MS. BURKART:  Would it be appropriate to do some type

24   of a missing evidence instruction, your Honor?

25        THE COURT:  No.  It would amount to argumentation in

1   this context.  I gave an instruction that they can base their

2   determination on evidence or the lack of evidence, but beyond

3   that I am not going to get into it.

4        MR. SHEKETOFF:  In order to save my rights, we talked

5   about it before the charge, I would object to the idea that in

6   Aggravated Identity Theft the name is enough.  I want to object

7   to the concept of variants in accompanying information, such as

8   business addresses and names of companies, and I want to object

9   to the First Circuit taking the "without lawful authority" out

10  of the statute.

11       THE COURT:  As to the third, I stand mute.  But I

12  think I have covered all of those accurately in light of the

13  First Circuit determinations, and, of course, it can be

14  revisited, if it comes to that, in post-trial motions.

15  (END OF SIDEBAR CONFERENCE)

16

17       THE COURT:  So, let me turn to how you go about your

18  business.  In some ways I cannot tell if you are doing it

19  right, because you are going to go in that room, nobody else is

20  going to be watching, and we are counting on you to follow the

21  rules here.  I have tried to outline as best I can the rules in

22  the case, the instructions, but ultimately we leave it to you

23  to make the determinations.

24       There are some basic principles that you should keep

25  in mind.

1          The purpose of jury deliberations is to use collective

2    recollection to reach a collective judgment.  That means all of

3    you should be talking to each other, because, as I said, this

4    has to be unanimous.  What we are looking for is a rational

5    discussion of the evidence by all of the jurors for the purpose

6    of reaching that unanimous verdict.  Of course, each juror has

7    to decide the case for himself or herself in the context of the

8    evidence and the law, but you have to do so with proper respect

9    for the views of others.

10          You have not had a lot of time to talk together or get

11    to know each other, but you may have the experience that lots

12    of jurors have, that that person who seemed perfectly

13    reasonable when they were talking about the Red Sox is now

14    expressing some unusual views about the nature of the evidence.

15    That is what happens when groups make decisions.  They talk it

16    through and try, in a rational and a civil way, to reach a

17    conclusion.

18          A juror is free to reconsider that juror's views, if

19    persuaded by rational discussion, but you should not do that

20    solely for the purpose of reaching a unanimous verdict.  It has

21    to be both your verdict and the verdict of the jury together,

22    and it has to be, as I said, unanimous.

23          One of the things that needs to be done is to identify

24    a foreperson.  So, after a nationwide search, Mr. Ryaboy made

25    the mistake of sitting in Jury Seat Number One.  The effect of

1    that is that you are now the foreperson of the jury.  There is

2    no extra money and you do not get an extra vote, but I do it by

3    just picking people who make the mistake of sitting in Seat

4    Number One.  I do not mean to diminish the importance of your

5    position, but you should understand it is done at random.

6            What it really means is that someone just kind of sits

7    at the head of the table, or wherever, and makes sure people do

8    not talk over each other, that everybody gets heard.  If

9    somebody leaves the table to use the facilities or take a break

10   or something, stop the discussion.  Everybody has to hear what

11   everybody else has to say.

12           Now, one of the things that I will advise you -- as I

13   said, I cannot force you to choose some particular method or

14   require you to choose some particular method of jury evaluation

15   of the evidence, but one thing I think is a pretty good idea is

16   this, and I will tell you the alternative, which I would

17   strongly urge you not to do.  There is an alternative, the

18   jurors just say, "Let us take a straw vote; maybe we can settle

19   this like that (indicating)."  The danger with that is, among

20   other things, it does not suggest full consideration of the

21   evidence.  Second, once people take a vote, they start

22   defending their positions rather than just evaluating the

23   evidence.

24           So, what I would suggest is that the first thing you

25   do is you sit down and go around the table, and each person

1    express a view about some aspect of the evidence that was

2    particularly compelling to them without taking a position --

3    you may be able to infer what their position is -- but without

4    taking a position, so you are not in a position of defending a

5    position or your approach to it.  That way you start to get the

6    benefit of what the other person has to say.  That is what I

7    mean about "collective recollection."  You will find somebody

8    is going to remember something and that will click in your

9    mind, and you will say "Oh, that's right, I forgot about that,"

10   or, "That is something I had not thought about."  So, together

11   you work your way through.

12           Now, my hope is that the instructions are clear enough

13   that you have got the road map that is provided by the

14   indictment to see what the Government has undertaken to prove,

15   that you will not need to ask questions.  But if you do ask

16   questions, they should be in writing, and they should be signed

17   by -- sorry, Mr. Ryaboy -- I have to look your name up each

18   time -- signed by Mr. Ryaboy.  If he will not sign it, by some

19   other juror.  They are submitted to the Court Officer, who will

20   be outside your deliberation room and/or Mr. Lovett, if he is

21   there.  They will bring it to me, I will talk to the lawyers

22   about it and we will get back to you.  Now, you just heard the

23   judge is going to talk to the lawyers, which means we are not

24   talking about a quick turnaround time on questions, just so you

25   understand.  But, nevertheless, if you have questions, that is

1    the way to do it, on the substance of the case.

2         If you have questions like, "When do we eat?", all

3    those are the kinds of things that -- first, I will answer

4    that.  I think it is 12:15, isn't it, Jarrett?  Something like

5    that.  The food will be brought in to you.  Creature-comfort

6    things likes that you can address to the Court Officer or

7    Mr. Lovett.  But anything that touches on this case tell us.

8         One thing you do not tell us is where you stand,

9    because at some point you are going to take a vote, and when

10   you take a vote we are not entitled to know where you stand.

11   So, in any communication just do not tell us.  This is a

12   process, as I said, of working it out among yourselves, and so

13   interim determinations or interim views are not appropriate for

14   the Court or the parties to be aware of.

15        Ultimately, you will reach a verdict, and the way in

16   which you will report it is, you tell the Court Officer, you

17   will come back into the courtroom with a signed jury verdict,

18   and I will inquire of the foreperson regarding it.

19        Now, are there any other matters that the parties

20   would like me to address to the jury at this point?

21        MR. GARLAND:  Nothing from the Government, your Honor.

22        MR. SHEKETOFF:  No, your Honor.

23        THE COURT:  So, what we are going to do is send you

24   back into the jury room.  We have, in addition to the hard copy

25   of the documents, you saw the TV screen there.  It is not

1    really a TV screen.  It is there for the evidence in the case,

2    and I think, as others jurors have, you will be able to use

3    that fairly effectively so you can all see documents at the

4    same time.  You can also look at them separately.

5          There is a final point.  It is the final point,

6    because I do not like to do it, but I have to, because I have

7    to play by the rules, too.  But in the Federal Rules of

8    Criminal Procedure only 12 jurors can deliberate.  Two persons

9    have to be identified as alternates, and I identify the last

10   two people who were chosen here, that is Ms. Redfield and

11   Ms. Corday.

12         I do not like to do it because it was clear to all of

13   us, I think, here, and I will comment on it as well, that all

14   of the jurors were paying very careful attention to the

15   evidence, and I think the people who pay careful attention to

16   the evidence and are sitting in the jury box ought to be able

17   to deliberate, except the Federal Rules say no, only 12 persons

18   can do it.  I do not like to separate the alternates as well,

19   because I have always been concerned that alternates maybe will

20   not pay as much attention to it, but it is clear to me that,

21   Ms. Redfield, and, Ms. Corday, you were paying very careful

22   attention to this case.

23         Unlike some other sessions in this court and in the

24   state court, I will not keep you here in the courthouse.  You

25   are free to go, but I will ask you not to discuss the case at

1    all, to leave Mr. Lovett with contact information, because from

2    time to time a juror turns out to be disposed for sickness or

3    something like that, and then we do have to bring the

4    alternates back in and we will have to start all over again.

5    But we need you on active duty, I guess, like in the National

6    Guard, before the evidence is completed.  You also probably

7    will want to know how it turned out, so Mr. Lovett will tell

8    you that as well.

9           But, again, thank you very much for your attendance

10   here.  You can pick up your things, if you have things in the

11   jury room, and once you have left the 12 jurors who are the

12   remaining jurors in the case will deliberate.

13          All right.  So, you are free to go back to the jury

14   room.  Good luck.

15          THE CLERK:  All rise for the jury.

16          (The jury exited the courtroom at 11:50 a.m.)

17          THE COURT:  Five-minute rule.  You have got to be

18   someplace that we can get you here in five minutes, or things

19   will happen in your absence.  So, tell Mr. Lovett where you are

20   going to be.

21          Anything else?

22          MR. SHEKETOFF:  No, your Honor.

23          THE COURT:  So, we will be in recess.

24     (The Court discussed an unrelated case with Atty. Sheketoff)

25          THE CLERK:  All rise.

1          (The Honorable Court exited the courtroom at 11:55 a.m.)

2                 (Recess taken while jury in deliberations)

3          THE CLERK:  All rise.

4       (The Honorable Court entered the courtroom at 2:05 p.m.)

5          THE COURT:  Well, we have a question from the jury:

6    "Can we get a repeat of the guidance on deciding Count Six?"

7          So, what are the parties' views on that?

8          MS. BURKART:  The Government's position is that that

9    would be appropriate, your Honor.

10         THE COURT:  And do you have a particular way that you

11   would like to have that done?

12         MS. BURKART:  Logistically, what options are

13   available?

14         THE COURT:  Well, in time, I suppose anything.  The

15   question is, is there time enough.  It takes a little while to

16   pull together the transcript.  That seems not necessarily

17   timely.  I can do it again myself, I guess, with the risk that

18   there may be some variance from what I said before.

19         MS. BURKART:  I think that would be appropriate, your

20   Honor.

21         THE COURT:  Mr. Sheketoff?

22         MR. SHEKETOFF:  Well, I think you should answer their

23   question, obviously, and either alternative is acceptable to

24   us.  Can I save my rights, since you are going to give

25   basically the same charge on the same issues?

1      THE COURT:  Yes.  To the degree that my repeating what

2  I said before in substance is objected to, it is a continuing

3  objection.  If there is something new that you hear in the

4  course of this that you want to preserve, I think you have to

5  preserve it.  The First Circuit is, I understand, hell on

6  wheels about preserving objections after --

7      MR. SHEKETOFF:  So, if there is something new that I

8  object to, I will make it clear on the record, but otherwise I

9  have a continuing objection to the same points that I assume

10  you are going to make that you made the last time.  Thank you.

11      THE COURT:  Fine, thank you.

12      So, I am going to ask Mr. Lovett to bring the jury in,

13  and I am going to charge them again.

14      THE CLERK:  All rise for the jury.

15      (Jury entered the courtroom at 2:10 p.m.)

16      THE CLERK:  You may be seated.

17      THE COURT:  Ladies and gentlemen, I have your inquiry,

18  which I will label as Jury Exhibit No. 1, inquiring, "Can we

19  get a repeat of the guidance on deciding Count Six?"  So, let

20  me restate that portion of the instructions.  You have to

21  understand that all of the instructions are important.  I

22  understand you focus me on a particular one, but you are going

23  to consider this in light of all of the instructions that I

24  have given you here.

25      The allegation in Count Six is that Mr. Kuc knowingly

1    possessed and used without lawful authority a means of

2    identification of another person, to wit, the name F.S., which

3    we know is Francisco Samuel, and that he did so alone and in

4    conjunction with Mr. Samuel's business address and business

5    name, that business address and variants thereof.  The term

6    "means of identification" is defined as any name or number that

7    may be used alone or in conjunction with any other information

8    to identify a specific individual.  That could include any

9    name, or Social Security number, or date of birth, things like

10   that.  But here they focused and charged the name "Francisco

11   Samuel."

12          The Aggravated Identity Theft charges against Mr. Kuc

13   are based on his use of the name "Francisco Samuel," again,

14   alone and in conjunction with Francisco Samuel's business name

15   and business address and variants thereof.  The "use of a means

16   of identification without lawful authority" does not mean that

17   the means of identification must be stolen or taken without the

18   person's permission.  "Use of a means of identification without

19   lawful authority" means that it is without the right or

20   permission to act on that other person's behalf in a way that

21   is not contrary to the law.  Regardless of how the means of

22   identification is actually obtained, if its subsequent use

23   breaks the law during and in relation to the commission of the

24   crime of Mail Fraud or Wire Fraud, then it is used without

25   lawful authority.  Again, I want to emphasize that to act

1    knowingly means that the act was done voluntarily and

2    intentionally and not as a result of some accident or mistake.

3          So, what the Government must prove in this connection

4    is that Mr. Cook possessed or used Francisco Samuel's name and

5    addresses during and in relation to the commission of another

6    felony, that is, Mail Fraud or Wire Fraud.  In order to prove

7    that Mr. Kuc acted during and in relation to Mail Fraud or Wire

8    Fraud, you must find that his unauthorized use and possession

9    of the means of identification facilitated or played a role in

10   the offense of Mail Fraud or Wire Fraud.  You are going to be

11   applying the elements of Mail Fraud and Wire Fraud, of course,

12   in making that determination, as I described to you earlier in

13   determining whether or not the defendant's actions facilitated

14   or played a role in the commission of Mail Fraud or Wire Fraud,

15   keeping in mind that the Aggravated Identity Theft count charge

16   charges possession and the use of the means of identification

17   during and in relation to Mail Fraud and Wire Fraud, not simply

18   the commission of those other offenses.

19         Now, there is one other dimension that I focused you

20   on before in dealing with this issue.  It is possible to look

21   at the charge here and identify five or six or many occasions

22   in which there was the use of Mr. Samuel's name, if you find

23   that.  Of course, I tell you these things to try to identify

24   those areas that you might have to direct yourself to based on

25   whatever fact-finding you make.  I am not making that kind of

1    fact-finding.

2         But let us assume that there are three or four or five

3    or many alternative occasions on which there could have been

4    the use of Mr. Samuel's name.  You are obligated to find

5    unanimously at least one of those uses in order to find the

6    Government has met its burden with respect to Mail Fraud.  One

7    of you could not say, "Well, it was the occasion when a package

8    showed up in Cumberland, Rhode Island," and another group,

9    three or four, say some other occasion.  You have to agree on

10   the occasion on which it is used.  That is what we mean by

11   "unanimity" in this area.

12        So, let me recapitulate here.  First, the Government

13   has to prove that the defendant committed Wire Fraud or Mail

14   Fraud; second, that during and in relation to the crime of Wire

15   Fraud or Mail Fraud the defendant knowingly possessed or used a

16   means of identification as described in the superseding

17   indictment without lawful authority; third, that the means of

18   identification belonged to another person; and, fourth, that

19   the defendant knew that the means of identification belonged to

20   another real person, and the means of identification alleged

21   here is the name "Francisco Samuel."

22        Now, is there anything further that counsel would have

23   me address?

24        MS. BURKART:  No, your Honor.

25        MR. SHEKETOFF:  No, your Honor.

1          THE COURT:  So, with that further instruction, I will

2     send you back to continue your deliberations.

3          THE CLERK:  All rise for the jury.

4               (Jury Exhibit No. 1 marked)

5          (The jury exited the courtroom at 2:15 p.m.)

6          THE COURT:  All right.  The one thing that I want to

7     mention here is I think both of the parties have received the

8     Pretrial Services Report.

9          Have you, Mr. Sheketoff?

10         MR. SHEKETOFF:  No.

11         THE COURT:  I am going to ask Pretrial Services to

12    provide it to you, because in the event of a jury verdict of

13    guilty on any of the counts, it raises the question about the

14    continued enlargement of the defendant on bail.  There are

15    facts or circumstances alleged here that would bear on that

16    that I have just received.

17         MR. SHEKETOFF:  I haven't seen it.

18         THE COURT:  So, if Pretrial Services is here, make

19    sure that Mr. Sheketoff --

20         Mr. Garland, do you have a copy?

21         MR. GARLAND:  We do have a copy.  I think it was

22    e-mailed to us.

23         THE COURT:  Pardon me?

24         MR. GARLAND:  I think we do have a copy of it

25    electronically.

1          THE COURT:  All right.  Just so that there is no

2     surprise or misunderstanding about what may be addressed in

3     that connection.

4          So, do we have the Cloutier people here?  We will move

5     forward on that, and we will be in recess on this matter.

6          (Recess taken - Court holds hearing in unrelated case)

7          THE CLERK:  Court is now back on record in the matter

8     of United States versus Matthew Kuc, Criminal Action 11-10014.

9          THE COURT:  Well, as I indicated, we have a verdict,

10    and so I will bring the jury in to return the verdict.

11         THE CLERK:  All rise for the jury.

12         (The jury entered the courtroom at 2:40 p.m.)

13         THE CLERK:  You may be seated.

14         THE COURT:  Mr. Foreman, I understand the jury has

15    reached a unanimous verdict; is that correct?

16         THE FOREPERSON:  Yes, sir.

17         THE COURT:  If you could pass it to Mr. Lovett.

18                       (Pause)

19         THE CLERK:  Mr. Foreperson, Members of the Jury,

20    please harken to your verdict as it is recorded.

21         Criminal Action 11-10014, the United States versus

22    Matthew J. Kuc.

23         "With respect to Count One, we, the jury, find the

24    defendant Matthew J. Kuc guilty.

25         With respect to Count Two, we, the jury, find the

1    defendant Matthew J. Kuc guilty.

2              With respect to Count Three, we, the jury, find the

3    defendant Matthew J. Kuc guilty.

4              With respect to Count Four, we, the jury, find the

5    defendant Matthew J. Kuc guilty.

6              With respect to Count Five, we, the jury, find the

7    defendant Matthew J. Kuc guilty.

8              With respect to Count Six, we, the jury, find the

9    defendant Matthew J. Kuc guilty."

10             Signed and dated June 28th, 2012.

11             So say you, Mr. Foreperson, and so say you all,

12   Members of the Jury?

13                  (The jury answered affirmatively)

14             THE COURT:  All right.  Is there anything further from

15   counsel?

16             MR. GARLAND:  Not at this point.  I assume we will.

17             THE COURT:  So, ladies and gentlemen, what that means

18   is your jury service is completed, and you are shortly going to

19   be free to go, and you do not have to listen to my instructions

20   any longer.  But I have some observations.

21             I told you that this is your verdict, and it would be

22   improper for me to comment on the substance of the verdict.

23   But I can comment, I did in the course of instructions, about

24   what was clear to me and I think clear to the parties as well,

25   that you were paying very careful attention to the evidence as

1   it came in, absorbing the evidence in a serious manner and

2   giving it serious consideration.  That is what we look for in

3   juries, and I think that is what we got from you, a group of

4   people who took their responsibilities seriously to get a

5   serious evaluation of the evidence.  And so, on behalf of the

6   Court and on behalf of the parties, I want to thank you for

7   your jury service in that regard.

8        There is another dimension to this.  The Court has a

9   responsibility to protect the integrity and privacy of the jury

10  as much as we can consistent with the law.  There is a rule in

11  this Judicial Circuit that no party or representative of a

12  party may contact a juror after a verdict is returned without

13  the express approval of the Court.  This is not the kind of

14  case in which I would anticipate being asked, but it certainly

15  is not the kind of case in which I would permit it, if I were

16  asked.

17       Now, what that means is that you are free to talk to

18  whoever you want.  That is going to be up to you.  But there is

19  a larger principle that I bring to your attention.  You have

20  just had a conversation, a probably intense conversation, about

21  who you believe and what you believe under the circumstances,

22  and you expressed yourselves, I suspect, with candor and force.

23       It may occur to you that you would not want to have

24  other people characterizing to some third party what you said

25  under confidential circumstances like that, that you would like

1    to keep them confidential, and if you feel that way, then I

2    suggest to you that perhaps you want to be extra certain that

3    you maintain the confidences of your colleagues.  I cannot tell

4    you, as I said, what to do, but I can make that suggestion as

5    another way to observe the integrity of the jury process.

6            But, in conclusion, I will go back to where I started,

7    which is that we asked of you to take your time and imposed on

8    you to do a very important public service, and on behalf of the

9    Court and certainly on the basis of my personal observation you

10   did that.  So, thank you very much, and you are now free to go.

11           THE CLERK:  All rise for the jury.

12           (The jury exited the courtroom at 2:45 p.m.)

13           THE COURT:  You may be seated.

14           I guess the question of bail pending sentencing, which

15   will take place on September 21st at 2:30, is open.  I raise

16   the issue of the Pretrial Services Report, which appends a 302

17   from Special Agent Heitkamp suggesting continuation of the

18   course of conduct that was charged here during the period of

19   pretrial release.

20           So, I guess I want to understand what the Government's

21   view is on further or continued enlargement on bail.

22           MR. GARLAND:  Your Honor, the Government's position

23   would be that, even absent this conduct, of course there would

24   be grounds to hold him because he faces sentencing, because he

25   faces incarceration, a mandatory sentence here.

1          But setting that aside, there is conduct --

2          THE COURT:  When you say "mandatory sentence," are you

3    telling me that it is mandatory that his bail be terminated?

4          MR. GARLAND:  No.  What I am saying is that because of

5    the 1028A conviction, as long as that stands and is not set

6    aside by the Court, that carries a mandatory two-year sentence.

7    So, this is a case in which the Government, of course, would be

8    recommending a sentence of imprisonment, and because he would

9    be facing a certain sentence of at least two years of

10   imprisonment, setting aside what else is done on that, then

11   incarceration would be appropriate, even if there weren't this

12   conduct.

13         The conduct is here.  The conduct shows that Mr. Kuc

14   engaged in the same sort of fraud in this year, the last few

15   months, I think it's February, March and a few times in April

16   as well.  When you look at some of the chats that are submitted

17   to the Court, I think if you look at the one, for example, that

18   is dated 2/27/2012, I think it starts at 4:15 p.m., it starts

19   out with Matt Kuc, "I'm the IT person here."  This is the

20   conduct that was the subject of this case, and, by doing this,

21   I think it qualifies, at the very least, as Pretrial points

22   out, not following the strictures that were put down for him

23   for continued release.  So, that leaves the question of whether

24   he can be indeed trusted to do that in the future pending

25   sentencing.

1        We would recommend that under 3143 he would be a

2    continued danger economically to the community if he were

3    allowed to remain at large until then.  We would ask that he be

4    remanded.  If not, then we would recommend stringent

5    conditions, even more stringent conditions of his presentencing

6    release.

7        THE COURT:  Well, I just want to be sure we are on the

8    same page about this.  We are talking about 3143B, in which

9    pending appeal by the defendant I must order a person who has

10   been found guilty of an offense -- I am sorry -- 3143(a), in

11   which I must order a person who has been found guilty and is

12   awaiting imposition of the sentence to begin that sentence,

13   unless I find by clear and convincing evidence that the person

14   is not likely to flee or pose a danger to the safety of any

15   person in the community.

16       Is that where we are?

17       MR. GARLAND:  That's the provision that we are under

18   at this point, your Honor.

19       THE COURT:  All right.  Now, let me ask another

20   question, so that I can be sure, and Mr. Sheketoff can respond

21   to it.  I am not sure I understand why the Government did not

22   seize the two computers or take the offer of the two computers

23   that were offered up Thursday.  Why?

24       MR. GARLAND:  Why did it not take those computers?

25   Number one, we didn't have anybody at that point who could

1    actually look at the computers, analyze the computers to do a

2    forensic examination of that hard drive.  To do the sorts of

3    things, analyses, you would want to do would include not only

4    just turning on the computer and hitting F2, but you would want

5    to do a bunch of other things.  You would want to look at that

6    hard drive, you would want to see whether that utility that

7    Mr. Long had testified about was present, whether it had been

8    deleted.  That takes, as Mr. Velasco says, a long time to do,

9    and that wasn't something that could be done.

10            The second thing was that there were no indications to

11   us that that evidence, to the extent that there was evidence of

12   those computers, were at all authenticated.

13            THE COURT:  If they were, then why wouldn't it be

14   obstruction of justice?

15            MR. GARLAND:  If they were why would it not be

16   obstruction of justice?  It would be obstruction of justice.

17            THE COURT:  So, the Government chose not to take

18   evidence of potential obstruction of justice because Mr.

19   Velasco takes ten months to do computer forensics?

20            MR. GARLAND:  The Government chose not to do it

21   because we also have a computer that we didn't know where it

22   had come from.  We had --

23            THE COURT:  Is the Government generally so selective

24   in its choice of evidence to seize?

25            MR. GARLAND:  We also did not want to put ourselves in

1      the chain of custody for something we had never seen before.

2           THE COURT:  You did not want to put yourself in the

3      chain of custody?  You mean, when the Government seizes

4      contraband it has delicate views about chain of custody?

5           MR. GARLAND:  I guess the point is at that point it

6      wasn't even clear to us what we had at that time.

7           THE COURT:  So, the Government only seizes things that

8      it is sure it knows what it has?  I just find it passing

9      peculiar that the Government did not take up the question, take

10     them into evidence at that point when the evidence is arguably

11     evidence of obstruction of justice.

12          MR. GARLAND:  The Government did not think that it was

13     going to be able to address that in the time it was going to be

14     timely for this trial.

15          THE COURT:  And I doubt I would have allowed a

16     superseding indictment to do that.  That does not mean that you

17     wait until you have done one before you charge another.  I just

18     do not quite understand it, to be perfectly candid, but it is

19     on my mind, and that is why I raise it for Mr. Sheketoff why I

20     should not view this, if it were willfully created for purposes

21     of creating false evidence concerning a piece of computer

22     equipment, as obstruction.

23          But, Mr. Sheketoff?

24          MR. SHEKETOFF:  Well, I think it would be obstruction

25     if it was willfully created as false evidence.  But I don't

1    think it was willfully created as false evidence.  There are

2    other possible explanations.  The offer to the Government is

3    still available.  They can come and take it, if they want.

4           So, that's question number one.

5           Question number two, I count five contacts after

6    release.  I am not addressing contacts before release, just

7    after release.

8           THE COURT:  I suppose that is right, that we are

9    dealing with contacts after release, but release in this

10   case was --

11          MR. SHEKETOFF:  I don't remember the exact date, but

12   we know that the search was in December of 2010, so the first

13   after-release entry on page 1 of their spreadsheet is 2/28/12.

14   Then there is a 3/06/12, and 3/17, 4/14 and 4/25, all in '12,

15   five contacts.

16          THE COURT:  These are ones for which the chats are

17   provided at the end of the 302.

18          MR. SHEKETOFF:  So, first, I would point out to the

19   Court that the right name is given every time.  This is

20   batteries that are used in the household.  The right address is

21   given every time, and all the right contact information is

22   given every time.  I believe that if you give me a day or two

23   he can find the tracking orders showing that he sent the stuff

24   back.  I mean, this would be insane over these batteries.  I

25   agree.  I mean, it would be insane.

1          He informs me that he has, in fact, sent each one of

2     those things back.  These are power supplies for the house that

3     he lives in with his parents.  I believe I could come in

4     tomorrow or on Monday and have something to show that he sent

5     these things back.  We are talking about the earlier things.

6     I'm talking about these, where he's giving *his* name, *his*

7     address, *his* --

8               THE COURT:  When was he arrested?

9               MS. BURKART:  December 14th, 2010.

10              THE COURT:  So, the breakpoint is really the last six,

11    and those are the ones that are found in the chats?

12              MR. SHEKETOFF:  Yeah.  So, I mean, the only thing that

13    would be fraudulent is if he didn't send it back.  There's

14    nothing else fraudulent about it.

15              THE COURT:  Well, there is an IT Department in the

16    house?

17              MR. SHEKETOFF:  Well, yes and no.  I mean, he is the

18    IT Department for the house, but it is not material that he

19    says he is the IT Department for the house.  The battery, if it

20    failed and it is under warranty, or it didn't, and if he sent

21    it back he has done nothing wrong.  He has given all the

22    correct -- he doesn't lose his rights to replace warrantied

23    items just because he has done bad things with these things in

24    the past.

25              The real issue, it seems to me, is did he send them

1    back, and I think I can prove that he did.

2           MR. GARLAND:  Your Honor, just two points.  One is

3    that, if you look at the chat that looks like it's on March 5

4    of this year --

5           THE COURT:  March 5?

6           MR. GARLAND:  That's correct, your Honor.  I think at

7    the top left corner it says, "Incident 12/03/06, 000520."  It

8    appears as you go down through this chat that, although the

9    entry on the spreadsheet says "Matt Kuc," the name that was

10   used during this chat was "Taduesz Kuc," which we know to be

11   the defendant's father.

12          The second thing that I can tell the Court is that the

13   chats that we provided to Pretrial were the chats that back up

14   the entries on the spreadsheet.  There are other chats in which

15   the defendant did not get a piece of equipment.  What happened

16   was he would contact Schneider Electric, and they started

17   asking him for a picture of the equipment, it's not a bad thing

18   for them to be doing.  And what would happen during those chats

19   is that the chat would go dead, the user, Matt Kuc, would

20   disconnect, and the inference is obvious there.

21          THE COURT:  Well, there is an inference, I guess, but

22   I do not have that before me.

23          MR. GARLAND:  That is correct.  That has been provided

24   to Pretrial already, a couple of those, and we can provide

25   those to the Court as well.

1          THE COURT:  So, let us recapitulate, then.  Can the

2     Government say that the equipment that is identified in what I

3     do have is not returned?

4          MR. GARLAND:  That is what is stated by Michael

5     Schiver (ph) in the 302.  That is the last line:  "Schiver

6     advised that per APC's records APC has not received any damaged

7     unit back from Kuc."

8          THE COURT:  Well, I guess your offer is tomorrow or

9     Monday?  This is, as far as I am concerned, quite serious.

10         MR. SHEKETOFF:  I am well aware of that, your Honor.

11    I have heard you on these topics before.  The last computer

12    case I had with you we had the same issue going on.  Yes,

13    Friday or Monday, whichever you prefer.

14         THE COURT:  Is there any question that your client can

15    obtain the evidence by tomorrow?

16       (Atty. Sheketoff conferred with defendant off the record)

17         MR. SHEKETOFF:  Yeah, he believes he can.

18         THE COURT:  So, let us continue the question of

19    whether or not bail is going to be revoked until tomorrow at

20    1:00.

21         MR. SHEKETOFF:  Fine.

22         THE PRETRIAL SERVICES REPRESENTATIVE:  Your Honor, if

23    I may, I think the other important issue that seems to be

24    missed here is that Mr. Kuc was not supposed to be using any

25    computer other than for legitimate employment purposes.  So, if

1    he is using the computer at home, which he is also not supposed

2    to have a computer in his residence that he can access the

3    Internet on -- and I actually did a home contact and blatantly

4    asked him if he had any computers that were working.  He did

5    have numerous old computer parts that I actually was concerned

6    about and called the Government and asked them if they were

7    parts left behind by the agents when they did the initial

8    search.  Mr. Kuc assured me that any computer parts were not

9    working parts, they were just monitors, there were no hard

10   drives.  His father actually asked me if there was any way he

11   could get his laptop back from the Government.  I said that

12   that would be an issue taken up with the Court.

13        So, he is well aware that he shouldn't have a computer

14   in his residence let alone be using a computer for anything

15   other than employment purposes.  So, for these chats to have

16   even occurred it's a blatant violation of his pretrial

17   conditions.

18        THE COURT:  Well, the way the condition reads is as

19   follows, it is Condition No. 7, as I read it:  "The defendant

20   shall refrain from using a computer or accessing the Internet

21   on any device, including any smartphone, except for legitimate

22   employment purposes.  All personal computers currently in the

23   residence shall be removed from the residence within 48 hours

24   of the defendant's release."

25        So, I suppose someone could read this

1   hyper-technically and say, well, this arrived in the residence

2   after 48 hours, but as far as I can see, I think Ms. Affsa has

3   a strong point.  This is not for employment purposes, and while

4   there has been offered a justification for being on the

5   Internet separate and apart from the question of compliance

6   with the conditions, the conditions do not permit it.  He

7   cannot use it.  Now, maybe the answer on some of these is it

8   was the defendant's father that was using it, but the

9   justification that was given to me is that he used his own

10  name.

11      I cannot under these circumstances find by clear and

12  convincing evidence that he may not be engaged in harm to the

13  community through his continued release.  I am concerned about

14  his access to whatever he says is going to justify this, but

15  this seems a pretty clear violation of his terms of pretrial

16  release.

17      MR. SHEKETOFF:  Your Honor, but I do not believe you

18  would violate him if on five occasions for batteries for the

19  home, that backup power supply of the home, he stood behind his

20  father who actually got on the Internet himself to get

21  replacement batteries for these batteries that affect the home.

22      THE COURT:  I do not know that that is the case, but

23  that is not what is presented to me right now.  What is

24  presented to me right now is *prima facie* demonstration that he

25  violated his terms of pretrial release, my terms, by accessing

1    a computer for other than employment purposes.  He did not ask

2    the Court, and, more than that, I am told that he -- or the

3    Government says, and the 302 supports this proposition, that

4    the records indicate that they have not even been sent back,

5    which is the same crime of which he has been convicted today or

6    adjudged guilty today.

7           MR. SHEKETOFF:  Right.

8           THE COURT:  The only issue for me is at this point his

9    ability to obtain this evidence.

10          MR. SHEKETOFF:  So, can we come back tomorrow morning?

11          THE COURT:  Why can't the evidence be obtained by his

12   parents?

13          MR. SHEKETOFF:  Perhaps it can.  I cannot say with

14   definite certainty that it cannot, but do you want to give him

15   an opportunity to talk to his parents and suggest whether they

16   might be able to find it?

17          THE COURT:  Yes, I do, because under ordinary

18   circumstances this is the kind of thing in which I would revoke

19   bail, and I am not sure there is any reason I would not on the

20   evidence here.  I have your representation that it was sent

21   back and there is evidence somewhere, but all I have is a 302

22   that says at least as of June 4th it had not gotten back there,

23   and we are talking about transactions that took place as early

24   as February 27th.

25          MR. SHEKETOFF:  Correct.  So, I am just concerned with

1   being able to prove to you tomorrow.  Maybe I will not be able

2   to, but maybe I will.  I would like at least the opportunity to

3   persuade you that he sent those back.  If I had seen this

4   yesterday, I would have come with whatever information I could

5   have.

6          There is, realistically, no chance, in my view, that

7   he is going to flee between now and tomorrow morning.  Even if

8   the hearing is not till 1:00, we can be here at 9:00 tomorrow

9   morning.

10          THE COURT:  Well, I will do the hearing as early as

11   possible.  If you are telling me he can do it overnight, I will

12   think about it.  I do not want you showing up at 9:00 and

13   saying, "I did not have enough time to get it."

14          MR. SHEKETOFF:  Right.  He will be able to locate it

15   if it's within in his home.  It would be some sort of receipts

16   for sending it back to whoever he sent it back to.  So, I don't

17   think he needs days to find that.

18          MR. GARLAND:  Your Honor, the one thing, as I had a

19   chance to fully look through this, it appears that those chats

20   that I was telling you about are -- you can see the chats, for

21   example, there's one on 5/3/12 where I believe, as you go

22   through, really towards the end you have the APC person saying,

23   "In order to proceed with warranty replacement I would require

24   a picture of the white bar code which is located on the rear of

25   the UPS," I understand that to mean "Uninterruptible Power

1   Supply," "with model and serial number."  And so the response

2   comes back, "Okay, where should I e-mail it?"  "You can attach

3   it to this chat."  Boom, it's disconnected.

4        And then my recollection is that if you go back one

5   before that, there is another one that has the similar sort of

6   termination for the conversation.  That's APC deciding to

7   demand real proof that there was a piece of equipment at that

8   house.  They asked for that picture and the chat disconnects at

9   that point.

10       Again, maybe if it happened one time, that might be

11   you know, a perfectly understandable computer glitch or

12   something like that.  If it happens more than once, especially

13   in these circumstances, it takes on a whole different meaning.

14       THE COURT:  Well, I will reschedule this, then, for

15   9:00 tomorrow morning.  I will permit the defendant to be

16   enlarged until then.

17       MR. SHEKETOFF:  Thank you, your Honor.

18       THE COURT:  He understands, and I am sure you are

19   going to fully advise him regarding the consequences of failing

20   to appear and flight, but he has appeared to date, so I am not

21   focusing on flight, I am focusing on the question of harm,

22   which is essentially repeating the crime here or themes and

23   variations of it, and there is a substantial likelihood that I

24   am going to remit him to the custody of the Marshals under the

25   circumstances, unless there is some demonstration that this is

1   different than is portrayed here.

2        I am influenced as well by Ms. Affsa focusing my

3   attention on the language of the release conditions that were

4   imposed by Judge Sorokin, including access to a computer here.

5   I do not understand how anybody facing these kinds of charges

6   would not read this with exquisite formality.

7        MR. SHEKETOFF:  Well, in many ways I agree, but you

8   and I are not facing these kinds of charges.

9        THE COURT:  That is true.  But in any event, I am

10  going to enlarge him until tomorrow at 9:00.  We will have full

11  argument tomorrow morning with respect to it.

12       As to the two computers that were offered but not

13  taken, the Government makes its own choices.  I think I have

14  made clear my view that, when there are circumstances like

15  this, I just do not understand why the Government would not

16  accept the offer, and I understand the offer is still

17  outstanding.

18       So, 9:00 tomorrow morning.

19       MR. SHEKETOFF:  Yes, your Honor.

20     (WHEREUPON, the proceedings adjourned at 3:10 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3         I, Brenda K. Hancock, RMR, CRR and Official Reporter

4   of the United States District Court, do hereby certify that the

5   foregoing transcript constitutes, to the best of my skill and

6   ability, a true and accurate transcription of my stenotype

7   notes taken in the matter of United States of America v.

8   Matthew Kuc, No. 1:11-cr-10014-DPW-1.

9

10

11

12

13

14   Date:    February 19, 2013         /s/ *Brenda K. Hancock*

15                                      Brenda K. Hancock, RMR, CRR

16                                      Official Court Reporter

17

18

19

20

21

22

23

24

25