1      UNITED STATES DISTRICT COURT
        DISTRICT OF MASSACHUSETTS
2

3

4  THE UNITED STATES OF AMERICA       )
                                      )
5                                     )
                                      )
6  vs.                                ) No.
                                      ) 1:11-cr-10014-DPW-1
7                                     )
   MATTHEW J. KUC,                    )
8                                     )
              Defendant.              )
9

10

   BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
11

12
             DAY ONE OF SENTENCING HEARING
13

14

15
       John Joseph Moakley United States Courthouse
16                  Courtroom No. 1
                  One Courthouse Way
17                 Boston, MA 02210
                   October 26, 2012
18                    2:40 p.m.

19

20

21        Brenda K. Hancock, RMR, CRR
              Official Court Reporter
22     John Joseph Moakley United States Courthouse
                  One Courthouse Way
23                 Boston, MA 02210
                   (617)439-3214
24

25

```
 1   APPEARANCES:

 2        UNITED STATES ATTORNEY'S OFFICE
          By:  AUSA Amy H. Burkart
 3             AUSA Scott Garland
          Suite 9200
 4        Boston, MA 02210
          On behalf of the United States of America
 5
          ROBERT L. SHEKETOFF, ESQ.
 6        One McKinley Square
          Boston, MA 02109
 7        On behalf of the Defendant.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1               P R O C E E D I N G S:
 2          THE CLERK:  All rise.
 3      (The Honorable Court entered the courtroom at 2:40 p.m.)
 4          THE CLERK:  This Honorable Court is now in session.
 5   You may be seated.
 6          This is Criminal Action 11-10014, The United States
 7   versus Matthew Kuc.
 8          THE COURT:  Well, I realize I have a Motion to
 9   Continue that is assented to here, but I want to get as far as
10   we can with some things to find out exactly what the dimensions
11   of any additional materials would be.
12          I have read the Presentence Report objections, at
13   least from the defendant.  They seem to me to be addressed to
14   the articulation rather than to the Guidelines themselves, with
15   the exception of obstruction.
16          But maybe I am missing something, Mr. Sheketoff.
17          MR. SHEKETOFF:  Your Honor, to be completely frank,
18   even though I made objections to things like loss, the real
19   objections that I hope to, perhaps, persuade you on are only
20   two, and the first is obstruction of justice, as you pointed
21   out.  That's the reason for my Motion to Continue.
22          It's not the Government's fault, and I don't blame
23   them, I blame myself.  I misunderstood what they were
24   maintaining, and if you read my objection to the Presentence
25   Report, that misunderstanding is actually in there, because I
```

1    thought they were claiming that they had connections -- they
2    could trace chassis parts that I had explained when I turned
3    this material over to the FBI had nothing to do with the
4    motherboards.  But, in fact, they are claiming they can trace
5    the motherboards, which before I would want to be heard on
6    this, I would want to do a little bit more work on it, because
7    I think it's a very important point, and it would influence
8    virtually everything that I say.
9         The other guideline issue that I raise is, and I
10   actually found a First Circuit case on it, it seems to be the
11   only one, 686 F.3d at 1, is the relocation enhancement.  He
12   gets an additional two points because one of the addresses he
13   used was Rhode Island, and the theory is that he relocated the
14   fraud to Rhode Island in order to evade law enforcement.  So, I
15   object to that one, too.  I'm prepared to argue that one today.
16        THE COURT:  When you say the case is 686 F.3d, it is
17   what?
18        MR. SHEKETOFF:  686 F.3d 1.  It's the only case I can
19   find that addresses --
20        THE COURT:  FNU LNU versus FNU LNU?
21        MR. SHEKETOFF:  Oh, I'm sorry, no.  It's <u>United States</u>
22   <u>versus Savarese</u>, S-A-V-A-R-E-S-E.  That's the only First
23   Circuit case I could find.  It's a brand new case, I think it's
24   the summer of this year.  It's on point in that it discusses
25   this guideline.  I'm not saying it's just some exposition of

1     this issue.  So, those are my two guideline issues.
2             But the whole speech I would give depends on my view
3     of obstruction of justice.
4             THE COURT:  Well, but what do you want to do?
5             MR. SHEKETOFF:  This is what I want to do, your Honor.
6     I want to actually look at the parts that I gave to the
7     Government, which I never did before, because I wouldn't know
8     how to take them apart, or at least look at the pictures that
9     the Government has of these ID numbers, and I want to do some
10    investigation to try and figure out in my own mind if there is
11    some rational explanation that I could give you, because
12    whether there is or there isn't makes a huge difference to me
13    in terms of what I say at sentencing.
14            THE COURT:  All right.
15            MR. SHEKETOFF:  And in addition, your Honor, I would
16    want to give my client a lie detector test.
17            THE COURT:  Well, am I going to get a memorandum, an
18    expert report, something like that?  I have the highest regard
19    for your technical expertise, but I am not sure that it
20    includes analysis of motherboards.
21            MR. SHEKETOFF:  No, I don't think it does.  For
22    instance, I don't know if this is a plastic tag that goes on
23    the board or if it's embedded into it.  I don't know if -- the
24    way Dell keeps records -- this is my fault, and I don't suggest
25    that it isn't, but I just missed the fact that they were

1  tracing the motherboards, too.  I thought they were tracing the
2  chassis, the keyboard, things that I had already told them were
3  irrelevant to the presentation that I was making to them.
4       Even if I come to the conclusion that the Government
5  is completely right, which I hope I don't, but if I were to
6  come to that conclusion, I would give a completely different
7  sentencing argument to your Honor than I would if I thought I
8  had a possibility that they were wrong.  To me, and I know to
9  the Court, it matters whether or not he obstructed justice.
10      THE COURT:  There is no question in my mind that it is
11 not merely a guideline issue for me but something broader in
12 terms of any of a number of dimensions to sentencing analysis,
13 the most specific, obviously, being specific deterrence.
14      So, let me see if I have got this right.  For purposes
15 of continuance, you want to take up the question of paragraph
16 38, which is the location enhancement.  Paragraph 41, which is
17 the obstruction enhancement, that is a swing of four points for
18 the *Guidelines* that would, if your position is accepted, take
19 it down to 24 here.
20      MR. SHEKETOFF:  23 or 24?  I'm not sure.
21      THE COURT:  23, take it down to 23.  I just want to be
22 sure I have got cabined the disputes that the parties have.
23      MR. SHEKETOFF:  Those are my guideline disputes.
24 Depending on how those will resolve -- to me, depending on how
25 the obstruction of justice is resolved, if it ended up being

1    resolved in my favor, I can see myself making certain speeches,
2    and if it ended up not being resolved in my favor, I can see
3    myself not making those speeches.  But they are not really
4    guideline speeches, they are --
5             THE COURT:  Well, but it affects the *Guidelines*.
6             MR. SHEKETOFF:  Right.
7             THE COURT:  The first order of business is to properly
8    calculate the *Guidelines* --
9             MR. SHEKETOFF:  Correct.
10            THE COURT:  -- and that is what is involved here.
11            MR. SHEKETOFF:  Yes.
12            THE COURT:  Now, the second issue that I see or second
13   layer of issue that I see, you alluded to it and I was not
14   certain that I fully understood what you were saying, but the
15   question of loss.
16            MR. SHEKETOFF:  Right.
17            THE COURT:  The loss here is calculated between a
18   million and a half a million dollars.
19            MR. SHEKETOFF:  Right.
20            THE COURT:  Is that in dispute?
21            MR. SHEKETOFF:  Well, not like the others are in
22   dispute.
23            THE COURT:  Pardon me?
24            MR. SHEKETOFF:  Not like the others are in dispute.
25            THE COURT:  Well, but this is the law of the excluded

1  middle at this point.

2          MR. SHEKETOFF:  Right.

3          THE COURT:  It either is or it ain't.

4          MR. SHEKETOFF:  Well, I objected to it.  I have some
5  theory that I could say out loud in 30 seconds, which is, what
6  Dell did, and it's the Dell number that's driving this, I
7  believe, is they didn't send new parts, they sent parts that
8  had been returned to them that they had refurbished.  When you
9  make a warranty claim you get a refurbished part, you don't get
10 a new part, and I think they have overestimated the value of
11 their refurbishments.

12         THE COURT:  But how do we get to that value?  I look
13 at the calculation of loss here.  Even looking at the
14 difference between retail price and replacement price, we are
15 up into over a million dollars.

16         MR. SHEKETOFF:  No, I agree that's correct, but my
17 view is that I am not exactly sure what replacement price is.

18         THE COURT:  It is called "replacement cost."  That is
19 the figure that they use.  Reading from the Presentence Report,
20 replacement costs for Dell total $1,379,000.

21         MR. SHEKETOFF:  What I am saying, your Honor, is I
22 believe, and I could be wrong, because I often am, that that is
23 what it would cost Dell to make that part -- let's say they
24 sent Mr. Kuc a motherboard.  They claim the replacement cost is
25 $200.  I think what they are saying is, "If we were to

1    reproduce that motherboard, it would cost us $200 and,
2    therefore, the replacement cost is $200."  But what I'm
3    suggesting is they sent a refurbished motherboard, one that
4    they had already made their money on and then fixed up a little
5    bit, and that doesn't really have --
6         THE COURT:  Well, even if I embrace that argument,
7    which I am not yet prepared to do, how do I resolve that?  This
8    is costing -- the warranty department is a profit center?  What
9    are you going to offer about that other than just mere
10   argument?
11        I would add one further thing.  I think we all got a
12   memorandum from the Probation dated today, I think -- no, it
13   was on the 22nd, but I looked at it today -- from Lenovo, in
14   which Lenovo has additional amounts that they want to include
15   in making their calculation both for restitution purposes but
16   also for loss purposes as well.  If you include the Lenovo
17   figure, which is $193,036, we are up to $1,901,000.
18        I guess what I am getting down to is one can nibble at
19   the margins on this, but I do not think it takes you out of the
20   guideline range of $1 million to $2.5 million.
21        MR. SHEKETOFF:  Your Honor, as I said at the
22   beginning, this is not my strongest argument, but I was hoping
23   that the Government would actually ask Dell what the real value
24   of the refurbished part is.
25        THE COURT:  What does "real value" mean?  It means to

1  me, anyway, what a willing buyer would pay in the market for
2  it.  Whether they get it back easily because they are redoing
3  something is a separate issue for me.
4          MR. SHEKETOFF:  Well, I just believe that that number
5  would be, in fact -- I agree with you that should be the
6  number, but I believe that that number is, in fact, way below
7  the quote, unquote, replacement cost.
8          THE COURT:  Well, if there is a dispute about it, I
9  will resolve it, but as it stands right now I have a submission
10 that is the *prima facie* evidence of that.
11         MR. SHEKETOFF:  Right, but I don't have access to Dell
12 to ask them.  They do sell the stuff.  For instance, in tracing
13 the stuff for the obstruction of justice, it turns out that
14 when Dell gets these things back, they do unload them to
15 wholesalers.  I think we heard evidence of that at trial, too.
16 So, they probably know what the real cost --
17         THE COURT:  Another way of looking at it is what was
18 Mr. Kuc charging for it?
19         MR. SHEKETOFF:  And Probation went to that as another
20 possible way to do it.  I think in many ways that is a much
21 fairer way.
22         THE COURT:  It does not change the loss calculation --
23 I mean the loss category.
24         MR. SHEKETOFF:  It only doesn't change the loss
25 calculation if you assume that every single item that was sold

1   on eBay during that period of time was from this scheme, and
2   the Government knows that that's not true.  This may not be my
3   strongest point, but --
4           THE COURT:  Well, I want to shape the rules of
5   engagement over this, over the outstanding issues.  The first
6   issue, obstruction, you will make whatever argument you make on
7   that.
8           The second issue, call it the relocation issue, I have
9   been pointed to a case that I will review and go from there.
10          With respect to loss, if there is going to be a
11  dispute about loss, I want to know about it and what evidence
12  is going to be offered with respect to it.  I will tell you
13  that I view the claim for replacement cost by Dell to stand
14  unrebutted.  Now, if you want to rebut it, you may say that you
15  want to bring somebody in from Dell to testify about it.  I do
16  not know.  But in the absence of some further development of
17  evidence, I am going to take it as it is.
18          MR. SHEKETOFF:  Understood.
19          THE COURT:  And that similarly goes for -- I will
20  listen to argument, obviously, about the Lenovo belated
21  submission, but it seems plausible to me, and that is the
22  standard that I am using, unless you want to attempt to punch
23  holes in that.
24          Now, how long is it going to take?  You say two weeks.
25  I do not want this to come simply by the oral tradition.  I

1  want a briefing of some sort.  How long?
2          MR. SHEKETOFF:  Well, I really do want to give him a
3  lie detector test, and I want to ask the Government if they
4  want to pick the examiner, because then it is completely above
5  board, everyone gets to see it, no questions about it, I don't
6  give a dry run, and they have picked someone that they think is
7  reliable, as opposed to me picking the usual suspect.  So, I
8  want to negotiate with them about that.
9          So, how much time are you willing to give me, your
10 Honor?
11         THE COURT:  Well, it seems to me that all of these
12 things can be tied up in three weeks.
13         MR. SHEKETOFF:  Fair enough.
14         THE COURT:  So, I would want a memorandum by November
15 16, and the memorandum should indicate whether or not you want
16 live testimony in the case.
17         MR. SHEKETOFF:  Yes, your Honor.
18         THE COURT:  Then the Government response, because the
19 next week is a holiday, November 30th.  Then we will set the
20 sentencing for 10:00 on Monday, December 3rd.  If there is a
21 request for live testimony, I want to know about that as
22 quickly as possible on that.
23         MR. SHEKETOFF:  Yes, your Honor.
24         THE COURT:  But we are limited to those three topics,
25 as far as I am concerned.

1        Let me just be sure I have got all the materials here.
2   I have a Sentencing Memorandum from the Government, I have a
3   letter from Ms. Leshi.
4        Are there any other written documents I should have.
5        MR. SHEKETOFF:  No.
6        MR. GARLAND:  I think just the letter from Lenovo that
7   you mentioned before.
8        THE COURT:  Yes, Lenovo.  Apart from the materials
9   that Probation has provided here.
10       All right.  So, we will use that schedule, and we will
11  get to the conclusion of this, I hope, on December 3rd.
12       MR. SHEKETOFF:  Thank you.
13       THE COURT:  All right.  We will be in recess.
14       THE CLERK:  All rise.
15     (The Honorable Court exited the courtroom at 3:00 p.m.)
16      (WHEREUPON, the proceedings adjourned at 3:00 p.m.)
17
18
19
20
21
22
23
24
25

C E R T I F I C A T E

I, Brenda K. Hancock, RMR, CRR and Official Reporter of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of United States of America v. Matthew Kuc, No. 1:11-cr-10014-DPW-1.

Date:    February 19, 2013        /s/ *Brenda K. Hancock*

Brenda K. Hancock, RMR, CRR

Official Court Reporter