```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2

 3

 4    THE UNITED STATES OF AMERICA      )
                                        )
 5                                      )
                                        )
 6    vs.                               )  No.
                                        )  1:11-cr-10014-DPW-1
 7                                      )
      MATTHEW J. KUC,                   )
 8                                      )
                        Defendant.      )
 9


10
      BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
11

12
                     DAY TWO OF SENTENCING HEARING
13

14

15
              John Joseph Moakley United States Courthouse
16                       Courtroom No. 1
                        One Courthouse Way
17                       Boston, MA 02210
                        December 3, 2012
18                         11:15 a.m.

19

20

21               Brenda K. Hancock, RMR, CRR
                     Official Court Reporter
22       John Joseph Moakley United States Courthouse
                     One Courthouse Way
23                    Boston, MA 02210
                       (617)439-3214
24

25
```

1    APPEARANCES:

2         UNITED STATES ATTORNEY'S OFFICE
          By:  AUSA Amy H. Burkart
3              AUSA Scott Garland
          Suite 9200
4         Boston, MA 02210
          On behalf of the United States of America
5
          ROBERT L. SHEKETOFF, ESQ.
6         One McKinley Square
          Boston, MA 02109
7         On behalf of the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | P R O C E E D I N G S: |
| 2 | THE CLERK:  All rise. |
| 3 | (The Honorable Court entered the courtroom at 11:15 a.m.) |
| 4 | THE CLERK:  This Honorable Court is now in session. |
| 5 | You may be seated. |
| 6 | This is Criminal Action 11-10114, The United States |
| 7 | Versus Matthew J. Kuc. |
| 8 | THE COURT:  Well, I have received the Revised |
| 9 | Presentence Report, which bears the revision date of November |
| 10 | 27, I have received a letter from Ms. Leshi with some |
| 11 | attachments and the Government's Supplemental Response to the |
| 12 | Defendant's Memorandum regarded *Guideline*s issues.  Of course, |
| 13 | I have the Defendant's Memorandum and the Government's |
| 14 | Sentencing Memorandum as well. |
| 15 | Are there any other written materials I should have? |
| 16 | MR. SHEKETOFF:  The defendant submitted a letter to |
| 17 | the Court. |
| 18 | THE COURT:  Yes, I have that as well. |
| 19 | MR. SHEKETOFF:  Okay. |
| 20 | THE COURT:  I should have mentioned that specifically. |
| 21 | And I had an earlier letter from Ms. Leshi as well on October |
| 22 | 24th. |
| 23 | MR. GARLAND:  Pardon me, your Honor.  There were also |
| 24 | victim impact statements. |
| 25 | THE COURT:  I think they are attached, are they not, |

1    to the --

2            MR. GARLAND:  I believe those were provided separately

3    to the Court.

4            THE PROBATION OFFICER:  There were victim impact

5    statements from Hewlett-Packard --

6            THE COURT:  Right.

7            THE PROBATION OFFICER:  -- which offered retail and

8    replacement, and there was a victim impact statement from

9    Lenovo --

10           THE COURT:  Right.

11           THE PROBATION OFFICER:  -- with their replacement

12   costs, and then there was a chart from APC that had their

13   retail and replacement costs.

14           THE COURT:  Right.  Let me be sure that I have seen

15   them all.  I have the Hewlett-Packard one, which was attached

16   to the Presentence Report, or at least when it reached me it

17   was, the Lenovo one, and the APC one, so that should be it.

18           Then, outstanding we have the issues of the Motion For

19   the Money Judgment, and Preliminary Order of Forfeiture and

20   Motion for Return of Property.

21           I guess the issue, really, for me is to be sure that I

22   have dealt with the objections to the Presentence Report at the

23   outset.

24           The question of relocation I do not think needs any

25   further discussion.  It is clear to me that as part of the

1    scheme the defendant chose a mechanism by using another address

2    in another state to relocate, and that justifies a two-level

3    increase.

4         The question of obstruction of justice, Mr. Sheketoff,

5    do you want to be heard any further regarding it?  I have the

6    FBI 302s indicating that the subject computers were sold about

7    six weeks before they were used or the Government was notified

8    about them in the pretrial discussion.  Is there anything else

9    to say about it?

10        MR. SHEKETOFF:  Well, yes and no, your Honor.  No

11   for -- I do want to save my rights on it, but basically no.

12   But, yes, it's not the computers, it's really the motherboards

13   that are at issue, because --

14        THE COURT:  How could I not find that these were

15   contrived for purposes of misleading the Government and

16   obstructing justice here?  I understand that one can make

17   various kinds of arguments about the motherboard and where the

18   motherboard might have come from and what you could take off

19   the motherboard, but the short of it is there was a

20   contrivance, a contrivance designed to mislead the Court --

21   mislead the Government, first, and then the Court.

22        MR. SHEKETOFF:  Okay.  So, that's why I said, "Yes,"

23   and "No."  Because you said "computer," I just -- it's

24   motherboard.  For purposes of this hearing, that's not a

25   distinction that matters, I concede that.  But the computer was

1  never represented to be something that he had all along; it was

2  the motherboard inside this chassis that was represented.  You

3  have already made it clear what you are going to find.

4          THE COURT:  Well, I want to be sure I am not missing

5  something.  Is there any basis for me not to find that?  What

6  could I say other than there was a contrivance?

7          MR. SHEKETOFF:  I understand.  I'm just saving my

8  rights on it.

9          THE COURT:  All right.  So, with respect to the

10  obstruction of justice outstanding issue there, I am not going

11  to modify the Presentence Report.

12          Then we have, in addition, the question of restitution

13  here and amount of loss.  I understand there is no further

14  dispute with respect to that; is that right?

15          MR. SHEKETOFF:  Correct.

16          THE COURT:  So, are there other issues, guideline

17  issues that we should take up?

18          MR. SHEKETOFF:  Well, the relocation, I really

19  disagree with your Honor on that.

20          THE COURT:  I understand that.  I have read your

21  brief, and I understand the position with respect to it.  I

22  find that this is applicable here.

23          MR. SHEKETOFF:  Your Honor, he was still using the

24  other addresses.

25          THE COURT:  I do not care whether it was a successful

1   relocation, an unsuccessful relocation, partial relocation,

2   whether there was something else going on.  The short of it is

3   he undertook to use another jurisdiction for purposes of the

4   fraud in furthering the fraud, and that, it seems to me,

5   justifies the two-level increase in the offense level.

6          I understand your disagreement with that, or I

7   understand that you do disagree.  I am not sure I understand

8   the agreement.  But, in any event, that, it seems to me,

9   resolves that, or that guidelines issue is resolved adversely

10  to the objection, so I want to be sure I am not missing

11  something else, some other objections that I need to take up.

12         MR. SHEKETOFF:  I don't believe so, your Honor.

13         THE COURT:  So that we are clear about this, I am now

14  dealing with a total Offense Level of 27, a Criminal History

15  Category of I, with the addition of the 24 months that must be

16  consecutive for the Identity Theft.  The guideline range is 94

17  to 111 months' incarceration, 1 to 3 years of supervised

18  release, a fine of $12,500 to $125,000, that there is a total

19  of $1,917,388.90 of restitution that is owed as set forth in

20  the Presentence Report, to Dell $1,241,113.20, Hewlett-Packard

21  $467,032.79, Lenovo Group $193,036, and APC $16,207.09, and

22  then there is a Special Assessment of $600, $100 for each

23  count.

24         So, are we dealing with the same set of numbers here?

25         MR. SHEKETOFF:  I don't like the numbers, but we are

1    dealing with those numbers.

2            THE COURT:  I understand, but those are the ones that

3    are applicable here, I take it.

4            MR. GARLAND:  Your Honor, in the PSR it mentions a few

5    numbers that were asked for by Lenovo in their victim impact

6    statement that's in addition to the amount of equipment.  That

7    was I think $18,720 for labor and investigation costs and

8    $9,652 for shipping costs.  The Court noted that there was a

9    question about that last time, about whether that should be

10   added in there.  I think it was in the submission.  We would

11   suggest that it's appropriate here to award that.

12           THE COURT:  Have the other ones asked for that?

13           THE PROBATION OFFICER:  No, your Honor.

14           MR. GARLAND:  No, not that we know of.

15           THE COURT:  I am not going to include that in this

16   here.  So, I leave it at the $16,207.09.

17           So, I will hear from the Government with respect to

18   its recommendation.

19           MR. GARLAND:  Thank you, your Honor.

20           The Government is recommending 96 months of

21   imprisonment, 36 months of supervised release thereafter, no

22   fine because of an inability to pay, a $600 mandatory Special

23   Assessment, and the restitution and forfeiture as the Court has

24   noted, as well as the return of the Dell, HP and 3COM equipment

25   that the Government has taken from his place.

1          THE COURT:  So, that ties in, I guess, to the question

2    of the Motion for Return of Property?

3          MR. GARLAND:  That's correct, your Honor.

4          THE COURT:  The Government is not opposing return of

5    the iPhone, the SUPER MICRO custom server, the CHENBRO custom

6    workstation and the CISCO Voice over Internet telephones?

7          MR. GARLAND:  That's correct.  If it's not Dell, 3COM,

8    HP or Lenovo equipment, it should go back to the defendant.

9          THE COURT:  All right.

10         MR. GARLAND:  In addressing the Government's

11   recommendation, I want to start very briefly with the crime,

12   because the Court, obviously, knows what the crime was, but I

13   want to talk about how the crime tells you something about who

14   Mr. Kuc is, and then I want to talk a bit about Mr. Kuc.

15         The crime started in mid-2005 and continued through

16   2010.  It consisted of about 9,000 fraudulent transactions,

17   which we computed to be about four frauds a day, involved

18   millions of dollars' worth of computer equipment.  He was

19   Lenovo's number one warranty fraud problem.

20         That's not the whole story of what this crime was.  We

21   have a lot of white-collar defendants who come to the court who

22   are caught, and when they are caught you are pretty sure that

23   they are not going to offend again.  But there are some aspects

24   of this crime and how it played out and how it played out

25   before this Court that I think give every indication that

1   Mr. Kuc will offend and reoffend as long as he is given a

2   chance to do so.

3        Let me start with the name and the address variations.

4   Essentially, each one of these times that a company would stop

5   shipping equipment to Mr. Kuc, every time it would call him and

6   ask him where the equipment was, every time it would send him

7   an invoice, which was over and over and over again, that was a

8   wake-up call, and that was a time that Mr. Kuc, when

9   essentially called on what he was doing, could have essentially

10  said, You know what, I got away with it up to this point, this

11  is kind of telling me that people are catching on, and many

12  defendants who are caught in that way, they stop, they stop at

13  that point.

14       But that's not what Mr. Kuc did.  What Mr. Kuc did was

15  he came up with yet more names, with yet more companies, with

16  yet more addresses and address variations.  At every wake-up

17  call he basically hit the moral snooze button and just kept

18  reoffending.  That basically shows you that he had disregard

19  for the computer companies.

20       I am not going to try to pretend to you that a

21  commuter company is, necessarily, as sympathetic as a widow or

22  an orphan, but he had a lot of disregard for the computer

23  companies, and that has some effect on the rest of us and the

24  amount of money that we pay for our computer products, too.

25       But then you get to another aspect of this crime, and

1    that was the fact that he was using the names of his parents,

2    of Mr. Samuel, who was a friend and business associate, he was

3    using the names of other companies that he had in common with

4    Mr. Di Ciaccio.  And what does that tell you about the

5    defendant?  It shows you that he had high disregard for his

6    friends and his family and his business associates, too,

7    because he was willing to, essentially, embroil them in this

8    sort of a crime and, essentially, open them up to the scrutiny

9    of the Government as well.

10        So, so far we know that he has disregard for the

11   computer companies, and for his friends and for his family.

12        Well, what is the next wake-up call that Mr. Kuc gets?

13   In December of 2010 he's arrested.  He's arrested, he's put in

14   jail for a few days.  We work out conditions of release.  One

15   of those conditions of release was, of course, he had to put up

16   sureties, but another one was that he not sell computer

17   equipment for a period of time, because there was a concern

18   that he not reengage in this.

19        After that period of time lapsed, I cannot recall at

20   this point whether it was three months or six months, Mr. Kuc

21   started to reoffend.  He essentially assumed that we didn't

22   know about APC Schneider, and at that time we didn't know about

23   APC Schneider, but at the beginning of this year, in 2010, he

24   reoffends.  He has had the ultimate wake-up call of being

25   arrested and going to jail, and, in fact, facing a trial here,

1    but he reoffends for another 24,000-or-so worth of money, and

2    then, as the months tick down and he is getting closer and

3    closer to trial, what does he do?  He obtains some computer

4    equipment, offers it to the Government in basically a gesture

5    that, look, if you accept what I'm saying about this computer

6    equipment, it casts reasonable doubt on two of your counts.

7    The intent of doing that is not just that we think about that

8    but, of course, the jury and the Court do that, too.

9         What does that show you about Mr. Kuc?  It shows you

10   that he has the utmost disregard not just for the computer

11   companies, not just for his friends and his family and his

12   business associates, but for Court, for the jury and for the

13   Government as well.  What that shows you is somebody who has

14   that amount of disregard for essentially all of society.  This

15   is somebody who is going to reoffend and reoffend as much

16   chances as he can.

17        Now, I think it also shows about the defendant that he

18   feels that he is essentially entitled to whatever he can get.

19   If he can talk somebody into giving him something that he is

20   not entitled to, that's his, and he should essentially have it.

21   He is just going to keep on doing that.

22        Now, there are a couple of responses that Mr. Kuc has

23   brought up, not as a defense but to essentially mitigate what's

24   happened here.  One of the things he said in his letter to you,

25   "Judge, this isn't the real me, this isn't who I am.  This is a

1    mistake that was brought on, and if you look at the rest of my

2    life, I've really lived blamelessly."  And that, too, is

3    something that many white-collar defendants who are having

4    their first time in Federal Court will say to the Court, and a

5    lot of times it happens to be true of somebody who is in

6    Criminal History Category I.  That's not the case here.

7         To just go back over it again, he offended from 2005

8    to the end of 2010.  He continued reoffending or started to

9    reoffend again in 2012.  Mr. Kuc is only, I think, about 32.

10   That's a significant portion of his adulthood, a very

11   significant portion of his adulthood, around six and a half to

12   seven and a half years, depending on how you calculate it.  I

13   would suggest that a crime that is done that often, that

14   frequently, with utter disregard for friends and family,

15   business associates, that shows you who he is.

16        Now, another thing that I think is worth thinking

17   about here is also who Mr. Kuc is.  According to everybody, he

18   was a pretty good computer repair person.  His people at

19   Sensible Computers liked him.  They employed him for a very

20   long time, they gave him a salary, they gave him a car.  He was

21   good, he had skills.  He had a way of making money that was a

22   legitimate way of making money.

23        And building on that, you recall there was testimony,

24   and it's in the PSR as well, that he had two other companies.

25   Setting aside Total Asset Recovery, which we saw was pervaded

1  by fraud, but he had KD Group and he had Cyon Data Systems as

2  well, so other means of making money at that time.  As well in

3  the PSR it discloses that he was trained to be an EMT, yet

4  another way that he could have legitimate income that didn't

5  require him to go out and steal things.  He had all these ways

6  of making money, but that's not what he was doing with most of

7  his time, and that's certainly not how he made most of his

8  money.  He stole rather than relying on that.  So, this isn't a

9  crime where somebody basically has no other way of making

10  money.  He had plenty of opportunities of making money.

11       Now, it's not a crime that's really necessitated by

12  gambling, either.  There is mention in the PSR that Mr. Kuc

13  gambled, but it's hardly a gambling problem.  I think it says

14  that he spent essentially $4,800 over five years.  That's not a

15  lot of money towards gambling, and it certainly pales in

16  comparison to the amount of money that he stole, either.  So,

17  he didn't need to do this because of lack of opportunity, or

18  education or because of a gambling problem.

19       Now, he mentions that there was a drug and alcohol

20  problems as well.  I am not qualified to addresses that.

21  That's what he says was a problem.  I don't know whether that

22  was true or not, but I think the Court needs to think about if

23  there was a drug and alcohol problem did that really affect

24  Mr. Kuc and how he operated?  The Government says it did not.

25       This is a man who had one job at Sensible Computers,

1    he had a huge job in stealing computers by fraud and then

2    reselling them, he had an ISP, an Internet service provider,

3    Cyon Data Systems, and then he had KD Group as well.  He was

4    functioning at a very, very high level by having all of these

5    different, essentially, fingers in a lot of different pies at

6    the time as well.  So, it doesn't appear that the drugs and

7    alcohol, if they were really a factor, were affecting his need

8    to steal.

9        Now, the other thing to think about I think as well is

10   the fact that this is not a crime of financial need, either.

11   In the PSR and also in his submissions and other submissions by

12   the character letter, it talks about the father's medical

13   issues.  The Government doesn't contest the father did have

14   serious medical issues as well, apparently enough to allow him

15   to go to Rhode Island and drive the packages back and forth,

16   but, nonetheless, it didn't allow him to work at the job he had

17   worked at for so long.  And that sets up an image of basically

18   a family and a person who could not live but for the

19   defendant's fraud; it was sort of a necessary response to an

20   impoverished condition.

21       But if the Court looked at the photos and saw the

22   photos that the Government submitted on Friday, they don't

23   suggest that this is a family that was having a difficult time

24   financially.  The father's loss of his job and the defendant's

25   fraud allowed them to live in a really, really beautiful house.

1          THE COURT:  Am I correct that the Government's intent

2    is to forfeit the house?

3          MR. GARLAND:  The Government is pursuing that, yes.

4    The Government is pursuing that, your Honor.

5          And in the house as well is this kitchen, which is

6    nicer than any kitchen that I have ever eaten in in my life.

7          And the garage, although you can see that the garage

8    is fairly big, it's only a two-car garage.  This room up here,

9    as we had testimony about, was devoted to the defendant's

10   office space.  Since it wasn't big enough to hold all of the

11   cars, you can see in here that there is a lift that allows you

12   to put one car on top of the other, and that car that's

13   underneath the canopy right here that has a little bit of

14   yellow, that's a Lamborghini.

15         So, this wasn't some sort of a Jean Valjean crime.

16   This was a crime of somebody who wanted the best of everything,

17   was willing to steal it, and who didn't really care who got in

18   his way as he did.  That's the definition of incorrigible, of

19   somebody who is either unwilling or incapable of being

20   reformed.

21         If we thought that just a short period of time in jail

22   might cure him of these notions, that he would go back out and

23   that he would be a productive member of society at that time,

24   then there might be an argument for a below-guideline sentence,

25   I suppose.  But that's not the case here.  You have somebody

1    who has utter disregard for essentially everybody, including

2    this Court and the jury.  Being in jail isn't going to cure him

3    of that.  It's going to give him some time to reflect, but it's

4    also going to give him time where he's not making money, where

5    he's not in society.  The desires that he has, the same sort of

6    urges that he has will renew again, and it may not be when he

7    gets out computer components that he steals.  There are lots of

8    different products out there that you can steal by warranty

9    fraud.  So, I think the way to consider this is that every

10   month that the defendant is in jail is a month that he is not

11   ought there committing fraud, four acts of fraud a day.

12         Now, this is a long sentence.  It's a long sentence

13   for somebody who is here the first time in Federal Court, but

14   Mr. Kuc has essentially earned every month of it.

15         This is also a parsimonious sentence.  Despite the

16   fact that it's 96 months, the Government has chosen a

17   conservative estimate of loss, not the highest estimate of

18   loss, which would have gone up to $3 million and added yet

19   another two points.  As well, we have chosen the low end of the

20   guideline sentencing range, right there, two months above the

21   guideline sentencing range, the bottom.  The Government could

22   have come back with a much higher recommendation.  So, we do

23   think that this sentence as well satisfies the role of

24   parsimony that the Court has to operate under as well.

25         Those are the reasons that we recommend the sentences

1    recommended above, 96 months of incarceration, 36 months of

2    supervised release.

3          THE COURT:  All right.  Thank you.

4          Mr. Sheketoff.

5          MR. SHEKETOFF:  The only advantage I have today over

6    my colleagues at the other end of the table is I'm much older

7    than they are, and I have seen a little bit more than they

8    have.

9          Eight years is an enormous sentence, which you are

10   fully aware of, your Honor.  "No greater than necessary" is the

11   overriding message of our sentencing statute.  I don't know

12   where the Government gets its crystal ball.  I have been doing

13   this a very long time.  I don't have a crystal ball.  I've

14   learned that I'm incapable of judging the future any better

15   than anyone else is.

16         THE COURT:  Well, we are required to, and there are

17   two factors that are particularly important to me here.  One is

18   the post-arrest computer fraud, and the other is the

19   contrivance with respect to a motherboard but a piece of

20   equipment that would have and was, in fact, alluded to during

21   the course of trial, and I find wrongfully.

22         So, what am I supposed to do with the obligation to

23   think prospectively, because that is what the question of

24   specific deterrence is, when someone is continuing the same

25   kind of activity while he is under conditions of pretrial

1    release?

2              MR. SHEKETOFF:  Can I address that?

3              THE COURT:  Sure.

4              MR. SHEKETOFF:  The thing that strikes me the most

5    about this client -- and I have become reflective over the

6    years about what it is that motivates my clients, what do I

7    think about them, what is going on here -- it's clear to me,

8    from being present at the Presentence Report interview, from

9    dealing with this client for a very long period of time, much

10   longer than typically, because the case did go to trial, and

11   dealing with his parents and his present girlfriend and his

12   past girlfriend, that the most striking thing about this client

13   to me is he has no judgment whatsoever, none.  He just doesn't

14   have judgment.  He certainly is not going to get it from his

15   father, at least presently and ever since I've met him, because

16   his father has had strokes, and his father does not think

17   clearly anymore, period.  And he's not going to get it from his

18   mother, who I have come to know, who, for reasons that are not

19   important, has no judgment of her own.  And he didn't get it

20   from the Army, because he didn't stay long enough.  That wasn't

21   his fault, because, as you have read in the Presentence Report,

22   he was honorably discharged.  But he didn't get it from the

23   Army, and he didn't go to college.  He didn't have a chance to

24   be around peers and that kind of setting and learn a little bit

25   about judgment.  He has no judgment, none.  That doesn't make

1    him an evil person.

2         I think about the Ten Commandments.  He has got one

3    problem, it's "Thou shalt not steal."  That's his problem.  He

4    doesn't have the judgment to stop, but he's going to have the

5    judgment now because he's going to be incarcerated for some

6    significant period of time.  Does it really make a margin of

7    difference whether it's seven years, or eight years, or six

8    years or four years?  I don't think so, your Honor.  That's a

9    significant period of time.  If you don't learn your lesson

10   from four years or three years or five years, you're not going

11   to ever learn it.

12        He is a child that has not grown up, and when you read

13   the Presentence Report, a Lamborghini?  You've got to be

14   kidding me.  A lift in your own garage, out partying every

15   night, hundreds of different girlfriends?  No judgment, none.

16        Perhaps I should have been wiser when he gave me those

17   computers -- motherboards at the last minute.

18        THE COURT:  There was no suggestion here that you did

19   anything improper, put to one side the strategic dimension to

20   it.  But if a client says he has got an explanation, gives it

21   to his counsel, assuming that counsel will use it, that is not

22   just lack of judgment, that is a choice, just as continuing to

23   engage in the fraud is a choice.  This is being presented in

24   some ways as someone who is incapable of making decisions.

25        MR. SHEKETOFF:  Oh, no.  He is more than capable of

1  making decisions, but he has no judgment about those decisions.

2  Even this computer manipulation at the end, as you found it to

3  be, it doesn't submarine the Government's case; it nicks it.

4  THE COURT:  Well, then, the answer to that is it was

5  worse than wrong, it was stupid, but it was both.

6  MR. SHEKETOFF:  Right.  But that stupidity, that part

7  of it I think is who he has been.  A Lamborghini?  I mean, what

8  do you need that for?  He spent five years of his life stealing

9  from computer companies.  That's what he did, that's what the

10  jury found, and it's with no judgment, in my view.  Spending

11  the money, for the most part, except for the part that he

12  spends on his parents by fixing their house -- and there was a

13  huge change in their financial situation once the father was no

14  longer able to work.  That's not the motive.  This began long

15  before the father was unable to work.  But the rest of it is

16  just spent like a child would spend money.

17  And Aggravated Identity Theft adding two years to

18  this?  Aggravated Identity Theft?  If there's a continuum of

19  Aggravated Identity Theft, this has to be the low end of the

20  continuum.  It seems to me using all the false names is more

21  egregious than using his friend's name.  He doesn't steal his

22  friend's identity in any way.  That, to me, is just the name of

23  the offense.  And then you tell the jury, even if the friend

24  authorized it, it doesn't matter, it's still Aggravated

25  Identity Theft because you used the name of a real person in

1    committing a fraud.

2         The last sentencing I had before this one, and I hate

3    it when clients do this to me, but the last sentencing I had

4    before this one was the man got six years and six months for an

5    extortion, for a series of extortions.  He was alleged to have

6    been the head of La Cosa Nostra, the acting boss.  The

7    obstruction of justice in that case was an attempt to find

8    Frank Salemme and, perhaps, kill him.  That was the theory of

9    the obstruction of justice.  He got six years and six months.

10   Oh, and he had a prior extortion.  That was a guideline

11   sentence.

12        Eight years is way too much, your Honor.  He is only

13   30-something-years old.  The song says, "We only have a hundred

14   years to live."  We don't have a hundred years to live, we have

15   something less than that, all of us, and he does have his

16   health issues.  This is an enormous part of somebody's life,

17   enormous.

18        The message, if it's ever going to get through, is

19   going to get through in a much shorter period of time.  I

20   believe that you believe that.  You may believe that it's never

21   going to get through.  I think he may, in fact, grow up, but as

22   I said at the beginning, I do not have a crystal ball.  But the

23   message is going to get through whether it's two years, four

24   years, six years or eight years.  The only one it's really

25   going to matter to is Matthew Kuc, and we don't have forever to

1    live.

2         Thank you.

3         THE COURT:  Thank you.  Mr. Kuc, I will hear from you,

4    if you want to speak.

5         THE DEFENDANT:  Your Honor, putting aside this case, I

6    would like the Court to know and for you to know that I've

7    never committed a crime before.  I'm not familiar with the

8    entire process or what not.  I'd like to just apologize to the

9    victims and what not.  It's not the person I am.  Reflecting

10   from it now, being incarcerated, and looking at the life that I

11   lived is not the person I am.  It's basically -- I mean, I can

12   see, like, my substance abuse being a contributing factor to

13   that.  I didn't really think of the problem because I used it

14   for coping.  I guess I was a functioning alcoholic, because

15   what happened is I did try to -- I drank and what not and I

16   still functioned normally, but it did suppress other feelings

17   and what not of committing wrong or what not.  I was basically

18   self-medicating myself that way.  I can see how it affected my

19   family.  It's nothing I'd ever wish upon anybody how it

20   affected them versus it affecting me also.

21        I am truly sorry for what has happened and the whole

22   case, basically.  I don't know how much I can say than what I

23   wrote in the letter to you.  I'm not very good at public

24   speaking, as you can tell, but I am truly sorry.  It's not the

25   person I am right now.

1        I did suffer -- well, I'm going to counseling right

2   now for substance abuse and alcoholism, and reflecting back to

3   what I was doing and how I acted, it did affect me in a major

4   way.

5        And I think that's pretty much it.  Pretty much what I

6   was going to say is outlined in the letter.  Like I said, I'm

7   not very good at public speaking, so I would like to end it at

8   that.  Thank you.

9        THE COURT:  Thank you.

10       Well, I have always been somewhat skeptical of the

11  loss-driven guidelines, because they take on a kind of

12  *Sorcerer's Apprentice* quality in increasing the amount of time

13  that people can be assigned a guidelines sentence for, but this

14  is not one of those cases.  The Sorcerer's Apprentice here was

15  the defendant.  Every day for an extended period of time the

16  defendant engaged in a fraud, and it added up.

17       I do think that the calculation here is a conservative

18  one in terms of loss, but it is not just loss on the market, it

19  is direct loss by companies that is aggregated over an extended

20  period of time.  So, my concern about the hydraulic pressures

21  of lost monies in economic cases like this is mitigated.  I'm

22  not in all cases of the view that the *Guidelines* in this area

23  are reasonable, but they are here.

24       The question of Identity Theft is a particular

25  construct that Congress has created.  Congress has been

1   sufficiently animated to tell judges they have no, I will not

2   say "judgment," but can exercise none in this area by providing

3   a mandatory 24 months' consecutive sentence.  These reflect

4   some important community values:  the idea that you do not take

5   another man's name and use it improperly.

6          So, I return to the fundamental questions, quite apart

7   from the *Guidelines*, which I think are properly calculated here

8   and in the range of reason in ways that I do not always think

9   in fraud cases, to the considerations of Section 3553.

10          We first start with the seriousness of the offense.

11  Well, this is a serious offense.  It is a continual, everyday

12  choice on the part of the defendant to do wrong and to do it by

13  taking other people's identities.  But more than that, even

14  when arrested the defendant continued it.  The argument is made

15  very forcefully and, to some degree, I think compelling that

16  this is an individual who lacks judgment.  That is the very

17  best that could be said.  I do not necessarily buy that.  This

18  is an individual who made some choices that he could live high,

19  live large, and do it by funding his lifestyle through a

20  pattern of persistent criminality corrosive to the

21  relationships that others might value with friends and with

22  family.

23          I turn, then, to the nature and circumstances of the

24  defendant himself.  Here, as with everyone, it is mixed.  There

25  is a certain almost delusional quality to the party life with

1    the Lamborghini that took over the defendant.  The substance

2    abuse was part of the scene that he embraced and chose to

3    embrace.  Of course, it is emphasized here because it is one

4    potential form of mitigation.  I do not find it to be

5    mitigation here.  This is someone who chose the party life and

6    could fund it, and it gives me pause about whether or not the

7    defendant ever will get it.  He says he gets it now.  I do not

8    necessarily accept that at this point.

9         Now, over against this is a willingness on the part of

10   the defendant to -- not just willingness -- a coming forward to

11   assist his parents and assist his father in a difficult medical

12   situation, to provide funds for his parents and their house and

13   all of that.  That he was able to spend and willing to spend

14   his own time counts for a great deal.  His money counts for

15   nothing, because it was dirty money, but it suggests an

16   individual who has redeeming characteristics if he is disabused

17   of the idea that easy money can make for an easy life.

18        I then turn to the question of general deterrence.

19   What does this say to other persons who are thinking about

20   buying a Lamborghini with dirty money or partying with dirty

21   money, or making what we assume is some sort of cost-benefit

22   analysis of is it worth it to me to do this, take this chance?

23        Now, there is no perfect market in the information

24   that is provided by sentences, and I tend to think that the

25   length of sentence is less important than the certainty of

1  sentence, and we certainly do not have certainty in this area,

2  but it counts for something.  It counts for something to say

3  there is a very long sentence that awaits you if you choose to

4  engage in this kind of persistent fraud and you continue it

5  after you are under terms of supervised release, and you add,

6  as a flourish, a pathetic effort to mislead with equipment

7  that, given an adequate amount of time, can be demonstrated to

8  be not part in any way of the overall scheme that he had but,

9  rather, a red herring, a pair of red herrings thrown out.

10       The short of it is this is not merely Aggravated

11  Identity Theft, this is aggravated abuse and contempt of the

12  Courts and the criminal justice system, and for purposes of

13  general deterrence it is important to have a severe sentence.

14       That takes me to the question that I think is the

15  stone for stumbling that was identified by Mr. Sheketoff, which

16  is, who has a crystal ball?  That is the question of specific

17  deterrence.

18       The Government is rather harsh in the way in which it

19  describes things.  I do not consider it to be unfounded in that

20  harshness, and maybe that is a bracing bath to dump this case

21  in to understand it, but the Government's argument basically is

22  no time would be sufficient to warehouse this defendant to keep

23  him from doing things.  Well, of course the various factors of

24  Section 3553 are considered *inter se*, but they are

25  incommensurable, you try to find a balance among them, and the

1    overarching principle is that of parsimony, which the parties

2    have recognized that the sentence be no greater than necessary

3    but sufficient to serve all of those purposes.

4         I tend not to take the harshest possible view, the one

5    mounted by the Government, with respect to the defendant.  I do

6    think that he is likely to get it at some point, likely to

7    understand that you just cannot do this.  Will it take four

8    years, or five, or six, or seven, or eight or twelve?  That is

9    the crystal ball problem.  Will it ever happen?  That is the

10   larger crystal ball question in the specific deterrence area.

11        But this much I think I know, and that is that there

12   is nothing inconsistent with a long sentence to serve specific

13   deterrence of this defendant.

14        I turn to the question of penological benefit.  I

15   would never send anybody to prison for their own good, but I

16   evaluate prison and what is available to the defendant or

17   facing the defendant as a way of understanding the impact of

18   the sentence here.  His newfound recognition of a substance

19   abuse problem is something that can be addressed in prison.

20   There is the opportunity for some form of vocational education.

21   Prison is not a means of self-improvement, for the most part,

22   and is unlikely to be for this defendant, but it is a mechanism

23   to call to the defendant's attention the shortcomings that he

24   has, if he addresses them.

25        Now, there is a danger, of course, that the defendant

1     is going to fall in with others with similar interests and

2     avocations.  He has been more or less a loner now, and maybe he

3     will encounter people who will offer him the opportunity when

4     he emerges to engage in even more sophisticated fraud.  I am

5     concerned about that, and I weigh it.

6          I then turn to the question of disparity.

7     Mr. Sheketoff pointed out one set of immediate disparities

8     between another kind of case that he had and this case.  I do

9     not know enough about the other case to make comparisons.  I do

10    know a little bit about sentences imposed in fraud cases and

11    the purposes of the *Sentencing Guidelines* as conceived by its

12    progenitors.

13          Under the general rubric of avoiding unwarranted

14    disparities, there are two camps.  One camp thought that

15    sentences for non-white-collar crime were too low, the judges

16    were too soft, another camp thought that white-collar crimes

17    were too low, that the judges were too soft, and in the case of

18    white-collar sentences there was significant factual basis for

19    finding that people who shared aspirations, largely, and

20    backgrounds, largely, of people federal judges were familiar

21    with were getting lighter sentences.

22          So, the unlikely bedfellows, put simply, Senator

23    Kennedy and Senator Thurman, who conceived the Sentencing

24    Reform Act, produced their compromise, which was to have in

25    this case, this type of case, severe sentences for people who

1  are involved in white-collar activity, and that is reflected in

2  the *Guidelines* themselves, but it also reflects a larger

3  societal view.

4         It was expressed by Judge Friendly at one point that a

5  person can commit as much economic damage with a fountain pen

6  or, in this case a mouse, as he can with a crowbar, and that is

7  what this defendant did.

8         I have looked at other sentences in this general fraud

9  area, I have indicated my concerns about the *Guidelines* in this

10  fraud loss area, the tendency for them to create a kind of

11  bubble, inflating and overinflating the essential wrongdoing,

12  but I come back to where I started.  This is a case involving

13  repeated, well thought out, willful criminal activity, which,

14  albeit nonviolent, is about as serious as comes before the

15  Federal Court and is meant to be treated with great

16  seriousness, and it is compounded by what I will broadly call

17  contumacious conduct on the part of the defendant.

18         The short of it is I find the Government's

19  recommendation to be appropriate.  I impose a sentence of

20  72 months with respect to Counts One, Two, Four, Five and Count

21  Six, and to that I attach consecutively 24 months through

22  Count Seven.  I will impose a period of supervised release of

23  3 years.  I will not impose a fine, because the restitutionary

24  amount is daunting, daunting because the defendant was

25  assiduous in his criminality, and the restitution will be made

1    as identified in the Presentence Report to the several

2    corporate entities.  There is a Special Assessment of $600,

3    which is due immediately.

4          I will make a recommendation that the defendant

5    participate in the substance abuse program while in the Bureau

6    of Prisons' custody.  He is a functioning substance abuser, in

7    fact, it was part of his lifestyle, embraced as such, as far as

8    I can see, but except as it was the pharmacological equivalent

9    of a Lamborghini, it was not a cause for the crime that he

10   could not, himself, have prevented, but, nevertheless, it is

11   something that can fuel continued misconduct and continued

12   failure to face himself.  So, I make the recommendation.  It is

13   up to the defendant whether he participates in it while he is

14   in the Bureau of Prisons.

15         I will make a recommendation that he be incarcerated

16   in a prison facility that is capable of dealing with his

17   medical needs and as close as possible to his parents so that

18   they may maintain a relationship.  But, of course, that is a

19   recommendation.  The Bureau of Prisons does what it wants.

20         I have indicated the restitution, but I will recite it

21   again.  It is $1,241,113.20 to Dell, $193,036 to Lenovo Group,

22   $467,032.79 to Hewlett-Packard and $16,207.09 to APC.

23         Given the amount involved here, I am going to require

24   that any payments that are made be divided proportionately

25   among the parties.  It seems unlikely that the defendant will

1    be able to pay his restitutionary requirements, although it is

2    due immediately, and if not paid immediately there will be some

3    requirements under the Bureau of Prisons --

4          VOICE FROM THE AUDIENCE:  We need an ambulance.  We

5    need an ambulance, please.

6          THE COURT:  Get 911, Jarrett, and also the nurse.

7          VOICE FROM THE AUDIENCE:  We need an ambulance,

8    please.

9          THE COURT:  We are getting one.

10          We will take a brief recess.

11          VOICE FROM AUDIENCE:  Can we get some water, please?

12          THE COURT:  We will be in recess.

13       (The Honorable Court exited the courtroom at 12:15 p.m.)

14                         (Recess taken)

15          THE CLERK:  All rise.

16        (The Honorable Court entered the courtroom at 12:35 p.m.)

17          THE CLERK:  This Honorable Court is back in session.

18    You may be seated.

19          THE COURT:  The terms and conditions of supervised

20    release that we were discussing, of course, include the

21    repayment of the restitution, which, as I have indicated, seems

22    quite daunting, but the defendant, if he cannot pay the

23    restitution, is going to be placed upon a Court-ordered

24    repayment schedule after consultation with the Probation Office

25    and the Court itself.

1          To the degree that the defendant has not paid his

2     restitution, he is prohibited from incurring new credit charges

3     or opening additional lines of credit without the approval of

4     the Probation Office while any financial obligations remain

5     outstanding.  He is obligated to provide the Probation Office

6     with access to any requested financial information, and he

7     should understand that that information may be shared with the

8     Financial Litigation Unit of the United States Attorney's

9     Office.

10          He is, of course, subject to the mandatory conditions

11     of supervised release, and given the substance-abuse issues

12     that he is beginning to acknowledge, the defendant is going to

13     be obligated to submit to drug testing by the Probation Office

14     in an amount not to exceed 104 drug tests per year.  He will be

15     subject to a substance-abuse program, which I mean to be broad

16     enough to include mental-health concerns as well that is

17     designed to provide him with some better insight into his

18     substance-abuse problems and better prepare him to deal

19     effectively with the issues that that presents for his personal

20     life.

21          He is prohibited from possessing a firearm or other

22     dangerous weapon.

23          I am going to obligate him not to consume any

24     alcoholic beverages in addition to not to make use of any

25     controlled substances without prescription.

1          He is prohibited from engaging in any occupation,

2    business or profession that would require him or enable him to

3    buy, or sell, or receive computers or computer components

4    without the approval of the Court after input from the

5    Probation Office.

6          Now, are there any other conditions that the parties

7    would like me to consider here?

8          MS. BURKART:  No additional provisions, your Honor.

9    There is the matter of the Motion for Forfeiture.

10          THE COURT:  We will reach that in a moment.

11          Anything else?  All right.

12          So, let us turn to the question of the forfeiture

13    here.

14          Mr. Sheketoff, anything further on the question of

15    forfeiture as manifested in the Government's Proposed Motion

16    for Money Judgment and Preliminary Order?

17          MR. SHEKETOFF:  No, your Honor.

18          THE COURT:  So, I will sign that.

19          Then, the remaining issues are Request for Return of

20    Personal Property pursuant to Federal Criminal Rule of

21    Procedure 41(e), and I understand the Government does not

22    oppose so much of it as does not include any Dell or HP

23    equipment.

24          Is that correct?

25          MS. BURKART:  That's correct, your Honor.

1          THE COURT:  Anything further on that, Mr. Sheketoff?

2          MR. SHEKETOFF:  There is, and I think the Government

3     may at some point have offered me copies of the hard drives,

4     because there is material on those that he might want to have.

5     So, while I am not going to get the computers back that they

6     want forfeited, if there is material on the hard drives I would

7     like to be able to exercise that.  I think they made me that

8     offer at some point.

9          MS. BURKART:  Just to clarify, the hard drives that

10    were on his personal computers?

11         MR. SHEKETOFF:  Yes.

12         MS. BURKART:  I think those would be evidence in the

13    case, so I don't believe those are subject to the return of

14    property.  I believe the return of property would be the

15    computer equipment that was obtained.  I think with regard to

16    the evidence we could come to an agreement regarding --

17         THE COURT:  I think I am not going to deal with that

18    now, because I assume an appeal --

19         MR. SHEKETOFF:  Yes.

20         THE COURT:  -- and the need to maintain any

21    evidentiary materials.

22         MR. SHEKETOFF:  Okay, fair enough.

23         THE COURT:  All right.  So, I will allow the Motion

24    for the Return of Personal Property to the extent agreed upon

25    by the Government in its opposition, in part.

1          Now, I do not believe there are any other issues that

2     need to be taken up at this point.

3          MR. GARLAND:  No.

4          THE COURT:  Mr. Kuc, there is no question that this

5     has been a very emotional set of issues and hearing for you,

6     and I do not mean to take it further except to use it to

7     emphasize that what every one of us does has consequences for

8     other people.  I understand that probably as well as anybody

9     here, and I take no particular pleasure in sentencing someone

10    to the sentence I have imposed in this case.  I have tried to

11    explain why I did.

12         But, ultimately, all of this depends on you.  You are

13    going to have a great deal of time to think about it, think

14    about the impacts that you have had on other people and on

15    yourself.  If you address those in an intelligent and mature

16    fashion, you will be successful.  You have great competences,

17    as the Government indicated here.  They have been misused, but

18    ultimately, it is up to you.

19         You should understand you have a right of appeal, and

20    you will want to discuss with your counsel whether or not that

21    makes any sense under these circumstances.

22         Anything further?

23         MS. BURKART:  No, your Honor.

24         MR. SHEKETOFF:  No, your Honor.

25         THE COURT:  All right.  We will be in recess.

1          THE CLERK:  All rise.

2      (The Honorable Court exited the courtroom at 12:40 p.m.)

3        (WHEREUPON, the proceedings adjourned at 12:40 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3           I, Brenda K. Hancock, RMR, CRR and Official Reporter

4    of the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of United States of America v.

8    Matthew Kuc, No. 1:11-cr-10014-DPW-1.

9

10

11

12

13

14   Date:    February 19, 2013          /s/ *Brenda K. Hancock*

15                                        Brenda K. Hancock, RMR, CRR

16                                        Official Court Reporter

17

18

19

20

21

22

23

24

25