```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    . CRIMINAL NO. 11-cr-10014-DPW
      Plaintiff              .
                             . BOSTON, MASSACHUSETTS
          v.                 . MARCH 21, 2011
                             .
MATTHEW J. KUC,              .
      Defendant              .
. . . . . . . . . . . . . . .

                   TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE LEO T. SOROKIN
                  UNITED STATES MAGISTRATE JUDGE

       APPEARANCES:

       For the Government:  UNITED STATES ATTORNEY'S OFFICE
                            BY: Sarah E. Walters, AUSA
                            One Courthouse Way, Suite 9200
                            Boston, MA 02210
                            617-748-3960
                            sarah.walters@usdoj.gov

       For the Defendant:   Robert Sheketoff, Esq.
                            One McKinley Square
                            Boston, MA 02109
                            617-367-3449
                            Sheketoffr@aol.com
```

Court Reporter:

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

*Judy Bond Gonsalves*
**Certified Federal Court Transcriber**
508.984.7003

```
 1  COURT CALLED INTO SESSION
 2  (4:02:33 p.m.)
 3          THE CLERK:  Today's March 21, the case of the
 4  United States V. Kuc.  Criminal Action 11-10014 will now be
 5  heard before this Court.
 6          Counsel, please identify themselves for the
 7  record.
 8          MS. WALTERS:  Good afternoon, Your Honor.  Sarah
 9  Walters on behalf of the United States.
10          MR. SHEKETOFF:  And good afternoon, Your Honor.
11  Robert Sheketoff for the defendant who's at counsel table
12  with me.
13          THE COURT:  All right.  Good afternoon.  So I have
14  you here, because what I really wanted to find out is --
15  from all of you is a little bit more detail about -- I'm a
16  little confused as to what Mr. Kuc is doing, and I thought
17  the easiest way to find this out since I recognize if I had
18  Mr. Moriarty call Mr. Kuc's employer, that may result in his
19  termination, whatever he's doing, whether he's doing
20  something that I feel they need to be notified about or not.
21  And so I thought the first stage would be to have him come
22  here and get a little report from all of you just what he's
23  doing and hear what the issues might be depending on what
24  the circumstances are.  Take it one step at a time.
25          So maybe, Mr. Sheketoff, you could fill me in as
```

1 to what the nature of his job is at the moment.
2          MR. SHEKETOFF:  Okay.  Actually, I think if you
3 don't object, Your Honor, that you could address him
4 directly.
5          THE COURT:  Fine.  I don't object.  I didn't know
6 if you would.
7          MR. SHEKETOFF:  No, I don't.
8          THE COURT:  So Mr. Kuc, what are you doing?
9          THE DEFENDANT:  I'm a remote support --
10          MR. SHEKETOFF:  Stand up.
11          THE DEFENDANT:  Oh, sorry.
12          Remote support specialist -- technician.  It's
13 like if somebody has a problem with their computer or
14 what-not, something like a piece of software breaks, one
15 just don't boot up, I'm basically working at a help desk.
16 People call in, and I try to solve the issue remotely by
17 logging in or trying to walk that person through the --
18 through the phone on how to solve the problem.
19          THE COURT:  So you might either give them advice
20 on the telephone in response to their questions or problems.
21          THE DEFENDANT:  Correct.
22          THE COURT:  That's one thing you might do.
23          THE DEFENDANT:  Correct.
24          THE COURT:  And on others might remote in to their
25 computer --

```
 1              THE DEFENDANT:  Correct.
 2              THE COURT:  -- and then attempt to reset something
 3  or examine or duplicate the problem.
 4              THE DEFENDANT:  Correct.  Like an example would be
 5  like -- let's say somebody has a problem with like Microsoft
 6  Office or Outlook not opening up.  We're basically an
 7  outsourced help desk or I.T. department for small
 8  businesses.  They would call a support number.  I'm a tier
 9  III technician which means if the tier I or tier II can't
10  fix the problem, then they what they call dispatch the
11  ticket to me which is I try to resolve it as a tier III
12  tech.
13              THE COURT:  All right.  And how long are you doing
14  this --
15              This was not a permanent job; it's through a temp
16  agency.
17              THE DEFENDANT:  Correct.
18              THE COURT:  So how long is this placement for?
19              THE DEFENDANT:  It could be from -- uh, they say
20  it can be from like up to three months to a permanent
21  position.
22              THE COURT:  Oh, all right.
23              Any other questions, Mr. Moriarty, you think I
24  should ask him?
25              THE PROBATION OFFICER:  (Inaudible).
```

1    THE COURT:  Ms. Walters, anything else you think I
2 should ask?
3    MS. WALTERS:  No additional questions, I don't
4 think.
5    I mean, I think from talking to Mr. Moriarty he is
6 not -- and I think you understand this.  My understanding is
7 he's not notified either the temp agency or his current
8 assignment --
9    THE COURT:  No, no.  I understand that.
10   MS. WALTERS:  -- of what the charge is.
11   THE COURT:  Right.
12   THE PROBATION OFFICER:  There might be a question
13 on whether or not you have communication directly with any
14 of the victims.
15   THE COURT:  Oh, that's a good point.
16   Do you have any -- you communicate with the
17 customers of this firm you're working for.  Correct?
18   THE DEFENDANT:  Correct.
19   THE COURT:  Do you communicate with any of their
20 software or hardware suppliers?
21   THE DEFENDANT:  Uh, software.
22   THE COURT:  All right.
23   THE DEFENDANT:  Which that would be primarily
24 Microsoft if it's a severe like sever-down issue.  Or, umm,
25 our -- the -- I guess the remote server package that they

use which is a -- it's called Zena Soft Info Tech, and that's about it.

    THE COURT: Any contact with, say, Dell or Apple, or?

    THE DEFENDANT: Not presently, no.

    THE COURT: Is there above tier III, a tier IV or tier V?

    THE DEFENDANT: Umm, actually the hardware is actually a lower tier.

    Let's say there's a server failed. Let's say a part just dies out in a system. They would dispatch a lower tech to usually replace the part.

    I'm mostly on the softer side of the repair of the issue and what-not.

    THE COURT: And you don't actually ever go out there, do you?

    THE DEFENDANT: Umm, I think I've went out there one time, because they had one of those multi-function -- multi-function printer copiers, and it ended up being, I believe, like what they call a fuser assembly that wasn't functioning on it. I didn't really touch the machine. I just, you know, said this is bad and you know the customer needs to take care of this.

    THE COURT: All right. Okay.

    Anything else?

1          MS. WALTERS:  Your Honor, it just occurred to me.
2 The level -- where he is physically when he's doing this and
3 the level of supervision he has over it I think are
4 relevant, as well
5          THE COURT:  Where do you do this?
6          THE DEFENDANT:  They're out of our Franklin
7 office.
8          THE COURT:  And who else is in the office?
9          THE DEFENDANT:  There's another -- there's
10 actually a phone technician and my manager.
11         THE COURT:  So three of you work there.
12         THE DEFENDANT:  Correct.
13         THE COURT:  All right.
14         THE DEFENDANT:  And then also the owner.  He
15 doesn't really do any of the remote stuff.  He just handles
16 the business aspect of the company.
17         THE COURT:  And he works there, as well.
18         THE DEFENDANT:  Correct.
19         THE COURT:  I see.  Those are the only people who
20 work in that office.
21         THE DEFENDANT:  Correct.  It's a small company.
22         THE COURT:  Uh-huh.  All right.
23         Anything else?
24         Okay.  You can be seated.  Thank you, Mr. Kuc.
25         All right.  So Ms. Walters, what do you think the

```
 1  issues are and the concerns?
 2           MS. WALTERS:  Well, I think first and foremost the
 3  fact that he has not and believes he can not inform his
 4  employer about this, about the current charges, is
 5  problematic.  I mean, it limits Mr. Moriarty's ability to
 6  supervise him obviously, and so that's a huge concern right
 7  off the bat.
 8           Umm, I mean, if it was a situation where Mr.
 9  Moriarty could contact the employer, could actually do a
10  real investigation here so we had Mr. Moriarty's opinion on
11  this, is that --
12           THE COURT:  Verified as to what he does.
13           MS. WALTERS:  Exactly.
14           That certainly would verify what he does and then
15  get -- get a report which is what we'd all sort of expected
16  we'd have today or the next time we got together.  That
17  would certainly give comfort.
18           The fact that he is, you know, doing this
19  remotely, obviously he's accessing the Internet which he's
20  entitled to do for legitimate employment concerns -- for
21  legitimate employment reasons but without verification.
22  Without verification that the employer knows about what the
23  issues are, knows what the allegations are, knows the type
24  of supervision that he needs when performing this is of
25  grave concern, and for that reason we'd object to the
```

1  situation.
2            THE COURT:  All right.  So you want -- would you
3  --
4            If Mr. Moriarty had spoke to the employer, and the
5  employer said this is what he said -- said exactly what Mr.
6  Kuc said in terms of his duties and responsibilities and
7  activities and supervision and the like, would you then
8  object to him working there?
9            MS. WALTERS:  I think that would give us much more
10 comfort if we knew -- and that the employer said and we're
11 willing -- you know --
12           THE COURT:  I'm trying to figure out is it the job
13 or is it the process of verifying the job or both.
14           MS. WALTERS:  I would say it's frankly a
15 combination of the two.
16           But if we had an employer who said, look, here are
17 the limitations -- you know, if we had more comfort about
18 what the limitations were for him in terms of, you know,
19 whether he would contact any of the victims, that his
20 Internet access is monitored, so he's not -- so we're not
21 just relying on him in terms of --
22           THE COURT:  Did I impose an Internet restriction
23 on him?
24           MS. WALTERS:  There was an Internet restriction
25 except for employer --

1        THE COURT:  I see.

2        MS. WALTERS:  -- legitimate employee -- employer
3 -- employee related -- employment -- sorry -- related work.

4        So without some verification that that's being
5 honored, that's -- that's a -- that's a real concern.

6        So I think it would depend on what the employer
7 says about their ability to monitor what he's doing.

8        And that -- you know, if it's on site in on
9 office, and he's not able to go to then go to customers who
10 don't know about these allegations --

11       THE COURT:  Let's say presumably they don't
12 monitor everything he does on the Internet.  He does what he
13 says, but they -- you know, they monitor it in the sense if
14 they walk by and they see what's on the screen and beyond
15 that they're not logging and tracking what he does and the
16 like.

17       MS. WALTERS:  I think this is someone who needs to
18 be logged and tracked.

19       I mean, my understanding --

20       And Mr. Garland is on this case, because it
21 involves computers.  And he's not here right now.

22       -- but is that, you know, if you've got a
23 business, they're going to be able to log and track what
24 he's doing.  Like and, you know, maybe the way to do it is
25 if they don't want to spend the effort to look at, they can

1  send reports to Mr. Moriarty, and he can make sure what he's
2  doing.
3         I think this defendant needs to know that people
4  are checking up on where he's going.
5         THE COURT:  Okay.
6         MS. WALTERS:  He proved that he was quite expert
7  at spoofing who he really was.
8         THE COURT:  Okay.  Mr. Moriarty, have anything to
9  add?
10        THE PROBATION OFFICER:  I think I'm most concerned
11 with the company taking the proper precautions.
12        THE COURT:  All right.  Okay.
13        THE PROBATION OFFICER:  As in his daily work life.
14        THE COURT:  All right.  Mr. Sheketoff?
15        MR. SHEKETOFF:  I mean, it's just a 'catch 22'.  I
16 don't just mean for this client but for anyone who has a
17 pending charge and/or a criminal conviction.  You want them
18 to work and to be a productive member of society, but you
19 want to make it impossible at the same time for them to work
20 and be a productive member of society.  So I'm not
21 suggesting this is a unique 'catch 22' for him.
22        Most of the time the Court is setting a condition
23 of release that you seek employment and find it.
24        So in this case, Your Honor, the Government -- and
25 I'm not commenting -- I'm not suggesting this is improper in

1  any way.  I'm just making this observation.

2          The Government has been very aggressive about his
3  assets and his money.  There's a *lis pendens* on the house
4  that belongs to his parents.  All funds that he had had been
5  seized by the Government.  There's a hold on his IRAs.

6          In other words, he has no --

7          The Government agreed to return two of his
8  vehicles, that I could sell them if necessary to -- but only
9  as legal fees.

10         I mean, I can't even sell them until I've
11 convinced the Government that the money's going to me, not
12 to him, as legal fees.

13         So he has a father that has had a series of
14 strokes and is not really capable of working.  His mother
15 works.  And this, you know, is the difference -- this is a
16 difference maker.  It's not, you know, yes, he can probably
17 get a job at McDonald's and flip burgers, but this is, you
18 know, a job that you can actually make a thousand dollars a
19 week as opposed to, you know, a hundred dollars a week.  So
20 that's part of it.

21         The other part of it is he is presumed to be
22 innocent, and that is also part of the American tradition.
23 And if he is, in fact, guilty of what he's charged with --
24 we'll find that out soon enough, he would be really insane
25 -- really insane to use this little period of time that he

1 has between indictment and disposition of his case to repeat
2 the exact same behavior.  I mean, you would have to really
3 assume that he's really foolish beyond words to think that
4 he's going to spend this period of time repeating --
5          THE COURT:  So let me ask you one question.  The
6 driving concern is if Pretrial notifies, the employer will
7 just say forget it.
8          MR. SHEKETOFF:  Correct.
9          THE COURT:  The one -- unlike some cases.  I
10 imagine there was some press coverage of Mr. Kuc's charge.
11 I don't know that to be the case, but I just imagine that
12 that was -- that that might have occurred in a case like
13 this.
14          If that were the case -- and I'm assuming since
15 this is a computer company these people are on -- the people
16 who run the company are on the computer all the time.  Might
17 they not already have done their own Google search and
18 discovered some of this information?
19          MR. SHEKETOFF:  They might have, but they've never
20 said anything to him about it.
21          THE COURT:  Uh-huh.
22          MR. SHEKETOFF:  So, you know, I'm trying to think
23 of some sort of compromise.
24          I suppose I could talk to my client about asking
25 if he could get his employer to write a job description of

1 what he does.  You know, I would have to think of some
2 excuse for, you know, why his lawyer would need that.  You
3 know, he could say he's involved in civil litigation,
4 because he is involved in some sort of civil litigation with
5 the *lis pendens* on his parents' home.
6          You know, so I can make an attempt, I think, to
7 corroborate at least his view of what his job is.  I think.
8          But it is a 'catch 22'.  You know, it's not like
9 he has access to all this other money.
10         You know, if the Government wants to return the
11 money that they've seized and drop the *lis pendens* on his
12 IRAs and waive that kind of stuff and really give him access
13 to funds; you know, we'd be glad to give up the job.
14         THE COURT:  All right.  So, well, that's between
15 all of you.
16         I'm going to think about this.  I'll issue an
17 order tonight or tomorrow.  I just want to -- I hear --
18         I mean, you guys presented what is a difficult and
19 recurring sometimes dilemma which is you want people who are
20 on Pretrial release like yourself, Mr. Kuc, to work and to
21 get the most productive job that you can get.  On the other
22 hand, your case raises -- the allegations against you raise
23 concerns and -- about -- not all jobs but certain kinds of
24 jobs.
25         And so I want to think about having heard now from

1  you what the job is and what -- and from Ms. Walters about
2  what the Government's perspective was and what the things
3  they were concerned about were.
4      I'll think about it briefly, and I'll resolve this
5  if not today before I leave certainly tomorrow.  All right?
6      Anything else?
7      MS. WALTERS:  I just would add, you know, Mr.
8  Sheketoff's suggestion about the job description, I don't
9  know that that the job description is really the issue.
10      THE COURT:  That doesn't mean what you say.
11      MS. WALTERS:  Yeah.  Yeah.
12      THE COURT:  I understand.  Yeah, so I'm not
13  pursuing it.
14      MS. WALTERS:  Yeah.  Thank you.
15      THE COURT:  I meant it's a good faith offer.
16      MS. WALTERS:  Yeah, yeah.  Uh-huh.
17      THE COURT:  I understand it doesn't meet what you
18  want.
19      MS. WALTERS:  Right.
20      MR. SHEKETOFF:  The final thing I'd like to say,
21  Your Honor, is that I've been doing this for a long time.  I
22  meet a lot of clients.  I'm not a lie detector.  I don't
23  pretend that I am.
24      But some clients strike me as completely
25  untrustworthy, completely oblivious to what their situation

1 is, you know, completely willing to take any opportunity
2 that they have to continue in a prior lifestyle.  And other
3 clients don't.
4     Now I'm not saying this is some sort of one
5 hundred percent certainty.  But the reason I said he'd have
6 to be a complete fool, is because I think he's a wise enough
7 person and an intelligent enough person to know this is the
8 exact wrong time to continue with the kind of behavior that
9 got him indicted.  You know, I just think that he's not
10 somebody that would be that foolish.
11     THE COURT:  Okay.  Thank you.
12     All right.  We're adjourned.
13     THE CLERK:  This matter's adjourned.
14   (Court adjourned at 4:19:09)

                                                                    17
1                           CERTIFICATION

2      I, Judy Bond Gonsalves, a court approved transcriber,

3 certify that the foregoing is a correct transcript from the

4 official electronic sound recording of the proceedings in

5 the above-entitled matter.

6

7

8  _____*[signature]*_____    March 2, 2013
     Judy Bond Gonsalves

9


*Judy Bond Gonsalves*
**Certified Federal Court Transcriber**
508.984.7003